UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------

|  |  |
|---|---|
| GLOBE COMPOSITE SOLUTIONS, LTD. F/K/A KALM-FORSYTHE GLOBAL INNOVATIONS, LTD.<br><br>Plaintiff,<br><br>v.<br><br>RICHARD C. SOMERVILLE, ANNE ROCHE-SOMERVILLE, and SOLAR CONTRUCTION, INC. F/K/A GLOBE RUBBER WORKS, INC.<br><br>Defendants. | Civil Action No. 05-10323DPW<br><br>REQUEST FOR ORAL ARGUMENT |

---------------------------------------------------------

## PLAINTIFF'S EX PARTE MOTION FOR ATTACHMENT ON TRUSTEE PROCESS

Pursuant to Rule 64 of the Federal Rules of Civil Procedure and Rule 4.2 of the Massachusetts Rules of Civil Procedure, the plaintiff, Globe Composite Solutions, Ltd. f/k/a Kalm-Forsythe Global Innovations, Ltd. ("Globe Composite") moves, *ex parte*, for an order approving attachments on trustee process in the amount of $1,662,000 on all bank accounts owned by the defendants, Richard C. Somerville ("Somerville"), Anne Roche-Somerville, and Solar Construction, Inc. f/k/a Globe Rubber Works, Inc. ("Globe Rubber") (collectively, "Defendants") in Massachusetts.

Globe Composite brings this action against Defendants for claims arising out of an asset purchase agreement between Globe Composite, Globe Rubber, and Somerville. Specifically, Globe Composite alleges breach of contract, fraud, violations of G.L. c.

93A, and seeks declaratory and injunctive relief.  Globe Composite expects to obtain a

judgment in excess of $1,662,000.

In support of its motion, Globe Composite attaches the accompanying

memorandum of law and Affidavit of Carl Forsythe.


By its attorneys,


Evan T. Lawson, BBO #289280
Kristina A. Engberg, BBO# 629441
Lawson & Weitzen, LLP
88 Black Falcon Avenue
Boston, Massachusetts 02210
(617) 439-4990

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GLOBE COMPOSITE SOLUTIONS, LTD. F/K/A KALM-FORSYTHE GLOBAL INNOVATIONS, LTD.<br><br>Plaintiff,<br><br>v.<br><br>RICHARD C. SOMERVILLE, ANNE ROCHE-SOMERVILLE, and SOLAR CONTRUCTION, INC. F/K/A GLOBE RUBBER WORKS, INC.<br><br>Defendants. | Civil Action No. 05-10323DPW |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTACHMENT ON TRUSTEE PROCESS

Pursuant to Rule 64 of the Federal Rules of Civil Procedure and Rule 4.2 of the

Massachusetts Rules of Civil Procedure, the plaintiff, Globe Composite Solutions, Ltd.

f/k/a Kalm-Forsythe Global Innovations, Ltd. ("Globe Composite") moves this court for

an order approving attachments on trustee process in the amount of $1,662,000 on all

bank accounts owned by Richard C. Somerville ("Somerville"), Anne-Roche Somerville

("Roche-Somerville"), and Solar Construction, Inc. f/k/a Globe Rubber Works, Inc.

("Globe Rubber") (collectively, "Defendants") in Massachusetts.

### FACTUAL BACKGROUND

Globe Rubber was a contractor supplying goods and services to the United States

Government, including, but not limited to, suppliers to the United States Navy. Prior to

Globe Composite's acquisition of Globe Rubber's assets, Globe Rubber entered into one

or more contracts or agreements with contractors that build submarines for the United States Navy. Specifically, Globe Rubber entered into contracts with General Dynamics Corporation Electric Boat Division ("General Dynamics Corporation") and Northrop Grumman Newport News Shipbuilding, Inc. ("Newport News Shipbuilding, Inc.") to supply synthetic-material submarine parts that would be used to build submarines for the United States Navy. The contracts with General Dynamics Corporation and Newport News Shipbuilding, Inc. required that Globe Rubber's synthetic-material submarine parts conform to the contractors' or the United States Government's specifications.

In or about August 2004, Globe Composite entered into an Asset Purchase Agreement (the "Agreement", attached hereto as Exhibit A) with Globe Rubber and Somerville. In the Agreement, Globe Composite purchased identified assets of Globe Rubber for approximately $898,000. Additionally, Globe Composite paid Somerville approximately $1.5 million in cash and issued a $400,000 promissory note due November 30, 2004, a $200,000 promissory note due August 3, 2006, and a $150,000 promissory note due in 12 quarterly payments commencing November 3, 2004 with the first three quarterly payments deferred to August 2, 2005, to Somerville for identified intellectual property, totaling approximately $2.25 million.

Pursuant to the Agreement, Globe Rubber retained identified liabilities relating to its products and contracts, including, *inter alia*:

> (i) Any Liability arising out of or relating to products of Globe [Rubber] to the extent manufactured or sold prior to [July 1, 2004]; . . . (ii) any Liability under any Contract assumed by [Globe Composite] . . . that arises after [July 1, 2004] if and only to the extent that such arises out of or relates to any Breach that occurred prior to [July 1, 2004].

2

Exhibit A, § 2.5(b). Moreover, Globe Composite assumed only identified liabilities of

Globe Rubber, including, *inter alia*:

> (vi) any Liability arising after the Effective Date under any of the
> Globe [Rubber] Contracts (except for any Globe [Rubber] Contract
> not listed on Schedule 4.17(a) of the Disclosure Schedule, whose
> failure to be so listed constitutes a Breach of Section 4.17 hereof)
> other than any Liability thereunder for a material Breach that
> occurred prior to the Effective Date.

Exhibit A, § 2.5(a).

In the Agreement, Globe Rubber and Somerville made numerous representations

and warranties including, *inter alia*:

> § 4.10. Globe [Rubber] has no liabilities or obligations of any
> material nature which are required to be reflected on Globe
> [Rubber]'s financial statements . . . in order to fairly present its
> financial condition, except for liabilities or obligations reflected in
> Globe [Rubber]'s Year-End Balance Sheet or Globe [Rubber]'s
> Interim Balance Sheet and Liabilities incurred in the Ordinary
> Course of Business since the respective dates thereof.

> § 4.12. Since the date of Globe [Rubber]'s Year-End Balance
> Sheet, there has not been any material adverse change in the
> business, operations, properties, prospects, assets, or condition of
> Globe [Rubber], and to the knowledge of Globe [Rubber] and
> Somerville no event has occurred or circumstance exists that may
> be reasonably foreseen by a prudent person as likely to result in
> such a material adverse change.

> § 4.14. (i) . . . [T]o Globe [Rubber]'s and Somerville's
> Knowledge, Globe [Rubber] is in full compliance, in all material
> respects, with each Legal Requirement and Governmental
> Authorization that is applicable to it or to the conduct or operation
> of its business or the ownership or use of any of its assets; (ii) to
> Globe [Rubber]'s and Somerville's Knowledge, no even has
> occurred or circumstance exists that (with or without notice or
> lapse of time) may constitute or result in a material violation by
> Globe [Rubber] of, or a material failure on the part of Globe
> [Rubber] to comply with, any Legal Requirement or Governmental
> Authorization.

> § 4.17(a). Schedule 4.17(a) of the Disclosure Schedule contains a complete and accurate list, and Globe [Rubber] and Somerville have delivered to [Globe Compliance] true and complete copies, of (i) each executory Globe [Rubber] Contract that involves the performance of services or delivery of goods or materials by or to Globe [Rubber] of an amount or value in excess of $10,000.

Exh. A.

A portion of the required government specifications with respect to Globe Rubber's products are subject to security clearance. In or about late August 2004, Globe Composite gained interim security clearance and partial access to the government specifications. In or about December 13, 2004, Globe Composite discovered that Globe Rubber and Somerville had prepared numerous certifications that its products met government specifications, knowing that the certifications were false, and gave these certifications to, *inter alia*, Newport News Shipbuilding, Inc., General Dynamics Corporation, and the United States Department of Defense Defense Finance and Accounting Service ("DFAS").

The value of assets and intellectual property purchased by Globe Composite was dependant upon the contracts with, *inter alia*, General Dynamics Corporation, Newport News Shipbuilding, Inc., and DFAS and the products satisfying government specifications. Globe Rubber and Somerville did not disclose to Globe Composite the actions described above until after Globe Composite discovered the false certifications.

On or about January 6, 2005, Somerville admitted to Globe Composite that he had directed the falsification of the certification data. Further, Somerville admitted to the Department of Defense Criminal Investigation Services and other government agencies that he had falsified this data.

4

Additionally, it appears that prior to the asset purchase transaction with Globe Composite, Globe Rubber entered into certain non-solicitation agreements with Shuster Corporation. Those agreements were not disclosed in the disclosure schedule and were not known to Globe Rubber until November 8, 2004; on November 4, 2004, Somerville stated that the non-solicitation agreement did not exist.  On November 8, 2004, however, Shuster Corporation notified Globe Composite of the existence of the non-solicitation agreement.  Somerville's and Globe Composite's alleged violation of the non-solicitation agreement is the subject of a lawsuit pending in Massachusetts Superior Court for Bristol County, *Shuster Corporation v. Globe Composite and Richard Somerville*, Civil Action Number BRCV2005-00056.

The representations and warranties contained in the Agreement were false and fraudulent because (a) all liabilities of Globe Rubber were not reflected in its financial statements; (b) material adverse changes had occurred in Globe Rubber's business since the year-end balance sheet was calculated; (c) Globe Rubber was not in full compliance with government authorizations and certifications; and (d) the Shuster contracts were not disclosed.  Globe Rubber and Somerville knew that these representations and warranties were false.

Further, in order to induce Globe Composite to enter the Agreement, Somerville represented to Globe Composite that Globe Rubber was in good corporate health and was in compliance with its contractual obligations, while knowing that these statements were false. For instance, in 2004 prior to the sale of assets, Somerville stated "the material we're using for the RFID conveyors are from custom alloyed blend" and "the composite chain material is a brand new material that we developed", while knowing that both of

5

these statements were false. Further, Somerville stated, *inter alia*, "this business is worth five million dollars" while knowing that this statement was false.

Moreover, in order to induce Globe Composite to enter the Agreement, Roche-Somerville represented to Globe Composite that Globe Rubber was in good corporate health and was in compliance with its contractual obligations, while knowing that these statements were false and knowing of Somerville's and Globe Rubber's fraudulent actions. For instance, in 2004 prior to the sale of assets, Roche-Somerville stated, *inter alia*, "you're getting a real jewel" and "you're getting a real bargain".

Globe Composite must now make great expenditures in order to conform to government specifications and in order to comply with its contracts assumed from Globe Rubber in the Agreement.

Pursuant to the Agreement, Globe Composite withheld $165,000 of the asset purchase price and placed those funds in an escrow account to pay indemnification claims pursuant to the Agreement. Exh. A, § 2.4(d). On or about January 31, 2005, Globe Composite demanded that all escrow funds be released to it in order to indemnify damages, expenses, and warranty claims made against it. In accordance with the Agreement, Globe Composite submitted a Disbursement Request form to Somerville for his signature. Somerville refused to execute the form. Accordingly, the escrow funds have not been released.

Because of Defendants' breach of contract and fraudulent actions, Globe Composite has been unable to deliver approximately $800,000 in product orders to Newport News Shipbuilding, Inc., General Dynamics Corporation, and the DFAS due to non-conforming parts. This has caused a severe capital shortage for Globe Composite,

which must now raise interim working capital. As a result of Globe Composite's failure to deliver those products as specified, Globe Composite has suffered significant and immeasurable harm to its reputation and future business potential. Globe Composite has already expended approximately $230,000 in warranty claims made against it due to Globe Rubber's faulty products. Globe Composite has also spent approximately $200,000 in necessary product changes and management time in order to comply with government specifications. Moreover, Globe Composite is currently expending funds and diverting management resources in order to defend itself against the Shuster suit, discussed above.

Additionally, it anticipates continuing expending substantial funds in order to comply with its contracts. Globe Composite must revamp the quality control area at a cost of $45,000. It must raise additional capital, which will cost about $63,000. Upgrading equipment will cost approximately $94,300. Finally, diverted management time in order to complete this work will cost about $209,000. Accordingly, Globe Composite anticipates recovery in excess of $1,622,000.

## ARGUMENT

Pursuant to Fed. R. Civ. P. 64, a prejudgment attachment may be granted "under the circumstances and in the manner provided by the law of the state in which the district court is held". Under Massachusetts law, an *ex parte* order for attachment on trustee process may be entered "upon findings by the court that there is a reasonable likelihood that the plaintiff will recover judgment in an amount equal to or greater than the amount of the trustee process over and above any liability insurance known or reasonably

believed to be available, and that . . . there is an immediate danger that the defendant will dissipate" the bank account. Mass. R. Civ. P. 4.2(g).[1]

### A. Globe Composite Is Likely To Succeed On The Merits

In is well-settled that in order for a court to issue an attachment on the assets of a party, the moving party must demonstrate that there is a reasonable likelihood that it will succeed on the merits. See, e.g., Anderson Foreign Motors, Inc. v. New England Toyota Distributor, Inc., 475 F. Supp.973, 978 (D. Mass. 1979). Based on the face of the Agreement and the actions of the defendants, it is clear that Globe Composite will succeed on the merits of its case. Accordingly, the court should grant this Motion for Attachment.

#### i.    *Globe Rubber And Somerville Have Breached The Agreement*

Globe Composite is likely to recover on its breach of contract claim. In the Agreement, Globe Rubber made several clear representations and warranties that were subsequently discovered to be false, as discussed above. Globe Rubber's products simply failed to conform to government specifications that Globe Rubber and Somerville had certified the products satisfied. Somerville has admitted that the certifications were false. Globe Rubber and Somerville had represented and warranted in the Agreement, however, that Globe Rubber was in full compliance with all government authorizations. Further, this failure to comply with government specifications was an undisclosed liability, and represented a liability not shown in Globe Rubber's year-end balance sheet, breaching representations and warranties contained in the Agreement. Additionally, Globe Rubber and Somerville failed to disclose each executory contract in excess of $10,000 as they

---

[1] While damages for breach of the Agreement is limited, pursuant to the Agreement, to one-half of the aggregate sum of the purchase price of the identified assets, Defendants' fraud precludes them from enforcing the Agreement.

8

had warranted and represented they had done, as evidenced by the Shuster contract discussed above. These clear violations of the representations and warranties contained in the Agreement constitute breach of contract.

As a result of these breaches, Globe Composite has suffered damage. It has incurred great costs and will continue to incur great costs in order to comply with contracts acquired from Globe Rubber and government specifications contained therein.

ii.        <em>Defendants Have Committed Fraud</em>

The Defendants' words and actions constitute fraud, and Globe Composite is likely to recover on this claim. In order to establish fraud, a plaintiff must show that a false statement of material fact was made by the defendants, inducing the plaintiff to act, and that the plaintiff relied on that statement to the plaintiff's detriment. Zimmerman v. Kent, 31 Mass. App. 72, 77 (1991); Powell v. Rasmussen, 355 Mass. 117, 118-119 (1969). Defendants' representations fall squarely within the scope of fraud.

The first element in a claim of fraud is that a false representation was made. Zimmerman, 31 Mass. App. at 78. Here, the representations and warranties contained in the Agreement, discussed above, were clearly false. Contrary to the representations and warranties contained in the Agreement as well as representations made by both Somerville and Roche-Somerville, Globe Rubber's products did not comply with government specifications. Somerville has admitted that certifications that the products complied with government specifications were false. Further, products that Somerville claimed were proprietary and custom-designed in order to satisfy government specifications were later discovered to be generic material, not proprietary or custom-designed. These products did not conform to government specifications. Additionally,

Somerville and Globe Rubber represented and warranted that all Globe Rubber executory contracts in excess of $10,000 had been disclosed. This statement was later found to be false when the Shuster contract, discussed above, was discovered.

Further, the false statement must be material in order to recover under a fraud claim. A material statement is one that "a reasonable man would attach importance [to] . . . in determining his choice of action in the transaction in question". Id., quoting Rogen v. Ilikon Corp., 361 F.2d 260, 266 (1st Cir. 1966). Here, each false statement made was material; Globe Composite reasonably attached importance to each statement. Had Globe Composite been aware of the true facts, it would not have entered into the asset purchase agreement.

Moreover, the false statements induced Globe Composite to act. The value of the asset purchase transaction was dependent upon the contracts with, *inter alia*, General Dynamics Corporation, Newport News Shipbuilding, Inc, and DFAS. The contracts, in turn, relied on the certifications that the products complied with government specifications. Globe Composite entered into the Agreement based on statements in the Agreement and statements made by Somerville and Roche-Somerville concerning the products complying with government specifications. But for Globe Rubber's products satisfying government specifications and therefore, complying with the contracts, Globe Composite would not have entered into the Agreement.

Further, Globe Composite reasonably relied on those statements. None of the statements were "preposterous or palpably false". Yorke v. Taylor, 332 Mass. 368, 371 (1955). In fact, Globe Rubber had presented certifications to the United States

10

government representing that its products complied with government specifications.
Globe Composite's reliance on such statements was entirely reasonable.

Finally, Globe Composite relied on the fraudulent statements to its detriment. It
has been forced to expend great sums in order to comply with government specifications
and in order to defend itself against the Shuster suit. If the misrepresentations had been
true, Globe Composite would not have expended these funds.

Accordingly, Globe Composite is likely to prevail on its fraud claims.

### iii. The Defendants' Actions Violated G.L. c. 93A

By their actions, the Defendants violated G.L. c. 93A, § 11. Pursuant to G.L. c.
93A, § 11, "any person who engages in the conduct of any trade or commerce and who
suffers any loss of money or property . . . as the result of the use or employment of
another person who engages in any trade or commerce . . . of an unfair or deceptive act or
practice" may recover for that loss. There is no dispute here that the parties engage in
trade or commerce. Further, it is well-settled that a misrepresentation under common law
can form the basis for recovery pursuant to G.L. c. 93A. See, e.g., Levings v. Forbes &
Wallace, Inc., 8 Mass. App. 498, 504 (1979); McEvoy Travel Bureau , Inc. v. Norton
Co., 408 Mass. 704, 714 (1990); Glickman v. Brown, 21 Mass. App. 229, 235 (1985);
Sheehy v. Lipton Indus., Inc., 24 Mass. App. 188, 194-195 (1987). Globe Composite
suffered damage due to the intentional misrepresentations made by Defendants, as
discussed above. Globe Composite is entitled to multiple damages due to the fraud of the
Defendants.[2] Accordingly, because the fraudulent statements made by the Defendants

---

[2] While Globe Composite could seek attachments equal to treble the amount of its damages, see, e.g., Aetna
Casualty and Surety Co. v. Rodco Autobody, et al., 138 F.R.D. 328, 341 (D. Mass. 1991), it is currently
only seeking attachments in the amount of its damages.

11

constitute unfair acts or practices, Globe Composite is likely to prevail on its G.L. c. 93A claim.

### B. There Is A Clear Danger That The Defendants Will Dissipate Their Bank Accounts

In accordance with Mass. R. Civ. Pro. 4.2(g), the plaintiff must show that there is a clear danger that the defendants will dissipate the bank accounts sought to be attached *ex parte* absent an order for attachment on trustee process. Here, there is a clear danger that defendants will dissipate the accounts sought to be attached by this motion. If notified in advance of the attachment on trustee process, the defendants would have no incentive to keep funds in their bank accounts. Rather, they would remove those funds from the trustee in order to avoid the attachment.

### CONCLUSION

For the above-stated reasons, Globe Composite respectfully requests that this Court grant attachments in the amount of $1,662,000 on real estate, goods, chattel, and other property owned by Defendants.

By its attorneys,

Evan T. Lawson, BBO #289280
Kristina A. Engberg, BBO# 629441
Lawson & Weitzen, LLP
88 Black Falcon Avenue
Boston, Massachusetts 02210
(617) 439-4990

# Asset Purchase Agreement

This ASSET PURCHASE AGREEMENT (as amended from time to time, this *"Agreement"*) is made and entered into this 3rd day of August, 2004, by and between KALM-FORSYTHE GLOBAL INNOVATIONS, LTD., a Texas limited partnership (*"KFGI"*), GLOBE RUBBER WORKS, INC., a Massachusetts corporation (*"Globe"*), and RICHARD SOMERVILLE, an individual resident of Massachusetts (*"Somerville"*).

## RECITALS

A.    Somerville, directly or indirectly, owns (163) shares of the common stock, par value One Hundred Dollars ($100.00) per share, of Globe, which constitutes one hundred percent (100%) of the issued and outstanding shares of capital stock of Globe.

B.    Globe desires to sell, and KFGI desires to purchase, the Globe Assets from Globe for the consideration and on the terms set forth in this Agreement.

C.    Somerville desires to sell, and KFGI desires to purchase, the Somerville Intellectual Property for and in consideration and on the terms set forth in this Agreement.

D.    Somerville desires to contribute the Somerville Goodwill to KFGI and, in exchange, KFGI desires to issue to Somerville a limited partner interest in KFGI that will, after all contemplated issuance of partnership interests, equal a 7.5% partnership interest in KFGI.

## AGREEMENT

The parties, intending to be legally bound, agree as follows:

## ARTICLE 1
## DEFINITIONS

For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires, the terms defined in this ARTICLE 1 have the meanings assigned to them or referred to in this ARTICLE 1 and include the plural as well as the singular:

*"504 Loan Funding"* — the funding of that certain contemplated loan to be issued in the amount of $729,000 from the Massachusetts Certified Development Corp. to KFGI, to be guaranteed by the U.S. Small Business Administration, the proceeds of which will be used by KFGI to purchase certain real estate and equipment in connection with the operation of the business following the Closing.

*"Appurtenances"* — all privileges, rights, easements, hereditaments and appurtenances belonging to or for the benefit of the Land, including all easements appurtenant to and for

the benefit of any Land (a *"Dominant Parcel"*) for, and as the primary means of access between, the Dominant Parcel and a public way, or for any other use upon which lawful use of the Dominant Parcel for the purposes for which it is presently being used is dependent, and all rights existing in and to any streets, alleys, passages and other rights-of-way included thereon or adjacent thereto (before or after vacation thereof) and vaults beneath any such streets.

*"Best Efforts"* — the efforts that a reasonably prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible; *provided, however,* that an obligation to use Best Efforts under this Agreement does not require the Person subject to that obligation to take actions that (i) would result in a materially adverse change in the benefits to such Person of this Agreement and the Contemplated Transactions; or (ii) would be, in the judgment of a reasonably prudent person, inconsistent with or deleterious to the Person or his company's legitimate business interests.

*"Breach"* — a "Breach" of a representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement will be deemed to have occurred if there is or has been (a) any material inaccuracy in, material breach of, or material failure to perform or comply with, such representation, warranty, covenant, obligation, or other provision, or (b) any successful claim (by any Person) or other occurrence or circumstance that is or was, in either case, materially inconsistent with such representation, warranty, covenant, obligation, or other provision, and the term "Breach" means any such inaccuracy, breach, failure, claim, occurrence, or circumstance.

*"Closing"* — as defined in Section 2.7.

*"Closing Date"* — the date hereof.

*"Competing Business"* — with respect to the business of Globe, as defined in Section 4.23, and with respect to the business of KFGI, as defined in Section 5.23.

*"Confidential Information"* — as defined in Section 9.1(a).

*"Consent"* — any approval, consent, ratification, waiver, or other authorization (including any Governmental Authorization).

*"Contemplated Transactions"* — all of the transactions contemplated by this Agreement or such other agreements contemplated hereunder.

*"Contract"* — any agreement, contract, obligation, promise, or undertaking (whether written or oral and whether express or implied) that is legally binding.

*"Damages"* — as defined in Section 7.2.

*"Disclosure Schedule"* — the applicable disclosure schedule delivered by the parties hereto concurrently with the execution and delivery of this Agreement.

*"Disclosing Party"* — as defined in Section 9.1(a).

*"Effective Date"* — July 1, 2004.

*"Employment Agreement"* — as defined in Section 2.8(a)(vi).

*"Encumbrance"* — any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

*"Environment"* — soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

*"Environmental, Health, and Safety Liabilities"* — any cost, damages, expense, liability, obligation, or other responsibility arising from or under Environmental Law or Occupational Safety and Health Law.

*"Environmental Law"* — any Legal Requirement that relates to (i) advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or hazardous substances or materials, violations of discharge limits, or other prohibitions and of the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment; (ii) preventing or reducing to acceptable levels the release of pollutants or hazardous substances or materials into the Environment; (iii) reducing the quantities, preventing the release, or minimizing the hazardous characteristics of wastes that are generated; (iv) assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of; (v) protecting resources, species, or ecological amenities; (vi) reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil, or other potentially harmful substances; (vii) cleaning up pollutants that have been released, preventing the threat of release, or paying the costs of such clean up or prevention; or (viii) making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets.

*"ERISA"* — the Employee Retirement Income Security Act of 1974 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

*"Escrow Account"* — as defined in Section 2.4(d).

*"Escrow Agents"* — Mark G. Johnson and William R. Rodgers, counsel to KFGI and Globe, respectively.

*"Escrow Agreement"* — as defined in Section 2.4(d).

*"Excluded Globe Assets"* — as defined in Section 2.2.

*"Globe Assets"* — as defined in Section 2.1.

*"Globe Assumed Liabilities"* — as defined in Section 2.5.

*"Globe Bill of Sale, Assignment and Assumption Agreement"* — as defined in Section 2.8(a)(i).

*"Globe Contract"* — any Contract (a) under which Globe has or may acquire any rights, (b) under which Globe has or may become subject to any obligation or liability, or (c) by which Globe or any of the assets owned or used by it is or may become bound.

*"Globe Real Property"* — as defined in Section 4.6.

*"Globe's Facilities"* — any real property, including without limitation the Globe Real Property, leaseholds, or other interests currently owned or operated by Globe and any buildings, plants, structures, or equipment (including motor vehicles, tank cars, and rolling stock) currently owned or operated by Globe.

*"Globe's Intellectual Property Assets"* — as defined in Section 4.22(a).

*"Globe's Interim Balance Sheet"* — as defined in Section 4.4(a)(ii).

*"Globe Plan"* — as defined in Section 4.13(a).

*"Globe's Year-End Balance Sheet"* — as defined in Section 4.4(a)(i).

*"Governmental Authorization"* — any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

*"Governmental Body"* — any (i) nation, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

*"Ground Lease"* — any long-term lease of land in which most of the rights and benefits comprising ownership of the land and the Improvements thereon or to be constructed thereon, if any, are transferred to the tenant for the term thereof.

-4-

*"Ground Lease Property"* — any land, improvements and appurtenances subject to a Ground Lease in favor of Globe.

*"Hazardous Activity"* — the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, Release, storage, transfer, transportation, treatment, or use (including any withdrawal or other use of groundwater) of Hazardous Materials in, on, under, about, or from the Globe or KFGI Facilities, as the case may be, or any part thereof into the Environment, and that materially increases the danger, or risk of danger, or poses an unreasonable risk of harm to persons or property on or off the Facilities, or that may affect the value of such Facilities.

*"Hazardous Materials"* — any waste or other substance that is listed, defined, designated, or classified as, or otherwise determined to be, hazardous, radioactive, or toxic or a pollutant or a contaminant under or pursuant to any Environmental Law, including any admixture or solution thereof, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefor and asbestos or asbestos-containing materials.

*"Improvements"* — all buildings, structures, fixtures and improvements located on any Land, including those under construction.

*"IRC"* — the Internal Revenue Code of 1986, as amended, or any successor law, and regulations issued by the IRS pursuant to the Internal Revenue Code of 1986, as amended, or any successor law.

*"IRS"* — the United States Internal Revenue Service or any successor agency, and, to the extent relevant, the United States Department of the Treasury.

*"KFGI Contract"* — any Contract (a) under which KFGI has or may acquire any rights, (b) under which KFGI has or may become subject to any obligation or liability, or (c) by which KFGI or any of the assets owned or used by it is or may become bound.

*"KFGI's Facilities"* — any real property, leaseholds, or other interests currently owned or operated by KFGI and any buildings, plants, structures, or equipment (including motor vehicles, tank cars, and rolling stock) currently owned or operated by KFGI.

*"KFGI's Intellectual Property Assets"* — as defined in Section 5.22(a).

*"KFGI's Interim Balance Sheet"* — as defined in Section 5.4(a)(ii).

*"KFGI Promissory Note"* — as defined in Section 2.4(b).

*"KFGI's Year-End Balance Sheet"* — as defined in Section 5.4(a)(i).

*"Knowledge"* — an individual will be deemed to have "Knowledge" of a particular fact or other matter if (i) such individual is actually aware of such fact or other matter; or (ii) a prudent individual could be expected to discover or otherwise become aware of such fact

or other matter in the course of conducting a reasonable investigation concerning the existence of such fact or other matter.  A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving, or who has at any time served, as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has Knowledge of such fact or other matter.

*"Land"* — all parcels and tracts of land in which Globe or KFGI, as the case may be, has an ownership interest.

*"Legal Requirement"* — any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty.

*"Liability"* — with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

*"Noncompetition Agreements"* — as defined in Section 2.8(a)(vii).

*"Occupational Safety and Health Law"* — any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, including without limitation the Occupational Safety and Health Act of 1970, as amended (OSHA), and any governmental program designed to provide safe and healthful working conditions.

*"Order"* — any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

*"Ordinary Course of Business"* — an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person.

*"Organizational Documents"* — (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (e) any amendment to any of the foregoing.

*"PBGC"* — as defined in Section 4.13(a).

*"Permitted Encumbrances"* — any Encumbrance listed on Schedule 4.6(b) of the Disclosure Schedule, liens for Taxes not yet due and payable, warehouse and mechanics liens for amounts not overdue, governmental restrictions of general application, and covenants, restrictions and matters of record affecting the Globe Real Property.

*"Person"* — any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

*"Plan"* — as defined in Section 4.13(a).

*"Plan Sponsor"* — as defined in Section 4.13(a).

*"Proceeding"* — any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

*"Real Property"* — any Land and Improvements and all Appurtenances thereto.

*"Real Property Lease"* — any Ground Lease or Space Lease.

*"Record"* — information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

*"Related Person"* — with respect to a particular individual each other member of such individual's Family or any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family. For purposes of this definition, the *"Family"* of an individual includes (i) the individual, (ii) the individual's spouse, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree, and (iv) any other natural person who resides with such individual.

*"Release"* — any spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping, or other releasing into the Environment, whether intentional or unintentional.

*"Representative"* — with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

*"Retained Globe Liabilities"* — as defined in Section 2.5(b).

*"Schedule"* — a part or section of the Disclosure Schedule.

*"Somerville Goodwill"* — as defined in Section 3.1.

*"Somerville Intellectual Property"* — as defined in Section 2.3.

-7-

*"Space Lease"* — any lease or rental agreement pertaining to the occupancy of any improved space on any Land.

*"Tangible Personal Property"* — any all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property (other than Globe's inventory) of every kind owned or leased by Globe (wherever located and whether or not carried on Globe's books), together with any express or implied warranty by the manufacturers or sellers or lessors of any item or component part thereof and all maintenance records and other documents relating thereto.

*"Tax"* — any tax (including any income tax, capital gains tax, value-added tax, sales tax, property tax, gift tax, or estate tax), levy, assessment, tariff, duty (including any customs duty), and any related charge or amount (including any fine, penalty, interest, or addition to tax), imposed, assessed, or collected by or under the authority of any Governmental Body or payable pursuant to any tax-sharing agreement or any other Contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, or deficiency.

*"Tax Return"* — any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any Tax.

*"Third Party"* — a Person that is not a party to this Agreement.

*"Third-Party Claim"* — any claim against any Indemnified Person by a Third Party, whether or not involving a Proceeding.

*"Threatened"* — a claim, Proceeding, dispute, action, or other matter will be deemed to have been "Threatened" if any demand or statement has been made (orally or in writing) or any notice has been given (orally or in writing), or if any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such a claim, Proceeding, dispute, action, or other matter is likely to be asserted, commenced, taken, or otherwise pursued in the future.

## ARTICLE 2
## SALE AND TRANSFER OF GLOBE ASSETS AND SOMERVILLE INTELLECTUAL PROPERTY; CLOSING

### 2.1    GLOBE ASSETS TO BE SOLD

Upon the terms and subject to the conditions set forth in this Agreement, at the Closing and effective as of the Effective Date, Globe shall sell, convey, assign, transfer and deliver to KFGI, and KFGI shall purchase and acquire from Globe, free and clear of any Encumbrances other than Permitted Encumbrances, all of Globe's right, title and interest in and to all of Globe's property and assets, real, personal or mixed, tangible and

-8-

intangible, of every kind and description, wherever located, including the following (but excluding the Excluded Globe Assets):

(a)     all cash, cash equivalents and short-term investments;

(b)     all of Globe's Facilities;

(c)     all Tangible Personal Property, including those items described in Schedule 2.1(c) of the Disclosure Schedule;

(d)     all of Globe's inventories;

(e)     all of Globe's accounts receivable that Globe has not pledged or factored prior to the Effective Date;

(f)     all Globe Contracts, including those listed in Schedule 4.17(a) of the Disclosure Schedule, and all outstanding offers or solicitations made by or to Globe to enter into any Contract;

(g)     all rights in connection with and assets of the Globe Rubber Works, Inc. Profit Sharing 401(k) Plan;

(h)     all Governmental Authorizations and all pending applications therefor or renewals thereof, in each case to the extent transferable to KFGI, including those listed in Schedule 4.14 of the Disclosure Schedule;

(i)     all data and Records related to the operations of Globe, including client and customer lists and Records, referral sources, lists of market representatives, lists of distributors, research and development reports and Records, production reports and Records, service and warranty Records, equipment logs, operating guides and manuals, financial and accounting Records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and Records and, subject to Legal Requirements, copies of all personnel Records and other Records described in Section 2.2(e);

(j)     all of the intangible rights and property of Globe, including the Globe Intellectual Property Assets (but not the Somerville Intellectual Property), going concern value, goodwill related to the corporation (excluding the Somerville Goodwill), telephone, telecopy and e-mail addresses and listings and those items listed in Schedules 4.22(d), (e), (f), and (g) of the Disclosure Schedule;

(k)     all rights to receive outstanding property and casualty insurance indemnity payments for insured losses, if any, arising from or relating to losses or claims in respect of the Globe Assets or the Globe Assumed Liabilities prior to the Effective Date;

Dallas_1\3979467\7
41932-2 7/25/2004

(l)    all claims of Globe against third parties relating to the Globe Assets (but not in respect of any Excluded Globe Asset or any Retained Globe Liability), whether choate or inchoate, known or unknown, contingent or noncontingent, including all such claims listed in Schedule 2.1(l) of the Disclosure Schedule; and

(m)    all rights of Globe relating to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof that are not excluded under Sections 2.2(c) or 2.2(f), including, without limitation, those listed in Schedule 2.1(m) of the Disclosure Schedule.

All of the property and assets to be transferred to KFGI hereunder are herein referred to collectively as the *"Globe Assets."*

Notwithstanding the foregoing, the transfer of the Globe Assets pursuant to this Agreement shall not include the assumption of any Liability related to the Globe Assets unless KFGI expressly assumes that Liability pursuant to Section 2.5(a).

## 2.2   EXCLUDED GLOBE ASSETS

Notwithstanding anything to the contrary contained in Section 2.1 or elsewhere in this Agreement, the following assets of Globe (collectively, the *"Excluded Globe Assets"*) are not part of the sale and purchase contemplated hereunder, are excluded from the Globe Assets and shall remain the property of Globe after the Closing:

(a)    all minute books, stock Records, tax records, and corporate seals;

(b)    the shares of capital stock of Globe held in treasury;

(c)    all insurance policies and rights thereunder (except to the extent the right to receive indemnity payments for insured losses has been assigned to KFGI as specified in Section 2.1(l));

(d)    all of the Globe Contracts listed in Schedule 2.2(d) of the Disclosure Schedule

(e)    all personnel Records and other Records that Globe is required by law to retain in its possession;

(f)    all claims for refund of Taxes and other governmental charges of whatever nature;

(g)    all rights in connection with and assets of the Globe Plans excluding the Globe Rubber Works, Inc. Profit Sharing 401(k) Plan, which has been expressly included as a Globe Asset hereunder;

(h)    all accounts receivable pledged or factored by Globe prior to the Effective Date;

(i)    all rights of Globe under this Agreement, the Globe Bill of Sale, Assignment and Assumption Agreement, the Deferral Promissory Note and the KFGI Promissory Note;

(j)     the property and assets expressly designated in Schedule 2.2(j) of the Disclosure Schedule;

(k)     all claims of Globe against third parties relating to the Excluded Globe Assets or any Retained Globe Liability, whether choate or inchoate, known or unknown, contingent or noncontingent;

(l)     subject to Section 8.18, all right, title and interest in and to any recovery, damages or other awards to which Globe may become entitled under, in connection with or arising out of that certain class action complaint and the lawsuit associated therewith known as Globe Rubber v. Crompton Corporation, Case Number 04cv1654 pending in the United States District Court for the Eastern District of Pennsylvania (the *"Crompton Matter"*); and

(m)     the Lexus automobile that Somerville has previously used as a company car.

### 2.3     SOMERVILLE INTELLECTUAL PROPERTY

Upon the terms and conditions set forth in this Agreement, at the Closing and effective as of the Effective Date, Somerville shall sell, convey, assign, transfer and deliver to KFGI, and KFGI shall purchase and acquire from Somerville, free and clear of any Encumbrances, all of Somerville's right, title and interest in and to the intellectual property identified as the *"Somerville Intellectual Property"* on Schedule 2.3 of the Disclosure Schedule.

### 2.4     CONSIDERATION

(a)     The consideration for the Globe Assets, payable to Globe, will be (i) Eight Hundred Ninety-Eight Thousand Dollars ($898,000) in cash, and (ii) the assumption of the Globe Assumed Liabilities pursuant to the Globe Bill of Sale, Assignment and Assumption Agreement (collectively, the *"Globe Assets Purchase Price"*).

(b)     The consideration for the Somerville Intellectual Property, payable to Somerville, shall be (i) One Million Five Hundred Two Thousand Dollars ($1,502,000) in cash, (ii) a promissory note (the *"Deferral Promissory Note"*) executed by KFGI and payable to Somerville in the amount of Two Hundred Thousand Dollars ($200,000), which note shall be in the form attached as Exhibit 2.4(b)(ii) and shall be subordinate to KFGI's senior credit facility, (iii) a promissory note (the *"KFGI Promissory Note"*) executed by KFGI and payable to Somerville in the amount of One Hundred Fifty Thousand Dollars ($150,000), which note shall be in the form of Exhibit 2.4(b)(iii) and shall be subordinate to KFGI's senior credit facility, and (iv) a promissory note (the "Tax Payment Promissory Note") executed by KFGI and payable to Somerville in the amount of Four Hundred Thousand Dollars ($400,000), which note shall be in the form attached as Exhibit 2.4(b)(iv) and shall not be subordinate to KFGI's senior credit facility (collectively, the *"Somerville Intellectual Property Purchase Price"*).

-11-

(c)     Subject to Sections 2.4(d), 2.4(e) and 2.4(f), the Globe Assets Purchase Price will be paid to Globe and the Somerville Intellectual Property Purchase Price will be paid to Somerville at Closing. The cash portion of the Globe Assets Purchase Price and the Somerville Intellectual Property Purchase Price will be paid by wire transfer or other mutually acceptable means, and the Globe Bill of Sale, Assignment and Assumption Agreement, the Deferral Promissory Note and the KFGI Promissory Note will be executed and delivered at Closing.

(d)     Anything herein to the contrary notwithstanding, KFGI shall retain One Hundred Sixty-Five Thousand Dollars ($165,000) out of the cash portion of the Globe Assets Purchase Price, and shall deposit such amount at Closing in an interest bearing account established by the Escrow Agents in a Boston, Massachusetts bank (the *"Escrow Account"*) as contemplated by an Escrow Agreement by and among KFGI, Globe and the Escrow Agents in the form of Exhibit 2.4(d) (the *"Escrow Agreement"*). Funds in the Escrow Account shall be held and disbursed by the Escrow Agents in accordance with the Escrow Agreement. Immediately following the first anniversary of the Closing Date, the Escrow Agents shall pay the balance of such amount, plus any accrued interest, to Globe; provided that the Escrow Agents shall retain on deposit so much thereof as KFGI reasonably and in good faith deems necessary to cover any pending indemnification claims as have been properly asserted by KFGI in accordance with ARTICLE 7 hereof prior to the first anniversary date of the Closing Date and which are then unresolved, and the Escrow Agents shall continue to hold same pursuant to the Escrow Agreement until such claims have been finally resolved.

2.5     LIABILITIES

(a)     Globe Assumed Liabilities. On the Closing Date and effective as of the Effective Date, KFGI shall assume and agree to promptly pay, perform and discharge only the following Liabilities of Globe (the *"Globe Assumed Liabilities"*):

    (i)     any Liability reflected on Globe's Interim Balance Sheet that remains unpaid as of the Effective Date, including without limitation; (i) all trade debt and accounts payable, (ii) all bank debt or other indebtedness for borrowed money, (iii) all debt owed to Somerville or his spouse (or family members of either) shown thereon (which debts shall be paid by KFGI at Closing), (iv) all Taxes, (v) the $150,000 promissory note issued by Globe in favor of KFGI dated September 9, 2003, and (vi) the $200,000 promissory note executed by Globe in favor of KFGI dated April 19, 2004;

    (ii)     any trade debt or account payable incurred by Globe in the Ordinary Course of Business between the date of Globe's Interim Balance Sheet and the Effective Date that remains unpaid as of the Closing Date, but expressly excluding any liability for tortious conduct or for a material breach of contract;

-12-

(iii)   any Liability to Globe's customers incurred by Globe in the Ordinary Course of Business for orders outstanding as of the Effective Date reflected on Globe's books (other than any Liability arising out of or relating to a Breach that occurred prior to the Effective Date);

(v)   any Liability to Globe's customers for warranty claims (as distinguished from product liability claims) under its established warranty practices given by Globe to its customers in the Ordinary Course of Business prior to the Effective Date;

(vi)   any Liability arising after the Effective Date under any of the Globe Contracts (except for any Globe Contract not listed on Schedule 4.17(a) of the Disclosure Schedule, whose failure to be so listed constitutes a Breach of Section 4.17 hereof) other than any Liability thereunder for a material Breach that occurred prior to the Effective Date;

(viii)  any liability arising in the Ordinary Course of Business to employees of Globe, to the extent reflected on Globe's books, for current salary or wages and payroll taxes thereon, accrued rights to sick pay and vacation pay and any 401(k) employer matching payments due for current period under the Globe 401(k) Plan;

(ix)   any Liability of Globe described in Schedule 2.5(a)(ix) of the Disclosure Schedule; and

(x)   Liabilities pursuant to Section 2.5(c).

(b)   Retained Globe Liabilities. The Retained Globe Liabilities shall remain the sole responsibility of and shall be retained, paid, performed and discharged solely by Globe. *"Retained Globe Liabilities"* shall mean every Liability of Globe other than the Globe Assumed Liabilities, including, without limitation:

(i)   any Liability arising out of or relating to products of Globe to the extent manufactured or sold prior to the Effective Date other than to the extent assumed under Section 2.5(a)(iii), (iv) or (v);

(ii)   any Liability under any Contract assumed by KFGI pursuant to Section 2.5(a) that arises after the Effective Date if and only to the extent that such arises out of or relates to any Breach that occurred prior to the Effective Date;

(iii)   any Liability for Taxes (other then Taxes reflected on Globe's Year-End or Globe's Interim Balance Sheets or otherwise assumed by KFGI hereunder) including (A) any Taxes arising as a result of Globe's operation of its business or ownership of the Globe Assets prior to the Effective Date, (B) any Taxes that will arise as a result of the sale of the Globe Assets

-13-

pursuant to this Agreement (except as otherwise provided in Article 7) and (C) any deferred Taxes of any nature;

(iv)     any Liability under any Contract included among the Globe Excluded Assets;

(v)      any Environmental, Health and Safety Liabilities but only to the extent exclusively arising out of or relating to Globe's operation prior to the Effective Date of real property during the time Somerville owned a controlling interest in Globe;

(vi)     any Liability under any undisclosed barter, employment, sales, marketing, distributor, bonus, severance, retention or termination agreement or arrangement, whether written or oral, with any employee of Globe, any independent contractor or any of Globe's or Somerville's Related Persons, other than to the extent assumed under Sections 2.5(a)(i), (ii), (iii), (vi) or (ix);

(vii)    any Liability arising out of or relating to any employee grievance in respect of periods prior to the Effective Date other than in respect of the Globe Assumed Liabilities whether or not the affected employees are hired by KFGI;

(viii)   any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Globe except to extent assumed under Sections 2.5(a)(i), (ii) or (iii);

(ix)     any Liability to distribute to any of Globe's shareholders or otherwise apply all or any part of the consideration received hereunder;

(x)      any Liability arising out of any Proceeding pending as of the Effective Date;

(xi)     any Liability arising out of any Proceeding commenced after the Effective Date and arising out of or relating to any occurrence or event happening prior to the Effective Date, but expressly excluding any Liability in respect of a Proceeding within the scope of KFGI's indemnity undertaking at Section 7.3 or a Liability in respect of a Globe Assumed Liability;

(xii)    any Liability of Globe under this Agreement or any other document executed in connection with the Contemplated Transactions;

(xiii)   any Liability of Globe based upon Globe's acts or omissions occurring after the Closing Date; and

-14-

(xiv)   any Liability of Globe related to the lease or purchase or other financing of the Lexus automobile that Somerville has previously used as a company car.

(c)   Post-Effective Date Operating Liabilities.   Except to the extent of any Globe Retained Liabilities, KFGI acknowledges and agrees that it shall be solely responsible for the operation of the business utilizing the Globe Assets and for any Liabilities associated with the operation of the business utilizing the Globe Assets from and after the Effective Date.

## 2.6   ALLOCATION OF GLOBE ASSETS PURCHASE PRICE

The Globe Assets Purchase Price shall be allocated in accordance with Schedule 2.6 of the Disclosure Schedule. After the Closing, the parties shall make consistent use of the allocation, fair market value and useful lives specified in Schedule 2.6 of the Disclosure Schedule for all Tax purposes and in all filings, declarations and reports with the IRS in respect thereof, including the reports required to be filed under Section 1060 of the Code. KFGI shall prepare and deliver IRS Form 8594 to Globe for its review and approval within forty-five (45) days after the Closing Date to be filed with the IRS. If Globe raises any objection to such form, the parties agree to negotiate a resolution to such matter and to agree on a mutually acceptable form within 30 days. In any Proceeding related to the determination of any Tax, neither KFGI nor Globe or Somerville shall contend or represent that such allocation is not a correct allocation.

## 2.7   CLOSING

The purchase and sale provided for in ARTICLE 2 of this Agreement (the *"Closing"*) will take place at the offices of Globe's counsel, Tarlow, Breed, Hart, Murphy & Rodgers, P.C., at 21 Custom House Street, Boston, MA 02110, commencing at 10:00 a.m. (local time) on the date hereof. Subject to the provisions of ARTICLE 6, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.7 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement. In such a situation, the Closing will occur as soon as practicable, subject to the provisions of ARTICLE 6.

## 2.8   CLOSING OBLIGATIONS

In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

(a)   Globe and Somerville, as the case may be, shall have delivered to KFGI:

(i)   a bill of sale, assignment and assumption agreement for all of the Globe Assets in the form of Exhibit 2.8(a)(i) (the *"Globe Bill of Sale, Assignment and Assumption Agreement"*) executed by Globe;

-15-

(ii)    [Intentionally Omitted];

(iii)    general assignment of all Globe Intellectual Property Assets and separate assignments of all registered Globe Marks, Globe Patents and Globe Copyrights, each as in the forms of Exhibit 2.8(a)(iii) executed by Globe;

(iv)    assignments of all Somerville Intellectual Property in the form of Exhibit 2.8(a)(iv) executed by Somerville;

(v)    such other deeds, bills of sale, assignments, customary owner's affidavits, customary tax certificates and affidavits, and documents and other instruments of transfer and conveyance as may reasonably be requested by KFGI, each in form and substance reasonably satisfactory to KFGI and its legal counsel and executed by Globe;

(vi)    an employment agreement in the form of Exhibit 2.8(a)(vi), executed by Somerville (the *"Employment Agreement"*);

(vii)    noncompetition agreements in the form of Exhibit 2.8(a)(vii), executed by Gregg Somerville, Wendy Somerville and Anne Roach-Somerville (the *"Noncompetition Agreements"*);

(viii)    a certificate of the Secretary of Globe certifying, as complete and accurate as of the Closing, attached copies of the Organizational Documents of Globe, certifying and attaching all requisite resolutions or actions of Globe's board of directors and shareholders approving the execution and delivery of this Agreement and the consummation of the Contemplated Transactions and certifying to the incumbency and signatures of the officers of Globe executing this Agreement and any other document relating to the Contemplated Transactions;

(ix)    the Escrow Agreement executed by Globe;

(x)    such other documents as KFGI may reasonably request for the purpose of facilitating the consummation or performance of any of the Contemplated Transactions; and

(xi)    written evidence of the results of a certified environmental review of the compliance of Globe's septic, sewage, and wastewater systems with applicable requirements of Title V of the Code of Massachusetts Regulations (310 CMR Sec 15, et seq.) and the remedial efforts required of Globe in correcting any deficiencies identified in such review, including without limitation the connection of the sewage systems to Globe's facilities to the main city sewer line, and, in the event such remedial efforts have not been completed as of the date hereof, Somerville shall deposit $25,000 into escrow to cover the costs of such remedial efforts conducted post-closing.

-16-

(b)     KFGI shall have delivered to Globe:

   (i)     Seven Hundred Thirty-Three Thousand ($733,000) by wire transfer to an
           account specified by Globe in a writing delivered to KFGI at least three
           (3) days prior to the Closing Date;

   (ii)    the Globe Bill of Sale, Assignment and Assumption Agreement executed
           by KFGI;

   (iii)   the Employment Agreement executed by KFGI;

   (iv)    the Noncompetition Agreements executed by KFGI;

   (v)     a certificate of the Secretary of KFGI certifying, as complete and accurate
           as of the Closing, attached copies of the Organizational Documents of
           KFGI and certifying and attaching all requisite resolutions or actions of
           KFGI's board of directors approving the execution and delivery of this
           Agreement and the consummation of the Contemplated Transactions and
           certifying to the incumbency and signatures of the officers of KFGI
           executing this Agreement and any other document relating to the
           Contemplated Transactions; and

   (vi)    a written release of all claims from Michael Whitworth running to Globe,
           Somerville and all of their respective officers, directors, successors and
           assigns in the form attached hereto as Exhibit 2.8(b)(vi).

(c)     KFGI shall have delivered to Somerville:

   (i)     One Million Five Hundred Two Thousand Dollars ($1,502,000) by wire
           transfer to an account specified by Somerville in a writing delivered to
           KFGI at least three (3) days prior to the Closing Date;

   (ii)    the Deferral Promissory Note, executed by KFGI;

   (iii)   the KFGI Promissory Note, executed by KFGI;

   (iv)    the Tax Payment Promissory Note, executed by KFGI; and

   (v)     a release of Somerville from any and all Assumed Liabilities as have been
           personally guaranteed by Somerville duly executed by the Third Party
           holding such guarantees and discharges of any mortgages on his residence
           and collateral assignments of life insurance policies in his life as have
           been granted to Third Parties incident to such guarantees, as such
           guarantees and mortgages and insurance policies are identified on
           Schedule 2.5(a)(ix) of the Disclosure Schedule.

(d)     KFGI shall have delivered to the Escrow Agents:

-17-

(i)    The Escrow Agreement executed by Globe and KFGI; and

(ii)   One Hundred Sixty-Five Thousand Dollars ($165,000).

(e)    Each party hereto shall have delivered such other documents as any other party hereto may reasonably request for the purpose of facilitating the consummation or performance of any of the Contemplated Transactions.

## ARTICLE 3
## CONTRIBUTION OF SOMERVILLE GOODWILL

### 3.1    CONTRIBUTION OF SOMERVILLE GOODWILL

Upon the terms and conditions set forth in this Agreement, on and effective as of the first practicable date following the 504 Loan Funding (the *"Somerville Goodwill Closing Date"*), Somerville shall contribute to KFGI, free and clear of any Encumbrances, all of Somerville's right, title and interest in and to all of the personal goodwill that Somerville possesses as a result of his individual achievements and reputation in the business community (the *"Somerville Goodwill"*). KFGI covenants and agrees that it will not deal with, use, or exploit the Somerville Goodwill in any manner which disparages, embarrasses, or ridicules Somerville or holds Somerville in a false light or otherwise portrays him in a false, misleading, or demeaning manner or invades his privacy.

### 3.2    ISSUANCE OF KFGI EQUITY INTEREST

In consideration for the contribution of Somerville Goodwill by Somerville and on the Somerville Goodwill Closing Date, KFGI shall issue to Somerville an equity interest in KFGI (the *"KFGI Equity Interest"*) in an amount equal to seven and one-half percent (7.5%) of all outstanding limited partnership interests in KFGI as of the Somerville Goodwill Closing Date (calculated on a fully diluted basis) with the same voting rights and other rights, priorities, preferences and privileges as all existing limited partners as of the Closing Date subject only to the amendment attached hereto as Exhibit 3.3(b) (the *"Somerville Goodwill Purchase Price"*), and the value of the Somerville Goodwill shall be deemed to be Somerville's initial capital contribution to KFGI. By mutual agreement of the parties, the KFGI Equity Interest will have an agreed value equal to seven and one-half percent (7.5%) of all capital accounts of all partners of KFGI (including Somerville) as of the Somerville Goodwill Closing Date.

### 3.3    COVENANTS

(a)    So long as the KFGI Equity Interest has not been issued to Somerville, between the Closing Date and the Somerville Goodwill Closing Date, KFGI hereby agrees not to merge or consolidate with any other person, liquidate its business, make any distributions to its partners, or sell all or substantially all of its assets, recapitalize KFGI or authorize or issue any equity interests senior to existing limited partners, or amend its partnership agreement in any respect other than as contemplated by Section 3.3(b).

-18-

(b)    Immediately following the Closing Date, KFGI shall adopt an amendment to its Revised and Amended Agreement of Limited Partnership in substantially the form attached as Exhibit 3.3(b).

### 3.4   CLOSING

(a)    The contribution of the Somerville Goodwill and the payment of the Somerville Goodwill Purchase Price will take place on Somerville Goodwill Closing Date. The Somerville Goodwill Purchase Price will be delivered in form and substance mutually acceptable to the parties as provided herein.

(b)    On the Somerville Goodwill Closing Date, Somerville shall deliver (i) an assignment of the Somerville Goodwill in the form of Exhibit 3.4(b) executed by Somerville, and (ii) a form of acknowledgement, together with such other documents as KFGI shall reasonably request, each executed by Somerville, evidencing Somerville's agreement to be bound by the KFGI's Revised and Amended Agreement of Limited Partnership.

(c)    On the Somerville Goodwill Closing Date, KFGI shall deliver a copy of KFGI's Revised and Amended Partnership Agreement, revised to reflect the admission of Somerville as a 7.5% limited partner as of the Somerville Goodwill Closing Date and amended as contemplated by Section 3.3(b).

### ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF GLOBE AND SOMERVILLE

The Disclosure Schedule is divided into schedules which are numbered to correspond to sections of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, any matter which is disclosed by either Globe or Somerville in any particular schedule of the Disclosure Schedule, or Exhibits thereto, relating to this ARTICLE 4 shall be deemed to be disclosed in respect of all sections of this ARTICLE 4 to which such disclosure may relate and to qualify all of the representations and warranties of Globe and Somerville contained in this Agreement that are relevant thereto. Subject to the qualifications, exclusions, limitations and disclosures set forth in the Disclosure Schedule in regard to this ARTICLE 4, each of Globe and Somerville represents and warrants, jointly and severally, to KFGI as follows:

### 4.1   ORGANIZATION AND GOOD STANDING

(a)    Globe is a corporation duly organized, validly existing, and in good standing under the laws of the State of Massachusetts, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under the Globe Contracts. Globe is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

-19-

(b)     Globe has delivered to KFGI copies of the Organizational Documents of Globe, as currently in effect.

**4.2     AUTHORITY; NO CONFLICT**

(a)     This Agreement constitutes the legal, valid, and binding obligation of Globe and Somerville, enforceable against each of them in accordance with its terms. Upon the execution and delivery by Globe and Somerville of the Employment Agreement, the Escrow Agreement and any other documents that either Globe or Somerville is required to execute and deliver in connection with or in furtherance of the Contemplated Transactions, (collectively, the ***"Globe's Closing Documents"***), the Globe's Closing Documents will constitute the legal, valid, and binding obligations of Globe and Somerville, enforceable against each of them, as applicable, in accordance with their respective terms. Globe has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and the Globe's Closing Documents and to perform its obligations under this Agreement and the Globe's Closing Documents. Somerville has all necessary legal capacity to enter into this Agreement and the Globe's Closing Documents to which Somerville is a party and to perform his obligations hereunder and thereunder.

(b)     Neither the execution and delivery of this Agreement nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time) (i) contravene, conflict with, or result in a material violation or breach of (A) any provision of the Organizational Documents of Globe, (B) any Globe Contract of a material nature; (C) any Order to which Globe or Somerville, or any of the assets owned or used by the Globe, may be subject; or (D) any Governmental Authorization that is held by Globe or that otherwise relates to the business of, or any of the assets owned or used by, the Globe; (ii) cause Globe to become subject to, or to become liable for the payment of, any Tax; or (iii) result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by Globe.

**4.3     CAPITALIZATION**

The authorized equity securities of Globe consist of 300 shares of common stock, par value $100.00 per share, of which 163 shares are issued and outstanding and constitute the Shares. Somerville is the record and beneficial owner and holder of the Shares, free and clear of all Encumbrances. There are no Contracts relating to the issuance, sale, or transfer of any equity securities or other securities of Globe.

**4.4     FINANCIAL STATEMENTS**

(a)     Globe and Somerville have delivered to KFGI:

(i)     An unaudited balance sheet of Globe as at December 31, 2003 (*"Globe's Year-End Balance Sheet"*), and the related statements of income, changes in stockholders' equity, and cash flow for the fiscal year then ended, and

(ii)    An unaudited balance sheet of Globe as at June 30, 2004 (*"Globe's Interim Balance Sheet"*) and the related unaudited statements of income, changes in stockholders' equity, and cash flow for the 2 months then ended.

(b)    Such financial statements fairly present the financial condition and the results of operations, changes in stockholders' equity, and cash flow of Globe as at the respective dates of and for the periods referred to in such financial statements.

### 4.5   BOOKS AND RECORDS

The books of account, minute books, stock record books, and other Records of Globe, all of which have been made available to KFGI, are up to date, complete and correct in all material respects and in the possession of Globe.

### 4.6   TITLE TO PROPERTIES; ENCUMBRANCES

(a)    Schedule 4.6(a) of the Disclosure Schedule contains a complete and accurate list of all Real Property, Ground Lease Property, or other real property interests therein owned by Globe (the *"Globe Real Property"*).

(b)    Except for the Globe Real Property, which is discussed in Section 4.6(a), Globe owns all the Globe Assets (whether tangible or intangible) free and clear of all Encumbrances, except as shown on Schedule 4.6(b) of the Disclosure Schedule.

### 4.7   SUFFICIENCY OF ASSETS

The Globe Assets, the Somerville Intellectual Property and the Somerville Goodwill constitute all of the material assets, tangible and intangible, of any nature whatsoever, necessary to operate Globe's business in the manner presently operated by Globe.

### 4.8   ACCOUNTS RECEIVABLE

All accounts receivable of Globe that are reflected on Globe's Year-End Balance Sheet or Globe's Interim Balance Sheet or on the accounting records of Globe as of the Effective Date represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. There is to Globe's and Somerville's Knowledge no contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, under any Contract with any obligor of an accounts receivable relating to the amount or validity of such accounts receivable. Globe and Somerville have delivered to KFGI a complete and accurate list of all accounts receivable as of the date of Globe's Interim Balance Sheet, which list sets forth the aging of such accounts receivable.

**4.9   INVENTORY**

All inventory of Globe reflected in Globe's Year-End Balance Sheet or Globe's Interim Balance Sheet, consists of a quality and quantity usable and salable in the Ordinary Course of Business other than such portion of inventory which is either (i) reserved against in Globe's Year-End Balance Sheet or Globe's Interim Balance Sheet as potentially unsalable or (ii) does not represent an amount which would have a material adverse effect on the financial condition of Globe.

**4.10   NO UNDISCLOSED LIABILITIES**

Except as set forth in Schedule 4.10 of the Disclosure Schedule, Globe has no liabilities or obligations of any material nature which are required to be reflected on Globe's financial statements (whether known or unknown and whether absolute, accrued, contingent, or otherwise) in order to fairly present its financial condition, except for liabilities or obligations reflected in Globe's Year-End Balance Sheet or Globe's Interim Balance Sheet and liabilities incurred in the Ordinary Course of Business since the respective dates thereof.

**4.11   TAXES**

(a)   Globe has filed or caused to be filed (on a timely basis since January 1, 2001) all Tax Returns that are or were required to be filed by or with respect to Globe, pursuant to applicable Legal Requirements. Globe and Somerville have delivered to KFGI copies of all such Tax Returns. Globe has paid all Taxes that have or may have become due pursuant to those Tax Returns, except such Taxes, if any, as are being contested in good faith.

(b)   All Tax Returns filed by Globe are true, correct, and complete in all material respects.

**4.12   NO MATERIAL ADVERSE CHANGE**

Since the date of Globe's Year-End Balance Sheet, there has not been any material adverse change in the business, operations, properties, prospects, assets, or condition of Globe, and to the knowledge of Globe and Somerville no event has occurred or circumstance exists that may be reasonably foreseen by a prudent person as likely to result in such a material adverse change.

**4.13   EMPLOYEE BENEFITS**

(a)   As used in this Section 4.13 and in Section 5.13, the following terms have the meanings set forth below.

*"Globe Plan"* means all Plans of which Globe is or was the Plan Sponsor, or to which Globe otherwise contributes or has contributed, or in which Globe otherwise participates

or has participated. All references to Plans are to Globe Plans unless the context requires otherwise.

*"PBGC"* means the Pension Benefit Guaranty Corporation, or any successor thereto.

*"Plan"* has the meaning given in ERISA § 3(3).

*"Plan Sponsor"* has the meaning given in ERISA § 3(16)(B).

(b)  Schedule 4.13(b) of the Disclosure Schedule contains a complete and accurate list of all Globe Plans.

(c)  Globe and Somerville have delivered to KFGI (i) all material documents that set forth the terms of the Globe Plans; (ii) all personnel, payroll, and employment manuals and policies; and (iii) all insurance policies purchased by or to provide benefits under the Globe Plan and presently in effect.

(d)  Except as set forth in Schedule 4.13(d) of the Disclosure Schedule:

   (i)   Globe has performed, in all material respects, all of its obligations under all Globe Plans. Globe has made appropriate entries in its financial records and statements for all obligations and liabilities under such Plans that have accrued but are not due.

   (ii)  Globe, with respect to all Globe Plans, is in full compliance, in all material respects, with ERISA, the IRC, and other applicable Laws.

   (iii) No accumulated funding deficiency, whether or not waived, exists with respect to any Globe Plan.

   (iv)  Neither Globe nor Somerville has Knowledge of any facts or circumstances that may give rise to any liability of Somerville, Globe, or KFGI to the PBGC under Title IV of ERISA.

   (v)   The consummation of the Contemplated Transactions will not result in the payment, vesting, or acceleration of any benefit under any Globe Plan.

## 4.14  COMPLIANCE WITH LEGAL REQUIREMENTS AND GOVERNMENTAL AUTHORIZATIONS

Except as set forth in Schedule 4.14 of the Disclosure Schedule, (i) to Globe's and Somerville's Knowledge, Globe is in full compliance, in all material respects, with each Legal Requirement and Governmental Authorization that is applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets; (ii) to Globe's and Somerville's Knowledge, no event has occurred or circumstance exists that (with or without notice or lapse of time) may constitute or result in a material violation by Globe of, or a material failure on the part of Globe to comply with, any Legal

Requirement or Governmental Authorization; and (iii) Globe has not received any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply with, any Legal Requirement or Governmental Authorization,

### 4.15    LEGAL PROCEEDINGS; ORDERS

(a)    Except as set forth in Schedule 4.15 of the Disclosure Schedule, there is no Proceeding pending or, to the Knowledge of Globe or Somerville, Threatened by or against Globe or Somerville (i) that relates to or may materially affect the Globe Assets, the Somerville Intellectual Property or the Somerville Goodwill; or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

(b)    Except as set forth in Schedule 4.15 of the Disclosure Schedule, there is no Order having specific reference to Globe to which Globe, or any of the assets owned or used by Globe, is subject.

### 4.16    ABSENCE OF CERTAIN CHANGES AND EVENTS

Except as set forth in Schedule 4.16 of the Disclosure Schedule, since the date of Globe's Year-End Balance Sheet, Globe has conducted its businesses only in the Ordinary Course of Business and there has not been any (i) change in Globe's authorized or issued capital stock; grant of any stock option or right to purchase shares of capital stock of Globe; issuance of any security convertible into such capital stock; grant of any registration rights; purchase, redemption, retirement, or other acquisition by Globe of any shares of any such capital stock; or declaration or payment of any dividend or other distribution or payment in respect of shares of capital stock; (ii) amendment to the Organizational Documents of Globe; (iii) payment or increase by Globe of any bonuses, salaries, or other compensation to any stockholder, director, officer, or employee or entry into any employment, severance, or similar Contract with any director, officer, or employee (except in the Ordinary Course of Business); (iv) damage to or destruction or loss of any Globe Asset or Somerville Asset, whether or not covered by insurance, materially and adversely affecting the properties, assets, business, financial condition, or prospects of Globe, taken as a whole; (v) sale (other than sales of inventory in the Ordinary Course of Business), lease, or other disposition (other than dispositions in the Ordinary Course of Business of assets no longer needed or useful in the business which have become obsolete, depleted or worn out) of any Globe Asset or Somerville Asset or property of Globe or mortgage, pledge, or imposition of any lien or other encumbrance on any Globe Asset or Somerville Asset; (vi) transaction between Globe and any stockholder, officer or director of Globe or any Related Person of any of them of an amount or value in excess of $10,000; or (vii) agreement, whether oral or written, by Globe to do any of the foregoing.

**4.17  CONTRACTS; NO DEFAULTS**

(a)    Schedule 4.17(a) of the Disclosure Schedule contains a complete and accurate list, and Globe and Somerville have delivered to KFGI true and complete copies, of (i) each executory Globe Contract that involves the performance of services or delivery of goods or materials by or to Globe of an amount or value in excess of $10,000; (ii) each executory licensing agreement or other Globe Contract with respect to patents, trademarks, copyrights, or other intellectual property, including agreements with current or former employees, consultants, or contractors regarding the appropriation or the non-disclosure of any of Globe's Intellectual Property Assets; (iii) each executory Globe Contract that commits Globe to make a capital expenditure, or incur a liability, either direct or contingent, in excess of $10,000; and (iv) each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

(b)    To the Knowledge of Globe and Somerville, each Contract identified in Schedule 4.17(a) of the Disclosure Schedule is in full force and effect and is valid and enforceable in accordance with its terms.

(c)    Except as set forth in Schedule 4.17(c) of the Disclosure Schedule (i) Globe is in full compliance with all material terms and requirements of each material Globe Contract; (ii) no event has occurred that gives Globe or any other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any material Globe Contract; and (iii) Globe has not given to or received from any other Person any notice or other communication (whether oral or written) regarding any actual, alleged, possible, or potential violation or breach of, or default under, any material Globe Contract.

**4.18  INSURANCE**

Globe and Somerville have delivered to KFGI a true and complete list of all policies of insurance to which Globe is a party or under which Globe, or any director of Globe, is or has been covered at any time since January 1, 2003.

**4.19  ENVIRONMENTAL MATTERS**

Except as set forth in Schedule 4.19 of the Disclosure Schedule:

(a)    To the knowledge of Globe or Somerville, Globe is in full compliance, in all material respects, with all applicable Environmental Laws.

(b)    There are no pending or, to the Knowledge of Globe or Somerville, Threatened claims, Encumbrances, or Environmental, Health, and Safety Liabilities arising under or pursuant to a violation by Globe of any Environmental Law (during the period from 1987 through the Closing Date), with respect to or affecting any of

Globe's Facilities or any other properties and assets (whether real, personal, or mixed) in which Globe has an interest.

(c)     Neither Globe nor Somerville has Knowledge of, nor have Globe or Somerville received, any citation, directive, inquiry, notice, Order, summons, warning, or other communication that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities (during the period from 1987 through the Closing Date) with respect to any of Globe's Facilities or any other properties or assets (whether real, personal, or mixed) in which Globe has an interest which has not been fully addressed and/or remedied.

(d)     Globe and Somerville are not aware of there being any Hazardous Materials present on or in the Environment at Globe's Facilities except for such materials used in the Ordinary Course of Business and in compliance with law. Neither Globe nor Somerville (during the period from 1987 through the Closing Date) has conducted, or permitted to be conducted, any Hazardous Activity at Globe's Facilities or any other properties or Globe Assets (whether real, personal, or mixed), except in full compliance with all applicable Environmental Laws.

(e)     Globe and Somerville have delivered to KFGI true and complete copies of any reports, studies, analyses, tests, or monitoring possessed or initiated since 1999 by Globe or Somerville pertaining to Hazardous Materials or Hazardous Activities in, on, or under Globe's Facilities, or concerning compliance by Somerville or Globe.

### 4.20   EMPLOYEES

(a)     Schedule 4.20 of the Disclosure Schedule contains a complete and accurate list of each employee of Globe. With respect to each employee, Globe and Somerville have delivered to KFGI each employee's job title; current compensation; accrued vacation; and service credited for purposes of vesting and eligibility to participate under Globe's employee benefit plans.

(b)     To the Knowledge of Globe or Somerville, no director, officer, or other key employee of Globe intends to terminate his employment with Globe.

### 4.21   LABOR RELATIONS; COMPLIANCE

Globe is not a party to any collective bargaining or other labor Contract.

### 4.22   INTELLECTUAL PROPERTY

(a)     Intellectual Property Assets—The term *"Globe's Intellectual Property Assets"* means all of the intellectual property owned, used and/or licensed by Globe (other

-26-

than the Somerville Intellectual Property) that relates to Globe and its business, including:

(i)    the names "Globe Rubber Works, Inc.," "Globe Rubber Works," and "Globe Rubber" together with all fictional business names, trading names, registered and unregistered trademarks, service marks, and applications presently in use by Globe (collectively, ***"Globe Marks"***);

(ii)    all patents, patent applications, and inventions and discoveries that may be patentable (collectively, ***"Globe Patents"***);

(iii)    all copyrights in both published works and unpublished works (collectively, ***"Globe Copyrights"***);

(iv)    all rights in mask works (collectively, ***"Globe Rights in Mask Works"***);

(v)    all know-how, trade secrets, confidential information, customer lists, software, technical information, data, process technology, plans, drawings, and blue prints (collectively, ***"Globe Trade Secrets"***); and

(vi)    all rights in internet web sites and internet domain names presently used by Globe, including, without limitation, globerubberworks.com (collectively ***"Globe Net Names"***).

(b)    <u>Agreements</u>—Schedule 4.22(b) of the Disclosure Schedule contains a complete and accurate list of all Globe Contracts relating to Globe's Intellectual Property Assets to which Globe or Somerville is a party or by which Globe or Somerville is bound. There are no pending or, to the Knowledge of Globe or Somerville, Threatened disputes or disagreements with respect to any such Globe Contracts.

(c)    <u>Ownership</u>

(i)    To the knowledge of Somerville and Globe, Globe is the owner of all right, title, and interest in and to each of Globe's Intellectual Property Assets, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

(ii)    All current employees of Globe who are materially involved in the development of Globe's Intellectual Property have executed written Contracts with Globe that assign to Globe all rights to any inventions, improvements, discoveries, or information relating to the business of Globe.

(d)    <u>Patents</u>

(i)    Schedule 4.22(d) of the Disclosure Schedule contains a complete and accurate list of all Globe Patents.

-27-

(ii)    To the Knowledge of Globe or Somerville, (A) no Globe Patent has been challenged or threatened in any way, and (B) none of the products manufactured and sold, nor any process or know-how used, by Globe infringes or is alleged to infringe any patent or other proprietary right of any other Person.

(e)    <u>Trademarks</u>

(i)    Schedule 4.22(e) of Disclosure Schedule contains a complete and accurate list of all Globe Marks.

(ii)    To the Knowledge of Globe or Somerville, (A) no Globe Mark has been challenged or threatened in any way and (B) none of the Globe Marks used by Globe infringes or is alleged to infringe any trade name, trademark, or service mark of any other Person.

(f)    <u>Copyrights</u>

(i)    Schedule 4.22(f) of the Disclosure Schedule contains a complete and accurate list of all Globe Copyrights.

(ii)    To the Knowledge of Globe or Somerville, (A) no Globe Copyright has been challenged or threatened in any way, and (B) none of the subject matter of any of the Globe Copyrights infringes or is alleged to infringe any copyright of any third party or is a derivative work based on the work of any other Person (other than in respect of the Knowledge or memory of Somerville, which shall be addressed pursuant to Section 8.10).

(g)    <u>Trade Secrets</u>

(i)    With respect to each Globe Trade Secret, the documentation relating to such Globe Trade Secret is current, accurate, and sufficient in detail and content to identify and explain it and to allow its full and proper use without reliance on the knowledge or memory of any individual (other than in respect of the Knowledge or memory of Somerville, which shall be addressed pursuant to Section 8.10).

(ii)    Globe and Somerville have taken reasonable precautions to protect the secrecy, confidentiality, and value of their Globe Trade Secrets.

(h)    <u>Net Names</u>

(i)    Schedule 4.22(h) of the Disclosure Schedule contains a complete and accurate list of all Globe Net Names.

(ii)    All Globe Net Names have been registered in the name of Globe.

-28-

(iii) No Globe Net Name has been or is now involved in any dispute, opposition, invalidation or cancellation Proceeding and, to Globe's or Somerville's Knowledge, no such action is threatened with respect to any Globe Net Name.

## 4.23  RELATIONSHIPS WITH RELATED PERSONS

Neither Globe nor Somerville nor any Related Person of either of them has any interest in any property (whether real, personal, or mixed and whether tangible or intangible) used in or pertaining to Globe's businesses other then Somerville Intellectual Properties and Somerville Goodwill. Neither Globe nor Somerville nor any Related Person of either of them has an equity interest or any other financial or profit interest in a Person that has (i) material business dealings or a material financial interest in any transaction with Globe, or (ii) engaged in competition with Globe with respect to any line of the products or services of Globe (a *"Competing Business"*) in any market presently served by Globe. Except as set forth in Schedule 4.23 of the Disclosure Schedule, neither Globe nor Somerville nor any Related Person of either of them is a party to any Contract with, or has any claim or right against, Globe.

## 4.24  NECESSARY APPROVALS

Globe and Somerville have made all filings required by Legal Requirements to be made by either of them in order to consummate the Contemplated Transactions.

## 4.25  BROKERS OR FINDERS

Neither Globe nor any of its agents have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

## 4.26  CHANGE OF NAME

Simultaneously with the Closing, Globe has amended its Organizational Documents and has made all filings required by Legal Requirements to be made by it in order to change its name to Solar Construction, Inc.

## 4.27  REAL ESTATE RELATED REPRESENTATIONS

(a) Compliance With Laws.  To the best of Globe's and Somerville's Knowledge, and except as set forth on Schedule 4.27 of the Disclosure Schedule, Globe's Facilities are not currently subject to (i) any existing, pending or threatened investigation or inquiry by any governmental authority or (ii) any remedial obligations under any Legal Requirement.    Neither Globe nor Somerville nor either of their Representatives have received any notice from any municipal, state, federal or other governmental authority of any violation of any Legal Requirement issued in respect of Globe's Facilities which has not been heretofore corrected, and to their Knowledge no such violation exists.

-29-

(b)     Zoning.  Except as disclosed to KFGI in writing, there are no pending or threatened requests or applications by Globe, or to Globe or Somerville's Knowledge any proceedings brought by any Person to alter or restrict the zoning or other use restrictions applicable to Globe's Facilities.  To the best of Globe's and Somerville's Knowledge, there is no judicial or administrative action or any action by adjacent landowners which would adversely affect, prevent, or limit the use of the Land as currently zoned and platted.

(c)     Taxes.  Globe has paid all property taxes and property assessments due and payable for Globe's Facilities and on the Closing Date Globe's Facilities will be subject to no liens for unpaid taxes or assessments other than the lien for real estate taxes and property assessments for the year in which Closing occurs.  Globe has not retained any person or firm to file a notice of protest against, or to commence any action to review, any real property tax assessment against Globe's Facilities or any portion thereof and, no such action has been taken by or on behalf of Globe.

(d)     Assessments.  There are no unpaid assessments or other charges for utilities, roads (or the widening of roads) or other public improvements against Globe's Facilities and, to the best of Globe's and Somerville's Knowledge, no such assessments have been proposed.  All sewer, water, gas, electric, telephone and drainage lines and facilities required by law for the normal operation of Globe's Facilities are fully installed, currently function satisfactorily and service Globe's Facilities for its current use except as disclosed on Schedule 4.27 of the Disclosure Schedule, and there are no unpaid assessments or charges for the installation of such utilities or for making connection thereto that have not been fully paid.

(e)     Condemnation.  Globe has not received any notice of any condemnation or similar proceedings having been instituted or threatened against Globe's Facilities or any part thereof, nor is any such proceeding threatened or contemplated to Globe's or Somerville's or their respective Representative's knowledge.

(f)     Submission Items.  All items delivered to KFGI under Section 8.15, are to the Knowledge of Globe or Somerville true, correct and complete in all respects.

(g)     Independent Unit.  Globe's Facilities do not rely on any facilities located on any property that is not part of Globe's Facilities to fulfill any municipal or other governmental requirement or to obtain essential systems or services (such as, without limitation, drainage facilities and retention ponds) for which Globe does not have a valid easement.  Likewise, no other building or property that is not part of Globe's Facilities relies on, to the Knowledge of Globe or Somerville, Globe's Facilities or its facilities to fulfill any municipal or other governmental requirement or to obtain essential systems or services without having a valid easement for same.

-30-

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF KFGI

The Disclosure Schedule is divided into schedules which are numbered to correspond to sections of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, any matter which is disclosed by KFGI in any particular schedule of the Disclosure Schedule, or Exhibits thereto, relating to this ARTICLE 5 shall be deemed to be disclosed in respect of all sections of this ARTICLE 5 to which such disclosure may relate and to qualify all of the representations and warranties of KFGI contained in this Agreement that are relevant thereto. Subject to the qualifications, exclusions, limitations and disclosures set forth in the Disclosure Schedule in regard to this ARTICLE 5, KFGI represents and warrants to Globe and Somerville as follows:

5.1    ORGANIZATION AND GOOD STANDING

(a)    KFGI is a limited partnership duly organized and validly existing in good standing under the laws of the State of Texas, with full power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under the KFGI Contracts. KFGI is duly qualified to do business as a foreign limited partnership and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

(b)    KFGI has delivered to Globe and Somerville copies of the Organizational Documents of KFGI, as currently in effect.

5.2    AUTHORITY; NO CONFLICT

(a)    This Agreement constitutes the legal, valid, and binding obligation of KFGI, enforceable against KFGI in accordance with its terms. Upon the execution and delivery by KFGI of the Employment Agreement, the Deferral Promissory Note, the KFGI Promissory Note, the Tax Payment Promissory Note, the Escrow Agreement and any other documents that KFGI is required to execute and deliver in connection with or in furtherance of the Contemplated Transactions, (collectively, the *"KFGI's Closing Documents"*), the KFGI's Closing Documents will constitute the legal, valid, and binding obligations of KFGI, enforceable against KFGI in accordance with their respective terms. KFGI has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and the KFGI's Closing Documents and to perform its obligations under this Agreement and the KFGI's Closing Documents.

(b)    Neither the execution and delivery of this Agreement nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time) (i) contravene, conflict with, or result in a material violation or breach of (A) any provision of the Organizational Documents of KFGI, (B) any KFGI Contract ; (C) any Order to which KFGI, or

-31-

any of the assets owned or used by KFGI, may be subject; or (D) any Governmental Authorization that is held by KFGI or that otherwise relates to the business of, or any of the assets owned or used by, KFGI; (ii) cause KFGI to become subject to, or to become liable for the payment of, any Tax; or (iii) result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by KFGI.

### 5.3    CAPITALIZATION

Immediately following Closing, the outstanding partnership interests of KFGI will be owned by its general and limited partners free and clear of all encumbrances. There are no Contracts relating to the issuance, sale, or transfer of any partnership interests or other securities of KFGI . A true and complete copy of the limited partnership agreement of KFGI, as in effect as of the date hereof and identifying all partners, is attached hereto as Schedule 5.3 of the Disclosure Schedule.

### 5.4    FINANCIAL STATEMENTS

(a)    KFGI has delivered to Globe and Somerville:

    (i)    An unaudited balance sheet of KFGI as at December 31, 2003 (*"KFGI's Year-End Balance Sheet"*), and the related statements of income, changes in owners' equity, and cash flow for the fiscal year then ended, and

    (ii)    an unaudited balance sheet of KFGI as at June 30, 2004 (*"KFGI's Interim Balance Sheet"*) and the related unaudited statements of income, changes in owners' equity, and cash flow for the 2 months then ended.

(b)    Such financial statements fairly present the financial condition and the results of operations, changes in stockholders' equity, and cash flow of KFGI as at the respective dates of and for the periods referred to in such financial statements.

### 5.5    BOOKS AND RECORDS

The books of account, minute books, stock record books, and other Records of KFGI, all of which have been made available to Globe and Somerville, are up to date, complete and correct in all material respects and in the possession of KFGI.

### 5.6    TITLE TO PROPERTIES; ENCUMBRANCES

Schedule 5.6(a) of the Disclosure Schedule contains a complete and accurate list of all Real Property, Ground Lease Property, or other interests therein owned by KFGI. KFGI owns all material properties and assets reflected in KFGI's Year-End Balance Sheet and KFGI's Interim Balance Sheet free and clear of all Encumbrances, except as shown on Schedule 5.6(b) of the Disclosure Schedule.

### 5.7    SUFFICIENCY OF ASSETS

The building, plants, structures, and equipment, Intellectual Properties and other tangible and intangible assets of KFGI constitute all of the material assets, tangible and intangible, of any nature whatsoever, necessary for the continued conduct of KFGI's businesses after the Closing in substantially the same manner as conducted prior to the Closing.

### 5.8    ACCOUNTS RECEIVABLE

All accounts receivable of KFGI that are reflected on KFGI's Year-End Balance Sheet or KFGI's Interim Balance Sheet or on the accounting records of KFGI as of the Closing Date represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. There is, to KFGI's Knowledge, no contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, under any Contract with any obligor of an accounts receivable relating to the amount or validity of such accounts receivable. KFGI has delivered to Globe and Somerville a complete and accurate list of all accounts receivable as of the date of KFGI's Interim Balance Sheet, which list sets forth the aging of such accounts receivable.

### 5.9    INVENTORY

All inventory of KFGI reflected in KFGI's Year-End Balance Sheet or KFGI's Interim Balance Sheet, consists of a quality and quantity usable and salable in the Ordinary Course of Business other than such portion of inventory which is either (i) reserved against in KFGI's Year-End Balance Sheet or KFGI's Interim Balance Sheet as potentially unsalable or (ii) does not represent an amount which would have a material adverse effect on the financial condition of KFGI.

### 5.10    NO UNDISCLOSED LIABILITIES

Except as set forth in Schedule 5.10 of the Disclosure Schedule, KFGI has no liabilities or obligations of any material nature which are required to be reflected on KFGI's financial statements (whether known or unknown and whether absolute, accrued, contingent, or otherwise) in order to fairly present its financial condition except for liabilities or obligations reflected in KFGI's Year-End Balance Sheet or KFGI's Interim Balance Sheet and liabilities incurred in the Ordinary Course of Business since the respective dates thereof.

### 5.11    TAXES

(a)    KFGI has filed or caused to be filed (on a timely basis since January 1, 2001) all Tax Returns that are or were required to be filed by or with respect to KFGI, pursuant to applicable Legal Requirements. KFGI has delivered to Globe and Somerville copies of all such Tax Returns. KFGI has paid all Taxes that have or may have become due pursuant to those Tax Returns, except such Taxes, if any, as are being contested in good faith.

(b)    All Tax Returns filed by KFGI are true, correct, and complete in all material respects.

## 5.12    NO MATERIAL ADVERSE CHANGE

Since the date of KFGI's Year-End Balance Sheet, there has not been any material adverse change in the business, operations, properties, prospects, assets, or condition of KFGI, and to knowledge of KFGI no event has occurred or circumstance exists that may be reasonably foreseen by a prudent person as likely to result in such a material adverse change.

## 5.13    EMPLOYEE BENEFITS

(a)    As used in this Section 5.13, *"KFGI Plan"* means all Plans of which KFGI is or was the Plan Sponsor, or to which KFGI otherwise contributes or has contributed, or in which KFGI otherwise participates or has participated. All references to Plans are to KFGI Plans unless the context requires otherwise.

(b)    Schedule 5.13(b) of the Disclosure Schedule contains a complete and accurate list of all KFGI Plans

(c)    KFGI has delivered to Globe and Somerville (i) all material documents that set forth the terms of the KFGI Plans, (ii) all personnel, payroll, and employment manuals and policies; and (iii) all insurance policies purchased by or to provide benefits under the KFGI Plan and presently in effect.

(d)    Except as set forth in Schedule 5.13(d) of the Disclosure Schedule:

   (i)    KFGI has performed, in all material respects, all of its obligations under all KFGI Plans. KFGI has made appropriate entries in its financial records and statements for all obligations and liabilities under such Plans that have accrued but are not due.

   (ii)    KFGI, with respect to all KFGI Plans is in full compliance, in all material respects, with ERISA, the IRC, and other applicable Laws.

   (iii)    No accumulated funding deficiency, whether or not waived, exists with respect to any KFGI Plan.

   (iv)    KFGI has no Knowledge of any facts or circumstances that may give rise to any liability of KFGI, Globe, or Somerville to the PBGC under Title IV of ERISA.

   (v)    The consummation of the Contemplated Transactions will not result in the payment, vesting, or acceleration of any benefit under any KFGI Plan.

**5.14    COMPLIANCE    WITH    LEGAL    REQUIREMENTS    AND    GOVERNMENTAL
AUTHORIZATIONS**

Except as set forth in Schedule 5.14 of the Disclosure Schedule, (i) to KFGI's
knowledge, KFGI is in full compliance, in all material respects, with each Legal
Requirement and Governmental Authorization that is applicable to it or to the conduct or
operation of its business or the ownership or use of any of its assets; (ii) to KFGI's
knowledge, no event has occurred or circumstance exists that (with or without notice or
lapse of time) may constitute or result in a material violation by KFGI of, or a material
failure on the part of KFGI to comply with, any Legal Requirement or Governmental
Authorization, (iii) KFGI has not received any notice or other communication (whether
oral or written) from any Governmental Body or any other Person regarding any actual,
alleged, possible, or potential violation of, or failure to comply with, any Legal
Requirement or Governmental Authorization,

**5.15    LEGAL PROCEEDINGS; ORDERS**

(a)     Except as set forth in Schedule 5.15(a) of the Disclosure Schedule, there is no
Proceeding pending or, to KFGI's Knowledge, Threatened against KFGI (i) that
relates to or may materially affect the business of, or any of the assets owned or
used by, KFGI; or (ii) that challenges, or that may have the effect of preventing,
delaying, making illegal, or otherwise interfering with, any of the Contemplated
Transactions.

(b)     Except as set forth in Schedule 5.15(b) of the Disclosure Schedule, there is no
Order having specific reference to KFGI to which KFGI, or any of the assets
owned or used by KFGI, is subject.

**5.16    ABSENCE OF CERTAIN CHANGES AND EVENTS**

Except as set forth in Schedule 5.16 of the Disclosure Schedule, since the date of KFGI's
Year-End Balance Sheet, KFGI has conducted its businesses only in the Ordinary Course
of Business and there has not been any (i) change in KFGI's authorized or issued
partnership interests; grant of any option or right to purchase partnership interests of
KFGI; issuance of any security convertible into such partnership interests; grant of any
registration rights; purchase, redemption, retirement, or other acquisition by KFGI of any
such partnership interests; or declaration or payment of any distribution or payment in
respect of the partnership interests; (ii) amendment to the Organizational Documents of
KFGI; (iii) payment or increase by KFGI of any bonuses, salaries, or other compensation
to any stockholder, director, officer, or employee or entry into any employment,
severance, or similar Contract with any director, officer, or employee (except in the
Ordinary Course of Business); (iv) damage to or destruction or loss of any asset or
property of KFGI, whether or not covered by insurance, materially and adversely
affecting the properties, assets, business, financial condition, or prospects of KFGI, taken
as a whole; (v) sale (other than sales of inventory in the Ordinary Course of Business),
lease, or other disposition (other than dispositions in the Ordinary Course of Business of

assets no longer needed or useful in the business which have become obsolete, depleted or worn out) of any asset or property of KFGI or mortgage, pledge, or imposition of any lien or other encumbrance on any material asset or property of KFGI; (vi) transaction between KFGI and any stockholder, officer or director of KFGI or any Related Person of any of them of an amount in excess of $10,000; or (vii) agreement, whether oral or written, by KFGI to do any of the foregoing.

**5.17    CONTRACTS; NO DEFAULTS**

(a)    Schedule 5.17(a) of the Disclosure Schedule contains a complete and accurate list, and KFGI has delivered to Globe and Somerville true and complete copies, of (i) each executory KFGI Contract that involves the performance of services or delivery of goods or materials by or to KFGI of an amount or value in excess of $10,000; (ii) each executory licensing agreement or other KFGI Contract with respect to patents, trademarks, copyrights, or other intellectual property, including agreements with current or former employees, consultants, or contractors regarding the appropriation or the non-disclosure of any of KFGI's Intellectual Property Assets; (iii) each executory KFGI Contract that commits KFGI to make a capital expenditure, or incur a liability, either direct or contingent, in excess of $10,000; and (iv) each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

(b)    To KFGI's Knowledge, each Contract identified in Schedule 5.17(a) of the Disclosure Schedule is in full force and effect and is valid and enforceable in accordance with its terms.

(c)    Except as set forth in Schedule 5.17(c) of the Disclosure Schedule (i) KFGI is in full compliance with all material terms and requirements of each material KFGI Contract; (ii) no event has occurred that gives KFGI or any other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any material KFGI Contract; and (iii) KFGI has not given to or received from any other Person any notice or other communication (whether oral or written) regarding any actual, alleged, possible, or potential violation or breach of, or default under, any material KFGI Contract.

**5.18    INSURANCE**

KFGI has delivered to Globe and Somerville a true and complete list of all policies of insurance to which KFGI is a party or under which KFGI, or any director of KFGI, is or has been covered at any time since January 1, 2003.

**5.19    ENVIRONMENTAL MATTERS**

Except as set forth in Schedule 5.19 of the Disclosure Schedule:

-36-

(a) KFGI is in full compliance, in all material respects, with all applicable Environmental Laws.

(b) There are no pending or, to the Knowledge of KFGI, Threatened claims, Encumbrances, or other restrictions of any nature, resulting from any Environmental, Health, and Safety Liabilities or arising under or pursuant to any Environmental Law (during KFGI's ownership), with respect to or affecting any of KFGI's Facilities or any other properties and assets (whether real, personal, or mixed) in which KFGI has an interest.

(c) KFGI does not have Knowledge of, nor has KFGI received, any citation, directive, inquiry, notice, Order, summons, warning, or other communication that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities (during KFGI's ownership) with respect to any of KFGI's Facilities or any other properties or assets (whether real, personal, or mixed) in which KFGI has an interest.

(d) KFGI is not aware of there being any Hazardous Materials present on or in the Environment at KFGI's Facilities except for such materials used in the Ordinary Course of Business and in compliance with law. KFGI has not (during KFGI's ownership) conducted, or permitted to be conducted, any Hazardous Activity at KFGI's Facilities or any other properties or assets (whether real, personal, or mixed) in which KFGI has an interest, except in full compliance with all applicable Environmental Laws.

(e) KFGI has delivered to Globe and Somerville true and complete copies of any reports, studies, analyses, tests, or monitoring possessed or initiated since 1999 by KFGI pertaining to Hazardous Materials or Hazardous Activities in, on, or under KFGI's Facilities, or concerning compliance by KFGI.

**5.20    EMPLOYEES**

(a) Schedule 5.20 of the Disclosure Schedule contains a complete and accurate list of each employee of KFGI. With respect to each employee, KFGI has delivered to Globe and Somerville each employee's job title; current compensation; accrued vacation; and service credited for purposes of vesting and eligibility to participate under KFGI's employee benefit plans.

(b) To KFGI's Knowledge, no director, officer, or other key employee of KFGI intends to terminate his employment with KFGI.

**5.21    LABOR RELATIONS; COMPLIANCE**

KFGI is not a party to any collective bargaining or other labor Contract.

## 5.22   INTELLECTUAL PROPERTY

(a)   Intellectual Property Assets—The term *"KFGI's Intellectual Property Assets"* means all of the intellectual property owned, used and/or licensed by KFGI that relates to KFGI and its business, including:

     (i)   the name "Kalm-Forsythe Global Innovations, Ltd.," "KFGI" and all fictional business names, trading names, registered and unregistered trademarks, service marks, and applications (collectively, *"KFGI Marks"*);

     (ii)   all patents, patent applications, and inventions and discoveries that may be patentable (collectively, *"KFGI Patents"*);

     (iii)   all copyrights in both published works and unpublished works (collectively, *"KFGI Copyrights"*);

     (iv)   all rights in mask works (collectively, *"KFGI Rights in Mask Works"*); and

     (v)   all know-how, trade secrets, confidential information, customer lists, software, technical information, data, process technology, plans, drawings, and blue prints (collectively, *"KFGI Trade Secrets"*).

(b)   Agreements—Schedule 5.22(b) of the Disclosure Schedule contains a complete and accurate list of all KFGI Contracts relating to KFGI's Intellectual Property Assets to which KFGI is a party or by which KFGI is bound. There are no pending or, to KFGI's Knowledge, Threatened disputes or disagreements with respect to any such KFGI Contracts.

(c)   Ownership

     (i)   KFGI is the owner of all right, title, and interest in and to each of KFGI's Intellectual Property Assets, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

     (ii)   All current employees of KFGI have executed written Contracts with KFGI that assign to KFGI all rights to any inventions, improvements, discoveries, or information relating to the business of KFGI.

(d)   Patents

     (i)   Schedule 5.22(d) of the Disclosure Schedule contains a complete and accurate list of all KFGI Patents.

     (ii)   To KFGI's Knowledge, (A) no KFGI Patent has been challenged or threatened in any way, and (B) none of the products manufactured and

-38-

sold, nor any process or know-how used, by KFGI infringes or is alleged to infringe any patent or other proprietary right of any other Person.

(e)   Trademarks

(i)   Schedule 5.22(e) of Disclosure Schedule contains a complete and accurate list of all KFGI Marks.

(ii)   To KFGI's Knowledge, (A) no KFGI Mark has been challenged or threatened in any way and (B) none of the KFGI Marks used by KFGI infringes or is alleged to infringe any trade name, trademark, or service mark of any other Person.

(f)   Copyrights

(i)   Schedule 5.22(f) of the Disclosure Schedule contains a complete and accurate list of all KFGI Copyrights.

(ii)   To KFGI's Knowledge, (A) no KFGI Copyright has been challenged or threatened in any way, and (B) none of the subject matter of any of the KFGI Copyrights infringes or is alleged to infringe any copyright of any third party or is a derivative work based on the work of any other Person.

(g)   Trade Secrets

(i)   With respect to each KFGI Trade Secret, the documentation relating to such KFGI Trade Secret is current, accurate, and sufficient in detail and content to identify and explain it and to allow its full and proper use without reliance on the knowledge or memory of any individual.

(ii)   KFGI has taken reasonable precautions to protect the secrecy, confidentiality, and value of the KFGI Trade Secrets.

**5.23   RELATIONSHIPS WITH RELATED PERSONS**

Neither KFGI nor any Related Person of KFGI has any interest in any property (whether real, personal, or mixed and whether tangible or intangible) used in or pertaining to KFGI's businesses. Neither KFGI nor any Related Person of KFGI has an equity interest or any other financial or profit interest in a Person that has (i) material business dealings or a material financial interest in any transaction with KFGI, or (ii) engaged in competition with KFGI with respect to any line of products or services of KFGI (a *"Competing Business"*) in any market presently served by KFGI. Except as set forth in Schedule 5.23 of the Disclosure Schedule, neither KFGI nor any Related Person of KFGI is a party to any Contract with, or has any claim or right against, KFGI.

**5.24 NECESSARY APPROVALS**

KFGI has made all filings required by Legal Requirements to be made by it in order to consummate the Contemplated Transactions.

**5.25 BROKERS OR FINDERS**

KFGI and its agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

## ARTICLE 6
## TERMINATION

**6.1 TERMINATION EVENTS**

This Agreement may be terminated:

(a) by either KFGI, on the one hand, or Globe or Somerville, on the other hand, if a material Breach of any provision of this Agreement has been committed by the other party and such Breach has not been waived; or

(b) by mutual consent of the parties hereto.

**6.2 EFFECT OF TERMINATION**

Each party's right of termination under Section 6.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 6.1, all further obligations of the parties under this Agreement will terminate, except that the obligations in this Section 6.2 and ARTICLE 9 and ARTICLE 10 will survive; *provided, however*, that if this Agreement is terminated by a party because of the Breach of the Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

## ARTICLE 7
## INDEMNIFICATION; REMEDIES

**7.1 SURVIVAL; RIGHT TO INDEMNIFICATION NOT AFFECTED BY KNOWLEDGE**

All representations, warranties, covenants, and obligations in this Agreement, the Disclosure Schedule and any certificates or documents delivered pursuant to this Agreement will survive the Closing as and to the extent provided herein. The right to indemnification, payment of Damages or other remedy based on such representations, warranties, covenants, and obligations will not be affected by any investigation

conducted with respect to, or any Knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, payment of Damages, or other remedy based on such representations, warranties, covenants, and obligations.

## 7.2    INDEMNIFICATION AND PAYMENT OF DAMAGES BY GLOBE OR SOMERVILLE

Subject to the limitations contained in this ARTICLE 7, Globe and Somerville, jointly and severally, will indemnify and hold harmless KFGI and its general partner, KalFor Solutions Group, LLC, (collectively, the *"KFGI Indemnitees"*) for, and will pay to the KFGI Indemnitees the amount of, any loss, liability, claim, damage (excluding incidental and consequential damages), or expense (including costs of investigation and defense and reasonable attorneys' fees), whether or not involving a third-party claim (collectively, *"Damages"*), arising, directly or indirectly, from or in connection with (a) any Breach of any representation or warranty made by Globe or Somerville in this Agreement, the Disclosure Schedule, or any certificates delivered by Globe or Somerville pursuant to this Agreement; or (b) any Breach by Globe or Somerville of any covenant or obligation of Globe or Somerville in this Agreement, the Disclosure Schedule, or any certificates delivered by Globe or Somerville pursuant to this Agreement; or (c) the issuance of unauthorized capital stock by Globe to the Globe Rubber Works, Inc. Profit Sharing 401(k) Plan for the benefit of the account of Somerville (d) any product shipped or manufactured by, or any services provided by, Globe prior to the Effective Date except to the extent the responsibility therefor is assumed by KFGI per Section 2.5(a) hereof.

## 7.3    INDEMNIFICATION AND PAYMENT OF DAMAGES BY KFGI

Subject to the limitations contained in this ARTICLE 7, KFGI and its affiliated entities will indemnify and hold harmless Globe and Somerville (collectively, the *"Globe Indemnitees"*) for, and will pay to the Globe Indemnitees the amount of, any Damages arising, directly or indirectly, from or in connection with (a) any Breach of any representation or warranty made by KFGI in this Agreement, the Disclosure Schedule, or any certificates delivered by KFGI pursuant to this Agreement; or (b) any Breach by KFGI of any covenant or obligation of KFGI in this Agreement, the Disclosure Schedule, or any certificates delivered by KFGI pursuant to this Agreement; or (c) the conduct of the business from and after the Effective Date, or (d) any challenge by the IRS or the Massachusetts Department of Revenue (DOR) regarding the relative dollar amounts allocated hereunder to the Globe Assets Purchase Price, the Somerville Goodwill Purchase Price or the Somerville Intellectual Property Purchase Price or any challenge by the IRS or the DOR to the valuations used in determining such allocations, or any disallowance of or curtailment of same, or any re-allocation of the amounts thereof or any restructuring or reclassification of such purchase prices, and any additional taxes, penalties, or interest charged to or payable by Globe or Somerville incident thereto, and all costs of defense of any audit or resulting Proceeding (including with out limitations

-41-

reasonable attorney fees, accounting fees, and costs of appraisers and expert witnesses and the like) (the *"Tax Structure Indemnity"*).

## 7.4    TIME LIMITATIONS

Neither Globe and Somerville, on the one hand, nor KFGI, on the other hand, will have any liability (for indemnification or otherwise) with respect to any representation or warranty other than those in Sections 4.6, 4.11 and 4.25 (in the case of Globe or Somerville) and Sections 5.6, 5.11 and 5.25 (in the case of KFGI) unless on or before the first anniversary date of the Closing, KFGI, on the one hand, or Globe or Somerville, on the other hand, as the case may be, notifies the other party of a claim specifying the factual basis of that claim in reasonable detail to the extent then known by the party asserting the claim for indemnification hereunder. A claim with respect to Sections 4.6, 4.11 and 4.25 (in the case of the Globe and Somerville) and Sections 5.6, 5.11 and 5.25 (in the case of KFGI), or a claim for indemnification or reimbursement in respect thereof must be asserted within 2 years of Closing. Any claim for indemnification not timely submitted in accordance with the requirements of this Agreement and the time frames of this Section shall be barred and deemed waived, excepting only claims for breach of Somerville's representations under Sections 4.6 or Somerville's obligations under Section 8.1 and KFGI's representations under Section 5.6 or KFGI's obligations under Section 7.3(d) in respect of the Tax Structure Indemnity, or KFGI's obligations under Section 8.8, which excepted claims may be brought at any time.

## 7.5    LIMITATIONS ON AMOUNT

Neither Globe and Somerville, on the one hand, nor KFGI, on the other hand, will have any liability (for indemnification or otherwise) under Sections 7.2 and 7.3 until the total of all Damages with respect to such matters exceeds One Hundred Thousand Dollars $100,000.00, and then only for the total amount of all Damages in excess of Twenty-Five Thousand Dollars ($25,000). However, the limitations imposed by this Section 7.5 will not apply to (i) any Breach of any of representations and warranties of either party of which the maker had actual knowledge at the time such representation and warranty was made, (ii) any breach of Section 8.1 by either Globe or Somerville, (iii) KFGI's obligations in respect of Globe Assumed Liabilities or the KFGI Equity Interest and its other obligations under ARTICLE 3, (iv) KFGI's obligations in respect of the Tax Structure Indemnity, or (v) KFGI's obligations under Section 8.8. In no event will any party hereto be liable for Damages of any nature on any one or more claims under Section 7.2 or 7.3, which in the aggregate exceed one-half (1/2) of the aggregate sum of the Globe Assets Purchase Price, the Somerville Intellectual Property Purchase Price and the Somerville Goodwill Purchase Price.

## 7.6    RIGHT OF SET-OFF

Upon notice by either Globe or Somerville, on the one hand, or KFGI, on the other hand, as the case may be, to the other party specifying in reasonable detail the basis for a claim for indemnification hereunder, the party asserting the claim for indemnification may set-

-42-

off any amount to which it may be entitled under this ARTICLE 7 against amounts otherwise payable hereunder to the other party. The exercise of such right of set-off by either party in good faith, if ultimately determined to be justified, will not constitute an event of default hereunder. Neither the exercise of nor the failure to exercise such right of set-off will constitute an election of remedies or limit in any manner the enforcement of any other remedies that either party may have available to it.

**7.7   EXCLUSIVE REMEDY**

Each party agrees that the indemnification provisions of this Article 7 shall be the sole and exclusive remedy for Damages incurred by a party hereto arising out of claims for breach of warranties, representations or covenants contained in this Agreement.

**ARTICLE 8**
**ADDITIONAL COVENANTS**

**8.1   NONCOMPETITION, NONSOLICITATION AND NONDISPARAGEMENT**

(a)   Noncompetition. For a period of five (5) years after the Closing Date, neither Globe nor Somerville shall, anywhere Globe presently conducts its business, directly or indirectly invest in, own, manage, operate, finance, control, advise, render services to or guarantee the obligations of any Person engaged in or planning to become engaged in a Competing Business; *provided, however,* that Globe or Somerville may purchase or otherwise acquire up to (but not more than) one percent (1%) of any class of the securities of any Person (but may not otherwise participate in the activities of such Person) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities and Exchange Act of 1934, as amended.

(b)   Nonsolicitation. For a period of five (5) years after the Closing Date, neither Globe nor Somerville shall, directly or indirectly:

(i)   solicit the business of any Person who is a customer of Globe for or in respect of any Competing Business;

(i)   solicit the business of any Person who is a customer of KFGI for or in respect of any Competing Business;

(ii)   cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of KFGI to cease doing business with KFGI, to deal with any competitor of KFGI or in any way interfere with its relationship with KFGI;

(iii)   cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of Globe on the Closing Date or within the year preceding the

Closing Date to cease doing business with KFGI, to deal with any competitor of KFGI or in any way interfere with its relationship with KFGI; or

(iv)     hire, retain or attempt to hire or retain any employee or independent contractor of KFGI or in any way interfere with the relationship between KFGI and any of its employees or independent contractors.

(c)     <u>Nondisparagement.</u> After the date hereof, no party hereto shall disparage any other party hereto or his or its affiliates, partners, officers, employees or agents.

(d)     <u>Modification of Covenant.</u> If a final judgment of a court or tribunal of competent jurisdiction determines that any term or provision contained in Section 8.1(a) through (c) is invalid or unenforceable, then the parties agree that the court or tribunal will have the power to reduce the scope, duration or geographic area of the term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. At the court's discretion, this Section 8.1 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed. This Section 8.1 is reasonable and necessary to protect and preserve KFGI's legitimate business interests and the value of the Globe Assets, the Somerville Intellectual Property and the Somerville Goodwill and to prevent any unfair advantage conferred on Globe or Somerville.

(e)     In the event that (i) KFGI shall fail, after notice and the expiration of any applicable cure period, to make timely and complete payment of the KFGI Promissory Note, or (ii) Somerville's employment with KFGI under the Employment Agreement shall be terminated by KFGI or Somerville and, in either case, KFGI shall not make the resulting payments due to Somerville under the Employment Agreement, then Somerville shall be automatically freed and relieved of the obligations under this Section 8.1.

**8.2     PAYMENT OF ALL TAXES RESULTING FROM SALE OF GLOBE ASSETS BY GLOBE**

Globe and KFGI shall each pay in a timely manner all Taxes assessed on it by an Taxing Authority resulting from or payable in connection with the sale of the Globe Assets pursuant to this Agreement. Notwithstanding the foregoing, this Section 8.2 this shall not impair or diminish, in any way, KFGI's indemnity obligations in respect of the Tax Structure Indemnity under Section 7.3.

**8.3     PAYMENT OF LIABILITIES**

In addition to payment of Taxes pursuant to Section 8.2, each party shall pay, or make adequate provision for the payment, in full all of the Liabilities as assumed or retained under this Agreement.

-44-

## 8.4    RESTRICTIONS ON GLOBE DISSOLUTION AND DISTRIBUTIONS

Globe shall not dissolve, or make any distribution of the proceeds received pursuant to this Agreement to its Shareholders, without having first made reasonable provision for the payment of, or reserves for, all of its liabilities.

## 8.5    REMOVING EXCLUDED GLOBE ASSETS

Within ninety (90) days following the Closing Date, KFGI shall present to Globe and Somerville a list of Excluded Globe Assets to be removed from Globe's Facilities, which Excluded Globe Assets must have been located on the Globe Real Property and outside of the main manufacturing facility as of the Closing Date.    Within sixty (60) days following the receipt of such list from KFGI, Globe shall remove at its expense all Excluded Globe Assets detailed on the list from all of Globe's Facilities; provided, however, that Globe shall be entitled to reasonable additional time to remove the listed assets if weather conditions hinder, delay or otherwise temporarily prevent such removal. Such removal shall be done in such manner as to avoid any damage to Globe's Facilities and any disruption of the business operations to be conducted by KFGI after the Closing. Any damage to the Globe Assets or to the Facilities resulting from such removal shall be promptly paid by Globe. Should Globe fail to remove the Excluded Globe Assets as required by this Section 8.5, KFGI shall have the right, but not the obligation, (a) to remove the Excluded Globe Assets at Globe's sole cost and expense; (b) to store the Excluded Globe Assets and to charge Globe all storage costs associated therewith; (c) to treat the Excluded Globe Assets as unclaimed and to proceed to dispose of the same under the laws governing unclaimed property; or (d) to exercise any other right or remedy conferred by this Agreement or otherwise available at law or in equity. Globe shall promptly reimburse KFGI for all costs and expenses incurred by KFGI in connection with any Excluded Globe Assets not removed by Globe on or before the Closing Date.

## 8.6    REPORTS AND RETURNS

The parties hereto shall cooperate after the Closing in preparing and filing all reports and returns required by Legal Requirements relating to the business of Globe as conducted using the Globe Assets, the Somerville Intellectual Property and the Somerville Goodwill.

## 8.7    ASSISTANCE IN PROCEEDINGS

Globe will cooperate with KFGI and its counsel in the contest or defense of, and make available its personnel and provide any testimony and access to its books and Records in connection with, any Proceeding involving or relating to (a) any Contemplated Transaction or (b) any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction on or before the Closing Date involving Globe or its business or Somerville. KFGI will cooperate with Globe and Somerville and their respective counsel in the contest or defense of, and make available its personnel and provide any testimony and access to its books and Records in connection with, any Proceeding involving or relating to (a) any

-45-

Contemplated Transaction or (b) any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction on or before the Closing Date involving Globe, or its business or Somerville.

## 8.8    ADDITIONAL PAYMENT

In the event that KFGI, within three (3) years following the Effective Date, sells, conveys or transfers to any Third Party (excluding a Third Party that is and remains a corporation, partnership or limited liability company owned or controlled by KFGI) (i) Globe's "marine division" (being that segment of Globe's business that pertains principally to the manufacture, sale and/or repair or refurbishment of impellers and drive savers), (ii) any other integrated business unit of Globe (such as, by way of example, the square wheel technology, postal business, material handling, aerospace or oilfield operations), or (iii) any Globe Assets other than in the Ordinary Course Business for a sum of money in excess of $500,000 in the aggregate, then KFGI shall pay to Somerville an amount equal to 7% of the net proceeds received by KFGI for such sale (calculated by subtracting from the aggregate sales price, including without limitations royalties payable, promissory notes, installment obligations, or other consideration paid or payable by such Third Party, the amount of any liabilities retained by KFGI and reasonably related and fairly allocated to the assets sold. KFGI shall pay to Somerville such portion of the amounts as are received by it to which Somerville is entitled to hereunder within ten (10) days of KFGI's receipt of the final sales proceeds, i.e., after any post closing accounting or other verification procedures between KFGI and the buyer are concluded, but in any event no later than ninety (90) days after the closing of the subject transaction. KFGI's obligations pursuant to this Section 8.8 shall not apply to any sales, conveyances or transfers of (i) any assets sold in the Ordinary Course of Business of KFGI, (ii) the real estate owned by Globe in Rockland, Massachusetts, (iii) assets incident to the dissolution and liquidation of KFGI, or (iv) resulting from the change of control, merger, conversion or consolidation of KFGI as a going concern with or into a Third Party or from KFGI's participation in, and contribution of assets to, any joint venture, partnership or other arrangement (provided that same is not adopted to circumvent the provisions of this Section 8.8).

## 8.9    USE OF NAME

Following the Closing Date, neither Globe nor Somerville shall use the names "Globe Rubber Works, Inc.," "Globe Rubber Works," "Globe Rubber," "Globe" or "GRW," whether individually or in combination, in connection with the operation of any business enterprise (other than in fulfilling Globe's and Somerville's respective obligations under the Employment Agreement).

## 8.10    DOCUMENTATION OF SOMERVILLE INTELLECTUAL PROPERTY

Globe and Somerville shall prepare written documentation of all Globe Intellectual Property and Somerville Intellectual Property, respectively, which, in the opinion of KFGI, has not been properly documented in written format, and Globe and Somerville

-46-

shall cooperate with KFGI in obtaining such Government Authorizations as KFGI, in its sole discretion, deems necessary.

### 8.11    CUSTOMER AND OTHER BUSINESS RELATIONSHIPS

After the Closing, Globe and Somerville will cooperate with KFGI at KFGI's expense in its efforts to continue and maintain for the benefit of KFGI those business relationships of Globe existing prior to the Closing and relating to the business to be operated by KFGI after the Closing, including relationships with lessors, employees, regulatory authorities, licensors, customers, suppliers and others, and Globe will satisfy the Retained Globe Liabilities in a manner that is not detrimental to any of such relationships subject to Globe having the right to contest same in good faith. Globe and Somerville will refer to KFGI all inquiries relating to such business. Neither Globe nor any of its officers, employees, agents or shareholders shall take any action that would tend to diminish the value of the Globe Assets, Somerville Intellectual Property or Somerville Goodwill after the Closing or that would interfere with the business of KFGI to be engaged in after the Closing, including disparaging the name or business of KFGI.

### 8.12    RETENTION OF AND ACCESS TO RECORDS

After the Closing Date, KFGI shall retain for a period consistent with KFGI's record-retention policies and practices those Records of Globe delivered to KFGI. KFGI also shall provide Globe and Somerville and their Representatives reasonable access thereto, during normal business hours and on at least three days' prior written notice, to enable them to prepare financial statements or tax returns or deal with tax audits or for any other reasonable business purpose, for example, but not in limitation, in order to conduct any Proceeding in which Globe or Somerville may be involved.  After the Closing Date, Globe and Somerville shall provide KFGI and its Representatives reasonable access to Records that are Excluded Globe Assets, during normal business hours and on at least three days' prior written notice, for any reasonable business purpose specified by KFGI in such notice.

### 8.13    SECURITY CLEARANCE

Globe and Somerville shall cooperate with KFGI and its executive officers to obtain, on behalf of KFGI and any of its executive officers, from the Department of Defense, the Defense Security Service, or any other Governmental Body the necessary level of security clearance required to negotiate and transact business with the Department of Defense and to otherwise conduct the business of Globe as presently conducted.

### 8.14    FURTHER ASSURANCES

The parties shall cooperate reasonably with each other and with their respective Representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and shall (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and (c) do such other acts and things, all as the other party may reasonably

request for the purpose of carrying out the intent of this Agreement and the Contemplated Transactions.

### 8.15    REAL ESTATE DILIGENCE

KFGI has been permitted to make any physical inspections and conduct any and all investigations of Globe's Facilities as deemed necessary by KFGI. Globe and its Representatives have made available to KFGI and its Representatives all applicable books and records relating to Globe's Facilities and the ownership, operation, use and maintenance of Globe's Facilities.

### 8.16    EXISTING NON-COMPETITION AGREEMENTS

Globe agrees that at any time following the Closing Date it will not seek to enforce any of its rights under any existing non-competition agreements executed by any employees, consultants, contractors, Representatives, customers, vendors or other Persons in its favor and relating to the operation of the business utilizing the Globe Assets, Somerville Intellectual Property or Somerville Goodwill.

### 8.17    SEWER LINE INSTALLATION

Somerville agrees to pay for the remedial costs of ensuring that the sewage and wastewater systems at Globe's Facilities comply with the requirements of Title V of the Code of Massachusetts Regulations (310 CMR Sec 15, et seq.), including the connection of all sewage systems at Globe's Facilities to the main city sewer line and shall deposit $25,000 into escrow to cover the costs of such remedial measures.

### 8.18    IN-KIND SETTLEMENT PROCEEDS

Somerville and Globe agree to pay to KFGI, without additional consideration, any settlement or judgment proceeds received in connection with the Crompton matter that are delivered in the form of in-kind property related to trade discounts or credits. The parties acknowledge that Globe is not under any obligation to seek such in-kind property related to trade discounts or credits as part of any settlement, and Globe is authorized to bargain for, and to retain for itself, any cash or other settlement proceeds.

## ARTICLE 9
## CONFIDENTIALITY

### 9.1    DEFINITION OF CONFIDENTIAL INFORMATION

(a)    As used in this ARTICLE 9, the term *"Confidential Information"* includes any and all of the following information of KFGI, Globe or Somerville that has been or may hereafter be disclosed in any form, whether in writing, orally, electronically or otherwise, or otherwise made available by observation, inspection or otherwise by either party (KFGI on the one hand or Globe and Somerville, collectively, on the other hand) or its Representatives (collectively, a

-48-

*"Disclosing Party"*) to the other party or its Representatives (collectively, a *"Receiving Party"*):

(i) all information that is a trade secret under applicable trade secret or other law;

(ii) all information concerning product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer hardware, Software and computer software and database technologies, systems, structures and architectures;

(iii) all information concerning the business and affairs of the Disclosing Party (which includes historical and current financial statements, financial projections and budgets, tax returns and accountants' materials, historical, current and projected sales, capital spending budgets and plans, business plans, strategic plans, marketing and advertising plans, publications, client and customer lists and files, contracts, the names and backgrounds of key personnel and personnel training techniques and materials, however documented), and all information obtained from review of the Disclosing Party's documents or property or discussions with the Disclosing Party regardless of the form of the communication; and

(iv) all notes, analyses, compilations, studies, summaries and other material prepared by the Receiving Party to the extent containing or based, in whole or in part, upon any information included in the foregoing.

(b) Any trade secrets of a Disclosing Party shall also be entitled to all of the protections and benefits under applicable trade secret law and any other applicable law. If any information that a Disclosing Party deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret for purposes of this ARTICLE 9, such information shall still be considered Confidential Information of that Disclosing Party for purposes of this ARTICLE 9 to the extent included within the definition. In the case of trade secrets, each of KFGI, Globe and Somerville hereby waives any requirement that the other party submit proof of the economic value of any trade secret or post a bond or other security.

## 9.2    RESTRICTED USE OF CONFIDENTIAL INFORMATION

(a) Each Receiving Party acknowledges the confidential and proprietary nature of the Confidential Information of the Disclosing Party and agrees that such Confidential Information (i) shall be kept confidential by the Receiving Party; (ii) shall not be used for any reason or purpose other than to evaluate and

-49-

consummate the Contemplated Transactions; and (iii) without limiting the foregoing, shall not be disclosed by the Receiving Party to any Person, except in each case as otherwise expressly permitted by the terms of this Agreement or with the prior written consent of an authorized representative of Globe or Somerville with respect to Confidential Information of Globe or Somerville (each, a *"Globe Contact"*) or an authorized representative of KFGI with respect to Confidential Information of KFGI (each, a *"KFGI Contact"*). Each of KFGI, Globe and Somerville shall disclose the Confidential Information of the other party only to its Representatives who require such material for the purpose of evaluating the Contemplated Transactions and are informed by KFGI, Globe and Somerville, as the case may be, of the obligations of this ARTICLE 9 with respect to such information. Each of KFGI, Globe and Somerville shall (A) enforce the terms of this ARTICLE 9 as to its respective Representatives; (B) take such action to the extent necessary to cause its Representatives to comply with the terms and conditions of this ARTICLE 9; and (C) be responsible and liable for any breach of the provisions of this ARTICLE 9 by it or its Representatives.

(b)      From and after the Closing, the provisions of Section 9.2(a) above shall not apply to or restrict in any manner KFGI's use of any Confidential Information of Globe or Somerville relating to any of the Globe Assets, the Somerville Intellectual Property the Somerville Goodwill or the Globe Assumed Liabilities.

**9.3     EXCEPTIONS**

Sections 9.2(a) and (b) do not apply to that part of the Confidential Information of a Disclosing Party that a Receiving Party demonstrates (a) was, is or becomes generally available to the public other than as a result of a breach of this ARTICLE 9 by the Receiving Party or its Representatives; (b) was or is developed by the Receiving Party independently of and without reference to any Confidential Information of the Disclosing Party; or (c) was, is or becomes available to the Receiving Party on a nonconfidential basis from a Third Party not bound by a confidentiality agreement or any legal, fiduciary or other obligation restricting disclosure.

**9.4     RETURN OR DESTRUCTION OF CONFIDENTIAL INFORMATION**

If this Agreement is terminated, each Receiving Party shall (a) destroy all Confidential Information of the Disclosing Party prepared or generated by the Receiving Party without retaining a copy of any such material; (b) promptly deliver to the Disclosing Party all other Confidential Information of the Disclosing Party, together with all copies thereof, in the possession, custody or control of the Receiving Party; and (c) certify all such destruction in writing to the Disclosing Party, *provided, however,* that the Receiving Party may retain a list that contains general descriptions of the information it has returned or destroyed to facilitate the resolution of any controversies after the Disclosing Party's Confidential Information is returned.

-50-

## ARTICLE 10
## GENERAL PROVISIONS

### 10.1   EXPENSES

Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fair and reasonable fees and expenses of agents, representatives, counsel, and accountants, except that the legal fees and expenses incurred by Somerville and/or Globe relative to the Contemplated Transactions shall be borne by Globe and provided that to the extent not paid by Globe prior to Closing, such fees and expenses shall be promptly paid at Closing by KFGI and shall be treated as Globe Assumed Liabilities.   In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.

### 10.2   PUBLIC ANNOUNCEMENTS

Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued, if at all, at such time and in such manner as KFGI and Globe or Somerville shall jointly determine.

### 10.3   NOTICES

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may designate by notice to the other parties):

### 10.4   JURISDICTION; SERVICE OF PROCESS

Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement or otherwise relating to the Contemplated Transactions may be brought against any of the parties exclusively (i) in the courts of the State of Massachusetts  or (ii) if it has or can acquire jurisdiction, in the United States District Court for the District of the State of Massachusetts, and each of the parties consents to the sole and exclusive jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding, consents to the jurisdiction of such courts over such matters, and waives any objection to venue laid therein.   Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

Dallas_1\3979467\7
41932-2 7/25/2004

## 10.5   FURTHER ASSURANCES

The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

## 10.6   WAIVER

Except as otherwise provided in ARTICLE 7, the rights and remedies of the parties to this Agreement are cumulative and not alternative. Except as otherwise provided in ARTICLE 7, neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.

## 10.7   ENTIRE AGREEMENT AND MODIFICATION

This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

## 10.8   DISCLOSURE SCHEDULE

(a)     The Disclosure Schedule is expressly incorporated herein and constitutes an integral part of this Agreement for all purposes.

(b)     In the event of any inconsistency between the statements in the body of this Agreement and those in the Disclosure Schedule (other than an exception or exceptions to the representations and warranties of this Agreement expressly set forth in the Disclosure Schedule), the statements in the body of this Agreement will control.

## 10.9   ASSIGNMENTS, SUCCESSORS, AND NO THIRD-PARTY RIGHTS

Neither party may assign any of its rights under this Agreement without the prior consent of the other parties. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties, except that the right to receive indemnification from Globe or Somerville under ARTICLE 7 is personal to KFGI and non-transferable. Except as noted, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

### 10.10  SEVERABILITY

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

### 10.11  SECTION HEADINGS; CONSTRUCTION

The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

### 10.12  TIME OF ESSENCE

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

### 10.13  GOVERNING LAW

This Agreement will be governed by and construed and enforced under the laws of the State of Massachusetts without regard to conflicts of laws principles.

### 10.14  COUNTERPARTS

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement under seal as of the date first written above.

Dallas_1\3979467\7
41932-2 7/25/2004

KFGI:

KALM-FORSYTHE GLOBAL
INNOVATIONS, LTD.

By:     KalFor Solutions Group, LLC,
        General Partner

        By: _____
            (Carl W. Forsythe, President

Address:
10440 N. Central Expressway
Suite 1475
Dallas, Texas  75205
Phone: (214) 373-4562
Fax:    (214) 891-3366


SOMERVILLE:

_____
RICHARD SOMERVILLE

Address:
_344 KEENE ST._
_DUXBURY_
_MA 02332_
Phone: _781-837-9401_
Fax:  _SAME_


GLOBE:

GLOBE RUBBER WORKS, INC.

By: _____
Name: _RICHARD SOMERVILLE_
Title: _Pres_

Address:

Phone:_____
Fax:_____

EXHIBIT 3.3(b)

## FIRST AMENDMENT TO
## REVISED AND AMENDED AGREEMENT
## OF LIMITED PARTNERSHIP OF
## KALM-FORSYTHE GLOBAL INNOVATIONS, LTD.

This First Amendment to the Revised and Amended Agreement of Limited Partnership of Kalm-Forsythe Global Innovations, Ltd. (this "Amendment") is made and entered into this _____ day of August, 2004 by and between KalFor Solutions Group, LLC, a Texas limited liability company ("KalFor"), in its capacity as general partner (the "General Partner") of Kalm-Forsythe Global Innovations, Ltd., a Texas limited partnership (the "Partnership"), and the individuals and entities identified as the limited partners of the Partnership on the signature page hereto (the "Limited Partners").

### W I T N E S S E T H:

WHEREAS, KalFor is the General Partner of the Partnership;

WHEREAS, KalFor, as the General Partner, has the power and authority under the Revised and Amended Agreement of Limited Partnership of the Partnership (the "Partnership Agreement") to acquire assets necessary to carry out the purposes of the Partnership;

WHEREAS, KalFor, in its capacity as General Partner, has negotiated and entered into, on behalf of the Partnership, that certain Asset Purchase Agreement (the "APA") by and among the Partnership and Globe Rubber Works, Inc. (the "Seller"), whereby the Partnership is to acquire substantially all of the assets of the Seller;

WHEREAS, as a condition to the closing of the transactions contemplated by the APA, the Partnership is required to adopt certain amendments to the Partnership Agreement as set forth below.

WHEREAS, Section 13.10 of the Partnership Agreement provides that the Partnership Agreement may be amended for the foregoing purposes on the condition that the General Partner and the holders of a Super Majority in Interest of the Partners consent to such amendment; and

WHEREAS, KalFor, in its capacity as General Partner, and the holders of in excess of a Super Majority in Interest of the Partners have consented in writing to the proposed amendment;

NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Definitions. All capitalized terms used and not otherwise defined herein shall have the meanings ascribed thereto in the Partnership Agreement.

2. Amendments.

   (a) The Partnership Agreement shall be and hereby is amended by deleting Section 8.3 thereof entitled "Restrictions on Authority of General Partner" and replacing it with a

new Section 8.3 entitled "<u>Restrictions on Authority of General Partner</u>" which new Section 8.3 shall read in its entirety as follows:

"3.5    <u>Restrictions on Authority of General Partner</u>.    Notwithstanding the provisions of Section 8.2, without the vote or approval of a Super Majority in Interest of the Partners, the General Partner shall not have the authority to:

A.  Perform any act in violation of any applicable law, rule or regulation or perform any act which is inconsistent with or in contravention of this Agreement;

B.  Do any act which would make it impossible to carry on the business of the Partnership;

C.  Confess a judgment against the Partnership;

D.  Borrow from the Partnership;

E.  Possess the Partnership's Property or assign the rights of the Partnership in specific assets or property for other than a purpose of the Partnership;

F.  Admit a person as a general partner, except as provided in this Agreement;

G.  Admit a person as a limited partner, except as provided in this Agreement;

H.  Create, incur, guarantee, assume or otherwise become directly or indirectly liable for any indebtedness other than (a) open account trade debt, (b) a working capital credit line and term loans established with a financial institution and approved by the board of directors or other governing body of the General Partner, and (c) capitalized leases approved by the board of directors or other governing body of the General Partner;

I.  Materially change the principal business of the Partnership;

J.  Authorize or issue, or obligate itself to issue, any other equity security (including any security convertible into or exercisable for any equity security) senior to or on a parity with the present limited partners;

K.  Merge or consolidate with any other person, or sell, assign, lease or otherwise dispose of all or substantially all of its assets to any person;

L.  Make redemptions of partnership interests without affording all limited partners the opportunity to participate in the redemption; or

M.  Contract or otherwise deal with the Partnership except as pursuant to Section 8.4 hereof.

No Person dealing with the General Partner shall be required to determine its authority on behalf of the Partnership to make any commitment or undertaking, or to execute any agreement or other instrument, or to do any other act or thing, nor to determine any fact or circumstance bearing upon the existence of its authority. In addition, a purchaser of the Partnership's Property shall not be required to determine the authority of the General Partner to sign and deliver on behalf of the Partnership any agreement of sale or transfer, or any instrument of conveyance or assignment, or to see the application or distribution or proceeds paid or credited in connection therewith."

(b) The Partnership Agreement shall be and hereby is amended by deleting Section 8.4 thereof entitled "General Partner's Right to Deal with Partnership" and replacing it with a new Section 8.4 entitled "General Partner's Right to Deal with Partnership" which new Section 8.4 shall read in its entirety as follows:

"8.4    General Partner's Right to Deal with Partnership. The General Partner, its officers, directors or members of their respective families, and its affiliated entities shall have the right to contract and otherwise deal with the Partnership if, and only if, (a) the interest of any such person is fully disclosed to the Limited Partners in a report from the General Partner to the Limited Partners (b) the transaction is on arm's-length terms which are no less favorable to the Partnership as those which could have been obtained from an unaffiliated third party, and (iii) such transaction is approved by a disinterested majority of the board of directors or other governing body of the General Partner."

(c) The Partnership Agreement shall be and hereby is amended by deleting the phrase, "Upon request of any Limited Partner, the" from the first line of Section 7.3 thereof and inserting the word, "The" in its place.

(d) The Partnership Agreement shall be and hereby is amended by inserting the phrase, ", and shall inform the Partners of any material developments affecting the Partnership" immediately following the word "sheet" at the end of the first sentence of Section 7.3 thereof.

(e) The Partnership Agreement shall be and hereby is amended by inserting a new Section 9.9 entitled "Preemptive Rights" immediately following Section 9.8 thereof, which new Section 9.9 shall read in its entirety as follows:

"9.9    Preemptive Rights. In the event that the Partnership shall propose to issue any (i) partnership interests or other equity securities of the Partnership, (ii) options to purchase or rights to subscribe for partnership interests or other equity securities of the Partnership, (iii) securities convertible into or exchangeable for partnership interests or other equity securities of the Partnership, (iv) options to purchase or rights to subscribe for securities convertible into or exchangeable for partnership interests or other equity securities of the Partnership, the Partnership shall be required to deliver to the Limited Partners written notice of such issuance within thirty (30)

days. Upon receipt of such notice, the Limited Partners shall have, for a period of thirty (30) days, the preemptive right to subscribe for and purchase such securities to be issued, at such price and on such terms as such securities are to be issued, up to an amount equal to their existing percentage Ownership Interest. The Company shall promptly notify its Limited Partners of any proposed issuance of such securities. Notwithstanding the foregoing, this Section 9.9 shall not apply to any securities issued (i) in connection with any equity compensation plans, or (ii) in connection with any merger, consolidation or acquisition.

(f) The Partnership Agreement shall be and hereby is amended by inserting new Section 6.2 entitled "Tax Distributions" immediately following Section 6.1 thereof, which new Section 6.2 shall read in its entirety as follows:

"6.2   Tax Distributions.  Distributable Funds shall be distributed quarterly to the Partners pro rata in accordance with their respective Ownership Interests up to an amount equal to (i) the highest marginal effective tax rate for individuals imposed under the Code multiplied by (ii) the Partnership's net taxable income and gain for such calendar year through such quarter, plus (iii) the highest marginal effective tax rate for individuals imposed under state, municipal or other governmental body rules or regulations that such individual is subject to multiplied by (iv) the Partnership's net taxable income and gain for such calendar year through such quarter, less the amount of aggregate distributions made pursuant to this Section 6.2 with respect to such period."

(g) The Partnership Agreement shall be and hereby is amended by inserting new Section 10.6 entitled "Tag-Along Rights" immediately following Section 10.5 thereof, which new Section 10.6 shall read in its entirety as follows:

"10.6   Tag-Along Rights.

A.  Subject to the provisions of this Section 10.6, if Carl W. Forsythe, KalFor Solutions Group, LLC or Emerald Grove Capital, Ltd., or any of their related entities, proposes to sell, dispose of or otherwise transfer to any purchaser greater than fifty percent of its Ownership Interest (a "Tag-Along Sale") and no rights of first refusal under Section 10.1 have been exercised with respect to such Ownership Interest, such Partner shall not effect such Tag-Along Sale unless, prior to the consummation thereof, each of the other Partners shall have been afforded the opportunity to join in such Tag-Along Sale as provided in Section 10.6B.

B.  Prior to the consummation of any Tag-Along Sale, the purchaser shall make a written offer (the "Tag-Along Offer") to each of the other Partners to acquire out of the total Ownership Interest proposed to be acquired by the purchaser in the Tag-Along Sale (the "Target Interest") the same proportion of the Target Interest as the total Ownership Interest owned by the other Partners (on the date that the Tag-Along Offer is made) bears to the total owned (on such date) by all of the Partners. Such offer by the proposed purchaser shall be made at the same sales price and on the

-4-

same terms as the offer by the proposed purchaser to the selling Partner. The other Partners shall have ten (10) days after their receipt of the Tag-Along Offer in which to accept the Tag-Along Offer.

        C. This Section 10.6 does not apply to any Transfer (i) to any Permitted Transferee, or (ii) by last will and testament or pursuant to the laws of descent and distribution."

(h) The Partnership Agreement shall be and hereby is amended by (i) deleting the section reference "10.3" from the third line of Section 10.3D thereof and inserting the section reference "10.6" in its place and (ii) deleting the section reference "10.4B" from the fourth line of Section 10.3D thereof and inserting the section reference "10.3B" in its place.

3.    <u>Reaffirmation of Partnership Agreement</u>. Except as expressly amended by this Amendment, the Partnership Agreement is hereby reaffirmed, ratified and confirmed and continues in full force and effect unaffected hereby.

4.    <u>Governing Law</u>. This Amendment has been executed in the State of Texas and shall be governed by and construed in accordance with the laws of the State of Texas and the laws of the United States of America applicable to transactions within the State of Texas.

**[Signature Page to Follow]**

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the date first above written.

GENERAL PARTNER:

KalFor Solutions Group, LLC

By: _____
    Name: _____
    Title: _____

LIMITED PARTNERS:

Emerald Grove Capital, Ltd.

By: _____
    Its general partner

By: _____
    Name: _____
    Title: _____

_____
Chris Crawford

Dallas_1\4000697\1
41932-2 7/15/2004

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| GLOBE COMPOSITE SOLUTIONS, LTD. F/K/A KALM-FORSYTHE GLOBAL INNOVATIONS, LTD.<br><br>Plaintiff,<br><br>v.<br><br>RICHARD C. SOMERVILLE, ANNE ROCHE-SOMERVILLE, and SOLAR CONTRUCTION, INC. F/K/A GLOBE RUBBER WORKS, INC.<br><br>Defendants. | Civil Action No. 05-10323DPW |

## AFFIDAVIT OF CARL FORSYTHE

I, Carl Forsythe, do hereby depose and state:

1.    I am the President and CEO of Globe Composite Solutions, Ltd., f/k/a Kalm-

Forsythe Global Innovations, Ltd. ("Globe Composite").

2.    In August 2004, Globe Composite entered into an Asset Purchase Agreement

("Agreement") with Globe Rubber Works, Inc. ("Globe Rubber") and Richard

Somerville ("Somerville").

3.    The Agreement is attached to the Memorandum Of Law In Support Of Plaintiff's

Motion For Attachment.

4.    The Agreement's Disclosure Schedule is attached to the Memorandum Of Law In

Support Of Plaintiff's Motion For Attachment.

5.     Pursuant to the Agreement, Globe Composite purchased identified assets and identified liabilities of Globe Rubber for $898,000.

6.     Pursuant to the Agreement, Globe Composite paid Somerville approximately $1.5 million in cash and issued a $400,000 promissory note, a $200,000 promissory note, and a $150,000 promissory note for identified intellectual property, totaling approximately $2.25 million.

7.     As part of the purchase of Globe Rubber assets, Globe Composite was induced to lend $350,000 to Globe Rubber, which was effectively forgiven and not considered in the calculation of the final purchase price amount.

8.     Immediately after the acquisition, Globe Composite was induced to pay approximately $500,000 to undisclosed severely delinquent Globe Rubber trade payable accounts to restore necessary supplier relationships critical to the operation of Globe Composite.

9.     Globe Rubber made numerous representations and warranties as set forth in the Agreement.

10.    Prior to Globe Composite's acquisition of Globe Rubber's assets, Globe Rubber entered into one or more contracts or agreements with contractors who build submarines for the United States Navy. Specifically, Globe Rubber entered into contracts with General Dynamics Corporation Electric Boat Division and Northrop Grumman Newport News Shipbuilding, Inc. These contracts required that Globe Rubber's synthetic-material submarine parts conform to the contractors' or the United States Government's specifications.

11.    In the Agreement, Globe Rubber represented and warranted that it was in compliance with all contractor and government authorizations.

12.    A portion of the required government specifications with respect to Globe Rubber's products are subject to security clearance. In or about late August 2004, Globe Composite gained interim security clearance and partial access to the government specifications. In or about December 13, 2004, Globe Composite discovered that Globe Rubber and Somerville had prepared numerous certifications that its products met contractor or government specifications, knowing that the certifications were false, and gave these certifications to, *inter alia*, Northrop Grumman Newport News Shipbuilding, Inc., General Dynamics Corporation Electric Boat Division and the DOD Defense Finance and Accounting Service (DFAS).

13.    On or about January 6, 2005, I confronted Somerville with Globe Rubber documents showing the falsified certification data. Somerville admitted that he was responsible for guiding and directing the falsification of these certification documents.

14.    In or about January 6, 2005 Somerville was interviewed by representatives of the Department of Defense Criminal Investigation Services and other government agencies regarding the falsified documents. Somerville told me that he admitted to the investigators that he was responsible for the falsification of the certification documents.

15.    In or about January 9, 2005 while traveling with Somerville in Chicago, Somerville stated to me that he was completely forthright and honest with the Federal investigators in admitting that he bears sole responsibility for falsifying the certification documents, stating: "they can't kill you if you're upfront with them".

16.     The value of the assets and intellectual property purchased by Globe Composite
was dependant upon the contracts with, *inter alia*, Northrop Grumman Newport News
Shipbuilding, Inc., General Dynamics Corporation Electric Boat Division and the DOD
Defense Finance and Accounting Service (DFAS) and the products satisfying
government specifications.

17.     Globe Rubber and Somerville did not disclose to Globe Composite the actions
described above until after Globe Composite discovered the false certifications.

18.     Had Globe Composite or I been aware that Globe Rubber products did not meet
government specifications, Globe Composite would not have entered the Agreement.

19.     It appears that prior to the asset purchase transaction with Globe Composite,
Globe Rubber entered into certain non-solicitation agreements with Shuster Corporation.

20.     I learned of the existence of a non-solicitation agreement between Globe Rubber
and Shuster on or about November 8, 2004, after Richard Somerville stated to me on
November 4, 2004 that no such agreement existed.  This agreement was signed by
Richard Somerville on May 1, 2001.

21.     Somerville's and Globe Composite's alleged violation of this non-solicitation
agreement is the subject of a lawsuit pending in Massachusetts Superior Court for Bristol
County which is causing Globe Composite to incur defense costs.

22.     The representations and warranties contained in the Agreement were false and
fraudulent because (a) all liabilities of Globe Rubber were not reflected in its financial
statements; (b) material adverse changes had occurred in Globe Rubber's business since
the year-end balance sheet was calculated; (c) Globe Rubber was not in full compliance

with government authorizations and certifications; and (d) the Shuster contracts were not disclosed.

23.     Further, in order to induce Globe Composite to enter the Agreement, Somerville represented to Globe Composite that Globe Rubber was in good corporate health and was in compliance with its contractual obligations. For instance, in 2004 prior to the sale of assets, Somerville stated "the material we're using for the RFID conveyors are from custom alloyed blend" and "the composite chain material is a brand new material that we developed". Further, Somerville stated, inter alia, "this business is worth five million dollars" while knowing that this statement was false. Globe Composite relied on these representations, which I later discovered to be false.

24.     Similarly, in order to induce Globe Composite to enter the Agreement, Anne Roche-Somerville ("Roche-Somerville") represented to Globe Composite that Globe Rubber was in good corporate health and was in compliance with its contractual obligations, while knowing that these statements were false and knowing of Somerville's and Globe Rubber's fraudulent actions. For instance, in 2004 prior to the sale of assets, Roche-Somerville stated, *inter alia*, "you're getting a real jewel" and "you're getting a real bargain". Globe Composite relied on these representations, which I later discovered to be false.

25.     Pursuant to the Agreement, Globe Composite withheld $190,000 of the asset purchase price and placed those funds in an escrow account; $165,000 is to be used to pay indemnification claims pursuant to the Agreement. On or about January 31, 2005, Globe Composite demanded that all escrow funds be released to it in order to indemnify damages, expenses, and warranty claims made against it. In accordance with the

Agreement, Globe Composite submitted a Disbursement Request form to Somerville for his signature. Somerville refused to execute the form. Accordingly, the escrow funds have not been released.

26.     Globe Composite must now make great expenditures in order for its products to conform to government specifications and in order to comply with its contracts assumed from Globe Rubber in the Agreement.

27.     Globe Composite has been unable to deliver approximately $800,000 in product orders to Northrop Grumman Newport News Shipbuilding, Inc., General Dynamics Corporation Electric Boat Division and the DOD Defense Finance and Accounting Service (DFAS) because of these non-conforming parts, causing a severe cash shortage at the company. Globe Composite must now take extraordinary measures with its lenders and investors to satisfy borrower requirements and raise interim working capital.

28.     Globe Composite has suffered significant and immeasurable harm to its reputation and future business potential as a result of negative feedback from buyers and other personnel at Northrop Grumman Newport News Shipbuilding, Inc., General Dynamics Corporation Electric Boat Division and the DOD Defense Finance and Accounting Service (DFAS) regarding Globe Composite's perceived inability to produce parts conforming to specifications that Globe Rubber and Richard Somerville knew to be unattainable or previously certified falsely.

29.     Globe Composite has already expended approximately $230,000 in warranty claims made against it due to Globe Rubber's faulty products. Globe Composite has also spent approximately $200,000 in necessary product changes and management time in order to comply with government specifications. Moreover, Globe Composite is

currently expending funds and diverting management resources in order to defend itself against the Shuster suit, discussed above.

30.    Globe Composite anticipates expending an additional $432,000 in order to comply with government specifications.  It must revamp the quality control area at a cost of $45,000.  It must raise additional capital, which will cost about $63,000.  Upgrading equipment will cost approximately $94,300.  Finally, diverted management time in order to complete this work will cost about $209,000.

Signed under the pains and penalties of perjury this 18th day of February, 2005.

_____
Carl Forsythe