UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ ) | | |
| GLOBE COMPOSITE SOLUTIONS, LTD. ) | Civil Action No. 05 10323 DPW | |
| F/K/A KALM-FORSYTHE GLOBAL ) | | |
| INNOVATIONS, LTD. ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | **ANSWER TO PLAINTIFF'S SECOND** | |
| ) | **AMENDED COMPLAINT AND** | |
| ) | **AMENDED COUNTERCLAIM OF** | |
| ) | **DEFENDANTS ANNE ROCHE-** | |
| ) | **SOMERVILLE, EXECUTRIX OF THE** | |
| ) | **ESTATE OF RICHARD C. SOMERVILLE** | |
| RICHARD C. SOMERVILLE, ANNE ) | **AND SOLAR CONSTRUCTION,** | |
| ROCHE-SOMERVILLE, and ) | **INC. F/K/A GLOBE RUBBER** | |
| SOLAR CONSTRUCTION, INC. F/K/A ) | **WORKS, INC.** | |
| GLOBE RUBBER WORKS, INC. ) | | |
| Defendants. ) | **JURY TRIAL DEMANDED** | |
| _____) | | |

| | |
|---|---|
| _____ ) | |
| RICHARD C. SOMERVILLE and ) | |
| SOLAR CONSTRUCTION, INC. F/K/A ) | |
| GLOBE RUBBER WORKS, INC. ) | |
| Plaintiffs-in-Counterclaim ) | |
| ) | |
| v. ) | |
| ) | |
| GLOBE COMPOSITE SOLUTIONS, LTD. ) | |
| F/K/A KALM-FORSYTH GLOBAL ) | |
| INNOVATIONS, LTD. and ) | |
| CARL W. FORSYTHE ) | |
| Defendants-in-Counterclaim ) | |
| _____) | |

## <u>ANSWER</u>

### <u>FIRST DEFENSE</u>

Defendants, Anne Roche-Somerville, Executrix of the Estate of Richard C.

Somerville (the "Estate") and Solar Construction, Inc. f/k/a Globe Rubber Works, Inc.

("Globe Rubber") (the term "defendants" shall refer to the Estate and Globe Rubber collectively) hereby answer plaintiff Globe Composite Solutions, Ltd. f/k/a Kalm-Forsyth Global Innovations, Ltd.'s ("Globe Composite") Second Amended Complaint.

Defendants answer each separately numbered paragraph of the Second Amended Complaint as follows:

## Parties

1.    Defendants have insufficient information with which to admit or deny the allegations contained in paragraph 1.

2.    Admitted except that the principal place of business is 344 Keene Street, Duxbury, Massachusetts, 02332.

3.    Admitted

4.    Admitted.

## Jurisdiction and Venue

5.    To the extent paragraph 5 sets forth conclusions of law and not allegations of fact, no answer is necessary.

6.    To the extent paragraph 6 sets forth conclusions of law and not allegations of fact, no answer is necessary.

## Facts Common to All Claims

7.    In response to the first sentence of paragraph 7, defendants are without sufficient information and/or knowledge to answer the first sentence and state that the Complaint does not indicate "all material times before closing the asset purchase." Further answering the first sentence, defendants admit that Globe Rubber contracted to supply gaskets to a supplier of the United States Navy.  Further answering the first

sentence, defendants admit that Globe Rubber contracted to supply composite components to the United States Postal Service.  Defendants admit the second sentence of paragraph 7 and to the extent the second sentence refers to contracts or agreements, the contracts and agreements speak for themselves.  In response to the third sentence of paragraph 7, defendants admit that for many years Globe Rubber entered into contracts with General Dynamics and Newport News Shipbuilding, Inc. to supply components to outfit submarines being built by General Dynamics and Newport News Shipbuilding but deny the remaining allegations.

8.    Insofar as paragraph 8 refers to a document, the document speaks for itself and no further answer is necessary.

9.    Defendants deny that the entire Asset Purchase Agreement is attached as Exhibit A, but admit the remaining allegations contained in the first sentence of paragraph 9.  Insofar as the second sentence of paragraph 9 refers to a document, the document speaks for itself and no further answer is necessary.

10.    Insofar as paragraph 10 refers to a document, the document speaks for itself and no further answer is necessary.

11.    Insofar as paragraph 11 refers to a document, the document speaks for itself and no further answer is necessary.  Furthering answering, the Globe Rubber retained liabilities included, *inter alia*:

> (i) Any Liability arising out of or relating to products of Globe [Rubber] to the extent manufactured or sold prior to [July 1, 2004] **other than to the extent assumed under Section 2.5(a)(iii), (iv) or (v)**;
> (ii) any Liability under any Contract assumed by [Globe Composite] **pursuant to Section 2.5(a)** that arises after [July 1, 2004] if and only to the extent that such arises out of or relates to any Breach that occurred prior to [July 1, 2004].

Exh. A, § 2.5(b) (emphasis added).

12.    Defendants deny that Globe Composite assumed "only identified liabilities of Globe Rubber." Further answering, defendants state that insofar as the allegations of paragraph 12 refer to a document, the document speaks for itself and no further answer is necessary.

13.    Insofar as paragraph 13 refers to a document, the document speaks for itself and no further answer is necessary.

14.    Defendants admit that certain aspects of certain Globe Rubber operations were subject to certain levels of security clearance but deny the remaining allegations of paragraph 14. Further answering, defendants state that the gaskets are not subject to security clearance.

15.    Defendants are without sufficient information and/or knowledge with which to admit or deny the allegations contained in the first sentence of paragraph 15. The second sentence is denied.

16.     Defendants are without sufficient information and/or knowledge of how Globe Composite perceived the value of the Globe Rubber assets and Richard Somerville's ("Somerville") intellectual property. To the extent that any further answer is required, defendants state that the Asset Purchase Agreement speaks for itself. To the extent that any further answer is required, the allegations are denied.

17.    Defendants are without sufficient information and/or knowledge to respond to paragraph 17 and state that the Complaint does not indicate which actions are being referenced as "the actions described above." Further answering, the defendants are without sufficient information and/or knowledge to know what knowledge the plaintiff

4

acquired during the one and a half (1 ½) year due diligence period prior to the closing

during which time the plaintiff and/or its representative(s) and its agent(s) were on site at

Globe Rubber with full access to all of the corporate defendant's business and personnel.

Further answering, defendants state that plaintiff was aware of the problems

manufacturing the gaskets and investigated the problem prior to the closing.

18.    In response to the first sentence, defendants admit that Globe Rubber

and Shuster Corporation entered into a document entitled a Non-Solicitation Agreement

in 2001, which document speaks for itself.  Insofar as the second sentence of paragraph

18 refers to a document, the document speaks for itself and no further answer is

necessary.  As to the remaining allegations in the second sentence, defendants are without

sufficient information and/or knowledge to admit or deny whether the Non-Solicitation

Agreement was known to Globe Composite until October 2004.  Further answering the

second sentence, defendants state that during the one and a half (1 ½) year due diligence

period prior to the closing, the plaintiff and/or its representative(s) and its agent(s) were

on site at Globe Rubber with full access to all corporate defendant's business and

personnel.  As to the third sentence in paragraph 18, defendants admit that Shuster

Corporation communicated with Globe Composite concerning the existence of the Non-

Solicitation Agreement on or about November 8, 2004 but have no knowledge of whether

and when the plaintiff had prior notice of the Non-Solicitation Agreement.  Defendants

admit that Shuster Corporation sued Globe Composite and Somerville based upon Globe

Composite's knowing and intentional conduct in Massachusetts Superior Court for

Bristol County, *Shuster Corporation v Globe Composite and Richard Somerville*, Civil

Action Number BRCV2005-00056.

5

19. To the extent paragraph 19 sets forth conclusions of law and not allegations of fact, no answer is necessary. To the extent that paragraph 19 alleges allegations of fact, paragraph 19 is denied.

20. Denied.

21. Insofar as paragraph 21 is not directed to the defendants, no answer is required. To the extent an answer is required, the allegations are denied.

22. Denied.

23. To the extent plaintiff must make any expenditure to defend against the Shuster claims, defendants state that such expenditures are due to plaintiff's own knowing and intentional conduct for which defendants are not liable.

24. Insofar as paragraph 24 refers to a document, the document speaks for itself and no further answer is necessary. To the extent that any further answer is required, the allegations are denied. Further answering, defendants state that in addition to the $165,000 held by designated escrow agents, an additional $25,000 is also held by the escrow agents to defray costs Somerville was expected to incur and has incurred pursuant to Section 8.17 of the Asset Purchase Agreement. Thus, there is currently $190,000 in escrow, plus interest. In addition, there are three (3) promissory notes totaling $750,000 executed and delivered by plaintiff to Somerville, one of which promissory note in the amount of $400,000 was also executed and delivered by Carl Forsythe, the President and CEO of Globe Composite. All three notes are in default and are due. None of the notes have been paid. Further answering, on or about February 1, 2005, plaintiff wrongfully terminated Somerville's employment with Globe Composite thereby seeking to wrongfully deprive Somerville of in excess of $1,000,000 in

compensation to which he is entitled under the terms of an Employment Agreement executed by plaintiff and Somerville, and that such amount is due and payable to the Estate.  Further answering, defendants state that Somerville had a contractual right to receive a 7.5% equity interest in Globe Composite and that Globe Composite wrongfully seeks to evade its obligations to provide such equity interest to Somerville and/or the Estate.

25.    Defendants admit that plaintiff wrote a letter dated January 31, 2005, the terms of which speak for itself.  The second sentence of paragraph 25 is denied. Defendants admit the third sentence of paragraph 25 to the extent that defendants admit that Globe Composite submitted a Disbursement Request form to Somerville for his signature but defendants deny that the Disbursement Request was in accordance with the Asset Purchase Agreement.  As to the fourth sentence, defendants admit that Somerville has refused to execute the form.  As to the fifth sentence, defendants admit that the escrow funds have not been released.

26.    Admitted.

27.    Denied.


**Count I**
**(Breach of Contract)**

28.    Denied.

29.    Denied.

30.    Denied.

**Count II**
**(Fraud)**

31.    Denied.

32.    Denied.

33.    Denied.

34.    Denied.

**Count III**
**(G.L. c. 231A, § 1)**

35.    Defendants deny paragraph 35 to the extent that plaintiff alleges that Somerville engaged in fraud and breach of representations of warranties.  Defendants admit that an actual controversy has arisen between Globe Composite and Somerville because Somerville submitted a demand for payment pursuant to the terms of the $400,000 promissory note on February 4, 2005 and Globe Composite and Forsythe have not paid the note.

36.    Admitted and further state that other actual controversies exist between the parties.

37.    Denied.

38.    Denied.

39.    Defendants deny paragraph 39 to the extent that the plaintiff seeks injunctive relief.  Defendants admit that declaratory relief will terminate the controversy surrounding the promissory note and the escrow fund, but state that other controversies exist between the parties.

40.   Denied.

## Claim IV
## (Violation of  G.L. c. 93a)

41.   To the extent paragraph 41 sets forth conclusions of law and not allegations of fact, no answer is necessary.  Insofar as any further answer is necessary, paragraph 41 is denied.

42.   Denied.

43.   Insofar as the defendants deny the allegations of the acts as set forth in paragraph 42, the defendants deny such acts were made knowingly and willfully. Defendants deny any remaining allegations contained in paragraph 43.

44.   Denied.

45.   Denied.

## SECOND DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

## THIRD DEFENSE

Plaintiff's claims must fail due to the equitable doctrine of Estoppel.

## FOURTH DEFENSE

Plaintiff's claims must fail due to the equitable doctrine of Laches.

## FIFTH DEFENSE

Plaintiff's claims must fail due to the equitable doctrine of Waiver.

## SIXTH DEFENSE

Plaintiff's claims must fail due to the equitable doctrine of Unclean Hands.

## SEVENTH DEFENSE

Plaintiff's claims are barred by its failure to mitigate damages.

## EIGHTH DEFENSE

Plaintiff's claims must fail to the extent that they are precluded by Section 7.7 of the Asset Purchase Agreement.

## NINTH DEFENSE

Plaintiff's claim must fail to the extent that they are precluded by Section 10.7 of the Asset Purchase Agreement.

## TENTH DEFENSE

Plaintiff fails to state the circumstances constituting fraud with particularity.

## ELEVENTH DEFENSE

Plaintiff's fraud claims must fail because of its failure to demonstrate reasonable reliance.

## TWELFTH DEFENSE

Any statements made by the defendants are not actionable since they constitute statements of opinions.

## THIRTEENTH DEFENSE

Plaintiff's claims are barred by the fact that any statements made by the defendants were true.

## FOURTEENTH DEFENSE

Plaintiff's claims are barred by the fact that any statements made by the defendants were believed by them to be true.

### FIFTEENTH DEFENSE

Plaintiff's claims are barred by its own material breach of contract.

### SIXTEENTH DEFENSE

Plaintiff's claims are barred by its unfair and/or deceptive acts or practices in violation of M.G.L. c. 93A.

### SEVENTEENTH DEFENSE

Plaintiff's claims are barred by its own fraud.

### EIGHTEENTH DEFENSE

The forfeiture clause contained in the Employment Agreement is not enforceable.

### JURY DEMAND

All of the Defendants hereby demand a trial by jury on all issues and claims so triable.


WHEREFORE, the defendants respectfully request that this Honorable Court enter judgment dismissing plaintiff's complaint in its entirety with prejudice and with costs and attorney's fees assessed against the plaintiff.

### AMENDED COUNTERCLAIM

The Defendants in the above-captioned action, Anne Roche-Somerville, the Executrix of the Estate of Richard C. Somerville (the "Estate") and Solar Construction, Inc. f/k/a Globe Rubber Works, Inc. ("Globe Rubber"), the Plaintiffs-in-Counterclaim here, hereby assert the following amended counterclaim.

### Parties

1.      Richard C. Somerville ("Somerville") was an individual residing at 344 Keene Street, Duxbury, Massachusetts 02332. Somerville died on June 7, 2005. The Plaintiff-in-Counterclaim, Anne Roche-Somerville is an individual residing at 344 Keene Street, Duxbury, Massachusetts 02332. Roche-Somerville was appointed Executrix of the estate in Brockton Probate Court, County of Plymouth, docket number 05P1198-EP1, on August 24, 2005 and is still duly qualified and is acting as Executrix.

2.      The Plaintiff-in-Counterclaim Solar Construction, Inc., f/k/a Globe Rubber Works, Inc. ("Globe Rubber") is a Massachusetts corporation with a principal place of business at 344 Keene Street, Duxbury, Massachusetts 02332.

3.      Upon information and belief, the Defendant-in-Counterclaim Globe Composite Solutions, Ltd., f/k/a Kalm-Forsythe Global Innovations, Ltd. ("Globe Composite") is a Texas Corporation with a principal place of business at 10440 N. Central Expressway, Suite 1475, Dallas, Texas 75231.

4.      Upon information and belief, the Defendant-in-Counterclaim Carl W. Forsythe ("Forsythe") is an individual residing in Texas and is the President and CEO of Globe Composite.

**Jurisdiction and Venue**

5.      Jurisdiction is conferred by 28 U.S.C. § 1332 because there is diversity among the parties and the amount in controversy exceeds $75,000.

6.      Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(a) because Globe Composite is doing business in this district, the claims arose in this district and the defendants-in-counterclaim are located in this district.

**Factual Background**

7.      Prior to Globe Composite and Globe Rubber entering into an asset purchase agreement in August 2004, Globe Rubber served a diverse set of industrial, commercial and military customers in its design and manufacture of non-metallic components.

8.      Somerville began working at Globe Rubber on or about 1956.  He remained in the technical areas of the company until the mid-1970s and Somerville acquired Globe Rubber on or about 1984.

9.      Globe Rubber began manufacturing Radio Frequency Identification ("RFID") conveyors for Globe Composite sometime on or about 2002.

10.      On or about February 2003, Carl Forsythe, approached Somerville and initiated negotiations related to the potential acquisition of the Globe Rubber business.

11.      During the negotiations that ensued over approximately one and a half (1 ½) years, Forsythe personally, and/or through his agent(s) and representative(s), examined financial and operational aspects of Globe Rubber.  Globe Rubber provided Forsythe or his agents(s) or his representative(s) with full access to the Globe Rubber

facility and its personnel. In 2004, one of Globe Composite's agents was placed at Globe Rubber.

12. In or about August 2004, Globe Composite, Globe Rubber and Somerville executed an Asset Purchase Agreement, a copy of which is attached hereto without exhibits as **Exhibit A** (the "Asset Purchase Agreement"). A copy of the Globe Rubber Disclosure Schedule which was part of the Asset Purchase Agreement is attached hereto as **Exhibit B**. In summary, as consideration for the purchase of the business of Globe Rubber and certain intellectual property and goodwill of Somerville, Globe Composite agreed in the Asset Purchase Agreement to:

(i) pay $898,000 in cash to Globe Rubber and assume certain Globe Rubber liabilities;

(ii) pay Somerville $1,502,000 in cash for his intellectual property;

(iii) pay Somerville an additional $750,000 for his intellectual property via three promissory notes: one in the amount of $400,000, one in the amount of $200,000 and one in the amount of $150,000 (the $400,000 promissory note was also executed by Forsythe as a co-maker);

(iv) pay Somerville approximately $1,000,000 million over five (5) years under an employment agreement in salary, plus bonuses and other benefits;

(v) deliver 7.5% of all outstanding limited partnership interests in Globe Composite to Somerville.

13. In the Asset Purchase Agreement, Globe Composite agreed to pay Globe Rubber for the Globe Rubber assets as follows, *inter alia*:

(a)    The consideration for the [Globe Rubber] Assets, payable to [Globe Rubber], will be (i) [$898,000] in cash, and (ii) the assumption of the [Globe Rubber] Assumed Liabilities pursuant to the [Globe Rubber] Bill of Sale, Assignment and Assumption Agreement (collectively, the "[Globe Rubber] Asset Purchase Price").

Exh. A, § 2.4(a).

14.    In the Asset Purchase Agreement, Globe Composite agreed to pay to Somerville for his intellectual property as follows, *inter alia*:

(b) The consideration for the Somerville Intellectual Property, payable to Somerville, shall be (i) [$1,502,000] in cash, (ii) a promissory note … executed by [Globe Composite] and payable to Somerville in the amount of [$200,000], which note shall be in the form attached as Exhibit 2.4(b)(ii) and shall be subordinate to [Globe Composite]'s senior credit facility, (iii) a promissory note … executed by [Globe Composite] and payable to Somerville in the amount of [$150,000] which note shall be in the form of Exhibit 2.4(b)(iii) and shall be subordinate to [Globe Composite]'s senior credit facility, and (iv) a promissory note … executed by [Globe Composite and Forsythe] and payable to Somerville in the amount of [$400,000], which note shall be in the form attached as Exhibit 2.4(b)(iv) and shall not be subordinate to [Globe Composite]'s senior credit facility.

Exh. A, § 2.4(b).

The promissory note payable in the original principal amount of $200,000 is attached hereto as **Exhibit C** (the "$200,000 Note").  The promissory note payable in the original principal amount of $150,000 is attached hereto as **Exhibit D** (the "$150,000 Note").

The promissory note payable in the original principal amount of $400,000 is attached hereto as **Exhibit E** (the "$400,000 Note").

15.    Globe Composite agreed to pay $100,000 due under the $200,000 Note, together with all accrued interest, to Somerville, on August 3, 2005.  Exh. C. Globe Composite agreed to pay the remaining outstanding principal, with interest, on the $200,000 Note to Somerville on or before August 3, 2006.  Exh. C.

16.     Globe Composite agreed to pay the $150,000 Note to Somerville in twelve (12) quarterly installments with payment deferred until August 2, 2005 at which time the first three (3) quarterly installments are due.  Exh. D.  Globe Composite agreed to pay the remaining principal, with interest, on the $150,000 Note to Somerville on or before August 3, 2007.  Exh. D.

17.     Globe Composite and Forsythe jointly and severally agreed to pay the $400,000 Note to Somerville on or before 120 days from August 3, 2004 (December 1, 2004).  Exh. E.  Globe Composite and Forsythe further promised to pay interest at a rate of one and a half percent (1 ½%) per month upon an event of default and to pay any costs and expenses (including reasonable attorney's fees) incurred by Somerville in the enforcement or collection of the $400,000 Note.  Exh. E.  Globe Composite and Forsythe have failed and refused to make any payments under the $400,000 Note.

18.      Globe Composite further agreed that failure to pay any payment due under the $400,000 Note was an event of default under the $200,000 Note and the $150,000 Note.  Upon such event, the unpaid balance of the principal and interest on the $200,000 Note and the $150,000 Note would also become immediately due at the option of Somerville.  Further, upon default under the $200,000 Note and/or the $150,000 Note, Globe Composite promised to pay interest at a rate of one and a half percent (1 ½ %) per month and to pay any costs and expenses (including reasonable attorney's fees) incurred in the enforcement or collection of the $200,000 Note and/or the $150,000 Note.

19.     In the Asset Purchase Agreement, Globe Composite, Globe Rubber and Somerville agreed to enter into an escrow agreement whereby $190,000 was placed in an escrow account.  A copy of Escrow Agreement is attached hereto as **Exhibit F**.

("Escrow Agreement").  The escrow amount was designated for two purposes in the

Escrow Agreement as set forth, *inter alia*, as follows,:

> [Globe Rubber] and [Globe Composite] desire to establish an escrow account … for the purpose of holding [**$190,000**] (the "Escrow Amount) out of the cash portion of the [Globe Rubber] Assets Purchase Price (as defined in the Asset Purchase Agreement) received at the Closing (as defined in the Asset Purchase Agreement), to consist of **$25,000 escrow** to cover costs to be incurred by [Globe Rubber] for repairs to the underground septic system serving 254 Beach Street, Rockland, Massachusetts (the "Rockland Premises") for compliance with Title V of the Code of Massachusetts Regulations (310 CMR Sec. 15, et seq.) (the "**Title V Escrow Amount**") and a separate **$165,000 escrow** (the "**Indemnification Escrow Amount**").

Exh. E (emphasis added).

20.    In the Asset Purchase Agreement, Somerville further agreed to

contribute to Globe Composite all of his right, title and interest in the personal goodwill

that he possessed as a result of his individual achievements and reputation in the

business community.  Exh. A, § 3.1.  Somerville agreed to contribute his goodwill to

Globe Composite as soon as practicable after Globe Composite obtained a loan in the

amount of $729,000 from the Massachusetts Certified Development Corp. (the date of

which is identified as the "Somerville Goodwill Closing Date").  Id.

21.    In consideration for the contribution of Somerville's goodwill and on

the Somerville Goodwill Closing Date, Globe Composite agreed to issue an equity

interest in Globe Composite in an amount equal to seven and one-half percent (7.5%) of

all outstanding limited partnership interests in Globe Composite as of the Somerville

Goodwill Closing Date.  Exh. A, § 3.2.  Forsythe and his financial advisors placed a

$750,000 value on the 7.5% equity interest in Globe Composite for purposes of the

conversations concerning the structure of the deal and the taxation of it.

17

22.     In the Asset Purchase Agreement, Globe Composite and Somerville also agreed to enter into an Employment Agreement for an initial term of five (5) years, a copy of which is attached hereto as **Exhibit G** (the "Employment Agreement"). Pursuant to the Employment Agreement, Globe Composite agreed to provide various compensation and benefits to Somerville, including but not limited to, an annual salary of $200,000 per year for five (5) years and any renewal years, bonuses, five (5) weeks paid vacation and medical, retirement and insurance benefits.  Exh. G, § 3.

23.     The Employment Agreement provided that if Globe Composite terminated Somerville "without cause," Somerville would be entitled to the following lump sum payment within ten (10) days of such termination:

> (A) a lump sum payment to Employee equal to the aggregate of the Base Salary Employee would have been entitled to for the remaining period of the Employment Period or such Renewal Period, and
> (B) a lump sum payment on account of the bonus payments Employee would have received for the remainder of the Employment Period or such Renewal Period, this amount being stipulated as equal to $50,000 for each full calendar year (and the prorated amount thereof for each partial calendar year) remaining in the Employment Period or such Renewal Period.

Exh. G, 8(f).

24.     Globe Composite agreed that the termination of Somerville for any reason other than those reasons **expressly specified** in the Employment Agreement as "for cause" would be deemed to be a termination of employment "without cause."  See Exh. G, 8(c)(iii).

25.     A "for cause" termination pursuant to the Employment Agreement is defined as follows:

> (1)     the Employee's **conviction** of either (x) a felony, (y) a misdemeanor involving moral turpitude, or (z) any crime **in connection**

**with his employment by the Employer** the nature of which involves dishonesty, assault, battery or which brings disrepute to the Employer by virtue of its association with the Employee, but specifically shall not include traffic offenses;

(2)    any intentional act by the Employee not undertaken in good faith that is clearly contrary to the best interests of the Employer;

(3)    the Employee's repeated and willful failure to take actions within the scope of his duties, his abilities and which are permitted by law to implement policies, strategies or initiatives of the Employer which the Employer has communicated to him in writing after thirty (30) days notice and opportunity to cure has been afforded to him by the Employer;

(4)    the repeated and continued failure of the Employee to attend to his duties and responsibilities after 30 days written notice and opportunity to cure has been afforded to him by the Employer;

(5)    any willful act by the Employee against the Employer to attend to enrich the Employer in a material respect in derogation of his duties to the Employer and at the expense of the Employer; or

(6)    **the material breach** of any term or provision of this Agreement or the Asset Purchase Agreement by the Employee and such breach is not cured within thirty (30) days of written notice thereof from Employer.

Exh. G, 8(c)(ii) (emphasis added).

26.    On or about December 1, 2004, Globe Composite and Forsythe breached their obligations under the $400,000 Note by failing to pay the $400,000 Note when it became due.

27.    Globe Composite and Forsythe had no justification for failing to pay such $400,000 Note.

28.    The $400,000 Note was not paid by Globe Composite and Forsythe in an effort to evade their obligations under the $400,000 Note and in an effort to renegotiate the terms of the Asset Purchase Agreement after the closing of the transaction.

29.    At the time Globe Composite and Forsythe intentionally breached their obligations under the $400,000 Note, Globe Composite had as security for any claims that Globe Composite could assert against Globe Rubber and/or Somerville under the Asset Purchase Agreement, in addition to the $400,000 Note, the following:

(i)    the $190,000 escrow described above;

(ii)    the right to set off amounts payable under the $200,000 Note under Article 7.6 of the Asset Purchase Agreement;

(iii)    the right to set off amounts payable under the $150,000 Note under Article 7.6 of the Asset Purchase Agreement; and

(iv)    Somerville's right to 7.5 % of the equity interest in Globe Composite.

30.    Therefore, had Globe Composite paid the $400,000 Note when due, Globe Composite would still have had $540,000 of remaining security for any claims Globe Composite could assert against Globe Rubber and/or Somerville.  In addition, Globe Composite would have had as additional security, Somerville's right to 7.5 % of the equity interest in Globe Composite, which Forsythe and his financial advisors had valued at $750,000.

31.    Globe Composite and Forsythe failed and refused to pay the $400,000 Note when it became due because Globe Composite and Forsythe sought to use it as leverage in its attempt to renegotiate the terms of the Asset Purchase Agreement after the closing of the transaction.

32.    On or about February 1, 2005, Globe Composite and Forsythe continued their wrongful attempt to evade their obligations under the Asset Purchase Agreement by terminating Somerville from his employment with Globe Composite.

33. Globe Composite and Forsythe wrongfully claimed that Somerville was terminated with cause in furtherance of its efforts to:

(i) evade Globe Composite's obligation to pay Somerville the agreed upon termination payment, in excess of $1 million, to which Somerville was entitled upon being terminated without cause; and

(ii) evade Globe Composite's obligation to issue 7.5% of the equity interest in Globe Composite to Somerville as required by Article 3.2 of the Asset Purchase Agreement.

34. The termination of Somerville was without cause pursuant to the Employment Agreement.

35. Globe Composite and Forsythe's claim that there was cause for the termination was a pretext in furtherance of Globe Composite and Forsythe's attempt to evade Globe Composite's obligations to pay the full purchase price under the Asset Purchase Agreement.

36. Because Somerville's employment at Globe Composite was terminated without cause pursuant to the Employment Agreement, Somerville became entitled to a lump sum payment of in excess of $1,000,000 as required by Section 8(f) of the Employment Agreement.

37. The actions by Forsythe and Globe Composite in failing to pay the $400,000 Note when due and in falsely claiming that the termination of Somerville was for cause were wrongful actions designed to avoid paying to Somerville the amounts to which he was entitled to in return for selling the agreed intellectual property and goodwill to Globe Composite.

21

38.     By letter dated January 31, 2005, Globe Composite wrongfully demanded that all escrow funds, including those escrow funds designated to reimburse Somerville for expenses he actually incurred related to the remedial measures related to the sewer system at the Globe facility, be released to it to satisfy approximately $230,000 in alleged claims for alleged damages, expenses and warranty claims.  Globe Rubber has refused to release the funds on the basis that the Globe Composite demand was not justified under the Asset Purchase Agreement and/or the Escrow Agreement.

39.     On or about February 4, 2005, Somerville demanded full payment of the $400,000 Note.  A copy of the Somerville demand is attached hereto as **Exhibit H**.

40.     As of the present time, Globe Composite and Forsythe have failed and refused to pay the amounts due under the $400,000 Note.

41.     Defendants-in-counterclaim have no lawful justification to withhold payment of the $400,000 Note.

42.     On or about March 28, 2005, Somerville declared the $200,000 Note and the $150,000 Note to be immediately due and payable.

43.     Globe Composite has also failed to pay the $200,000 Note and the $150,000 Note.

44.     Globe Composite continues to fail to pay to the Estate the amounts that it is owed under Section 8(f) of the Employment Agreement, which amounts are in excess of $1,000,000.

45.     The Estate has also incurred over $36,000 in costs related to the sewer line remedial measures Somerville undertook at the Globe Composite facility.

Accordingly, the Estate is entitled to be reimbursed $25,000 from the escrow held pursuant to the Asset Purchase Agreement and the Escrow Agreement.

46.    Additionally, the Estate has a right to 7.5% of the equity interest in Globe Composite in accordance with the terms of the Asset Purchase Agreement.

47.    Somerville was the insured under a policy issued by Lincoln Financial Group (hereinafter "Lincoln) in the amount of $250,000 (hereinafter the "Lincoln Policy").  Globe Rubber Works, Inc., which changed its name to Solar Construction, Inc., was the owner and beneficiary of the Lincoln Policy.

48.    Upon information and belief, Globe Composite improperly submitted a request to Lincoln to change the beneficiary and the ownership of the Lincoln Policy from Globe Rubber Works, Inc., now known as Solar Construction, Inc., to Globe Composite.

49.    Somerville was also insured under a policy issued by American General Life Insurance Company (hereinafter "American General") in the amount of $250,000 (hereinafter the "American General Policy").  Globe Rubber Works was the owner and beneficiary of the American General Policy.

50.    Upon information and belief, Globe Composite improperly submitted a request to American General to change the beneficiary and the ownership of the American General Policy from Globe Rubber Works, Inc., now known as Solar Construction, Inc., to Globe Composite.

51.    Somerville died on June 7, 2005.

52.    Globe Rubber is entitled to the proceeds of the Lincoln Policy.

53.    Contrary to the rights of Globe Rubber, upon information and belief, on or about July 5, 2005, Globe Composite made a demand upon Lincoln for the payment of the insurance proceeds from the Lincoln Policy.  Upon information and belief, Lincoln paid the proceeds of the Lincoln Policy to Globe Composite.

54.    Globe Rubber is entitled to the proceeds of both the Lincoln Policy and the American General Policy.

55.    Upon information and belief, Globe Composite improperly submitted a claim for the proceeds of the American General Policy.  Globe Rubber also submitted a claim for the American General Policy.  As a result of both Globe Composite and Globe Rubber submitting a claim for the proceeds of the American General Policy, American General has brought an interpleader action in the United States District Court, District of Massachusetts.  The case name is *American General Life Insurance Company v. Kalfor Solutions Group, LLC, in its capacity as General Partner of Globe Composite Solutions, Ltd. Solar Construction, Inc. and Anne Roche-Somerville, in her capacity as Executrix of the Estate of Richard C. Somerville*, docket number 05-CV-11925.  In this case, the Estate and Globe Rubber asserted a cross-claim against Globe Composite for a declaratory judgment that the Estate is entitled to receive the proceeds of the American General Policy and a claim to reach and apply.

**Count I**
**(Payment of the $400,000 Note)**
**The Estate v. Globe Composite and Forsythe**

56.    The plaintiffs-in-counterclaim re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 54 as if fully set forth herein in their entirety.

57.    By, among other things, those facts as set forth above, Globe Composite and Forsythe have defaulted under the $400,000 Note.

58.    As a result of Globe Composite and Forsythe's default, the Estate is entitled to payment of the original principal amount with interest at a rate of eighteen percent (18%) per annum from February 4, 2005, plus all costs and expenses, including all reasonable attorneys fees, for the enforcement and collection of the $400,000 Note.

### Count II
### <u>(Payment of the $200,000 Note and the $150,000 Note)</u>
### The Estate v. Globe Composite

59.    The plaintiffs-in-counterclaim re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 57 as if fully set forth herein in their entirety.

60.    By, among other things, those facts as set forth above, Globe Composite has defaulted under the $200,000 Note and the $150,000 Note.

61.    As a result of Globe Composite's default, the Estate is entitled to payment of the amounts under the $200,000 Note and the $150,000 Note as are determined to be due and payable, plus interest, as provided for in each Note, costs and expenses, including reasonable attorney's fees, for the enforcement and collection of the Notes.

### Count III
### <u>(Breach of the Employment Agreement)</u>
### The Estate v. Globe Composite

62.    The plaintiffs-in-counterclaim re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 60  as if fully set forth herein in their entirety.

63.    By, among other things, those facts as set forth above, Globe Composite breached the Employment Agreement with Somerville.

64.    As a result of Globe Composite's breach of the Employment Agreement, the Estate has suffered, and continues to suffer, damage.

65.    As a result of Globe Composite's breach of the Employment Agreement, the Estate is entitled to damages, interest, costs and expenses, including reasonable attorney's fees.

**Count IV**
**(Breach of the Asset Purchase Agreement)**
**The Estate and Globe Rubber v. Globe Composite**

66.    The plaintiffs-in-counterclaim re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 64 as if fully set forth herein in their entirety.

67.    By, among other things, those facts as set forth above, Globe Composite breached the Asset Purchase Agreement with Somerville and Globe Rubber.

68.    As a result of Globe Composite's breach of the Asset Purchase Agreement, the Estate and Globe Rubber have suffered, and continue to suffer, damage.

69.    As a result of Globe Composite's breach of the Asset Purchase Agreement, the Estate and Globe Rubber are entitled to damages, interest, cost and expenses, including reasonable attorney's fees.

26

**Count V**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**The Estate and Globe Rubber v. Globe Composite**

70. The plaintiffs-in-counterclaim re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 68 as if fully set forth herein in their entirety.

71. By, among other things, those facts as set forth above, Globe Composite breached the implied covenant of good faith and fair dealing.

72. As a result of Globe Composite's breach of the implied covenant of good faith and fair dealing, Somerville and Globe Rubber have suffered, and continue to suffer, damage.

73. As a result of Globe Composite's breach of the implied covenant of good faith and fair dealing, Somerville and Globe Rubber are entitled to damages, interest, costs and expenses, including reasonable attorney's fees.

**Count VI**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**The Estate and Globe Rubber v. Forsythe**

74. The plaintiffs-in-counterclaim re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 72 as if fully set forth herein in their entirety.

75. By executing the $400,000 Note, Forsythe personally owed an obligation of good faith and fair dealing.

76. Forsythe breached such obligation of good faith and fair dealing.

77. As a result of Forsythe's breach of the covenant of good faith and fair dealing Globe Rubber and/or Somerville suffered damages.

27

78.    As a result of Forsythe's breach of the covenant of good faith and fair dealing, Globe Rubber and/or the Estate are entitled to damages, interest, costs and expenses, including reasonable attorney's fees.

**Count VII**
**(Declaratory Relief M.G.L. c. 231A, § 1)**
**The Estate and Globe Rubber v. Globe Composite and Forsythe**

79.    The plaintiffs-in-counterclaim re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 77 as if fully set forth herein in their entirety.

80.    An actual controversy has arisen been the Estate and Globe Composite concerning

    i.   the $400,000 Note;

    ii.   the $200,000 Note;

    iii.   the $150,000 Note;

    iv.   the Employment Agreement, specifically whether Somerville is entitled to be paid the lump sum payment required under Section 8(f) of the Employment Agreement; and

    v.   whether Somerville is entitled to enforce his right to 7.5% of the equity interest in Globe Composite.

81.    An actual controversy has arisen between Globe Rubber and Globe Composite concerning whether Globe Composite is entitled to retain the proceeds of the Lincoln Policy.

82.    The Estate will suffer damages if it is not entitled to enforce the $400,000 Note, the $200,000 Note, the $150,000 Note, and the Employment Agreement

including without limitation the lump sum payment under Section 8(f) of the Employment Agreement and the equity interest pursuant to Section 3.2 of the Asset Purchase Agreement.

83. Globe Rubber will suffer damages if Globe Composite retains the proceeds of the Lincoln Policy.

84. Granting declaratory relief will terminate the controversy.

85. The Estate is entitled to a declaratory judgment that

i. Globe Composite and Forsythe breached their obligations under the $400,000 Note and such Note is due and payable;

ii. Globe Composite is obligated to pay the $200,000 Note and the $150,000 Note, and that such notes are in default and are due;

iii. The Estate is owed the lump sum payment under Section 8(f) of the Employment Agreement; and

iv. The Estate is entitled to a 7.5% interest in Globe Composite.

86. Globe Rubber is entitled to a declaratory judgment that Globe Rubber is entitled to receive the proceeds of the Lincoln Policy.

## Count VIII
### (Fraud)
**The Estate and Globe Rubber v. Globe Composite and Forsythe**

87. The plaintiffs-in-counterclaim re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 86 as if fully set forth herein in their entirety.

88. Defendants Globe Composite represented to Somerville that it would comply with the Asset Purchase Agreement including without limitation, making the

payments required under the $400,000 Note, the $200,000 Note, the $150,000 Note, the Employment Agreement, and delivering a 7.5% interest in Globe Composite to Somerville.

89.     Such representations were made on behalf of Globe Composite by Forsythe.

90.     Forsythe individually represented that he would make the payment required under the $400,000 Note on or about December 1, 2004.

91.     Based upon the conduct of Globe Composite and Forsythe after the execution of the Asset Purchase Agreement, the Estate and Globe Rubber believe that Globe Composite never intended to

 i. pay the $400,000 Note;

 ii. pay the $200,000 Note;

 iii. pay the $150,000 Note;

 iv. pay its obligations under the Employment Agreement; and

 v. provide Somerville with a 7.5% equity interest in Globe Composite.

92.     Based upon the conduct of Globe Composite and Forsythe after the execution of the Asset Purchase Agreement, the Estate and Globe Rubber believe that Forsythe never intended to

 i. pay or allow Globe Composite to pay the $400,000 Note;

 ii. allow Globe Composite to pay the $200,000 Note;

 iii. allow Globe Composite to pay the $150,000 Note;

 iv. allow Globe Composite to pay its obligations under the Employment Agreement; and

v.    allow a 7.5% equity interest in Globe Composite to be delivered to

Somerville.

93.    The representations set forth above by Globe Composite and Forsythe
were false and the misrepresentations were material misrepresentations.  At the time the
material misrepresentations were made, Globe Composite and Forsythe knew or had
reason to know of their falsity.

94.    The misrepresentations set forth above by Globe Composite and
Forsythe were made with the intent that Somerville and Globe Rubber rely on same and
that they would induce Somerville and Globe Rubber to enter into the Asset Purchase
Agreement.

95.    Somerville and Globe Rubber reasonably relied on such material
misrepresentations by Globe Composite and Forsythe to their damage.

**Count IX**
**(Violation of M.G.L. c. 93A)**
**The Estate and Globe Rubber v. Globe Composite and Forsythe**

96.    The plaintiffs-in-counterclaim re-allege and incorporate herein by
reference the allegations contained in paragraphs 1 through 95 as if fully set forth herein
in their entirety.

97.    At all times materials Somerville, Globe Rubber, Globe Composite
and Forsythe were engaged in trade or commerce.

98.    The actions and/or inactions by Globe Composite and Forsythe,
including among others, those as set forth above, constitute unfair and/or deceptive acts
or practices proscribed by M.G.L. c. 93A, §§ 2 & 11.

99.    The unfair and/or deceptive acts or practices, including among others, those as set forth above, were done knowingly and/or willfully.

100.    The defendants'-in-counterclaim acts and/or omissions occurred substantially and primarily within the Commonwealth of Massachusetts.

101.    As a direct and proximate result of the unfair and/or deceptive acts or practices of the defendants-in-counterclaim, the plaintiffs-in-counterclaim have suffered and continue to suffer damages.

102.    As a result of the defendants'-in-counterclaim violations of G.L. c. 93A, the plaintiffs-in-counterclaim are entitled to three times their actual damages, plus interest, costs, expert fees and reasonable attorney's fees.

**Count X**
**(Breach of Fiduciary Duty)**
**The Estate v. Forsythe**

103.    The plaintiffs-in-counterclaim re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 102 as if fully set forth herein in their entirety.

104.    Pursuant to Article 3, Section 3.2 of the Asset Purchase Agreement, Globe Composite "shall" issue Somerville a 7.5% equity interest on the Somerville Goodwill Closing Date.

105.    The consideration for the issuance of the equity interest was Somerville's goodwill and Section 3.2 of the Asset Purchase Agreement specifically states that such "shall be deemed to be Somerville's initial capital contribution to [Globe Composite]."

106.    Section 3.2 further states that the equity interest due to Somerville would have "the same voting rights and other rights, priorities, preferences and privileges as all existing limited partners, subject only the First Amendment to the Revised and Amended Agreement of Limited Partnership of Kalm-Forsythe Globe Innovations, Ltd. (the "Partnership Agreement"), a copy of which was attached to and made an exhibit of the Asset Purchase Agreement.

107.    The Asset Purchase Agreement and the Partnership Agreement represent agreements which were fully negotiated and agreed to by both Globe Composite and Somerville, who were both represented by counsel.

108.    By the terms of the Asset Purchase Agreement and the Partnership Agreement, Somerville's entitlement to receive his 7.5% interest Globe Composite in the future vested on August 3, 2004.

109.    By at least August 3, 2004, Globe Composite owed Somerville a fiduciary duty.

110.    In breach of the fiduciary duty that he owed to Somerville, Forsythe discharged Somerville in an attempt to deprive Somerville of

(i)      over $1 million to which Somerville was entitled under the Employment Agreement; and

(ii)     the 7.5% ownership interest to which Somerville is entitled in Globe Composite.

111.    As a result of Forsythe's breach of the fiduciary duty, the Estate has suffered damages.

112.    As a result of Forsythe's breach of the fiduciary duty, the Estate is entitled to damages, interest, costs and expenses, including reasonable attorney's fees

### COUNT XI
### (Unjust Enrichment)
### Globe Rubber v. Globe Composite

113.    Globe Rubber repeats and realleges the allegations contained in paragraphs 1-112 as if expressly set forth herein.

114.    By receiving the proceeds of the $250,000 Lincoln Policy, Globe Composite has been unjustly enriched.

**115.**    As a direct and proximate result, Globe Rubber has been damaged.

### COUNT XII
### (Money Had and Received)
### Globe Rubber v. Globe Composite

116.    Globe Rubber repeats and realleges the allegations contained in paragraphs 1-115 as if expressly set forth herein.

117.    Through its actions, Globe Composite has improperly obtained money from Lincoln Financial which belongs to Globe Rubber and has refused to return the money to Globe Rubber.

118.    Under the circumstances, equity and good conscience require that the money is returned to Globe Rubber.

### COUNT XIII
### (Tortious Interference with Contractual Relations)
### Globe Rubber v. Globe Composite

119.    Globe Rubber repeats and realleges the allegations contained in paragraphs 1-118 as if expressly set forth herein.

120.    Globe Composite knew, or should have known, that Globe Rubber was both the owner and the beneficiary of the Lincoln Policy and that the Lincoln Policy was not part of the Asset Purchase Agreement.

121.    Despite said knowledge, Globe Composite interfered with Globe Rubber's rights to collect under the Lincoln Policy by sending a notice of claim to Lincoln Financial.

122.    As a direct result thereof, Lincoln Financial improperly paid the proceeds of the Lincoln Policy to Globe Composite, causing damage to Globe Rubber.

## COUNT XIV
### (Conversion)
### Globe Rubber v. Globe Composite

123.    Globe Rubber repeats and realleges the allegations contained in paragraphs 1-122 as if expressly set forth herein.

124.    Upon information and belief, Globe Composite has converted the property of Globe Rubber in violation of the rights of Globe Rubber to control its use.

125.    Globe Rubber has been damaged by the acts of Globe Composite.

## JURY DEMAND

The plaintiffs-in-counterclaim herby demand a trial by jury on all issues and claims so triable.

## PRAYERS FOR RELIEF

WHEREFORE, the defendants/plaintiffs-in-counterclaim respectfully request that this Honorable Court award the following relief:

35

1.     Enter judgment on Count I of the Counterclaim in favor of the Estate and against the Globe Composite and Forsythe, jointly and severally, in the amount of the Estate's damages plus interest, costs and expenses, including attorney's fees;

2.     Enter judgment on Count II of the Counterclaim in favor of the the Estate and against Globe Composite in the amount of the Estate's damages plus interest, costs and expenses, including attorney's fees.

3.     Enter judgment on Count III of the Counterclaim in favor of the Estate and against Globe Composite in the amount of the Estate's damages plus interest, costs and expenses, including attorney's fees.

4.     Enter judgment on Count IV of the Counterclaim in favor of the plaintiffs-in-counterclaim and against Globe Composite in the amount of plaintiffs-in-counterclaim's damages plus interest, costs and expenses, including attorney's fees.

5.     Enter judgment on Count V of the Counterclaim in favor of plaintiffs-in-counterclaim and against Globe Composite in the amount of plaintiffs-in-counterclaim's damages plus interest, costs and expenses, including attorney's fees.

6.     Enter judgment on Count VI of the Counterclaim in favor of plaintiffs-in-counterclaim and against Forsythe in the amount of plaintiffs-in-counterclaim's damages plus interest, costs and expenses, including attorney's fees.

7.     Enter a declaratory judgment on Count VII of the Counterclaim in favor of the Estate and Globe Rubber and against Globe Composite and Forsythe declaring that

        i.     Globe Composite and Forsythe breached their obligations under the $400,000 Note

    ii.      Globe Composite is obligated to pay the $200,000 Note and the

            $150,000 Note and that such notes are in default and are due

    iii.     the Estate is owed the lump sum payment under Section 8(f) of the

            Employment Agreement

    iv.     the Estate is entitled to a 7.5% interest in Globe Composite

    v.      Globe Rubber is entitled to receive the proceeds of the Lincoln

            Policy.

8.    Enter judgment on Count VIII in favor of plaintiffs-in-counterclaim and against Globe Composite and Forsythe in the amount of plaintiffs-in-counterclaim's damages plus interest, costs and expenses, including attorney' fees.

9.    Enter judgment on Count IX of the Counterclaim in favor of plaintiffs-in-counterclaim and against Globe Composite and Forsythe, jointly and severally, in the amount of three times plaintiffs-in-counterclaim's damages, plus interest, costs and expenses, including attorney's fees and expert fees.

10.    Enter judgment on Count X of the Counterclaim in favor of the Estate and against Forsythe in the amount of the Estate's damages, plus interest, costs and expenses, including attorney's fees.

11.    Enter judgment on Count XI in favor of Globe Rubber and against Globe Composite, in the amount of Globe Rubber's damages plus interest, costs, expenses, and attorneys fees.

12.    Enter judgment on Count XII in favor of Globe Rubber and against Globe Composite in the amount of Globe Rubber's damages, interest, costs, expenses and attorney's fees.

13.    Enter judgment on Count XIII in favor of Globe Rubber and against Globe Composite in the amount of Globe Rubber's damages, interest, costs, expenses and attorney's fees.

14.    Enter judgment on Count XIV in favor of Globe Rubber and against Globe Composite in the amount of Globe Rubber's damages, interest, costs, expenses and attorney's fees.

15.    Grant such other and further relief to the defendants/plaintiffs-in-counterclaim as justice may require.

Respectfully submitted,

The Defendants/Plaintiffs-in-Counterclaim,
Anne Roche-Somerville, Executrix of the Estate of
Richard C. Somerville and Solar Construction Inc.,
f/k/a Globe Rubber Works, Inc.

By their attorneys,

/s/ Mark S. Furman
Mark S. Furman (BBO# 181680)
Jennifer C. Roman (BBO# 643223)
Tarlow, Breed, Hart & Rodgers, P.C.
101 Huntington Avenue
Boston, MA 02199
(617) 218-2000

Dated:  December  23, 2005

# Exhibit A

# Asset Purchase Agreement

This ASSET PURCHASE AGREEMENT (as amended from time to time, this *"Agreement"*) is made and entered into this 3rd day of August, 2004, by and between KALM-FORSYTHE GLOBAL INNOVATIONS, LTD., a Texas limited partnership (*"KFGI"*), GLOBE RUBBER WORKS, INC., a Massachusetts corporation (*"Globe"*), and RICHARD SOMERVILLE, an individual resident of Massachusetts (*"Somerville"*).

## R E C I T A L S

A.     Somerville, directly or indirectly, owns (163) shares of the common stock, par value One Hundred Dollars ($100.00) per share, of Globe, which constitutes one hundred percent (100%) of the issued and outstanding shares of capital stock of Globe.

B.     Globe desires to sell, and KFGI desires to purchase, the Globe Assets from Globe for the consideration and on the terms set forth in this Agreement.

C.     Somerville desires to sell, and KFGI desires to purchase, the Somerville Intellectual Property for and in consideration and on the terms set forth in this Agreement.

D.     Somerville desires to contribute the Somerville Goodwill to KFGI and, in exchange, KFGI desires to issue to Somerville a limited partner interest in KFGI that will, after all contemplated issuance of partnership interests, equal a 7.5% partnership interest in KFGI.

## AGREEMENT

The parties, intending to be legally bound, agree as follows:

## ARTICLE 1
## DEFINITIONS

For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires, the terms defined in this ARTICLE 1 have the meanings assigned to them or referred to in this ARTICLE 1 and include the plural as well as the singular:

*"504 Loan Funding"* — the funding of that certain contemplated loan to be issued in the amount of $729,000 from the Massachusetts Certified Development Corp. to KFGI, to be guaranteed by the U.S. Small Business Administration, the proceeds of which will be used by KFGI to purchase certain real estate and equipment in connection with the operation of the business following the Closing.

*"Appurtenances"* — all privileges, rights, easements, hereditaments and appurtenances belonging to or for the benefit of the Land, including all easements appurtenant to and for

-1-

the benefit of any Land (a *"Dominant Parcel"*) for, and as the primary means of access between, the Dominant Parcel and a public way, or for any other use upon which lawful use of the Dominant Parcel for the purposes for which it is presently being used is dependent, and all rights existing in and to any streets, alleys, passages and other rights-of-way included thereon or adjacent thereto (before or after vacation thereof) and vaults beneath any such streets.

*"Best Efforts"* — the efforts that a reasonably prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible; *provided, however,* that an obligation to use Best Efforts under this Agreement does not require the Person subject to that obligation to take actions that (i) would result in a materially adverse change in the benefits to such Person of this Agreement and the Contemplated Transactions; or (ii) would be, in the judgment of a reasonably prudent person, inconsistent with or deleterious to the Person or his company's legitimate business interests.

*"Breach"* — a "Breach" of a representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement will be deemed to have occurred if there is or has been (a) any material inaccuracy in, material breach of, or material failure to perform or comply with, such representation, warranty, covenant, obligation, or other provision, or (b) any successful claim (by any Person) or other occurrence or circumstance that is or was, in either case, materially inconsistent with such representation, warranty, covenant, obligation, or other provision, and the term "Breach" means any such inaccuracy, breach, failure, claim, occurrence, or circumstance.

*"Closing"* — as defined in Section 2.7.

*"Closing Date"* — the date hereof.

*"Competing Business"* — with respect to the business of Globe, as defined in Section 4.23, and with respect to the business of KFGI, as defined in Section 5.23.

*"Confidential Information"* — as defined in Section 9.1(a).

*"Consent"* — any approval, consent, ratification, waiver, or other authorization (including any Governmental Authorization).

*"Contemplated Transactions"* — all of the transactions contemplated by this Agreement or such other agreements contemplated hereunder.

*"Contract"* — any agreement, contract, obligation, promise, or undertaking (whether written or oral and whether express or implied) that is legally binding.

*"Damages"* — as defined in Section 7.2.

-2-

*"Disclosure Schedule"* — the applicable disclosure schedule delivered by the parties hereto concurrently with the execution and delivery of this Agreement.

*"Disclosing Party"* — as defined in Section 9.1(a).

*"Effective Date"* — July 1, 2004.

*"Employment Agreement"* — as defined in Section 2.8(a)(vi).

*"Encumbrance"* — any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

*"Environment"* — soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

*"Environmental, Health, and Safety Liabilities"* — any cost, damages, expense, liability, obligation, or other responsibility arising from or under Environmental Law or Occupational Safety and Health Law.

*"Environmental Law"* — any Legal Requirement that relates to (i) advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or hazardous substances or materials, violations of discharge limits, or other prohibitions and of the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment; (ii) preventing or reducing to acceptable levels the release of pollutants or hazardous substances or materials into the Environment; (iii) reducing the quantities, preventing the release, or minimizing the hazardous characteristics of wastes that are generated; (iv) assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of; (v) protecting resources, species, or ecological amenities; (vi) reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil, or other potentially harmful substances; (vii) cleaning up pollutants that have been released, preventing the threat of release, or paying the costs of such clean up or prevention; or (viii) making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets.

*"ERISA"* — the Employee Retirement Income Security Act of 1974 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

*"Escrow Account"* — as defined in Section 2.4(d).

-3-

*"Escrow Agents"* — Mark G. Johnson and William R. Rodgers, counsel to KFGI and Globe, respectively.

*"Escrow Agreement"* — as defined in Section 2.4(d).

*"Excluded Globe Assets"* — as defined in Section 2.2.

*"Globe Assets"* — as defined in Section 2.1.

*"Globe Assumed Liabilities"* — as defined in Section 2.5.

*"Globe Bill of Sale, Assignment and Assumption Agreement"* — as defined in Section 2.8(a)(i).

*"Globe Contract"* — any Contract (a) under which Globe has or may acquire any rights, (b) under which Globe has or may become subject to any obligation or liability, or (c) by which Globe or any of the assets owned or used by it is or may become bound.

*"Globe Real Property"* — as defined in Section 4.6.

*"Globe's Facilities"* — any real property, including without limitation the Globe Real Property, leaseholds, or other interests currently owned or operated by Globe and any buildings, plants, structures, or equipment (including motor vehicles, tank cars, and rolling stock) currently owned or operated by Globe.

*"Globe's Intellectual Property Assets"* — as defined in Section 4.22(a).

*"Globe's Interim Balance Sheet"* — as defined in Section 4.4(a)(ii).

*"Globe Plan"* — as defined in Section 4.13(a).

*"Globe's Year-End Balance Sheet"* — as defined in Section 4.4(a)(i).

*"Governmental Authorization"* — any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

*"Governmental Body"* — any (i) nation, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

*"Ground Lease"* — any long-term lease of land in which most of the rights and benefits comprising ownership of the land and the Improvements thereon or to be constructed thereon, if any, are transferred to the tenant for the term thereof.

-4-

*"Ground Lease Property"* — any land, improvements and appurtenances subject to a Ground Lease in favor of Globe.

*"Hazardous Activity"* — the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, Release, storage, transfer, transportation, treatment, or use (including any withdrawal or other use of groundwater) of Hazardous Materials in, on, under, about, or from the Globe or KFGI Facilities, as the case may be, or any part thereof into the Environment, and that materially increases the danger, or risk of danger, or poses an unreasonable risk of harm to persons or property on or off the Facilities, or that may affect the value of such Facilities.

*"Hazardous Materials"* — any waste or other substance that is listed, defined, designated, or classified as, or otherwise determined to be, hazardous, radioactive, or toxic or a pollutant or a contaminant under or pursuant to any Environmental Law, including any admixture or solution thereof, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefor and asbestos or asbestos-containing materials.

*"Improvements"* — all buildings, structures, fixtures and improvements located on any Land, including those under construction.

*"IRC"* — the Internal Revenue Code of 1986, as amended, or any successor law, and regulations issued by the IRS pursuant to the Internal Revenue Code of 1986, as amended, or any successor law.

*"IRS"* — the United States Internal Revenue Service or any successor agency, and, to the extent relevant, the United States Department of the Treasury.

*"KFGI Contract"* — any Contract (a) under which KFGI has or may acquire any rights, (b) under which KFGI has or may become subject to any obligation or liability, or (c) by which KFGI or any of the assets owned or used by it is or may become bound.

*"KFGI's Facilities"* — any real property, leaseholds, or other interests currently owned or operated by KFGI and any buildings, plants, structures, or equipment (including motor vehicles, tank cars, and rolling stock) currently owned or operated by KFGI.

*"KFGI's Intellectual Property Assets"* — as defined in Section 5.22(a).

*"KFGI's Interim Balance Sheet"* — as defined in Section 5.4(a)(ii).

*"KFGI Promissory Note"* — as defined in Section 2.4(b).

*"KFGI's Year-End Balance Sheet"* — as defined in Section 5.4(a)(i).

*"Knowledge"* — an individual will be deemed to have "Knowledge" of a particular fact or other matter if (i) such individual is actually aware of such fact or other matter; or (ii) a prudent individual could be expected to discover or otherwise become aware of such fact

-5-

or other matter in the course of conducting a reasonable investigation concerning the existence of such fact or other matter. A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving, or who has at any time served, as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has Knowledge of such fact or other matter.

*"Land"* — all parcels and tracts of land in which Globe or KFGI, as the case may be, has an ownership interest.

*"Legal Requirement"* — any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty.

*"Liability"* — with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

*"Noncompetition Agreements"* — as defined in Section 2.8(a)(vii).

*"Occupational Safety and Health Law"* — any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, including without limitation the Occupational Safety and Health Act of 1970, as amended (OSHA), and any governmental program designed to provide safe and healthful working conditions.

*"Order"* — any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

*"Ordinary Course of Business"* — an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person.

*"Organizational Documents"* — (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (e) any amendment to any of the foregoing.

*"PBGC"* — as defined in Section 4.13(a).

Dallas_1\3979467\7
41932-2 7/25/2004

*"Permitted Encumbrances"* — any Encumbrance listed on Schedule 4.6(b) of the Disclosure Schedule, liens for Taxes not yet due and payable, warehouse and mechanics liens for amounts not overdue, governmental restrictions of general application, and covenants, restrictions and matters of record affecting the Globe Real Property.

*"Person"* — any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

*"Plan"* — as defined in Section 4.13(a).

*"Plan Sponsor"* — as defined in Section 4.13(a).

*"Proceeding"* — any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

*"Real Property"* — any Land and Improvements and all Appurtenances thereto.

*"Real Property Lease"* — any Ground Lease or Space Lease.

*"Record"* — information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

*"Related Person"* — with respect to a particular individual each other member of such individual's Family or any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family. For purposes of this definition, the *"Family"* of an individual includes (i) the individual, (ii) the individual's spouse, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree, and (iv) any other natural person who resides with such individual.

*"Release"* — any spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping, or other releasing into the Environment, whether intentional or unintentional.

*"Representative"* — with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

*"Retained Globe Liabilities"* — as defined in Section 2.5(b).

*"Schedule"* — a part or section of the Disclosure Schedule.

*"Somerville Goodwill"* — as defined in Section 3.1.

*"Somerville Intellectual Property"* — as defined in Section 2.3.

Dallas_1\3979467\7
41932-2 7/25/2004

*"Space Lease"* — any lease or rental agreement pertaining to the occupancy of any improved space on any Land.

*"Tangible Personal Property"* — any all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property (other than Globe's inventory) of every kind owned or leased by Globe (wherever located and whether or not carried on Globe's books), together with any express or implied warranty by the manufacturers or sellers or lessors of any item or component part thereof and all maintenance records and other documents relating thereto.

*"Tax"* — any tax (including any income tax, capital gains tax, value-added tax, sales tax, property tax, gift tax, or estate tax), levy, assessment, tariff, duty (including any customs duty), and any related charge or amount (including any fine, penalty, interest, or addition to tax), imposed, assessed, or collected by or under the authority of any Governmental Body or payable pursuant to any tax-sharing agreement or any other Contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, or deficiency.

*"Tax Return"* — any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any Tax.

*"Third Party"* — a Person that is not a party to this Agreement.

*"Third-Party Claim"* — any claim against any Indemnified Person by a Third Party, whether or not involving a Proceeding.

*"Threatened"* — a claim, Proceeding, dispute, action, or other matter will be deemed to have been "Threatened" if any demand or statement has been made (orally or in writing) or any notice has been given (orally or in writing), or if any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such a claim, Proceeding, dispute, action, or other matter is likely to be asserted, commenced, taken, or otherwise pursued in the future.

## ARTICLE 2
## SALE AND TRANSFER OF GLOBE ASSETS AND SOMERVILLE INTELLECTUAL PROPERTY; CLOSING

### 2.1    GLOBE ASSETS TO BE SOLD

Upon the terms and subject to the conditions set forth in this Agreement, at the Closing and effective as of the Effective Date, Globe shall sell, convey, assign, transfer and deliver to KFGI, and KFGI shall purchase and acquire from Globe, free and clear of any Encumbrances other than Permitted Encumbrances, all of Globe's right, title and interest in and to all of Globe's property and assets, real, personal or mixed, tangible and

-8-

intangible, of every kind and description, wherever located, including the following (but excluding the Excluded Globe Assets):

(a)     all cash, cash equivalents and short-term investments;

(b)     all of Globe's Facilities;

(c)     all Tangible Personal Property, including those items described in Schedule 2.1(c) of the Disclosure Schedule;

(d)     all of Globe's inventories;

(e)     all of Globe's accounts receivable that Globe has not pledged or factored prior to the Effective Date;

(f)     all Globe Contracts, including those listed in Schedule 4.17(a) of the Disclosure Schedule, and all outstanding offers or solicitations made by or to Globe to enter into any Contract;

(g)     all rights in connection with and assets of the Globe Rubber Works, Inc. Profit Sharing 401(k) Plan;

(h)     all Governmental Authorizations and all pending applications therefor or renewals thereof, in each case to the extent transferable to KFGI, including those listed in Schedule 4.14 of the Disclosure Schedule;

(i)     all data and Records related to the operations of Globe, including client and customer lists and Records, referral sources, lists of market representatives, lists of distributors, research and development reports and Records, production reports and Records, service and warranty Records, equipment logs, operating guides and manuals, financial and accounting Records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and Records and, subject to Legal Requirements, copies of all personnel Records and other Records described in Section 2.2(e);

(j)     all of the intangible rights and property of Globe, including the Globe Intellectual Property Assets (but not the Somerville Intellectual Property), going concern value, goodwill related to the corporation (excluding the Somerville Goodwill), telephone, telecopy and e-mail addresses and listings and those items listed in Schedules 4.22(d), (e), (f), and (g) of the Disclosure Schedule;

(k)     all rights to receive outstanding property and casualty insurance indemnity payments for insured losses, if any, arising from or relating to losses or claims in respect of the Globe Assets or the Globe Assumed Liabilities prior to the Effective Date;

-9-

(l)     all claims of Globe against third parties relating to the Globe Assets (but not in respect of any Excluded Globe Asset or any Retained Globe Liability), whether choate or inchoate, known or unknown, contingent or noncontingent, including all such claims listed in Schedule 2.1(l) of the Disclosure Schedule; and

(m)     all rights of Globe relating to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof that are not excluded under Sections 2.2(c) or 2.2(f), including, without limitation, those listed in Schedule 2.1(m) of the Disclosure Schedule.

All of the property and assets to be transferred to KFGI hereunder are herein referred to collectively as the ***"Globe Assets."***

Notwithstanding the foregoing, the transfer of the Globe Assets pursuant to this Agreement shall not include the assumption of any Liability related to the Globe Assets unless KFGI expressly assumes that Liability pursuant to Section 2.5(a).

## 2.2   EXCLUDED GLOBE ASSETS

Notwithstanding anything to the contrary contained in Section 2.1 or elsewhere in this Agreement, the following assets of Globe (collectively, the ***"Excluded Globe Assets"***) are not part of the sale and purchase contemplated hereunder, are excluded from the Globe Assets and shall remain the property of Globe after the Closing:

(a)     all minute books, stock Records, tax records, and corporate seals;

(b)     the shares of capital stock of Globe held in treasury;

(c)     all insurance policies and rights thereunder (except to the extent the right to receive indemnity payments for insured losses has been assigned to KFGI as specified in Section 2.1(l));

(d)     all of the Globe Contracts listed in Schedule 2.2(d) of the Disclosure Schedule

(e)     all personnel Records and other Records that Globe is required by law to retain in its possession;

(f)     all claims for refund of Taxes and other governmental charges of whatever nature;

(g)     all rights in connection with and assets of the Globe Plans excluding the Globe Rubber Works, Inc. Profit Sharing 401(k) Plan, which has been expressly included as a Globe Asset hereunder;

(h)     all accounts receivable pledged or factored by Globe prior to the Effective Date;

(i)     all rights of Globe under this Agreement, the Globe Bill of Sale, Assignment and Assumption Agreement, the Deferral Promissory Note and the KFGI Promissory Note;

(j)     the property and assets expressly designated in Schedule 2.2(j) of the Disclosure Schedule;

(k)     all claims of Globe against third parties relating to the Excluded Globe Assets or any Retained Globe Liability, whether choate or inchoate, known or unknown, contingent or noncontingent;

(l)     subject to Section 8.18, all right, title and interest in and to any recovery, damages or other awards to which Globe may become entitled under, in connection with or arising out of that certain class action complaint and the lawsuit associated therewith known as Globe Rubber v. Crompton Corporation, Case Number 04cv1654 pending in the United States District Court for the Eastern District of Pennsylvania (the "*Crompton Matter*"); and

(m)     the Lexus automobile that Somerville has previously used as a company car.

## 2.3    SOMERVILLE INTELLECTUAL PROPERTY

Upon the terms and conditions set forth in this Agreement, at the Closing and effective as of the Effective Date, Somerville shall sell, convey, assign, transfer and deliver to KFGI, and KFGI shall purchase and acquire from Somerville, free and clear of any Encumbrances, all of Somerville's right, title and interest in and to the intellectual property identified as the "*Somerville Intellectual Property*" on Schedule 2.3 of the Disclosure Schedule.

## 2.4    CONSIDERATION

(a)     The consideration for the Globe Assets, payable to Globe, will be (i) Eight Hundred Ninety-Eight Thousand Dollars ($898,000) in cash, and (ii) the assumption of the Globe Assumed Liabilities pursuant to the Globe Bill of Sale, Assignment and Assumption Agreement (collectively, the "*Globe Assets Purchase Price*").

(b)     The consideration for the Somerville Intellectual Property, payable to Somerville, shall be (i) One Million Five Hundred Two Thousand Dollars ($1,502,000) in cash, (ii) a promissory note (the "*Deferral Promissory Note*") executed by KFGI and payable to Somerville in the amount of Two Hundred Thousand Dollars ($200,000), which note shall be in the form attached as Exhibit 2.4(b)(ii) and shall be subordinate to KFGI's senior credit facility, (iii) a promissory note (the "*KFGI Promissory Note*") executed by KFGI and payable to Somerville in the amount of One Hundred Fifty Thousand Dollars ($150,000), which note shall be in the form of Exhibit 2.4(b)(iii) and shall be subordinate to KFGI's senior credit facility, and (iv) a promissory note (the "Tax Payment Promissory Note") executed by KFGI and payable to Somerville in the amount of Four Hundred Thousand Dollars ($400,000), which note shall be in the form attached as Exhibit 2.4(b)(iv) and shall not be subordinate to KFGI's senior credit facility (collectively, the "*Somerville Intellectual Property Purchase Price*").

-11-

(c)     Subject to Sections 2.4(d), 2.4(e) and 2.4(f), the Globe Assets Purchase Price will be paid to Globe and the Somerville Intellectual Property Purchase Price will be paid to Somerville at Closing. The cash portion of the Globe Assets Purchase Price and the Somerville Intellectual Property Purchase Price will be paid by wire transfer or other mutually acceptable means, and the Globe Bill of Sale, Assignment and Assumption Agreement, the Deferral Promissory Note and the KFGI Promissory Note will be executed and delivered at Closing.

(d)     Anything herein to the contrary notwithstanding, KFGI shall retain One Hundred Sixty-Five Thousand Dollars ($165,000) out of the cash portion of the Globe Assets Purchase Price, and shall deposit such amount at Closing in an interest bearing account established by the Escrow Agents in a Boston, Massachusetts bank (the *"Escrow Account"*) as contemplated by an Escrow Agreement by and among KFGI, Globe and the Escrow Agents in the form of Exhibit 2.4(d) (the *"Escrow Agreement"*). Funds in the Escrow Account shall be held and disbursed by the Escrow Agents in accordance with the Escrow Agreement. Immediately following the first anniversary of the Closing Date, the Escrow Agents shall pay the balance of such amount, plus any accrued interest, to Globe; provided that the Escrow Agents shall retain on deposit so much thereof as KFGI reasonably and in good faith deems necessary to cover any pending indemnification claims as have been properly asserted by KFGI in accordance with ARTICLE 7 hereof prior to the first anniversary date of the Closing Date and which are then unresolved, and the Escrow Agents shall continue to hold same pursuant to the Escrow Agreement until such claims have been finally resolved.

## 2.5     LIABILITIES

(a)     <u>Globe Assumed Liabilities</u>. On the Closing Date and effective as of the Effective Date, KFGI shall assume and agree to promptly pay, perform and discharge only the following Liabilities of Globe (the *"Globe Assumed Liabilities"*):

(i)     any Liability reflected on Globe's Interim Balance Sheet that remains unpaid as of the Effective Date, including without limitation; (i) all trade debt and accounts payable, (ii) all bank debt or other indebtedness for borrowed money, (iii) all debt owed to Somerville or his spouse (or family members of either) shown thereon (which debts shall be paid by KFGI at Closing), (iv) all Taxes, (v) the $150,000 promissory note issued by Globe in favor of KFGI dated September 9, 2003, and (vi) the $200,000 promissory note executed by Globe in favor of KFGI dated April 19, 2004;

(ii)     any trade debt or account payable incurred by Globe in the Ordinary Course of Business between the date of Globe's Interim Balance Sheet and the Effective Date that remains unpaid as of the Closing Date, but expressly excluding any liability for tortious conduct or for a material breach of contract;

-12-

(iii)    any Liability to Globe's customers incurred by Globe in the Ordinary Course of Business for orders outstanding as of the Effective Date reflected on Globe's books (other than any Liability arising out of or relating to a Breach that occurred prior to the Effective Date);

(v)    any Liability to Globe's customers for warranty claims (as distinguished from product liability claims) under its established warranty practices given by Globe to its customers in the Ordinary Course of Business prior to the Effective Date;

(vi)    any Liability arising after the Effective Date under any of the Globe Contracts (except for any Globe Contract not listed on Schedule 4.17(a) of the Disclosure Schedule, whose failure to be so listed constitutes a Breach of Section 4.17 hereof) other than any Liability thereunder for a material Breach that occurred prior to the Effective Date;

(viii)    any liability arising in the Ordinary Course of Business to employees of Globe, to the extent reflected on Globe's books, for current salary or wages and payroll taxes thereon, accrued rights to sick pay and vacation pay and any 401(k) employer matching payments due for current period under the Globe 401(k) Plan;

(ix)    any Liability of Globe described in Schedule 2.5(a)(ix) of the Disclosure Schedule; and

(x)    Liabilities pursuant to Section 2.5(c).

(b)    Retained Globe Liabilities. The Retained Globe Liabilities shall remain the sole responsibility of and shall be retained, paid, performed and discharged solely by Globe. "Retained Globe Liabilities" shall mean every Liability of Globe other than the Globe Assumed Liabilities, including, without limitation:

(i)    any Liability arising out of or relating to products of Globe to the extent manufactured or sold prior to the Effective Date other than to the extent assumed under Section 2.5(a)(iii), (iv) or (v);

(ii)    any Liability under any Contract assumed by KFGI pursuant to Section 2.5(a) that arises after the Effective Date if and only to the extent that such arises out of or relates to any Breach that occurred prior to the Effective Date;

(iii)    any Liability for Taxes (other then Taxes reflected on Globe's Year-End or Globe's Interim Balance Sheets or otherwise assumed by KFGI hereunder) including (A) any Taxes arising as a result of Globe's operation of its business or ownership of the Globe Assets prior to the Effective Date, (B) any Taxes that will arise as a result of the sale of the Globe Assets

-13-

pursuant to this Agreement (except as otherwise provided in Article 7) and (C) any deferred Taxes of any nature;

(iv)  any Liability under any Contract included among the Globe Excluded Assets;

(v)  any Environmental, Health and Safety Liabilities but only to the extent exclusively arising out of or relating to Globe's operation prior to the Effective Date of real property during the time Somerville owned a controlling interest in Globe;

(vi)  any Liability under any undisclosed barter, employment, sales, marketing, distributor, bonus, severance, retention or termination agreement or arrangement, whether written or oral, with any employee of Globe, any independent contractor or any of Globe's or Somerville's Related Persons, other than to the extent assumed under Sections 2.5(a)(i), (ii), (iii), (vi) or (ix);

(vii)  any Liability arising out of or relating to any employee grievance in respect of periods prior to the Effective Date other than in respect of the Globe Assumed Liabilities whether or not the affected employees are hired by KFGI;

(viii)  any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Globe except to extent assumed under Sections 2.5(a)(i), (ii) or (iii);

(ix)  any Liability to distribute to any of Globe's shareholders or otherwise apply all or any part of the consideration received hereunder;

(x)  any Liability arising out of any Proceeding pending as of the Effective Date;

(xi)  any Liability arising out of any Proceeding commenced after the Effective Date and arising out of or relating to any occurrence or event happening prior to the Effective Date, but expressly excluding any Liability in respect of a Proceeding within the scope of KFGI's indemnity undertaking at Section 7.3 or a Liability in respect of a Globe Assumed Liability;

(xii)  any Liability of Globe under this Agreement or any other document executed in connection with the Contemplated Transactions;

(xiii)  any Liability of Globe based upon Globe's acts or omissions occurring after the Closing Date; and

-14-

(xiv)    any Liability of Globe related to the lease or purchase or other financing of the Lexus automobile that Somerville has previously used as a company car.

(c)    <u>Post-Effective Date Operating Liabilities</u>.  Except to the extent of any Globe Retained Liabilities, KFGI acknowledges and agrees that it shall be solely responsible for the operation of the business utilizing the Globe Assets and for any Liabilities associated with the operation of the business utilizing the Globe Assets from and after the Effective Date.

## 2.6    ALLOCATION OF GLOBE ASSETS PURCHASE PRICE

The Globe Assets Purchase Price shall be allocated in accordance with Schedule 2.6 of the Disclosure Schedule. After the Closing, the parties shall make consistent use of the allocation, fair market value and useful lives specified in Schedule 2.6 of the Disclosure Schedule for all Tax purposes and in all filings, declarations and reports with the IRS in respect thereof, including the reports required to be filed under Section 1060 of the Code. KFGI shall prepare and deliver IRS Form 8594 to Globe for its review and approval within forty-five (45) days after the Closing Date to be filed with the IRS. If Globe raises any objection to such form, the parties agree to negotiate a resolution to such matter and to agree on a mutually acceptable form within 30 days.  In any Proceeding related to the determination of any Tax, neither KFGI nor Globe or Somerville shall contend or represent that such allocation is not a correct allocation.

## 2.7    CLOSING

The purchase and sale provided for in ARTICLE 2 of this Agreement (the *"Closing"*) will take place at the offices of Globe's counsel, Tarlow, Breed, Hart, Murphy & Rodgers, P.C., at 21 Custom House Street, Boston, MA 02110, commencing at 10:00 a.m. (local time) on the date hereof.  Subject to the provisions of ARTICLE 6, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.7 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement. In such a situation, the Closing will occur as soon as practicable, subject to the provisions of ARTICLE 6.

## 2.8    CLOSING OBLIGATIONS

In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

(a)    Globe and Somerville, as the case may be, shall have delivered to KFGI:

(i)    a bill of sale, assignment and assumption agreement for all of the Globe Assets in the form of Exhibit 2.8(a)(i) (the *"Globe Bill of Sale, Assignment and Assumption Agreement"*) executed by Globe;

-15-

(ii)     [Intentionally Omitted];

(iii)    general assignment of all Globe Intellectual Property Assets and separate assignments of all registered Globe Marks, Globe Patents and Globe Copyrights, each as in the forms of Exhibit 2.8(a)(iii) executed by Globe;

(iv)     assignments of all Somerville Intellectual Property in the form of Exhibit 2.8(a)(iv) executed by Somerville;

(v)      such other deeds, bills of sale, assignments, customary owner's affidavits, customary tax certificates and affidavits, and documents and other instruments of transfer and conveyance as may reasonably be requested by KFGI, each in form and substance reasonably satisfactory to KFGI and its legal counsel and executed by Globe;

(vi)     an employment agreement in the form of Exhibit 2.8(a)(vi), executed by Somerville (the *"Employment Agreement"*);

(vii)    noncompetition agreements in the form of Exhibit 2.8(a)(vii), executed by Gregg Somerville, Wendy Somerville and Anne Roach-Somerville (the *"Noncompetition Agreements"*);

(viii)   a certificate of the Secretary of Globe certifying, as complete and accurate as of the Closing, attached copies of the Organizational Documents of Globe, certifying and attaching all requisite resolutions or actions of Globe's board of directors and shareholders approving the execution and delivery of this Agreement and the consummation of the Contemplated Transactions and certifying to the incumbency and signatures of the officers of Globe executing this Agreement and any other document relating to the Contemplated Transactions;

(ix)     the Escrow Agreement executed by Globe;

(x)      such other documents as KFGI may reasonably request for the purpose of facilitating the consummation or performance of any of the Contemplated Transactions; and

(xi)     written evidence of the results of a certified environmental review of the compliance of Globe's septic, sewage, and wastewater systems with applicable requirements of Title V of the Code of Massachusetts Regulations (310 CMR Sec 15, et seq.) and the remedial efforts required of Globe in correcting any deficiencies identified in such review, including without limitation the connection of the sewage systems at Globe's facilities to the main city sewer line, and, in the event such remedial efforts have not been completed as of the date hereof, Somerville shall deposit $25,000 into escrow to cover the costs of such remedial efforts conducted post-closing.

-16-

(b)    KFGI shall have delivered to Globe:

    (i)    Seven Hundred Thirty-Three Thousand ($733,000) by wire transfer to an account specified by Globe in a writing delivered to KFGI at least three (3) days prior to the Closing Date;

    (ii)    the Globe Bill of Sale, Assignment and Assumption Agreement executed by KFGI;

    (iii)    the Employment Agreement executed by KFGI;

    (iv)    the Noncompetition Agreements executed by KFGI;

    (v)    a certificate of the Secretary of KFGI certifying, as complete and accurate as of the Closing, attached copies of the Organizational Documents of KFGI and certifying and attaching all requisite resolutions or actions of KFGI's board of directors approving the execution and delivery of this Agreement and the consummation of the Contemplated Transactions and certifying to the incumbency and signatures of the officers of KFGI executing this Agreement and any other document relating to the Contemplated Transactions; and

    (vi)    a written release of all claims from Michael Whitworth running to Globe, Somerville and all of their respective officers, directors, successors and assigns in the form attached hereto as Exhibit 2.8(b)(vi).

(c)    KFGI shall have delivered to Somerville:

    (i)    One Million Five Hundred Two Thousand Dollars ($1,502,000) by wire transfer to an account specified by Somerville in a writing delivered to KFGI at least three (3) days prior to the Closing Date;

    (ii)    the Deferral Promissory Note, executed by KFGI;

    (iii)    the KFGI Promissory Note, executed by KFGI;

    (iv)    the Tax Payment Promissory Note, executed by KFGI; and

    (v)    a release of Somerville from any and all Assumed Liabilities as have been personally guaranteed by Somerville duly executed by the Third Party holding such guarantees and discharges of any mortgages on his residence and collateral assignments of life insurance policies in his life as have been granted to Third Parties incident to such guarantees, as such guarantees and mortgages and insurance policies are identified on Schedule 2.5(a)(ix) of the Disclosure Schedule.

(d)    KFGI shall have delivered to the Escrow Agents:

-17-

(i)     The Escrow Agreement executed by Globe and KFGI; and

(ii)     One Hundred Sixty-Five Thousand Dollars ($165,000).

(e)     Each party hereto shall have delivered such other documents as any other party hereto may reasonably request for the purpose of facilitating the consummation or performance of any of the Contemplated Transactions.

## ARTICLE 3
## CONTRIBUTION OF SOMERVILLE GOODWILL

### 3.1     CONTRIBUTION OF SOMERVILLE GOODWILL

Upon the terms and conditions set forth in this Agreement, on and effective as of the first practicable date following the 504 Loan Funding (the *"Somerville Goodwill Closing Date"*), Somerville shall contribute to KFGI, free and clear of any Encumbrances, all of Somerville's right, title and interest in and to all of the personal goodwill that Somerville possesses as a result of his individual achievements and reputation in the business community (the *"Somerville Goodwill"*). KFGI covenants and agrees that it will not deal with, use, or exploit the Somerville Goodwill in any manner which disparages, embarrasses, or ridicules Somerville or holds Somerville in a false light or otherwise portrays him in a false, misleading, or demeaning manner or invades his privacy.

### 3.2     ISSUANCE OF KFGI EQUITY INTEREST

In consideration for the contribution of Somerville Goodwill by Somerville and on the Somerville Goodwill Closing Date, KFGI shall issue to Somerville an equity interest in KFGI (the *"KFGI Equity Interest"*) in an amount equal to seven and one-half percent (7.5%) of all outstanding limited partnership interests in KFGI as of the Somerville Goodwill Closing Date (calculated on a fully diluted basis) with the same voting rights and other rights, priorities, preferences and privileges as all existing limited partners as of the Closing Date subject only to the amendment attached hereto as Exhibit 3.3(b) (the *"Somerville Goodwill Purchase Price"*), and the value of the Somerville Goodwill shall be deemed to be Somerville's initial capital contribution to KFGI. By mutual agreement of the parties, the KFGI Equity Interest will have an agreed value equal to seven and one-half percent (7.5%) of all capital accounts of all partners of KFGI (including Somerville) as of the Somerville Goodwill Closing Date.

### 3.3     COVENANTS

(a)     So long as the KFGI Equity Interest has not been issued to Somerville, between the Closing Date and the Somerville Goodwill Closing Date, KFGI hereby agrees not to merge or consolidate with any other person, liquidate its business, make any distributions to its partners, or sell all or substantially all of its assets, recapitalize KFGI or authorize or issue any equity interests senior to existing limited partners, or amend its partnership agreement in any respect other than as contemplated by Section 3.3(b).

-18-

(b)     Immediately following the Closing Date, KFGI shall adopt an amendment to its Revised and Amended Agreement of Limited Partnership in substantially the form attached as Exhibit 3.3(b).

## 3.4    CLOSING

(a)     The contribution of the Somerville Goodwill and the payment of the Somerville Goodwill Purchase Price will take place on Somerville Goodwill Closing Date. The Somerville Goodwill Purchase Price will be delivered in form and substance mutually acceptable to the parties as provided herein.

(b)     On the Somerville Goodwill Closing Date, Somerville shall deliver (i) an assignment of the Somerville Goodwill in the form of Exhibit 3.4(b) executed by Somerville, and (ii) a form of acknowledgement, together with such other documents as KFGI shall reasonably request, each executed by Somerville, evidencing Somerville's agreement to be bound by the KFGI's Revised and Amended Agreement of Limited Partnership.

(c)     On the Somerville Goodwill Closing Date, KFGI shall deliver a copy of KFGI's Revised and Amended Partnership Agreement, revised to reflect the admission of Somerville as a 7.5% limited partner as of the Somerville Goodwill Closing Date and amended as contemplated by Section 3.3(b).

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF GLOBE AND SOMERVILLE

The Disclosure Schedule is divided into schedules which are numbered to correspond to sections of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, any matter which is disclosed by either Globe or Somerville in any particular schedule of the Disclosure Schedule, or Exhibits thereto, relating to this ARTICLE 4 shall be deemed to be disclosed in respect of all sections of this ARTICLE 4 to which such disclosure may relate and to qualify all of the representations and warranties of Globe and Somerville contained in this Agreement that are relevant thereto. Subject to the qualifications, exclusions, limitations and disclosures set forth in the Disclosure Schedule in regard to this ARTICLE 4, each of Globe and Somerville represents and warrants, jointly and severally, to KFGI as follows:

## 4.1    ORGANIZATION AND GOOD STANDING

(a)     Globe is a corporation duly organized, validly existing, and in good standing under the laws of the State of Massachusetts, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under the Globe Contracts. Globe is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

-19-

(b)     Globe has delivered to KFGI copies of the Organizational Documents of Globe, as currently in effect.

**4.2    AUTHORITY; NO CONFLICT**

(a)     This Agreement constitutes the legal, valid, and binding obligation of Globe and Somerville, enforceable against each of them in accordance with its terms. Upon the execution and delivery by Globe and Somerville of the Employment Agreement, the Escrow Agreement and any other documents that either Globe or Somerville is required to execute and deliver in connection with or in furtherance of the Contemplated Transactions, (collectively, the **"Globe's Closing Documents"**), the Globe's Closing Documents will constitute the legal, valid, and binding obligations of Globe and Somerville, enforceable against each of them, as applicable, in accordance with their respective terms. Globe has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and the Globe's Closing Documents and to perform its obligations under this Agreement and the Globe's Closing Documents. Somerville has all necessary legal capacity to enter into this Agreement and the Globe's Closing Documents to which Somerville is a party and to perform his obligations hereunder and thereunder.

(b)     Neither the execution and delivery of this Agreement nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time) (i) contravene, conflict with, or result in a material violation or breach of (A) any provision of the Organizational Documents of Globe, (B) any Globe Contract of a material nature; (C) any Order to which Globe or Somerville, or any of the assets owned or used by the Globe, may be subject; or (D) any Governmental Authorization that is held by Globe or that otherwise relates to the business of, or any of the assets owned or used by, the Globe; (ii) cause Globe to become subject to, or to become liable for the payment of, any Tax; or (iii) result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by Globe.

**4.3    CAPITALIZATION**

The authorized equity securities of Globe consist of 300 shares of common stock, par value $100.00 per share, of which 163 shares are issued and outstanding and constitute the Shares. Somerville is the record and beneficial owner and holder of the Shares, free and clear of all Encumbrances. There are no Contracts relating to the issuance, sale, or transfer of any equity securities or other securities of Globe.

**4.4    FINANCIAL STATEMENTS**

(a)     Globe and Somerville have delivered to KFGI:

Dallas_1\3979467\7
41932-2 7/25/2004

(i)    An unaudited balance sheet of Globe as at December 31, 2003 (*"Globe's Year-End Balance Sheet"*), and the related statements of income, changes in stockholders' equity, and cash flow for the fiscal year then ended, and

(ii)    An unaudited balance sheet of Globe as at June 30, 2004 (*"Globe's Interim Balance Sheet"*) and the related unaudited statements of income, changes in stockholders' equity, and cash flow for the 2 months then ended.

(b)    Such financial statements fairly present the financial condition and the results of operations, changes in stockholders' equity, and cash flow of Globe as at the respective dates of and for the periods referred to in such financial statements.

### 4.5    BOOKS AND RECORDS

The books of account, minute books, stock record books, and other Records of Globe, all of which have been made available to KFGI, are up to date, complete and correct in all material respects and in the possession of Globe.

### 4.6    TITLE TO PROPERTIES; ENCUMBRANCES

(a)    Schedule 4.6(a) of the Disclosure Schedule contains a complete and accurate list of all Real Property, Ground Lease Property, or other real property interests therein owned by Globe (the *"Globe Real Property"*).

(b)    Except for the Globe Real Property, which is discussed in Section 4.6(a), Globe owns all the Globe Assets (whether tangible or intangible) free and clear of all Encumbrances, except as shown on Schedule 4.6(b) of the Disclosure Schedule.

### 4.7    SUFFICIENCY OF ASSETS

The Globe Assets, the Somerville Intellectual Property and the Somerville Goodwill constitute all of the material assets, tangible and intangible, of any nature whatsoever, necessary to operate Globe's business in the manner presently operated by Globe.

### 4.8    ACCOUNTS RECEIVABLE

All accounts receivable of Globe that are reflected on Globe's Year-End Balance Sheet or Globe's Interim Balance Sheet or on the accounting records of Globe as of the Effective Date represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. There is to Globe's and Somerville's Knowledge no contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, under any Contract with any obligor of an accounts receivable relating to the amount or validity of such accounts receivable. Globe and Somerville have delivered to KFGI a complete and accurate list of all accounts receivable as of the date of Globe's Interim Balance Sheet, which list sets forth the aging of such accounts receivable.

### 4.9 INVENTORY

All inventory of Globe reflected in Globe's Year-End Balance Sheet or Globe's Interim Balance Sheet, consists of a quality and quantity usable and salable in the Ordinary Course of Business other than such portion of inventory which is either (i) reserved against in Globe's Year-End Balance Sheet or Globe's Interim Balance Sheet as potentially unsalable or (ii) does not represent an amount which would have a material adverse effect on the financial condition of Globe.

### 4.10 NO UNDISCLOSED LIABILITIES

Except as set forth in Schedule 4.10 of the Disclosure Schedule, Globe has no liabilities or obligations of any material nature which are required to be reflected on Globe's financial statements (whether known or unknown and whether absolute, accrued, contingent, or otherwise) in order to fairly present its financial condition, except for liabilities or obligations reflected in Globe's Year-End Balance Sheet or Globe's Interim Balance Sheet and liabilities incurred in the Ordinary Course of Business since the respective dates thereof.

### 4.11 TAXES

(a)    Globe has filed or caused to be filed (on a timely basis since January 1, 2001) all Tax Returns that are or were required to be filed by or with respect to Globe, pursuant to applicable Legal Requirements. Globe and Somerville have delivered to KFGI copies of all such Tax Returns. Globe has paid all Taxes that have or may have become due pursuant to those Tax Returns, except such Taxes, if any, as are being contested in good faith.

(b)    All Tax Returns filed by Globe are true, correct, and complete in all material respects.

### 4.12 NO MATERIAL ADVERSE CHANGE

Since the date of Globe's Year-End Balance Sheet, there has not been any material adverse change in the business, operations, properties, prospects, assets, or condition of Globe, and   to the knowledge of Globe and Somerville no event has occurred or circumstance exists that may be reasonably foreseen by a prudent person as likely to result in such a material adverse change.

### 4.13 EMPLOYEE BENEFITS

(a)    As used in this Section 4.13 and in Section 5.13, the following terms have the meanings set forth below.

*"Globe Plan"* means all Plans of which Globe is or was the Plan Sponsor, or to which Globe otherwise contributes or has contributed, or in which Globe otherwise participates

-22-

or has participated. All references to Plans are to Globe Plans unless the context requires otherwise.

*"PBGC"* means the Pension Benefit Guaranty Corporation, or any successor thereto.

*"Plan"* has the meaning given in ERISA § 3(3).

*"Plan Sponsor"* has the meaning given in ERISA § 3(16)(B).

(b)    Schedule 4.13(b) of the Disclosure Schedule contains a complete and accurate list of all Globe Plans.

(c)    Globe and Somerville have delivered to KFGI (i) all material documents that set forth the terms of the Globe Plans; (ii) all personnel, payroll, and employment manuals and policies; and (iii) all insurance policies purchased by or to provide benefits under the Globe Plan and presently in effect.

(d)    Except as set forth in Schedule 4.13(d) of the Disclosure Schedule:

    (i)    Globe has performed, in all material respects, all of its obligations under all Globe Plans. Globe has made appropriate entries in its financial records and statements for all obligations and liabilities under such Plans that have accrued but are not due.

    (ii)    Globe, with respect to all Globe Plans, is in full compliance, in all material respects, with ERISA, the IRC, and other applicable Laws.

    (iii)    No accumulated funding deficiency, whether or not waived, exists with respect to any Globe Plan.

    (iv)    Neither Globe nor Somerville has Knowledge of any facts or circumstances that may give rise to any liability of Somerville, Globe, or KFGI to the PBGC under Title IV of ERISA.

    (v)    The consummation of the Contemplated Transactions will not result in the payment, vesting, or acceleration of any benefit under any Globe Plan.

**4.14  COMPLIANCE WITH LEGAL REQUIREMENTS AND GOVERNMENTAL AUTHORIZATIONS**

Except as set forth in Schedule 4.14 of the Disclosure Schedule, (i) to Globe's and Somerville's Knowledge, Globe is in full compliance, in all material respects, with each Legal Requirement and Governmental Authorization that is applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets; (ii) to Globe's and Somerville's Knowledge, no event has occurred or circumstance exists that (with or without notice or lapse of time) may constitute or result in a material violation by Globe of, or a material failure on the part of Globe to comply with, any Legal

Requirement or Governmental Authorization; and (iii) Globe has not received any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply with, any Legal Requirement or Governmental Authorization,

**4.15   LEGAL PROCEEDINGS; ORDERS**

(a)   Except as set forth in Schedule 4.15 of the Disclosure Schedule, there is no Proceeding pending or, to the Knowledge of Globe or Somerville, Threatened by or against Globe or Somerville (i) that relates to or may materially affect the Globe Assets, the Somerville Intellectual Property or the Somerville Goodwill; or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

(b)   Except as set forth in Schedule 4.15 of the Disclosure Schedule, there is no Order having specific reference to Globe to which Globe, or any of the assets owned or used by Globe, is subject.

**4.16   ABSENCE OF CERTAIN CHANGES AND EVENTS**

Except as set forth in Schedule 4.16 of the Disclosure Schedule, since the date of Globe's Year-End Balance Sheet, Globe has conducted its businesses only in the Ordinary Course of Business and there has not been any (i) change in Globe's authorized or issued capital stock; grant of any stock option or right to purchase shares of capital stock of Globe; issuance of any security convertible into such capital stock; grant of any registration rights; purchase, redemption, retirement, or other acquisition by Globe of any shares of any such capital stock; or declaration or payment of any dividend or other distribution or payment in respect of shares of capital stock; (ii) amendment to the Organizational Documents of Globe; (iii) payment or increase by Globe of any bonuses, salaries, or other compensation to any stockholder, director, officer, or employee or entry into any employment, severance, or similar Contract with any director, officer, or employee (except in the Ordinary Course of Business); (iv) damage to or destruction or loss of any Globe Asset or Somerville Asset, whether or not covered by insurance, materially and adversely affecting the properties, assets, business, financial condition, or prospects of Globe, taken as a whole; (v) sale (other than sales of inventory in the Ordinary Course of Business), lease, or other disposition (other than dispositions in the Ordinary Course of Business of assets no longer needed or useful in the business which have become obsolete, depleted or worn out) of any Globe Asset or Somerville Asset or property of Globe or mortgage, pledge, or imposition of any lien or other encumbrance on any Globe Asset or Somerville Asset; (vi) transaction between Globe and any stockholder, officer or director of Globe or any Related Person of any of them of an amount or value in excess of $10,000; or (vii) agreement, whether oral or written, by Globe to do any of the foregoing.

-24-

4.17    CONTRACTS; NO DEFAULTS

(a)    Schedule 4.17(a) of the Disclosure Schedule contains a complete and accurate list, and Globe and Somerville have delivered to KFGI true and complete copies, of (i) each executory Globe Contract that involves the performance of services or delivery of goods or materials by or to Globe of an amount or value in excess of $10,000; (ii) each executory licensing agreement or other Globe Contract with respect to patents, trademarks, copyrights, or other intellectual property, including agreements with current or former employees, consultants, or contractors regarding the appropriation or the non-disclosure of any of Globe's Intellectual Property Assets; (iii) each executory Globe Contract that commits Globe to make a capital expenditure, or incur a liability, either direct or contingent, in excess of $10,000; and (iv) each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

(b)    To the Knowledge of Globe and Somerville, each Contract identified in Schedule 4.17(a) of the Disclosure Schedule is in full force and effect and is valid and enforceable in accordance with its terms.

(c)    Except as set forth in Schedule 4.17(c) of the Disclosure Schedule (i) Globe is in full compliance with all material terms and requirements of each material Globe Contract; (ii) no event has occurred that gives Globe or any other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any material Globe Contract; and (iii) Globe has not given to or received from any other Person any notice or other communication (whether oral or written) regarding any actual, alleged, possible, or potential violation or breach of, or default under, any material Globe Contract.

4.18    INSURANCE

Globe and Somerville have delivered to KFGI a true and complete list of all policies of insurance to which Globe is a party or under which Globe, or any director of Globe, is or has been covered at any time since January 1, 2003.

4.19    ENVIRONMENTAL MATTERS

Except as set forth in Schedule 4.19 of the Disclosure Schedule:

(a)    To the knowledge of Globe or Somerville, Globe is in full compliance, in all material respects, with all applicable Environmental Laws.

(b)    There are no pending or, to the Knowledge of Globe or Somerville, Threatened claims, Encumbrances, or Environmental, Health, and Safety Liabilities arising under or pursuant to a violation by Globe of any Environmental Law (during the period from 1987 through the Closing Date), with respect to or affecting any of

Globe's Facilities or any other properties and assets (whether real, personal, or mixed) in which Globe has an interest.

(c) Neither Globe nor Somerville has Knowledge of, nor have Globe or Somerville received, any citation, directive, inquiry, notice, Order, summons, warning, or other communication that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities (during the period from 1987 through the Closing Date) with respect to any of Globe's Facilities or any other properties or assets (whether real, personal, or mixed) in which Globe has an interest which has not been fully addressed and/or remedied.

(d) Globe and Somerville are not aware of there being any Hazardous Materials present on or in the Environment at Globe's Facilities except for such materials used in the Ordinary Course of Business and in compliance with law. Neither Globe nor Somerville (during the period from 1987 through the Closing Date) has conducted, or permitted to be conducted, any Hazardous Activity at Globe's Facilities or any other properties or Globe Assets (whether real, personal, or mixed), except in full compliance with all applicable Environmental Laws.

(e) Globe and Somerville have delivered to KFGI true and complete copies of any reports, studies, analyses, tests, or monitoring possessed or initiated since 1999 by Globe or Somerville pertaining to Hazardous Materials or Hazardous Activities in, on, or under Globe's Facilities, or concerning compliance by Somerville or Globe.

**4.20   EMPLOYEES**

(a) Schedule 4.20 of the Disclosure Schedule contains a complete and accurate list of each employee of Globe. With respect to each employee, Globe and Somerville have delivered to KFGI each employee's job title; current compensation; accrued vacation; and service credited for purposes of vesting and eligibility to participate under Globe's employee benefit plans.

(b) To the Knowledge of Globe or Somerville, no director, officer, or other key employee of Globe intends to terminate his employment with Globe.

**4.21   LABOR RELATIONS; COMPLIANCE**

Globe is not a party to any collective bargaining or other labor Contract.

**4.22   INTELLECTUAL PROPERTY**

(a) Intellectual Property Assets—The term *"Globe's Intellectual Property Assets"* means all of the intellectual property owned, used and/or licensed by Globe (other

than the Somerville Intellectual Property) that relates to Globe and its business, including:

   (i)   the names "Globe Rubber Works, Inc.," "Globe Rubber Works," and "Globe Rubber" together with all fictional business names, trading names, registered and unregistered trademarks, service marks, and applications presently in use by Globe (collectively, *"Globe Marks"*);

   (ii)   all patents, patent applications, and inventions and discoveries that may be patentable (collectively, *"Globe Patents"*);

   (iii)   all copyrights in both published works and unpublished works (collectively, *"Globe Copyrights"*);

   (iv)   all rights in mask works (collectively, *"Globe Rights in Mask Works"*);

   (v)   all know-how, trade secrets, confidential information, customer lists, software, technical information, data, process technology, plans, drawings, and blue prints (collectively, *"Globe Trade Secrets"*); and

   (vi)   all rights in internet web sites and internet domain names presently used by Globe, including, without limitation, globerubberworks.com (collectively *"Globe Net Names"*).

(b)   <u>Agreements</u>—Schedule 4.22(b) of the Disclosure Schedule contains a complete and accurate list of all Globe Contracts relating to Globe's Intellectual Property Assets to which Globe or Somerville is a party or by which Globe or Somerville is bound. There are no pending or, to the Knowledge of Globe or Somerville, Threatened disputes or disagreements with respect to any such Globe Contracts.

(c)   <u>Ownership</u>

   (i)   To the knowledge of Somerville and Globe, Globe is the owner of all right, title, and interest in and to each of Globe's Intellectual Property Assets, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

   (ii)   All current employees of Globe who are materially involved in the development of Globe's Intellectual Property have executed written Contracts with Globe that assign to Globe all rights to any inventions, improvements, discoveries, or information relating to the business of Globe.

(d)   <u>Patents</u>

   (i)   Schedule 4.22(d) of the Disclosure Schedule contains a complete and accurate list of all Globe Patents.

-27-

(ii)  To the Knowledge of Globe or Somerville, (A) no Globe Patent has been challenged or threatened in any way, and (B) none of the products manufactured and sold, nor any process or know-how used, by Globe infringes or is alleged to infringe any patent or other proprietary right of any other Person.

(e)  Trademarks

(i)  Schedule 4.22(e) of Disclosure Schedule contains a complete and accurate list of all Globe Marks.

(ii)  To the Knowledge of Globe or Somerville, (A) no Globe Mark has been challenged or threatened in any way and (B) none of the Globe Marks used by Globe infringes or is alleged to infringe any trade name, trademark, or service mark of any other Person.

(f)  Copyrights

(i)  Schedule 4.22(f) of the Disclosure Schedule contains a complete and accurate list of all Globe Copyrights.

(ii)  To the Knowledge of Globe or Somerville, (A) no Globe Copyright has been challenged or threatened in any way, and (B) none of the subject matter of any of the Globe Copyrights infringes or is alleged to infringe any copyright of any third party or is a derivative work based on the work of any other Person (other than in respect of the Knowledge or memory of Somerville, which shall be addressed pursuant to Section 8.10).

(g)  Trade Secrets

(i)  With respect to each Globe Trade Secret, the documentation relating to such Globe Trade Secret is current, accurate, and sufficient in detail and content to identify and explain it and to allow its full and proper use without reliance on the knowledge or memory of any individual (other than in respect of the Knowledge or memory of Somerville, which shall be addressed pursuant to Section 8.10).

(ii)  Globe and Somerville have taken reasonable precautions to protect the secrecy, confidentiality, and value of their Globe Trade Secrets.

(h)  Net Names

(i)  Schedule 4.22(h) of the Disclosure Schedule contains a complete and accurate list of all Globe Net Names.

(ii)  All Globe Net Names have been registered in the name of Globe.

-28-

(iii) No Globe Net Name has been or is now involved in any dispute, opposition, invalidation or cancellation Proceeding and, to Globe's or Somerville's Knowledge, no such action is threatened with respect to any Globe Net Name.

### 4.23 RELATIONSHIPS WITH RELATED PERSONS

Neither Globe nor Somerville nor any Related Person of either of them has any interest in any property (whether real, personal, or mixed and whether tangible or intangible) used in or pertaining to Globe's businesses other then Somerville Intellectual Properties and Somerville Goodwill. Neither Globe nor Somerville nor any Related Person of either of them has an equity interest or any other financial or profit interest in a Person that has (i) material business dealings or a material financial interest in any transaction with Globe, or (ii) engaged in competition with Globe with respect to any line of the products or services of Globe (a *"Competing Business"*) in any market presently served by Globe. Except as set forth in Schedule 4.23 of the Disclosure Schedule, neither Globe nor Somerville nor any Related Person of either of them is a party to any Contract with, or has any claim or right against, Globe.

### 4.24 NECESSARY APPROVALS

Globe and Somerville have made all filings required by Legal Requirements to be made by either of them in order to consummate the Contemplated Transactions.

### 4.25 BROKERS OR FINDERS

Neither Globe nor any of its agents have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

### 4.26 CHANGE OF NAME

Simultaneously with the Closing, Globe has amended its Organizational Documents and has made all filings required by Legal Requirements to be made by it in order to change its name to Solar Construction, Inc.

### 4.27 REAL ESTATE RELATED REPRESENTATIONS

(a) Compliance With Laws. To the best of Globe's and Somerville's Knowledge, and except as set forth on Schedule 4.27 of the Disclosure Schedule, Globe's Facilities are not currently subject to (i) any existing, pending or threatened investigation or inquiry by any governmental authority or (ii) any remedial obligations under any Legal Requirement. Neither Globe nor Somerville nor either of their Representatives have received any notice from any municipal, state, federal or other governmental authority of any violation of any Legal Requirement issued in respect of Globe's Facilities which has not been heretofore corrected, and to their Knowledge no such violation exists.

-29-

(b) **Zoning.** Except as disclosed to KFGI in writing, there are no pending or threatened requests or applications by Globe, or to Globe or Somerville's Knowledge any proceedings brought by any Person to alter or restrict the zoning or other use restrictions applicable to Globe's Facilities. To the best of Globe's and Somerville's Knowledge, there is no judicial or administrative action or any action by adjacent landowners which would adversely affect, prevent, or limit the use of the Land as currently zoned and platted.

(c) **Taxes.** Globe has paid all property taxes and property assessments due and payable for Globe's Facilities and on the Closing Date Globe's Facilities will be subject to no liens for unpaid taxes or assessments other than the lien for real estate taxes and property assessments for the year in which Closing occurs. Globe has not retained any person or firm to file a notice of protest against, or to commence any action to review, any real property tax assessment against Globe's Facilities or any portion thereof and, no such action has been taken by or on behalf of Globe.

(d) **Assessments.** There are no unpaid assessments or other charges for utilities, roads (or the widening of roads) or other public improvements against Globe's Facilities and, to the best of Globe's and Somerville's Knowledge, no such assessments have been proposed. All sewer, water, gas, electric, telephone and drainage lines and facilities required by law for the normal operation of Globe's Facilities are fully installed, currently function satisfactorily and service Globe's Facilities for its current use except as disclosed on Schedule 4.27 of the Disclosure Schedule, and there are no unpaid assessments or charges for the installation of such utilities or for making connection thereto that have not been fully paid.

(e) **Condemnation.** Globe has not received any notice of any condemnation or similar proceedings having been instituted or threatened against Globe's Facilities or any part thereof, nor is any such proceeding threatened or contemplated to Globe's or Somerville's or their respective Representative's knowledge.

(f) **Submission Items.** All items delivered to KFGI under Section 8.15, are to the Knowledge of Globe or Somerville true, correct and complete in all respects.

(g) **Independent Unit.** Globe's Facilities do not rely on any facilities located on any property that is not part of Globe's Facilities to fulfill any municipal or other governmental requirement or to obtain essential systems or services (such as, without limitation, drainage facilities and retention ponds) for which Globe does not have a valid easement. Likewise, no other building or property that is not part of Globe's Facilities relies on, to the Knowledge of Globe or Somerville, Globe's Facilities or its facilities to fulfill any municipal or other governmental requirement or to obtain essential systems or services without having a valid easement for same.

Dallas_1\979467\7
41932-2 7/25/2004

# ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF KFGI

The Disclosure Schedule is divided into schedules which are numbered to correspond to sections of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, any matter which is disclosed by KFGI in any particular schedule of the Disclosure Schedule, or Exhibits thereto, relating to this ARTICLE 5 shall be deemed to be disclosed in respect of all sections of this ARTICLE 5 to which such disclosure may relate and to qualify all of the representations and warranties of KFGI contained in this Agreement that are relevant thereto. Subject to the qualifications, exclusions, limitations and disclosures set forth in the Disclosure Schedule in regard to this ARTICLE 5, KFGI represents and warrants to Globe and Somerville as follows:

5.1    ORGANIZATION AND GOOD STANDING

(a)    KFGI is a limited partnership duly organized and validly existing in good standing under the laws of the State of Texas, with full power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under the KFGI Contracts. KFGI is duly qualified to do business as a foreign limited partnership and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

(b)    KFGI has delivered to Globe and Somerville copies of the Organizational Documents of KFGI, as currently in effect.

5.2    AUTHORITY; NO CONFLICT

(a)    This Agreement constitutes the legal, valid, and binding obligation of KFGI, enforceable against KFGI in accordance with its terms. Upon the execution and delivery by KFGI of the Employment Agreement, the Deferral Promissory Note, the KFGI Promissory Note, the Tax Payment Promissory Note, the Escrow Agreement and any other documents that KFGI is required to execute and deliver in connection with or in furtherance of the Contemplated Transactions, (collectively, the *"KFGI's Closing Documents"*), the KFGI's Closing Documents will constitute the legal, valid, and binding obligations of KFGI, enforceable against KFGI in accordance with their respective terms. KFGI has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and the KFGI's Closing Documents and to perform its obligations under this Agreement and the KFGI's Closing Documents.

(b)    Neither the execution and delivery of this Agreement nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time) (i) contravene, conflict with, or result in a material violation or breach of (A) any provision of the Organizational Documents of KFGI, (B) any KFGI Contract ; (C) any Order to which KFGI, or

-31-

any of the assets owned or used by KFGI, may be subject; or (D) any Governmental Authorization that is held by KFGI or that otherwise relates to the business of, or any of the assets owned or used by, KFGI; (ii) cause KFGI to become subject to, or to become liable for the payment of, any Tax; or (iii) result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by KFGI.

### 5.3    CAPITALIZATION

Immediately following Closing, the outstanding partnership interests of KFGI will be owned by its general and limited partners free and clear of all encumbrances.  There are no Contracts relating to the issuance, sale, or transfer of any partnership interests or other securities of KFGI .  A true and complete copy of the limited partnership agreement of KFGI, as in effect as of the date hereof and identifying all partners, is attached hereto as Schedule 5.3 of the Disclosure Schedule.

### 5.4    FINANCIAL STATEMENTS

(a)    KFGI has delivered to Globe and Somerville:

    (i)    An unaudited balance sheet of KFGI as at December 31, 2003 (*"KFGI's Year-End Balance Sheet"*), and the related statements of income, changes in owners' equity, and cash flow for the fiscal year then ended, and

    (ii)    an unaudited balance sheet of KFGI as at June 30, 2004 (*"KFGI's Interim Balance Sheet"*) and the related unaudited statements of income, changes in owners' equity, and cash flow for the 2 months then ended.

(b)    Such financial statements fairly present the financial condition and the results of operations, changes in stockholders' equity, and cash flow of KFGI as at the respective dates of and for the periods referred to in such financial statements.

### 5.5    BOOKS AND RECORDS

The books of account, minute books, stock record books, and other Records of KFGI, all of which have been made available to Globe and Somerville, are up to date, complete and correct in all material respects and in the possession of KFGI.

### 5.6    TITLE TO PROPERTIES; ENCUMBRANCES

Schedule 5.6(a) of the Disclosure Schedule contains a complete and accurate list of all Real Property, Ground Lease Property, or other interests therein owned by KFGI. KFGI owns all material properties and assets reflected in KFGI's Year-End Balance Sheet and KFGI's Interim Balance Sheet free and clear of all Encumbrances, except as shown on Schedule 5.6(b) of the Disclosure Schedule.

Dallas_1\3979467\7
41932-2 7/25/2004

### 5.7   SUFFICIENCY OF ASSETS

The building, plants, structures, and equipment, Intellectual Properties and other tangible and intangible assets of KFGI constitute all of the material assets, tangible and intangible, of any nature whatsoever, necessary for the continued conduct of KFGI's businesses after the Closing in substantially the same manner as conducted prior to the Closing.

### 5.8   ACCOUNTS RECEIVABLE

All accounts receivable of KFGI that are reflected on KFGI's Year-End Balance Sheet or KFGI's Interim Balance Sheet or on the accounting records of KFGI as of the Closing Date represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. There is, to KFGI's Knowledge, no contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, under any Contract with any obligor of an accounts receivable relating to the amount or validity of such accounts receivable. KFGI has delivered to Globe and Somerville a complete and accurate list of all accounts receivable as of the date of KFGI's Interim Balance Sheet, which list sets forth the aging of such accounts receivable.

### 5.9   INVENTORY

All inventory of KFGI reflected in KFGI's Year-End Balance Sheet or KFGI's Interim Balance Sheet, consists of a quality and quantity usable and salable in the Ordinary Course of Business other than such portion of inventory which is either (i) reserved against in KFGI's Year-End Balance Sheet or KFGI's Interim Balance Sheet as potentially unsalable or (ii) does not represent an amount which would have a material adverse effect on the financial condition of KFGI.

### 5.10   NO UNDISCLOSED LIABILITIES

Except as set forth in Schedule 5.10 of the Disclosure Schedule, KFGI has no liabilities or obligations of any material nature which are required to be reflected on KFGI's financial statements (whether known or unknown and whether absolute, accrued, contingent, or otherwise) in order to fairly present its financial condition except for liabilities or obligations reflected in KFGI's Year-End Balance Sheet or KFGI's Interim Balance Sheet and liabilities incurred in the Ordinary Course of Business since the respective dates thereof.

### 5.11   TAXES

(a)   KFGI has filed or caused to be filed (on a timely basis since January 1, 2001) all Tax Returns that are or were required to be filed by or with respect to KFGI, pursuant to applicable Legal Requirements. KFGI has delivered to Globe and Somerville copies of all such Tax Returns. KFGI has paid all Taxes that have or may have become due pursuant to those Tax Returns, except such Taxes, if any, as are being contested in good faith.

-33-

(b)     All Tax Returns filed by KFGI are true, correct, and complete in all material respects.

## 5.12   NO MATERIAL ADVERSE CHANGE

Since the date of KFGI's Year-End Balance Sheet, there has not been any material adverse change in the business, operations, properties, prospects, assets, or condition of KFGI, and to knowledge of KFGI no event has occurred or circumstance exists that may be reasonably foreseen by a prudent person as likely to result in such a material adverse change.

## 5.13   EMPLOYEE BENEFITS

(a)     As used in this Section 5.13, *"KFGI Plan"* means all Plans of which KFGI is or was the Plan Sponsor, or to which KFGI otherwise contributes or has contributed, or in which KFGI otherwise participates or has participated.  All references to Plans are to KFGI Plans unless the context requires otherwise.

(b)     Schedule 5.13(b) of the Disclosure Schedule contains a complete and accurate list of all KFGI Plans

(c)     KFGI has delivered to Globe and Somerville (i) all material documents that set forth the terms of the KFGI Plans, (ii) all personnel, payroll, and employment manuals and policies; and (iii) all insurance policies purchased by or to provide benefits under the KFGI Plan and presently in effect.

(d)     Except as set forth in Schedule 5.13(d) of the Disclosure Schedule:

   (i)     KFGI has performed, in all material respects, all of its obligations under all KFGI Plans. KFGI has made appropriate entries in its financial records and statements for all obligations and liabilities under such Plans that have accrued but are not due.

   (ii)     KFGI, with respect to all KFGI Plans is in full compliance, in all material respects, with ERISA, the IRC, and other applicable Laws.

   (iii)     No accumulated funding deficiency, whether or not waived, exists with respect to any KFGI Plan.

   (iv)     KFGI has no Knowledge of any facts or circumstances that may give rise to any liability of KFGI, Globe, or Somerville to the PBGC under Title IV of ERISA.

   (v)     The consummation of the Contemplated Transactions will not result in the payment, vesting, or acceleration of any benefit under any KFGI Plan.

-34-

## 5.14 COMPLIANCE WITH LEGAL REQUIREMENTS AND GOVERNMENTAL AUTHORIZATIONS

Except as set forth in Schedule 5.14 of the Disclosure Schedule, (i) to KFGI's knowledge, KFGI is in full compliance, in all material respects, with each Legal Requirement and Governmental Authorization that is applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets; (ii) to KFGI's knowledge, no event has occurred or circumstance exists that (with or without notice or lapse of time) may constitute or result in a material violation by KFGI of, or a material failure on the part of KFGI to comply with, any Legal Requirement or Governmental Authorization, (iii) KFGI has not received any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply with, any Legal Requirement or Governmental Authorization,

## 5.15 LEGAL PROCEEDINGS; ORDERS

(a)  Except as set forth in Schedule 5.15(a) of the Disclosure Schedule, there is no Proceeding pending or, to KFGI's Knowledge, Threatened against KFGI (i) that relates to or may materially affect the business of, or any of the assets owned or used by, KFGI; or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

(b)  Except as set forth in Schedule 5.15(b) of the Disclosure Schedule, there is no Order having specific reference to KFGI to which KFGI, or any of the assets owned or used by KFGI, is subject.

## 5.16 ABSENCE OF CERTAIN CHANGES AND EVENTS

Except as set forth in Schedule 5.16 of the Disclosure Schedule, since the date of KFGI's Year-End Balance Sheet, KFGI has conducted its businesses only in the Ordinary Course of Business and there has not been any (i) change in KFGI's authorized or issued partnership interests; grant of any option or right to purchase partnership interests of KFGI; issuance of any security convertible into such partnership interests; grant of any registration rights; purchase, redemption, retirement, or other acquisition by KFGI of any such partnership interests; or declaration or payment of any distribution or payment in respect of the partnership interests; (ii) amendment to the Organizational Documents of KFGI; (iii) payment or increase by KFGI of any bonuses, salaries, or other compensation to any stockholder, director, officer, or employee or entry into any employment, severance, or similar Contract with any director, officer, or employee (except in the Ordinary Course of Business); (iv) damage to or destruction or loss of any asset or property of KFGI, whether or not covered by insurance, materially and adversely affecting the properties, assets, business, financial condition, or prospects of KFGI, taken as a whole; (v) sale (other than sales of inventory in the Ordinary Course of Business), lease, or other disposition (other than dispositions in the Ordinary Course of Business of

Dallas_1\3979467\7
41932-2 7/25/2005

assets no longer needed or useful in the business which have become obsolete, depleted or worn out) of any asset or property of KFGI or mortgage, pledge, or imposition of any lien or other encumbrance on any material asset or property of KFGI; (vi) transaction between KFGI and any stockholder, officer or director of KFGI or any Related Person of any of them of an amount in excess of $10,000; or (vii) agreement, whether oral or written, by KFGI to do any of the foregoing.

## 5.17    CONTRACTS; NO DEFAULTS

(a)    Schedule 5.17(a) of the Disclosure Schedule contains a complete and accurate list, and KFGI has delivered to Globe and Somerville true and complete copies, of (i) each executory KFGI Contract that involves the performance of services or delivery of goods or materials by or to KFGI of an amount or value in excess of $10,000; (ii) each executory licensing agreement or other KFGI Contract with respect to patents, trademarks, copyrights, or other intellectual property, including agreements with current or former employees, consultants, or contractors regarding the appropriation or the non-disclosure of any of KFGI's Intellectual Property Assets; (iii) each executory KFGI Contract that commits KFGI to make a capital expenditure, or incur a liability, either direct or contingent, in excess of $10,000; and (iv) each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

(b)    To KFGI's Knowledge, each Contract identified in Schedule 5.17(a) of the Disclosure Schedule is in full force and effect and is valid and enforceable in accordance with its terms.

(c)    Except as set forth in Schedule 5.17(c) of the Disclosure Schedule (i) KFGI is in full compliance with all material terms and requirements of each material KFGI Contract; (ii) no event has occurred that gives KFGI or any other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any material KFGI Contract; and (iii) KFGI has not given to or received from any other Person any notice or other communication (whether oral or written) regarding any actual, alleged, possible, or potential violation or breach of, or default under, any material KFGI Contract.

## 5.18    INSURANCE

KFGI has delivered to Globe and Somerville a true and complete list of all policies of insurance to which KFGI is a party or under which KFGI, or any director of KFGI, is or has been covered at any time since January 1, 2003.

## 5.19    ENVIRONMENTAL MATTERS

Except as set forth in Schedule 5.19 of the Disclosure Schedule:

-36-

(a)   KFGI is in full compliance, in all material respects, with all applicable Environmental Laws.

(b)   There are no pending or, to the Knowledge of KFGI, Threatened claims, Encumbrances, or other restrictions of any nature, resulting from any Environmental, Health, and Safety Liabilities or arising under or pursuant to any Environmental Law (during KFGI's ownership), with respect to or affecting any of KFGI's Facilities or any other properties and assets (whether real, personal, or mixed) in which KFGI has an interest.

(c)   KFGI does not have Knowledge of, nor has KFGI received, any citation, directive, inquiry, notice, Order, summons, warning, or other communication that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities (during KFGI's ownership) with respect to any of KFGI's Facilities or any other properties or assets (whether real, personal, or mixed) in which KFGI has an interest.

(d)   KFGI is not aware of there being any Hazardous Materials present on or in the Environment at KFGI's Facilities except for such materials used in the Ordinary Course of Business and in compliance with law. KFGI has not (during KFGI's ownership) conducted, or permitted to be conducted, any Hazardous Activity at KFGI's Facilities or any other properties or assets (whether real, personal, or mixed) in which KFGI has an interest, except in full compliance with all applicable Environmental Laws.

(e)   KFGI has delivered to Globe and Somerville true and complete copies of any reports, studies, analyses, tests, or monitoring possessed or initiated since 1999 by KFGI pertaining to Hazardous Materials or Hazardous Activities in, on, or under KFGI's Facilities, or concerning compliance by KFGI.

5.20   **EMPLOYEES**

(a)   Schedule 5.20 of the Disclosure Schedule contains a complete and accurate list of each employee of KFGI. With respect to each employee, KFGI has delivered to Globe and Somerville each employee's job title; current compensation; accrued vacation; and service credited for purposes of vesting and eligibility to participate under KFGI's employee benefit plans.

(b)   To KFGI's Knowledge, no director, officer, or other key employee of KFGI intends to terminate his employment with KFGI.

5.21   **LABOR RELATIONS; COMPLIANCE**

KFGI is not a party to any collective bargaining or other labor Contract.

-37-

5.22    INTELLECTUAL PROPERTY

(a)    Intellectual Property Assets—The term *"KFGI's Intellectual Property Assets"* means all of the intellectual property owned, used and/or licensed by KFGI that relates to KFGI and its business, including:

    (i)    the name "Kalm-Forsythe Global Innovations, Ltd.," "KFGI" and all fictional business names, trading names, registered and unregistered trademarks, service marks, and applications (collectively, *"KFGI Marks"*);

    (ii)    all patents, patent applications, and inventions and discoveries that may be patentable (collectively, *"KFGI Patents"*);

    (iii)    all copyrights in both published works and unpublished works (collectively, *"KFGI Copyrights"*);

    (iv)    all rights in mask works (collectively, *"KFGI Rights in Mask Works"*); and

    (v)    all know-how, trade secrets, confidential information, customer lists, software, technical information, data, process technology, plans, drawings, and blue prints (collectively, *"KFGI Trade Secrets"*).

(b)    Agreements—Schedule 5.22(b) of the Disclosure Schedule contains a complete and accurate list of all KFGI Contracts relating to KFGI's Intellectual Property Assets to which KFGI is a party or by which KFGI is bound. There are no pending or, to KFGI's Knowledge, Threatened disputes or disagreements with respect to any such KFGI Contracts.

(c)    Ownership

    (i)    KFGI is the owner of all right, title, and interest in and to each of KFGI's Intellectual Property Assets, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

    (ii)    All current employees of KFGI have executed written Contracts with KFGI that assign to KFGI all rights to any inventions, improvements, discoveries, or information relating to the business of KFGI.

(d)    Patents

    (i)    Schedule 5.22(d) of the Disclosure Schedule contains a complete and accurate list of all KFGI Patents.

    (ii)    To KFGI's Knowledge, (A) no KFGI Patent has been challenged or threatened in any way, and (B) none of the products manufactured and

Dallas_1\397946\7
41932-2 7/25/2004

sold, nor any process or know-how used, by KFGI infringes or is alleged to infringe any patent or other proprietary right of any other Person.

(e) Trademarks

(i) Schedule 5.22(e) of Disclosure Schedule contains a complete and accurate list of all KFGI Marks.

(ii) To KFGI's Knowledge, (A) no KFGI Mark has been challenged or threatened in any way and (B) none of the KFGI Marks used by KFGI infringes or is alleged to infringe any trade name, trademark, or service mark of any other Person.

(f) Copyrights

(i) Schedule 5.22(f) of the Disclosure Schedule contains a complete and accurate list of all KFGI Copyrights.

(ii) To KFGI's Knowledge, (A) no KFGI Copyright has been challenged or threatened in any way, and (B) none of the subject matter of any of the KFGI Copyrights infringes or is alleged to infringe any copyright of any third party or is a derivative work based on the work of any other Person.

(g) Trade Secrets

(i) With respect to each KFGI Trade Secret, the documentation relating to such KFGI Trade Secret is current, accurate, and sufficient in detail and content to identify and explain it and to allow its full and proper use without reliance on the knowledge or memory of any individual.

(ii) KFGI has taken reasonable precautions to protect the secrecy, confidentiality, and value of the KFGI Trade Secrets.

5.23  RELATIONSHIPS WITH RELATED PERSONS

Neither KFGI nor any Related Person of KFGI has any interest in any property (whether real, personal, or mixed and whether tangible or intangible) used in or pertaining to KFGI's businesses. Neither KFGI nor any Related Person of KFGI has an equity interest or any other financial or profit interest in a Person that has (i) material business dealings or a material financial interest in any transaction with KFGI, or (ii) engaged in competition with KFGI with respect to any line of products or services of KFGI (a *"Competing Business"*) in any market presently served by KFGI. Except as set forth in Schedule 5.23 of the Disclosure Schedule, neither KFGI nor any Related Person of KFGI is a party to any Contract with, or has any claim or right against, KFGI.

Dallas_1\3979467\7
41932-2 7/25/2004

### 5.24    NECESSARY APPROVALS

KFGI has made all filings required by Legal Requirements to be made by it in order to consummate the Contemplated Transactions.

### 5.25    BROKERS OR FINDERS

KFGI and its agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

## ARTICLE 6
## TERMINATION

### 6.1    TERMINATION EVENTS

This Agreement may be terminated:

(a)    by either KFGI, on the one hand, or Globe or Somerville, on the other hand, if a material Breach of any provision of this Agreement has been committed by the other party and such Breach has not been waived; or

(b)    by mutual consent of the parties hereto.

### 6.2    EFFECT OF TERMINATION

Each party's right of termination under Section 6.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 6.1, all further obligations of the parties under this Agreement will terminate, except that the obligations in this Section 6.2 and ARTICLE 9 and ARTICLE 10 will survive; *provided, however*, that if this Agreement is terminated by a party because of the Breach of the Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

## ARTICLE 7
## INDEMNIFICATION; REMEDIES

### 7.1    SURVIVAL; RIGHT TO INDEMNIFICATION NOT AFFECTED BY KNOWLEDGE

All representations, warranties, covenants, and obligations in this Agreement, the Disclosure Schedule and any certificates or documents delivered pursuant to this Agreement will survive the Closing as and to the extent provided herein. The right to indemnification, payment of Damages or other remedy based on such representations, warranties, covenants, and obligations will not be affected by any investigation

conducted with respect to, or any Knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, payment of Damages, or other remedy based on such representations, warranties, covenants, and obligations.

### 7.2    INDEMNIFICATION AND PAYMENT OF DAMAGES BY GLOBE OR SOMERVILLE

Subject to the limitations contained in this ARTICLE 7, Globe and Somerville, jointly and severally, will indemnify and hold harmless KFGI and its general partner, KalFor Solutions Group, LLC, (collectively, the *"KFGI Indemnitees"*) for, and will pay to the KFGI Indemnitees the amount of, any loss, liability, claim, damage (excluding incidental and consequential damages), or expense (including costs of investigation and defense and reasonable attorneys' fees), whether or not involving a third-party claim (collectively, *"Damages"*), arising, directly or indirectly, from or in connection with (a) any Breach of any representation or warranty made by Globe or Somerville in this Agreement, the Disclosure Schedule, or any certificates delivered by Globe or Somerville pursuant to this Agreement; or (b) any Breach by Globe or Somerville of any covenant or obligation of Globe or Somerville in this Agreement, the Disclosure Schedule, or any certificates delivered by Globe or Somerville pursuant to this Agreement; or (c) the issuance of unauthorized capital stock by Globe to the Globe Rubber Works, Inc. Profit Sharing 401(k) Plan for the benefit of the account of Somerville (d) any product shipped or manufactured by, or any services provided by, Globe prior to the Effective Date except to the extent the responsibility therefor is assumed by KFGI per Section 2.5(a) hereof.

### 7.3    INDEMNIFICATION AND PAYMENT OF DAMAGES BY KFGI

Subject to the limitations contained in this ARTICLE 7, KFGI and its affiliated entities will indemnify and hold harmless Globe and Somerville (collectively, the *"Globe Indemnitees"*) for, and will pay to the Globe Indemnitees the amount of, any Damages arising, directly or indirectly, from or in connection with (a) any Breach of any representation or warranty made by KFGI in this Agreement, the Disclosure Schedule, or any certificates delivered by KFGI pursuant to this Agreement; or (b) any Breach by KFGI of any covenant or obligation of KFGI in this Agreement, the Disclosure Schedule, or any certificates delivered by KFGI pursuant to this Agreement; or (c) the conduct of the business from and after the Effective Date, or (d) any challenge by the IRS or the Massachusetts Department of Revenue (DOR) regarding the relative dollar amounts allocated hereunder to the Globe Assets Purchase Price, the Somerville Goodwill Purchase Price or the Somerville Intellectual Property Purchase Price or any challenge by the IRS or the DOR to the valuations used in determining such allocations, or any disallowance of or curtailment of same, or any re-allocation of the amounts thereof or any restructuring or reclassification of such purchase prices, and any additional taxes, penalties, or interest charged to or payable by Globe or Somerville incident thereto, and all costs of defense of any audit or resulting Proceeding (including with out limitations

-41-

reasonable attorney fees, accounting fees, and costs of appraisers and expert witnesses and the like) (the *"Tax Structure Indemnity"*).

### 7.4    TIME LIMITATIONS

Neither Globe and Somerville, on the one hand, nor KFGI, on the other hand, will have any liability (for indemnification or otherwise) with respect to any representation or warranty other than those in Sections 4.6, 4.11 and 4.25 (in the case of Globe or Somerville) and Sections 5.6, 5.11 and 5.25 (in the case of KFGI) unless on or before the first anniversary date of the Closing, KFGI, on the one hand, or Globe or Somerville, on the other hand, as the case may be, notifies the other party of a claim specifying the factual basis of that claim in reasonable detail to the extent then known by the party asserting the claim for indemnification hereunder. A claim with respect to Sections 4.6, 4.11 and 4.25 (in the case of the Globe and Somerville) and Sections 5.6, 5.11 and 5.25 (in the case of KFGI), or a claim for indemnification or reimbursement in respect thereof must be asserted within 2 years of Closing.  Any claim for indemnification not timely submitted in accordance with the requirements of this Agreement and the time frames of this Section shall be barred and deemed waived, excepting only claims for breach of Somerville's representations under Sections 4.6 or Somerville's obligations under Section 8.1 and KFGI's representations under Section 5.6 or KFGI's obligations under Section 7.3(d) in respect of the Tax Structure Indemnity, or KFGI's obligations under Section 8.8, which excepted claims may be brought at any time.

### 7.5    LIMITATIONS ON AMOUNT

Neither Globe and Somerville, on the one hand, nor KFGI, on the other hand, will have any liability (for indemnification or otherwise) under Sections 7.2 and 7.3 until the total of all Damages with respect to such matters exceeds One Hundred Thousand Dollars $100,000.00, and then only for the total amount of all Damages in excess of Twenty-Five Thousand Dollars ($25,000). However, the limitations imposed by this Section 7.5 will not apply to (i) any Breach of any of representations and warranties of either party of which the maker had actual knowledge at the time such representation and warranty was made, (ii) any breach of Section 8.1 by either Globe or Somerville, (iii) KFGI's obligations in respect of Globe Assumed Liabilities or the KFGI Equity Interest and its other obligations under ARTICLE 3, (iv) KFGI's obligations in respect of the Tax Structure Indemnity, or (v) KFGI's obligations under Section 8.8.  In no event will any party hereto be liable for Damages of any nature on any one or more claims under Section 7.2 or 7.3, which in the aggregate exceed one-half (1/2) of the aggregate sum of the Globe Assets Purchase Price, the Somerville Intellectual Property Purchase Price and the Somerville Goodwill Purchase Price.

### 7.6    RIGHT OF SET-OFF

Upon notice by either Globe or Somerville, on the one hand, or KFGI, on the other hand, as the case may be, to the other party specifying in reasonable detail the basis for a claim for indemnification hereunder, the party asserting the claim for indemnification may set-

Dallas_1\3979467\7
41932-2 7/25/2004

off any amount to which it may be entitled under this ARTICLE 7 against amounts otherwise payable hereunder to the other party. The exercise of such right of set-off by either party in good faith, if ultimately determined to be justified, will not constitute an event of default hereunder. Neither the exercise of nor the failure to exercise such right of set-off will constitute an election of remedies or limit in any manner the enforcement of any other remedies that either party may have available to it.

**7.7    EXCLUSIVE REMEDY**

Each party agrees that the indemnification provisions of this Article 7 shall be the sole and exclusive remedy for Damages incurred by a party hereto arising out of claims for breach of warranties, representations or covenants contained in this Agreement.

## ARTICLE 8
## ADDITIONAL COVENANTS

**8.1    NONCOMPETITION, NONSOLICITATION AND NONDISPARAGEMENT**

(a)    <u>Noncompetition</u>. For a period of five (5) years after the Closing Date, neither Globe nor Somerville shall, anywhere Globe presently conducts its business, directly or indirectly invest in, own, manage, operate, finance, control, advise, render services to or guarantee the obligations of any Person engaged in or planning to become engaged in a Competing Business; *provided, however*, that Globe or Somerville may purchase or otherwise acquire up to (but not more than) one percent (1%) of any class of the securities of any Person (but may not otherwise participate in the activities of such Person) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities and Exchange Act of 1934, as amended.

(b)    <u>Nonsolicitation</u>. For a period of five (5) years after the Closing Date, neither Globe nor Somerville shall, directly or indirectly:

    (i)    solicit the business of any Person who is a customer of Globe for or in respect of any Competing Business;

    (i)    solicit the business of any Person who is a customer of KFGI for or in respect of any Competing Business;

    (ii)    cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of KFGI to cease doing business with KFGI, to deal with any competitor of KFGI or in any way interfere with its relationship with KFGI;

    (iii)    cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of Globe on the Closing Date or within the year preceding the

-43-

Closing Date to cease doing business with KFGI, to deal with any competitor of KFGI or in any way interfere with its relationship with KFGI; or

(iv)    hire, retain or attempt to hire or retain any employee or independent contractor of KFGI or in any way interfere with the relationship between KFGI and any of its employees or independent contractors.

(c)    <u>Nondisparagement</u>. After the date hereof, no party hereto shall disparage any other party hereto or his or its affiliates, partners, officers, employees or agents.

(d)    <u>Modification of Covenant</u>. If a final judgment of a court or tribunal of competent jurisdiction determines that any term or provision contained in Section 8.1(a) through (c) is invalid or unenforceable, then the parties agree that the court or tribunal will have the power to reduce the scope, duration or geographic area of the term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. At the court's discretion, this Section 8.1 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed. This Section 8.1 is reasonable and necessary to protect and preserve KFGI's legitimate business interests and the value of the Globe Assets, the Somerville Intellectual Property and the Somerville Goodwill and to prevent any unfair advantage conferred on Globe or Somerville.

(e)    In the event that (i) KFGI shall fail, after notice and the expiration of any applicable cure period, to make timely and complete payment of the KFGI Promissory Note, or (ii) Somerville's employment with KFGI under the Employment Agreement shall be terminated by KFGI or Somerville and, in either case, KFGI shall not make the resulting payments due to Somerville under the Employment Agreement, then Somerville shall be automatically freed and relieved of the obligations under this Section 8.1.

8.2    PAYMENT OF ALL TAXES RESULTING FROM SALE OF GLOBE ASSETS BY GLOBE

Globe and KFGI shall each pay in a timely manner all Taxes assessed on it by an Taxing Authority resulting from or payable in connection with the sale of the Globe Assets pursuant to this Agreement. Notwithstanding the foregoing, this Section 8.2 this shall not impair or diminish, in any way, KFGI's indemnity obligations in respect of the Tax Structure Indemnity under Section 7.3.

8.3    PAYMENT OF LIABILITIES

In addition to payment of Taxes pursuant to Section 8.2, each party shall pay, or make adequate provision for the payment, in full all of the Liabilities as assumed or retained under this Agreement.

-44-

## 8.4    RESTRICTIONS ON GLOBE DISSOLUTION AND DISTRIBUTIONS

Globe shall not dissolve, or make any distribution of the proceeds received pursuant to this Agreement to its Shareholders, without having first made reasonable provision for the payment of, or reserves for, all of its liabilities.

## 8.5    REMOVING EXCLUDED GLOBE ASSETS

Within ninety (90) days following the Closing Date, KFGI shall present to Globe and Somerville a list of Excluded Globe Assets to be removed from Globe's Facilities, which Excluded Globe Assets must have been located on the Globe Real Property and outside of the main manufacturing facility as of the Closing Date.   Within sixty (60) days following the receipt of such list from KFGI, Globe shall remove at its expense all Excluded Globe Assets detailed on the list from all of Globe's Facilities; provided, however, that Globe shall be entitled to reasonable additional time to remove the listed assets if weather conditions hinder, delay or otherwise temporarily prevent such removal. Such removal shall be done in such manner as to avoid any damage to Globe's Facilities and any disruption of the business operations to be conducted by KFGI after the Closing. Any damage to the Globe Assets or to the Facilities resulting from such removal shall be promptly paid by Globe. Should Globe fail to remove the Excluded Globe Assets as required by this Section 8.5, KFGI shall have the right, but not the obligation, (a) to remove the Excluded Globe Assets at Globe's sole cost and expense; (b) to store the Excluded Globe Assets and to charge Globe all storage costs associated therewith; (c) to treat the Excluded Globe Assets as unclaimed and to proceed to dispose of the same under the laws governing unclaimed property; or (d) to exercise any other right or remedy conferred by this Agreement or otherwise available at law or in equity. Globe shall promptly reimburse KFGI for all costs and expenses incurred by KFGI in connection with any Excluded Globe Assets not removed by Globe on or before the Closing Date.

## 8.6    REPORTS AND RETURNS

The parties hereto shall cooperate after the Closing in preparing and filing all reports and returns required by Legal Requirements relating to the business of Globe as conducted using the Globe Assets, the Somerville Intellectual Property and the Somerville Goodwill.

## 8.7    ASSISTANCE IN PROCEEDINGS

Globe will cooperate with KFGI and its counsel in the contest or defense of, and make available its personnel and provide any testimony and access to its books and Records in connection with, any Proceeding involving or relating to (a) any Contemplated Transaction or (b) any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction on or before the Closing Date involving Globe or its business or Somerville. KFGI will cooperate with Globe and Somerville and their respective counsel in the contest or defense of, and make available its personnel and provide any testimony and access to its books and Records in connection with, any Proceeding involving or relating to (a) any

-45-

Contemplated Transaction or (b) any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction on or before the Closing Date involving Globe, or its business or Somerville.

## 8.8   ADDITIONAL PAYMENT

In the event that KFGI, within three (3) years following the Effective Date, sells, conveys or transfers to any Third Party (excluding a Third Party that is and remains a corporation, partnership or limited liability company owned or controlled by KFGI) (i) Globe's "marine division" (being that segment of Globe's business that pertains principally to the manufacture, sale and/or repair and refurbishment of impellers and drive savers), (ii) any other integrated business unit of Globe (such as, by way of example, the square wheel technology, postal business, material handling, aerospace or oilfield operations), or (iii) any Globe Assets other than in the Ordinary Course Business for a sum of money in excess of $500,000 in the aggregate, then KFGI shall pay to Somerville an amount equal to 7% of the net proceeds received by KFGI for such sale (calculated by subtracting from the aggregate sales price, including without limitations royalties payable, promissory notes, installment obligations, or other consideration paid or payable by such Third Party, the amount of any liabilities retained by KFGI and reasonably related and fairly allocated to the assets sold. KFGI shall pay to Somerville such portion of the amounts as are received by it to which Somerville is entitled to hereunder within ten (10) days of KFGI's receipt of the final sales proceeds, i.e., after any, post closing accounting or other verification procedures between KFGI and the buyer are concluded, but in any event no later than ninety (90) days after the closing of the subject transaction. KFGI's obligations pursuant to this Section 8.8 shall not apply to any sales, conveyances or transfers of (i) any assets sold in the Ordinary Course of Business of KFGI, (ii) the real estate owned by Globe in Rockland, Massachusetts, (iii) assets incident to the dissolution and liquidation of KFGI, or (iv) resulting from the change of control, merger, conversion or consolidation of KFGI as a going concern with or into a Third Party or from KFGI's participation in, and contribution of assets to, any joint venture, partnership or other arrangement (provided that same is not adopted to circumvent the provisions of this Section 8.8).

## 8.9   USE OF NAME

Following the Closing Date, neither Globe nor Somerville shall use the names "Globe Rubber Works, Inc.," "Globe Rubber Works," "Globe Rubber," "Globe" or "GRW," whether individually or in combination, in connection with the operation of any business enterprise (other than in fulfilling Globe's and Somerville's respective obligations under the Employment Agreement).

## 8.10   DOCUMENTATION OF SOMERVILLE INTELLECTUAL PROPERTY

Globe and Somerville shall prepare written documentation of all Globe Intellectual Property and Somerville Intellectual Property, respectively, which, in the opinion of KFGI, has not been properly documented in written format, and Globe and Somerville

shall cooperate with KFGI in obtaining such Government Authorizations as KFGI, in its sole discretion, deems necessary.

### 8.11    CUSTOMER AND OTHER BUSINESS RELATIONSHIPS

After the Closing, Globe and Somerville will cooperate with KFGI at KFGI's expense in its efforts to continue and maintain for the benefit of KFGI those business relationships of Globe existing prior to the Closing and relating to the business to be operated by KFGI after the Closing, including relationships with lessors, employees, regulatory authorities, licensors, customers, suppliers and others, and Globe will satisfy the Retained Globe Liabilities in a manner that is not detrimental to any of such relationships subject to Globe having the right to contest same in good faith. Globe and Somerville will refer to KFGI all inquiries relating to such business. Neither Globe nor any of its officers, employees, agents or shareholders shall take any action that would tend to diminish the value of the Globe Assets, Somerville Intellectual Property or Somerville Goodwill after the Closing or that would interfere with the business of KFGI to be engaged in after the Closing, including disparaging the name or business of KFGI.

### 8.12    RETENTION OF AND ACCESS TO RECORDS

After the Closing Date, KFGI shall retain for a period consistent with KFGI's record-retention policies and practices those Records of Globe delivered to KFGI. KFGI also shall provide Globe and Somerville and their Representatives reasonable access thereto, during normal business hours and on at least three days' prior written notice, to enable them to prepare financial statements or tax returns or deal with tax audits or for any other reasonable business purpose, for example, but not in limitation, in order to conduct any Proceeding in which Globe or Somerville may be involved. After the Closing Date, Globe and Somerville shall provide KFGI and its Representatives reasonable access to Records that are Excluded Globe Assets, during normal business hours and on at least three days' prior written notice, for any reasonable business purpose specified by KFGI in such notice.

### 8.13    SECURITY CLEARANCE

Globe and Somerville shall cooperate with KFGI and its executive officers to obtain, on behalf of KFGI and any of its executive officers, from the Department of Defense, the Defense Security Service, or any other Governmental Body the necessary level of security clearance required to negotiate and transact business with the Department of Defense and to otherwise conduct the business of Globe as presently conducted.

### 8.14    FURTHER ASSURANCES

The parties shall cooperate reasonably with each other and with their respective Representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and shall (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and (c) do such other acts and things, all as the other party may reasonably

-47-

request for the purpose of carrying out the intent of this Agreement and the Contemplated Transactions.

### 8.15   REAL ESTATE DILIGENCE

KFGI has been permitted to make any physical inspections and conduct any and all investigations of Globe's Facilities as deemed necessary by KFGI. Globe and its Representatives have made available to KFGI and its Representatives all applicable books and records relating to Globe's Facilities and the ownership, operation, use and maintenance of Globe's Facilities.

### 8.16   EXISTING NON-COMPETITION AGREEMENTS

Globe agrees that at any time following the Closing Date it will not seek to enforce any of its rights under any existing non-competition agreements executed by any employees, consultants, contractors, Representatives, customers, vendors or other Persons in its favor and relating to the operation of the business utilizing the Globe Assets, Somerville Intellectual Property or Somerville Goodwill.

### 8.17   SEWER LINE INSTALLATION

Somerville agrees to pay for the remedial costs of ensuring that the sewage and wastewater systems at Globe's Facilities comply with the requirements of Title V of the Code of Massachusetts Regulations (310 CMR Sec 15, et seq.), including the connection of all sewage systems at Globe's Facilities to the main city sewer line and shall deposit $25,000 into escrow to cover the costs of such remedial measures.

### 8.18   IN-KIND SETTLEMENT PROCEEDS

Somerville and Globe agree to pay to KFGI, without additional consideration, any settlement or judgment proceeds received in connection with the Crompton matter that are delivered in the form of in-kind property related to trade discounts or credits. The parties acknowledge that Globe is not under any obligation to seek such in-kind property related to trade discounts or credits as part of any settlement, and Globe is authorized to bargain for, and to retain for itself, any cash or other settlement proceeds.

## ARTICLE 9
## CONFIDENTIALITY

### 9.1   DEFINITION OF CONFIDENTIAL INFORMATION

(a)     As used in this ARTICLE 9, the term *"Confidential Information"* includes any and all of the following information of KFGI, Globe or Somerville that has been or may hereafter be disclosed in any form, whether in writing, orally, electronically or otherwise, or otherwise made available by observation, inspection or otherwise by either party (KFGI on the one hand or Globe and Somerville, collectively, on the other hand) or its Representatives (collectively, a

-48-

*"Disclosing Party"*) to the other party or its Representatives (collectively, a *"Receiving Party"*):

(i)    all information that is a trade secret under applicable trade secret or other law;

(ii)    all information concerning product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer hardware, Software and computer software and database technologies, systems, structures and architectures;

(iii)    all information concerning the business and affairs of the Disclosing Party (which includes historical and current financial statements, financial projections and budgets, tax returns and accountants' materials, historical, current and projected sales, capital spending budgets and plans, business plans, strategic plans, marketing and advertising plans, publications, client and customer lists and files, contracts, the names and backgrounds of key personnel and personnel training techniques and materials, however documented), and all information obtained from review of the Disclosing Party's documents or property or discussions with the Disclosing Party regardless of the form of the communication; and

(iv)    all notes, analyses, compilations, studies, summaries and other material prepared by the Receiving Party to the extent containing or based, in whole or in part, upon any information included in the foregoing.

(b)    Any trade secrets of a Disclosing Party shall also be entitled to all of the protections and benefits under applicable trade secret law and any other applicable law. If any information that a Disclosing Party deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret for purposes of this ARTICLE 9, such information shall still be considered Confidential Information of that Disclosing Party for purposes of this ARTICLE 9 to the extent included within the definition. In the case of trade secrets, each of KFGI, Globe and Somerville hereby waives any requirement that the other party submit proof of the economic value of any trade secret or post a bond or other security.

## 9.2   RESTRICTED USE OF CONFIDENTIAL INFORMATION

(a)    Each Receiving Party acknowledges the confidential and proprietary nature of the Confidential Information of the Disclosing Party and agrees that such Confidential Information (i) shall be kept confidential by the Receiving Party; (ii) shall not be used for any reason or purpose other than to evaluate and

-49-

consummate the Contemplated Transactions; and (iii) without limiting the foregoing, shall not be disclosed by the Receiving Party to any Person, except in each case as otherwise expressly permitted by the terms of this Agreement or with the prior written consent of an authorized representative of Globe or Somerville with respect to Confidential Information of Globe or Somerville (each, a *"Globe Contact"*) or an authorized representative of KFGI with respect to Confidential Information of KFGI (each, a *"KFGI Contact"*). Each of KFGI, Globe and Somerville shall disclose the Confidential Information of the other party only to its Representatives who require such material for the purpose of evaluating the Contemplated Transactions and are informed by KFGI, Globe and Somerville, as the case may be, of the obligations of this ARTICLE 9 with respect to such information. Each of KFGI, Globe and Somerville shall (A) enforce the terms of this ARTICLE 9 as to its respective Representatives; (B) take such action to the extent necessary to cause its Representatives to comply with the terms and conditions of this ARTICLE 9; and (C) be responsible and liable for any breach of the provisions of this ARTICLE 9 by it or its Representatives.

(b)     From and after the Closing, the provisions of Section 9.2(a) above shall not apply to or restrict in any manner KFGI's use of any Confidential Information of Globe or Somerville relating to any of the Globe Assets, the Somerville Intellectual Property the Somerville Goodwill or the Globe Assumed Liabilities.

### 9.3     EXCEPTIONS

Sections 9.2(a) and (b) do not apply to that part of the Confidential Information of a Disclosing Party that a Receiving Party demonstrates (a) was, is or becomes generally available to the public other than as a result of a breach of this ARTICLE 9 by the Receiving Party or its Representatives; (b) was or is developed by the Receiving Party independently of and without reference to any Confidential Information of the Disclosing Party; or (c) was, is or becomes available to the Receiving Party on a nonconfidential basis from a Third Party not bound by a confidentiality agreement or any legal, fiduciary or other obligation restricting disclosure.

### 9.4     RETURN OR DESTRUCTION OF CONFIDENTIAL INFORMATION

If this Agreement is terminated, each Receiving Party shall (a) destroy all Confidential Information of the Disclosing Party prepared or generated by the Receiving Party without retaining a copy of any such material; (b) promptly deliver to the Disclosing Party all other Confidential Information of the Disclosing Party, together with all copies thereof, in the possession, custody or control of the Receiving Party; and (c) certify all such destruction in writing to the Disclosing Party, *provided, however,* that the Receiving Party may retain a list that contains general descriptions of the information it has returned or destroyed to facilitate the resolution of any controversies after the Disclosing Party's Confidential Information is returned.

-50-

# ARTICLE 10
## GENERAL PROVISIONS

### 10.1 EXPENSES

Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fair and reasonable fees and expenses of agents, representatives, counsel, and accountants, except that the legal fees and expenses incurred by Somerville and/or Globe relative to the Contemplated Transactions shall be borne by Globe and provided that to the extent not paid by Globe prior to Closing, such fees and expenses shall be promptly paid at Closing by KFGI and shall be treated as Globe Assumed Liabilities. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.

### 10.2 PUBLIC ANNOUNCEMENTS

Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued, if at all, at such time and in such manner as KFGI and Globe or Somerville shall jointly determine.

### 10.3 NOTICES

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may designate by notice to the other parties):

### 10.4 JURISDICTION; SERVICE OF PROCESS

Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement or otherwise relating to the Contemplated Transactions may be brought against any of the parties exclusively (i) in the courts of the State of Massachusetts or (ii) if it has or can acquire jurisdiction, in the United States District Court for the District of the State of Massachusetts, and each of the parties consents to the sole and exclusive jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding, consents to the jurisdiction of such courts over such matters, and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

-51-

## 10.5 FURTHER ASSURANCES

The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

## 10.6 WAIVER

Except as otherwise provided in ARTICLE 7, the rights and remedies of the parties to this Agreement are cumulative and not alternative. Except as otherwise provided in ARTICLE 7, neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.

## 10.7 ENTIRE AGREEMENT AND MODIFICATION

This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

## 10.8 DISCLOSURE SCHEDULE

(a)     The Disclosure Schedule is expressly incorporated herein and constitutes an integral part of this Agreement for all purposes.

(b)     In the event of any inconsistency between the statements in the body of this Agreement and those in the Disclosure Schedule (other than an exception or exceptions to the representations and warranties of this Agreement expressly set forth in the Disclosure Schedule), the statements in the body of this Agreement will control.

## 10.9 ASSIGNMENTS, SUCCESSORS, AND NO THIRD-PARTY RIGHTS

Neither party may assign any of its rights under this Agreement without the prior consent of the other parties. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties, except that the right to receive indemnification from Globe or Somerville under ARTICLE 7 is personal to KFGI and non-transferable. Except as noted, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

Dallas_1\3979467\7
41932-2 7/25/2004

### 10.10  SEVERABILITY

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

### 10.11  SECTION HEADINGS; CONSTRUCTION

The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

### 10.12  TIME OF ESSENCE

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

### 10.13  GOVERNING LAW

This Agreement will be governed by and construed and enforced under the laws of the State of Massachusetts without regard to conflicts of laws principles.

### 10.14  COUNTERPARTS

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement under seal as of the date first written above.

-53-

**KFGI:**

KALM-FORSYTHE GLOBAL
INNOVATIONS, LTD.

By:    KalFor Solutions Group, LLC,
       General Partner

By:    _____
       Carl W. Forsythe, President

Address:
10440 N. Central Expressway
Suite 1475
Dallas, Texas 75205
Phone: (214) 373-4562
Fax:    (214) 891-3366

**SOMERVILLE:**

RICHARD SOMERVILLE

Address:
344 KEENE St.
_____
Phone:_____
Fax:_____

**GLOBE:**

GLOBE RUBBER WORKS, INC.

By:_____
Name:_____
Title:_____

-54-

Address: _____
        _____
        _____
Phone: _____
Fax: _____

EXHIBIT 3.3(b)

# FIRST AMENDMENT TO
# REVISED AND AMENDED AGREEMENT
# OF LIMITED PARTNERSHIP OF
# KALM-FORSYTHE GLOBAL INNOVATIONS, LTD.

This First Amendment to the Revised and Amended Agreement of Limited Partnership of Kalm-Forsythe Global Innovations, Ltd. (this "Amendment") is made and entered into this _____ day of August, 2004 by and between KalFor Solutions Group, LLC, a Texas limited liability company ("KalFor"), in its capacity as general partner (the "General Partner") of Kalm-Forsythe Global Innovations, Ltd., a Texas limited partnership (the "Partnership"), and the individuals and entities identified as the limited partners of the Partnership on the signature page hereto (the "Limited Partners").

## W I T N E S S E T H:

WHEREAS, KalFor is the General Partner of the Partnership;

WHEREAS, KalFor, as the General Partner, has the power and authority under the Revised and Amended Agreement of Limited Partnership of the Partnership (the "Partnership Agreement") to acquire assets necessary to carry out the purposes of the Partnership;

WHEREAS, KalFor, in its capacity as General Partner, has negotiated and entered into, on behalf of the Partnership, that certain Asset Purchase Agreement (the "APA") by and among the Partnership and Globe Rubber Works, Inc. (the "Seller"), whereby the Partnership is to acquire substantially all of the assets of the Seller;

WHEREAS, as a condition to the closing of the transactions contemplated by the APA, the Partnership is required to adopt certain amendments to the Partnership Agreement as set forth below.

WHEREAS, Section 13.10 of the Partnership Agreement provides that the Partnership Agreement may be amended for the foregoing purposes on the condition that the General Partner and the holders of a Super Majority in Interest of the Partners consent to such amendment; and

WHEREAS, KalFor, in its capacity as General Partner, and the holders of in excess of a Super Majority in Interest of the Partners have consented in writing to the proposed amendment;

NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Definitions.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed thereto in the Partnership Agreement.

2. **Amendments.**

   (a) The Partnership Agreement shall be and hereby is amended by deleting Section 8.3 thereof entitled "Restrictions on Authority of General Partner" and replacing it with a

new Section 8.3 entitled "<u>Restrictions on Authority of General Partner</u>" which new Section 8.3 shall read in its entirety as follows:

"3.5     <u>Restrictions on Authority of General Partner</u>.  Notwithstanding the provisions of Section 8.2, without the vote or approval of a Super Majority in Interest of the Partners, the General Partner shall not have the authority to:

A.  Perform any act in violation of any applicable law, rule or regulation or perform any act which is inconsistent with or in contravention of this Agreement;

B.  Do any act which would make it impossible to carry on the business of the Partnership;

C.  Confess a judgment against the Partnership;

D.  Borrow from the Partnership;

E.  Possess the Partnership's Property or assign the rights of the Partnership in specific assets or property for other than a purpose of the Partnership;

F.  Admit a person as a general partner, except as provided in this Agreement;

G.  Admit a person as a limited partner, except as provided in this Agreement;

H.  Create, incur, guarantee, assume or otherwise become directly or indirectly liable for any indebtedness other than (a) open account trade debt, (b) a working capital credit line and term loans established with a financial institution and approved by the board of directors or other governing body of the General Partner, and (c) capitalized leases approved by the board of directors or other governing body of the General Partner;

I.  Materially change the principal business of the Partnership;

J.  Authorize or issue, or obligate itself to issue, any other equity security (including any security convertible into or exercisable for any equity security) senior to or on a parity with the present limited partners;

K.  Merge or consolidate with any other person, or sell, assign, lease or otherwise dispose of all  or substantially all of its assets to any person;

L.  Make redemptions of partnership interests without affording all limited partners the opportunity to participate in the redemption; or

M.  Contract or otherwise deal with the Partnership except as pursuant to Section 8.4 hereof.

No Person dealing with the General Partner shall be required to determine its authority on behalf of the Partnership to make any commitment or undertaking, or to execute any agreement or other instrument, or to do any other act or thing, nor to determine any fact or circumstance bearing upon the existence of its authority. In addition, a purchaser of the Partnership's Property shall not be required to determine the authority of the General Partner to sign and deliver on behalf of the Partnership any agreement of sale or transfer, or any instrument of conveyance or assignment, or to see the application or distribution or proceeds paid or credited in connection therewith."

(b) The Partnership Agreement shall be and hereby is amended by deleting Section 8.4 thereof entitled "General Partner's Right to Deal with Partnership" and replacing it with a new Section 8.4 entitled "General Partner's Right to Deal with Partnership" which new Section 8.4 shall read in its entirety as follows:

"8.4    General Partner's Right to Deal with Partnership. The General Partner, its officers, directors or members of their respective families, and its affiliated entities shall have the right to contract and otherwise deal with the Partnership if, and only if, (a) the interest of any such person is fully disclosed to the Limited Partners in a report from the General Partner to the Limited Partners (b) the transaction is on arm's-length terms which are no less favorable to the Partnership as those which could have been obtained from an unaffiliated third party, and (iii) such transaction is approved by a disinterested majority of the board of directors or other governing body of the General Partner."

(c) The Partnership Agreement shall be and hereby is amended by deleting the phrase, "Upon request of any Limited Partner, the" from the first line of Section 7.3 thereof and inserting the word, "The" in its place.

(d) The Partnership Agreement shall be and hereby is amended by inserting the phrase, " , and shall inform the Partners of any material developments affecting the Partnership" immediately following the word "sheet" at the end of the first sentence of Section 7.3 thereof.

(e) The Partnership Agreement shall be and hereby is amended by inserting a new Section 9.9 entitled "Preemptive Rights" immediately following Section 9.8 thereof, which new Section 9.9 shall read in its entirety as follows:

"9.9    Preemptive Rights. In the event that the Partnership shall propose to issue any (i) partnership interests or other equity securities of the Partnership, (ii) options to purchase or rights to subscribe for partnership interests or other equity securities of the Partnership, (iii) securities convertible into or exchangeable for partnership interests or other equity securities of the Partnership, (iv) options to purchase or rights to subscribe for securities convertible into or exchangeable for partnership interests or other equity securities of the Partnership, the Partnership shall be required to deliver to the Limited Partners written notice of such issuance within thirty (30)

days. Upon receipt of such notice, the Limited Partners shall have, for a period of thirty (30) days, the preemptive right to subscribe for and purchase such securities to be issued, at such price and on such terms as such securities are to be issued, up to an amount equal to their existing percentage Ownership Interest. The Company shall promptly notify its Limited Partners of any proposed issuance of such securities. Notwithstanding the foregoing, this Section 9.9 shall not apply to any securities issued (i) in connection with any equity compensation plans, or (ii) in connection with any merger, consolidation or acquisition.

(f) The Partnership Agreement shall be and hereby is amended by inserting new Section 6.2 entitled "Tax Distributions" immediately following Section 6.1 thereof, which new Section 6.2 shall read in its entirety as follows:

"6.2    Tax Distributions. Distributable Funds shall be distributed quarterly to the Partners pro rata in accordance with their respective Ownership Interests up to an amount equal to (i) the highest marginal effective tax rate for individuals imposed under the Code multiplied by (ii) the Partnership's net taxable income and gain for such calendar year through such quarter, plus (iii) the highest marginal effective tax rate for individuals imposed under state, municipal or other governmental body rules or regulations that such individual is subject to multiplied by (iv) the Partnership's net taxable income and gain for such calendar year through such quarter, less the amount of aggregate distributions made pursuant to this Section 6.2 with respect to such period."

(g) The Partnership Agreement shall be and hereby is amended by inserting new Section 10.6 entitled "Tag-Along Rights" immediately following Section 10.5 thereof, which new Section 10.6 shall read in its entirety as follows:

"10.6    Tag-Along Rights.

A.    Subject to the provisions of this Section 10.6, if Carl W. Forsythe, KalFor Solutions Group, LLC or Emerald Grove Capital, Ltd., or any of their related entities, proposes to sell, dispose of or otherwise transfer to any purchaser greater than fifty percent of its Ownership Interest (a "Tag-Along Sale") and no rights of first refusal under Section 10.1 have been exercised with respect to such Ownership Interest, such Partner shall not effect such Tag-Along Sale unless, prior to the consummation thereof, each of the other Partners shall have been afforded the opportunity to join in such Tag-Along Sale as provided in Section 10.6B.

B.    Prior to the consummation of any Tag-Along Sale, the purchaser shall make a written offer (the "Tag-Along Offer") to each of the other Partners to acquire out of the total Ownership Interest proposed to be acquired by the purchaser in the Tag-Along Sale (the "Target Interest") the same proportion of the Target Interest as the total Ownership Interest owned by the other Partners (on the date that the Tag-Along Offer is made) bears to the total owned (on such date) by all of the Partners. Such offer by the proposed purchaser shall be made at the same sales price and on the

same terms as the offer by the proposed purchaser to the selling Partner. The other Partners shall have ten (10) days after their receipt of the Tag-Along Offer in which to accept the Tag-Along Offer.

C. This Section 10.6 does not apply to any Transfer (i) to any Permitted Transferee, or (ii) by last will and testament or pursuant to the laws of descent and distribution."

(h) The Partnership Agreement shall be and hereby is amended by (i) deleting the section reference "10.3" from the third line of Section 10.3D thereof and inserting the section reference "10.6" in its place and (ii) deleting the section reference "10.4B" from the fourth line of Section 10.3D thereof and inserting the section reference "10.3B" in its place.

3.    Reaffirmation of Partnership Agreement.    Except as expressly amended by this Amendment, the Partnership Agreement is hereby reaffirmed, ratified and confirmed and continues in full force and effect unaffected hereby.

4.    Governing Law.  This Amendment has been executed in the State of Texas and shall be governed by and construed in accordance with the laws of the State of Texas and the laws of the United States of America applicable to transactions within the State of Texas.

**[Signature Page to Follow]**

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the date first above written.

GENERAL PARTNER:

KalFor Solutions Group, LLC

By: _____
    Name: _____
    Title: _____

LIMITED PARTNERS:

Emerald Grove Capital, Ltd.

By: _____
    Its general partner

By: _____
    Name: _____
    Title: _____

_____
Chris Crawford

Dallas_1\4000697\1
41932-2 7/15/2004

# Exhibit B

## GLOBE DISCLOSURE SCHEDULE

This is the Disclosure Schedule of Globe under that certain Asset Purchase Agreement dated as of August 3, 2004 (the "**Agreement**"), by and among Globe, Somerville and KFGI. Capitalized terms used in this Disclosure Schedule (the "Globe Disclosure Schedule") but not defined herein shall have the meanings assigned in the Agreement. Schedules numbered below correspond to sections of Article 4 of the Agreement. Any matter which is disclosed in a particular schedule or section of the Globe Disclosure Schedule (including in any exhibit identified in a particular schedule or section and attached) shall be deemed to qualify the representations and warranties of Globe and Somerville contained in the similarly numbered section of the Agreement as well as any other numbered section of Article 4 of the Agreement to which such disclosure may apply.

### Schedule 2.1(c)  Tangible Personal Property

Reference is made to Exhibit 2.1(c) attached and incorporated in this Schedule 2.1(c).

### Schedule 2.1(l)  Claims against Third Parties

None, other than the claim against Crompton Corporation which is an Excluded Globe Asset under the Agreement.

### Schedule 2.1(m)  Deposits and Pre-Paid Expense

1.    Reference is made to the deposit referred to in Item 10 of Schedule 4.17(a).

2.    Globe has received from customer Lee Tools a $3,000 deposit against future order(s).

3.    Pre-paid enrollment fee of $7,216 paid to Administaff, Globe's employee benefit plan administrator.

4.    Globe has prepaid various insurance policies' premiums in the aggregate amount of $37,320 in premiums.

### Schedule 2.2(d)  Globe Contracts that are Excluded Globe Assets

None.

### Schedule 2.2(j)  Other Excluded Globe Assets

None.

FINAL EXECUTION COPY          INITIAL

Accepted by Globe and Somerville:

Accepted by KFGI:

<u>**Schedule 2.3**</u>  **Somerville Intellectual Property**

All of the intellectual property owned by Somerville that is used by Globe in its business, including:

1.  All fictional business names, trading names, registered and unregistered trademarks, service marks, and applications;

2.  All patents, patent applications, and inventions and discoveries that may be patentable (for the avoidance of doubt, excluding the patent applications, inventions and discoveries and rights therein covered by the Patent Assignments it being understood that such intellectual property is a Globe's Intellectual Property Asset);

3.  All copyrights in both published works and unpublished works;

4.  All rights in mask works; and

5.  All know-how, trade secrets, confidential information, software, technical information, data, process technology, plans, drawings, and blue prints (for the avoidance of doubt, excluding the patent applications, inventions and discoveries and rights therein covered by the Patent Assignments it being understood that such intellectual property is a Globe's Intellectual Property Asset).

<u>**Schedule 2.5(a)(ix)**</u>  **Other Liabilities of Globe that are Globe Assumed Liabilities**

1.  Reference is made to the equipment leases listed as Items 1 through 12 on Schedule 4.6(b).

2.  Reference is made to the leases identified under the heading *CAPITAL LEASES* under Item 4. (iii) in Schedule 4.17(a); excluding, however, the car loan from Rockland Federal Credit Union, identified under such heading, which car loan is a Retained Globe Liability (the "RFCU Car Loan").

3.  Reference is made to the Liabilities of Globe which are secured in part by the Encumbrances identified in Items 3 through 6 of Exhibit 4.6 to this Disclosure Schedule.

4.  The following Liabilities of Globe have been guaranteed by Somerville, and under Section 2.8(c)(v) of the Agreement, releases of such guarantees by Third Parties holders are required to be delivered by KFGI, including without limitation, discharges of mortgages on Somerville's residence, releases of collateral assignment of life insurance policies, as specified below (for the avoidance of doubt, KFGI may deliver such releases of guarantees or collateral assignment of

life insurance policy, and discharges of mortgage, after the Closing in accordance with customary transactional practice):

(i)   Guarantee of the equipment lease to Highland Capital Corp. identified in Item 8 of Schedule 4.6(b);

(ii)  Guarantee of the truck loan from Rockland Federal Credit Union, identified under the heading *CAPITAL LEASES* under Item 4(iii) in Schedule 4.17(a). For the avoidance of doubt, KFGI is not required to obtain a release of Somerville's guarantee of the RFCU Car Loan; see Item 2 of this Schedule 2.5(a)(ix).

(iii) Guarantees of the Liabilities of Globe which are secured in part by the Encumbrances identified in Items 3 through 6 of Exhibit 4.6 to this Disclosure Schedule, which Liabilities are also identified under the heading *CAPITAL LEASES* under Item 4(iii) in Schedule 4.17(a) as First International (Equipment), First International Baule', and First International (Building and Land).

(iv)  Collateral assignment of life insurance policy to First International Bank, with respect to Jefferson Pilot Financial Life Insurance Policy No. 659012772, insuring Somerville, given as security for the guarantee of Somerville of the Liabilities of Globe to First International Bank. These Globe Liabilities also relate to the Encumbrance referred to as Item 5 of Exhibit 4.6.

(v)   Mortgage dated May 19, 1998, to First National Bank of New England, on Somerville's residence, and filed with the Plymouth County Registry District of the Land Court, Massachusetts, as Document No. 427512 and noted on Certificate of Title No. 61483. These Globe Liabilities also relate to the Encumbrance referred to as Item 4 of Exhibit 4.6.

## Schedule 2.6  Allocation of Globe Assets Purchase Price

| Amount | Description |
|---|---|
| $   605,000 | Tangible Personal Property |
| $        -0- | Globe Facilities as are not Real Property |
| $1,305,000 | Globe Real Property |
| $   953,000 | Globe's inventories |
| $   899,000 | Globe's accounts receivable |
| $        -0- | Globe Contracts |
| $        -0- | intangible property rights (including, without limitation, the Globe Intellectual Property Assets and goodwill) |
| ($2,564,000) | Aggregate Debt Assumed |
| $   898,000 | **Total Purchase Price of Globe Assets** |

The Tangible Personal Property is allocated amongst the respective items in the manner set forth in the "in – place value appraisal" of Joseph Finn Co., Inc. dated February 6, 2004, a copy of which is attached. The useful life of the respective Globe Assets shall be determined in accordance with generally accepted accounting principles.

### Schedule 4.2  Authority; No Conflict

4.2(b)(i)   1. The following Globe Contracts that involve the performance of services or delivery of goods or materials by or to Globe of an amount in excess of $10,000 contain a prohibition on assignment by Globe without the consent of the other party to the contract:

(i)  Purchase Order No. 7371 from GE Medical Systems, Ultrasound & Primary Care Diagnostics, LLC, dated February 12, 2004, for an original aggregate amount of $83,874.

(ii)  Purchase Order No. 4500035195 from The Port Authority of NY & NJ, dated January 30, 2004, for an original aggregate amount of $46,800.

(iii) Purchase Order No. PPP226-126 from Electric Boat Corporation (A General Dynamics Company), dated February 25, 2004, for an original aggregate amount of $44,617.

(iv)  Purchase Order No. SP0540-04-M-F872; Requisition/Purchase Request No. YPI04099002014 from Defense Supply Center Phila G & I, dated April 21, 2004, for an original aggregate amount of $99,600.

(v)  Purchase Order No. PPP231-019 from Electric Boat Corporation (A General Dynamics Company), dated December 5, 2003, for an original aggregate amount of $32,220.

(vi)  Purchase Order No. PPQ061-114 from Electric Boat Corporation (A General Dynamics Company), dated April 6, 2004, for an original aggregate amount of $15,200.

(vii)  Purchase Order No. PPP226-126 from Electric Boat Corporation (A General Dynamics Company), dated February 26, 2004, for an original aggregate amount of $44,617.

(viii)  Purchase Order No. PPQ062-063 from Electric Boat Corporation (A General Dynamics Company), dated April 6, 2004, for an original aggregate amount of $15,200.

(ix)  Purchase Order No. 1556 from SHURflo (A WICOR Company), dated May 25, 2004, for an original aggregate amount of $21,200.

(x)  Purchase Order No. 4500166731 from Northrop Grumman Newport News Shipbuilding, dated May 24, 2004, for an original aggregate amount of $180,553.

(xi)  Purchase Order No. 8040 from GE Medical Systems, Ultrasound & Primary Care Diagnostics, LLC, dated June 16, 2004, for an original aggregate amount of $84,900.

(xii)  Purchase Order No. PPQ105-023 from Electric Boat Corporation (A General Dynamics Company), dated June 15, 2004, for an original aggregate amount of $29,205.

(xiii)  Purchase Order No. PPQ115-025 from Electric Boat Corporation (A General Dynamics Company), dated June 17, 2004, for an original aggregate amount of $31,560.

(xiv)  The various equipment leases identified under item 4 (iii) of schedule 4.17 (a) or under the section of Schedule 4.6 entitled "Encumbrances on Globe Assets."

2.  The loan documents between Globe and First National Bank of New England; reference is made to the pay-off statements set forth in Exhibit 4.2(b)(i) 2 attached and incorporated in this Item 2 of Schedule 4.2(b)(i).

3.  The consummation of the Contemplated Transactions will materially violate or invalidate the following Governmental Authorizations:

(i)  Department of Defense Security Clearance Letter of Consent issued June 17, 2004 to Globe employee John Peter Bodee for Interim Secret Level of Clearance.

(ii)  Department of Defense Security Clearance Letter of Consent issued April 21, 2003 to Globe employee Jason Thomas Dahlberg for Confidential Level of Clearance.

(iii)  Department of Defense Security Clearance Letter of Consent issued June 25, 2003 to Globe employee Charles Robert Foley for Secret Level of Clearance.

(iv)  Department of Defense Security Clearance Letter of Consent issued April 28, 2003 to Globe employee Robert Barnet Karnes for Interim Secret Level of Clearance.

(v)  Department of Defense Security Clearance Letter of Consent issued April 14, 2004 to Globe employee Kevin John Lynch for Interim Secret Level of Clearance.

(vi)  Department of Defense Security Clearance Letter of Consent issued April 14, 2004 to Globe employee Thomas Herbert Roberts for Confidential Level of Clearance.

(vii)  Department of Defense Security Clearance Letter of Consent issued May 5, 2004 to Somerville for Secret Level of Clearance.

(viii)  Department of Defense Security Clearance Letter of Consent issued June 13, 2003 to Globe employee Charles William Stoddard for Confidential Level of Clearance.

(ix)  Department of Defense security clearance at the SECRET level issued February 3, 1998 to the Globe facility in Rockland, Massachusetts.

(x)  Security Agreement dated September 22, 1987, by and between the United States of American, through the Defense Investigative Service acting for the Department of Defense and other governmental User Agencies, and Globe.

## Schedule 4.3  Capitalization

1.      Somerville owns individually 88 shares of Globe common stock.  The remaining 75 shares of issued and outstanding Globe common Stock are owned by Globe Rubber Works, Inc. Profit Sharing 401(k) Plan for the account of Richard C. Somerville.

2.      The Articles of Organization of Globe, as amended to date, contain restrictions on transfer applicable to Globe's equity securities.

## Schedule 4.6  Title to Properties; Encumbrances

4.6(a)  Globe Real Property

1.      Globe owns the property located at and known as 254 Beech Street, Rockland as more particularly set forth in a Deed dated December 7, 1976, and recorded with

the Plymouth County Registry of Deeds in Book 4223, Page 240 (the "Rockland Facility")

2. Globe leases as a tenant-at-will without written agreement, the property located at and known as 66 Pond Street, Whitman, Massachusetts ("Whitman Facility"). By letter from the owner of the Whitman Facility dated June 6, 2004, the monthly rent effective July 1, 2004, is $1,954.

4.6(b) Encumbrances on Globe Assets

Globe Assets which consist of Tangible Personal Property which are leased by Globe are identified on Schedule 2.1(c) as "Leased Equipment", and reference is made to those leased Tangible Personal Property on that Schedule 2.1(c) which have a value individually of more than $10,000. Without limitation to the foregoing, Globe Assets which are leased Tangible Personal Property are:

1. The equipment described in a certain Equipment Lease dated November 1, 2000, between Globe and Textron Financial Corporation ("Textron"), providing for 36 monthly payments of $277.00 each, and a purchase by Globe of the equipment at the end of the lease term for $1.00.

2. Equipment described in a certain Equipment Lease of Atrump Miller / Fortune Lathe from Textron, providing for 60 monthly payments of $459.32 each.

3. Teksoft CAD CAM System under a certain Equipment Lease dated July 23, 1999, between Globe and Textron, providing for 60 monthly payments of $305.00 each, and a purchase by Globe of the equipment at the end of the term for $1.00.

4. The equipment described in a certain Equipment Lease dated June 28, 2003, between Globe and Dell Financial Services L.P. ("Dell"), providing for 36 monthly payments of $288.55 each, and a purchase by Globe of the equipment at the end of the term for $1.00, as amended by Lease No. 001-006321940-001 dated June 23, 2003 and Lease No. 001-006321940-002 dated September 23, 2003.

5. Copier lease under a certain Image Management Agreement dated August 12, 2003, between Globe and IOS Capital, Inc., an affiliate of IKON Office Solutions, Inc. ("IKON"), under which Globe has per copy charges but subject to 36 minimum monthly payments of $460.00 each.

6. Globe leases various machine shop-type equipment under an Equipment Lease Agreement dated November 5, 1999, between Globe and William and Mary Alexander, providing for 60 monthly payments commencing January 1, 2000, each in the amount of $1,250. Globe has purchase options at different prices at different dates, including for an aggregate price of $1.00 on January 1, 2005.

7

7.  Purchase Order entitled "Invoice" dated November 27, 2002, issued by Globe to John Ebinger, for $40,000, with respect to 1 Hillyer CNC 600 Machine Center, for which monthly payments by Globe are $1,361 for 42 months.

8.  Equipment described in a Master Lease Agreement, including any schedule made a part thereof, executed by lessor Highland Capital Corp. August 8, 2002 and by lessee Globe July 29, 2002, providing for 48 monthly payments each in the amount of $936.50.

9.  Equipment described in a Lease Agreement dated December 8, 2003, between CIT Technology Financing Services, Inc. as lessor, and Globe as lessee, providing for 36 monthly payments each in the amount of $287.00.

10. Equipment described in a Business Lease Agreement, including any schedule made a part thereof, dated April 9, 2004, between Hewlett Packard Financial Services Company as lessor and Globe as lessee, providing for 36 monthly payments each in the amount of $278.55.

11. Equipment subject to Installment Payment Agreement No. 13272001, including any schedules thereto, dated June 15, 2004, between Heartland Business Credit and Globe obligating Globe to make 36 monthly payments each in the amount of $218.89.

12. Equipment described in an Equipment Lease Contract, dated February 3, 2004, between Avalon Leasing, Inc. d/b/a Marlin Leasing as lessor and Globe as lessee, providing for 36 monthly payments each in the amount of $221.21.

Based upon a search of the records of the office of the Massachusetts Secretary of State as of July 2, 2004, the Globe Assets, or the portion of Globe Assets as are specified in the attached Exhibit 4.6, are subject to those UCC Financing Statements evidencing the respective Encumbrances as identified in Exhibit 4.6 attached and incorporated in this Schedule 4.6.

### Schedule 4.9   Inventory

There is a $160,000 reserve in Globe's Year-End Balance Sheet taken for potentially unsaleable inventory. The accounting work papers related to such reserve have been provided to KFGI. This potentially unsaleable inventory is still in Globe's possession.

### Schedule 4.10 No Undisclosed Liabilities

1.  Reference is made to the item disclosed under Schedule 4.9.

2.  Reference is made to items 7 and 8 of Schedule 4.19.

## Schedule 4.12 No Material Adverse Changes

1.    Since December 31, 2003, Globe has delivered and/or attempted delivery of approximately $500,000 of product to Globe's customer the United States Postal Service ("USPS") at the request of the USPS. However, the USPS has refused delivery of certain of that product stating that until the USPS issues purchase orders against the shipped goods it will not take delivery of it. Until Globe receives the purchase orders, Globe cannot be assured that it will receive payment for these goods.

2.    Reference is made to the patent applications described in the Patent Assignments identified as items 13 and 14 of Schedule 4.17(a). In Globe's Year-End Balance Sheet legal fees incurred and paid in connection with said patent applications and Patent Assignments in the amount of $24,099 were shown as a Globe asset as a receivable due from Somerville to Globe. But since by virtue of the Patent Assignments, the intellectual property rights related to said patent applictions were actually then owned by Globe and part of Globe's Intellectual Property Assets this entry shown as a receivable due from Somerville to Globe in Globe's Year-End Balance Sheet has now been re-characterized in Globe's Interim Balance Sheet as an expense of Globe rather than a receivable of Globe due from Somerville.

3.    Reference is made to items 7 and 8 of Schedule 4.19.

## Schedule 4.13(b) Employee Benefits

### Health Insurance
Administaff (Tufts Health Care; United Health Care & CIGNA)
Company pays 80% - Employee pays 20% of premium cost
Employee eligible after 30 days

### Dental
Carrier – Administaff (United Health Care)
Company pays 80% - Employee Pays 20% of premium cost
Employee eligible after 30 days

### Life Insurance
Carrier – Administaff (CIGNA Group Plan)
Company pays 100% for one-time salary- Employee can obtain supplemental coverage to three-times salary at his/her premium cost
Employee eligible upon hire

### Long-term Disability
Carrier – CIGNA Group Insurance (Administaff)
Company pays 100% of premium cost
Employee eligible after 30 days

Short-term Disability

Carrier – CIGNA Group Insurance (Administaff)

Employer pays 100% of premium cost.
Employee eligible immediately

Vision Care

Carrier – VSP (Administaff)
Employer pays 100% of premium cost
Employee eligible after 30 days

401K Plan

Plan Administrator – CPI
Contribution is Employee discretion
Matching funds from Globe at Globe's discretion
Employee eligible after one year of employment

Paid Time Off

10 days of paid time off earned per Calendar year on a pro rated basis for Employees
having at least one year but less than 9 years of employment service.
Accrues monthly at pro rated rate of days per month based on the applicable annual rate
(e.g. 0.83 days per month for less than 9 years of service, 1.25 days per month for
between 9 years and less than 16 years of service, etc.).
Additional 5 days after 8th year of service and less than 16 years.
Additional 5 days after 16th year of service and less than 23 years.
Additional 5 days after 23 years of service.
11 specified paid holidays

Section 125 Plan

For employee contribution of 20% premium cost under health and dental insurance plans.

**Schedule 4.13(d)  Non-compliance of Globe Plans**

None.

**Schedule 4.14 Legal Compliance**

Reference is made to items 7 and 8 of Schedule 4.19.

**Schedule 4.15 Legal Proceedings; Orders**

(a)
1.    National Coating Corporation, an abutter to Globe Real Property in Rockland,
      Massachusetts, has claimed by letter from its lawyer, that Globe is encroaching on
      such abutter's property by Globe's use without permission of a portion of the

abutter's property for placement of a dumpster and storage trailers. The abutter has not yet initiated a lawsuit; if it does Globe intends to claim that Globe is lawfully using the disputed property by reason of adverse possession.

2.    Globe entered into a Confidential Settlement Agreement and Mutual Release dated November 24, 2003, with Green, Tweed & Co., Inc. under which Globe made a $50,000 settlement payment and undertook certain reciprocal obligations including non-disparagement and agreements not to sue.

3.    Globe and Massachusetts Department of Environmental Protection executed an Administrative Consent Order and Notice of Noncompliance, ACOP-SE-99-9009-27B, effective September 3, 1999, as modified by an Administrative Consent Order and Notice of Noncompliance, ACOP-SE-99-9009-27B, executed November 12, 1999 by Globe and November 15, 1999 by the Massachusetts Department of Environmental Protection, a copy of each of which has been provided to KFGI (the "1999 Mass DEP Consent Orders").

4.    Reference is made to the matters disclosed under Schedule 4.19.

5.    Claims by Globe in the matter entitled <u>Globe Rubber Works, Inc. v. Crompton Corporation,</u> Case No. 04cv1654, United States District Court for the Eastern District of Pennsylvania.

(b)

By letter dated June 23, 2003 from Paul Slaney, Globe's controller, Globe responded to a prior Grand Jury subpoena issued to Globe requesting documents related to East Coast Staffing, Inc., a temporary employment agency that Globe had previously retained.

**<u>Schedule 4.16</u> Absence of Certain Changes and Events**

1.    Somerville has received a salary increase as of January 1, 2004, to $160,000. Certain other employees have also received salary increases in the Ordinary Course of Business since December 31, 2003. Somerville also received a $10,000 bonus on February 28, 2004. Since December 31, 2003, Somerville has been reimbursed approximately $32,000 for previously unreimbursed expenses incurred by him on behalf of Globe prior to December 31, 2003. Reference is made to item 2 of Schedule 4.12.

2.    Since December 31, 2003 there occurred a flood in the office conference room at the Rockland Facility. Globe received payment on its insurance claim related to such event.

3.    Globe's Year-End Balance Sheet reflects, in part, liabilities of Globe for then unreimbursed business expenses incurred by Somerville and his spouse. Subsequent to December 31, 2003, Somerville and his spouse have submitted

expense reimburse documentation with respect to approximately $32,000 of such expenses, collectively, as referred to in item 1 of this Schedule 4.16, and such expenses have been reimbursed by Globe. As of Closing, neither Somerville nor his spouse have any unreimbursed business expenses owed from Globe.

4.    Globe borrowed $100,000 from Us Unlimited, Inc. on June 30, 2004, evidenced by a certain Promissory Note dated June 30, 2004, which states, in part, that it is secured by a pledge of certain assets of Globe. No Encumbrances were filed with respect to this pledge. This loan was repaid in full on July 7, 2004.

5.    KFGI has provided secured loans to Globe in the aggregate principal amount of $350,000.

## Schedule 4.17 Contracts; No Defaults

Schedule 4.17(a)

1.    November 13, 2003 letter from Globe to Northrop Grumman providing Globe's pricing commitment for G.T.C. Sonar panels for 6 additional shipsets.

2.    For purposes of Schedules 4.17(a), 4.17(b) or 4.17(c), reference is made to the USPS matter disclosed under Schedule 4.12.

3.    Reference is made to the leases for Globe Assets which are leased Tangible Personal Property identified under Schedule 4.6.

4.    The following Globe Contracts:
   (i)  Executory Globe Contracts (customers) involving ≥$10,000 as of 7/01/04

| PO# | CUSTOMER | AWARD DATE | ORIG AMOUNT | OPEN AMOUNT |
|---|---|---|---|---|
| 1497 | Greenbriar Technical | 4/15/2004 | $16,410 | $10,940 |
| 0016740 | Sure-Feed Engineering | 3/10/2004 | $12,138 | $5,095 |
| 7371 | GE Medical Systems Ultrasound | 2/13/2004 | $83,874 | $2,240 |
| 29298 | Kinetic Systems | 1/27/2004 | $14,960 | $7,290 |
| 4270 | Lee Tool Co. | 10/3/2002 | $18,750 | $16,500 |
| 4500035195 | Port Authority of NY & NJ | 2/3/2004 | $46,800 | $46,800 |
| PPP226-126 | General Dynamics | 2/26/2004 | $44,617 | $44,617 |
| YPI04099002014 | DFAS-Columbus Ctr | 4/26/2004 | $99,600 | $99,600 |
| PPP231-019 | General Dynamics | 12/4/2003 | $32,200 | $32,200 |
| PPQ061-114 | General Dynamics | 4/6/2004 | $15,200 | $15,200 |
| PPP226-126 | General Dynamics | 2/26/2004 | $44,617 | $44,617 |
| PPQ062-063 | General Dynamics | 4/6/2004 | $15,200 | $15,200 |
| 9995844 | Duramax Marine | 6/3/2004 | $10,212 | $10,212 |

| PO# | CUSTOMER | AWARD DATE | ORIG AMOUNT | OPEN AMOUNT |
|---|---|---|---|---|
| 1556 | Shurflo | 5/26/2004 | $21,200 | $12,720 |
| 4500166731 | Newport New Shipbuilding | 6/11/2004 | $180,552 | $180,552 |
| 8040 | GE Medical Systems Ultrasound | 6/16/2004 | $84,900 | $76,410 |
| PPQ105-023 | General Dynamics | 6/18/2004 | $29,205 | $29,205 |
| PPQ115-025 | General Dynamics | 6/22/2004 | $31,560 | $31,560 |
| B29863 | B-C-D Metal Products | 6/23/2004 | $17,490 | $17,169 |
| 1658 | Shurflo | 7/9/04 | $25,440 | $25,440 |

(ii)  Executory Globe Contracts (vendors) $\leq$ $10,000 as of 7/01/04

| DATE | PO # | VENDOR | TOTAL COST | OPEN/CLOSED |
|---|---|---|---|---|
| 2/27/04 | 13055 | Pierce Roberts | 12,842 | Open |
| 3/3/04 | 13068 | Air Products | 22,950 | Open |
| 3/17/04 | 13153 | Belt Corp. | 14,250 | Open |
| 4/16/04 | 13323 | Belt Corp. | 16,073 | Open |
| 4/26/04 | 13372 | Vern's | 12,600 | Open |
| 5/3/04 | 13403 | Crompton | 16,425 | Open |
| 6/2/04 | 13546 | Air Products | 23,736 | Open |
| 6/15/04 | 13606 | Air Products | 13,788 | Open |
| 6/30/04 | 13364 | Pierce Roberts | 11,820 | Open |

(iii)    Executory Globe Contracts for services (machines and equipment as of 6/30/04)

|  | Bal. Due | Amt. Per Month |
|---|---|---|
| Verizon DIA (Dedicated Internet Access) Line T1 Service 2 year contract beginning April 2004 | | $837 |
| Verizon Flexpath Dedicated Telephone Service 36 month contract beginning April 2004 | | $737 |
| IOS Capital - Copier            August 2003 | | $504 |
| Global Shop Maintenance Contract   6/16/2003            Total $27,900.00 | $15,440 | |
| Supreme Storage - Trailer Storage (month-to-month) | | $1,034 |
| Atlas Alarm | $168 Quarterly | |
| Waste Management        3/2004 – 3/2005 | Variable amount - $205 minimum | |
| Purchase Power (postage meter)     no contract | | variable amount |

AMX Merchant Services                                          variable amount

NOVA Merchant Services                                         variable amount

VPN

Landmarc Consulting (environmental consultants)               variable amount

| *CAPITAL LEASES* | Bal. Due | Amt. Per Month |
|---|---|---|
| Heartland Business Credit | $7,880 | $218.89 |
| H. P. Financial Services computer equipment lease | | |
| 36-month term        Total $16,000.00 | $13,482 | $218.89 |
| 36 month term | $2,449.00 | $91 |
| Marlin Lease Kaiser TD61 Industrial Air Dryer | $5,306.97 | |
| $221.21        36-month lease        Total $7,963.56 | | |
| CIT Technology | $6,951 | $373 |
| Citicorp (Forktruck) | $324 | $380 |
| Dell Financial Service (Computer Equipment) | $5,644 | $289 |
| | $2,950 | $151 |
| | $4,615 | $200 |
| Highland Capital | $21,034 | $937 |
| John Ebinger   (Equipment) | $24,138 | $1,360 |
| Rockland Federal Credit Union (Truck) | $3,609 | $260 |
| Rockland Federal Credit Union (Car) | $19,209 | $585 |

**Note – The above car loan is a Retained Globe Liability, notwithstanding its inclusion on this Schedule.**

| | | |
|---|---|---|
| Textron Financial (CAD Equipment) | $297 | $305 |
| William Alexander (Equipment) | $5,671 | $1,250 |
| First International (Equipment) | $86,213 | $1,665 |
| First International Baule' | $117,912 | $1,628 |
| First International (Building & Land) | $965,791 | $5,292 |

5.  Annual Spill Response Agreement dated June 30, 2003, between Globe and North Country Environmental Services, Inc. under which the contractor will provide Globe with emergency hazardous waste spill response and remedial actions.

6.  Employment offer letter dated October 28, 2003, from Globe to Michael Carlisle containing contingent sales commission incentive payments.

7.  All Globe employees listed on Schedule 4.20, other than Somerville, have signed Globe's standard form Proprietary Information and Inventions and Non-Competition Agreement, a copy of which has been delivered to KFGI (collectively, the "Globe Employees Work-for-Hire Agreements").

8.  Reference is made to the verbal tenant-at-will lease of the Globe Real Property in Whitman, Massachusetts disclosed in Schedule 4.6.

9.  Consulting Agreement dated February 18, 2004 between Globe and John P. Boodee and Nondisclosure Agreement dated February 18, 2004 between them.

10. Globe has a verbal agreement with Michael Whitworth under which he serves as an independent contractor sales representative for Globe product sales to the USPS, and is entitled to receive 5% of amounts received by Globe from product sales to the USPS. As of the date of Globe's Interim Balance Sheet, Globe was indebted to Michael Whitworth in the amount of $39,907, which is a Globe Assumed Liability.

11. A commitment by Globe has been made to purchase certain capital equipment from RIM Equipment for an aggregate purchase price of $40,000. Globe has given the seller a $5,000 deposit.

12. Engagement letter dated June 18, 2004, by which Globe retained Moody, Famiglietti & Andronico, LLP for an appraisal at a cost of $12,500. Globe has paid one-half of the fee, the balance is not due until the appraisal is delivered.

13. Assignment dated November 7, 2003 by Robert B. Karnes, Somerville and Brian C. Evans to Globe of all assignors' right, title and interest in and to the inventions, patent application and patents, related to the invention subject to U.S. Patent Application No. 10/631,044 for Track System for Tow-Line Conveyors.

14. Assignment dated November 7, 2003 by Robert B. Karnes to Globe of all assignor's right, title and interest in and to the inventions, patent application and patents, related to the invention subject to U.S. Patent Application No. 10/631,046 for Non-Metallic Drive Chain (this Assignment and the Assignment referred to under No. 13 above are collectively referred to as the "Patent Assignments").

15. Letter agreement dated January 30, 2004, between Globe and Joseph Finn Co., Inc. ("Finn"), under which Finn performed an appraisal of the Tangible Personal Property for Globe for a cost of $3,000, which amount has been paid.

16. Mutual Nondisclosure Agreement dated July 15, 2004 between Globe and Martin Van Buren of Triad Engineering.

4.17(c)

Reference is made to the matter disclosed as item 1 of Schedule 4.12.

## Schedule 4.18  Insurance Policies

Below is a list of all policies of insurance to which Globe is a party or under which Globe, or any director of Globe in such capacity, is or has been covered at any time since January 1, 2003.

Pacific Insurance Company                                      Policy #ZG0021730
Combined Building, Personal Property and Business Income
Effective 5/3/2004 – 7/2/2005                    (extended month to month)

Twin City Fire Insurance Company - Hartford Insurance Group  Policy #02CESOA2938
General Liability Coverage                          Effective 10/1/2003-10/1/2004

Hartford Steam Boiler                                 Policy #FBP4900093
Miscellaneous Coverage                       Effective 10/1/2003-10/1/2004
        Equipment Breakdown

Travelers Casualty and Surety Company of America      Policy #104197103
        Crime                               Effective 10/1/2003-10/1/2004
        Employee Dishonesty
        Forgery Alterations
        Money & Sec. on Premises
        Money & Sec. – Messenger
        Computer Fraud

Travelers Insurance Company                     Policy #8105796A8911ND
Business Automobile                             Effective 7/1/2003-7/1/2004
                                               (extended month to month)

Hartford Insurance Group                         Policy #MSCWI4552
Miscellaneous Coverage                     Effective 4/30/2004-4/30/2005
        Computers
        Transportation
        Transit

16

PMC Insurance Group
Workers Compensation Coverage

Policy # WC 7819903
Terminated 3/1/04

Mount Hawley Insurance Company
Umbrella Coverage

Policy # MCU0018093
Effective 10/16/03 – 10/1/04

Workers Compensation - Specialty Risk Services – American International Group, Inc,
(AIG) (Administaff)
Effective 9/1/2003-9/15/2004
Long Term Disability – Cigna Group Insurance (Administaff)
Short Term Disability - Cigna Group Insurance (Administaff)
Life Insurance - Cigna Group Insurance (Administaff)
Health Insurance – Tufts Health Care; United Health Care (Administaff)
Vision Care – VSP (Administaff)
Dental Care – United Health Care (Administaff)
Key Man Life Insurance on Somerville

State Life Insurance

Policy #5110095310   $400,000
Effective 3/9/04 - 3/9/05

American General Life Insurance

Policy #U10005220L  $250,000
Effective 9/19/03 – 9/18/04

Lincoln Financial Group

Policy #G1637194     $250,000
Effective 9/1/03 – 9/1/04

## Schedule 4.19 Environmental Matters

1.    Reference is made to a certain report entitled "Phase I Environmental Site
Assessment and Limited Subsurface Investigation – Globe Rubber Works, Inc. –
254 Beech Hill Road, Rockland, Massachusetts", dated December 12, 2003,
prepared by Goldman Environmental Consultants, Inc. (the "2003 Environmental
Report"), and conditions, restrictions, Hazardous Materials, Hazardous Activities,
Environmental Liabilities, Health Liabilities, Safety Liabilities, claims,
Threatened Claims, instances of non-compliance with, or potential or threatened
non-compliance with, Environmental Laws, Orders, or Permits referred to in the
2003 Environmental Report or in any documents, report, instrument, assessment,
notice, Order, summons, warning, study, analyses, tests or monitoring described
or referenced in the 2003 Environmental Report.  A copy of the 2003
Environmental Report has been provided to KFGI.

2.    Without limitation to the disclosures set forth in Item 1 above, reference is made
to a certain report entitled "Phase I Environmental Site Assessment and Limited
Subsurface Investigation – Globe Rubber Works, Inc. – 254 Beech Hill Road,
Rockland, Massachusetts", dated April 15, 1998, prepared by Goldman
Environmental Consultants, Inc. (the "1998 Environmental Report"), and
conditions, restrictions, Hazardous Materials, Hazardous Activities,
Environmental Liabilities, Health Liabilities, Safety Liabilities, claims,
Threatened Claims, instances of non-compliance with, or potential or threatened

17

non-compliance with, Environmental Laws, Orders, or Permits referred to in the 1998 Environmental Report or in any documents, report, instrument, assessment, notice, Order, summons, warning, study, analyses, tests or monitoring described or referenced in the 1998 Environmental Report. A copy of the 1998 Environmental Report has been provided to KFGI.

3.     Conditions, restrictions, Hazardous Materials, Hazardous Activities, Environmental Liabilities, Health Liabilities, Safety Liabilities, claims, Threatened Claims, instances of non-compliance with, or potential or threatened non-compliance with, Environmental Laws, Orders, or Permits, as described in a letter dated May 15, 1998, from Goldman Environmental Consultants, Inc. to First National Bank of New England related to a so-called Limited Removal Action at the Rockland Facility under the regulations of the Massachusetts Department of Environmental Protection known as the Massachusetts Contingency Plan, 310 CMR 40.0000, or in any documents, report, instrument, assessment, notice, Order, summons, warning, study, analyses, tests or monitoring described or referenced in such May 15, 1998 letter. A copy of this letter has been provided to KFGI.

4.     Conditions, restrictions, Hazardous Materials, Hazardous Activities, Environmental Liabilities, Health Liabilities, Safety Liabilities, claims, Threatened Claims, instances of non-compliance with, or potential or threatened non-compliance with, Environmental Laws, Orders, or Permits, referred to in the 1999 Mass Consent Orders, or in any documents, report, instrument, assessment, notice, Order, summons, warning, study, analyses, tests or monitoring described or referenced in either of the 1999 Mass Consent Orders.

5.     Return to compliance letter dated June 8, 2000, from the Massachusetts Department of Environmental Protection to Globe, with respect to the 1999 Mass Consent Orders. Letter dated April 14, 2000, from the Massachusetts Department of Environmental Protection to Globe, with respect to the 1999 Mass Consent Orders, and Conditions, restrictions, Hazardous Materials, Hazardous Activities, Environmental Liabilities, Health Liabilities, Safety Liabilities, claims, Threatened Claims, instances of non-compliance with, or potential or threatened non-compliance with, Environmental Laws, Orders, or Permits, referred to in said April 14, 2000 letter, or in any documents, report, instrument, assessment, notice, Order, summons, warning, study, analyses, tests or monitoring described or referenced in said April 14, 2000 letter. A copy of these letters dated June 8, 2000 and April 14, 2000 has been provided to KFGI.

6.     Reference is made to the Globe Contract identified in item 4 of Schedule 4.17.

7.     Globe may be required by its operations in Rockland, Massachusetts as of the Closing Date to obtain a Limited Plan Application (LPA) Air Quality Permit from the Massachusetts Department of Environmental Protection due to possible emission levels of 1 – 5 tons per year of hazardous pollutant air. Globe is in the

process of more accurately determining the level of its emissions, following the submission of its annual source registration (emissions summary report) for the 2003 reporting year delineating certain fugitive air and particulate emissions. Globe acknowledges that the cost to obtain any such Permit described in this item 7 required by virtue of Globe's operations as of the Closing Date, is and shall be a Retained Globe Liability.

8.    By virtue of its operations as of the Closing Date, Globe is required to have, but does not currently have, a flammable material storage permit or license from the Rockland Fire Department as required under Legal Requirements. The specific volume of flammable materials at the Rockland, Massachusetts facility as of the Closing Date will determine which of a license or permit is required. Globe acknowledges that the cost to obtain any license or permit described in this item 8 required by virtue of Globe's operations as of the Closing Date, is and shall be a Retained Globe Liability.

**Schedule 4.20** Employees (as of June 30, 2004)

| | Name | Title | annual salary | hire date | Accrued vacation Hours |
|---|---|---|---|---|---|
| 1. | Alexander, William | Machine Shop Foreman | 42,000 | 10/19/1999 | 196.23 |
| 2. | Alves, Antonio | Production Labor | 21,840 | 11/6/2002 | 92.89 |
| 3. | Barbosa, Alvino | Molder | 21,840 | 11/12/2002 | 49.56 |
| 4. | Barros, Aristide | Molder | 25,708 | 12/11/1995 | 99.25 |
| 5. | Bessette, Joseph | Molder Technician | 42,224 | 5/1/2000 | 76.93 |
| 6. | Blair, Larry | Molder | 33,176 | 5/3/1999 | 180.95 |
| 7. | Bonelli, Carl | Fabricator | 44,928 | 9/13/1999 | 118.82 |
| 8. | Brandao, Juvenal | Production Labor | 19,760 | 11/10/2003 | 49.52 |
| 9. | Butler, Paul | Molder Technician | 20,800 | 1/19/2004 | 19.50 |
| 10. | Carlisle, Michael | Technical Sales | 30,000 | 11/3/2003 | 52.85 |
| 11. | Carreiro, Rui | Molding | 27,248 | 6/7/2004 | 6.16 |
| 12. | Charles, Frantz | Trim | 26,520 | 1/10/1994 | 139.23 |
| 13. | Croal, John | Molder Technician | 26,520 | 8/11/2003 | 65.53 |
| 14. | Croft, Maurice | Trim | 17,680 | 9/9/2002 | 0.00 |
| 15. | Cummings, Bernard | Model Shop Technician | 41,600 | 4/12/2004 | 19.50 |
| 16. | Dahlberg, Jason | Foreman (Special Projects) | 41,808 | 1/22/1996 | 72.21 |
| 17. | D'Arcy, Susanna | Accounting & Finance Specialist | 39,998 | 4/9/2003 | 30.71 |
| 18. | Davenport, Denise | Trim | 28,600 | 11/29/1999 | 90.25 |
| 19. | DeSimone, Fred | Mechanical Engineer | 40,000 | 1/19/2004 | 52.18 |
| 20. | Dion, Romeo | Molder, Director –Project Development | 36,504 | 4/20/1992 | 96.23 |
| 21. | Evans, Brian | | 80,000 | 2/24/2003 | 91.23 |
| 22. | Fasnacht, Roger | CFO | 120,000 | 3/29/2004 | 15.27 |
| 23. | Fogarty, Dennis | Production Machinist | 32,760 | 4/26/1999 | 52.95 |
| 24. | Foley, Charles | Customer Support | 48,500 | 6/14/1993 | 108.23 |
| 25. | Fox, Tam | CNC Machinist | 40,456 | 2/12/2003 | 109.54 |
| 26. | Freitas, Robin | Office Manager | 38,000 | 4/26/2004 | 12.83 |
| 27. | Gage, Nicholas | Molder | 18,720 | 6/25/2001 | 23.51 |
| 28. | Galloti, John | CNC Machinist | 40,040 | 3/8/2004 | 26.17 |
| 29. | Gerry, Michael | Molder | 29,432 | 2/23/1993 | 159.23 |

| | Name | Title | annual salary | hire date | Accrued vacation Hours |
|---|---|---|---|---|---|
| 30. | Gibson, Wendy | Scheduler | 37,440 | 4/16/1996 | 16.25 |
| 31. | Goncalves, Antonio | Production Labor | 20,800 | 11/10/2003 | 49.52 |
| 32. | Henson, John | Molder | 21,320 | 7/21/2003 | 76.20 |
| 33. | Janvier, Rigaud | Production Labor | 21,840 | 7/7/2003 | 79.53 |
| 34. | Jerrier, Lisa | Accounts Payable | 25,740 | 7/29/2002 | 57.86 |
| 35. | Karnes, Robert | Director, R&D | 80,500 | 9/8/1999 | 166.25 |
| 36. | King, Lisa | Buyer/Planner | 41,500 | 8/11/2003 | 37.53 |
| 37. | Larrett, Stephen | Shipper | 33,800 | 11/1/1999 | 80.85 |
| 38. | Leary, Donald | Molder | 26,520 | 6/24/1996 | 39.52 |
| 39. | Linscott, Michael | Receiver | 27,560 | 4/21/1997 | 176.22 |
| 40. | Littlefield, James | Molder | 24,960 | 1/8/2004 | 31.51 |
| 41. | Littlefield, Stephen | Molder Technician | 34,528 | 6/16/1986 | 137.18 |
| 42. | Lynch, Kevin | BUM – Military Handling | 56,078 | 3/9/1992 | 102.23 |
| 43. | MacDonald, Richard | Production Machinist | 33,800 | 8/24/1992 | 105.23 |
| 44. | McAvoy, Curtis | Production Labor | 21,424 | 12/11/2003 | 42.85 |
| 45. | Milewski, Slawomir | Machinist/Tool Maker | 59,488 | 6/28/1999 | 79.52 |
| 46. | Monteiro, Manuel | Production Labor | 21,320 | 12/5/2002 | 86.23 |
| 47. | Murray, Robert | Director - Production | 60,000 | 4/14/2003 | 112.23 |
| 48. | Nguyen, Dien | Production Machinist | 30,160 | 2/27/1998 | 0 |
| 49. | Orcutt, Stephen | Injection Molder | 35,360 | 12/2/2003 | 46.18 |
| 50. | Pendleton, Michael | Machinist/Tool Maker | 38,480 | 2/12/1996 | 109.56 |
| 51. | Peters, Robert | Machinist/Tool Maker | 47,840 | 3/17/1994 | 154.23 |
| 52. | Roberts, Thomas | Production, Manager | 55,100 | 7/18/1978 | 290.48 |
| 53. | Robertson, Scott | Molder | 29,120 | 7/19/2002 | 80.93 |
| 54. | Santos, Luiz | Production Labor | 13,650 | 12/19/2002 | 0.00 |
| 55. | Silveira, Jaider | Machinist | 29,120 | 4/27/2004 | 12.83 |
| 56. | Slaney, Paul | Controller | 72,000 | 5/12/2003 | 70.23 |
| 57. | Somerville, Richard | President | 160,000 | 2/29/2004 | 0.00 |
| 58. | Stetson, Dana | Material Manager | 55,000 | 12/8/2003 | 46.18 |
| 59. | Stoddard, Charles | QC Manager | 41,500 | 8/4/1986 | 177.61 |
| 60. | Walker, Nancy | QC Assistant | 37,440 | 4/2/1990 | 205.23 |
| 61. | Weixler, Michael | Shop Foreman | 45,032 | 1/3/1994 | 179.23 |
| 62. | Yost, Matthew | Molder | 30,160 | 10/24/1994 | 159.28 |
| 63. | Hobart, Micheal | Molder | 20,800 | 7/12/04 | NA as of 6/30 |

## Schedule 4.22 Intellectual Property

4.22(b)  Agreements

1.      Reference is made to the Globe Employees Work-for-Hire Agreements.

2.      Reference is made to the Patent Assignments.

4.22(c)  Ownership

1.      For the avoidance of doubt, the Somerville Intellectual Property is owned by Somerville and does not constitute Globe's Intellectual Property Assets.

2.    All or substantially all of the Globe Assets, including but not limited to Globe's Intellectual Property Assets, are subject to Encumbrances evidenced by UCC Financing Statements filed against Globe as Debtor:

3.    Reference is made to item 6 of Schedule 4.17(a) and those Globe employees identified therein that have not executed Globe Employees Work-for-Hire Agreements.

## 4.22(d)  Patents

1.    U.S. Patent Application 10/631,044, for Improved Track System for Tow-Line Conveyors

2.    U.S. Patent Application 10/631,046, for Non-Metallic Drive Chain

## 4.22(e)  Trademarks

1.    Marks currently used in Globe business:

   "Globe Rubber Works, Inc."
   "Globe Rubber Works"
   "Globe Rubber"
   "Drivesaver"
   "Pioneers in Formulating the Non-Metalic Age"
   "Polyuramide"

## 4.22(f)  Copyrights

No registered Copyrights

## 4.22(h)  Net Names

1.    globerubberworks.com

## Schedule 4.23 Relationships with Related Persons

1.    Reference is made to the Somerville Intellectual Property.

2.    Robert Roache, Somerville's brother-in-law, in 1995 made a $20,000 loan to Globe which is reflected as a Globe Liability on Globe's Year-End Balance Sheet. As of June 30, 2004, the total amount of indebtedness owed by Globe with respect to this loan was $43,846. For the avoidance of doubt, this Globe liability is an Assumed Liability.

3.      Somerville is owed, as of July 31, 2004, $29,716.79, being the remaining outstanding balance under a promissory note dated August 14, 2000, executed by Globe, in the original principal amount of $33,669.00. For the avoidance of doubt, this Globe liability is an Assumed Liability.

## Schedule 4.24   Necessary Approvals

Reference is made to item 3 of Schedule 4.2(b)(i) and the Governmental Authorizations identified therein. For the avoidance of doubt, Legal Requirements applicable to the Governmental Authorizations require that KFGI notify the Department of Defense in connection with the Contemplated Transactions.

## Schedule 4.27   Globe's Facilities

Reference is made to the matters disclosed in items 7 and 8 of Schedule 4.19.

## Exhibit 2.1 ( c )
(consisting of 13 pages)

### Tangible Personal Property

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|---|---|---|---|---|---|---|
| Rockland, MA | 2 | Assorted | | Floor Drill, Belt & Disc, Grinder, DE Grinder | 3 pcs | 5 |
| Rockland, MA | 3 | Assorted | | Flammable Cabinet, Hyd. Pallet Lift | 2 pcs | 4 |
| Rockland, MA | 4 | Dayton | | 1 Ton Elec. Hoist, Trolley, Beam | 1 | 7 |
| Rockland, MA | 5 | | | 15' x 15' x 5' Wood Warming Box, Elec. Heat | 1 | 1,0 |
| Rockland, MA | 6 | Performax | Supermax Max-3 | 25 HD Wide Belt Sander, 24" x 6" | 1 | 1,7 |
| Rockland, MA | 7 | Assorted | | Barrel Rollers, VS Drives | 2 | 3,0 |
| Rockland, MA | 8 | Long Island Electric | 850H-EM30 | Elec. Oven, s/n 474, 20', Hoist | 1 | 3,5 |
| Rockland, MA | 9 | | | 275 Gal. Steel Mixing Tank, 48" Dia., Mixer, Pump, Stand | 1 | 1,0 |
| Rockland, MA | 10 | Blakeslee | B600 | 60 Qt. Mixer, s/n 37414 | 1 | 1,9 |
| Rockland, MA | 11 | Ohaus | Explorer | Digital Scale | 1 | |
| Rockland, MA | 12 | Assorted | | Hand Truck, Cart, Hood, Truck, File | LOT | |
| Rockland, MA | 13 | | | 18" Dia. Vacuum Tank w/ Pump | 1 | |
| Rockland, MA | 14 | | | 18" Dia. Port. Vacuum Tank w/ Pump | 1 | |
| Rockland, MA | 15 | Ramco | 810 | Granulator, s/n J-1272-13 | 1 | |

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|---|---|---|---|---|---|---|
| Rockland, MA | 16 | Reed | 100TD | Injection Molder, 100 Ton, s/n P990605, Hopper, Advantage RSO-1250, HC-2JD2X Temp Control, s/n 6789 | 1 | 3,5 |
| Rockland, MA | 17 | Trubor | 75RS 1.5 | Injection Molder, s/n 7971-1, 75 Ton, Dri Air Dryer | 1 | 1,0 |
| Rockland, MA | 18 | Bry Air | RD-100 | Dryer, s/n 950211275, Hopper, Loader | 1 | 1,4 |
| Rockland, MA | 19 | French Oil | | Slab Side Hyd. Presses, 500 Ton, 36", 25 HP, Hyd. Unit, 1 Not in Service | 2 | 4,0 |
| Rockland, MA | 20 | Van Dorn | 300-RS-30F | Injection Molder, 1976, 300 Ton, 30 Oz., s/n 827 | 1 | 2, |
| Rockland, MA | 21 | Dri Air | Arid-X | Dryer, s/n's D5683, N/A | 2 | |
| Rockland, MA | 22 | | | 2" Port. Rubber Extruder, VS Drive, Control | 1 | 1, |
| Rockland, MA | 23 | Eemco | | 10" x 24" 2 Roll Rubber Mill, s/n 63-432 | 1 | 7, |
| Rockland, MA | 24 | | | 6" x 12", 2 Roll Mill (NIS) | 1 | 1. |
| Rockland, MA | 25 | PHI | | 18" Hyd. Heated Platen Press, s/n 897 | 1 | 1. |
| Rockland, MA | 26 | Clifton | 501 | 14" x 14" Hyd. Transfer Compression Molder, 25 | 1 | 1 |

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|---|---|---|---|---|---|---|
| | | | | Ton, 1973 | | |
| Rockland, MA | 27 | Dake | 44-426 | Hyd. Press, Elec. Platen, 14", s/n 165790 | 1 | 1,0 |
| Rockland, MA | 28 | Clifton | 1461 | 1973, 4 Post Hyd. Press, 20" x 20", 50 Ton, s/n 763 | 1 | 4,0 |
| Rockland, MA | 29 | PHI | | 4 Post Hyd. Press, 250 Ton, 18" x 18" | 1 | 6,0 |
| Rockland, MA | 30 | Asbec | HD2430 | Tumbler, s/n CV-6 | 1 | 7 |
| Rockland, MA | 31 | Assorted | | Preformer, Blue M Ovens, Arbor Press, Elec. Hoist, Grinder, Fan, Ladder, Racks, Scales, Tumbler, Rolls, Gantry | LOT | 1,2 |
| Rockland, MA | 32 | Craftsman | | 10" Abrasive Cutoff Saw | 1 | 1 |
| Rockland, MA | 33 | Milltronics | Partner MB25-A | CNC Mill, s/n 4983, Centurion VI Control, 18" x 56" Table, Tooling | 1 | 17,5 |
| Rockland, MA | 34 | Crown | | Elec. Stacker | 1 | 1 |
| Rockland, MA | 35 | Hillyer | CNC 600 | Router, s/n 370, GA Control | 1 | 2,5 |
| Rockland, MA | 36 | Desma | 960A20T | 1986, Vert. Rubber Injection Molder, 440 Ton, 2.5# Shot Size, 24" x 32", 3 Regloplas Temp Controls | 1 | 15,0 |

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|---|---|---|---|---|---|---|
| Rockland, MA | 37 | Desma | 960A20T | 1986, Vert. Rubber Injection Molder, 440 Ton, 2.5# Shot Size, 24" x 32", 3 Regloplas Temp Controls (NIS) | 1 | |
| Rockland, MA | 38 | Max Machinery Inc. | | 3 Component Mix, Meter & Dispensing Machine | 1 | 12,0 |
| Rockland, MA | 39 | Young & Bertke | | Gas Fired Oven, 2 Chamber, 8' x 8' x 12', 6' x 6' x 18' | 1 | 10,0 |
| Rockland, MA | 40 | | | 8 Compartment Elec. Ovens, Port. | 2 | 10,0 |
| Rockland, MA | 41 | | | 18" x 24" Autoclaves | 3 | 1,0 |
| Rockland, MA | 42 | Assorted | | Elec. Tray Ovens, Vacuum Tanks, Benches, Hot Plates, Chop Saw, Microwaves | LOT | 1,5 |
| Rockland, MA | 43 | PHI | P-210 | Hyd. Lab Press, 8" Elec. Platens, s/n 3152, 20 Ton | 1 | 7 |
| Rockland, MA | 44 | PHI | | Hyd. Press, 18" Elec. Platens, 75 Ton, s/n 601 | 1 | 2,5 |
| Rockland, MA | 45 | | | 16" x 30" Autoclaves | 5 | 2,5 |
| Rockland, MA | 46 | Despatch | | Elec. Tray Oven | 1 | 1,0 |
| Rockland, MA | 47 | Blue M | AGE 256G-3 | Elec. Oven, s/n A3-1502 | 1 | 1,0 |
| Rockland, MA | 49 | Mori Seiki | | 17" x 30" Lathe, s/n | 1 | 3, |

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|---|---|---|---|---|---|---|
| | | | | 12100, Tooling | | |
| Rockland, MA | 50 | Cincinnati | | 12.5" x 24" Lathe, s/n 1W2B5D-167, Tooling | 1 | 1,0 |
| Rockland, MA | 51 | Powermatic | 1150 | 15" VS Floor Drill, s/n 115V1074 | 1 | 5 |
| Rockland, MA | 52 | Assorted | | Grinders, Vises, Rotary Table, Clamps, Tools, Chucks, Benches, Cabinets | LOT | 5,0 |
| Rockland, MA | 54 | Kalamazoo | H9AW | Horiz. Band Saw, s/n 10452 | 1 | 1,7 |
| Rockland, MA | 55 | B&S | #2LH | 6" x 18" Surface Grinder | 1 | |
| Rockland, MA | 56 | Powermatic | 5 | 24" Vert. Band Saw, s/n 66-206 | 1 | 2,5 |
| Rockland, MA | 57 | Dewalt | | Bench Mitre Saw | 1 | |
| Rockland, MA | 58 | Powermatic | 15 | SS Planer, s/n 98150462 | 1 | 1, |
| Rockland, MA | 59 | Buffalo | | 10" Table Saw | 1 | |
| Rockland, MA | 60 | Assorted | | Shelving, Paint Shaker, Pallet Lift, Racks, Chain, Fall, Totes, Drum Stands, Stacker | LOT | 1. |
| Rockland, MA | 61 | Assorted | | Scales, Tester, Hood | LOT | |
| Rockland, MA | 62 | Nikon | 6C | 12" Profile Projector, s/n 10748 | 1 | 1. |
| Rockland, MA | 63 | Assorted | | Height Gage, Surface Gage, Centers, Surface | LOT | 2. |

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|---|---|---|---|---|---|---|
| | | | | Plates, Verniers, Mikes, Etc. | | |
| Rockland, MA | 64 | Assorted | | PC's, Furniture, Benches, Sealer, Files | LOT | 7 |
| Rockland, MA | 65 | Instron | 1011 | Tensil Tester | 1 | 2,0 |
| Rockland, MA | 66 | Powermatic | 1450 | 2 Spindle, 15" Drill, s/n 9151525 | 1 | 7 |
| Rockland, MA | 67 | Fortune | | 16" x 60" Gap Lathe, s/n 581837, Tooling, DRO, Tooling | 1 | 7,5 |
| Rockland, MA | 68 | First | | VS Vert. Mill, s/n 74060190, 3 HP, PF, 48" Table, DRO | 1 | 2,5 |
| Rockland, MA | 69 | Sharp | 1640C | 1997, 16" x 40" Gap Lathe, s/n 6808102, DRO, Tooling | 1 | 6,0 |
| Rockland, MA | 70 | Assorted | | Grinders, Vises, Tools, Tooling, Chain Fall, Benches, Shelving | LOT | 1, |
| Rockland, MA | 71 | Process Cooling | | Water Chilling System, Tank, Pumps, Filter, Cooling, Tower | 1 | 5, |
| Rockland, MA | 72 | Kinney | KDH130 | Vacuum Pump, s/n 266201 | 1 | |
| Rockland, MA | 73 | Assorted | | Heated Spin Coating Cabinets | 2 | 1, |
| Rockland, MA | 74 | Assorted | | 10 Assorted Autoclaves | LOT | 5. |
| Rockland, MA | 75 | Assorted | | Scale, Vacuum Boxes, | LOT | 3. |

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|---|---|---|---|---|---|---|
| | | | | Ovens, Floor Drill, Hot Plates | | |
| Rockland, MA | 76 | AFP | | Hyd. Barrel Crusher, 5 HP | 1 | 1,0 |
| Rockland, MA | 77 | Assorted | | Pallet Racks, Pallet Lift, Hand Trucks, Tapers, Scales, Sealer, Label Printer, PC, Strap Truck, Pumps, Drum Truck, Stacker | LOT | 5,0 |
| Rockland, MA | 78 | Weightronix | W1-110 | 4' Digital Platform Scale, s/n 24307, 6000# | 1 | 1,0 |
| Rockland, MA | 79 | Wilton | | 6" x 12" Belt & Disc Grinder, s/n 30600 | 1 | ! |
| Rockland, MA | 80 | Hotsy | | 24" Parts Washer | 1 | 1,( |
| Rockland, MA | 81 | Trinco | | 24" Blast Cabinet w/ Collector | 1 | |
| Rockland, MA | 82 | Skat Blast | | 6' Dry Blast Cabinet, Collector | 1 | 1, |
| Rockland, MA | 83 | Joy | | 40 HP Rotary Air Compressor, s/n 216233, 48,000 Hrs. | 1 | 4, |
| Rockland, MA | 84 | Process Heating | | 6' x 6' x 10', Gas Oven, s/n 1422 | 1 | 4, |
| Rockland, MA | 85 | Grieve | T500 | Elec. Oven, s/n 55812 | 1 | 2, |
| Rockland, MA | 86 | | | 36" x 18' Autoclave, Hyd. Door, Sterlco Heater | 1 | 5. |
| Rockland, MA | 87 | Assorted | | Vacuum Box & Floor Drill | 2 pcs | |

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|---|---|---|---|---|---|---|
| Rockland, MA | 88 | Joy Twistair | TA0220EAA2D5 | 50 HP, Air Compressor, 51K Hrs. | 1 | 4,0 |
| Rockland, MA | 89 | Deltech | HG750 | Air Dryer, s/n 872HG4872 | 1 | 1,0 |
| Rockland, MA | 90 | Miller | 185 | Port. Wire Feed Welder, s/n KJ019798 | 1 | 7 |
| Rockland, MA | 91 | Assorted | | Vacuum Pumps, Tools, Benches, Vises, Pump, Filler, Parts, Powcon Welder, Ladders, Etc. | LOT | 5,0 |
| Rockland, MA | 92 | Boy | 50T | 1982, 50 Ton, Injection Molder, s/n 51223 | 1 | 2,5 |
| Rockland, MA | 93 | Fluid Automation | CE4-55-55 | Twin Drum Pump, s/n 0318-94 | 1 | 3,0 |
| Rockland, MA | 94 | Assorted | | Freezer, Vacuum, Cabinet, Hoist, Vise, Bench | LOT | |
| Rockland, MA | 95 | Assorted | | Foyer Furniture, Sofa Tables, Desks, Chairs, Partition Cubicles, Files, Laptops, Refigerator, Tables, Shredder, Meridian Phone System, Cabinets, Safe, Etc. | LOT | 8. |
| Rockland, MA | 95.1 | | | **** METAL SHOP **** | | |
| Rockland, MA | 96 | Miller | Millermatic 300 | Wire Feed Welder, s/n LC556582 | 1 | 2. |

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|---|---|---|---|---|---|---|
| Rockland, MA | 97 | Midwest | 60 | Stud Welder, s/n 100-9907-12 | 1 | 1,0 |
| Rockland, MA | 97.1 | | | 16" Power Hack Saw | 1 | 7 |
| Rockland, MA | 98 | Miller | Synchrowave 300 | Welder, s/n JB569989, SP4 Programmer | 1 | 1,5 |
| Rockland, MA | 99 | Thermal Dynamics | PAK Master 100XL | Plasma Cutter | 1 | 1,2 |
| Rockland, MA | 100 | Assorted | | Rockwell 6" Belt Grinder, Powermatic Bench Drill, Grinders, Handshear, Clamps, Hyd. Press, Oxy Acet Outfit, Tables, Cabinets, Tools, Etc. | LOT | 3,0 |
| **TOTAL ROCKLAND, MA** | | | | | | 248,8 |
| Leased Equipment, Whitman, MA | 101 | Allis Chalmers | C-50 | LPG Forklift, 4250# Cap., s/n ABR523829, Side Shift | 1 | 5,5 |
| Leased Equipment, Whitman, MA | 102 | Buffalo | | 15" Bench Drill | 1 | 2 |
| Leased Equipment, Whitman, MA | 103 | Industrial | | 20" Floor Drill w/ Tapper | 1 | 3 |
| Leased Equipment, Whitman, MA | 104 | Walker Turner | | 15" Bench Drill | 1 | 1 |
| Leased Equipment, Whitman, MA | 105 | Delta | | 17" Floor Drill | 1 | 2 |
| Leased Equipment, Whitman, MA | 106 | Harrison | | 13" x 36" Lathe, s/n 306789 w/ Tooling | 1 | 4,5 |
| Leased Equipment, Whitman, MA | 107 | Assorted | | Cab's, Bench, Vise, Mic's | LOT | |
| Leased Equipment, Whitman, MA | 108 | Jet | 1550 | Engine Lathe, s/n 700511 w/ Tooling | 1 | 3,5 |
| Leased Equipment, Whitman, MA | 109 | Jet | | 18" x 60" Lathe, s/n 545 | 1 | 2, |
| Leased Equipment, Whitman, MA | 110 | Jet | | 13" x 40" Lathe, s/n | 1 | 1, |

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|---|---|---|---|---|---|---|
| | | | | N/A | | |
| Leased Equipment, Whitman, MA | 111 | Southbend | | 10" x 12" Turret Lathe, s/n 9009RKT11, Belt Drive, Tooling | 1 | 70 |
| Leased Equipment, Whitman, MA | 112 | Assorted | | Collets, Gages, Pins, Etc. | LOT | 70 |
| Leased Equipment, Whitman, MA | 113 | Producto | | Hand Tapper w/ Tooling | 1 | 35 |
| Leased Equipment, Whitman, MA | 114 | Walker Turner | | 16" Vert. Band Saw | 1 | 60 |
| Leased Equipment, Whitman, MA | 115 | | | 1" Belt Sander | 1 | 1( |
| Leased Equipment, Whitman, MA | 116 | Walker Turner | | 20" Floor Drill | 1 | 3! |
| Leased Equipment, Whitman, MA | 116.1 | Atrump | | Vari Speed 3 HP, Vert. Mill, s/n K3VL-404, 50" PF Table w/ Vise, DRO | 1 | 6,5 |
| Leased Equipment, Whitman, MA | 117 | Bridgeport | | 1 HP, Vert. Mill, s/n 234656, 48" PF Table, DRO | 1 | 2,5 |
| Leased Equipment, Whitman, MA | 118 | Harig | 618 | Hyd. Surface Grinder, s/n 5934-H | 1 | 2,7 |
| Leased Equipment, Whitman, MA | 119 | Assorted | | Cabinet Indexers, Cutters, Tapper, Etc. | LOT | 3 |
| Leased Equipment, Whitman, MA | 120 | Bridgeport | | 1 1/2 HP, Vari Speed Vert. Mill, 36" Table, s/n 117890 | 1 | 1,( |
| Leased Equipment, Whitman, MA | 121 | Clausing | 8510 | Horiz. Miller, s/n 800691 w/ Vise | 1 | |
| Leased Equipment, Whitman, MA | 122 | Jet | 5VI-642K | Vert. Mill, s/n 8909191-2, 48" Table | 1 | 2, |
| Leased Equipment, Whitman, MA | 123 | Bridgeport | | 1 HP, Vert. Mill, 48" PF Table, s/n 203200, | 1 | 2, |

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|---|---|---|---|---|---|---|
| | | | | DRO, Swivel Base Vise | | |
| Leased Equipment, Whitman, MA | 124 | Bridgeport | | 1 HP, Vert. Mill, 48" PF Table, s/n 192397, DRO, Swivel Base Vise | 1 | 1,9 |
| Leased Equipment, Whitman, MA | 125 | Assorted | | Vise, Bench, Cab, Cutters | LOT | 2 |
| Leased Equipment, Whitman, MA | 126 | Jones & Shipman | 1049 | Cyl. Grinder, 10" x 18", s/n WDX-22-23 | 1 | 1,2 |
| Leased Equipment, Whitman, MA | 127 | Assorted | | 2 Pcs. Disc Sanders | LOT | 3 |
| Leased Equipment, Whitman, MA | 128 | Cincinnati | | 14" x 72", Cyl. Grinder, s/n N/A | 1 | 7 |
| Leased Equipment, Whitman, MA | 129 | Southbend | | 24" x 9', Lathe w/ Dumore Tool Post Grinder, Belt Drive | 1 | 2,5 |
| Leased Equipment, Whitman, MA | 130 | Assorted | | Ki Saw, Band Saw, Hack Saw | 3 pcs | 9 |
| Leased Equipment, Whitman, MA | 131 | Sears | | 10" Table Saw | 1 | |
| Leased Equipment, Whitman, MA | 132 | Clausing Colchester | | 15" x 48" Lathe, 2000 RPM, s/n 6-0015-14638 w/ Tooling | 1 | 5, |
| Leased Equipment, Whitman, MA | 133 | Assorted | | Sunnen Hone, Stacker, 6" Sander, Vise, Grinder, Arbor Press, Carbide Grinder, Welder, Cab's, Hardware | LOT | 1 |
| Leased Equipment, Whitman, MA | 134 | Assorted | | Pallet Racking, Shelves, Benches | LOT | |
| Leased Equipment, Whitman, MA | 135 | | | 6" Stroke Sander, 3 | 1 | 1 |

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|----------|--------|--------------|-------|-------------|-----|-----|
| | | | | HP, Shuttle Table | | |
| Leased Equipment, Whitman, MA | 136 | Randall | 1320 | 14" Roll Knife Slitter | 1 | 7 |
| Leased Equipment, Whitman, MA | 137 | USM | B | Hytronic Cutting Machine, s/n 3984-511 | 1 | 1,0 |
| Leased Equipment, Whitman, MA | 138 | Assorted | | Scale, Impulse Sealer, File, Circular Knife Cutter, Etc. | LOT | 4 |
| Leased Equipment, Whitman, MA | 139 | Champion | | 7.5 HP, Tank Mounted, Air Compressor | 1 | 1,5 |
| Leased Equipment, Whitman, MA | 140 | Assorted | | Power Tools | LOT | 4 |
| Leased Equipment, Whitman, MA | 141 | Mobile | | Hyd. Pallet Jack | 1 | 3 |
| Leased Equipment, Whitman, MA | 142 | Assorted | | Desk, PC, Printer, Files, Credenza, Copier | LOT | 4 |
| **TOTAL LEASED WHITMAN, MA** | | | | | | 62,3 |
| Leased Equipment, Rockland, MA | 1 | Halla | HLF-25 | LPG Forklift, 4700#, Triple Mast, s/n 1230K | 1 | 7,5 |
| Leased Equipment, Rockland, MA | 2 | Baule | UH4C/CV | 2000, Mix, Meter & Dispensing Machine, 4 Component Control, Curative Vacuum Loader, s/n 235-50, Spare Injector Unit | 1 | 95, |
| Leased Equipment, Rockland, MA | 3 | Z Corp. | Z400 | 3D Mold Making Machine, s/n 56130 | 1 | 21, |
| Leased Equipment, Rockland, MA | 4 | Atrump | K3SLF | Vert. Mills, s/n N/A, 50" Table, 3 HP, PF, VS, DRO | 2 | 13, |

| Location | LineID | Manufacturer | Model | Description | QTY | IPV |
|---|---|---|---|---|---|---|
| Leased Equipment, Rockland, MA | 5 | Hillyer | CNC 600 | Bridge Type Vert. Machining Center, s/n M457, GA Control, Auto Tool Change, 41" x 64.5" Table | 1 | 20,0 |
| Leased Equipment, Rockland, MA | 6 | HP | 800PS | 42" Color Plotter | 1 | 3,5 |
| Leased Equipment, Rockland, MA | 7 | Kaeser | TD61 | Industrial Dryer | 1 | 7,5 |
| | | | | | | 167,5 |
| TOTAL LEASED ROCKLAND, MA | | | | | | |
| | | | | | | |
| TOTAL IN-PLACE VALUE APPRAISAL | | | | | | $478,4 |

## Additional Tangible Personal Property owned by Globe and located at Globe's Rockland, Massachusetts facility (new purchases since February 2004)

| | Cost | |
|---|---|---|
| 1/12/04 Drum Crusher | $5,545 | Advanced Manufacturing |
| 2/28/04 EDM Machine | $1,450 | Karl Anderson |
| 4/30/04 Engineering Laptop | $3,182 | Brian Evans |
| 4/30/04 Computer Equip. HP Printer | $1,599 | Applied Systems Consulting |
| 4/30/04 Phone System Upgrade | $5,276 | Alternative Communications |
| 4/30/04 Phone System Upgrade | $1,297 | Alternative Communications |
| 5/10/04 CNC Machine | $38,703 | Finn Auctioneers |
| 5/25/04 CADD Edge Software | $3,800 | CADD Edge |
| 5/31/04 Viawarp Software | $1,022 | Reclass Software Purchase |
| 6/1/04 Computer Equip. – Workstations And Server | $16,000 | HP Financial |
| 6/14/04 Pervasive SQL and Project Module | $7,069 | Global Shop Solutions |

Miscellaneous office furniture

EXHIBIT 4.2(b)(i)2

<u>FIRST NATIONAL BANK OF NEW ENGLAND</u>
<u>LOAN PAY-OFF STATEMENTS</u>

(consisting of 4 pages)



UPS Capital Business Credit
Product Support
280 Trumbull St.
Hartford, CT 06103
877.765.3184 Tel

July 27, 2004

Tarlow Breed Hart Murphy & Rodgers, P.C.
21 Custom House Street
Boston, MA 02110

Via Facsimile: 617-261-7673

RE:      Loan Name: Globe Rubber Works, Inc.
         Loan Number: 3000329-0001
Notification Date to Lender: July 26, 2004

Dear Client:

You have requested the payoff on the above mentioned SBA loan. According to the terms of your SBA loan, there is a three-week lead time to a payoff. Therefore, the interest calculated for payoff is to:                              August 16, 2004

You may pay this amount through:                         August 16, 2004
The applicable interest per diem must be added if payoff is made after this date.

| Principal as of | 7/27/04 | $971,185.78 |
| Interest as of | 8/16/04 | 11,952.91 |
| Late fees as of | 7/26/04 | 565.67 |
| Escrow tax as of | 7/26/04 | -2,722.67 |
| | | |
| Total Payoff as of | 8/16/04 | $980,981.69 |

                         Per Diem                $161.86

This payoff is good through   August 16, 2004   providing there is no further activity on this loan. If payment is not received within ten (10) days of the date on this letter, please contact Product Support for a revised payoff. Upon written request, releases will be forwarded to attorney, unless we are notified differently.

Payoff will be accepted via wire transfer as directed below:

Bank of America
ABA #111000012
For further credit to UPS Capital Business Credit
Account Number 3751804662
            RE: Globe Rubber Works, Inc.
            Payoff Loan Number      3000329-0001

If you have any questions, please call me at (860) 241-4766.

Sincerely,

*Julie Eason*
Julie Eason
Product Support

JUL 27 2004 3:57PM    FMB OF NEW ENGLAND

UPS Capital Business Credit
Product Support
280 Trumbull St.
Hartford, CT 06103
877.765.3184 Tel

July 27, 2004

Tarlow Breed Hart Murphy & Rodgers, P.C.
21 Custom House Street
Boston, MA 02110

Via Facsimile: 617-261-7673

RE:    Loan Name: **Globe Rubber Works, Inc.**
       Loan Number: 3000329-0002

Dear Client:

You have requested the payoff on the above mentioned loan.
The interest calculated for payoff is to:    **July 28, 2004**

You may pay this amount through:    **July 28, 2004**
The applicable interest per diem must be added if payoff is made after this date.

| Principal as of | 7/27/04 | $119,375.50 |
|---|---|---|
| Interest as of | 7/28/04 | 1,018.86 |
| Late Fees as of | 7/27/04 | 225.06 |
| Total Payoff as of | 7/28/04 | $120,619.42 |

Per Diem    $18.23

This payoff is good through    July 28, 2004    providing there is no further activity
on this loan. If payment is not received within ten (10) days of the date on this letter, please
contact Product Support for a revised payoff. Upon written request, releases will be
forwarded to attorney, unless we are notified differently.

Payoff will be accepted via wire transfer as directed below:

Bank of America
ABA #111000012
For further credit to UPS Capital Business Credit
Account Number 3751804662
RE: Globe Rubber Works, Inc.
Payoff Loan Number    3000329-0002

If you have any questions, please call me at (860) 241-4766.

Sincerely,

*Julie Eason*

Julie Eason
Product Support

UPS Capital Business Credit
Product Support
280 Trumbull St.
Hartford, CT 06103
877.765.3184 Tel

July 27, 2004

Tarlow Breed Hart Murphy & Rodgers, P.C.
21 Custom House Street
Boston, MA 02110

Via Facsimile: 617-261-7673

RE:      Loan Name: **Globe Rubber Works, Inc.**
         Loan Number: 3000329-0003

Dear Client:

You have requested the payoff on the above mentioned loan.
The interest calculated for payoff is to:      July 28, 2004

You may pay this amount through:      July 28, 2004
The applicable interest per diem must be added if payoff is made after this date.

| Principal as of | 7/27/04 | $88,160.80 |
|---|---|---|
| Interest as of | 7/28/04 | 823.65 |
| Late Fees as of | 7/27/04 | 249.63 |
| Total Payoff as of | 7/28/04 | $89,234.08 |

Per Diem.      $14.69

This payoff is good through      July 28, 2004      providing there is no further activity
on this loan. If payment is not received within ten (10) days of the date on this letter, please
contact Product Support for a revised payoff. Upon written request, releases will be
forwarded to attorney, unless we are notified differently.

Payoff will be accepted via wire transfer as directed below:

Bank of America
ABA #111000012
For further credit to UPS Capital Business Credit
Account Number 3751804662
RE: Globe Rubber Works, Inc.
Payoff Loan Number      3000329-0003

If you have any questions, please call me at (860) 241-4766.

Sincerely,

*Julie Eason*

Julie Eason
*Product Support*

EXHIBIT 4.6

## UCC FINANCING STATEMENTS AGAINST GLOBE

(consisting of 29 pages)

A.    Secretary of the Commonwealth of Massachusetts Filings:

1.    A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to Textron Financial Corporation, as Secured Party, filed with the Massachusetts Secretary of the Commonwealth on November 13, 2000 at 9:33 a.m. as File No. 00755747 covering specific leased equipment (See copy attached and made a part hereof).

2.    A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to Highland Capital Corp., as Secured Party, filed with the Massachusetts Secretary of the Commonwealth on July 31, 2002 at 1:41 p.m. as File No. 200213791850 covering specific leased equipment (See copy attached and made a part hereof).

3.    A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to First National Bank of New England, as Secured Party, filed with the Massachusetts Secretary of the Commonwealth on May 19, 1998 at 4:03 p.m. as File No. 98551244, as affected by a UCC Continuation Statement filed with the Massachusetts Secretary of the Commonwealth on April 11, 2003 at 3:04 p.m. as File No. 200319784350, covering all or substantially all Globe's Assets (See copy attached and made a part hereof).

4.    A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to First National Bank of New England, as Secured Party, filed with the Massachusetts Secretary of the Commonwealth on May 19, 1998 at 4:04 p.m. as File No. 98551246, as affected by a UCC Continuation Statement filed with the Massachusetts Secretary of the Commonwealth on April 11, 2003 at 3:03 p.m. as File No. 200319784080, covering all or substantially all Globe's Assets (See copy attached and made a part hereof).

5.    A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to First International Bank, as Secured Party, filed with the Massachusetts Secretary of the Commonwealth on July 27, 1999 at 3:03 p.m. as File No. 99649546, as affected by a UCC Continuation Statement filed with the Massachusetts Secretary of the Commonwealth on June 25, 2004 at 4:33 p.m. as File No. 200430971770, covering all or substantially all Globe's Assets (See copy attached and made a part hereof).

6.  A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to Textron Financial Corporation, as Secured Party, filed with the Massachusetts Secretary of the Commonwealth on August 2, 1999 at 11:02 a.m. as File No. 99650627, as assigned to Sovereign Bank, Network Capital Alliance, as Assignee, by UCC Assignment filed with the Massachusetts Secretary of the Commonwealth on December 8, 2000 at 10:37 a.m. as File No. 00761496, covering specific equipment (See copy attached and made a part hereof).

7.  A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to Textron Financial Corporation, as Secured Party, filed with the Massachusetts Secretary of the Commonwealth on August 3, 1999 at 11:11 a.m. as File No. 99651058 covering specific equipment (See copy attached and made a part hereof).

8.  A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to Kalm-Forsythe Global Innovations, Ltd., as Secured Party, filed with the Massachusetts Secretary of the Commonwealth on February 19, 2004 at 2:50 p.m. as File No. 200427635290 covering all accounts receivable (See copy attached and made a part hereof).

9.  A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to Dell Financial Services, L.P., as Secured Party, filed with the Massachusetts Secretary of the Commonwealth on April 16, 2004 at 1:35 p.m. as File No. 200429138870 covering specific leased computer equipment (See copy attached and made a part hereof).

The above UCC search was conducted at the Massachusetts Secretary of the Commonwealth, UCC Division. The search covers the period through the end of business on July 2, 2004.

B.  **Rockland Town Clerk Filings**:

1.  A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to Textron Financial Corporation, as Secured Party, filed with the Rockland Town Clerk on August 2, 1999 at 9:00 a.m. as File No. 14189, as assigned to Sovereign Bank, Network Capital Alliance, as Assignee, by UCC Assignment filed with the Rockland Town Clerk on December 11, 2000 at 9:00 a.m. as File No. 14595, covering specific equipment (See copy attached and made a part hereof).

2.  A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to Textron Financial Corporation, as Secured Party, filed with the Rockland Town Clerk on August 3, 1999 at 9:00 a.m. as File No. 14190, covering specific equipment (See copy attached and made a part hereof).

3.  A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to First International Bank, as Secured Party, filed with the Rockland Town Clerk on August 5, 1999 at 9:00 a.m. as File No. 14193, covering all or substantially all Globe's Assets (See copy attached and made a part hereof).

4.  A UCC-1 Financing Statement from Globe Rubber Works, Inc., as Debtor, to Textron Financial Corporation, as Secured Party, filed with the Rockland Town Clerk on November 13, 2000 at 9:00 a.m. as File No. 14575, covering specific equipment (See copy attached and made a part hereof).

The above UCC search results were taken from a July 21, 2004 report prepared by Capitol Services, Inc. and provided to Globe by KFGI. The search covers the period through the end of business on July 17, 2004.

2639617-40-1

T2232 TEXTRON.1

This FINANCING STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code.

| | | | 1A SOCIAL SECURITY OR FEDERAL TAX NO |
|---|---|---|---|
| 1 DEBTOR (LAST NAME FIRST IF AN INDIVIDUAL) | | | |
| GLOBE RUBBER WORKS, INC. | | | |
| 1B MAILING ADDRESS | | 1C CITY, STATE | 1D ZIP CODE |
| 254 BEECH ST | | ROCKLAND, MA | 02370 |
| 2 ADDITIONAL DEBTOR (IF ANY) (LAST NAME FIRST - IF AN INDIVIDUAL) | | | 2A SOCIAL SECURITY OR FEDERAL TAX NO |
| 2B MAILING ADDRESS | | 2C CITY STATE | 2D ZIP CODE |
| 3 DEBTOR'S TRADE NAMES OR STYLES (IF Any) | | | 3A FEDERAL TAX NUMBER |

| 4 SECURED PARTY NAME | Textron Financial Corporation | | 4A SOCIAL SECURITY NO , FEDERAL TAX NO OR BANK TRANSIT AND A B A NO |
|---|---|---|---|
| MAILING ADDRESS | 4949 SW Meadows Road, Ste 650 | | D56008768 |
| CITY | Lake Oswego | STATE OR  ZIP CODE 97035 | |
| 5 ASSIGNEE OF SECURED PARTY NAME | | | 5A SOCIAL SECURITY NO , FEDERAL TAX NO OR BANK TRANSIT AND A B A NO |
| MAILING ADDRESS | | | |
| CITY | | STATE  ZIP CODE | |

6 This FINANCING STATEMENT covers the following types or items of property (include description of real property on which located and owner of record when required by instruction 4)

1 SOLIDWORKS 2000, CD-ROM, INCL DOCS1 SUBSCRIPTION SERVICE1 SW MDT MIGRATION PROMOTION1 CADD EDGE TRAINING Equipment/Lease No 00913510100005

| 7 CHECK IF APPLICABLE | X | 7A | PRODUCTS OF COLLATERAL ARE ALSO COVERED | 7B DEBTOR(S) SIGNATURE NOT REQUIRED IN ACCORDANCE WITH INSTRUCTION 5(a)(1)(b)  (1)  (2)  (3)  (4) | Filed With  Massachusetts |
|---|---|---|---|---|---|

| 8 CHECK IF APPLICABLE | X | DEBTOR IS A TRANSMITTING UTILITY IN ACCORDANCE WITH UCC SECTION 9105 (1)(n) |
|---|---|---|

X _(signature)_

SIGNATURE(S) OF DEBTOR(S)
GLOBE RUBBER WORKS, INC.
RICHARD SOMERVILLE
ATTORNEY-IN-FACT
TYPE OR PRINT NAME(S) OF DEBTOR(S)

X

SIGNATURE(S) OF SECURED PARTY(IES)
Textron Financial Corporation
ATTORNEY IN-FACT
TYPE OR PRINT NAME(S) OF SECURED PARTY(IES)

10 THIS SPACE FOR USE OF FILING OFFICER (DATE TIME FILE NUMBER AND FILING OFFICER)

C O D E

Equipment/Lease No: 00913510100005

155714

| 11 RETURN COPY TO | | |
|---|---|---|
| NAME | UCC Direct Services | (800) 331-3262 |
| ADDRESS | P.O. Box 29071 | (818) 662-4141 |
| CITY | Glendale | |
| STATE | CA | |
| ZIP CODE | 91209-9071 | |

MA SOC   Filing Number: 200213791850   Date: 07/31/2002 1:41:00 PM

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone:(800) 331-3282       Fax: (818) 662-4141

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

UCC Direct Services          509759 IHIGHLANDCAP
                             5512456-40-1
P.O. Box 29071

Glendale, CA 91209-9071

File with:  Massachusetts

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| GLOBE RUBBER WORKS, INC. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 254 BEECH STREET | ROCKLAND | MA | 02370 | |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | Corporation | MA | 041371290 ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Highland Capital Corp. | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 5 Center Avenue | Little Falls | NJ | 07424 | |

4. This FINANCING STATEMENT covers the following collateral:
(1) Z400 MONOCHROME 3D PRINTER WITH STARTER KIT AND DE-POWDERER 200210000 TOGETHER WITH ALL REPLACEMENTS, UPGRADES, REPLACEABLE PARTS, REPAIRS, ADDITIONS, SUBSTITUTIONS, ACCESSORIES, PROCEEDS THEREFROM, AND INSURANCE PROCEEDS, IF ANY (COLLECTIVELY REFERRED TO AS "EQUIPMENT")\ THIS FINANCING STATEMENTIS BEING RECORDED PURSUANT TO A LEASE AGREEMENT BETWEEN THE SECURED PARTY AND THE DEBTOR FOR NOTICE PURPOSES ONLY AND SHALL NOT BE DEEMED TO GRANT THE DEBTOR ANY PROPERTY INTEREST IN THE EQUIPMENT OR INSURANCE PROCEEDS, IF ANY.

| 5. ALTERNATIVE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS.   Attach Appendum | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |
|---|---|---|

8. OPTIONAL FILER REFERENCE DATA                    20021000

5512456 2184-30-0

Prepared by UCC Direct Services, P.O. Box 29071, Glendale, CA 91209-9071  Tel (800)331-3282

NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

**Exhibit A**
**(Collateral Description)**

Debtor:                              Secured Party:

Globe Rubber Works, Inc.             First National
254 Beech Street                     Bank of New England
Rockland, MA 02370                   One Commercial Plaza
                                     Hartford, CT 06103

(a)  all equipment, as that term is defined in Article 9 of the Uniform Commercial Code as in affect from time-to-time in the Commonwealth of Massachusetts (the "UCC"), and, in any event, shall include without limitation, all machinery, tools, dyes, equipment, furnishings, fixtures, leasehold improvements, vehicles (other than motor vehicles) and computers and other electronic data processing and other office equipment, now owned or hereafter acquired, any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto, and all contracts, contract rights and chattel paper arising out of any lease of any of the foregoing;

(b)  all proceeds, as that term is defined in Article 9 of the UCC, now owned or hereafter acquired, and, in any event, shall include (a) any and all accounts, chattel paper, instruments, cash and other proceeds payable to the Debtor from time-to-time in respect of any of the foregoing collateral security, (b) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time-to-time with respect to any of the collateral security, (c) any and all payments (in any form whatsoever) made or due and payable to the Debtor from time-to-time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the collateral security by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), and (d) any and all other amounts from time-to-time paid or payable under or in connection with any of the collateral security;

(c)  all other collateral in which the Debtor may hereafter grant to the Secured Party a security interest; and

(d)  all renewals, substitutions, replacements, additions, accessions and products of any and all of the foregoing.

Globe Rubber Works, Inc.
254 Beech Richmond Street
Rockland, MA 02370

First National Bank
of New England
One Commercial Plaza
Hartford, CT 06103

5/24/78

The property of the Debtor, more fully described on Exhibit A attached hereto
and incorporated herein by reference, including products and proceeds thereof.

Filed with the Secretary of State

Term Loan

Globe Rubber Works, Inc.

BY: Michael C. Roderick, President

MA SOC   Filing Number: 200319784350   Date: 04/11/2003 3:04:00 PM

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Phone (800) 331-3282   Fax (818) 662-4141

B. SEND ACKNOWLEDGEMENT TO: (Name and Mailing Address)   509201 1FIRSTNATIONAL2

UCC Direct Services             5764450.1
P.O. Box 29071
Glendale, CA 91209-9071         MAMA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
98551244  05-19-98  SS MA

☐ 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement

3. ☒ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.
☐ DELETE name: Give record name to be deleted in item 6a or 6b.
☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7d. TAX ID#: SSN or EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR FIRST NATIONAL BANK OF NEW ENGLAND | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
PBC RUBBER WORKS, INC.   4 02050

Globe Rubber Works, Inc.
254 Beech Street
Rockland, MA 02370

First National Bank
of New England
One Commercial Plaza
Hartford, CT 06103

5 5 / 2 4 6

the property of the Debtor, more fully described on Exhibit A attached hereto
and incorporated herein by reference, including products and proceeds therefrom.

SBA Loan

Filed with the Secretary of State

Globe Rubber Works/Bio:

By: Richard C. Bonerville, President

551246

**Exhibit A**
**(Collateral Description)**

Debtor:

Globe Rubber Works, Inc.
254 Beach Street
Rockland, MA 02370

Secured Party:

First National
Bank of New England
One Commercial Plaza
Hartford, CT 06103

(a) all accounts, as that term is defined in Article 9 of the Uniform Commercial Code as in effect from time to time in the Commonwealth of Massachusetts (the "UCC"), now owned or hereafter acquired and, in any event, shall include any right to payment held by Debtor, whether in the form of accounts receivable, notes, drafts, acceptances or other forms of obligations and receivables, now owned or hereafter received or acquired by or belonging or owing to the Debtor (including, without limitation, under any trade name, style or division thereof) for inventory sold or leased or services rendered by it whether or not earned by performance, together with all guarantees and security therefor and all proceeds thereof, whether cash proceeds or otherwise, including, without limitation, all right, title and interest of Debtor in the inventory which gave rise to any such accounts, including, without limitation, unpaid seller's rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed, rejected or repossessed inventory or other goods;

(b) all chattel paper, as that term is defined in Article 9 of the UCC, now owned or hereafter acquired, and, in any event, shall include any writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods, whether now or hereafter held by Debtor;

(c) all contracts, undertakings, franchise agreements or other agreements (other than rights evidenced by chattel paper, documents or instruments, as those terms are defined above and below), now owned or hereafter acquired, in or under which the Debtor may now or hereafter have any right, title or interest, including, without limitation, with respect to an account, and any agreement relating to the terms of payment or the terms of performance thereof;

(d) all documents, as that term is defined in Article 9 of the UCC now owned or hereafter acquired;

(e) all equipment, as that term is defined in Article 9 of the UCC and, in any event, shall include, without limitation, all machinery, tools, dyes, equipment, furnishings, fixtures, leasehold improvements, vehicles (other than motor vehicles) and computers and other electronic data processing and other office equipment,

-1-



now owned or hereafter acquired, any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto, and all contracts, contract rights and chattel paper arising out of any lease of any of the foregoing;

(f) all general intangibles, as that term is defined in Article 9 of the UCC, now owned or hereafter acquired, and, in any event, shall include all right, title and interest which the Debtor may now or hereafter have in or under any contract, all customer lists, trademarks, patents, rights in intellectual property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, recipes, experience, processes, models, drawings, blueprints, catalogs, materials and records, goodwill (including, without limitation, the goodwill associated with any trademark, trademark registration or trademark licensed under any trademark license), claims in or under insurance policies, including unearned premiums, uncertificated securities, deposit accounts, rights to receive tax refunds and other payments, and rights of indemnification;

(g) all instruments, as that term is defined in Article 9 of the UCC, now owned or hereafter acquired, and, in any event, shall include any negotiable instrument or certificated security, as defined in Article 8 of the UCC, or any other writing which evidences a right to the payment of money and is not itself an instrument that constitutes, or is a part of a group of writings that constitute, chattel paper, and is of a type which, in the ordinary course of business, is transferred by delivery with any ordinary necessary endorsement or assignment, whether now or hereafter held by Debtor;

(h) all inventory, as that term is defined in Article 9 of the UCC, now owned or hereafter acquired, wherever located, and, in any event, shall include all inventory, merchandise, goods and other personal property which are held by or on behalf of the Debtor for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process or materials used or consumed or to be used or consumed in the Debtor's business or the processing, packaging, promotion, delivery or shipping of the same, and all finished goods, whether or not the same is in transit or in the constructive, actual or

-2-

exclusive occupancy or possession of the Debtor or is held by the Debtor or by others for the Debtor's account, including, without limitation, all goods covered by purchase orders and contracts with suppliers and all goods billed and held by suppliers and all inventory which may be located on premises of the Debtor or of any carriers, forwarding agents, truckers, warehousemen, vendors, selling agents or other persons;

(f) all proceeds, as that term is defined in Article 9 of the UCC, now owned or hereafter acquired, and, in any event, shall include (a) any and all accounts, chattel paper, instruments, cash and other proceeds payable to the Debtor from time-to-time in respect of any of the foregoing collateral security, (b) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time-to-time with respect to any of the collateral security, (c) any and all payments (in any form whatsoever) made or due and payable to the Debtor from time-to-time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the collateral security by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), and (d) any and all other amounts from time-to-time paid or payable under or in connection with any of the collateral security;

(g) any other collateral in which the Debtor may hereafter grant to the Secured Party a security interest; and

(h) all renewals, substitutions, replacements, additions, accessions and products of any and all of the foregoing.

-2-

MA SOC   Filing Number: 200319784080   Date: 04/11/2003 3:03:00 PM

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Phone (800) 331-3282    Fax (818) 662-4141

B. SEND ACKNOWLEDGEMENT TO: (Name and Mailing Address)   509201 1FIRSTNATIONAL2

UCC Direct Services          5764446.1
P.O. Box 29071
Glendale, CA 91209-9071      MAMA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
98551246  05-19-98  SS MA

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

1. ☒ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.
☐ DELETE name: Give record name to be deleted in item 6a or 6b.
☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. TAX ID#: SSN or EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR FIRST NATIONAL BANK OF NEW ENGLAND | FIRST NAME | MIDDLE NAME | SUFFIX |
| 9b. INDIVIDUAL'S LAST NAME | | | |

11. OPTIONAL FILER REFERENCE DATA   UPPERWORKS, INC.  4-02050

Globe Rubber Works, Inc.
254 Beech Street
Rockland, MA-02370

First International Bank
280 Trumbull Street
Hartford, CT 06103

The property of the Debtor, as more fully described
on Exhibit A attached hereto and incorporated herein
by reference.

Filed with: Secretary of State

Globe Rubber Works, Inc.

By Richard C. Somerville, President

Debtor or by others for the Debtor's account, including, without limitation, all goods covered by purchase orders and contracts with suppliers and all goods billed and held by suppliers and all inventory which may be located on premises of the Debtor or of any carriers, forwarding agents, truckers, warehousemen, vendors, selling agents or other persons;

(i) all proceeds, as that term is defined in Article 9 of the UCC, now owned or hereafter acquired, and, in any event, shall include (a) any and all accounts, chattel paper, instruments, cash and other proceeds payable to the Debtor from time-to-time in respect of any of the foregoing collateral security, (b) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time-to-time with respect to any of the collateral security, (c) any and all payments (in any form whatsoever) made or due and payable to the Debtor from time-to-time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the collateral security by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), and (d) any and all other amounts from time-to-time paid or payable under or in connection with any of the collateral security;

(j) all other collateral in which the Debtor may hereafter grant to the Secured Party a security interest; and

(k) all renewals, substitutions, replacements, additions, accessions and products of any and all of the foregoing.

MA SOC   Filing Number: 200430971770   Date: 6/25/2004 4:33:00 PM

# UCC-3 Form - Continuation
Original File Number: 99649546   Original File Date: 7/27/1999 3:03:00 PM

FILER INFORMATION
  Full name: UCC DIRECT SERVICES    Phone: (800) 331-328
CONTACT INFORMATION
  Contact name: GISELLA MELENDEZ
  Street #1: 330 N. BRAND BLVD., SUITE 700
  Street #2: DFS NO: 6291386.1
  City: GLENDALE    State: CA    ZIP: 91203    Country: USA
  Notification Method: E-Mail    Email: sosack@uccdirect.com

DEBTOR INFORMATION
  Org. Name: GLOBE RUBBER WORKS, INC.
  Mailing Address1: 254 BEECH ST.
  City: ROCKLAND   State: MA    ZIP: 02370   Country:

SECURED PARTY INFORMATION
  Org. Name: FIRST INTERNATIONAL BANK
  Mailing Address1: 280 TRUMBULL ST.
  City: HARTFORD    State: CT    ZIP: 06103    Country:

TRANSACTION TYPE: STANDARD

1957577_4-3042

93616 TEXTRON.1

This STATEMENT is presented for filing pursuant to the Uniform Commercial Code

| | | 1B. DATE OF ORIG. FINANCING STATEMENT | 1C. PLACE OF FILING ORIG FINANCING STATEMENT |
|---|---|---|---|
| | | | Massachusetts |

1. FILE NO. OF ORIG FINANCING STATEMENT  
650627

1A. DATE OF FILING OF ORIG FINANCING STATEMENT  
08-02-99

2A. SOCIAL SECURITY NO. FEDERAL TAX NO.  
023242540

2. DEBTOR (LAST NAME FIRST)  
GLOBE RUBBER WORKS, INC.

2C. CITY, STATE  
ROCKLAND, MA

2D. ZIP CODE  
02370

2B. MAILING ADDRESS  
254 BEECH ST

3. ADDITIONAL DEBTOR (IF ANY) (LAST NAME FIRST)

3A. SOCIAL SECURITY OR FEDERAL TAX NO

3B. MAILING ADDRESS

3C. CITY, STATE

3D. ZIP CODE

4. SECURED PARTY  
NAME  Textron Financial Corporation  
MAILING ADDRESS  40 Westminster Street  
CITY  Providence  STATE  RI  ZIP CODE  02940

4A. SOCIAL SECURITY NO. FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO.

5. ASSIGNEE OF SECURED PARTY (IF ANY)  
NAME  SOVEREIGN BANK  
NETWORK CAPITAL ALLIANCE  
MAILING ADDRESS  368 VETERANS HIGHWAY  
CITY  COMMACK  STATE  NY  ZIP CODE  11725

5A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO.  
23-1237295

6.  
A.  CONTINUATION- The original Financing Statement between the foregoing Debtor and Secured Party bearing the file number and date shown above is continued. If collateral is crops or timber, check here and insert description of real property on which growing or to be grown in item 7 below.

B.  RELEASE- From the collateral described in the Financing Statement bearing the file number shown above, the Secured Party releases the collateral described in item 7 below.

C.  X  ASSIGNMENT- The Secured Party certifies that the Secured Party has assigned to the Assignee above named, the Secured Party's rights under the Financing Statement bearing the file number shown above in the collateral described in Item 7 below.

D.  TERMINATION- The Secured Party certifies that the Secured Party no longer claims a security interest under Financing Statement bearing the file number shown above.

E.  AMENDMENT- The Financing Statement bearing the file number shown above is amended as set forth in item 7 below. (Signature of Debtor required on all amendments.)

F.  OTHER

7.  
SOVEREIGN BANK  
NETWORK CAPITAL ALLIANCE  
368 VETERANS HIGHWAY  
COMMACK, NY 11725  
FULL ASSIGNMENT. ALL COLLATERAL ON ORIGINAL FINANCING STATEMENT.

00 DEC -8 AM 10:

8.  Equipment/Lease No: 91351-05    (DATE)    19

GLOBE RUBBER WORKS, INC.  
DEBTOR SIGNATURE NOT REQUIRED

9. This Space Use of Filing Officer  
(Date, Time, Filing Office)

| CODE | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |

By _____  
SIGNATURE(S) OF DEBTOR(S)    (TITLE)

Textron Financial Corporation  
By _____  
ATTORNEY-IN-FACT    (TITLE)  
SIGNATURE(S) OF SECURED PARTY(IES)

10.  Return Copy to

NAME  UCC Direct Services  
ADDRESS  P.O. Box 29071  
CITY AND STATE  Glendale  
CA  
91209-9071

(800) 331-3282  
(818) 662-4141

Uniform Commercial Code — Form UCC-2  
Prepared with UCC Direct for Windows. Data File Services, Inc.  P.O. Box 275,  Van Nuys,  CA.,  91408-0275  Tel: (818) 909-2200

(1) FILING OFFICER COPY

MA SOC   Filing Number: 200427635290   Date: 02/19/2004 2:50:00 PM

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Kalm-Forsythe Global Innovations, Ltd.
3922 Windsor Avenue
Dallas, TX 75205

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Globe Rubber Works, Inc. | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 254 Beech Street | Rockland | MA | 02370 | USA |

| 1d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | Corporation | Massachusetts | ☑ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Kalm-Forsythe Global Innovations, Ltd. | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3922 Windsor Avenue | Dallas | TX | 75205 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All accounts receivable of Debtor, pursuant to that certain Promissory Note from Debtor to Secured Party dated February 17, 2004.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum     7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional]    All Debtors    Debtor 1    Debtor 2

8. OPTIONAL FILER REFERENCE DATA

GLO100-001 / Commonwealth of Massachusetts

MA SOC    Filing Number: 200429138870    Date: 04/16/2004 1:35:00 PM

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Diligenz, Inc.    1-800-858-5294 |

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

```
7903845

Diligenz, Inc.
6500 Harbour Heights Pkwy, Suite 400
Mukilteo, WA 98275

            Filed in: Massachusetts  (S.O.S.)
```

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| GLOBE RUBBER WORKS, INC | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 254 BEECH ST | ROCKLAND | MA | 02370 | USA |
| 1d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corp. | 1f. JURISDICTION OF ORGANIZATION MA | 1g. ORGANIZATIONAL ID #, if any 041371290 □ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any □ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Dell Financial Services, L.P. | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 12234 N. IH-35, Bldg. B | Austin | TX | 78753 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All computer equipment and peripherals (collectively Equipment) wherever located heretofore or hereafter leased to Lessee by Lessor pursuant to that certain Equipment Lease #006321940-003 dated APRIL 13, 2004, and/or any other Equipment leased pursuant to Leases that are in substantially the same form attached, including without limitation all substitutions, additions accessions and replacements thereto, and thereof, now or hereafter installed to, affixed to, or used in, conjunction with the Equipment and proceeds thereof together with all rental or installment payments, insurance proceeds, other proceeds and payments due and to become due and arising from or relating to said Equipment.

| 5. ALTERNATIVE DESIGNATION (if applicable): [X] LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) (optional) [ADDITIONAL FEE] | | All Debtors | Debtor 1 | Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | 7903845 |

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

61014-21-817926

# CAPITOL SERVICES, INC.



**CAPITOL**
SERVICES, INC

**CAPITOL**
**CORPORATE**
SERVICES, INC.

| | | |
|---|---|---|
| Date: | 07/21/2004 | **Copies Requested:** Copies updated from |
| Subject: | Globe Rubber Works, Inc. | |
| | | **Copy Update:**    07/19/2003 |
| Jurisdiction: | Town of Rockland, Plymouth County, MA | |
| Index Searched: | UCC | **Reference:**    41932-2 |
| Searched Through: | 07/17/2004 | |

| File Date | File # | Type of Filing | Secured Party |
|---|---|---|---|
| 08/02/1999 | 14189 | Financing Statement | TEXTRON FINANCIAL CORPORATION<br>PROVIDENCE, RI |
| 12/11/2000 | 14595 | Assignment | SOVEREIGN BANK<br>COMMACK, NY |
| 08/03/1999 | 14190 | Financing Statement | TEXTRON FINANCIAL CORPORATION<br>PROVIDENCE, RI |
| 08/05/1999 | 14193 | Financing Statement | FIRST INTERNATIONAL BANK<br>HARTFORD, CT |

CAPITOL SERVICES, INC. MAKES NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY REGARDING THIS SEARCH REPORT. THE PARTIES AGREE THAT ALL LIABILITY RELATING TO THIS REPORT SHALL BE LIMITED TO AN AMOUNT EQUAL TO THE FEE PAID BY THE CUSTOMER FOR THIS REPORT.

07/20/2004  15:06    5082384678          LEGALTRIEVE INFO                    PAGE  04/07

1957577-40-2
92272 TEXTRON2

This FINANCING STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code.

| 1. DEBTOR (LAST NAME FIRST IF AN INDIVIDUAL) | | | 1A. SOCIAL SECURITY OR FEDERAL TAX NO. |
|---|---|---|---|
| GLOBE RUBBER WORKS, INC. | | | 023242540 |
| 1B. MAILING ADDRESS | 1C. CITY, STATE | | 1D. ZIP CODE |
| 254 BEECH ST | ROCKLAND, MA | | 02370 |
| 2. ADDITIONAL DEBTOR (IF ANY) (LAST NAME FIRST - IF AN INDIVIDUAL) | | | 2A. SOCIAL SECURITY OR FEDERAL TAX NO. |
| 2B. MAILING ADDRESS | 2C. CITY, STATE | | 2D. ZIP CODE |
| 3. DEBTOR'S TRADE NAMES OR STYLES (IF ANY) | | | 3A. FEDERAL TAX NUMBER |

| 4. SECURED PARTY NAME | Textron Financial Corporation | | | 4A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A B.A. NO. |
|---|---|---|---|---|
| MAILING ADDRESS | 40 Westminster Street | | | 056008768 |
| CITY | Providence | STATE  RI | ZIP CODE  02940 | |
| 5. ASSIGNEE OF SECURED PARTY NAME | | | | 5A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO. |
| MAILING ADDRESS | | | | |
| CITY | | STATE | ZIP CODE | |

6. This FINANCING STATEMENT covers the following types or items of property (include description of real property on which located and owner of record when required by instruction 4):

"The property described below includes all replacement parts, additions, and accessory items." 1 CAD CAM SYSTEM

| 7. CHECK IF APPLICABLE [X] | 7A. [ ] PRODUCTS OF COLLATERAL ARE ALSO COVERED | 7B. DEBTOR(S) SIGNATURE NOT REQUIRED IN ACCORDANCE WITH INSTRUCTION 5(a) ITEM: [ ] (1)  [ ] (2)  [ ] (3)  [ ] (4)  Filed With:  Massachusetts |
|---|---|---|
| 8. CHECK IF APPLICABLE [X] | [ ] DEBTOR IS A "TRANSMITTING UTILITY" IN ACCORDANCE WITH UCC SECTION 9105 (1) (N) | |

X _Christt Pa_
SIGNATURE(S) OF DEBTOR(S)
GLOBE RUBBER WORKS, INC.
RICHARD C. SOMERVILLE
PRESIDENT          Attorney-In-Fact
TYPE OR PRINT NAME(S) OF DEBTOR(S)

X _[signature]_
SIGNATURE(S) OF SECURED PARTY(IES)
Textron Financial Corporation
          Attorney-In-Fact
TYPE OR PRINT NAME(S) OF SECURED PARTY(IES)

10. THIS SPACE FOR USE OF FILING OFFICER
(DATE, TIME, FILE NUMBER AND FILING OFFICER)

C
O    August 2, 1999
D    9:00 a.m.
E    #14189
     Town Clerk, Rockland

1
2
3
4
5
6
7
8
9

11. RETURN COPY TO:

| NAME | Data Filing Services | |
|---|---|---|
| ADDRESS | P.O. Box 29071 | (800) 331-3282 |
| CITY | Glendale | (818) 662-4141 |
| STATE | CA | |
| ZIP CODE | 91209-9071 | |

FORM UCC-1—
Approved by the Secretary of State
Prepared with UCC Direct for Windows. Data File Services, Inc., P.O. Box 975, Van Nuys, CA 91408-0975

07/20/2004  15:06    5082384678                    LEGALTRIEVE INFO                                    PAGE  03/07

1957577.1-30-1    14595

This STATEMENT is presented for filing pursuant to the Uniform Commercial Code    93616 TEXTRON.1

| 1. FILE NO. OF ORIG. FINANCING STATEMENT | 1A. DATE OF FILING OF ORIG. FINANCING STATEMENT | 1B. DATE OF ORIG. FINANCING STATEMENT | 1C. PLACE OF FILING ORIG. FINANCING STATEMENT |
|---|---|---|---|
| 14189 | 08-02-99 | | TC MA ROCKLAND |

| 2. DEBTOR (LAST NAME FIRST) | | | 2A. SOCIAL SECURITY NO., FEDERAL TAX NO. |
|---|---|---|---|
| GLOBE RUBBER WORKS, INC. | | | 023242540 |

| 2B. MAILING ADDRESS | 2C. CITY, STATE | 2D. ZIP CODE |
|---|---|---|
| 254 BEECH ST | ROCKLAND, MA | 02370 |

| 3. ADDITIONAL DEBTOR (IF ANY) (LAST NAME FIRST) | | 3A. SOCIAL SECURITY OR FEDRAL TAX NO |
|---|---|---|
| | | |

| 3B. MAILING ADDRESS | 3C. CITY,STATE | 3D. ZIP CODE |
|---|---|---|
| | | |

4. SECURED PARTY  Textron Financial Corporation
   NAME
   MAILING ADDRESS  40 Westminster Street
   CITY  Providence    STATE  RI    ZIP CODE  02940

4A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO.

5. ASSIGNEE OF SECURED PARTY (IF ANY)
   SOVEREIGN BANK
   NAME  NETWORK CAPITAL ALLIANCE
   MAILING ADDRESS  368 VETERANS HIGHWAY
   CITY  COMMACK    STATE  NY    ZIP CODE  11725

5A. SOCIAL SECURITY NO., FEDERAL TAX NO., OR BANK TRANSIT AND A.B.A. NO.
23-1237295

6. A ☐ CONTINUATION-  The original Financing Statement between the foregoing Debtor and Secured Party bearing the file number and date shown above is continued.  If collateral is crops or timber, check here ☐ and insert description of real property on which growing or to be grown in Item 7 below.

B ☐ RELEASE-  From the collateral described in the Financing Statement bearing the file number shown above, the Secured Party releases the collateral described in Item 7 below.

C ☒ ASSIGNMENT-  The Secured Party certifies that the Secured Party has assigned to the Assignee above named, the Secured Party's rights under the Financing Statement bearing the file number shown above in the collateral described in Item 7 below.

D ☐ TERMINATION-  The Secured Party certifies that the Secured Party no longer claims a security interest under Financing Statement bearing the file number shown above.

E ☐ AMENDMENT-  The Financing Statement bearing the file number shown above is amended as set forth in Item 7 below. (Signature of Debtor required on all amendments.)

F ☐ OTHER

7.
SOVEREIGN BANK
NETWORK CAPITAL ALLIANCE
368 VETERANS HIGHWAY
COMMACK, NY 11725
FULL ASSIGNMENT.  ALL COLLATERAL ON ORIGINAL FINANCING STATEMENT.

| | | CODE | 9. This Space Use of Filing Officer (Date, Time, Filing Office) |
|---|---|---|---|
| Equipment/Lease No: 91351-05 | | | |
| GLOBE RUBBER WORKS, INC    (DATE) _____ 19___ | | | December 11, 2000 |
| DEBTOR SIGNATURE NOT REQUIRED | | | 9:00a.m. |
| | | 1 | #14595 |
| By: | | 2 | Town Clerk, Rockland |
| SIGNATURE(S) OF DEBTOR(S)    (TITLE) | | 3 | |
| Textron Financial Corporation | | | |
| By: ATTORNEY-IN-FACT | | 4 | |
| SIGNATURE(S) OF SECURED PARTY(IES)    (TITLE) | | 5 | |
| 0. | Return Copy to | | |
| NAME | UCC Direct Services | 6 | |
| ADDRESS | P.O. Box 29071 | | (800) 331-3282 |
| CITY AND | Glendale | 7 | (818) 662-4141 |
| STATE | CA | | |
| | 91209-9071 | 8 | |
| | | 9 | |

Uniform Commercial Code — Form UCC-2

07/28/2004   15:06   5082384678                    LEGALTRIEVE INFO                    PAGE  05/07

1957577-40-2   TC
92272 TEXTRON2

This FINANCING STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code.

| 1. DEBTOR (LAST NAME FIRST IF AN INDIVIDUAL) | | 1A. SOCIAL SECURITY OR FEDERAL TAX NO. |
| GLOBE RUBBER WORKS, INC. | | 023242540 |
| 1B. MAILING ADDRESS | 1C. CITY STATE | 1D. ZIP CODE |
| 254 BEECH ST | ROCKLAND, MA | 02370 |
| 2. ADDITIONAL DEBTOR (IF ANY) (LAST NAME FIRST - IF AN INDIVIDUAL) | | 2A. SOCIAL SECURITY OR FEDERAL TAX NO |
| 2B. MAILING ADDRESS | 2C. CITY STATE | 2D. ZIP CODE |
| 3. DEBTOR'S TRADE NAMES OR STYLES (If Any) | | 3A. FEDERAL TAX NUMBER |

| 4. SECURED PARTY NAME | Textron Financial Corporation | | 4A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A B.A. NO |
| MAILING ADDRESS | 40 Westminster Street | | 056008768 |
| CITY | Providence | STATE  RI   ZIP CODE   02940 | |
| 5. ASSIGNEE OF SECURED PARTY NAME | | | 5A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A B.A. NO |
| MAILING ADDRESS | | | |
| CITY | | STATE       ZIP CODE | |

6. This FINANCING STATEMENT covers the following types or items of property (Include description of real property on which located and owner of record when required by Instruction 4).

"The property described below includes all replacement parts, additions, and accessory items." 1 CAD CAM SYSTEM

| CHECK IF APPLICABLE [X] | 7A. [ ] PRODUCTS OF COLLATERAL ARE ALSO COVERED | 7B. DEBTOR(S) SIGNATURE NOT REQUIRED IN ACCORDANCE WITH INSTRUCTION 4(a) ITEM [ ] (1) [ ] (2) [ ] (3) [ ] (4)   Filed With:   Massachusetts |
| CHECK IF APPLICABLE [X] | [ ]   DEBTOR IS A "TRANSMITTING UTILITY" IN ACCORDANCE WITH UCC SECTION 9105 (1) (n) | |

X   _[signature]_                           Attorney-In-Fact
SIGNATURE(S) OF DEBTOR(S)
GLOBE RUBBER WORKS, INC.
RICHARD C SOMERVILLE
PRESIDENT
TYPE OR PRINT NAME(S) OF DEBTOR(S)

X   _[signature]_
SIGNATURE(S) OF SECURED PARTY(IES)
Textron Financial Corporation
Attorney-In-Fact
TYPE OR PRINT NAME(S) OF SECURED PARTY(IES)

RETURN COPY TO:

| NAME | Data Filing Services | |
| ADDRESS | P.O. Box 29071 | (800) 331-3282 |
| CITY | Glendale | (818) 662-4141 |
| STATE | CA | |
| ZIP CODE | 91209-9071 | |

10. THIS SPACE FOR USE OF FILING OFFICER (DATE, TIME, FILE NUMBER AND FILING OFFICER)

August 3, 1999
9:00 a.m.
#14190
Town Clerk, Rockland

FORM UCC-1

| 4 ☐ Filed for record in the real estate records. | 5 ☐ Debtor is a Transmitting Utility. | 6. No. of Additional Sheets Presented: |
|---|---|---|
| 1. Debtor(s) (Last Name First) and address(es) | 2 Secured Party(ies) and address(es) | 3. For Filing Officer (Date, Time, Number, and Filing Office) |
| Globe Rubber Works, Inc.<br>254 Beech Street<br>Rockland, MA  02370 | First International Bank<br>280 Trumbull Street<br>Hartford, CT  06103 | August 5, 1999<br>9:00 a.m.<br>#14193<br>Town Clerk, Rockland |

7. This financing statement covers the following types (or items) of property:

The property of the Debtor, as more fully described
on Exhibit A attached hereto and incorporated herein
by reference.

Filed with:  Town of Rockland

Check ☒ if covered:    ☒ Proceeds of Collateral are also covered.    ☒ Products of Collateral are also covered

Globe Rubber Works, Inc.

Whichever is
Applicable
(See Instruction
Number 9)

By: _____
        Richard C. Somerville, President

Signature(s) of Debtor (Or Assignor)              Signature(s) of Secured Party (Or Assignee)

Filing Officer Copy — Alphabetical
STANDARD FORM — UNIFORM COMMERCIAL CODE — FORM UCC-1      Rev. April 1957   Forms may be purchased from Hobbs & Warren, Inc., Boston MA 02101

reclaimed, rejected or repossessed inventory or other goods;

(b) all chattel paper, as that term is defined in Article 9
of the UCC, now owned or hereafter acquired, and, in any event,
shall include any writing or writings which evidence both a
monetary obligation and a security interest in or a lease of
specific goods, whether now or hereafter held by Debtor;

(c) all contracts, undertakings, franchise agreements or
other agreements (other than rights evidenced by chattel paper,
documents or instruments, as those terms are defined above and
below), now owned or hereafter acquired, in or under which the
Debtor may now or hereafter have any right, title or interest,
including, without limitation, with respect to an account, and any
agreement relating to the terms of payment or the terms of
performance thereof;

(d) all documents, as that term is defined in Article 9 of
the UCC now owned or hereafter acquired;

(e) all equipment, as that term is defined in Article 9 of
the UCC, and, in any event, shall include, without limitation, all
machinery, tools, dyes, equipment, furnishings, fixtures, leasehold
improvements, vehicles (other than motor vehicles) and computers
and other electronic data processing and other office equipment,
now owned or hereafter acquired, any and all additions,

-1-

07/20/2004  15:06    5082384678                    LEGAL TRIEVE INFO                         PAGE  07/07

                                                                                    145 75
                                                                                    2639817-40-2      TC
                                                                                    92880 TEXTRON.1

This FINANCING STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code.

| 1 DEBTOR (LAST NAME FIRST IF AN INDIVIDUAL): GLOBE RUBBER WORKS, INC | | 1A SOCIAL SECURITY OR FEDERAL TAX NO. |
|---|---|---|
| 1B. MAILING ADDRESS 254 BEECH ST | 1C. CITY STATE ROCKLAND, MA | 1D. ZIP CODE 02370 |
| 2. ADDITIONAL DEBTOR (IF ANY) (LAST NAME FIRST - IF AN INDIVIDUAL) | | 2A. SOCIAL SECURITY OR FEDERAL TAX NO. |
| 2B. MAILING ADDRESS | 2C. CITY, STATE | 2D. ZIP CODE |
| 3. DEBTOR'S TRADE NAMES OR STYLES (If any) | | 3A. FEDERAL TAX NUMBER |

| 4. SECURED PARTY NAME | Textron Financial Corporation | | | 4A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO. |
|---|---|---|---|---|
| MAILING ADDRESS | 4949 SW Meadows Road, Ste. 650 | | | 056008768 |
| CITY | Lake Oswego | STATE OR | ZIP CODE 97035 | |
| 5. ASSIGNEE OF SECURED PARTY NAME | | | | 5A. SOCIAL SECURITY NO., FEDERAL TAX NO. OR BANK TRANSIT AND A.B.A. NO. |
| MAILING ADDRESS | | | | |
| CITY | | STATE | ZIP CODE | |

6. This FINANCING STATEMENT covers the following types or items of property (include description of real property on which located and owner of record when required by instruction 4).

1 SOLIDWORKS 2000, CD-ROM, INCL. DOCS1 SUBCRIPTION SERVICE1 SW MDT MIGRATION PROMOTION1 CADD EDGE TRAINING Equipment/Lease No: 00913510100006

| CHECK IF APPLICABLE [X] | 7A. [ ] PRODUCTS OF COLLATERAL ARE ALSO COVERED | 7B. DEBTOR(S) SIGNATURE NOT REQUIRED IN ACCORDANCE WITH INSTRUCTION 5(A) ITEM: [ ] (1) [ ] (2) [ ] (3) [ ] (4) | Filed With:  Massachusetts |
|---|---|---|---|

| CHECK IF APPLICABLE [X] | [ ] DEBTOR IS A "TRANSMITTING UTILITY" IN ACCORDANCE WITH UCC SECTION 9105 (1) (N) | |
|---|---|---|

SIGNATURE(S) OF DEBTOR(S)
GLOBE RUBBER WORKS, INC.
RICHARD SOMERVILLE
ATTORNEY-IN-FACT
TYPE OR PRINT NAME(S) OF DEBTOR(S)

SIGNATURE(S) OF SECURED PARTY(IES)
Textron Financial Corporation
ATTORNEY-IN-FACT
TYPE OR PRINT NAME(S) OF SECURED PARTY(IES)

RETURN COPY TO:                               Equipment/Lease No: 00913510100006

| NAME | UCC Direct Services |
|---|---|
| ADDRESS | P.O Box 29071 |
| CITY | Glendale |
| STATE | CA |
| ZIP CODE | 91209-9071 |

(800) 331-3282
(818) 662-4141

10. THIS SPACE FOR USE OF FILING OFFICER
(DATE, TIME, FILE NUMBER AND FILING OFFICER)

November 13, 2000
9:00a.m.
#14575
Town Clerk, Rockland

CODE
1
2
4
5
7
9
0

FORM UCC-1—
Approved by the Secretary of State

# Exhibit C



COPY

### PROMISSORY NOTE

$200,000.00                                                                                        As of August 3, 2004

FOR VALUE RECEIVED, on or before that date two years from the date hereof (as such date may be accelerated in accordance with this Note, the "*Maturity Date*"), the undersigned (hereinafter referred to as "*Borrower*"), promises to pay to the order of Richard Somerville (including any subsequent holder of this Note, "*Somerville*") at his offices at 254 Beach Street, Rockland, Massachusetts 02370, or as such other address written notice of which is provided to Borrower, the principal amount of Two Hundred Thousand And No/100 Dollars ($200,000.00) ("*Total Principal Amount*"), or such amount less than the Total Principal Amount which is outstanding from time to time if the total amount outstanding under this Promissory Note ("*Note*") is less than the Total Principal Amount, together with interest thereon at a fluctuating rate per annum which shall from day to day be equal to a rate ("*Contract Rate*"), calculated on the basis of the actual days elapsed but computed as if each year consisted of three hundred sixty (360) days, equal to (A) prior to an Event of Default, [the sum of (i) the Prime Rate of interest ("*Prime Rate*") as established on the Closing Date (as such rate is published in the Wall Street Journal) and (ii) two percent (2%) and (B) following the occurrence and during the pendency of an Event of Default, eighteen percent (18%). Borrower by execution of this Note acknowledges that the Total Principal Amount is currently outstanding.

The principal and all accrued but unpaid interest on this Note shall be due and payable as follows:

(a)    $100,000.00 of the outstanding principal, together with all accrued and unpaid interest shall be due and payable one year from the date of this Note;

(b)    the remaining outstanding principal balance of this Note, together with all accrued and unpaid interest shall be due and payable on the Maturity Date.

Pursuant to that certain Subordination Agreement between Somerville, the Borrower and The Property and Casualty Initiative, LLC (the "*PCI Subordination*"), that certain Subordination Agreement between Somerville, the Borrower and Banknorth, N.A. (the "*Banknorth Subordination*"), and that certain Subordination Agreement between Somerville, the Borrower and The Massachusetts Business Development Corporation (the "*MBDC Subordination*," and together with the PCI Subordination and the Banknorth Subordination, the "*Subordination Agreements*"), all indebtedness under this Note is subordinate to all indebtedness now or hereafter owing by Borrower to any of the lenders that are signatories to the Subordination Agreements as set forth therein. This Note and the Subordination Agreements are hereafter collectively referred to as the "*Loan Documents*."

Borrower is also indebted to Somerville under (i) a certain Promissory Note of even date herewith, executed by Borrower to Somerville, in the original principal amount of $150,000.00, and (ii) a certain Promissory Note of even date herewith, executed by Borrower to Somerville, in the original principal amount of $400,000.00 (collectively, the "*Remaining Notes*").

This Note may be prepaid in whole or in part at any time without penalty or premium. The interest payable hereunder shall be calculated on the basis of a 360-day year, and payments shall be computed by using the actual number of days in any given period.

The undersigned agrees to pay on demand all costs and expenses, including all reasonable attorneys' fees, for the enforcement or collection of this Note, whether or not suit is initiated. The undersigned also agrees to pay interest on all amounts not paid when due, pursuant to the terms hereof, by acceleration, or otherwise, at the rate of one and one-half (1 ½%) percent per month or portion thereof until paid in full.

The occurrence of any of the following ("*Events of Default*") shall render the unpaid balance of all outstanding principal and interest immediately due and payable forthwith at the option of Somerville:

(i)     Failure to pay any payment due hereunder when due;

(ii)    Failure to pay any payment due under the Remaining Notes, or either of them, when due;

(iii)   Failure to pay when due any payment due by Borrower to Somerville under any other written agreement between the Borrower and Somerville or among the Borrower, Somerville and any other persons;

(iv)    Any payment default by Borrower under debt owed by Borrower from time to time to any of The Property and Casualty Initiative, LLC, Banknorth, N.A., or The Massachusetts Business Development;

(v)     If Borrower shall make an assignment for the benefit of creditors, or file a voluntary petition under any bankruptcy or insolvency laws, or any other federal or state insolvency law, or apply for or consent to the appointment of a receiver, trustee or custodian of all or part of its respective property;

(vi)    If the Borrower shall have an involuntary petition filed against it under any bankruptcy law, or any other federal or state insolvency law and such proceeding shall not have been dismissed within 60 days of filing; or

(vii)   If a proceeding shall be commenced against the Borrower seeking the appointment of a trustee, receiver or custodian of all or part of its respective property.

In addition, this Promissory Note shall become immediately due and payable in full upon (i) the sale of all or substantially all of the property or assets or capital stock of the Borrower, or (ii) upon a merger or consolidation of the Borrower with another entity where, after giving effect to such transaction, the holders of the capital stock of the Borrower immediately prior to such transaction, hold after giving effect to such transaction, less than fifty one (51%) percent of the capital stock of the entity surviving such merger or consolidation transaction.

All payments and prepayments of principal on this Note shall be made in lawful money of the United States of America in immediately available funds, at the address of Somerville indicated above, or such other place as the holder of this Note shall designate in writing to Borrower. If any payment of principal on this Note shall become due on a day which is not a Business Day (as hereinafter defined), such payment shall be made on the next succeeding

Business Day. As used herein, the term *"Business Day"* shall mean any day other than any day on which commercial banks in the State of Massachusetts are authorized to be closed.

The Borrower does hereby waive presentment, demand, notice of dishonor, non-payment and protest and notice of protest and all suretyship defenses and defenses in the nature thereof and assent to any extension or postponement of time of payment or other indulgence which at any time may be granted by Somerville. No delay or omission on the part of Somerville in exercising any right hereunder shall operate as a waiver of such right or of any other rights of Somerville, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any further occasion.

No single or partial exercise of any power hereunder or under any other written agreement of which the Borrower and Somerville are parties shall preclude other or future exercise thereof or the exercise of any other power, nor is Somerville obligated to pursue remedies following an Event of Default in any particular order or sequence.

This Note and all of the other Loan Documents are intended to not require interest payments that exceed the maximum amount permitted by applicable usury laws. If any provision hereof or of any of the other Loan Documents or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the application of such provision to any other person or circumstance nor the remainder of the instrument in which such provision is contained shall be affected thereby and shall be enforced to the greatest extent permitted by law.

Borrower and Somerville each hereby irrevocably submit to the personal jurisdiction of any state or Federal court sitting in the Commonwealth of Massachusetts over any suit, action or proceeding arising out of or relating to this Note. Borrower and Somerville each hereby irrevocably waive to the fullest extent permitted by applicable law any objection which it may have or hereafter have to laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any suit, action or proceeding brought in such a court has been brought in an inconvenient forum. Borrower agrees that service of process in any action or suit shall be sufficient if made by certified mail to 254 Beach Street, Rockland, Massachusetts 02370, or to such other address as Borrower shall have given Holder not less than ten days written notice by certified mail.

THIS NOTE HAS BEEN EXECUTED UNDER, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MASSACHUSETTS, WITHOUT REFERENCE TO CHOICE OF LAW PRINCIPLES.

This Promissory Note has been executed and shall take effect as a sealed instrument.

BORROWER

**KALM-FORSYTHE GLOBAL INNOVATIONS, LTD.**

By:   KalFor Solutions Group, LLC,
       General Partner

By:   _____
       Carl W. Forsythe, President

Dallas_1\4004879\1
41932-2 7/22/2004

# Exhibit D



# PROMISSORY NOTE

$150,000.00

As of August 3, 2004

FOR VALUE RECEIVED, on or before August 3, 2007 (as such date may be accelerated in accordance with this Note, the "*Maturity Date*"), the undersigned (hereinafter referred to as "*Borrower*"), promises to pay to the order of Richard Somerville (including any subsequent holder of this Note, "*Somerville*") at his offices at 254 Beach Street, Rockland, Massachusetts 02370, or at such other address written notice of which is provided to Borrower, the principal amount of One Hundred Fifty Thousand And No/100 Dollars ($150,000.00) ("*Total Principal Amount*"), or such amount less than the Total Principal Amount which is outstanding from time to time if the total amount outstanding under this Promissory Note ("*Note*") is less than the Total Principal Amount, together with interest thereon until paid at a fluctuating rate per annum which shall from day to day be equal to a rate ("*Contract Rate*"), calculated on the basis of the actual days elapsed but computed as if each year consisted of three hundred sixty (360) days, equal to (A) prior to an Event of Default, the sum of (i) the Prime Rate of interest ("*Prime Rate*") as established on the Closing Date (as such rate is published in the Wall Street Journal) and (ii) two percent (2%) and (B) following the occurrence and during the pendency of an Event of Default, eighteen percent (18%). Borrower by execution of this Note acknowledges that the Total Principal Amount is currently outstanding.

The principal of and all accrued but unpaid interest on this Note shall be due and payable as follows:

(a)     The principal and interest on this Note shall be payable in twelve quarterly installments payable on each successive February 3, May 3, August 3, and November 3 thereafter until the Maturity Date, commencing with November 3, 2004;

(b)     all payment of principal in the first three quarterly installments shall be deferred until August 2, 2005, and paid at that date, together with the fourth quarterly installment; and

(c)     the outstanding principal balance of this Note, together with all accrued but unpaid interest, shall be due and payable on the Maturity Date.

Borrower is also indebted to Somerville under (i) a certain Promissory Note of even date herewith, executed by Borrower to Somerville, in the original principal amount of $200,000.00, and (ii) a certain Promissory Note of even date herewith, executed by Borrower to Somerville, in the original principal amount of $400,000.00 (collectively, the "*Remaining Notes*").

This Note may be prepaid in whole or in part at any time without penalty or premium. The interest payable hereunder shall be calculated on the basis of a 360-day year, and payments shall be computed by using the actual number of days in any given period.

The undersigned agrees to pay on demand all costs and expenses, including all reasonable attorneys' fees, for the enforcement or collection of this Note, whether or not suit is initiated. The undersigned also agrees to pay interest on all amounts not paid when due, pursuant to the terms

hereof, by acceleration, or otherwise, at the rate of one and one-half (1 ½%) percent per month or portion thereof until paid in full.

The occurrence of any of the following ("*Events of Default*") shall render the unpaid balance of all outstanding principal and interest immediately due and payable forthwith at the option of Somerville:

(i)   Failure to pay any payment due hereunder when due;

(ii)  Failure to pay any payment due under the Remaining Notes, or either of them, when due;

(iii) Failure to pay when due any payment due by Borrower to Somerville under any other written agreement between the Borrower and Somerville or among the Borrower, Somerville and any other persons;

(iv)  Any payment default by Borrower under the loan documents evidencing the senior indebtedness as contemplated by the Subordination Agreements (as defined below);

(v)   If Borrower shall make an assignment for the benefit of creditors, or file a voluntary petition under any bankruptcy or insolvency laws, or any other federal or state insolvency law, or apply for or consent to the appointment of a receiver, trustee or custodian of all or part of its respective property;

(vi)  If the Borrower shall have an involuntary petition filed against it under any bankruptcy law, or any other federal or state insolvency law and such proceeding shall not have been dismissed within 60 days of filing; or

(vii) If a proceeding shall be commenced against the Borrower seeking the appointment of a trustee, receiver or custodian of all or part of its respective property.

In addition, this Promissory Note shall become immediately due and payable in full upon (i) the sale of all or substantially all of the property or assets or capital stock of the Borrower, or (ii) upon a merger or consolidation of the Borrower with another entity where, after giving effect to such transaction, the holders of the capital stock of the Borrower immediately prior to such transaction, hold after giving effect to such transaction, less than fifty one (51%) percent of the capital stock of the entity surviving such merger or consolidation transaction.

Pursuant to that certain Subordination Agreement between Somerville, the Borrower and The Property and Casualty Initiative, LLC (the "*PCI Subordination*"), that certain Subordination Agreement between Somerville, the Borrower and Banknorth, N.A. (the "*Banknorth Subordination*"), and that certain Subordination Agreement between Somerville, the Borrower and The Massachusetts Business Development Corporation (the "*MBDC Subordination*," and together with the PCI Subordination and the Banknorth Subordination, the "*Subordination Agreements*"), all indebtedness under this Note is subordinate in the manner set forth in the Subordination Agreements to all indebtedness now or hereafter owing by Borrower to any of the lenders that are signatories to the Subordination Agreements as set forth therein. This Note and the Subordination Agreements are hereafter collectively referred to as the "*Loan Documents*."

All payments and prepayments of principal of or interest on this Note shall be made in lawful money of the United States of America in immediately available funds, at the address of Somerville indicated above, or such other place as the holder of this Note shall designate in

writing to Borrower. If any payment of principal of or interest on this Note shall become due on a day which is not a Business Day (as hereinafter defined), such payment shall be made on the next succeeding Business Day. As used herein, the term *"Business Day"* shall mean any day other than any day on which commercial banks in the State of Massachusetts are authorized to be closed.

The Borrower does hereby waive presentment, demand, notice of dishonor, non-payment and protest and notice of protest and all suretyship defenses and defenses in the nature thereof and assent to any extension or postponement of time of payment or other indulgence which at any time may be granted by Somerville. No delay or omission on the part of Somerville in exercising any right hereunder shall operate as a waiver of such right or of any other rights of Somerville, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any further occasion.

No single or partial exercise of any power hereunder or under any other written agreement of which the Borrower and Somerville are parties shall preclude other or future exercise thereof or the exercise of any other power, nor is Somerville obligated to pursue remedies following an Event of Default in any particular order or sequence.

This Note and all of the other Loan Documents are intended to not require interest payments that exceed the maximum amount permitted by applicable usury laws. Under any circumstances, if the amount of interest contracted for, charged, or received under this Note on the amount of principal actually outstanding from time to time under this Note would exceed the maximum amount of interest permitted by applicable usury laws, then in any such event (a) the provisions of this paragraph shall govern and control, (b) neither the Borrower nor any other person or entity now or hereafter liable for the payment hereof, shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum amount of interest permitted by applicable usury laws, (c) any such excess which may have been collected shall be either applied as a credit against the then unpaid principal amount hereof or refunded to the Borrower, at Somerville's option, and (d) the effective rate of interest shall be automatically reduced to the maximum lawful contract rate allowed under the applicable usury laws. If any provision hereof or of any of the other Loan Documents or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the application of such provision to any other person or circumstance nor the remainder of the instrument in which such provision is contained shall be affected thereby and shall be enforced to the greatest extent permitted by law.

Borrower and Somerville each hereby irrevocably submit to the personal jurisdiction of any state or Federal court sitting in the Commonwealth of Massachusetts over any suit, action or proceeding arising out of or relating to this Note. Borrower and Somerville each hereby irrevocably waive to the fullest extent permitted by applicable law any objection which it may have or hereafter have to laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any suit, action or proceeding brought in such a court has been brought in an inconvenient forum. Borrower agrees that service of process in any action or suit shall be sufficient if made by certified mail to 254 Beach Street, Rockland, Massachusetts 02370, or to such other address as Borrower shall have given Holder not less than ten days written notice by certified mail.

PROMISSORY NOTE – Page 3

THIS NOTE HAS BEEN EXECUTED UNDER, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MASSACHUSETTS, WITHOUT REFERENCE TO CHOICE OF LAW PRINCIPLES.

This Promissory Note has been executed and shall take effect as a sealed instrument.

BORROWER

KALM-FORSYTHE GLOBAL INNOVATIONS, LTD.

By:     KalFor Solutions Group, LLC, General Partner

By:     _____
        Carl W. Forsythe, President

# Exhibit E



# PROMISSORY NOTE

As of August 3, 2004

$400,000.00

    FOR VALUE RECEIVED, on or before the date 120 days from the date hereof (as such date may be accelerated in accordance with this Note, **"Maturity Date"**), the undersigned, jointly and severally (hereinafter referred to as **"Borrower"**), promises to pay to the order of Richard Somerville (**"Somerville"**) at his offices at 254 Beach Street, Rockland, Massachusetts 02370 the principal amount of Four Hundred Thousand And No/100 Dollars ($400,000.00) (**"Total Principal Amount"**), without interest prior to an Event of Default, and following the occurrence and during the pendency of an Event of Default, interest at the rate of eighteen percent (18%) per annum calculated on the basis of the actual days elapsed but computed as if each year consisted of three hundred sixty (360) days until paid in full. Borrower by execution of this Note acknowledges that the Total Principal Amount is currently outstanding.

    The principal on this Note, together with all accrued and unpaid interest, shall be due and payable in one lump sum on or before the Maturity Date.

    Borrower is also indebted to Somerville under (i) a certain Promissory Note of even date herewith, executed by Borrower to Somerville, in the original principal amount of $150,000.00, and (ii) a certain Promissory Note of even date herewith, executed by Borrower to Somerville, in the original principal amount of $200,000.00 (collectively, the **"Remaining Notes"**).

    This Note may be prepaid in whole or in part at any time without penalty or premium. The interest payable hereunder shall be calculated on the basis of a 360-day year, and payments shall be computed by using the actual number of days in any given period.

    The undersigned agrees to pay on demand all costs and expenses, including all reasonable attorneys' fees, for the enforcement or collection of this Note, whether or not suit is initiated. The undersigned also agrees to pay interest on all amounts not paid when due, pursuant to the terms hereof, by acceleration, or otherwise, at the rate of one and one-half (1 ½%) percent per month or portion thereof until paid in full.

    The occurrence of any of the following (**"Events of Default"**) shall render the unpaid balance of all outstanding principal and interest immediately due and payable forthwith at the option of Somerville:

    (i)    Failure to pay any payment due hereunder when due;

    (ii)    Failure to pay any payment due under the Remaining Notes, or either of them, when due;

    (iii)    Failure to pay when due any payment due by Borrower to Somerville under any other written agreement between the Borrower and Somerville or among the Borrower, Somerville and any other persons;

    (iv)    Any payment default by Borrower under debt owed by Borrower from time to time to any of The Property and Casualty Initiative, LLC, Banknorth, N.A., or The

Massachusetts Business Development

(v)    If Borrower shall make an assignment for the benefit of creditors, or file a voluntary petition under any bankruptcy or insolvency laws, or any other federal or state insolvency law, or apply for or consent to the appointment of a receiver, trustee or custodian of all or part of its respective property;

(vi)   If the Borrower shall have an involuntary petition filed against it under any bankruptcy law, or any other federal or state insolvency law and such proceeding shall not have been dismissed within 60 days of filing; or

(vii)  If a proceeding shall be commenced against the Borrower seeking the appointment of a trustee, receiver or custodian of all or part of its respective property.

In addition, this Promissory Note shall become immediately due and payable in full upon (i) the sale of all or substantially all of the property or assets or capital stock of the Borrower, or (ii) upon a merger or consolidation of the Borrower with another entity where, after giving effect to such transaction, the holders of the capital stock of the Borrower immediately prior to such transaction, hold after giving effect to such transaction, less than fifty one (51%) percent of the capital stock of the entity surviving such merger or consolidation transaction.

All payments and prepayments of principal on this Note shall be made in lawful money of the United States of America in immediately available funds, at the address of Somerville indicated above, or such other place as the holder of this Note shall designate in writing to Borrower. If any payment of principal on this Note shall become due on a day which is not a Business Day (as hereinafter defined), such payment shall be made on the next succeeding Business Day. As used herein, the term "*Business Day*" shall mean any day other than any day on which commercial banks in the State of Massachusetts are authorized to be closed.

The Borrower does hereby waive presentment, demand, notice of dishonor, non-payment and protest and notice of protest and all suretyship defenses and defenses in the nature thereof and assent to any extension or postponement of time of payment or other indulgence which at any time may be granted by Somerville. No delay or omission on the part of Somerville in exercising any right hereunder shall operate as a waiver of such right or of any other rights of Somerville, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any further occasion.

No single or partial exercise of any power hereunder or under any other written agreement of which the Borrower and Somerville are parties shall preclude other or future exercise thereof or the exercise of any other power, nor is Somerville obligated to pursue remedies following an Event of Default in any particular order or sequence.

This Note and all of the other Loan Documents are intended to not require interest payments that exceed the maximum amount permitted by applicable usury laws. If any provision hereof or of any of the other Loan Documents or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the application of such provision to any other person or circumstance nor the remainder of the instrument in which such provision is contained shall be affected thereby and shall be enforced to the greatest extent permitted by law.

Borrower and Somerville each hereby irrevocably submit to the personal jurisdiction of any state or Federal court sitting in the Commonwealth of Massachusetts over any suit, action or proceeding arising out of or relating to this Note. Borrower and Somerville each hereby irrevocably waive to the fullest extent permitted by applicable law any objection which it may have or hereafter have to laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any suit, action or proceeding brought in such a court has been brought in an inconvenient forum. Borrower agrees that service of process in any action or suit shall be sufficient if made by certified mail to 254 Beach Street, Rockland, Massachusetts 02370, or to such other address as Borrower shall have given Holder not less than ten days written notice by certified mail.

THIS NOTE HAS BEEN EXECUTED UNDER, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MASSACHUSETTS, WITHOUT REFERENCE TO CHOICE OF LAW PRINCIPLES.

[Remainder of Page Intentionally Left Blank]

This Promissory Note has been executed and shall take effect as a sealed instrument.

**BORROWER**

**KALM-FORSYTHE GLOBAL INNOVATIONS, LTD.**

By:    KalFor Solutions Group, LLC,
       General Partner

By:    _____
       Carl W. Forsythe, President

_____
Carl W. Forsythe, Individually

Dallas_1\4005985\1
41932-2 7/25/2004

# Exhibit F

Execution Copy

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "*Agreement*") dated effective as of the 3rd day of August, 2004, among GLOBE RUBBER WORKS, INC., a Massachusetts corporation ("*Globe*"), KALM-FORSYTHE GLOBAL INNOVATIONS, LTD., a Texas limited partnership ("*KFGI*"), MARK G. JOHNSON, an individual resident of Texas ("*Johnson*") and WILLIAM R. RODGERS, an individual resident of Massachusetts ("*Rodgers*" and together with Johnson, the "*Escrow Agents*").

## W I T N E S S E T H:

WHEREAS, KFGI, Globe and Richard Somerville ("*Somerville*") have entered into that certain Asset Purchase Agreement, dated as of August 3, 2004 (the "*Asset Purchase Agreement*"), for the purchase by KFGI of substantially all of the assets of Globe and all of the intellectual property and goodwill owned by Somerville related to the business of Globe; and

WHEREAS, the consummation of the transactions contemplated by the Asset Purchase Agreement by Globe and KFGI is conditioned upon the execution and delivery of this Agreement by Globe, KFGI and the Escrow Agents, respectively; and

WHEREAS, Globe and KFGI desire to establish an escrow account with the Escrow Agents for the purpose of holding One Hundred Ninety Thousand Dollars ($190,000) (the "*Escrow Amount*") out of the cash portion of the Globe Assets Purchase Price (as defined in the Asset Purchase Agreement) received at the Closing (as defined in the Asset Purchase Agreement), to consist of a $25,000 escrow to cover costs to be incurred by Globe for repairs to the underground septic system serving 254 Beach Street, Rockland, Massachusetts (the "*Rockland Premises*") for compliance with Title V of the Code of Massachusetts Regulations (310 CMR Sec 15, et seq.) (the "*Title V Escrow Amount*") and a separate $165,000 escrow (the "*Indemnification Escrow Amount*").

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt of which is acknowledged by each of the parties hereto, Globe, KFGI and the Escrow Agents hereby agree as follows:

1.  Appointment of Escrow Agents. Globe hereby appoints the Escrow Agents to hold the Escrow Amount in escrow on behalf of Globe. The Escrow Agents hereby accept such appointment in accordance with the terms and subject to the conditions set forth in this Agreement.

2.  Establishment of Escrow Account. On or before the date of the Closing, the Escrow Agents shall establish an interest bearing bank account in a Boston, Massachusetts bank (the "*Escrow Account*"), which shall bear taxpayer identification no. _____.

3.  Deposit of the Escrow Amount. KFGI will deliver the Escrow Amount to the Escrow Agents for deposit in the Escrow Account at the Closing.

4.  Account Statements. The Escrow Agents shall promptly notify Globe of the receipt by the Escrow Agents of the Escrow Amount received by the Escrow Agents and shall

deliver to Globe quarterly account statements with respect to the funds on deposit in the Escrow Account.

5.     _Escrow Period and Term of Agreement_.  The escrow period ("*Escrow Period*") shall begin at the Closing and shall terminate upon the first anniversary of the Closing.  Globe understands and agrees that during the Escrow Period, Globe shall not be entitled to any funds on deposit out of the Indemnification Escrow Amount, and no such funds shall become the property of Globe or any other entity nor shall such funds be subject to the debts of Globe or any other entity.  At termination of this Agreement, Exhibit B should be executed and delivered by Globe and KFGI to the Escrow Agents.

6.     _Disbursement From the Escrow Account_.  (a)  Upon receipt of a written request for disbursement from the Title V Escrow Amount received by the Escrow Agent from Globe and accompanied by invoices for remedial work incurred by Globe and reciting on such disbursement request as being "incurred as contemplated by Section 2.8(a)(xi) of the Asset Purchase Agreement" (a "*Title V Escrow Disbursement Request*"), which Title V Escrow Disbursement Request shall be provided by Globe simultaneously to KFGI with providing same to the Escrow Agent, if the Escrow Agents do not receive a written objection from KFGI within ten days of Escrow Agents' receipt of such Title V Escrow Disbursement Request, the Escrow Agents shall disburse funds from the Title V Escrow Amount in accordance with the Title V Escrow Disbursement Request.  If the Escrow Agents receive from KFGI a written notice of objection to the Title V Escrow Disbursement Request within such 10-day period, then the Escrow Agents shall not, absent a court order, disburse the Title V Escrow Funds requested by such Title V Escrow Disbursement Request to which KFGI has timely objected unless and until Globe and KFGI jointly provide written disbursement instructions to the Escrow Agents. KFGI covenants and agrees with Globe not to unreasonably object to any Title V Escrow Disbursement Request.  The Escrow Agents shall not be responsible for evaluating the truth or sufficiency of any Title V Escrow Disbursement Request other than for the presence of the required recital therein described above.  Likewise, the Escrow Agents shall not be responsible for evaluating the reasonableness or unreasonableness of any objection by KFGI to a Title V Escrow Disbursement Request.

(b)     Upon receipt of a written request for disbursement from the Indemnification Escrow Amount executed by Globe and KFGI, in the form attached as Exhibit A (the "*Disbursement Request*"), the Escrow Agents shall disburse to Globe or KFGI or third party, as applicable, funds from the Indemnification Escrow Amount out of the Escrow Account equal to an amount described in the Disbursement Request.  The Escrow Agents shall not be responsible for evaluating the truth or sufficiency of the request for disbursement.

7.     _Reimbursement of Expenses of the Escrow Agents_.  Globe and KFGI agree to reimburse (to be divided evenly between Globe and KFGI) the Escrow Agents for all commercially reasonable expenses incurred by the Escrow Agents in connection with their performance, however, no such reimbursement of expenses shall be paid out of or chargeable to the funds on deposit in the Escrow Account.

Execution Copy

8.    General Terms and Conditions.

(a)    The Escrow Agents may rely upon any written notice, request, certificate, authorization or other document which the Escrow Agents believe to be genuine. The Escrow Agents are acting hereunder as a depository only, and are not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Agreement or any part thereof or for the form of execution thereof or for the identity or authority of any person executing or depositing such subject matter. This Agreement expressly and exclusively sets forth the duties of the Escrow Agents with respect to any and all matters pertinent hereto and no implied duties or obligations shall be read into this Agreement against the Escrow Agents.

(b)    The Escrow Agents shall not be liable for action which they may take or refrain from taking in connection with this Agreement, other than their own gross negligence or willful misconduct.

(c)    In the event that any adverse claims or demands are made in connection with this Agreement, or in the event that the Escrow Agents are in doubt as to what action they should take hereunder, the Escrow Agents may, at their option, refuse to comply with any claims or demands on them, or refuse to take any other action hereunder so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agents shall not be or become liable in any way or to any person for their failure or refusal to act and the Escrow Agents shall be entitled to continue to refrain from acting until (i) the rights of all interested persons have been fully and finally adjudicated by a court of competent jurisdiction or (ii) all differences shall have been adjudged and all doubt resolved by agreement among all of the interested persons, and the Escrow Agents shall have been notified in writing by all such interested persons. In addition, the Escrow Agents are hereby authorized in the event of any doubt as to the course of action they should take under this Agreement, to petition any state court in the Commonwealth of Massachusetts or a United States Federal District Court in the Commonwealth of Massachusetts, for instructions or to interplead the funds on deposit in the Escrow Account into such court. The rights of the Escrow Agents under this paragraph are cumulative of all other rights which they may have by law or otherwise.

(d)    GLOBE AND KFGI, JOINTLY AND SEVERALLY, HEREBY AGREE TO INDEMNIFY AND HOLD HARMLESS THE ESCROW AGENTS FROM AND AGAINST ANY AND ALL LIABILITIES OR LOSSES TO WHICH THE ESCROW AGENTS MAY BE SUBJECT IN CONNECTION WITH THE SERVICES PROVIDED BY THE ESCROW AGENTS HEREUNDER, INCLUDING THOSE RELATED TO THE INSTITUTION OF ANY INTERPLEADER ACTION IN CONNECTION WITH ANY CONTROVERSY THAT MAY ARISE HEREUNDER. GLOBE AND KFGI, JOINTLY AND SEVERALLY, AGREE TO PAY ANY AND ALL COSTS, EXPENSES AND ATTORNEYS' FEES REASONABLY INCURRED BY THE ESCROW AGENTS IN CONNECTION WITH INVESTIGATING OR DEFENDING ANY CLAIM OR ACTION IN CONNECTION THEREWITH; PROVIDED HOWEVER THAT NEITHER GLOBE NOR KFGI SHALL BE OBLIGATED UNDER THE FOREGOING INDEMNITY WITH RESPECT TO ANY LIABILITY OR LOSS

(OR ACTION IN CONNECTION THEREWITH) TO THE EXTENT THAT SUCH LIABILITY OR LOSS RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE ESCROW AGENTS. GLOBE AND KFGI, JOINTLY AND SEVERALLY, SHALL, UPON THE REQUEST OF THE ESCROW AGENTS, ASSUME THE DEFENSE OF THE ESCROW AGENTS WITH RESPECT TO MATTERS AS TO WHICH GLOBE AND KFGI HAVE AGREED TO INDEMNIFY THE ESCROW AGENTS PURSUANT TO THE PRECEDING SENTENCE WITH COUNSEL SELECTED BY THE ESCROW AGENTS AND REASONABLY SATISFACTORY TO GLOBE AND KFGI. THE PROVISIONS OF THIS SUBSECTION (d) SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

(e)     The Escrow Agents may resign for any reason upon 30 days' prior written notice to Globe and KFGI. Upon expiration of such 30 day period, the Escrow Agents shall deliver all funds on deposit in the Escrow Account to any successor escrow agent appointed by Globe and KFGI, or if no successor escrow agent has been appointed, to any court of competent jurisdiction in the Commonwealth of Massachusetts. Upon such delivery, the Escrow Agents shall be released from any and all liability under this Agreement, except as otherwise provided in Paragraph 8(b) of this Agreement. The resignation of the Escrow Agents under this paragraph shall in no way change the terms of Paragraph 8(d) relating to the indemnity of the Escrow Agents.

(f)     All notices and communications hereunder shall be in writing and shall be deemed to be duly given if personally delivered, telecopied or sent by certified mail, return receipt requested, to the respective address or telecopy number set forth on the signature page hereof. The Escrow Agents shall not be charged with knowledge of any fact, including but not limited to performance or non-performance of any condition, unless they have actual knowledge thereof.

(g)     The rights created by this Agreement shall inure to the benefit of, and the obligations created hereby shall be binding upon, the successors and assigns of the parties hereto.

(h)     This Agreement shall be construed and enforced according to the laws of the Commonwealth of Massachusetts. Any suit or action relating to this Agreement shall be filed and maintained in state court in the Commonwealth of Massachusetts.

(i)     This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same agreement.

(j)     This Agreement and the Asset Purchase Agreement constitutes the entire understanding and agreement of the parties hereto with respect to the transactions described herein and supersedes all prior agreements of understandings, written or oral, between the parties with respect thereto.

Execution Copy

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first written above.

**GLOBE RUBBER WORKS, INC.**

By: _Richard Somerville_
Name: RICHARD SOMERVILLE
Its: VICE PRESIDENT.

Address:
254 Beach Street
Rockland, MA 02370
Attn. Richard C. Somerville
Telephone: (781) 871-3700
Fax: (781) 871-6631

**KALM-FORSYTHE GLOBAL INNOVATIONS, LTD.**

By:  KalFor Solutions Group, LLC,
       General Partner

        By: _____
        Carl W. Forsythe, President

Address:
10440 N. Central Expressway
Suite 1475
Dallas, Texas 75205
Telephone: (214) 373-4562
Fax: (214) 891-3366

-5-

Execution Copy

**MARK G. JOHNSON**

<u>Address:</u>
5400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Telephone: (214) 745-5600
Fax: (214) 745-5390

**WILLIAM R. RODGERS**

<u>Address:</u>
Tarlow, Breed, Hart, Murphy & Rodgers, P.C.
21 Custom House Street
Boston, MA 02110
Telephone: (617) 218-2000
Fax: (617) 261-7673

## Exhibit A

## DISBURSEMENT REQUEST

Pursuant to that certain Escrow Agreement dated effective as of August 3, 2004, among GLOBE RUBBER WORKS, INC., a Massachusetts corporation ("*Globe*"), KALM-FORSYTHE GLOBAL INNOVATIONS, LTD., a Texas limited partnership ("*KFGI*"), MARK G. JOHNSON, an individual resident of Texas and WILLIAM R. RODGERS, an individual resident of Massachusetts, Globe and KFGI hereby request disbursement of funds in the amount and manner described below from account number _____, styled _____ Escrow Account, with respect to the funds identified below.

Please disburse to:

Amount to disburse: _____

Form of distribution: _____

Payee's Mailing
  Address: _____

City/State: _____

Zip:

**GLOBE RUBBER WORKS, INC.**

By:_____
Name:_____
Its:_____

<u>Address:</u>
254 Beach Street
Rockland, MA  02370
Attn. Richard C. Somerville
Telephone: (781) 871-3700
Fax: (781) 871-6631

Execution Copy

KALM-FORSYTHE GLOBAL
INNOVATIONS, LTD.

By:  KalFor Solutions Group, LLC,
     General Partner

     By:_____
         Carl W. Forsythe, President

Address:
10440 N. Central Expressway
Suite 1475
Dallas, Texas  75205
Telephone:  (214) 373-4562
Fax:  (214) 891-3366

Execution Copy

## Exhibit B

## RELEASE AND DISCHARGE

The undersigned hereby release and discharge Mark G. Johnson and William R. Rodgers said Escrow Agents, from all further responsibility or liability as Escrow Agents under said Escrow Agreement dated August 3, 2004. Please accept this as authorization to close our escrow account, account number _____, as of this date.

Executed this _____ day of _____, 2005.

### GLOBE RUBBER WORKS, INC.

By:_____

Name:_____

Its:_____

Address:
254 Beach Street
Rockland, MA 02370
Attn. Richard C. Somerville
Telephone: (781) 871-3700
Fax: (781) 871-6631

### KALM-FORSYTHE GLOBAL INNOVATIONS, LTD.

By:  KalFor Solutions Group, LLC,
     General Partner

By:_____
     Carl W. Forsythe, President

Address:
10440 N. Central Expressway
Suite 1475
Dallas, Texas 75205
Telephone: (214) 373-4562
Fax: (214) 891-3366

# Exhibit G

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (as amended from time to time, this "Agreement") is made and entered into as of August 3, 2004 (the "Commencement Date"), by and between Kalm-Forsythe Global Innovations, Ltd., a Texas limited partnership (the "Employer"), and Richard Somerville, a resident of Massachusetts (the "Employee").

## W I T N E S S E T H:

**WHEREAS**, Employer, Employee and Globe Rubber Works, Inc., a Massachusetts corporation ("Globe"), have entered into a Asset Purchase Agreement, dated as of August 3, 2004 ("Asset Purchase Agreement"), for the purchase by KFGI of substantially all of the assets of Globe and all of the intellectual property and goodwill owned by Somerville related to the business of Globe;

**WHEREAS**, the consummation of the transactions contemplated by the Asset Purchase Agreement by Employer, Globe and Employee is conditioned upon the execution and delivery of this Agreement by Employee and Employer, respectively.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein and for other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, intending to be legally bound:

1. **Employment**. The Employer hereby employs the Employee, and the Employee hereby accepts such employment, upon the terms and subject to the conditions set forth in this Agreement.

2. **Term**. The term of employment under this Agreement shall commence on the Commencement Date and shall continue for a term of five (5) years (the "Employment Period"); provided, however, that at the end of such Employment Period the term of this Agreement shall continue and be extended until such time as either party hereto provides written notice to the other party of its intent to terminate this Agreement as provided for hereinafter (such period after the initial Employment Period being a "Renewal Period").

3. **Compensation; Reimbursement; etc.**

   (a)   The Employer shall pay to the Employee as compensation for all services rendered by the Employee during the Employment Period and any Renewal Period an annual base salary of Two Hundred Thousand Dollars ($200,000) (the "Base Salary") payable bimonthly or in other more frequent installments, as determined by the Employer.

   (b)   Each year during the Employment Period and any Renewal Period, in addition to the Base Salary and any other amounts payable to the Employee under any other provision of this

Agreement, the Employee shall be entitled to receive a bonus equal to up to 25% of Employee's annual Base Salary based on the same performance criteria as set forth in the general bonus plan structure applicable to all senior management members except as specifically and reasonably tailored to Employee's specific job responsibilities (the "Bonus Amount").

(c)    If Employee is employed by Employer for less than a full calendar year during any calendar year under the Employment Period or any Renewal Period, the amount of Employee's Base Salary and the Bonus Amount shall be prorated through the date of termination, subject to Section 8.

(d)    The Employer shall have the right to increase the Employee's compensation from time to time.  Except as otherwise provided by Section 8, the compensation provisions set forth in Sections 3(a), (b) and (c) shall not survive beyond the Employment Period and any applicable Renewal Period.

(e)    The Employer shall reimburse the Employee for all reasonable expenses incurred by the Employee in the performance of his duties under this Agreement; provided, however, that the Employee must furnish to the Employer an itemized account, satisfactory to the Employer, in substantiation of such expenditures.  Any single expense in excess of One Thousand Dollars ($1,000) must be pre-approved by the Employer in order to be reimbursable hereunder.

(f)    The Employee shall be entitled to such fringe benefits including, but not limited to, medical, retirement and insurance benefits, as may be provided from time to time by the Employer to other senior management members of the Employer except for benefits related to travel, relocation, dining and country club membership.

4.    **Duties**.  The Employee shall have the title of, and shall serve the Employer as, the Director of Research and Development. Employee shall serve at the direction and discretion of the Employer's board of directors and senior management and shall report to the Employer's chief executive officer.  The Employee's duties shall include such specific duties consistent with his position in the company as director of research and development as the Employer's board of directors and senior management shall assign to Employee from time to time. Employer may change the title of Employee's position at any time provided Employer does not substantially diminish the roles and responsibilities of Employee  or assign a title to Employee that is inconsistent with his duties and responsibilities or his reputation in the industry.

5.    **Extent of Services; Vacations and Days Off**.

(a)    During the term of his employment under this Agreement, the Employee shall devote his full time, energy and attention during regular business hours to the benefit and business of the Employer in performing his duties pursuant to this Agreement, provided that Employee shall be allowed to devote a reasonable amounts of time to civic, professional and charitable undertakings as long as same do not materially interfere with or detract from Employee performing his duties and responsibilities hereunder.

(b)    The Employee shall be entitled to five (5) weeks for paid vacation and such amounts of days for sick and holiday leave as the Employer may determine in accordance with the policy of

the Employer as may be established from time to time by the Employer and applied to other employees of the Employer.

6.    **Facilities**. The Employer shall provide the Employee with a furnished office and the facilities of the Employer shall be generally available to the Employee in the performance of his duties pursuant to this Agreement; it being understood and contemplated by the parties that such equipment, supplies and office personnel as are reasonably required for the performance of the Employee's duties under this Agreement shall be supplied by the Employer.

7.    **Illness or Incapacity, Termination on Death, Etc.**

(a)    If the Employee dies during the term of his employment, the Employer shall pay to the estate of the Employee (i) such compensation, including any incentive compensation earned but not yet paid, as would otherwise have been payable to the Employee up to the end of the month in which his death occurs, plus (ii) an amount equal to one-half (1/2) of Employee's Base Salary for the then remaining portion of the original Employment Period, plus (iii) a payment on account of the bonus payments Employee would have received for the remainder of the Employment Period, this amount being stipulated as equal to $25,000 for each full calendar year (and the prorated amount thereof for each partial calendar year) remaining in the Employment Period. If Employer maintains key-man life insurance on Employee, Employer shall pay the amounts under clauses (ii) and (iii) of this Section 7(a) to Employee's estate or representative in a single lump sum payment as soon as Employer receives the insurance proceeds. If Employer does not maintain key-man life insurance on Employee, Employer shall pay the amounts under clauses (ii) and (iii) of this Section 7(a) in equal installments, with the first such payment being due and payable within thirty (30) days of Employee's death, and the subsequent payments being due and payable on each successive regularly scheduled payroll date of the Employer. Other than the obligations set forth in this Section 7(a), the Employer shall have no additional financial obligation under this Agreement to the Employee or his estate.

(b)    (i)    During any period of disability, illness or incapacity during the term of this Agreement which renders the Employee at least temporarily unable to substantially perform (with or without reasonable accommodation) the services required under this Agreement for a period which shall not equal or exceed ninety (90) consecutive days or one hundred twenty (120) days in any continuous one (1) year period, the Employee shall continue to receive the Base Salary on the regularly scheduled payroll payment date of the Employer plus any incentive compensation earned but not yet paid, less any benefits received by him under any disability insurance carried by or provided by the Employer. Upon the Employee's permanent disability (as defined below), Employer may terminate the employment of Employee and the Employer shall pay to Employee in equal installments and payable on each regularly scheduled payroll payment date of the Employer (i) such compensation, including any incentive compensation earned but not yet paid, as would otherwise have been payable to the Employee up to the end of the month in which his permanent disability occurs, plus (ii) an amount equal to one-half (1/2) of Employee's Base Salary for the then remaining portion of the original Employment Period, plus (iii) a payment on account of the bonus payments Employee would have received for the remainder of the Employment Period, this amount being stipulated as equal to $25,000 for each full calendar year (and the prorated amount thereof for each partial calendar year) remaining in the Employment Period. All other rights of the Employee under

this Agreement shall terminate although the Employee shall continue to receive any disability benefits to which he may be entitled under any disability income insurance which may be carried by or provided by the Employer from time to time.

(ii)    The term "permanent disability" as used in this Agreement shall mean the inability of the Employee, as reasonably determined by the Employer, by reason of physical or mental disability to substantially perform (with or without reasonable accommodation) the services required of him under this Agreement for a period of ninety (90) consecutive days or one hundred twenty (120) days in any continuous any one (1) year period. Upon such determination, the Employer may terminate the Employee's employment under this Agreement upon the expiration of such qualifying period of disability. If any determination of the Employer with respect to permanent disability is disputed by the Employee, the parties hereto agree to abide by the decision of a panel of three physicians. The Employee and Employer shall each appoint one member, and the third member of the panel shall be appointed by the other two members. The Employee agrees to make himself available for and submit to examinations by such qualified physicians as may be directed by the Employer as to whom Employee raises, in good faith, no reasonable objection. Failure to submit to any such examination shall constitute a breach of a material part of this Agreement.

(iii)    Anything herein to the contrary notwithstanding, if Employer maintains disability insurance for Employee, (A) the definition of "permanent disability" for purposes hereof shall be automatically amended to conform to the standard definition of "permanent disability" or the equivalent term included in the disability insurance policy, and (B) the amount of the payments provided for under clause (i) of this Section 7(b) shall be reduced on a dollar for dollar basis by the amount of any payments made to Employee under such disability insurance policy.

8.    **Other Terminations**.

(a)    (i)    The Employee may terminate his employment hereunder voluntarily and without "good reason" upon giving at least thirty (30) days' prior written notice to the Employer.

(ii)    If the Employee gives notice pursuant to Section 8(a), the Employer shall have the right to relieve the Employee, in whole or in part, of his duties under this Agreement.

(b)    (i)    The Employee may terminate his employment hereunder without notice for "good reason."

(ii)    As used herein, "good reason" shall include:

(1)    the material breach of any term or provision of this Agreement or the Asset Purchase Agreement by the Employer and such breach is not cured within thirty (30) days of written notice thereof from Employee;

(2)    the relocation of the Employee's place of business to a location greater than forty (40) miles from Globe's present location at 254 Beech Street, Rockland, MA 02370;

(3)    the substantial diminution by the Employer of the defined role and responsibilities of the Employee without the Employee's consent or the Employer engaging in practices that amount to constructive dismissal; or

(4)    a change of control of Employer (i.e. where all or substantially all of the business of Employer is sold to a third party, by merger, stock sale, consolidation, asset sale).

(c)    (i)    The Employer may terminate the employment of the Employee hereunder either "for cause" or "without cause." The Employer may terminate the employment of the Employee for cause upon written notice that it intends to terminate the Employee's employment for cause, which written notice shall specify the act or acts with respect to which the Employer intends to so terminate the Employee's employment.

(ii)    As used herein, "for cause" shall include:

(1)    the Employee's conviction of either (x) a felony, (y) a misdemeanor involving moral turpitude, or (z) any crime in connection with his employment by the Employer the nature of which involves dishonesty, assault, battery or which brings disrepute to the Employer by virtue of its association with Employee, but specifically shall not include traffic offenses;

(2)    any intentional act by the Employee not undertaken in good faith that is clearly contrary to the best interests of Employer;

(3)    the Employee's repeated and willful failure to take actions within the scope of his duties, his abilities and which are permitted by law to implement policies, strategies or initiatives of the Employer which the Employer has communicated to him in writing after thirty (30) days notice and opportunity to cure has been afforded to him by the Employer;

(4)    the repeated and continued failure of the Employee to attend to his duties and responsibilities after 30 days written notice and opportunity to cure has been afforded to him by the Employer;

(5)    any willful act by the Employee against the Employer intended to enrich the Employee in a material respect in derogation of his duties to the Employer and at the expense of the Employer; or

(6)    the material breach of any term or provision of this Agreement or the Asset Purchase Agreement by the Employee and such breach is not cured within thirty (30) days of written notice thereof from Employer

(iii)    Termination of the employment of the Employee for reasons other than those expressly specified in this Agreement as for cause shall be deemed to be a termination of employment "without cause."

(d)     For purposes of this Section 8, the term "Accelerated Termination Date" shall mean (i) if the Employee terminates his employment pursuant to Section 8(a)(i), the effective date of termination as so identified by the Employee in his notice to the Employer, or (ii) if the Employer terminates the employment of the Employee, or relieves the Employee of his duties pursuant to Section 8(a)(ii), the effective date of termination as so identified by the Employer.

(e)     If the Employee shall terminate his employment voluntarily under Section 8(a)(i) without good reason at any time during the first three years of the Employment Period or if the Employer shall terminate the employment of the Employee "for cause" at any time during the first three years of the Employment Period, the Employer shall pay to the Employee such compensation, including the Base Salary, bonus compensation then earned and all accrued but unused vacation, sick and holiday leave, as would otherwise have been payable to the Employee up to and including the Accelerated Termination Date; provided, however, for the avoidance of doubt, the Employee shall not be entitled to any unpaid Bonus Amount, for the current calendar year in which such termination occurs, whether or not earned. If the Employee shall voluntarily terminate his employment under Section 8(a)(i) without good reason at any time after the first three years of the Employment Period, or if Employer shall terminate the employment of the Employee "for cause" at any time after the first three years of the Employment Period, the Employer shall pay to the Employee (i) such compensation, including the Base Salary, bonus compensation then earned and all accrued but unused vacation, sick and holiday leave, as and when same would otherwise have been payable to the Employee up to and including the Accelerated Termination Date plus (ii) thereafter an amount equal to one half of Employee's Base Salary, as and when same would otherwise have been payable to Employee, on regularly scheduled payroll payment dates of Employer, for the then remaining portion of the original Employment Period; provided, however, for the avoidance of doubt, the Employee shall not be entitled to any unpaid Bonus Amount, for the current calendar year in which such termination occurs, whether or not earned, or for the remaining portion of the Employment Period.

(f)     If (i) the Employer shall terminate the employment of the Employee "without cause" or (ii) if Employee shall terminate his employment for "good reason", effective on a date within the Employment Period or any Renewal Period, the Employee shall receive and Employer shall pay to Employee within ten (10) days of such termination, (A) a lump sum payment to Employee equal to the aggregate of the Base Salary Employee would have been entitled to for the remaining period of the Employment Period or such Renewal Period, and (B) a lump sum payment on account of the bonus payments Employee would have received for the remainder of the Employment Period or such Renewal Period, this amount being stipulated as equal to $50,000 for each full calendar year (and the prorated amount thereof for each partial calendar year) remaining in the Employment Period or such Renewal Period. Other than the obligations set forth in this Section 8(f), the Employer shall have no additional financial obligation under this Agreement to the Employee with respect to a termination "without cause."

(g)     If the payments provided in Section 8(f) hereof constitute a "parachute payment" within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), and if (but only if) the sum of the "present value" (as determined under Section 280G of the Code) of such payments and the "present value" of any other "parachute payment" from the Employer exceeds an amount equal to 299% of the Employee's "base amount" within the meaning of

Section 280G of the Code (the "299% Amount"), the amount of the payments provided in Section 8(f) hereof shall be grossed up by Employer to the extent necessary so that the sum of the "parachute payments" to be paid to Employee equals, after deduction for any tax penalties assessed or to be assessed on Employee, the amounts required by Section 8(f). The determination of whether any amount payable hereunder constitutes a "parachute payment" which causes the 299% Amount to be exceeded shall be made, if requested by the Employee or the Employer, by the Employer's public accounting firm. The costs of obtaining such determination shall be borne by the Employer. The fact that the payments provided in Section 8(f) hereof may be increased pursuant to this section shall not limit or otherwise affect any rights of the Employee to any employee benefit or other right arising other than pursuant to this Agreement. After receiving the payments provided in this Section 8, the Employee shall have no further rights under this Agreement. Notwithstanding any such termination of employment pursuant to this Section 8, the Employee's covenants set forth in Section 10 and 11 are intended to and shall remain in full force and effect provided Employer makes the payments to Employee as and when required by this Agreement.

(h)     In addition, if the Employee's employment is terminated within the first three years of the Employment Period either (i) by Employee under Section 8(a)(i) without good reason, or (ii) justifiably by Employer for cause under Section 8(c)(ii), effective as of the Accelerated Termination Date, the Employee shall automatically forfeit his entire ownership interest in KFGI.

(i)     In any dispute between the parties as to their respective rights and entitlements under this Section 8 resulting in suit being brought, the prevailing party shall be entitled to recover from the non-prevailing party the costs and expenses incurred in connection with such suit, including reasonable attorneys fees.

9.     **Disclosure**.  The Employee agrees that during the term of his employment by the Employer he will disclose and disclose only to the Employer all ideas, methods, plans, developments or improvements known by him which relate directly or indirectly to the business of the Employer, whether acquired by the Employee before or during his employment by the Employer.  Nothing in this Section 9 shall be construed as requiring any such communication where the idea, plan, method or development is lawfully protected from disclosure as a trade secret of a third party or by any other lawful prohibition against such communication.

10.     **Confidential Information**.

(a)     The Employee shall, during the period of his employment with the Employer and at all times thereafter, treat as confidential and, except as required in the performance of his duties and responsibilities with the Employer, not use or disclose, publish or otherwise make available to the public or to any individual, firm or corporation any confidential material (as hereinafter defined). The Employee agrees that all confidential material, together with all notes and records of the Employee relating thereto, and all copies or facsimiles thereof in the possession of the Employee, are the exclusive property of the Employer and the Employee agrees to return such material to the Employer promptly upon the termination of the Employee's employment with the Employer.

(b)     The term "confidential material" shall mean all information acquired by the Employee in the course of the Employee's employment with the Employer in any way concerning the products, projects, activities, business or affairs of the Employer or the Employer's customers, all sales and financial information concerning the Employer, all customer and supplier lists, all information concerning projects in research and development or marketing plans for any such products or projects, and all information in any way concerning the products, projects, activities, business or affairs of the Employer which is furnished to the Employee by the Employer or any of its agents, customers or vendors, as such; provided, however, that the term "confidential material" shall not include information which (i) becomes generally available to the public other than as a result of a disclosure by the Employee, (ii) was available to the Employee on a non-confidential basis prior to his employment with the Employer or (iii) becomes available to the Employee on a non-confidential basis from a source other than the Employer or any of its agents, franchisees, creditors, suppliers, lessors, lessees, customers or vendors, provided that such source is not bound by a confidentiality agreement with the Employer or any of such agents, franchisees, creditors, suppliers, lessors, lessees, or customers or vendors.

11.     <u>Noncompetition and Nonsolicitation</u>.  The Employee hereby acknowledges that, during and solely as a result of his employment by the Employer, he has received and shall continue to receive: (1) special training and education with respect to the operations of the business of the Employer, and (2) access to confidential information and business and professional contacts.  In consideration of the special and unique opportunities afforded to the Employee by the Employer as a result of the Employee's employment, as outlined in the previous sentence, the execution and delivery of the Asset Purchase Agreement by the Employer and other consideration set forth in this Agreement, the Employee hereby agrees as follows:

(a)     During that period (the "Restricted Period") beginning on the Commencement Date and ending on the later of (i) the fifth anniversary of the Commencement Date or (ii) the second anniversary of the effective date of the expiration or termination hereof, the Employee shall not, in any geographic area in which the Employer conducts its business at such time, directly or indirectly, enter into, engage in, be employed by or consult any business which competes with the business of the Employer by selling, offering to sell, soliciting offers to buy, or producing, or by consulting with others concerning the selling or producing of, any product or service substantially similar to those now or hereafter sold or produced by the Employer.  During the Restricted Period, the Employee shall not engage in such prohibited activities, either as an individual, partner, officer, director, principal, stockholder, employee, advisor, independent contractor, joint venturer, consultant, agent, representative or salesman for any person, firm, partnership, corporation or other entity so competing with the Employer.  The restrictions of this Section 11 shall not be violated by the ownership of no more than one percent (1%) of the outstanding securities of any company whose stock is traded on a national securities exchange or is quoted in the Automated Quotation System of the National Association of Securities Dealers (NASDAQ). The restrictions of this Section 11 shall be in addition to, and not in lieu of, any similar restrictions imposed on Employee pursuant to the Asset Purchase Agreement.

(b)     During the Restricted Period, the Employee agrees he will refrain from and will not, directly or indirectly, as an individual, partner, officer, director, principal, stockholder, employee,

advisor, independent contractor, joint venturer, consultant, agent, representative, salesman or otherwise (i) solicit or endeavor to solicit away from the Employer any officer, employee, consultant, customer or prospective customer, vendor or prospective vendor of the Employer, or (ii) employ any person who was an officer or employee of the Employer or who by reason of such person's position at any time is, or may be likely to be, in possession of any confidential material or trade secrets relating to the business or products of the Employer.

(c)     It is understood by and between the parties hereto that the foregoing restrictive covenants set forth in Sections 11(a) and (b) are essential elements of this Agreement, and that, but for the agreement of the Employee to comply with such covenants, the Employer would not have agreed to enter into this Agreement.  Such covenants by the Employee shall be construed as agreements independent of any other provision in this Agreement.  The existence of any claim or cause of action of the Employee against the Employer, whether predicated on this Agreement, or otherwise, shall not constitute a defense to the enforcement by the Employer of such covenants; provided, however, in the event Employer fails to make the payments as and when required by this Agreement and such failure continues without cure for a period of thirty (30) days, Employee shall be relieved of the restrictions of Sections 11(a) and (b) of this Agreement.

(d)     It is agreed by the Employer and Employee that if any portion of the covenants set forth in this Section 11 are held to be invalid, unreasonable, arbitrary or against public policy, then such portion of such covenants shall be considered divisible as to time, geographical area and scope of activities.  The Employer and Employee agree that, if any court of competent jurisdiction determines the specified time period or the specified geographical area applicable to this Section 11 to be invalid, unreasonable, arbitrary or against public policy, a lesser time period or geographical area which is determined to be reasonable, non-arbitrary and not against public policy may be enforced against the Employee. The Employer and the Employee agree that the foregoing covenants are appropriate and reasonable when considered in light of the nature and extent of the business conducted by the Employer.

12.     **Ownership of Work Product**.

(a)     Employee covenants and agrees that all right, title, and interest in all documentation, spread sheets, market data, market descriptions, building layouts, creative works, material designs, formulae, mixing, molding, curing and manufacturing processes, know-how, computer programs and information created, in whole or in part, by Employee during the Employment Period and relating to the business, operations, and/or goods and services provided by Employer, whether or not otherwise copyrightable or patentable, including all intellectual property rights therein, including patents, copyrights, and trademarks (collectively, the "Work Product"), shall be and shall remain the exclusive property of Employer.

(b)     Employee shall and hereby does automatically assign to Employer any right, title and interest which he may have in the Work Product. The Employee agrees to execute (i) any document or instrument requested by Employer, both during and after his employment, to vest Employer with all ownership rights in the Work Product, including but not limited to all papers and documents necessary or advisable for the preparation, prosecution, procurement and maintenance of trademark,

copyright and/or patent applications and trademarks, copyrights and/or patents of the United States of America and foreign countries for such work product to which Employer is entitled as above provided, and (ii) any and all proper documents as shall be required or necessary to vest title in Employer to such work product and all trademark, copyright, and patent applications and trademarks, copyrights and patents pertaining thereto. It is understood that all expenses in connection with such trademarks, copyrights, and patents and all applications related thereto shall be borne by Employer, but Employer shall be under no obligation to protect by trademark, copyright, patent, or otherwise any such work product except at its own discretion and to such extent as Employer shall deem desirable. If any Work Product can be protected by copyright, (i) as to that Work Product which falls within the designation of "work made for hire" as defined in 17 U.S.C. §101, the copyright of such Work Product shall be solely, completely, and exclusively for Employer, and (ii) as to that Work Product which does not constitute "work made for hire", the copyright to such Work Product shall be deemed to be assigned and transferred completely and exclusively by the Employee to Employer pursuant to this Agreement.

13.    **Key Man Life Insurance**. The Employee agrees to use his best efforts to cooperate with the Employer in procuring "key man" life insurance policies in the Employee's name for the benefit of the Employer at any time during the Employment Period, such cooperation to include, without limitation, the Employee being available for and consenting to any physical examinations, providing medical history record or other information or taking any other actions that may be necessary or advisable.

14.    **Sale of All or Substantially All of the Employer's Assets**. If Employer sells, assigns, transfers or otherwise conveys all or substantially all of its assets, other than as part of or in connection with the wind up and dissolution of Employer's business, as a condition to consummating such sale, Employer shall require the successor (or successors, as appropriate) of the assets to assume Employer's obligations under this Agreement.

15.    **Specific Performance**. The Employee agrees that damages at law will be an insufficient remedy to the Employer if the Employee violates the terms of Sections 9, 10 or 11 of this Agreement and that the Employer would suffer irreparable damage as a result of such violation. Accordingly, it is agreed that the Employer shall be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief to enforce the provisions of such Sections, which injunctive relief shall be in addition to any other rights or remedies available to the Employer. In the event that the Employer seeks to enforce the terms of Sections 9, 10 or 11 of this Agreement and is held by a final court of competent jurisdiction to not be entitled to any remedies against the Employee, the Employer shall pay all costs and expenses of the Employee, including reasonable fees and disbursements of counsel (both at trial and in appellate proceedings).

16.    **Compliance with Other Agreements**. The Employee represents and warrants that the execution of this Agreement by him and his performance of his obligations hereunder will not conflict with, result in the breach of any provision of or the termination of or constitute a default under any agreement to which the Employee is a party or by which the Employee is or may be bound.

17. **Waiver of Breach**. The waiver of a breach of any of the provisions of this Agreement by the parties hereto shall not be construed as a waiver of any subsequent breach by the breaching party.

18. **Binding Effect; Assignment**. The rights and obligations of the Employer under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Employer. This Agreement is a personal employment contract and the rights, obligations and interests of the Employee hereunder may not be sold, assigned, delegated, transferred, pledged or hypothecated.

19. **Entire Agreement**. This Agreement contains the entire agreement and supersedes all prior agreements and understandings, oral or written, with respect to the subject matter hereof. This Agreement may be waived, changed, amended, modified or discharged only by an agreement in writing signed by the party against whom any waiver, change, amendment, modification or discharge is sought.

20. **Construction and Interpretation**.

(a) This Agreement shall be construed pursuant to and governed by the laws of the Commonwealth of Massachusetts (but any provision of the law of such state shall not apply if the application of such provision would result in the application of the law of some other state or jurisdiction).

(b) The headings of the various sections in this Agreement are inserted for convenience of the parties and shall not affect the meaning, construction or interpretation of this Agreement.

(c) Any provision of this Agreement which is determined by a court of competent jurisdiction to be prohibited, unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or non-authorization without invalidating the remaining provisions hereof or affecting the validity, enforceability or legality of such provision in any other jurisdiction. In any such case, such determination shall not affect any other provision of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect. If any provision or term of this Agreement is susceptible to two or more constructions or interpretations, one or more of which would render the provision or term void or unenforceable, the parties agree that a construction or interpretation which renders the term or provision valid shall be favored.

21. **Notice**. All notices which are required or may be given under this Agreement hall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by telecopy or similar electronic transmission method; one (1) business day after it is sent, if sent by recognized expedited delivery service; and five (5) days after it is sent, if mailed, first class mail, certified mail, return receipt requested, with postage prepaid. In each case notice shall be sent to:

To the Employer:    Kalm-Forsythe Global Innovations, Ltd.
10440 N. Central Expressway
Suite 1475
Dallas, TX 75205
Attention: Mr. Carl Forsythe

To the Employee:    Richard Somerville
254 Beech St.
Rockland, MA. 02370

22.    **Venue; Process**. The parties to this Agreement agree that jurisdiction and venue in any action brought pursuant to this Agreement to enforce its terms or otherwise with respect to the relationships between the parties shall properly and exclusively lie in Plymouth County, Massachusetts (or the federal court having jurisdiction therefore). Such jurisdiction and venue are intended to be exclusive of any other jurisdiction or venue. The parties agree that they will not object that any action commenced in the foregoing jurisdiction is commenced in a forum non conveniens. The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court shall constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court.

**[Remainder of this Page Intentionally Left Blank]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

EMPLOYER:

KALM-FORSYTHE GLOBAL INNOVATIONS, LTD.

By:    KalFor Solutions Group, LLC,
       General Partner

By: _____
       Carl W. Forsythe, President

EMPLOYEE:

_____
RICHARD SOMERVILLE

# Exhibit H



**TARLOW BREED**
**HART & RODGERS**, P.C.
*Counsellors at Law*
Stephen Kutenplon
Direct Dial: (617) 218-2042
E-mail: skutenplon@tbhr-law.com

February 4, 2005

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Kalm-Forsythe Global Innovations, Ltd.
Attn: Carl W. Forsythe
c/o Globe Composite Solutions, Ltd.
254 Beach Street
Rockland, MA 02370

Mr. Carl W. Forsythe
254 Beach Street
Rockland, MA 02370

Re:   Promissory Note dated as of August 3, 2004 (the "Note"), in the original principal balance of $400,000, from Kalm-Forsythe Global Innovations, Ltd. and Carl W. Forsythe, individually, jointly and severally (each a "Borrower" and collectively, the "Borrowers") to the order of Richard Somerville

Gentlemen:

The undersigned, being the holder of the Note, hereby gives notice that the amounts due under the $400,000 Note at the Maturity Date, as defined in the Note, have not been paid. The Note is therefore in default for your failure to pay the total amount due as of the Maturity Date, and under the terms of the Note, the total amount due is the sum of $400,000, plus interest thereon at the annual rate of 18% from the Maturity Date through the payment date.

The undersigned also gives notice that the undersigned intends to exercise all remedies it may have under the Note. Under the terms of the Note, you are also responsible for payment on demand of all costs and expenses incurred by the undersigned in collecting or enforcing the Note, including but not limited to, attorney's fees.

Please be advised that this notice does not constitute a waiver of any of the undersigned's rights or remedies under the Note or statutory or common law.



Kalm-Forsythe Global Innovations, Ltd.
Attn: Carl W. Forsythe
Page 2
February 4, 2005

Kindly forward a check immediately in the amount of $414,200, representing the amount due as of February 10, 2005 under the Note, to the undersigned. Please be advised that the per diem under the Note is $200, exclusive of costs and expenses of collection and enforcement.

Very truly yours,

Richard Somerville
By his Attorney

Stephen Kutenplon

cc:    Mr. Richard Somerville
       Mark Johnson, Esq.
       William R. Rodgers, Esq.

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete
   item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
   so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
   or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                          □ Agent
                                           □ Addr

B. Received by ( Printed Name )    C. Date of De

D. Is delivery address different from item 1?  □ Yes
   If YES, enter delivery address below:        □ No

1. Article Addressed to:

Mr. Carl W. Forsythe
254 Beach St
Rockland, MA 02370

3. Service Type
   ☒ Certified Mail     □ Express Mail
   □ Registered         ☒ Return Receipt for Mercha
   □ Insured Mail       □ C.O.D.

4. Restricted Delivery? (Extra Fee)         □ Yes

2. Article Number
   (Transfer from service label)        7004 2510 0000 2458 2361

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete
   item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
   so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
   or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                          □ Ag
                                           □ Ad

B. Received by ( Printed Name )    C. Date of I

D. Is delivery address different from item 1?  □ Yes
   If YES, enter delivery address below:        □ No

1. Article Addressed to:

Kalm-Forsyth
Attn: Carl W. Forsythe
Globe Composite Solution
254 Beach St
Rockland MA 02370

3. Service Type
   ☒ Certified Mail     □ Express Mail
   □ Registered         ☒ Return Receipt for Merc
   □ Insured Mail       □ C.O.D.

4. Restricted Delivery? (Extra Fee)         □ Ye

2. Article Number
   (Transfer from service label)        7004 2510 0000 2458 2378

PS Form 3811, February 2004          Domestic Return Receipt          102595-