UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————

GLOBE COMPOSITE SOLUTIONS, LTD.  )
F/K/A KALM-FORSYTHE GLOBAL       )
INNOVATIONS, LTD.                )
                                 )
                                 )   Civil Action No. 05-10323DPW
            *Plaintiff*,         )
                                 )
v.                               )
                                 )
ANNE ROCHE-SOMERVILLE, individually )
and in her capacity as Executrix of the Estate of )
Richard C. Somerville, and       )
SOLAR CONSTRUCTION, INC., INC. F/K/A )
GLOBE RUBBER WORKS, INC.         )
                                 )
            *Defendants*.        )
———————————————————————

## CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The plaintiff, Globe Composite Solutions, Ltd., submits the following statement of

material facts in support of its Motion for Partial Summary Judgment.

Attached hereto are the following materials from which the statement of facts are drawn:

Exhibit A - Asset Purchase Agreement

Exhibit B - Globe Disclosure Schedule

Exhibit C - Somerville Employment Agreement

Exhibit D - Deposition of Carl Forsythe

Exhibit E - Deposition of Roger Fasnacht

Exhibit F - Lincoln Financial Group Life Ownership Change Form

Exhibit G- American General Life Change of Ownership Form

Exhibit H - Letter to Lincoln Financial signed by Richard Somerville

Exhibit I - Globe Composite's Premium Payment Checks

Exhibit J - Affidavit of Carl Forsythe

Exhibit K - Deposition of William Rodgers

Exhibit L - Somerville Termination Letter

Exhibit M - Transcript of Somerville Interview With Carl Forsythe

Exhibit N - Somerville Death Certificate

Exhibit O - Claim Letter from Counsel to Globe Composite to Lincoln Financial

Exhibit P - Claim Letter from Counsel to Globe Composite to American General

Exhibit Q - Lincoln Financial Group Claim Status

Exhibit R - Claim Letter from Counsel to Estate of Somerville to American General

## <u>MATERIAL FACTS</u>

1.  In or about August 2004, KFGI entered into an Asset Purchase Agreement with Globe
    Rubber and Richard C. Somerville, its owner and president (Agreement), whereby KFGI
    purchased identified assets of Globe Rubber for approximately $898,000, as well as
    identified intellectual property of Somerville for $2.25 million (KFGI paid $ 2.4 million
    in cash and issued three promissory notes totaling $750,000). Exhibit A, § 2.4, pp. 11-12.

2.  Section 2.2 of the Agreement provides that certain "excluded assets" shall not be part of
    the sale and shall remain the property of Globe Rubber after the closing, including "all
    insurance policies and rights thereunder...."  Exhibit A, § 2.2, p. 10.

3.      As part of its disclosures under the Agreement, Globe Rubber provided a list of all

"policies of insurance to which Globe [Rubber] is a party or under which Globe [Rubber],

or any director of Globe [Rubber] in such capacity, is or has been covered at any time

since January 1, 2003." This list includes, among others, three term life insurance

policies described as follows:

Key Man Life Insurance on Somerville

| State Life Insurance | Policy #5110095310 | $400,000 |
|---|---|---|
| | Effective 3/9/04 - 3/9/05 | |
| American General Life Insurance | Policy #U10005220L | $250,000 |
| | Effective 9/19/03 - 9/18/04 | |
| Lincoln Financial Group | Policy #G1637194 | $250,000 |
| | Effective 9/1/03 - 9/1/04 | |

Exhibit A, § 4.18, p. 25; Exhibit B, schedule 4.18, pp. 16-17.

4.      As a condition of the asset acquisition, KFGI agreed to execute an Employment

Agreement retaining Somerville, the former president of Globe Rubber, as the Director of

Research and Development of Globe Composite for a term of five (5) years. Exhibit A, §

2.8 (b)(iii), p. 17; Exhibit C.

5.      The Employment Agreement provides that Somerville shall use "his best efforts to

cooperate with [Globe Composite] in procuring "key man" life insurance policies in

[Somerville's] name for the benefit of [KFGI/Globe Composite] at any time during the

Employment Period, such cooperation to include, without limitation, [Somerville] being

available for and consenting to any physical examinations, providing medical history

record or other information or taking any other actions that may be necessary or

advisable." Exhibit C, § 13, p. 10.

6.    KFGI/Globe Composite required key man life insurance on Somerville as protection in

the event that Somerville was unable to fulfill his duties as the Director of Research and

Development.  Globe Composite assumed the Lincoln and American General term life

policies as part of the asset acquisition transaction for this purpose.  Exhibit D, p. 47, l. 20

- p. 48, l. 24.

7.    Globe Rubber's Chief Financial Officer (CFO) leading up to and at the time of the

closing was Roger Fasnacht (Fasnacht), and Fasnacht stayed on as the CFO of Globe

Composite after the closing. Exhibit E, p. 8, ll. 4-15.

8.    Fasnacht was initially retained by Globe Rubber in December 2002 as a consultant to

"cleanup" the company's financial records for presentation to prospective purchasers and

lenders Exhibit E, p. 7, ll 4-13.

9.    After becoming CFO of Globe Rubber, Fasnacht was responsible, among other things, for

negotiating the terms of the Agreement, providing all the financial and due diligence

information needed for the acquisition, and advising Somerville and his wife  with respect

to same.  Exhibit E, p. 17, ll. 8-17, p. 43, ll.10-12, p. 45, ll. 5-13, p. 46, l. 19 - p. 48, l. 4,

p.  50, l. 13 - p. 53, l. 10,  p. 65, l. 18- p. 66, l. 20,  p. 68, l. 21 - p. 70, l. 21.

10.    According to Fasnacht, the "key man" policies referenced in the Agreement were

transferred to Globe Composite as part of the acquisition in order to provide the new

company with key man insurance for Somerville.  Exhibit E, p. 83, l. 1 - p.89, l. 10.

11.    Globe Rubber and/or the Somerville and his wife also held certain whole life insurance

policies insuring Somerville at the time of the closing, but the term policies were

4

transferred to Globe Composite because they had little cash value. Exhibit E, p. 97, l. 21 - p. 98, l. 8.

12.    Immediately after the closing, Fasnacht took on the responsibility of effectuating the transfer of the Lincoln and American General policies from Globe Rubber to Globe Composite.  Exhibit E, p. 91. L. 16 - 20.  This entailed contacting the insurers, having several conversations with Somerville about the actions required on his part to transfer the policies, and getting his signature on various forms required by Lincoln and American General.  Exhibit E, p. 91, l. 16 - p. 101, l. 20; Exhibit F; Exhibit G; Exhibit H.

13.    Somerville signed these forms without questioning Globe Composite's right to the policies. Exhibit E, p. 93, l. 17-19; Exhibit F; Exhibit G; Exhibit H.

14.    Globe Composite paid all of the premiums on the policies after the closing.  Exhibit J, ¶ 3.  The first premium payment was made by Globe Composite to Lincoln on August 27, 2004, which was contemporaneous with the asset acquisition closing.  The first premium payment made by Globe Composite to American General was made on September 28, 2004.  Exhibit E, p. 89 ll. 14-23; Exhibit I.

15.    Globe Composite treated the premium payments as ordinary expenses.  If Solar or Somerville owned the policies, any premium payments made by Globe Composite would have been treated as ordinary income to Somerville in 2004 and 2005.  This was not the case.  Globe did not issue Somerville any W-2 for these premium payments in 2004 and 2005, nor was it requested by him or his estate.  Exhibit J, ¶ 3.

16.    William Rodgers (Rodgers), the corporate attorney who represented Globe Rubber in the acquisition of its assets by KFGI, testified in his deposition that while, in his opinion, the

5

Agreement reflects the "meeting of the minds of the parties on the disposition of the insurance policies," Somerville could have transferred the policies to satisfy his obligations under the Employment Agreement and Rodgers would expect the post-closing premiums to be paid by the owner of the policies. Exhibit K, p. 55, ll. 19-21, p. 60, ll. 1-5, p. 62, ll. 15-20.

17.   The Agreement provides that "each party shall pay, or make adequate provision for the payment, in full of the Liabilities as assumed or retained under this Agreement." Exhibit A, § 8.3, p. 44.

18.   Carl Forsythe (Forsythe), one of the founders of KFGI and the Chief Executive Officer and President of Globe Composite, has a Masters in Business from Cornell University, successfully passed his CPA exam, and was involved in finance and banking activities, including several acquisitions, from 1982 until 1999. Exhibit D, p. 7, ll. 4-6, p. 7., l. 12 - p. 8, l. 16; Exhibit J, ¶¶ 1, 2.

19.   According to Forsythe, term life policies with little or no cash value are financial obligations and do not become assets until the insured dies. As a result, the Lincoln and American General term policies were not "excluded assets" under the Agreement, but were in fact assumed liabilities. Exhibit D, p. 47, l. 20 - p. 48, l. 24.

20.   Somerville's employment with Globe Composite was terminated on January 31, 2005. Exhibit L.

21.   Somerville's employment was terminated because he admitted that he and Globe Rubber had falsified certifications to government contractors that parts manufactured by Globe Rubber

for U.S. Navy submarines, specifically 92 inch missile hatch gaskets and sonar panels, met the required specifications.  Exhibit L; Exhibit M.

22.    Somerville took his own life on June 7, 2005 at the age of seventy-one.  Exhibit N.

23.    Globe Composite filed claims against both policies on July 5, 2005.  Exhibits O and P.

24.    Lincoln paid the $250,000 in proceeds on its policy to Globe Composite on or about August 1, 2005.  Exhibit Q.

25.    The Estate of Somerville did not make a claim on the American General policy until September 21, 2005.  Exhibit R.  American General filed an interpleader action on October 25, 2005 due to competing claims on the policy proceeds by Globe Composite and Solar, and deposited the $250,000 in proceeds  with the court.

By its attorneys,


/s/ Clare B. Burhoe
Evan T. Lawson, BBO# 289280
Clare B. Burhoe, BBO# 632238
cburhoe@lawson-weitzen.com
LAWSON & WEITZEN, LLP
88 Black Falcon Avenue, Suite 345
Boston, Massachusetts  02210
(617)439-4990

## CERTIFICATE OF SERVICE

I, Clare B. Burhoe, hereby certify that on November 28, 2006 a true copy of the foregoing document was electronically filed with the Court and sent by first class mail to all counsel of record including Mark S. Furman and Jennifer C. Roman, Tarlow, Breed, Hart & Rodgers, PC, 101 Huntington Avenue, Suite 500, Boston, MA 02199. /s/ Clare B. Burhoe

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

V.                                        CASE NO. _____

_____


## NOTICE OF FILING WITH CLERK'S OFFICE

Notice is hereby given that the documents, exhibits or attachments listed below

have been manually filed with the Court and are available in paper form only:

The original documents are maintained in the case file in the Clerk's Office.

_____                          _____

Date                                       Attorney for

_____

_____

_____

_____

(Notice of Filing.wpd  - 7/03)

# EXHIBIT C

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (as amended from time to time, this "Agreement") is made and entered into as of August 3, 2004 (the "Commencement Date"), by and between Kalm-Forsythe Global Innovations, Ltd., a Texas limited partnership (the "Employer"), and Richard Somerville, a resident of Massachusetts (the "Employee").

## W I T N E S S E T H:

**WHEREAS,** Employer, Employee and Globe Rubber Works, Inc., a Massachusetts corporation ("Globe"), have entered into a Asset Purchase Agreement, dated as of August 3, 2004 ("Asset Purchase Agreement"), for the purchase by KFGI of substantially all of the assets of Globe and all of the intellectual property and goodwill owned by Somerville related to the business of Globe;

**WHEREAS,** the consummation of the transactions contemplated by the Asset Purchase Agreement by Employer, Globe and Employee is conditioned upon the execution and delivery of this Agreement by Employee and Employer, respectively.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein and for other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, intending to be legally bound:

1.    **Employment.** The Employer hereby employs the Employee, and the Employee hereby accepts such employment, upon the terms and subject to the conditions set forth in this Agreement.

2.    **Term.** The term of employment under this Agreement shall commence on the Commencement Date and shall continue for a term of five (5) years (the "Employment Period"); provided, however, that at the end of such Employment Period the term of this Agreement shall continue and be extended until such time as either party hereto provides written notice to the other party of its intent to terminate this Agreement as provided for hereinafter (such period after the initial Employment Period being a "Renewal Period").

3.    **Compensation; Reimbursement; etc.**

(a)    The Employer shall pay to the Employee as compensation for all services rendered by the Employee during the Employment Period and any Renewal Period an annual base salary of Two Hundred Thousand Dollars ($200,000) (the "Base Salary") payable bimonthly or in other more frequent installments, as determined by the Employer.

(b)    Each year during the Employment Period and any Renewal Period, in addition to the Base Salary and any other amounts payable to the Employee under any other provision of this

0000356

Agreement, the Employee shall be entitled to receive a bonus equal to up to 25% of Employee's annual Base Salary based on the same performance criteria as set forth in the general bonus plan structure applicable to all senior management members except as specifically and reasonably tailored to Employee's specific job responsibilities (the "Bonus Amount").

(c)     If Employee is employed by Employer for less than a full calendar year during any calendar year under the Employment Period or any Renewal Period, the amount of Employee's Base Salary and the Bonus Amount shall be prorated through the date of termination, subject to Section 8.

(d)     The Employer shall have the right to increase the Employee's compensation from time to time.  Except as otherwise provided by Section 8, the compensation provisions set forth in Sections 3(a), (b) and (c) shall not survive beyond the Employment Period and any applicable Renewal Period.

(e)     The Employer shall reimburse the Employee for all reasonable expenses incurred by the Employee in the performance of his duties under this Agreement; provided, however, that the Employee must furnish to the Employer an itemized account, satisfactory to the Employer, in substantiation of such expenditures.  Any single expense in excess of One Thousand Dollars ($1,000) must be pre-approved by the Employer in order to be reimbursable hereunder.

(f)     The Employee shall be entitled to such fringe benefits including, but not limited to, medical, retirement and insurance benefits, as may be provided from time to time by the Employer to other senior management members of the Employer except for benefits related to travel, relocation, dining and country club membership.

4.     **Duties**.  The Employee shall have the title of, and shall serve the Employer as, the Director of Research and Development.  Employee shall serve at the direction and discretion of the Employer's board of directors and senior management and shall report to the Employer's chief executive officer.  The Employee's duties shall include such specific duties consistent with his position in the company as director of research and development as the Employer's board of directors and senior management shall assign to Employee from time to time.  Employer may change the title of Employee's position at any time provided Employer does not substantially diminish the roles and responsibilities of Employee  or assign a title to Employee that is inconsistent with his duties and responsibilities or his reputation in the industry.

5.     Extent of Services; Vacations and Days Off.

(a)     During the term of his employment under this Agreement, the Employee shall devote his full time, energy and attention during regular business hours to the benefit and business of the Employer in performing his duties pursuant to this Agreement, provided that Employee shall be allowed to devote a reasonable amounts of time to civic, professional and charitable undertakings as long as same do not materially interfere with or detract from Employee performing his duties and responsibilities hereunder.

(b)     The Employee shall be entitled to five (5) weeks for paid vacation and such amounts of days for sick and holiday leave as the Employer may determine in accordance with the policy of

0000357

the Employer as may be established from time to time by the Employer and applied to other employees of the Employer.

6.    **Facilities.** The Employer shall provide the Employee with a furnished office and the facilities of the Employer shall be generally available to the Employee in the performance of his duties pursuant to this Agreement; it being understood and contemplated by the parties that such equipment, supplies and office personnel as are reasonably required for the performance of the Employee's duties under this Agreement shall be supplied by the Employer.

7.    **Illness or Incapacity, Termination on Death, Etc.**

(a)    If the Employee dies during the term of his employment, the Employer shall pay to the estate of the Employee (i) such compensation, including any incentive compensation earned but not yet paid, as would otherwise have been payable to the Employee up to the end of the month in which his death occurs, plus (ii) an amount equal to one-half (1/2) of Employee's Base Salary for the then remaining portion of the original Employment Period, plus (iii) a payment on account of the bonus payments Employee would have received for the remainder of the Employment Period, this amount being stipulated as equal to $25,000 for each full calendar year (and the prorated amount thereof for each partial calendar year) remaining in the Employment Period. If Employer maintains key-man life insurance on Employee, Employer shall pay the amounts under clauses (ii) and (iii) of this Section 7(a) to Employee's estate or representative in a single lump sum payment as soon as Employer receives the insurance proceeds. If Employer does not maintain key-man life insurance on Employee, Employer shall pay the amounts under clauses (ii) and (iii) of this Section 7(a) in equal installments, with the first such payment being due and payable within thirty (30) days of Employee's death, and the subsequent payments being due and payable on each successive regularly scheduled payroll date of the Employer. Other than the obligations set forth in this Section 7(a), the Employer shall have no additional financial obligation under this Agreement to the Employee or his estate.

(b)    (i)    During any period of disability, illness or incapacity during the term of this Agreement which renders the Employee at least temporarily unable to substantially perform (with or without reasonable accommodation) the services required under this Agreement for a period which shall not equal or exceed ninety (90) consecutive days or one hundred twenty (120) days in any continuous one (1) year period, the Employee shall continue to receive the Base Salary on the regularly scheduled payroll payment date of the Employer plus any incentive compensation earned but not yet paid, less any benefits received by him under any disability insurance carried by or provided by the Employer. Upon the Employee's permanent disability (as defined below), Employer may terminate the employment of Employee and the Employer shall pay to Employee in equal installments and payable on each regularly scheduled payroll payment date of the Employer (i) such compensation, including any incentive compensation earned but not yet paid, as would otherwise have been payable to the Employee up to the end of the month in which his permanent disability occurs, plus (ii) an amount equal to one-half (1/2) of Employee's Base Salary for the then remaining portion of the original Employment Period, plus (iii) a payment on account of the bonus payments Employee would have received for the remainder of the Employment Period, this amount being stipulated as equal to $25,000 for each full calendar year (and the prorated amount thereof for each partial calendar year) remaining in the Employment Period. All other rights of the Employee under

-3-

this Agreement shall terminate although the Employee shall continue to receive any disability benefits to which he may be entitled under any disability income insurance which may be carried by or provided by the Employer from time to time.

(ii)    The term "permanent disability" as used in this Agreement shall mean the inability of the Employee, as reasonably determined by the Employer, by reason of physical or mental disability to substantially perform (with or without reasonable accommodation) the services required of him under this Agreement for a period of ninety (90) consecutive days or one hundred twenty (120) days in any continuous any one (1) year period. Upon such determination, the Employer may terminate the Employee's employment under this Agreement upon the expiration of such qualifying period of disability. If any determination of the Employer with respect to permanent disability is disputed by the Employee, the parties hereto agree to abide by the decision of a panel of three physicians. The Employee and Employer shall each appoint one member, and the third member of the panel shall be appointed by the other two members. The Employee agrees to make himself available for and submit to examinations by such qualified physicians as may be directed by the Employer as to whom Employee raises, in good faith, no reasonable objection. Failure to submit to any such examination shall constitute a breach of a material part of this Agreement.

(iii)    Anything herein to the contrary notwithstanding, if Employer maintains disability insurance for Employee, (A) the definition of "permanent disability" for purposes hereof shall be automatically amended to conform to the standard definition of "permanent disability" or the equivalent term included in the disability insurance policy, and (B) the amount of the payments provided for under clause (i) of this Section 7(b) shall be reduced on a dollar for dollar basis by the amount of any payments made to Employee under such disability insurance policy.

8.    **Other Terminations**.

(a)    (i)    The Employee may terminate his employment hereunder voluntarily and without "good reason" upon giving at least thirty (30) days' prior written notice to the Employer.

(ii)    If the Employee gives notice pursuant to Section 8(a), the Employer shall have the right to relieve the Employee, in whole or in part, of his duties under this Agreement.

(b)    (i)    The Employee may terminate his employment hereunder without notice for "good reason."

(ii)    As used herein, "good reason" shall include:

(1)    the material breach of any term or provision of this Agreement or the Asset Purchase Agreement by the Employer and such breach is not cured within thirty (30) days of written notice thereof from Employee;

(2)    the relocation of the Employee's place of business to a location greater than forty (40) miles from Globe's present location at 254 Beech Street, Rockland, MA 02370;

-4-

0000359

(3)     the substantial diminution by the Employer of the defined role and responsibilities of the Employee without the Employee's consent or the Employer engaging in practices that amount to constructive dismissal; or

(4)     a change of control of Employer (i.e. where all or substantially all of the business of Employer is sold to a third party, by merger, stock sale, consolidation, asset sale).

(c)     (i)     The Employer may terminate the employment of the Employee hereunder either "for cause" or "without cause." The Employer may terminate the employment of the Employee for cause upon written notice that it intends to terminate the Employee's employment for cause, which written notice shall specify the act or acts with respect to which the Employer intends to so terminate the Employee's employment.

(ii)     As used herein, "for cause" shall include:

(1)     the Employee's conviction of either (x) a felony, (y) a misdemeanor involving moral turpitude, or (z) any crime in connection with his employment by the Employer the nature of which involves dishonesty, assault, battery or which brings disrepute to the Employer by virtue of its association with Employee, but specifically shall not include traffic offenses;

(2)     any intentional act by the Employee not undertaken in good faith that is clearly contrary to the best interests of Employer;

(3)     the Employee's repeated and willful failure to take actions within the scope of his duties, his abilities and which are permitted by law to implement policies, strategies or initiatives of the Employer which the Employer has communicated to him in writing after thirty (30) days notice and opportunity to cure has been afforded to him by the Employer;

(4)     the repeated and continued failure of the Employee to attend to his duties and responsibilities after 30 days written notice and opportunity to cure has been afforded to him by the Employer;

(5)     any willful act by the Employee against the Employer intended to enrich the Employee in a material respect in derogation of his duties to the Employer and at the expense of the Employer; or

(6)     the material breach of any term or provision of this Agreement or the Asset Purchase Agreement by the Employee and such breach is not cured within thirty (30) days of written notice thereof from Employer

(iii)     Termination of the employment of the Employee for reasons other than those expressly specified in this Agreement as for cause shall be deemed to be a termination of employment "without cause."

-5-

0000360

(d)    For purposes of this Section 8, the term "Accelerated Termination Date" shall mean (i) if the Employee terminates his employment pursuant to Section 8(a)(i), the effective date of termination as so identified by the Employee in his notice to the Employer, or (ii) if the Employer terminates the employment of the Employee, or relieves the Employee of his duties pursuant to Section 8(a)(ii), the effective date of termination as so identified by the Employer.

(e)    If the Employee shall terminate his employment voluntarily under Section 8(a)(i) without good reason at any time during the first three years of the Employment Period or if the Employer shall terminate the employment of the Employee "for cause" at any time during the first three years of the Employment Period, the Employer shall pay to the Employee such compensation, including the Base Salary, bonus compensation then earned and all accrued but unused vacation, sick and holiday leave, as would otherwise have been payable to the Employee up to and including the Accelerated Termination Date; provided, however, for the avoidance of doubt, the Employee shall not be entitled to any unpaid Bonus Amount, for the current calendar year in which such termination occurs, whether or not earned.  If the Employee shall voluntarily terminate his employment under Section 8(a)(i) without good reason at any time after the first three years of the Employment Period, or if Employer shall terminate the employment of the Employee "for cause" at any time after the first three years of the Employment Period, the Employer shall pay to the Employee (i) such compensation, including the Base Salary, bonus compensation then earned and all accrued but unused vacation, sick and holiday leave, as and when same would otherwise have been payable to the Employee up to and including the Accelerated Termination Date plus (ii) thereafter an amount equal to one half of Employee's Base Salary, as and when same would otherwise have been payable to Employee, on regularly scheduled payment dates of Employer, for the then remaining portion of the original Employment Period; provided, however, for the avoidance of doubt, the Employee shall not be entitled to any unpaid Bonus Amount, for the current calendar year in which such termination occurs, whether or not earned, or for the remaining portion of the Employment Period.

(f)    If (i) the Employer shall terminate the employment of the Employee "without cause" or (ii) if Employee shall terminate his employment for "good reason", effective on a date within the Employment Period or any Renewal Period, the Employee shall receive and Employer shall pay to Employee within ten (10) days of such termination, (A) a lump sum payment to Employee equal to the aggregate of the Base Salary Employee would have been entitled to for the remaining period of the Employment Period or such Renewal Period, and (B) a lump sum payment on account of the bonus payments Employee would have received for the remainder of the Employment Period or such Renewal Period, this amount being stipulated as equal to $50,000 for each full calendar year (and the prorated amount thereof for each partial calendar year) remaining in the Employment Period or such Renewal Period.  Other than the obligations set forth in this Section 8(f), the Employer shall have no additional financial obligation under this Agreement to the Employee with respect to a termination "without cause."

(g)    If the payments provided in Section 8(f) hereof constitute a "parachute payment" within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), and if (but only if) the sum of the "present value" (as determined under Section 280G of the Code) of such payments and the "present value" of any other "parachute payment" from the Employer exceeds an amount equal to 299% of the Employee's "base amount" within the meaning of

0000361

Section 280G of the Code (the "299% Amount"), the amount of the payments provided in Section 8(f) hereof shall be grossed up by Employer to the extent necessary so that the sum of the "parachute payments" to be paid to Employee equals, after deduction for any tax penalties assessed or to be assessed on Employee, the amounts required by Section 8(f). The determination of whether any amount payable hereunder constitutes a "parachute payment" which causes the 299% Amount to be exceeded shall be made, if requested by the Employee or the Employer, by the Employer's public accounting firm. The costs of obtaining such determination shall be borne by the Employer. The fact that the payments provided in Section 8(f) hereof may be increased pursuant to this section shall not limit or otherwise affect any rights of the Employee to any employee benefit or other right arising other than pursuant to this Agreement. After receiving the payments provided in this Section 8, the Employee shall have no further rights under this Agreement. Notwithstanding any such termination of employment pursuant to this Section 8, the Employee's covenants set forth in Section 10 and 11 are intended to and shall remain in full force and effect provided Employer makes the payments to Employee as and when required by this Agreement.

(h)     In addition, if the Employee's employment is terminated within the first three years of the Employment Period either (i) by Employee under Section 8(a)(i) without good reason, or (ii) justifiably by Employer for cause under Section 8(c)(ii), effective as of the Accelerated Termination Date, the Employee shall automatically forfeit his entire ownership interest in KFGI.

(i)     In any dispute between the parties as to their respective rights and entitlements under this Section 8 resulting in suit being brought, the prevailing party shall be entitled to recover from the non-prevailing party the costs and expenses incurred in connection with such suit, including reasonable attorneys fees.

9.     **Disclosure**.  The Employee agrees that during the term of his employment by the Employer he will disclose and disclose only to the Employer all ideas, methods, plans, developments or improvements known by him which relate directly or indirectly to the business of the Employer, whether acquired by the Employee before or during his employment by the Employer. Nothing in this Section 9 shall be construed as requiring any such communication where the idea, plan, method or development is lawfully protected from disclosure as a trade secret of a third party or by any other lawful prohibition against such communication.

10.     <u>Confidential Information</u>.

(a)     The Employee shall, during the period of his employment with the Employer and at all times thereafter, treat as confidential and, except as required in the performance of his duties and responsibilities with the Employer, not use or disclose, publish or otherwise make available to the public or to any individual, firm or corporation any confidential material (as hereinafter defined). The Employee agrees that all confidential material, together with all notes and records of the Employee relating thereto, and all copies or facsimiles thereof in the possession of the Employee, are the exclusive property of the Employer and the Employee agrees to return such material to the Employer promptly upon the termination of the Employee's employment with the Employer.

0000362

(b)    The term "confidential material" shall mean all information acquired by the Employee in the course of the Employee's employment with the Employer in any way concerning the products, projects, activities, business or affairs of the Employer or the Employer's customers, all sales and financial information concerning the Employer, all customer and supplier lists, all information concerning projects in research and development or marketing plans for any such products or projects, and all information in any way concerning the products, projects, activities, business or affairs of the Employer which is furnished to the Employee by the Employer or any of its agents, customers or vendors, as such; provided, however, that the term "confidential material" shall not include information which (i) becomes generally available to the public other than as a result of a disclosure by the Employee, (ii) was available to the Employee on a non-confidential basis prior to his employment with the Employer or (iii) becomes available to the Employee on a non-confidential basis from a source other than the Employer or any of its agents, franchisees, creditors, suppliers, lessors, lessees, customers or vendors, provided that such source is not bound by a confidentiality agreement with the Employer or any of such agents, franchisees, creditors, suppliers, lessors, lessees, or customers or vendors.

11.    **Noncompetition and Nonsolicitation.**  The Employee hereby acknowledges that, during and solely as a result of his employment by the Employer, he has received and shall continue to receive: (1) special training and education with respect to the operations of the business of the Employer, and (2) access to confidential information and business and professional contacts.  In consideration of the special and unique opportunities afforded to the Employee by the Employer as a result of the Employee's employment, as outlined in the previous sentence, the execution and delivery of the Asset Purchase Agreement by the Employer and other consideration set forth in this Agreement, the Employee hereby agrees as follows:

(a)    During that period (the "Restricted Period") beginning on the Commencement Date and ending on the later of (i) the fifth anniversary of the Commencement Date or (ii) the second anniversary of the effective date of the expiration or termination hereof, the Employee shall not, in any geographic area in which the Employer conducts its business at such time, directly or indirectly, enter into, engage in, be employed by or consult any business which competes with the business of the Employer by selling, offering to sell, soliciting offers to buy, or producing, or by consulting with others concerning the selling or producing of, any product or service substantially similar to those now or hereafter sold or produced by the Employer.  During the Restricted Period, the Employee shall not engage in such prohibited activities, either as an individual, partner, officer, director, principal, stockholder, employee, advisor, independent contractor, joint venturer, consultant, agent, representative or salesman for any person, firm, partnership, corporation or other entity so competing with the Employer.  The restrictions of this Section 11 shall not be violated by the ownership of no more than one percent (1%) of the outstanding securities of any company whose stock is traded on a national securities exchange or is quoted in the Automated Quotation System of the National Association of Securities Dealers (NASDAQ).  The restrictions of this Section 11 shall be in addition to, and not in lieu of, any similar restrictions imposed on Employee pursuant to the Asset Purchase Agreement.

(b)    During the Restricted Period, the Employee agrees he will refrain from and will not, directly or indirectly, as an individual, partner, officer, director, principal, stockholder, employee,

0000363

advisor, independent contractor, joint venturer, consultant, agent, representative, salesman or otherwise (i) solicit or endeavor to solicit away from the Employer any officer, employee, consultant, customer or prospective customer, vendor or prospective vendor of the Employer, or (ii) employ any person who was an officer or employee of the Employer or who by reason of such person's position at any time is, or may be likely to be, in possession of any confidential material or trade secrets relating to the business or products of the Employer.

(c)    It is understood by and between the parties hereto that the foregoing restrictive covenants set forth in Sections 11(a) and (b) are essential elements of this Agreement, and that, but for the agreement of the Employee to comply with such covenants, the Employer would not have agreed to enter into this Agreement. Such covenants by the Employee shall be construed as agreements independent of any other provision in this Agreement. The existence of any claim or cause of action of the Employee against the Employer, whether predicated on this Agreement, or otherwise, shall not constitute a defense to the enforcement by the Employer of such covenants; provided, however, in the event Employer fails to make the payments as and when required by this Agreement and such failure continues without cure for a period of thirty (30) days, Employee shall be relieved of the restrictions of Sections 11(a) and (b) of this Agreement.

(d)    It is agreed by the Employer and Employee that if any portion of the covenants set forth in this Section 11 are held to be invalid, unreasonable, arbitrary or against public policy, then such portion of such covenants shall be considered divisible as to time, geographical area and scope of activities. The Employer and Employee agree that, if any court of competent jurisdiction determines the specified time period or the specified geographical area applicable to this Section 11 to be invalid, unreasonable, arbitrary or against public policy, a lesser time period or geographical area which is determined to be reasonable, non-arbitrary and not against public policy may be enforced against the Employee. The Employer and the Employee agree that the foregoing covenants are appropriate and reasonable when considered in light of the nature and extent of the business conducted by the Employer.

12.    **Ownership of Work Product.**

(a)    Employee covenants and agrees that all right, title, and interest in all documentation, spread sheets, market data, market descriptions, building layouts, creative works, material designs, formulae, mixing, molding, curing and manufacturing processes, know-how, computer programs and information created, in whole or in part, by Employee during the Employment Period and relating to the business, operations, and/or goods and services provided by Employer, whether or not otherwise copyrightable or patentable, including all intellectual property rights therein, including patents, copyrights, and trademarks (collectively, the "Work Product"), shall be and shall remain the exclusive property of Employer.

(b)    Employee shall and hereby does automatically assign to Employer any right, title and interest which he may have in the Work Product. The Employee agrees to execute (i) any document or instrument requested by Employer, both during and after his employment, to vest Employer with all ownership rights in the Work Product, including but not limited to all papers and documents necessary or advisable for the preparation, prosecution, procurement and maintenance of trademark,

0000364

copyright and/or patent applications and trademarks, copyrights and/or patents of the United States of America and foreign countries for such work product to which Employer is entitled as above provided, and (ii) any and all proper documents as shall be required or necessary to vest title in Employer to such work product and all trademark, copyright, and patent applications and trademarks, copyrights and patents pertaining thereto. It is understood that all expenses in connection with such trademarks, copyrights, and patents and all applications related thereto shall be borne by Employer, but Employer shall be under no obligation to protect by trademark, copyright, patent, or otherwise any such work product except at its own discretion and to such extent as Employer shall deem desirable. If any Work Product can be protected by copyright, (i) as to that Work Product which falls within the designation of "work made for hire" as defined in 17 U.S.C. §101, the copyright of such Work Product shall be solely, completely, and exclusively for Employer, and (ii) as to that Work Product which does not constitute "work made for hire", the copyright to such Work Product shall be deemed to be assigned and transferred completely and exclusively by the Employee to Employer pursuant to this Agreement.

13.    **Key Man Life Insurance**. The Employee agrees to use his best efforts to cooperate with the Employer in procuring "key man" life insurance policies in the Employee's name for the benefit of the Employer at any time during the Employment Period, such cooperation to include, without limitation, the Employee being available for and consenting to any physical examinations, providing medical history record or other information or taking any other actions that may be necessary or advisable.

14.    **Sale of All or Substantially All of the Employer's Assets**.    If Employer sells, assigns, transfers or otherwise conveys all or substantially all of its assets, other than as part of or in connection with the wind up and dissolution of Employer's business, as a condition to consummating such sale, Employer shall require the successor (or successors, as appropriate) of the assets to assume Employer's obligations under this Agreement.

15.    **Specific Performance**. The Employee agrees that damages at law will be an insufficient remedy to the Employer if the Employee violates the terms of Sections 9, 10 or 11 of this Agreement and that the Employer would suffer irreparable damage as a result of such violation. Accordingly, it is agreed that the Employer shall be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief to enforce the provisions of such Sections, which injunctive relief shall be in addition to any other rights or remedies available to the Employer. In the event that the Employer seeks to enforce the terms of Sections 9, 10 or 11 of this Agreement and is held by a final court of competent jurisdiction to not be entitled to any remedies against the Employee, the Employer shall pay all costs and expenses of the Employee, including reasonable fees and disbursements of counsel (both at trial and in appellate proceedings).

16.    **Compliance with Other Agreements**. The Employee represents and warrants that the execution of this Agreement by him and his performance of his obligations hereunder will not conflict with, result in the breach of any provision of or the termination of or constitute a default under any agreement to which the Employee is a party or by which the Employee is or may be bound.

0000365

17.  **Waiver of Breach**.  The waiver of a breach of any of the provisions of this Agreement by the parties hereto shall not be construed as a waiver of any subsequent breach by the breaching party.

18.  **Binding Effect; Assignment**.  The rights and obligations of the Employer under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Employer.  This Agreement is a personal employment contract and the rights, obligations and interests of the Employee hereunder may not be sold, assigned, delegated, transferred, pledged or hypothecated.

19.  **Entire Agreement**.  This Agreement contains the entire agreement and supersedes all prior agreements and understandings, oral or written, with respect to the subject matter hereof.  This Agreement may be waived, changed, amended, modified or discharged only by an agreement in writing signed by the party against whom any waiver, change, amendment, modification or discharge is sought.

20.  **Construction and Interpretation**.

(a)  This Agreement shall be construed pursuant to and governed by the laws of the Commonwealth of Massachusetts (but any provision of the law of such state shall not apply if the application of such provision would result in the application of the law of some other state or jurisdiction).

(b)  The headings of the various sections in this Agreement are inserted for convenience of the parties and shall not affect the meaning, construction or interpretation of this Agreement.

(c)  Any provision of this Agreement which is determined by a court of competent jurisdiction to be prohibited, unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or non-authorization without invalidating the remaining provisions hereof or affecting the validity, enforceability or legality of such provision in any other jurisdiction.  In any such case, such determination shall not affect any other provision of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect.  If any provision or term of this Agreement is susceptible to two or more constructions or interpretations, one or more of which would render the provision or term void or unenforceable, the parties agree that a construction or interpretation which renders the term or provision valid shall be favored.

21.  **Notice**.  All notices which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by telecopy or similar electronic transmission method; one (1) business day after it is sent, if sent by recognized expedited delivery service; and five (5) days after it is sent, if mailed, first class mail, certified mail, return receipt requested, with postage prepaid.  In each case notice shall be sent to:

0000366

To the Employer:    Kalm-Forsythe Global Innovations, Ltd.
                    10440 N. Central Expressway
                    Suite 1475
                    Dallas, TX 75205
                    Attention:  Mr. Carl Forsythe

To the Employee:    Richard Somerville
                    254 Beech St.
                    Rockland, MA. 02370

22.    **Venue; Process**.  The parties to this Agreement agree that jurisdiction and venue in any action brought pursuant to this Agreement to enforce its terms or otherwise with respect to the relationships between the parties shall properly and exclusively lie in Plymouth County, Massachusetts (or the federal court having jurisdiction therefore). Such jurisdiction and venue are intended to be exclusive of any other jurisdiction or venue.  The parties agree that they will not object that any action commenced in the foregoing jurisdiction is commenced in a forum non conveniens. The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court shall constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court.

[Remainder of this Page Intentionally Left Blank]

0000367

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

EMPLOYER:

KALM-FORSYTHE GLOBAL INNOVATIONS, LTD.

By:   KalFor Solutions Group, LLC,
      General Partner

By: _____
      Carl W. Forsythe, President


EMPLOYEE:

_____
RICHARD SOMERVILLE

-13-

0000368

# EXHIBIT F

# Lincoln
Financial Group®

*Life Ownership Change Form*

Personal Service Center
P.O. Box 5048 MIR1
Hartford CT 06102-5048
Fax number 860 466-2835

| General Information | | |
|---|---|---|
| Policy number **G1637194** | Issued by (the Company) **ING Life** | |
| Insured's name **Richard C. Somerville** | | |
| Social security number **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** | | |
| Policy Owner's name **Globe Rubber Works, Inc.** | | |
| Social security number/Tax ID # **74-2922722** | | |
| Policy Owner's address **254 Beech St.** | | |
| City, State, ZIP **Rockland, MA 02370** | | |
| Policy Owner's phone no. **781-871-3702** | E-mail address | |

## New Owner Designation

*An ownership change does not change existing beneficiary designations. To change your beneficiary, please submit a Lincoln Beneficiary Change Form.*

*The signature of all owners will be required to exercise any contractual rights under the policy.*

*Please change the Owner of the policy listed above to (Select Only One): Complete by typewriter or print in ink.*

☐ The Insured. (If more than one insured, designation assumes jointly with right of survivorship arrangement.)

☐ To one person during his or her lifetime and thereafter the Insured

_____     _____
Name                                                                              Date of Birth

☐ To one person absolutely, his or her estate

_____     _____
Name                                                                              Date of Birth

To multiple owners *(check one)*:     ☐ Joint with Right of Survivorship     ☐ Tenants-in-common*

_____
*If tenant-in-common, specify shares, if not specified we will assume equal shares.*

To a *(check one)* ☐ Corporation ☐ Partnership ☐ LLC or ☐ Other *(specify)*

**Globe Composite Solutions, LTD     Rockland     MA**
Legal name                                                        City                 State

☐ To a trustee or successor trustee under a formal trust agreement

Name of Trustee(s) _____

Name of Trust _____

City, State _____ Date of Trust _____

I/We hereby certify that the Trustee(s) named are the Trustee(s) for the named Trust, which is in full force and effect. The Company shall not be obligated to inquire into the terms of any trust agreement affecting this policy and shall not be chargeable with knowledge of the terms thereof. The Company may rely solely upon the signature(s) of the Trustee(s) named to any receipt, release or waiver, or to any transfer or other instrument affecting this policy or any options privileges or benefits thereunder. Unless otherwise indicated the signature(s) of all Trustee(s) named, or their successors, will be required to exercise any contractual right under the policy. The Company shall have no obligation to see to the use or application of any funds paid to the Trustee(s) in accordance with the terms of the policy. Any such payment made by the Company to the Trustee(s) shall fully discharge the Company with respect to any amounts so paid.

**Agreements and Signatures**

*This section must be completed by the current policy owner.*

*Title required if a corporation, partnership or trust.*

*\*Two officer signatures are required for corporate owned policies.*

By signing below, you, the policy owner, certify that you have read this request and understand that it is subject to the provisions and conditions of the policies listed. You also certify that the policies are not assigned to any other person or corporation, except where otherwise noted on this request, and that no proceedings of bankruptcy or insolvency have been filed or are currently pending against you. We reserve the right to require additional information as needed.

Signed at _____ on _____
City and State                                                    Date

_Richard C. Somerville_ _____  _Richard Somerville_ President
Current Owner (full name)                Signature                Title*

_Paul Slaney_ _____  _Paul Slaney_ Controller
Current Owner (full name)                Signature                Title*

Assignee, Irrevocable Beneficiary or other interested party (name and signature)

Community property release - This section is applicable for community property states (AZ, CA, ID, LA, NV, NM, TX and WA). Determination of Community Property status depends on the current or former resident state of the policy owner.
By signing below, you the spouse/former spouse agree to the changes indicated above and;

☐ You give up your rights to this policy according to the community property laws in your state.

☐ You do not give up your rights to this policy.

Spouse's Signature _____ Date _____

Name (print or type) _____

---

**New Owner Information**

**THIS SECTION MUST BE COMPLETED BY THE NEW OWNER**

Policy Owner's address _254 Beech St._

City, State, ZIP _Rockland, MA 02370_

**Taxpayer Identification Number and Certification Substitute W-9**

*This is an IRS requirement.*

By signing below, you certify that the information provided is complete and accurate as shown. You also certify that you have read, understand and agree to the information provided in the Substitute W9 sections.
Under the penalties of perjury, I certify that:

- The number shown below is my correct taxpayer identification number.

  Social Security number or Tax Identification number _752989890_

- I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service that I am subject as a result of a failure to report all taxable income, including all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding. *(You must cross out this item if you have failed to report all interest and dividends on your tax report.)*

- I am a U.S. person *(including a U.S. resident alien)*.

Signature of new owner _____ Title _____ Date _____

_Carl Forsythe_
Print Name

# ⋔ Lincoln
## Financial Group®

*Life Ownership Change Form*

Personal Service Center
P.O. Box 5048 MIR1
Hartford  CT  06102-5048
Fax number  860 466-2835

| General Information | |
|---|---|
| Policy number **G1637194** | Issued by (the Company) **ING Life** |
| Insured's name **Richard C. Somerville** | |
| Social security number **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** | |
| Policy Owner's name **Globe Rubber Works, Inc.** | |
| Social security number/Tax ID # **74-2922722** | |
| Policy Owner's address **254 Beech St.** | |
| City, State, ZIP **Rockland, MA 02370** | |
| Policy Owner's phone no. **781-871-3702** | E-mail address |

## New Owner Designation

*An ownership change does not change existing beneficiary designations. To change your beneficiary, please submit a Lincoln Beneficiary Change Form.*

*The signature of all owners will be required to exercise any contractual rights under the policy.*

*Please change the Owner of the policy listed above to (Select Only One): Complete by typewriter or print in ink.*

☐ The Insured. (If more than one insured, designation assumes jointly with right of survivorship arrangement.)

☐ To one person during his or her lifetime and thereafter the Insured

_____        _____
Name                                              Date of Birth

☐ To one person absolutely, his or her estate

_____        _____
Name                                              Date of Birth

To multiple owners (**check one**):  ☐ Joint with Right of Survivorship  ☐ Tenants-in-common*

*If tenant-in-common, specify shares, if not specified we will assume equal shares.*

To a (**check one**) ☐ Corporation  ☐ Partnership  ☒ LLC  or  ☐ Other (*specify*)

**Globe Composite Solutions, LTD          Rockland          MA**
Legal name                                        City                    State

☐ To a trustee or successor trustee under a formal trust agreement

_____
Name of Trustee(s)

_____
Name of Trust

_____
City, State                              Date of Trust

I/We hereby certify that the Trustee(s) named are the Trustee(s) for the named Trust, which is in full force and effect. The Company shall not be obligated to inquire into the terms of any trust agreement affecting this policy and shall not be chargeable with knowledge of the terms thereof. The Company may rely solely upon the signature(s) of the Trustee(s) named to any receipt, release or waiver, or to any transfer or other instrument affecting this policy or any options privileges or benefits thereunder. Unless otherwise indicated the signature(s) of all Trustee(s) named, or their successors, will be required to exercise any contractual right under the policy. The Company shall have no obligation to see to the use or application of any funds paid to the Trustee(s) in accordance with the terms of the policy. Any such payment made by the Company to the Trustee(s) shall fully discharge the Company with respect to any amounts so paid.

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Form 32513  06/02

Page 1 of 2

RECEIVED TIME  FEB. 16.  5:08PM

**Agreements and Signatures**

*This section must be completed by the current policy owner.*

*Title required if a corporation, partnership or trust.*

*\*Two officer signatures are required for corporate owned policies.*

By signing below, you, the policy owner, certify that you have read this request and understand that it is subject to the provisions and conditions of the policies listed. You also certify that the policies are not assigned to any other person or corporation, except where otherwise noted on this request, and that no proceedings of bankruptcy or insolvency have been filed or are currently pending against you. We reserve the right to require additional information as needed.

Signed at  Rockland  MA             on  2/15/05
          City and State                   Date

Richard C. Somerville          x_Richard Somerville_  President
Current Owner (full name)        Signature            Title*

Paul Slaney                    x_____        Controller
Current Owner (full name)        Signature            Title*

_____        Title
Assignee, Irrevocable Beneficiary or other interested party (name and signature)   Date
        Owner

**Community property release** - This section is applicable for community property states (AZ, CA, ID, LA, NV, NM, TX and WA). Determination of Community Property status depends on the current or former resident state of the policy owner.
By signing below, you the spouse/former spouse agree to the changes indicated above and:

☐ You give up your rights to this policy according to the community property laws in your state.

☐ You do not give up your rights to this policy.

Spouse's Signature                              Date

Name (print or type)

---

**New Owner Information**

**THIS SECTION MUST BE COMPLETED BY THE NEW OWNER**

Policy Owner's address  254 Beech St.

City, State, ZIP  Rockland  MA  02370

**Taxpayer Identification Number and Certification Substitute W-9**

*This is an IRS requirement.*

By signing below, you certify that the information provided is complete and accurate as shown. You also certify that you have read, understand and agree to the information provided in the Substitute W9 sections.
Under the penalties of perjury, I certify that:

- The number shown below is my correct taxpayer identification number.

  Social Security number or Tax Identification number  752989890

- I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service that I am subject as a result of a failure to report all taxable income, including all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding. *(You must cross out this item if you have failed to report all interest and dividends on your tax report.)*

- I am a U.S. person *(including a U.S. resident alien)*.

Signature of new owner                 CEO          2/15/05
                                       Title         Date

Carl Forsythe
Print Name                                      Page 2 of 2

# EXHIBIT G

FEB-17-2005  10:24        781 893 7509                    781 893 7509    P.02/03
                                                          2/18/059:42A
                                                          015998000272
                                              **Change of Ownership**

 **AMERICAN GENERAL**

**American General Life Insurance Company (AGL),**
☐ Fixed Life Service Center • P. O. Box 4373, Houston, TX 77210-4373
☐ Variable Life Service Center • P. O. Box 4880, Houston, TX 77210-4880
Member of American International Group, Inc.
Instructions for completing this form are listed on the back. Please reference your contract for availability of certain requests.

| 1. CONTRACT IDENTIFICATION | CONTRACT No.: *U1000522OL* |
|---|---|
| | OWNER: *Globe Rubber Works, Inc.*  SSN/TIN OR EIN: *74-2922722* |
| ☐ Check Here if New Address | ADDRESS: *254 Beech St.*  PHONE No.: *781-871-3702* |
| | *Rockland, MA 02370* |
| | EMAIL ADDRESS (optional): |
| | INSURED/ANNUITANT (if other than Owner): *Richard Somerville* |

| 2. NEW OWNER(S) A. PRIMARY | NEW OWNER'S NAME: *Globe Composite Solutions, LTD* |
|---|---|
| | SSN/TIN OR EIN: *752989890* |
| | Address: *254 Beech St.* |
| | *Rockland, MA 02370* |
| | Phone No.: *781-871-3702* |
| B. CONTINGENT | NEW OWNER'S NAME: |
| | SSN/TIN OR EIN: |
| | Address: |
| | Phone No.: |

3. **SIGN HERE FOR ABOVE REQUEST**

The Company is requested and directed to recognize that the present owner(s) of the Contract has hereby designated the new owner(s) (the "Owner") of the Contract. The Owner designated above shall have sole ownership and control of the Contract during the lifetime of the Insured/Annuitant and shall be entitled to all ownership rights. See back for details.

**Under penalties of perjury, I certify that:**
1. The number shown on this form is my correct taxpayer identification number, and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to back-up withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.
The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

Signature of Current Owner    Date *2/14/05*    Signature of New Owner    Date *2/14/05*

Signature of Current Co-owner    Date        Signature of New Co-owner    Date
(or other party having interest in contract)    (or other party having interest in contract)

**RETURN COMPLETED FORM TO THE ADDRESS OF THE COMPANY CHECKED ABOVE.**

AGLC 0013 Rev0403                                              Page 1 of 2

FEB 17 2005 10:43                    781 893 7509        PAGE.02

# EXHIBIT H





**Globe Composite Solutions**
254 Beech Street
Rockland, MA 02370
781-871-3700
781-871-6631 (fax)



To: Elonie Smith          From: Roger Tessnaolt

Fax: 860-466-2835        Pages: 2

Phone:                   Date: 3/30/05

Re: Policy G1639194      CC:

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Elonie,
Copy of signed letter from Richard Somerville.
Please let me know if all paperwork is complete.

Thanks

Roger

The information contained in this FACSIMILE is CONFIDENTIAL.  This FACSIMILE is intended to be reviewed initially by only the individual named above.  If the reader of the TRANSMITTAL PAGE is not the intended recipient or representative of the intended recipient specifically authorized to review this information on this FACSIMILE, you are hereby notified that any review, dissemination or copying of this FACSIMILE or the information contained herein is prohibited.  If you have received this FACSIMILE in error, please immediately notify GLOBE COMPOSITE SOLUTIONS by telephone and return this FACSIMILE to GLOBE COMPOSITE SOLUTIONS at the above address by mail.

RECEIVED TIME  MAR. 30.  4:49PM        PRINT TIME  MAR. 31.  6:28AM



**GRW**
GLOBE RUBBER WORKS, INC.
254 Beech Street
Rockland, Massachusetts
02370-0183
USA

Pioneers in Formulating
The Non-Metallic Age...Est. 1890

781-871-3700
Fax 781-871-6631

Ms. Elonie Smith
Client Service Center, MIR1
The Lincoln National Life Insurance Company
Post Office Box 5048
Hartford, CT 06102

      Re:    Beneficiary Change
            Policy/Certificate No: G1637194
            Insured: Richard C. Somerville

Dear Ms. Smith:

      Pursuant to your letter dated March 10, 2005, I have attached the Annual Report that was filed with the Commonwealth of Massachusetts as evidence that I, Richard C. Somerville, was the sole Owner/Officer of Globe Rubber Works, Inc.

Very truly yours,

Richard C. Somerville
Globe Rubber Works, Inc.

# EXHIBIT I

# Banknorth, N.A.
## Massachusetts

STATEMENT OF ACCOUNT

GLOBE COMPOSITE SOLUTIONS LTD
254 BEECH ST
ROCKLAND MA 02370-0183

Page:                                   14 of  36
Statement Period:  Oct 01 2004-Oct 31 2004
Cust Ref #:            8242224933-702-I-***
Primary Account #:              824-2224933



#915    10/06    $476.00

#917    10/06    $7,959.92

#919    10/06    $4,736.72







#921    10/06    $405.00

#925    10/07    $1,982.72



#916    10/12    $977.75

#918    10/04    $179.54



#920    10/07    $5,865.00



#923    10/04    $97.84



#926    10/07    $589.90

**Banknorth, N.A.**
Massachusetts

GLOBE COMPOSITE SOLUTIONS LTD

STATEMENT OF ACCOUNT

Page:                                  11 of 33
Statement Period: Jun 01 2005-Jun 30 2005
Cust Ref #:              8242224933-702-I-***
Primary Account #:              824-2224933



#2221    6/22    $4,736.72

#2545    6/02    $285.00

#2568    6/09    $1,764.15

#2579    6/01    $2,110.30



#2594    6/01    $684.03



#2543    6/01    $5,741.10

#2558    6/01    $4,073.78



#2574    6/01    $1,034.25

#2580    6/01    $1,519.00



#2601    6/02    $14,551.44

**Banknorth, N.A.**
Massachusetts

GLOBE COMPOSITE SOLUTIONS LTD
254 BEECH ST
ROCKLAND MA  02370-0183

Page:                                14 of  27
Statement Period: Sep 01 2004-Sep 30 2004
Cust Ref #:              8242224933-702-I-***
Primary Account #:              824-2224933



#664      9/07      $2,643.17

#666      9/01      $1,480.79

#668      9/01      $720.00

#670      9/01      $346.66

#672      9/01      $1,874.84



#665      9/02      $975.00

#667      9/01      $2,939.77

#669      9/01      $4,544.62

#671      9/15      $500.00

#673      9/03      $72.66

# Banknorth, N.A.
Massachusetts

GLOBE COMPOSITE SOLUTIONS LTD

Page:                                16 of 31
Statement Period: Mar 01 2005-Mar 31 2005
Cust Ref #:             8242224933-702-I-***
Primary Account #:          824-2224933



#2088    3/04    $423.53

#2091    3/10    $1,954.00

#2093    3/07    $3,872.23

#2095    3/14    $570.00

#2097    3/10    $873.01



#2089    3/04    $1,163.75

#2092    3/09    $4,544.62

#2094    3/08    $2,632.20

#2096    3/08    $280.58

#2098    3/09    $215.25

# EXHIBIT J

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GLOBE COMPOSITE SOLUTIONS, LTD.<br>F/K/A KALM-FORSYTHE GLOBAL<br>INNOVATIONS, LTD.<br><br>*Plaintiff,*<br><br>v.<br><br>ANNE ROCHE-SOMERVILLE, individually<br>and in her capacity as Executrix of the Estate of<br>Richard C. Somerville, and<br>SOLAR CONSTRUCTION, INC., INC. F/K/A<br>GLOBE RUBBER WORKS, INC.<br><br>*Defendants.* | Civil Action No. 05-10323DPW |

## AFFIDAVIT OF CARL FORSYTHE

I, Carl Forsythe, hereby depose and state:

1.  I am one of the founders of Kalm Forsythe Global Innovations, Ltd and the Chief

    Executive Officer and President of Globe Composite Solutions, Ltd. (Globe Composite)

    and I have personal knowledge of the matters set forth herein.

2.  I have a Masters in Business from Cornell University in Finance and successfully passed

    my CPA exam. I was involved in finance and/or banking activities, including several

    acquisitions and sales, from 1982 until 1999.

3.  Globe Composite paid all of the premiums on the Lincoln Financial Group and

    American General Life Insurance policies insuring the life of Richard C. Somerville after

the asset acquisition in August 2004. Globe Composite treated the premium payments as ordinary expenses. If Solar or Somerville owned the policies, any premium payments made by Globe Composite would have been treated as ordinary income to Somerville in 2004 and 2005. This was not the case. Globe did not issue Somerville any W-2 for these premium payments in 2004 and 2005, nor was it requested by him or his estate

Signed under the pains of perjury this 21st day of November, 2006.

Carl W. Forsythe

# EXHIBIT K

Exhibit:  168                Volume 1, Pages 1 - 67

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Docket No. 0510323DPW

- - - - - - - - - - - - - - - - - - - - - - - - - - -

GLOBE COMPOSITE SOLUTIONS, LTD,

f/k/a  KALM-FORSYTHE GLOBAL INNOVATIONS, LTD

Plaintiffs

vs.

RICHARD C. SOMERVILLE, ANNE ROCHE-SOMERVILLE,

and SOLAR CONSTRUCTION, INC., f/k/a GLOBE RUBBER

WORKS, INC.

Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF WILLIAM R. RODGERS

Thursday, June 22, 2006, 2:14 p.m.

Lawson & Weitzen, LLP

88 Black Falcon Avenue

Boston, Massachusetts

- - - - - - - Reporter:  David A. Arsenault, RPR - - - - - - -

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404   fax 617.728.4403

2 (Pages 2 to 5)

## William R. Rodgers
## Volume 1 - June 22, 2006

2

1  APPEARANCES:
2
3  Lawson & Weitzen, LLP
4      Evan T. Lawson, Esq.
5      Clare B. Burhoe, Esq.
6      88 Black Falcon Avenue, Suite 345
7      Boston, Massachusetts 02210
8      617.439.4990  fax: 617.439.3917
9      elawson@lawson-weitzen.com
10     cburhoe@lawson-weitzen.com
11     for Plaintiff
12
13  Tarlow, Breed, Hart & Rodgers, P.C.
14     Mark S. Furman, Esq.
15     Jennifer C. Roman, Esq.
16     101 Huntington Avenue
17     Boston, Massachusetts 02199
18     617.218.2000  fax: 617.261.7673
19     mfurman@tbhr-law.com
20     jroman@tbhr-law.com
21     for Defendants
22
23  ALSO PRESENT:  Carl Forsythe
24

3

1          PROCEEDINGS - 2:14 p.m.
2          MR. LAWSON:  Objections, except as to
3  form and motions to strike, reserved.
4          MR. FURMAN:  Yes.
5          MR. LAWSON:  Read and sign but no
6  notary, right?
7          MR. FURMAN:  Yes.
8          ------------------------
9          WILLIAM R. RODGERS, sworn
10         ------------------------
11         EXAMINATION
12  BY MR. LAWSON:
13     Q.  Good afternoon, Mr. Rodgers.
14     A.  Hello, Mr. Lawson.
15     Q.  Would you identify yourself, please.
16     A.  I'm Bill Rodgers.
17     Q.  What's your occupation?
18     A.  I practice law.
19     Q.  What's the name under which you practice?
20     A.  Tarlow Breed Hart & Rodgers.
21     Q.  How long have you been an attorney?
22     A.  Since 1982.
23     Q.  Where are you admitted?
24     A.  Massachusetts and New York.

4

1     Q.  When were you first admitted in
2  Massachusetts, in '82?
3     A.  I don't remember which state was first.
4  They were both in '82.
5     Q.  Have you been with Tarlow Breed the entire
6  time?
7     A.  No.  We were formed in '91.
8     Q.  Before Tarlow Breed, where did you work?
9     A.  Bradley, Barry & Tarlow.
10    Q.  Is there an area of the law that you
11  concentrate in?
12    A.  I'm a business lawyer.
13    Q.  Did you represent Globe Rubber Works in
14  connection with the acquisition of its assets by
15  Kalm-Forsythe?
16    A.  No.  I think I misspoke there.
17    Q.  Let me show you what was marked as
18  an exhibit at Mr. Fasnacht's deposition.  An
19  agreement bearing Bates number 0000001 through
20  0000100.  I'll ask you if you are familiar with that
21  document.
22    A.  Other than the introductory pages, the
23  agreement behind it appears to be the document that
24  I was governing the transaction I was involved with.

5

1     Q.  Who did you represent in connection with
2  that?
3     A.  Globe Rubber Works and the Somervilles.
4     Q.  Prior to representing Globe Rubber Works
5  and the Somervilles in connection with the
6  transaction reflected in Exhibit 2 of Mr. Fasnacht's
7  deposition, did you represent any of the Somervilles
8  or Globe Rubber Works in connection with any other
9  legal matters?
10    A.  I was engaged to assist them in the
11  transaction in its various forms with Kalm-Forsythe,
12  KFGI, and in a period of time I might have touched
13  on an unrelated matter or two.
14    Q.  Were you engaged to represent all three of
15  them at the same time?
16    A.  I viewed it that way.
17    Q.  And before that engagement, had you
18  represented any one of them?
19    A.  No.
20    Q.  Did you know the Somervilles before that
21  engagement?
22    A.  I did not.
23    Q.  And how did you get introduced to the
24  Somervilles?

William R. Rodgers
Volume 1 - June 22, 2006

**Page 6**

1    A. Roger Fasnacht.
2    **Q. Did you know Roger Fasnacht before the**
3    **engagement?**
4    A. I did.
5    **Q. How long had you known him?**
6    A. I'm not precisely sure. I would say I
7    think I first met him in approximately 1995.
8    **Q. Do you remember the context in which you**
9    **met him?**
10   A. He was working for another company which I
11   represented.
12   **Q. Which company was that?**
13   A. Critech, C r i t e c h.
14   **Q. Did you represent Mr. Fasnacht?**
15   A. No.
16   **Q. Have you ever represented Mr. Fasnacht?**
17   A. No.
18   **Q. Has Mr. Fasnacht --**
19   A. I should say, for the avoidance of doubt,
20   he might have ask me a question or two along way
21   that might have legal implications with his
22   consulting practice, and so forth. I never formally
23   represented him.
24   **Q. How would you characterize your**

**Page 7**

1    **relationship with Mr. Fasnacht?**
2           MR. FURMAN: When?
3           MR. LAWSON: During the period of '95
4    really to the present.
5    A. At first he was working for a client
6    selling for him professionally. I came to
7    understand that he liked to play golf. So did I.
8    For a period of time he asked me if I would join him
9    and another coworker of his at a company he came to
10   work with that was somehow affiliated with Critech
11   and to play golf. For a season or two I joined them
12   on Sunday mornings for a round of golf.
13   **Q. During what period of time would that have**
14   **been?**
15   A. I would say that was probably '96-'97,
16   thereabouts.
17   **Q. In that time frame?**
18   A. Probably pre-2000. '99, '98, two seasons.
19   It got a bit much getting up that early and going
20   that far. Then I didn't have very much interaction
21   with him until he called in reference to this
22   transaction in 2003.
23   **Q. Do you recall approximately when he called**
24   **in 2003?**

**Page 8**

1    A. January, February; February, March; the
2    beginning of 2003.
3    **Q. Did you, prior to being deposed today,**
4    **review your records as far as timing?**
5    A. Yes.
6    **Q. What sort of records did you look through?**
7    A. I looked through my file on this
8    transaction.
9    **Q. Did you look at any calendar records,**
10   **datebook, computer calendar, something of that sort?**
11   A. I didn't look at my datebook. If I thought
12   of it, I would have.
13   **Q. Is that it? Did you look at anything else,**
14   **email, letters?**
15   A. I looked at emails. As I said, I looked
16   through my files. It had the correspondence clip.
17   **Q. Are you referring to the file that is kept**
18   **at your law firm?**
19   A. Yes.
20   **Q. Had Mr. Fasnacht referred any other**
21   **potential clients to you before 2003?**
22   A. I did some work for his wife's company. I
23   don't know if she did that on her own initiative or
24   it was a referral.

**Page 9**

1    **Q. Did you have any social interactions with**
2    **Mr. Fasnacht, such as going out to dinner or**
3    **visiting his home, things of that sort?**
4    A. I never visited his home. We went out to
5    dinner with Roger and his wife and the other fellow
6    I referred to and his wife that we played golf with.
7    At the end of the first golfing season we had a
8    dinner in town. I think that's the extent of the
9    social interactions that we have had.
10   **Q. At the time that Mr. Fasnacht called you**
11   **about Globe Rubber Works, was he employed there?**
12   A. I think he was consulting.
13   **Q. What was the purpose for which you were**
14   **engaged?**
15   A. To advise the company and the Somervilles
16   with a proposal to undertake a business transaction
17   with Mr. Forsythe's company.
18   **Q. Was that an hourly rate matter?**
19   A. Yes, it was.
20   **Q. Did you keep time records?**
21   A. Yes.
22   **Q. What was the method that you had for**
23   **keeping time records?**
24   A. I would write them down on a timesheet,

4 (Pages 10 to 13)

William R. Rodgers
Volume 1 - June 22, 2006

---

**10**

1  elapsed time.
2  **Q. What was your procedure for translating**
3  **what you put on the timesheet into a billing record?**
4  A. My assistant would enter my timesheet.
5  **Q. Into a computer program?**
6  A. Yes.
7  **Q. Can you tell us the name of the time system**
8  **you used?**
9  A. I think it is called Elite. We have had a
10  couple of them over the years. I think it is the
11  Elite system.
12  **Q. From the time that you started working on**
13  **anything having to do with Globe Rubber Works until**
14  **the time that you stopped working on anything having**
15  **to do with Globe Rubber Works, did you have the same**
16  **timekeeping system?**
17  A. I think so.
18  **Q. And is this time system capable of printing**
19  **a report that would show all of the entries for your**
20  **time on Globe Rubber Works?**
21  A. Yes.
22  **Q. And did you customarily record all the time**
23  **that you spent working for Globe Rubber Works?**
24  A. I probably didn't bill all my time that I

---

**11**

1  worked on Globe Rubber Works.
2  **Q. You mean you didn't record it?**
3  A. Right.
4  **Q. What would be your criteria for not**
5  **recording time?**
6  A. A rule of reason.
7  **Q. Can you amplify what you mean by a rule of**
8  **reason? How did you determine which time was**
9  **billable and which time were you choosing not to**
10  **bill?**
11  A. Fundamentally it is a value proposition.
12  **Q. Would it be fair to say that you would not**
13  **record a time that you felt was not providing any**
14  **value to the client?**
15  A. As I perceived it, yes.
16  **Q. If you had meetings with the client, did**
17  **you record the time for all your meetings with the**
18  **client?**
19  A. I would think so.
20  **Q. If you had meetings that involved the**
21  **client --**
22  A. Excuse me. If the word "all" was in your
23  question, I might not have recorded all the time but
24  I would have recorded the meeting.

---

**12**

1  **Q. And if there were meetings involving**
2  **yourself and the client and representatives of KFGI,**
3  **would you have recorded those meetings?**
4  A. I would have.
5  **Q. Are those records still accessible? Are**
6  **the time records relating to your representation of**
7  **Globe Rubber Works still accessible?**
8  A. Available. Accessible. If it means the
9  same. I suspect we have hard copies and I think you
10  can access electronic.
11  **Q. I understand that you are an attorney. Do**
12  **you have any specialized education in finance or**
13  **accounting?**
14  A. In the course of my studies I've taken
15  courses in both subjects.
16  **Q. Do you have an MBA?**
17  A. I do not.
18  **Q. What was your undergraduate degree?**
19  A. Economics.
20  **Q. Did you provide any legal services to Globe**
21  **Rubber Works after its name was changed to Solar**
22  **Construction?**
23  A. Yes.
24  **Q. And did you provide any legal services to**

---

**13**

1  **Solar Construction that's unrelated to the present**
2  **litigation that we are taking your deposition in?**
3  A. At what time period?
4  **Q. Any time after the name change?**
5  A. Other than the present litigation and the
6  transaction with Mr. Forsythe?
7  **Q. Right.**
8  A. And the probate of the Forsythe-Somerville
9  estate, no.
10  **Q. Did you or -- did your firm effectuate the**
11  **name change?**
12  A. Yes.
13  **Q. Did you do that yourself?**
14  A. Probably not.
15  **Q. And once Solar Construction was the name of**
16  **Globe Rubber Works, did you work on any leases or**
17  **other agreements on behalf of Solar Construction?**
18  A. I don't think so.
19  **Q. Did you provide any legal services to**
20  **Richard Somerville that were separate from services**
21  **in connection with the acquisition of Globe Rubber**
22  **Works?**
23  A. And this litigation?
24  **Q. Yes.**

---

FARMER ARSENAULT BROCK LLC

William R. Rodgers
Volume 1 - June 22, 2006

14

1    A. Separate from the two?
2    Q. Yes.
3    A. I don't think so, no.
4    Q. Did you provide any legal services to Anne
5    Somerville that were separate from the acquisition
6    and this litigation?
7    A. And the filing of his death certificate in
8    the probate of his affairs?  Is that within your
9    exception?  The answer is yes.
10   Q. That would be the probate of Richard
11   Somerville's estate?
12   A. Yes.  We might have undertaken some estate
13   planning work before his death.  I wasn't involved
14   with that.  One of my partners would have been.  I
15   don't think there was much traction gained before he
16   died.
17   Q. Did you provide any legal services to Solar
18   Construction in connection with the Schuster
19   litigation?
20        MR. FURMAN:  Him personally?
21        MR. LAWSON:  Him personally.
22   A. I'm glad you asked that.  Yes, I did.  I
23   would like to adjust my answers before accordingly.
24   I sort of thought of that in connection with this.

15

1    There are a lot of cross-claims.  I sort of lump it
2    together as one big mess.
3    Q. We all lump it together as one big mess.
4    Going back to your initial engagement,
5    what was the first subject matter of work that you
6    did for Globe Rubber Works?
7    A. It related to advising them relative to a
8    proposal by which Mr. Forsythe would buy into the
9    company, or his entity.
10   Q. Was there a letter of intent?
11   A. Eventually.
12   Q. Did you participate in the negotiation of
13   the letter of intent?
14   A. I did.
15   Q. Who was representing KFGI in connection
16   with the letter of intent?
17   A. To the best of my knowledge, no one.
18   Q. So you dealt directly with people who you
19   thought were part of KFGI?
20   A. Mostly the exchanges took place between
21   Roger and Dick on the one hand, and Carl Forsythe on
22   the other.  There were meetings that I attended
23   where Mr. Forsythe was present.  But his lawyer in
24   the transaction, if I recall correctly, introduced

16

1    himself to me after the letter of intent was signed.
2    I'm not precisely sure on that time line element.
3    Q. Do you know who drafted the letter of
4    intent?
5    A. What is it?  There were many back and forth
6    iterations of that that would defy a claim of
7    authorship by any one person.
8    Q. Do you remember who prepared the first
9    iteration?
10   A. Even that I don't.  The deal changed so
11   many times.  There were many competing proposals.
12   Q. Is the document that I showed you, Exhibit
13   2 of Mr. Fasnacht's deposition, the written
14   expression of the final deal, the ultimate deal?
15   A. It appears to be the agreement for the
16   final deal, yes.
17   Q. Can you summarize for us the evolution of
18   the deal, as you understood it, from the time --
19        MR. FURMAN:  Could you just clarify
20   whether you're asking him whether this is all of the
21   documents from the closing?
22        MR. LAWSON:  I didn't ask him that.  I
23   asked him if that was, reflected the ultimate deal.
24        MR. FURMAN:  Okay.

17

1    A. I think the answer is that it reflects part
2    of the ultimate deal, because it is an incomplete --
3    it is but a portion of the transactional documents.
4    Q. What other transactional documents are you
5    referring to?
6    A. There were assignments, there were bills of
7    sale, there were employment agreements, there were
8    escrow agreements, and so forth and so on, which
9    appear to be listed on the first couple of pages of
10   that binder which you showed me, which I hadn't seen
11   before, but it looked like a table of contents from
12   a binder prepared by the buyer's counsel.
13        MR. LAWSON:  I'm getting off my track,
14   but Claire will help me get back on it.
15   Q. Let me show you what was marked as Exhibit
16   11 from Mr. Fasnacht's deposition.  Have you seen
17   that document before?
18   A. It appears to be the employment agreement
19   signed at the closing.
20   Q. Was that one of the other documents that
21   you were referring to in your earlier answer that
22   was part of the deal?
23   A. Yes, it was one of the other documents.
24        (Discussion off the record.)

6 (Pages 18 to 21)

William R. Rodgers
Volume 1 - June 22, 2006

18

1      MR. LAWSON:  Can you tell me which one
2  is marked which?
3      MR. FURMAN:  According to my records,
4  the 400,000 is Exhibit 109.  110 is the $200,000
5  note and 111 is the 150,000 note.
6      MS. BURHOE:  They are from Roger's
7  deposition.
8      MR. LAWSON:  Can we agree that the
9  document that bears Bates numbers 302 to 323 was
10  marked as Exhibit 109 at Roger Fasnacht's
11  deposition.
12      MR. FURMAN:  My copies don't have Bates
13  numbers.
14      MS. ROMAN:  You have the originals right
15  there.
16      (Discussion off the record.)
17      MR. LAWSON:  Let's start all over again.
18      **Q.  I'm going to show you documents that were**
19  **marked at Roger Fasnacht's deposition as Exhibit**
20  **109, 110, 111 and ask you if you are familiar with**
21  **that.**
22      A.  They appear to be copies of the notes
23  executed at the closing.
24      **Q.  Were those additional documents that you**

19

1  **were referring to documents as part of the**
2  **transaction?**
3      A.  They were included among them, yes.
4      **Q.  I'd like you to go back to the time of your**
5  **original engagement, and going forward until the**
6  **time of the execution of the agreement that was**
7  **marked as Exhibit 2 at Mr. Fasnacht's deposition and**
8  **describe for us in a general way how the deal**
9  **evolved or changed from where it was when you first**
10  **got into it until the time that it was finally**
11  **consummated.**
12      A.  As I remember, the agreement was initially
13  a proposal for Mr. Forsythe to buy into the company
14  in installments over time.  It evolved into, at some
15  point there were some discussions, if I recall
16  correctly, about merging the companies.  There was a
17  proposal for it to be a stock deal.  Mr. Forsythe
18  didn't like that and wanted it to be an asset deal.
19  And then Mr. Forsythe didn't like that and it went
20  back to being a stock deal.  And then Mr. Forsythe
21  came to dislike that and it went back to being an
22  asset deal.  The price seemed to fall over time.
23      **Q.  Would that be the major evolutionary**
24  **changes?**

20

1      A.  That's my response to your question of
2  describing in an overview time how this happened to
3  pass.
4      **Q.  When in this evolutionary process did this**
5  **letter of intent get prepared and signed?**
6      A.  I think the letter of intent was signed in
7  the fall of '03 and the deal closed in August of
8  '04.  There were changes to the deal and its
9  structure.  It was constantly changing through
10  closing.  I'm not sure how closely the final deal is
11  relative to what was described in the letter of
12  intent.
13      **Q.  Do you remember whether the letter of**
14  **intent was for an asset purchase or a stock purchase**
15  **or a merger or partial buy-in?**
16      A.  I think it was for a stock purchase, if I
17  recall correctly.
18      **Q.  Let me show you what's been marked as**
19  **Exhibit 1 at Mr. Fasnacht's deposition and ask you**
20  **if you can identify that.**
21      A.  I don't recall if this is the letter of
22  intent as signed.
23      **Q.  Did you hear us both discussing the fact**
24  **that neither side seems to have been able to find**

21

1  the signed copy of the letter of intent?
2      A.  I heard that, yes.
3      **Q.  Did you yourself look for a signed copy of**
4  **the letter of intent ever?**
5      A.  Ever?
6      **Q.  Ever.**
7      A.  Probably.
8      **Q.  Are you aware of the existence of any**
9  **signed copy of the letter of intent?**
10      A.  I have no actual present knowledge of there
11  being one, but I would have thought there is one.  I
12  would have thought there was one, because it would
13  have been the road map for the preparation of the
14  first drafts of the documents.
15      **Q.  Were there drafts prepared for deals that**
16  **were different from the ultimate deal reflected in**
17  **Fasnacht 2?**
18      A.  I haven't read -- which is Fasnacht 2?
19      **Q.  That's the acquisition agreement.**
20      A.  Would you repeat the question.
21      MR. FURMAN:  Without exhibits.
22      **Q.  Were there agreements prepared to reflect**
23  **the earlier types of deals that you told us there**
24  **were?**

FARMER ARSENAULT BROCK LLC

William R. Rodgers
Volume 1 - June 22, 2006

22

1     A. There were.
2     **Q. And who drafted that?**
3     A. Winstead Seacrest of Dallas.
4     **Q. You had some editorial input?**
5     A. Yes.
6     **Q. I think you told us the deal kept changing**
7  **right up to the closing?**
8     A. Yes.
9     **Q. Was there an actual physical closing that**
10  **took place for this deal where everyone sat in the**
11  **room and exchanged papers?**
12     A. Mr. Forsythe and Mr. Somerville came to our
13  office to sign closing papers with the expectation
14  that it would be a closing, but as I understand it,
15  Mr. Forsythe couldn't close his financing for
16  another two weeks or so so it was an unusually
17  extended closing.
18     **Q. Do you remember the date on which**
19  **Mr. Forsythe came to your office?**
20     A. I think it was August 3rd.
21     **Q. And then the actual official closing**
22  **happened when the financing was complete?**
23       MR. FURMAN: Objection; calls for a
24  legal conclusion.

23

1       You can answer.
2     A. I'm not sure when --
3     **Q. I'll rephrase it even though I don't think**
4  **it is a very persuasive objection, but it points out**
5  **to me that's not really what I want to ask.**
6       **Did Mr. Forsythe and Mr. Somerville and**
7  **Anne Somerville sign Exhibit 2 on August 3rd and**
8  **then did everyone wait until the financing was**
9  **complete and the funds transferred sometime**
10  **thereafter?**
11       MR. FURMAN: Could you read back the
12  question, please.
13       (Question read by the reporter.)
14     A. I don't think so.
15     **Q. How did the delay in the financing affect**
16  **the formalization of the transaction?**
17     A. Well, I answered the way I did because I
18  don't think Anne Forsythe -- Anne Somerville signed.
19       MR. LAWSON: I'm not sure nobody would
20  be happy with that marriage.
21     **Q. So Anne Somerville was not a shareholder in**
22  **Globe Rubber?**
23     A. To my knowledge, she was not.
24     **Q. Was a part of the deal a requirement that**

24

1  she sign any document?  It is not a trick question.
2  **Let me point out to you that there's a reference to**
3  **a noncompetition agreement between KFGI and Anne**
4  **Somerville that's Exhibit P in the table of contents**
5  **for Fasnacht 2.  So did Mrs. Somerville sign such an**
6  **agreement as part of the transaction?**
7     A. I think she did.
8     **Q. And did she do it on August 3rd?**
9     A. I don't remember.  I didn't supervise the
10  execution of the documents.
11     **Q. Okay.  You weren't there when they were**
12  **signed?**
13     A. I was in the office, but our paralegal
14  conducted the signing exercise.
15     **Q. At the time that the signing exercise took**
16  **place, did you know that it would take some time**
17  **before the funds would be transferred?**
18     A. It was my expectation we would sign up when
19  we did, and the bank closing was to follow in the
20  next day or two.
21     **Q. Is that what happened?**
22     A. No.
23     **Q. What happened?**
24     A. It appeared that Mr. Forsythe had not

25

1  sequenced the availability of funds to buy -- hadn't
2  sufficiently coordinated his funding for the
3  purchase.
4     **Q. So what provision was made to deal with the**
5  **fact that the documents had been signed but the**
6  **money wasn't available?**
7     A. It was agreed with counsel that the
8  documents would be deemed in escrow.
9     **Q. Who held them?**
10     A. We did.
11     **Q. Was that escrow agreement reduced to**
12  **writing?**
13     A. No.  Other than perhaps -- excuse me.  Not
14  in a formal escrow agreement.  But I believe we
15  transmitted copies of the signature pages to Dallas
16  counsel under a fax or a notation of some manner
17  that the signature pages were being held in escrow
18  or the documents were being held in escrow pending
19  completion or a party saying we have had it, we are
20  not going through.
21     **Q. Did you receive any written acknowledgment**
22  **from Dallas counsel that that was the case?**
23     A. I don't recall, but it was clearly
24  understood and agreed.

8 (Pages 26 to 29)

William R. Rodgers
Volume 1 - June 22, 2006

26

1    Q. How would you characterize your working
2 relationship with Dallas counsel as this deal was
3 being put together?
4    A. My relationship? Satisfactory.
5    Q. Did you have any reason to doubt any verbal
6 assurances that Dallas counsel might give you from
7 time to time?
8    A. No.
9    Q. Did you offer them verbal assurances from
10 time to time about aspects of the deal?
11    A. Can you be more specific about verbal
12 assurances?
13    Q. Yes. Sometimes when deals of this
14 complexity are done, there's last-minute details
15 that need to be attended to. If the working
16 relationship is satisfactory, counsel will just take
17 the other counsel's word that we will work that out
18 later. Was this deal that type of situation?
19    A. I think if you look at the closing agenda
20 that Dallas counsel prepared, it was quite thorough
21 and particularly attended to. So those assurances
22 weren't necessary. And I don't believe there were
23 any exchange that I recall at closing relative to
24 post-closing tying up of loose ends, aside from our

27

1 undertaking to get them a complete set of documents.
2    Q. In the period of negotiation leading up to
3 the execution of Fasnacht 2, did you attend meetings
4 with Mr. Forsythe and closing counsel?
5    A. Surely as to one meeting. And I think
6 Mr. Johnson came back a second time.
7    Q. Did you ever attend meetings where
8 Mr. Forsythe was there without counsel?
9    A. Yes.
10    Q. And who from your side of the deal attended
11 those meetings?
12    A. I'm not sure if my colleague Steve
13 Kutenplon ever sat in on parts of any of them. I
14 think my paralegal, Patrick Minnahan might have sat
15 in on parts of them.
16    Q. Did Richard Somerville sit in on some of
17 them?
18    A. Yes. I thought you were asking me if
19 anyone else from my firm sat in on them.
20    Q. I was asking that, but I meant it more
21 generally. Did Richard Somerville participate in
22 most of those meetings?
23    A. Those meetings being the ones where
24 Mr. Johnson and Mr. Forsythe were present?

28

1    Q. Or Mr. Forsythe alone.
2    A. Some but not all.
3    Q. And did Anne Somerville sit in on any of
4 those meetings?
5    A. Some, but not all.
6    Q. Can you tell me approximately how many
7 meetings there were?
8    A. Meetings with Mr. Forsythe and his counsel?
9    Q. Meetings between your side of the deal and
10 some configuration of the other side of the deal.
11    A. At which I was present?
12    Q. Yes, at which you were present.
13    A. A handful is five?
14    Q. Yes. Did Mr. Fasnacht attend any of those
15 meetings?
16    A. Let me back up. What I just answered a
17 handful to was your broader at a moment or subset
18 thereof and their team and subset thereof, not
19 necessarily that Mr. Somerville was present at all
20 of them.
21    Q. Correct.
22    A. There were meetings that Mr. Fasnacht
23 attended, yes.
24    Q. Approximately how much, if you recall?

29

1        MR. FURMAN: At which both sides were
2 otherwise represented?
3        MR. LAWSON: Yes.
4    A. So how many times did Fasnacht attend a
5 meeting at which I was in where someone from
6 Mr. Forsythe side was there?
7    Q. Correct.
8    A. I'd say he was there most of them.
9    Q. And what was -- Mr. Fasnacht's position was
10 a consultant at that time?
11    A. He became an employee of the company along
12 the way. Precisely when, I'm not sure.
13    Q. And do you have a memory as to what
14 Mr. Fasnacht's purpose was for being at the meeting?
15    A. Yes.
16    Q. I should say your understanding of his
17 purpose.
18    A. He was an advisor to the Somervilles.
19    Q. Now, did you also have meetings with
20 Mr. Somerville, Mrs. Somerville and Mr. Fasnacht
21 where no one from the other side was present?
22    A. I did.
23    Q. How frequently did you have those meetings,
24 in other words, meetings of your side of the deal

William R. Rodgers
Volume 1 - June 22, 2006

30

1  that Mr. Fasnacht was present?
2      A. Do meetings include conference calls?
3      Q. Let's stick with meetings and then we will
4  move to conference calls. Physical meetings.
5      A. How many were there?
6      Q. Yeah.
7      A. I don't think I can recall specifically.
8      Q. Have you had occasion to read
9  Mr. Fasnacht's deposition?
10     A. I haven't.
11     Q. Let me read to you from his deposition
12  starting on Page 46:
13     "QUESTION: You got together with
14  Mr. Somerville, Mrs. Somerville and Mr. Rodgers; is
15  that right?
16     "ANSWER: Correct.
17     "QUESTION: How often did you do that?
18     "MR. FURMAN: This is after the LOI was
19  signed?
20     "MR. LAWSON: Right.
21     "ANSWER: I would say as a group maybe
22  over two, three weeks."
23        Does that comport with your memory of
24  meetings?

31

1      A. After the letter of intent was signed, I
2  wouldn't have thought it was quite that frequent.
3      Q. Do you think that your time records would
4  accurately reflect meetings of that sort?
5      A. Yes.
6      Q. Now, was Mrs. Somerville an active
7  participant in these meetings?
8      A. Some meetings she was more active and other
9  meetings she was less active.
10     Q. Did she raise questions?
11     A. She had questions.
12     Q. Did she make suggestions?
13     A. She made suggestions.
14     Q. Were her suggestions heeded?
15     A. Some were.
16     Q. Can you recall -- before we get into that.
17  The promissory notes, Exhibits 109, 110, 111, which
18  probably should be in front of you; would you agree
19  with me that looking at Exhibit 111, which I think
20  is the $150,000 promissory note -- can you take a
21  look at that?
22     A. I was waiting for your question.
23     Q. Would you agree that that note is signed by
24  KalFor Solutions Group, LLC by Carl Forsythe,

32

1  president?
2      A. It was signed by Mr. Forsythe in his
3  capacity as president of KalFor Solutions Group,
4  LLC, evidently acting as a general partner of the
5  partnership itself.
6      Q. Would you agree with me that Mr. Forsythe
7  did not sign that note personally?
8      A. Of course he personally signed it.
9      Q. In an individual capacity?
10     A. Not in an individual capacity.
11     Q. You would agree that he did not sign it in
12  an individual capacity; is that correct?
13     A. Yes, I think so.
14     Q. And if you look at Exhibit 110, would you
15  agree that Mr. Forsythe signed Exhibit 110 in the
16  same fashion as he signed Exhibit 111, that is, as
17  president --
18     A. In his representative capacity?
19     Q. Yes. And he did not sign that note
20  personally in an individual capacity.
21     A. Yes.
22     Q. And if you look at Exhibit 109, does it
23  appear that Mr. Forsythe signed that note both in a
24  representative capacity as president and also in an

33

1  individual capacity?
2      A. Yes.
3      Q. Can you tell us why Mr. Forsythe --
4  withdraw that. How did it come to be that
5  Mr. Forsythe signed Exhibit 109 in an individual
6  capacity?
7      A. It was a condition of closing.
8      Q. And was that reflected in Exhibit Number 2,
9  the agreement?
10     A. No, it wasn't.
11     Q. How did that come to be made a condition of
12  closing?
13     A. Mr. Forsythe was evidently unable to raise
14  adequate capital to effect the purchase, whether
15  from investors or his lenders. The company needed
16  more cash, he argued. His counsel argued that since
17  that $400,000 represented what we refer to as the
18  tax gross-up for the transaction structure he
19  selected, that Mr. Somerville wouldn't need that
20  money right away and would Mr. Somerville be willing
21  to accept his promissory note for a deferred payment
22  of that. And he was willing to do so only if
23  Mr. Forsythe bound himself personally to the payment
24  of that note.

FARMER ARSENAULT BROCK LLC

10 (Pages 34 to 37)

William R. Rodgers
Volume 1 - June 22, 2006

34

```
1        Q.  Was that done, were those discussions
2  face-to-face discussions?
3        A.  I believe they were in a telephone call
4  with his counsel on the line.
5        Q.  Who were the participants in that call?
6        A.  I believe it was -- I believe that Mark
7  Johnson was on that call.  I'm not sure.  I don't
8  presently recall who from the Winstead Seacrest law
9  firm was on that phone.  But I recall and believe
10 that Mr. Hudnall, Mr. Johnson, possibly Grant Adams;
11 Mr. Forsythe and probably Dick and Roger.
12       Q.  So the issue of the $400,000 note was a
13 matter of some significance to your side of the
14 transaction?
15       A.  Yes.
16       Q.  And the issue of whether Mr. Forsythe would
17 personally guarantee that note was an issue of some
18 significance?
19       A.  Yes.
20       Q.  Did you yourself ever ask Mr. Forsythe to
21 personally guarantee that particular note?
22       A.  There were several times in the course of
23 the transactions that I advanced the proposition
24 that Mr. Forsythe should be personally liable on the
```

35

```
1  transaction obligations his company was undertaking.
2        Q.  Did Mr. Forsythe agree to be personally
3  liable?
4        A.  He steadfastly declined to be until the day
5  he agreed to be personally liable on the $400,000
6  note.
7        Q.  What was the proximity in time between that
8  day of agreement and August 3rd?
9        A.  I believe that was on July 30th.
10       Q.  Would your time records reflect those
11 conversations?
12       A.  They would reflect the fact of the
13 conversation.
14       Q.  Not the content?
15       A.  I wouldn't think so.
16       Q.  Did you make notes that reflected the
17 content of the conversation?
18       A.  I did.
19       Q.  Do you still have those notes?
20       A.  I do.
21       Q.  In that conversation, was there discussion
22 about whether Mr. Forsythe would guarantee all of
23 the notes or just one of the notes?  Was that topic
24 discussed in that conversation?
```

36

```
1        A.  It wouldn't surprise me if the broader
2  request was made.
3        Q.  Would it be fair to say that him
4  guaranteeing the $400,000 note was a compromise
5  between your two positions, the two sides'
6  positions?
7             MR. FURMAN:  Objection.
8        Q.  You can answer.
9             MR. FURMAN:  You can answer.
10       A.  Was it a compromise?
11       Q.  Yeah.
12       A.  In the spirit of give and take, I think so.
13 I think that's a compromise, right?
14       Q.  That would be my definition.
15            I think you identified for us some names
16 of other people at Tarlow Breed who worked on this
17 deal beside yourself.  What I would ask you to do is
18 to list for me all the Tarlow Breed people who
19 worked on this deal that ultimately was signed on
20 August 3rd of 2004?
21       A.  To my recollection, there are a number of
22 people involved.  I might not name them all.
23       Q.  The best you can.
24       A.  The minor players.  But I took the lead.
```

37

```
1  Steve Kutenplon helped me.  Patrick Minnahan
2  assisted, John Blake assisted.  Jeff Hart was
3  involved.
4        Q.  H a r t?
5        A.  Yes.  Ed Tarlow might have been consulted.
6        Q.  Was there some negotiation over the
7  allocation of the purchase price to intellectual
8  property and goodwill?
9        A.  Yes.
10       Q.  What was the reason for negotiating that
11 allocation?  Maybe that's not a clear question.
12 What were the relative positions of the sides of the
13 deal on the allocation of the purchase price?
14       A.  At what point in the deal history?
15       Q.  At the point at which you got to what was
16 the final.
17       A.  I'm not sure I understand your question.
18 Can you repeat it?
19       Q.  Well, did your side of the deal want more
20 or less of the purchase price allocated to
21 intellectual property and goodwill?
22       A.  The transaction structure evolved into an
23 unusual one.  That left us, it caused us to be
24 especially interested in that allocation as it
```

William R. Rodgers
Volume 1 - June 22, 2006

38

1  related to the transaction structure.
2      Q.  Okay.  Was your side interested in a higher
3  allocation or a lower allocation to intellectual
4  property, as communicated to the other side?
5      A.  Whose intellectual property?
6      Q.  Well, was there more than one owner of
7  intellectual property owned in the deal?
8      A.  I would think so.
9      Q.  Which intellectual property was owned by
10  Dick Somerville and which was owned by Anne
11  Somerville and which was owned by Globe Rubber
12  Works?
13      A.  I don't think Anne Somerville owned
14  intellectual property.  If I recall, patents owned
15  by the company and the trademarks were as well.  And
16  Mr. Somerville had some intellectual property.
17      Q.  What was the nature of his intellectual
18  property?
19      A.  The transaction structure Mr. Forsythe
20  advanced argued that his know-how and his mental
21  processes constituted a form of intellectual
22  property.
23      Q.  That he wanted to buy?
24      A.  That Mr. Forsythe preferred to buy from

39

1  Mr. Somerville.
2      Q.  Exhibit 2, if you turn to Page Number 66.
3          MR. FURMAN:  Entitled Globe Disclosure
4  Statement.
5          MR. LAWSON:  Correct.  You read it with
6  a hundred percent accuracy.
7      Q.  Have you turned to that?
8      A.  I have.
9      Q.  Who drafted that document, if you know?
10      A.  My office.
11      Q.  And did you review it and approve it
12  yourself?
13      A.  I reviewed it and accepted it as complete.
14      Q.  Before the closing there was a period of
15  what we like to call due diligence.  Is that fair to
16  say?
17      A.  Yes.
18      Q.  During the period, representatives from the
19  Kalm-Forsythe side of things would be requesting
20  information and documents from the representatives
21  of the Globe Rubber Works side of things.  Would
22  that be fair to say?
23      A.  Yes.
24      Q.  Did you participate in that process of

40

1  providing information -- and by you I mean you
2  personally -- participate in the process of
3  providing information to Kalm-Forsythe?
4      A.  Was I involved?
5      Q.  Yes.
6      A.  Yes.
7      Q.  What was the nature of your involvement?
8      A.  Requests would be made and I would answer
9  some, direct inquiries to others to be answered by
10  them on occasion.  I would coordinate other aspects.
11  I supervised or asked others to undertake, to
12  participate in those activities as well.
13      Q.  Did other people at Tarlow Breed
14  participate in the due-diligence process?
15      A.  Yes.
16      Q.  Let me just reference Mr. Fasnacht's
17  deposition, Page 130.
18          "QUESTION:  During the due-diligence
19  period, you were the person on behalf of Globe
20  Rubber to whom Kalm-Forsythe was making its
21  due-diligence requests; is that right?
22          "ANSWER:  Yes."
23          Did Kalm-Forsythe also make requests
24  directly to you or to your firm?

41

1      A.  No.  Their lawyers might have, but
2  Kalm-Forsythe itself didn't.
3      Q.  To your knowledge, did they deal with Roger
4  Fasnacht directly?
5      A.  Who?
6      Q.  Kalm-Forsythe in connection with due
7  diligence.
8      A.  Many requests, yes.
9      Q.  What sort of requests were made to your
10  firm by Kalm-Forsythe's lawyers in connection with
11  the due-diligence process?
12      A.  Can you give us a copy of this or that; I
13  see some reference to this document you have.
14      Q.  In connection with the disclosure schedule
15  recently identified beginning with Bates number 66,
16  what did you do to determine the accuracy of the
17  disclosure statement?
18      A.  I asked our lawyers Steve Kutenplon to go
19  down to Globe Rubber and to sit with Roger and such
20  other people as they decided were appropriate to go
21  through the representations and warranties, and to
22  elicit the appropriate exceptions to the statements
23  stated and to gather up the documents called for.
24      Q.  Is it correct that the disclosure schedule,

12 (Pages 42 to 45)

William R. Rodgers
Volume 1 - June 22, 2006

42

1  based on 66 and following, reflects information that
2  was given to your firm by people at Globe Rubber
3  Works?
4      A.  In substantial part, yes.
5      Q.  Did anyone from your firm physically search
6  the files of Globe Rubber Works themselves?
7      A.  I don't know.
8      Q.  Would that -- if that were done, would that
9  be reflected in the time records of the firm?  Let
10  me withdraw that and rephrase it.  If that were
11  done, i.e., someone from your firm physically
12  searching the files of Globe Rubber Works, should
13  that be reflected in time records?
14      A.  Not necessarily.
15      Q.  Under what circumstances would someone from
16  Tarlow Breed be searching the files of Globe Rubber
17  Works and not recording the time they spent doing
18  that?
19      A.  If someone were searching the files of
20  Globe Rubber Works, file cabinets at Globe Rubber, I
21  would think that time would have been recorded.  It
22  might not have been described as such, which is how
23  I understood your prior question.
24      Q.  How else might it have been described?

43

1      A.  Conference with client re disclosure
2  schedule.
3          (A recess was taken.)
4      Q.  Let me show you what was marked as Exhibit
5  3 at Mr. Fasnacht's deposition.  You can have the
6  official one, if you want.  Did you see that --
7  first of all, are you familiar with that document?
8      A.  I've seen this document.
9      Q.  Were you aware of that document prior to
10  August 3rd of 2004?
11      A.  I was not.
12      Q.  Would you agree that that document is
13  something that should have been disclosed in a
14  disclosure schedule?
15          MR. FURMAN:  Objection.
16          You may answer.
17      A.  I'm uncertain.
18      Q.  Are you aware that anyone at your firm made
19  a determination that that document should not be
20  included in the disclosure statement?
21          THE WITNESS:  Would you read the
22  question.
23          (Question read by the reporter.)
24      A.  I'm not so aware.

44

1      Q.  Let me show you what was marked as Exhibit
2  18 of the Fasnacht deposition.  Have you seen that
3  email before?
4      A.  I don't specifically recall the document.
5      Q.  Would you agree that Exhibit 18 indicates
6  that as late as January of 2004 the deal was being
7  cast as a stock purchase?
8      A.  It appears that way.
9      Q.  Would that help you to determine when in
10  time the deal was recast as an asset purchase?
11      A.  Without meaning to be flip, I think I would
12  want to say which time?
13      Q.  There was back and forth a few times?
14      A.  A bunch of times.
15      Q.  Now, in terms of your firm's involvement in
16  due diligence and the preparation of the disclosure
17  statement, did your firm do its own file review, its
18  own diligence?
19      A.  What do you mean by that?
20      Q.  Did your firm undertake its own search of
21  the records of Globe Rubber Works to determine what
22  matters needed to be disclosed in a disclosure
23  statement, as opposed to asking the client the
24  question:  What have you got?

45

1      A.  I don't think we rummaged through the
2  drawers of the file cabinets of the company, if
3  that's what you mean.
4      Q.  Would it be correct that your firm relied
5  on whatever the representatives of Globe Rubber
6  Works told you were the materials that were
7  responsive to the due-diligence issues?
8      A.  Yes, among other things.
9      Q.  What other things?
10      A.  We would have searched public records.  We
11  would have reviewed documents that had passed
12  between the parties to the extent that we were
13  copied on them.  We would have made inquiries on a
14  section-by-section basis.
15      Q.  Now, one of the issues in this case has to
16  do with certain insurance policies.  Can you recall
17  meetings with the Kalm-Forsythe side of the deal
18  where life insurance policies were discussed?
19      A.  Yes.
20      Q.  How many of those meetings would you say
21  took place?
22      A.  Probably several.
23      Q.  What was the substance of the issue
24  concerning life insurance policies?

William R. Rodgers
Volume 1 - June 22, 2006

46

1          MR. FURMAN:  At any particular time,
2   every time?
3      Q.  As it began, as it evolved, if it evolved
4   over time?
5      A.  Mr. Forsythe wanted to require them,
6   certain of them.  I resisted that.
7      Q.  How was the issue ultimately resolved?
8      A.  They were excluded from the sale.
9      Q.  And specifically how many insurance
10  policies were in issue?
11     A.  That might have varied over time.
12     Q.  Is it correct that there were some
13  insurance policies that had cash value and some that
14  had no cash value?
15     A.  As I understood it.
16     Q.  Was Mr. Forsythe interested in acquiring
17  all the policies?
18     A.  I'm not sure what he was interested in.
19     Q.  As he expressed it?
20     A.  I think at one point or more, yes.
21     Q.  Let me just read to you from Mr. Fasnacht's
22  deposition, starting at Page 85.  The subject matter
23  is the insurance policies.
24          "QUESTION:  What was the proposal that

48

1          "ANSWER:  Well, be part of the assets
2   that were being acquired by Globe Composite.
3          "QUESTION:  Did you make that deal on
4   behalf of Globe Rubber and Dick Somerville with Mr.
5   Forsythe?"
6          Then there is a back and forth.
7          "ANSWER:  My recollection is that this
8   particular topic came up in a meeting between Carl
9   Forsythe and the Somervilles and counsel.
10         "QUESTION:  Were you present as well?
11         "ANSWER:  Yes.
12         "QUESTION:  When did that meeting take
13  place?
14         "ANSWER:  I'm only guessing.
15         "QUESTION:  Before the closing?
16         "ANSWER:  Yes.
17         "QUESTION:  Before the execution of
18  the --
19         "ANSWER:  -- final document?
20         "QUESTION:  -- of the final document?
21         "ANSWER:  Yes.  Because it was still
22  ironing out the details of the documents.
23         "QUESTION:  Tell us the substance of the
24  meeting.

47

1   you made to Mr. Forsythe?
2          "ANSWER:  Three of the policies would
3   remain with the company and two of the policies
4   would stay with the Somervilles."
5          This is Fasnacht testifying.
6          "QUESTION:  And which were the policies
7   that would stay with the Somervilles, if you
8   remember?
9          "ANSWER:  I can remember the amount.  I
10  can't remember the policies.
11         "QUESTION:  What were the amounts?
12         "ANSWER:  It was 900,000 in total.
13         "QUESTION:  In total?
14         "ANSWER:  I believe that's right.
15         "QUESTION:  What were the three policies
16  that stayed with the company?
17         "ANSWER:  Those were 900,000, I might be
18  off on the first amount.  It was close to that.
19         "QUESTION:  So as you sit here today,
20  you remember it was sort of an equal split roughly?
21         "ANSWER:  Yeah.
22         "QUESTION:  When you said stay with the
23  company, do you mean stay with Globe Rubber or go
24  with Globe Composite?

49

1          "ANSWER:  I recall it was to knock out
2   some of the of the lingering unresolved issues of
3   the negotiation and this was one of them.
4          "QUESTION:  The insurance policies?
5          "ANSWER:  Right.
6          "QUESTION:  What was said by each side
7   with respect to the insurance policy issue?
8          "ANSWER:  My recollection is that there
9   was very little contention or discussion.  It was
10  just a matter of saying which policies were going
11  and which ones were staying.  Neither party was
12  making too much of a deal out of it.
13         "QUESTION:  Okay.  Now specifically
14  there was an AIG, American General Life Insurance
15  Company policy.  Do you recall where that policy was
16  to go?
17         "ANSWER:  That was to stay with the
18  company.
19         "QUESTION:  And there was also a Lincoln
20  Financial Group policy?
21         "ANSWER:  Yes.
22         "QUESTION:  Do you remember that one?
23         "ANSWER:  Yes.
24         "QUESTION:  What was supposed to be the

FARMER ARSENAULT BROCK LLC

14 (Pages 50 to 53)

William R. Rodgers
Volume 1 - June 22, 2006

50

1   disposition of that policy?
2        "ANSWER:  That was to stay with the
3   company.
4        "QUESTION:  Can you recall the other
5   policy that was to stay with the company?
6        "ANSWER:  The other policy was a new
7   policy that was acquired in January of '04, I
8   believe, a term policy for 400,000, and I don't
9   recall the insurance company now.  That policy
10  expired one year later and was not renewed."
11       Do you recall such a conversation
12  between your side, including yourself and
13  Mr. Fasnacht and Mr. Forsythe and his lawyers?
14       MR. FURMAN:  Objection to the form of
15  the question.
16       You can answer.
17  A.  When did you start reading and when did you
18  start asking?
19  Q.  I stopped reading at the words:  "That
20  policy expired one year later and was not renewed"?
21  A.  Do I remember that conversation?
22  Q.  Yes.
23  A.  Does Mr. Fasnacht say when that
24  conversation took place?

51

1   Q.  He says he couldn't say.  But he said he's
2   going to guess February, March '04.
3   A.  I'm not sure which conversation he's
4   referring to.  I think that topic came up a number
5   of times.
6   Q.  Can you recall an agreement that the AIG
7   policy and the Lincoln Financial policy would be
8   part of what was acquired by Globe Rubber Works?
9   A.  The only thing that I think you can fairly
10  say was agreed with regard to the insurance policies
11  is what the definitive purchase agreement says.
12       MR. LAWSON:  This needs to be marked.
13       (Marked, Exhibit 168, Comments to Asset
14  Purchase Agreement.)
15  Q.  Do you recognize Exhibit 168?
16       (Pause.)
17  A.  I don't recognize it, no.
18  Q.  So you did not prepare this document?
19  A.  I'm saying simply that I don't recognize
20  it.
21  Q.  Do you recall preparing a document of this
22  sort?
23  A.  There were times throughout the case that I
24  prepared documents summarizing my comments.

52

1   Q.  Did you use this format to do so?
2   A.  By format, you mean?
3   Q.  I mean some sort of word-processing
4   document which is titled comments to asset purchase
5   agreement and a list of comments?
6   A.  In regard to having a list of comments, I
7   would have a list of comments.
8        MR. FURMAN:  Did you say this document
9   was produced in this case?
10       MR. LAWSON:  I think it was produced by
11  you folks.
12       MR. FURMAN:  Did we produce things
13  without Bates numbers?
14       MS. ROMAN:  No.
15       MR. FURMAN:  When you show a witness a
16  document, it is nice if it has been produced.
17       MR. LAWSON:  That's true.
18       MR. FURMAN:  Just as a general
19  proposition.
20       MR. LAWSON:  I don't know where we would
21  have gotten it from if we didn't get it from you.
22  That's my problem.  It might have fluttered out of a
23  group of documents that didn't get Bates-stamped.  I
24  don't know.  In any event, the witness doesn't

53

1   recognize this document.  I'll have to see if I can
2   figure out who might.
3   Q.  Do you remember ever having a tentative
4   agreement that insurance policies owned by Globe
5   Rubber were going to be retained by KFGI, two
6   policies for $250,000 and a new policy recently
7   acquired for 400,000?
8   A.  What does tentative mean?
9   Q.  At any time in the discussion was that sort
10  of an arrangement expressed as being acceptable to
11  both sides?
12  A.  Not to my recollection.
13  Q.  Do you ever remember a conversation between
14  both sides that you were present at where it was
15  discussed that the Somervilles proposed to keep the
16  policies that had a cash value and that KFGI would
17  retain the term policies?
18  A.  I don't recall.
19  Q.  After the closing occurred, did you have
20  any conversations -- after the closing occurred and
21  before this litigation began, did you have any
22  conversations with anyone on the subject of the
23  assignment of the term policies, the AIG and the
24  Lincoln Financial policies?

William R. Rodgers
Volume 1 - June 22, 2006

---

54

1    A. No.
2    **Q. I think you told us earlier that Anne**
3    **Somerville attended some of the meetings with both**
4    **sides present. Did I correctly remember that?**
5    A. Yes.
6    **Q. Did she participate in those meetings by**
7    **speaking and expressing her opinions?**
8    A. Yes.
9    **Q. Did Anne Somerville give any direction to**
10   **any lawyers at your firm as to how to conduct the**
11   **negotiations?**
12   A. She expressed her opinions, if that's what
13   you mean.
14   **Q. Now, Anne, was she a client of yours as**
15   **well in connection with this deal?**
16   A. I treated her as a client.
17   **Q. After the closing, I think you told us that**
18   **your firm effectuated a change of name to Solar**
19   **Construction?**
20   A. I think we filed the articles of amendment
21   to the corporate charter.
22   **Q. What was the purpose of changing the name?**
23   A. It was a requirement of the buyer.
24   **Q. Do you know whether Solar Construction**

---

55

1    transacted any business after the closing?
2        MR. FURMAN: If you can answer without
3    revealing telecommunications, you can answer. If
4    the only source is confidential attorney-client
5    communications, those are privileged and you
6    shouldn't answer.
7        A. I think what I know of Solar Construction I
8    learned from my clients.
9        **Q. I've got to go back and clarify. I may be**
10   **asking you questions that are repeating things you**
11   **already said. It won't take long and I'll be done.**
12   **With respect to the insurance policies, are you**
13   **aware of any understandings concerning the insurance**
14   **policies that were not reflected in Fasnacht Exhibit**
15   **2?**
16       A. You're referring to life insurance
17   policies?
18       **Q. Yes.**
19       A. I think the purchase agreement reflects the
20   meeting of the minds of the parties on the
21   disposition of the insurance policies.
22       **Q. Have you finished your answer?**
23       A. Yes.
24       **Q. Were the term insurance policies considered**

---

56

1    assets of Globe Rubber?
2        A. Which ones would those be?
3        **Q. The AIG and Lincoln Financial?**
4        A. I understood that they were policies owned
5    by the company. Which ones of the several that
6    insured the life of Dick were owned by the company,
7    I'm not presently mindful of.
8        **Q. Okay.**
9        A. But the policies that the company owned,
10   the company owned.
11       **Q. Were you aware that Mr. Somerville**
12   **following the closing executed documents assigning**
13   **the term policies to Globe Composite?**
14       A. I've come to understand there are
15   instruments that purport to bear his signature to
16   that effect.
17       **Q. Do you have any reason to think that he did**
18   **not sign them?**
19       A. I have no knowledge on the subject.
20       **Q. Have you looked at the instruments?**
21       A. I might have looked at one of them. I
22   don't specifically recall. Were they exhibits to
23   your complaint or anything?
24       **Q. They may have been. If you don't have a**

---

57

1    specific memory, that's fine. Are you familiar with
2    the signature?
3        A. I've seen his signature.
4        **Q. Are you familiar enough to be able to offer**
5    **an opinion of whether some other signature is his**
6    **signature?**
7        A. I don't think I would instantly recognize
8    his signature.
9            MR. LAWSON: I think I'm pretty much
10   done. Give me a minute.
11           (A recess was taken.)
12       **Q. Let me show you what's been marked as**
13   **Fasnacht Exhibit Number 10. Are you familiar with**
14   **this document?**
15       A. I've seen this document.
16       **Q. Did you see it before the preparation of**
17   **the disclosure schedule?**
18       A. I did not.
19       **Q. Was this document disclosed as part of the**
20   **disclosure schedule?**
21       A. Not to my recollection.
22       **Q. Let me show you what's been marked as**
23   **Fasnacht Number 12. You've seen that document**
24   **before?**

---

16 (Pages 58 to 61)

William R. Rodgers
Volume 1 - June 22, 2006

58

1    A.  Does that say cattle company, John Gunther
2  Cattle Company?  Is that what that says?
3    Q.  Yes.  John Gunther Cattle Company.
4        (Pause.)
5    A.  I don't think I've seen this document.
6    Q.  To your knowledge, was it referenced in the
7  disclosure schedule?
8    A.  Not to my recollection.
9    Q.  Would you consider Exhibit 12 to be a
10  liability of Globe Rubber Works?
11    A.  I wouldn't consider it a liability.  I
12  would consider it a commercial agreement.
13    Q.  As such, should it have been disclosed
14  during due diligence?
15    A.  If they asked for it, it should have been
16  disclosed.
17    Q.  Did they ask for all contracts, if you
18  recall?
19    A.  I don't recall.
20    Q.  Let me direct you back to the employment
21  agreement.
22        MR. FURMAN:  Fasnacht 11.
23    Q.  Direct your attention to Page 10, Paragraph
24  13.  Have you turned to that section?

59

1    A.  Yes.
2    Q.  Can you recall any conversations concerning
3  the particular provision that's embodied in
4  Paragraph 13?
5    A.  In general terms, yes.
6    Q.  And what was the substance of those
7  conversations?
8    A.  We bargained for a payout of the monies due
9  from Carl's company to Mr. Somerville under certain
10  circumstances in a lump-sum format.  This provision
11  would provide a funding mechanism for the payment of
12  that obligation were Mr. Somerville to die, and were
13  Globe Composite to proceed to go and purchase an
14  insurance policy on Mr. Somerville's life.
15    Q.  Can you recall any conversation where the
16  AIG and the Lincoln Financial policies were to be
17  used to cover the key-man provision in Paragraph 13?
18    A.  There were various permutations advanced
19  throughout the history of the transaction.  But as
20  the transaction came together in the final days and
21  leading up to its execution, there were no
22  discussions of using existing insurance policies to
23  answer, to serve as the key-man policy under this
24  Paragraph 13.

60

1    Q.  Under the terms of Paragraph 13,
2  Mr. Somerville could have transferred those term
3  policies to satisfy his corporation requirement,
4  could he not?
5    A.  I suppose he could have.  But it was
6  against all the advice -- rather, it was against the
7  positions I had advanced in that regard.
8    Q.  Well, if in fact Mr. Somerville -- if in
9  fact, those term policies were to be retained by
10  former Globe Rubber, now Solar Construction -- is
11  that your understanding of the deal?
12    A.  My understanding of the deal was that those
13  policies were to be retained by Globe Rubber and
14  were not sold and not to be transferred.
15    Q.  Based on that state of affairs, who would
16  be required to pay the premium on those policies?
17    A.  The contract would provide that the owner
18  would pay the premiums on the policies, I would
19  imagine.  I didn't read the policies.
20    Q.  So after the deal closed, then you would
21  expect that Solar would be paying the premiums on
22  those policies, that would be your expectation?
23    A.  I didn't know enough to know whether they
24  were fully paid up policies or not.

61

1    Q.  They were term?
2    A.  You can fully pay up term policies.
3    Q.  Let me represent to you they were not fully
4  paid up.
5    A.  Okay.
6    Q.  Assuming they were not fully paid up, you
7  would expect that Solar would be paying premiums,
8  wouldn't you?
9    A.  You would like me to speculate?
10    Q.  I'm asking you as an attorney familiar with
11  these types of transactions, familiar with this
12  particular deal who has told us that it was the
13  intention of the parties that these term policies
14  would be retained by the seller.  I'm simply asking
15  you that given all of that, would you expect that
16  the seller would be paying the premiums?
17    A.  Not if the premiums you're referring to
18  were within the scope of the assumed liability of
19  the contract, but otherwise perhaps.
20    Q.  So did Kalm-Forsythe assume the payment of
21  the premiums for the term policies?
22    A.  I don't know.  They assumed the liabilities
23  of the company reflected on the balance sheet.
24    Q.  Were the term policies reflected on the

William R. Rodgers
Volume 1 - June 22, 2006

---

62

1  balance sheet as liabilities?
2      A.  If they were included in the aggregated
3  numbers that were reflected on a balance sheet, I
4  doubt they were specifically culled out on a
5  financial statement.  But if they were among the
6  accounts payable by the company, they would have
7  been assumed.  And where Globe had considerable
8  payables, it wouldn't surprise me if premiums had
9  been accrued and included in the accounts payable of
10  the company such that Kalm-Forsythe per the
11  agreement would have paid them as they had agreed to
12  assume and pay them.
13      Q.  These would be preclosing premiums?
14      A.  Correct.
15      Q.  What would you expect would be -- who would
16  you expect would be required to pay the premiums
17  that accrued post closing?
18      A.  I would have expected -- I would have
19  speculated that the owner of the policy would have
20  paid them.
21      Q.  Thank you.  I don't have anything further.
22          MR. FURMAN:  I have a couple of
23  questions.
24

---

63

1          EXAMINATION
2  BY MR. FURMAN:
3      Q.  There was a point, Mr. Rodgers, where you
4  were discussing the AIG and Lincoln policies.  I
5  wrote down that you said something like if the
6  company owned the policy, the company owned the
7  policy, something to that effect.  Do you recall
8  that?
9      A.  Yes.
10      Q.  Who was the company that you were referring
11  to?
12      A.  Globe Rubber.
13      Q.  At any time did you consider that you were
14  representing Mr. Somerville and Globe Rubber on the
15  subject of the disposition of the insurance
16  policies, the Lincoln and AIG insurance policies?
17      A.  Yes.
18      Q.  At any time did any representative of the
19  Winstead law firm ask for your authorization to
20  bypass you and deal directly with Mr. Somerville on
21  the subject of the insurance policies?
22      A.  No.
23      Q.  At any time did Mr. Forsythe ask if it was
24  okay if he had his people do an end around you with

---

64

1  regard to the insurance policies?
2      A.  No.
3      Q.  At any time did Mr. Fasnacht, after the
4  closing while in the employ of Mr. Forsythe, ask you
5  for authorization to present to Mr. Somerville any
6  assignments of either an AIG or Lincoln life
7  insurance policy?
8      A.  No.
9      Q.  Mr. Rodgers, with regard to Exhibit 109,
10  the $400,000 promissory note dated as of August 3,
11  2004, which law firm drafted the form of the
12  promissory note which was executed?
13      A.  The Winstead Seacrest firm.
14      Q.  That was Mr. Forsythe and KFGI's firm?
15      A.  Yes, it was.
16          MR. LAWSON:  That's all I have.
17          (4:42 p.m.)
18
19
20
21
22
23
24

---

65

1          CERTIFICATE OF COURT REPORTER
2          I, David A. Arsenault, Registered
3  Professional Reporter, and Massachusetts Certified
4  Reporter (100693), do certify that the deposition of
5  WILLIAM R. RODGERS, in the matter of Globe Composite
6  v. Richard Somerville, on June 22, 2006, was
7  stenographically recorded by me; that the witness
8  provided satisfactory evidence of identification, as
9  prescribed by Executive Order 455 (03-13) issued by
10  the Governor of the Commonwealth of Massachusetts,
11  before being sworn by me, a Notary Public in and for
12  the Commonwealth of Massachusetts; that the
13  transcript produced by me is a true and accurate
14  record of the proceedings to the best of my ability;
15  that I am neither counsel for, related to, nor
16  employed by any of the parties to the above action;
17  and further that I am not a relative or employee of
18  any attorney or counsel employed by the parties
19  thereto, nor financially or otherwise interested in
20  the outcome of the action.
21
22  _____  6/30/06
23  David A. Arsenault, RPR
24

---

18 (Pages 66 to 68)

William R. Rodgers
Volume 1 - June 22, 2006

66

1          I N D E X
2
3        EXAMINATIONS
4  WILLIAM R. RODGERS
5     BY MR. LAWSON          3
6     BY MR. FURMAN         63
7       EXHIBITS MARKED
8    168, Comments to Asset Purchase    51
9  Agreement
10
11  Exhibits retained by Evan T. Lawson, Esq.
12
13
14
15
16
17
18
19
20
21
22
23
24

1   Sent via Courier to counsel/witness on 6/30/06
2
3          WILLIAM R. RODGERS
4     SIGNATURE PAGE/ERRATA SHEET INFORMATION
5       For deposition taken on: June 22, 2006
6       Globe Composite v. Richard Somerville
7
8       SIGNATURE INFORMATION FOR COUNSEL
9   The original signature page/errata sheet has been sent to Mark
10  S. Furman, Esq. to obtain signature from the deponent.  When
11  complete, please send original to Evan T. Lawson, Esq.
12
13          WITNESS INSTRUCTIONS
14  After reading the transcript of your deposition, please note any
15  change or correction and the reason on the errata/signature
16  page.  DO NOT make any notations on the transcript itself.  If
17  necessary, continue the format on a separate page.
18
19  PLEASE SIGN AND DATE the errata/signature page (before a notary
20  if requested) and return it to your counsel.
21
22
23
24

67

WITNESS:  WILLIAM R. RODGERS
CASE:   Globe Composite v. Richard Somerville
           SIGNATURE PAGE/ERRATA SHEET
PAGE   LINE   CHANGE OR CORRECTION AND REASON
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
I have read the transcript of my deposition taken June 22, 2006.
Except for any corrections or changes noted above I hereby
subscribe to the transcript as an accurate record of the
statements made by me.
Signed under the pains and penalties of perjury.

_____DATE_____
Deponent, WILLIAM R. RODGERS
On this _____ day of _____, 200__, before me, the
undersigned notary public, personally appeared WILLIAM R.
RODGERS, who presented satisfactory evidence of identification,
to wit, _____, and signed this document
in my presence.

_____
Notary Public in and for_____
My commission expires_____

FARMER ARSENAULT BROCK LLC

# EXHIBIT L



*Future Solutions: TODAY*

January 31, 2005

Mr. Richard C. Somerville
344 Keene Street
Duxbury, MA 02332

Dear Richard:

It has come to our attention that you caused to be prepared numerous certifications that products sold met governmental specifications, knowing that the certifications were false, and caused these product certifications to be made, used, presented or delivered to the United States Government. Further, you intentionally did not disclose to the Company these fraudulent actions prior to, during, or after the Company purchased the assets of Globe Rubber Works, Inc.

As a result of these fraudulent activities, we have been unable to successfully produce and certify for shipment certain parts for current or acquired orders for the United States Government or its defense contractors. This has caused an unnecessary cash shortfall to the Company and potentially creates a significant, and possibly irreparable, negative goodwill with the United States Government, its defense contractors and other current and prospective customers.

Such intentional acts by you were not undertaken in good faith and are clearly contrary to the best interests of the Company and constitute "cause" for termination pursuant to Section 8(c)(ii)(2) of the Employment Agreement.

Furthermore, such conduct constitutes a material breach of the Asset Purchase Agreement between you, Globe Rubber Works, Inc. and the Company dated August 3, 2004. As a result, such breach, which cannot be cured, constitutes "cause" for termination pursuant to Section 8(c)(ii)(6) of the Employment Agreement.

In accordance with Sections 8 and 21 of the Employment Agreement dated August 3, 2004 by and between you and Globe Composite Solutions, Ltd., formerly know as Kalm-Forsythe Global Innovations, Ltd., (the "Company") notice is hereby given that your employment is terminated "with cause" effective immediately. Payment of salary and wages and all benefits to you will cease as of today.

Pursuant to Section 8(c)(iii)(h) your entire ownership in the Company is deemed forfeited and any outstanding payments that may have been owed to you by the Company are hereby cancelled and forfeited as well.

GCS0473

You are required to immediately turn over to me all Company property in your possession or control, including but not limited to identification, keys and other Company property. You are to leave the premises immediately and arrangement will be made to have your personal belongings delivered to your home.

Despite the fact that your employment has been terminated, you are nonetheless bound and required to comply with the confidentiality and noncompetion covenants of the Employment Agreement.

Any future contact with the Company should be directed to me and you are to refrain from contacting any current employee of the Company.

Sincerely yours,

Carl W. Forsythe
President and CEO

GCS0474

# EXHIBIT N



# TOWN OF DUXBURY, MASSACHUSETTS

## OFFICE OF THE TOWN CLERK

TELEPHONE
934-1131

**The Commonwealth of Massachusetts**
STANDARD CERTIFICATE OF DEATH
REGISTRY OF VITAL RECORDS AND STATISTICS

REGISTERED NUMBER 69

STATE USE ONLY

**DECEDENT**

| DECEDENT - NAME   FIRST | MIDDLE | LAST | SEX | DATE OF DEATH (Mo., Day, Yr.) |
|---|---|---|---|---|
| Richard | C. | Somerville | M | June 7, 2005 |

| PLACE OF DEATH (City/Town) | COUNTY OF DEATH | HOSPITAL OR OTHER INSTITUTION - Name (If not in either, give street and number) |
|---|---|---|
| Duxbury | Plymouth | 344 Keene St. |

METHOD OF DISPOSITION (Check only one):
☐ Inpatient ☐ ER/Outpatient ☐ DOA    OTHER ☐ Nursing Home ☐ Residence ☐ Other (Specify)

SOCIAL SECURITY NUMBER: 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

IF US WAR VETERAN SPECIFY WAR: Korea

WAS DECEDENT OF HISPANIC ORIGIN? ☑ NO ☐ YES (If yes, Specify Puerto Rican, Dominican, Cuban, etc.)

RACE (e.g. White, Black, American Indian, etc.): White

DECEDENT'S EDUCATION (Highest Grade Completed) Elementary/Sec (0-12) College (1-4, 5+): 12

| AGE - Last Birthday (Yrs.) | UNDER 1 YEAR MOS. / DAYS | UNDER 1 DAY HOURS / MINS | DATE OF BIRTH (Mo., Day, Yr.) | BIRTHPLACE (City and State or Foreign Country) |
|---|---|---|---|---|
| 71 | | | Mar. 20, 1934 | Boston, MA |

| MARRIED, NEVER MARRIED, WIDOWED OR DIVORCED | NAME OF SPOUSE (if wife, give maiden name) | USUAL OCCUPATION | KIND OF BUSINESS OR INDUSTRY |
|---|---|---|---|
| Married | Anne Patricia Roche | President | Manufacturing |

RESIDENCE - NO. & ST., CITY/TOWN, COUNTY, STATE/COUNTRY: 344 Keene St., Duxbury, Plymouth, MA, USA   ZIP CODE 02332

| FATHER - NAME | STATE OF BIRTH (if not in US, name country) | MOTHER - (GIVEN) (MAIDEN) | STATE OF BIRTH (if not in US, name country) |
|---|---|---|---|
| Murray G. Somerville | Canada | Mildred Steeves | Canada |

**INFORMANT**

INFORMANT'S NAME: Anne Patricia Roche

MAILING ADDRESS - NO. & ST., CITY/TOWN, STATE, ZIP CODE: 344 Keene St., Duxbury, MA 02332

RELATIONSHIP: Wife

**DISPOSITION**

METHOD OF IMMEDIATE DISPOSITION: ☐ BURIAL ☑ CREMATION ☐ ENTOMBMENT ☐ REMOVAL FROM STATE ☐ DONATION ☐ OTHER SPEC.

FUNERAL SERVICE LICENSEE OR OTHER DESIGNEE: Albert E. Sullivan, Jr.   LICENSE # 5114

| PLACE OF DISPOSITION (Name of Cemetery, Crematory or other) | LOCATION (City/Town, State) |
|---|---|
| Duxbury Crematory | Duxbury, MA |

| DATE OF DISPOSITION | NAME AND ADDRESS OF FACILITY OR OTHER DESIGNEE |
|---|---|
| June 13, 2005 | Sullivan Funeral Home 551 Washington St. Hanover, MA 02339 |

29 PART I - Enter the diseases, injuries, or complications that caused the death. Do not use only the mode of dying, such as cardiac or respiratory arrest, shock or heart failure. List only one cause on each line (a through d) PRINT OR TYPE LEGIBLY.

IMMEDIATE CAUSE (Final disease or condition resulting in death): HANGING

Approximate Interval Between Onset and Death: MINUTES

Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (disease or injury that initiated events resulting in death) LAST

DUE TO (OR AS A CONSEQUENCE OF):

PART II - Other significant conditions contributing to death but not resulting in underlying cause given in Part I.

| WAS AUTOPSY PERFORMED? (Yes or No) | WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH (Yes or No) |
|---|---|
| Yes | Yes |

**CERTIFIER**

MED. EXAM. NOTIFIED? Yes

MANNER OF DEATH: ☐ NATURAL ☐ HOMICIDE ☐ COULD NOT BE DETERMINED ☐ ACCIDENT ☑ SUICIDE ☐ PENDING INVESTIGATION

| DATE OF INJURY (Mo., Day, Yr.) | TIME OF INJURY | INJURY AT WORK (Yes or No) |
|---|---|---|

DESCRIBE HOW INJURY OCCURRED: HANGING

PLACE OF INJURY (at home, farm, street, factory, office bldg., etc.): OUTSIDE

LOCATION (No. & St., City/Town, State): 344 KEENE STREET, DUXBURY, MA

36a. To the best of my knowledge, death occurred at the time, date, and place and due to the cause(s) stated.

37a. On the basis of examination and/or investigation, in my opinion death occurred at the time, date, and place and due to the cause(s) stated.

| DATE SIGNED (Mo., Day, Yr.) | HOUR OF DEATH |
|---|---|
| June 08, 2005 | UNKNOWN |

NAME OF ATTENDING PHYSICIAN IF NOT CERTIFIER

DATE SIGNED (Mo., Day, Yr.): June 07, 2005

PRONOUNCED DEAD (Mo., Day, Yr.): 07:59 AM

PRONOUNCED DEAD: AM

NAME AND ADDRESS OF CERTIFYING PHYSICIAN OR MEDICAL EXAMINER (Type or Print): RICHARD EVANS, M.D., 720 ALBANY STREET, BOSTON, MA 02118   LICENSE NO. OF CERTIFIER 58622

| WAS THERE A PRONOUNCEMENT FORM? No | IF YES, DATE PRONOUNCED | IF YES, TIME PRONOUNCED | NAME OF PRONOUNCER | TITLE ☐ R.N. ☐ P.A. |
|---|---|---|---|---|

DATE BURIAL PERMIT ISSUED: June 10, 2005

SIGNATURE OF HEALTH AGENT: Barbara J. Cook, Asst.   Duxbury

CLERK'S SIGNATURE: Barbara J. Cook, Asst.   June 10, 2005

I hereby certify that the above is a true copy of a Record on file in the Duxbury Town Clerk's Office

~~Duxbury Town Clerk~~/Assistant Town Clerk

*Barbara J. Cook*

Date *July 27, 2005*

TOWN SEAL

# EXHIBIT O

# LAWSON & WEITZEN, LLP

ATTORNEYS AT LAW

88 BLACK FALCON AVENUE, SUITE 345
BOSTON, MASSACHUSETTS 02210-2414

**BOSTON**
TELEPHONE (617) 439-4990
TELECOPIER (617) 439-3987
EMAIL: POST@LAWSON-WEITZEN.COM
WWW.LAWSON-WEITZEN.COM

EVAN T. LAWSON
RICHARD B. WEITZEN *
PAMELA B. BANKERT
FRANK L. BRIDGES
IRA H. ZALEZNIK
JOHN J. WELTMAN * * *
VALERIE L. PAWSON
GEORGE F. HAILER +
GEORGE E. CHRISTODOULO, PC
KENNETH B. GOULD
JOSEPH FRIEDMAN
JOHN A. TENNARO
WILLIAM F. COYNE, JR.
DAVID A. RICH *
DENNIS J. MANESIS * *
NATALIE A. KANELLIS †

PATRICIA L. FARNSWORTH
K. SCOTT GRIGGS
MICHAEL J. McDEVITT
STEVEN M. BUCKLEY
SONIA K. GUTERMAN, PH.D.
J. MARK DICKISON *
CLARE B. BURHOE
ROBERT J. ROUGHSEDGE + + +
CAROLINE A. O'CONNELL *
MARISSA A. GOLDBERG
MICHAEL WILLIAMS
KATHRYN E. PIECZARKA
DEAN J. HUTCHISON
SCOTT T. BUCKLEY
CHRISTOPHER S. FARNSWORTH
KRISTINA A. ENGBERG

**CAPE COD**
LAWSON, WEITZEN & BANKERT, LLP
SIX GRANITE STATE COURT
BREWSTER, MASSACHUSETTS 02631
TELEPHONE (508) 255-3600

**MARLBOROUGH**
LAWSON, WEITZEN & HAILER, LLP
171 LOCKE DRIVE, SUITE 101
MARLBOROUGH, MASSACHUSETTS 01752
TELEPHONE (508) 618-1025

July 5, 2005

**VIA CERTIFIED MAIL**

The Lincoln National Life Insurance Company
Client Service Center, M1R1
P.O. Box 5048
Hartford, CT 06102-5048

**Re:    Policy/Certificate Number: G1637194**
**Insured: Richard C. Somerville**

To Whom It May Concern:

This firm represents Globe Composite Solutions, Ltd., a subsidiary of Kalm-Forsythe Globe Innovations, Ltd., which purchased the assets of Globe Rubber Works, Inc. in August 2004. Globe Rubber Works, Inc. owned this life insurance policy through your Company, which insured Richard C. Somerville, the former president of Globe Rubber Works, Inc. After the asset purchase of Globe Rubber Works, Inc. was completed, it changed the owner of the life insurance policy to Globe Composite Solutions, Ltd. by completing a "Life Ownership Change Form" provided by your Company. See attached. For several months, your Company has failed to complete the assignment transaction, despite acknowledging that the assignment was intended by the parties.

The policy identified above is now owned by Globe Composite Solutions, Ltd. This letter will serve as notice that Globe Composite Solutions, Ltd. is making a claim under the policy because Richard C. Somerville died on June 6, 2005. By this letter, we are making formal demand for payment. If we do not hear from you within seven days, we will commence litigation.

* ALSO ADMITTED IN NY
** ALSO ADMITTED IN NH
*** ALSO ADMITTED IN CA
+ ALSO ADMITTED IN DC
++ ALSO ADMITTED IN NJ & PA
+++ ALSO ADMITTED IN RI, CT, NH & ME
† ALSO ADMITTED IN NH & NY



## Lincoln
### Financial Group®

*Life Ownership Change Form*

Personal Service Center
P.O. Box 5048 MIR1
Hartford CT 06102-5048
Fax number 860 466-2835

---

| General Information | |
|---|---|
| Policy number **G1637199** | Issued by (the Company) **ING Life** |

Insured's name **Richard C. Somerville**

Social security number **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**

Policy Owner's name **Globe Rubber Works, Inc.**

Social security number/Tax ID # **74-2922722**

Policy Owner's address **254 Beech St.**

City, State, ZIP **Rockland, MA 02370**

Policy Owner's phone no. **781-871-3702**    E-mail address

---

**New Owner Designation**

*An ownership change does not change existing beneficiary designations. To change your beneficiary, please submit a Lincoln Beneficiary Change Form.*

*The signature of all owners will be required to exercise any contractual rights under the policy.*

***Please change the Owner of the policy listed above to (Select Only One):*** *Complete by typewriter or print in ink.*

☐ The Insured. (If more than one insured, designation assumes jointly with right of survivorship arrangement.)

☐ To one person during his or her lifetime and thereafter the Insured

Name _____    Date of Birth _____

☐ To one person absolutely, his or her estate

Name _____    Date of Birth _____

To multiple owners **(check one)**:    ☐ Joint with Right of Survivorship    ☐ Tenants-in-common*

---

*\*If tenant-in-common, specify shares, if not specified we will assume equal shares.*

To a **(check one)** ☐ Corporation  ☐ Partnership  ☐ LLC  or ☐ Other (specify)
**Globe Composite Solutions, LTD    Rockland    MA**
Legal name                                    City            State

☐ To a trustee or successor trustee under a formal trust agreement

Name of Trustee(s) _____

Name of Trust _____

City, State _____    Date of Trust _____

I/We hereby certify that the Trustee(s) named are the Trustee(s) for the named Trust, which is in full force and effect. The Company shall not be obligated to inquire into the terms of any trust agreement affecting this policy and shall not be chargeable with knowledge of the terms thereof. The Company may rely solely upon the signature(s) of the Trustee(s) named to any receipt, release or waiver, or to any transfer or other instrument affecting this policy or any options privileges or benefits thereunder. Unless otherwise indicated the signature(s) of all Trustee(s) named, or their successors, will be required to exercise any contractual right under the policy. The Company shall have no obligation to see to the use or application of any funds paid to the Trustee(s) in accordance with the terms of the policy. Any such payment made by the Company to the Trustee(s) shall fully discharge the Company with respect to any amounts so paid.

---

**Agreements and Signatures**

*This section must be completed by the current policy owner.*

*Title required if a corporation, partnership or trust.*

*\*Two officer signatures are required for corporate owned policies.*

By signing below, you, the policy owner, certify that you have read this request and understand that it is subject to the provisions and conditions of the policies listed. You also certify that the policies are not assigned to any other person or corporation, except where otherwise noted on this request, and that no proceedings of bankruptcy or insolvency have been filed or are currently pending against you. We reserve the right to require additional information as needed.

Signed at _____ on _____

_City and State_ _____ _Date_ _____

Richard C. Somerville _____ x_Richard Somerville_ President
Current Owner (full name)          Signature              Title*

Paul Slaney _____ x_Paul Slaney_ Controller
Current Owner (full name)          Signature              Title*

_____
Assignee, Irrevocable Beneficiary or other interested party (name and signature)

_____

Community property release - This section is applicable for community property states (AZ, CA, ID, LA, NV, NM, TX and WA). Determination of Community Property status depends on the current or former resident state of the policy owner.
By signing below, you the spouse/former spouse agree to the changes indicated above and;

☐ You give up your rights to this policy according to the community property laws in your state.

☐ You do not give up your rights to this policy.

Spouse's Signature _____ Date _____

Name (print or type) _____

---

**New Owner Information**

**THIS SECTION MUST BE COMPLETED BY THE NEW OWNER**

Policy Owner's address  254 Beech St.

City, State, ZIP  Rockland, MA 02370

**Taxpayer Identification Number and Certification Substitute W-9**

By signing below, you certify that the information provided is complete and accurate as shown. You also certify that you have read, understand and agree to the information provided in the Substitute W9 sections.
Under the penalties of perjury, I certify that:

- The number shown below is my correct taxpayer identification number.

  Social Security number  or  Tax Identification number  752989890

*This is an IRS requirement.*

- I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service that I am subject as a result of a failure to report all taxable income, including all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding. *(You must cross out this item if you have failed to report all interest and dividends on your tax report.)*

- I am a U.S. person *(including a U.S. resident alien).*

Signature of new owner _____ Title _____ Date _____

Carl Forsythe
Print Name

# EXHIBIT P

# LAWSON & WEITZEN, LLP

ATTORNEYS AT LAW

88 BLACK FALCON AVENUE, SUITE 345
BOSTON, MASSACHUSETTS 02210-2414

**BOSTON**
TELEPHONE (617) 439-4990
TELECOPIER (617) 439-3987
EMAIL: POST@LAWSON-WEITZEN.COM
WWW.LAWSON-WEITZEN.COM

**CAPE COD**
LAWSON, WEITZEN & BANKERT, LLP
SIX GRANITE STATE COURT
BREWSTER, MASSACHUSETTS 02631
TELEPHONE (508) 255-3600

**MARLBOROUGH**
LAWSON, WEITZEN & HAILER, LLP
171 LOCKE DRIVE, SUITE 101
MARLBOROUGH, MASSACHUSETTS 01752
TELEPHONE (508) 618-1025

EVAN T. LAWSON
RICHARD B. WEITZEN *
PAMELA B. BANKERT
FRANK L. BRIDGES
IRA H. ZALEZNIK
JOHN J. WELTMAN * * *
VALERIE L. PAWSON
GEORGE F. HAILER +
GEORGE E. CHRISTODOULO, PC
KENNETH B. GOULD
JOSEPH FRIEDMAN
JOHN A. TENNARO
WILLIAM F. COYNE, JR.
DAVID A. RICH *
DENNIS J. MANESIS + +
NATALIE A. KANELLIS †

PATRICIA L. FARNSWORTH
K. SCOTT GRIGGS
MICHAEL J. McDEVITT
STEVEN M. BUCKLEY
SONIA H. GUTERMAN, Ph.D.
J. MARK DICKISON * *
CLARE B. BURHOE
ROBERT J. ROUGHSEDGE + + +
CAROLINE A. O'CONNELL *
MARISSA A. GOLDBERG
MICHAEL WILLIAMS
KATHRYN E. PIECZARKA
DEAN J. HUTCHISON
SCOTT T. BUCKLEY
CHRISTOPHER S. FARNSWORTH
KRISTINA A. ENGBERG

July 5, 2005

**VIA CERTIFIED MAIL**

American General Life Insurance Company
P.O. Box 4373
Houston, Texas 77210-4373

   **Re: Policy Number: U10005220L**
     **Insured: Richard C. Somerville**

To Whom It May Concern:

  This firm represents Globe Composite Solutions, Ltd., a subsidiary of Kalm-Forsythe Globe Innovations, Ltd., which purchased the assets of Globe Rubber Works, Inc. in August 2004. Globe Rubber Works, Inc. owned this life insurance policy through your Company, which insured Richard C. Somerville, the former president of Globe Rubber Works, Inc. After the asset purchase of Globe Rubber Works, Inc. was completed, it assigned the life insurance policy to Globe Composite Solutions, Ltd. by completing a "Change of Ownership" form provided by your Company. See attached. Globe Composite Solutions, Ltd. then designated a new beneficiary. See attached. For several months, your Company has failed to complete the change of ownership transaction, despite acknowledging that it was intended by the parties.

  The policy identified above is now owned by Globe Composite Solutions, Ltd. Further, this letter will serve as notice that Globe Composite Solutions, Ltd. is making a claim under the policy because Richard C. Somerville died on June 6, 2005. By this letter, we are making formal demand for payment. If we do not hear from you within seven days, we will commence litigation.

* ALSO ADMITTED IN NY
* * ALSO ADMITTED IN NH
* * * ALSO ADMITTED IN CA
+ ALSO ADMITTED IN DC
+ + ALSO ADMITTED IN NJ & PA
+ + + ALSO ADMITTED IN RI, CT, NH & ME
† ALSO ADMITTED IN NH & NY

# LAWSON & WEITZEN, LLP

American General Life Insurance Company
July 5, 2005
Page 2

Very Truly Yours,

Kathryn E. Pieczarka

Enc.
cc:    Evan T. Lawson, Esq.
       Carl W. Forsythe
       Roger Fasnacht

**AIG** **AMERICAN GENERAL**

**Change of Ownership**

**American General Life Insurance Company (AGL),**
 __ Fixed Life Service Center - P. O. Box 4373, Houston, TX 77210-4373
 __ Variable Life Service Center - P. O. Box 4880, Houston, TX 77210-4880
Member of American International Group, Inc.

Instructions for completing this form are listed on the back. Please reference your contract for availability of certain requests.

| | | |
|---|---|---|
| **1. CONTRACT IDENTIFICATION**<br><br>☐ Check Here if New Address | CONTRACT No.: _U10005220L_ | |
| | OWNER: _Globe Rubber Works, Inc._ | SSN/TIN OR EIN: _74-2922722_ |
| | ADDRESS: _254 Beech St._ | PHONE No.: _781-871-3702_ |
| | _Rockland, MA  02370_ | |
| | EMAIL ADDRESS (optional): _____ | |
| | INSURED/ANNUITANT (if other than Owner): _Richard Somerville_ | |

| | |
|---|---|
| **2. NEW OWNER(S)**<br><br>**A. PRIMARY** | NEW OWNER'S NAME: _Globe Composite Solutions, LTD_ |
| | SSN/TIN OR EIN: _752989890_ |
| | Address: _254 Beech St._ |
| | _Rockland, MA  02370_ |
| | Phone No.: _781-871-3702_ |
| **B. CONTINGENT** | NEW OWNER'S NAME: _____ |
| | SSN/TIN OR EIN: _____ |
| | Address: _____ |
| | _____ |
| | Phone No.: _____ |

**3. SIGN HERE FOR ABOVE REQUEST**

The Company is requested and directed to recognize that the present owner(s) of the Contract has hereby designated the new owner(s) (the "Owner") of the Contract. The Owner designated above shall have sole ownership and control of the Contract during the lifetime of the Insured/Annuitant and shall be entitled to all ownership rights. See back for details.

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number, and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to back-up withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.

The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

X _____  _____  _____  _____
Signature of Current Owner    Date    Signature of New Owner    Date

_____  _____  _____  _____
Signature of Current Co-owner    Date    Signature of New Co-Owner    Date
(or other party having interest in contract)    (or other party having interest in contract)

**RETURN COMPLETED FORM TO THE ADDRESS OF THE COMPANY CHECKED ABOVE.**

AGLC 0013 Rev0403

## - Instructions and Conditions -

| 1. | CONTRACT IDENTIFICATION | Complete all contract information in this section. Complete a separate request form for each contract. |
|---|---|---|
| 2. | NEW OWNER(S) | This Request is made subject to the terms and conditions of the Contract, and shall not result in a change in any provision of the Contract, except as expressly provided in this Request.

The Owner may transfer the ownership and control of the Contract to a new owner, but such change shall not be effective until approved by the Service Center. If the Owner predeceases the Insured/Annuitant, then the rights of such deceased Owner shall pass to the contingent owner if one is named. If a contingent owner is not named, the rights will pass to the Administrator/Executor of such deceased Owner.

This Request for Change of Ownership does not change the beneficiary or the mode of payment as a death claim under the Contract. Any payment which becomes due under the Contract during the lifetime of the Insured/Annuitant shall be made to the Owner with the exception that any provision which now expressly provides for payment to the Insured/Annuitant as a life income or annuity shall not be available to the Owner, unless the Owner is the Insured/Annuitant.

This Request is subject to any existing assignment of record with the company which issued the contract ("the Company").

**Trustee Owner**
If a trustee is designated as the new owner, the date and legal title of the trust must be stated and Trustee signatures are required in Section 3 as instructed by the trust agreement.

**Contingent Owner**
A contingent owner may be designated, and will be effective only if the new owner is a natural person (not a corporation, partnership or a trust), and the owner, or all designated owners (if more than one), predecease the Insured. A contingent owner may not be designated on an annuity contract. |
| 3. | SIGN HERE FOR ABOVE REQUEST | This request must be dated and all required signatures must be written in ink, using full legal names.

This request must be signed by:
• the person or persons who have the rights of ownership under the terms of the contract (co-owners, irrevocable beneficiary);
• by an Assignee if any; and
• by any other party who may have an interest in the contract by legal proceedings or statutes.

**Special circumstances – Corporate ownership:** The signature of one officer followed by the officer's title is required. The request must be submitted on a piece of corporate letterhead or paper with the corporate seal signed by that officer; **Partnerships:** The full name of the partnership should be written followed by the signatures of all partner(s), other than the Insured; **Trust:** If the contract is owned by or assigned to a Trustee, current Trustee(s) signatures are required as instructed by the trust agreement. Validation of Trustee(s) signatures may be required. |

**Change of Beneficiary**

# AIG    AMERICAN GENERAL

**American General Life Insurance Company (AGL),**
☐ Fixed Life Service Center - P. O. Box 4373, Houston, TX 77210-4373
☐ Variable Life Service Center - P. O. Box 4880, Houston, TX 77210-4880
Member of American International Group, Inc.
**Instructions for completing this form are listed on the back.**

| | | |
|---|---|---|
| **1. CONTRACT IDENTIFICATION** | CONTRACT NO.: _U10005220L_ | |
| | OWNER: _Globe Composite Solutions, LTD_ | SSN/TIN OR EIN: _752989890_ |
| ☐ Check Here if New Address | ADDRESS: _254 Beech St._ | PHONE NO.: _781-871-3702_ |
| | _Rockland, MA 02370_ | |
| | EMAIL ADDRESS (optional): _____ | |
| | INSURED/ANNUITANT (if other than Owner): _Richard C. Somerville_ | |

**2. BENEFICIARY DESIGNATIONS**

One or more of the following may be checked. If nothing is checked, the designation will be in effect for the base insured only.
Designation is in effect for:  ☒ Base Insured  ☐ Spouse Insured  ☐ Other _____

**A. PRIMARY**
*Address Required*

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|
| Globe Composite Solutions, LTD | employer | 254 Beech St. Rockland MA 02370 | 752989890 | 100% |

If a living or non-testamentary trust is designated as a primary beneficiary, complete the following:
_____ Dated: _____
Legal Name of Trust

**B. CONTINGENT**
*Address Required*

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|
| | | | | |
| | | | | |

_____ Dated: _____
Legal Name of Trust

**3. OPTIONAL CLAUSES**

One or more of the following may be checked if desired:
☐ POSTPONEMENT CLAUSE - COMMON DISASTER     ☐ CHILDREN'S CLAUSE - PER STIRPES
☐ MINOR BENEFICIARY CLAUSE - TRUSTEE FOR CHILDREN     ☐ IRREVOCABLE BENEFICIARY
Dated: _____
Name of Trust/Trustee

**4. SIGN HERE FOR ABOVE REQUEST**

The undersigned contract owner hereby revokes any previous beneficiary designation and any optional mode of settlement with respect to any death benefit proceeds payable at the death of the Insured/Annuitant.

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number, and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to back-up withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien). The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

_____     _____
Signature of Owner     Date     Signature of Co-owner     Date
(or other party having interest in contract)

_____
Witness     Date

**RETURN COMPLETED FORM TO THE ADDRESS OF THE COMPANY CHECKED ABOVE.**

## - Instructions and Conditions -

| | | |
|---|---|---|
| 1. | **CONTRACT IDENTIFICATION** | Complete all contract information in this section. You may use this form for multiple contracts that have the same contract owner and require the same signatures. |
| 2. | **BENEFICIARY DESIGNATIONS** | Unless otherwise provided, the right to change the beneficiary is reserved to the owner. Such change will be without prejudice to the company which issued the contract ("the Company") on account of any payment made or action taken by it before receipt of such notice at its Service Center.<br><br>Please select the Insureds/Annuitants for which the designation will take effect.<br><br>This designation, when filed with the Company, will become effective as of its date of execution. Such execution will constitute a waiver of any contract provision(s) requiring endorsement of change of beneficiary. All designations are subject to the terms and conditions of the contract, any indebtedness to the Company and any collateral assignment of the contract, whether made prior to or subsequent to the date of this designation.<br><br>The Company is released from all liability by making payment in accordance with this designation and assumes no responsibility for the use of money by any Trustee named herein. If a Trustee is named as the beneficiary, the date and legal title of the Trust must also be included.<br><br>The death proceeds shall be payable in equal shares to the designated beneficiaries, unless otherwise indicated. If beneficiaries are to receive unequal portions of the death benefit, it must be shown as a percentage of the death benefit and not as specific dollar amounts. In the event no beneficiary survives the insured and this form or the contract does not provide otherwise, the proceeds will be paid to the contract owner, or the executors or administrators of the contract owner's estate.<br><br>**SUGGESTED WORDING FOR COMMON DESIGNATIONS**<br>**Insured/Annuitant's Estate** – Executors or Administrators of the Insured's/Annuitant's Estate<br>**One individual beneficiary** – Mary Doe, wife, 100 N. Main St, Chicago, IL, SSN 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<br>**Two or more individual beneficiaries** – Jane Doe, daughter, 100 N. Main St, Chicago, IL, SSN 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 and John Doe, son, 100 N. Main St, Chicago, IL, SSN 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<br>**One class or unnamed children** – Children born of the marriage of the Insured and Mary Doe<br>**Unequal portions** – Jane Doe, daughter, 75%, 100 N. Main St, Chicago, IL, SSN 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; John Doe, son, 25%, 100 N. Main St, Chicago, IL, SSN 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<br>**Business Associate** – John Smith, Business Associate, 100 N. Main St, Chicago, IL, SSN 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<br>**Not Incorporated** – The Board of Directors of the ADA, 100 N. Main St, Chicago, IL<br>**Incorporated** – ADA, 100 N. Main St, Chicago, IL, A Corporation organized under the laws of the State of Illinois |
| 3. | **OPTIONAL CLAUSES** | **Postponement Clause - Common Disaster** – In no case shall any payment be made to any beneficiary designated in this form until thirty (30) days or state mandated period have elapsed following the Insured's death, and in the event of the death of a beneficiary during such period, payment shall be made in the same manner as provided in this form, had the said beneficiary predeceased the Insured. This provision does not apply to a Trustee.<br><br>**Children's Clause - Per Stirpes** – If a child of the Insured who is designated in this form as a beneficiary predeceases the Insured, leaving children who survive the Insured, then the shares the deceased beneficiary would have received shall be payable in equal shares to the surviving children of the deceased beneficiary.<br><br>**Minor Beneficiary Clause - Trustee for Children** – The Trustee appointed to any beneficiary who is a minor child will receive any payment due on or after the Insured's death on the date such payment falls due. Payment by the Company to such Trustee shall be an absolute and complete release and acquittance of the Company which shall not be held accountable or responsible for the use and application of the death benefit proceeds paid to such Trustee.<br><br>**Irrevocable Beneficiary** – The beneficiary will become an irrevocable beneficiary and must provide consent for future transactions. Minors who are designated as irrevocable beneficiaries will not be permitted to approve future transactions until they reach the age of majority. |
| 4. | **SIGN HERE FOR ABOVE REQUEST** | This request must be dated and all required signatures must be written in ink, using full legal names.<br><br>Taxpayer Identification Number Certification: You must cross out item 2 if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.<br><br>This request must be signed by:<br>• the person or persons who have the rights of ownership under the terms of the contract (co-owners, irrevocable beneficiary);<br>• by any other party who may have an interest in the contract by legal proceedings or statutes; and<br>• by a disinterested third party.<br><br>**Special circumstances – Corporate ownership:** The signature of one officer followed by the officer's title is required. The request must be submitted on a piece of corporate letterhead or paper with the corporate seal signed by that officer; **Partnerships:** The full name of the partnership should be written followed by the signatures of all partner(s), other than the Insured; **Trust:** If the contract is owned by or assigned to a Trustee, current Trustee(s) signatures are required as instructed by the trust agreement. Validation of Trustee(s) signatures may be required. |

# EXHIBIT Q

# ⋂ Lincoln
## Financial Group®

*The Lincoln National Life Insurance Company*
*Claim Services, MCL1*
*P.O. Box 5048*
*Hartford, CT 06102-5048*

# *Claim Status*

*Acting as administrative agent of:*
*Aetna Life Insurance Company*
*ING Life Insurance and Annuity Company*

GLOBE COMPOSITE SOLUTIONS LTD
SUITE 1475
10440 N CENTRAL EXPRESSWAY
DALLAS
TX 75205

August 1, 2005
Issuing Company:  ING Life Insurance and Annuity Company
Policy/Certificate Number: G 1637194
Insured:  RICHARD C SOMERVILLE

*300256552*

Your claim for benefits has been approved.  Since you elected Lump Sum payment, we have opened a SecureLine account in your name and deposited $251,366.44 into the account.  SecureLine is a service offered to you by the Company.  It is an interest bearing account, with check writing privileges, which is provided at no cost to you.  Both the principal and interest are guaranteed by the Company.  The following details the benefit that is being deposited in your SecureLine account:

### EXPLANATION OF BENEFITS

| | |
|---|---|
| Base Face Amount | $250,000.00 |
| Interest on Policy/Certificate | $1,366.44 |
| Interest Percentage(s) | 3.50% |
| Payee Amount Due | $251,366.44 |

If proceeds are being paid to you under more than one policy/certificate, only one SecureLine account will be opened in your name.  Your account total will equal the sum of the net proceeds due on each policy/certificate.

We believe that the interest included in this payment is fully taxable.  If the interest amount is $600 or more, we are required to report the amount to the Internal Revenue Service.  A copy of Form 1099-INT will be mailed to you at tax time.

You will soon be receiving a package of information about SecureLine and its benefits to you.  This information package fully explains your account and includes a supply of personalized checks.  If you decide that you need the entire proceeds immediately, just write one check for the account balance.  If you have any questions regarding your SecureLine account, please call 800 331-4631.

At Lincoln Life, we are committed to providing you with quality customer service.  If you have any questions or comments, please contact us at 800 444-2363 (Option 4).  We are available between the hours of 8:00 a.m. and 5:00 p.m. Eastern Time, Monday through Friday.  If you would prefer, you may contact us via facsimile at 800 682-3216.

Sincerely,

Jane Cummiskey
Claim Services

# EXHIBIT R

Case 1:05-cv-10323 DPW   Document 59-15   Filed 11/28/2006   Page 2 of 3
09/21/2005 17:13 FAX 617 261 7673      T. B, H & R, P.C.                      ☒002/003
Case 1:05-cv-11925-NMG     Document 1    Filed 09/22/2005    Page 1 of 2

# TARLOW BREED
# HART & RODGERS, P.C.
*Counsellors at Law*

Jennifer C. Roman
Direct Dial: (617) 218-2045
E-mail: jroman@tbhr-law.com

September 21, 2005

**VIA FACSIMILE AND FIRST CLASS MAIL**

Carey L. Bertrand, Esquire
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
155 Federal Street, 5th Floor
Boston, MA 02110

RE:    American General Life Insurance Company Policy No. U10005220L
       Insured: Richard C. Somerville
       <u>Notice of Claim</u>

Dear Attorney Bertrand:

As you are aware, this office represents the Estate of Richard C. Somerville, by the Executrix of the Estate, Mr. Somerville's widow, Anne Roche Somerville (hereinafter the "Estate"). It is my understanding that a death claim has been submitted by Globe Composite Solutions, Ltd. (hereinafter "Globe Composite") on the above-referenced policy.

By way of this letter, the Estate submits its notice of claim to American General Life Insurance Company (hereinafter "American General").

The Estate and Globe Composite are currently involved in litigation pending in the United States District Court, District of Massachusetts. The case name is <u>Globe Composite Solutions, Ltd. f/k/a Kalm-Forsythe Global Innovations, Ltd. v. Richard C. Somerville, Anne-Roche Somerville, and Solar Construction, Inc. f/k/a Globe Rubber Works, Inc.</u>, Docket No. 05-10323DPW. At the heart of the litigation is an Asset Purchase Agreement entered into between Somerville, Globe Rubber Works, Inc. and Kalm-Forsythe Global Innovations, Ltd.[1] (hereinafter the "Agreement") as well as an Employment Agreement entered into between Somerville and Globe Composite (hereinafter the "Employment Agreement").

---

[1] Kalm-Forsythe Global Innovations, Ltd. changed its name to Globe Composite upon the closing of the Asset Purchase Agreement. For simplification, the term "Globe Composite" shall refer to both Kalm-Forsythe Global Innovations, Ltd. and Globe Composite.

---

101 Huntington Avenue ▪ Prudential Center ▪ Boston, MA 02199 ▪ Telephone 617.218.2000 ▪ Fax 617.261.7673 ▪ www.tbhr-law.com



Carey L. Bertrand, Esquire
September 21, 2005
Page 2

Pursuant to the Agreement, Globe Composite purchased identified assets of Globe Rubber Works, Inc. Article 2, §2.2, identifies all excluded assets. Notably, excluded from the assets purchased by Globe Composite were "all insurance policies and rights thereunder. . . ." Accordingly, it is the position of the Estate that Globe Composite does not have any right to the above-referenced policy pursuant to the terms of the Agreement.

In the pending litigation, the Estate asserts that Globe Composite breached the terms of the Employment Agreement when it wrongfully terminated Somerville from his employment on January 31, 2005. Consistent with this position, Somerville made demand for the payment of an outstanding promissory note on February 4, 2005.

In our telephone conversation yesterday, you stated that the change of ownership form and the change of beneficiary form, both purportedly signed by Somerville, were dated February 14, 2005 and February 15, 2005, respectively. Both of these documents were submitted to American General. The timing of the alleged execution of these documents raises serious questions for the Estate, and these questions lead the Estate to question the validity of the documents. In addition, the Estate has not examined the documents which were submitted to American General, and we are unable to confirm the validity of Somerville's purported signature.

Please be advised that the Estate contests the alleged assignment of the above-referenced policy to Globe Composite. The Estate also contests the validity of any documents allegedly executed by Somerville purporting to change the ownership of the above-referenced policy and/or change the beneficiary of the above-referenced policy on the grounds of, among other things, duress, undue influence, and incapacity.

It is our position that the payment of any claim to Globe Composite under the above-referenced policy would be wrongful and expose American General to liability.

Please advise me immediately of your intended action so we may be able take any other action which may be necessary to protect our client's interest.

Please do not hesitate to contact me with any questions.

Very truly yours,

Jennifer C. Roman