UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GLOBE COMPOSITE SOLUTIONS, LTD. )
F/K/A KALM-FORSYTHE GLOBAL )
INNOVATIONS, LTD. )
        Plaintiff, )
)
v. )
)
RICHARD C. SOMERVILLE, ANNE )
ROCHE-SOMERVILLE, and )
SOLAR CONSTRUCTION, INC. F/K/A )
GLOBE RUBBER WORKS, INC. )
        Defendants. )

Civil Action No. 05 10323 DPW

RICHARD C. SOMERVILLE and )
SOLAR CONSTRUCTION, INC. F/K/A )
GLOBE RUBBER WORKS, INC. )
        Plaintiffs-in-Counterclaim )
)
v. )
)
GLOBE COMPOSITE SOLUTIONS, LTD. )
F/K/A KALM-FORSYTH GLOBAL )
INNOVATIONS, LTD. and )
CARL W. FORSYTHE )
        Defendants-in-Counterclaim )

## AFFIDAVIT OF JENNIFER C. ROMAN

I, Jennifer C. Roman, upon personal knowledge know these facts to be true, hereby

under oath depose and state the following:

    1.    I am an attorney duly licensed to practice law in the Commonwealth of

Massachusetts and this Court.  I am one of the attorneys representing the

defendants/plaintiffs-in-counterclaim Anne Roche-Somerville, individually and in her

capacity as Executrix of the estate of Richard C. Somerville and Solar Construction, Inc.

f/k/a Globe Rubber Works, Inc. (collectively, the "Defendants").  I have personal knowledge

of the matters set forth in this Affidavit.

2.    This affidavit is submitted in support of the Defendants' Opposition to the

Plaintiff's Partial Motion for Summary Judgment as well as in support of the Defendants'

request for relief pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.  Although

the Defendants are filing their opposition to the Plaintiff's Motion for Summary Judgment

contemporaneously herewith, Defendants assert that there is a plausible basis for believing

that granting additional time to complete discovery and obtain affidavits will produce

additional testimony which will influence the outcome of the pending motion for summary

judgment and that the court should refuse the application for judgment or, in the alternative,

order a continuance to permit the completion of Carl Forsythe's deposition and until such

time as Globe Composite is able to produce the originals of certain documents which are

relevant to the Summary Judgment Motion.

3.    Attached hereto as **Exhibit 1** is a true and accurate copy of American General

Life Insurance Company Policy No. U10005220L, Date of Issue: September 19, 1998 that

was marked during the deposition of Roger Fasnacht ("Fasnacht") on December 15, 2006 as

Deposition Exhibit No. 218.  It is also Exhibit 2 from the deposition of American General.

4.    Attached hereto as **Exhibit 2** is a true and accurate copy of the letter to

American General dated September 2, 2004 that was marked during the deposition of Roger

Fasnacht on December 15, 2006 as Deposition Exhibit No. 222.

5.      Attached hereto as **Exhibit 3** is a true and accurate copy of American General history from its internal imaging system for September 2, 2004 that was marked as Deposition Exhibit No. 11 at the deposition of American General.

6.      Attached hereto as **Exhibit 4** is a true and accurate copy of American General Annual Statement of Life Insurance, September 19, 2003 to September 19, 2004 that was marked during the deposition of Fasnacht on December 15, 2006 as Deposition Exhibit No. 216 and was marked as Exhibit 12 at the deposition of American General.

7.      Attached hereto as **Exhibit 5** is a true and accurate copy of FAX TRANSMISSION from Pension & Wealth Management to Policyowner Service, American General dated February 16, 2005 that was marked during the deposition of Fasnacht on December 15, 2006 as Deposition Exhibit No. 228 and as Exhibit 10 at the deposition of American General.

8.      Attached hereto as **Exhibit 6** is a true and accurate copy of American General "Change of Ownership" form faxed February 17, 2005 that was marked during the deposition of Fasnacht on January 31, 2006 as Deposition Exhibit No. 9 and as Exhibit 13 at the deposition of American General.

9.      Attached hereto as **Exhibit 7** is a true and accurate copy of American General "Change of Beneficiary" form faxed from Pension & Wealth Management to Policyowner Service, American General dated February 16, 2005 that was marked during the deposition of Fasnacht on December 15, 2006 as Deposition Exhibit No. 229 and as Exhibit 14 at the deposition of American General.

10.     Attached hereto as **Exhibit 8** is a true and accurate copy of a letter from American General to Globe Rubber Works, Inc. dated February 18, 2005 that was marked

during the deposition of American General on January 31, 2007 as Deposition Exhibit No. 16.

11.     Attached hereto as **Exhibit 9** is a true and accurate copy of FAX TRANSMISSION from Pension & Wealth Management to Agent's Team, American General dated February 23, 2005 that was marked during the deposition of Fasnacht on December 15, 2006 as Deposition Exhibit No. 232 and as Exhibit 19 at the deposition of American General.

12.     Attached hereto as **Exhibit 10** is a true and accurate copy of a letter from American General to Globe Rubber Works, Inc. dated February 24, 2005 that was marked during the deposition of Fasnacht on December 15, 2006 as Deposition Exhibit No. 233 and as Exhibit 20 at the deposition of American General.

13.     Attached hereto as **Exhibit 11** is a true and accurate copy of a letter "Request for Information" from Lincoln Financial Group to Globe Rubber Works, Inc. dated March 10, 2005 that was marked during the deposition of Fasnacht on December 15, 2006 as Deposition Exhibit No. 236.

14.     Attached hereto as **Exhibit 12** is a true and accurate copy of Lincoln Financial AWD History dated March 24, 2005 that was marked during the deposition of Fasnacht on December 15, 2006 as Deposition Exhibit No. 237.

15.     Attached hereto as **Exhibit 13** is a true and accurate copy of a Fax from Fasnacht to Elonie Smith dated March 29, 2005 that was marked during the deposition of Fasnacht on December 15, 2005 as Deposition Exhibit No. 238.

16.     Attached hereto as **Exhibit 14** is a true and accurate copy of a Fax from Roger Fasnacht to Elonie Smith dated March 30, 2005 that was marked during the deposition of Fasnacht on December 15, 2006 as Deposition Exhibit No. 239.  The enclosure to the fax

was an undated letter allegedly signed by Mr. Somerville. This letter is also Exhibit H to the Concise Statement of Facts filed by Plaintiff in support of its motion. Lincoln Financial has no record of ever receiving the original of this document (See Affidavit of Cheryl Wilson.)

17.     At my request, on or about November 10, 2006, the Plaintiff made available for my inspection the documents from Plaintiff's insurance file concerning the disputed Policies. Some, but not all of the documents made available for inspection at that time, had been previously produced. In addition, I requested the opportunity to inspect the original of the letter which is part of Exhibit 15, which letter also appears as Exhibit H to the Concise Statement of Facts filed by Plaintiff in support of its motion. On November 21, 2006, the Plaintiff, through counsel, stated that it could not locate the original of the requested document. (See November 21, 2006, email from Clare Burhoe, Esquire to me attached as **Exhibit 15.**)

18.     Exhibit 14 appears to have been prepared in March, 2005, after Mr. Somerville had been terminated from Globe Composite and after this lawsuit was commenced. In addition, Exhibit 14 appears to have been faxed from Globe Composite.

19.     Since Somerville has passed away, the Defendants are unable to speak with him about the circumstances surrounding the attempts made by Globe Composite to have the disputed insurance policies assigned to it, the alleged execution of any of the forms submitted to Lincoln Financial and American General or the letter allegedly signed by Somerville in March, 2005, which was submitted to Lincoln Financial on March 30, 2005

20.     Attached hereto as **Exhibit 16** is a true and accurate copy of Lincoln Financial AWD History dated June 3, 2005 that was admitted during the deposition of Fasnacht on December 15, 2006 as Deposition Exhibit No. 245.

21.     Attached hereto as **Exhibit 17** is a true and accurate copy of the July 5, 2005 letter from Kathryn E. Pieczarka, Esquire from Lawson & Weitzen, LLP to American General marked during the deposition of Fasnacht as Deposition Exhibit No. 247 and Exhibit 24 during the deposition of American General.

22.     Attached hereto as **Exhibit 18** is a true and accurate copy of the letter from Forsythe to American General dated September 15, 2005 marked during the deposition of American General as Deposition Exhibit No. 25.

23.     Attached hereto as **Exhibit 19** is a true and accurate copy of the letter from Forsythe to American General dated September 16, 2005 marked during the deposition of Forsythe on January 4, 2007 as Deposition Exhibit No. 255 and as Exhibit No. 26 during the deposition of American General.

24.     Attached hereto as **Exhibit 20** is a true and accurate copy of the Affidavit of Richard C. Somerville (excluding exhibits) dated March 28, 2005.

25.     ~~Attached hereto as **Exhibit 21** is a true and accurate copy of the $400,000~~ Promissory Note dated August 3, 2004.

26.     Attached hereto as **Exhibit 22** is a true and accurate copy of the deposition transcript of the December 15, 2006 deposition of Fasnacht.

27.     Attached hereto as **Exhibit 23** is a true and accurate copy of pages 1-97 of the deposition transcript of the January 4, 2007 deposition of Forsythe.

28.     Attached hereto as **Exhibit 24** is a true and accurate copy of the deposition transcript of the January 30, 2007 deposition of American General.

29.     Attached hereto as **Exhibit 25** is a true and accurate copy of a letter, signed under the pains and penalties of perjury, of Cheryl Wilson dated February 2, 2007.

28.    Attached hereto as **Exhibit 24** is a true and accurate copy of the deposition transcript of the January 30, 2007 deposition transcript of American General.

29.    Attached hereto as **Exhibit 25** is a true and accurate copy of a letter, signed under the pains and penalties of perjury from Cheryl Wilson dated February 2, 2007.

30.    In July and August, 2005, the Defendants finalized the automatic disclosures (August 5, 2005), identifying and producing responsive documents, finalizing written discovery requests (served August 5, 2005) and defending against Globe Composite's attempts to amend the Complaint.  After the filing of the Defendants' opposition to the motion to amend, Globe Composite withdrew its motion.

31.    The parties had scheduled the completion of the combined Rule 30(b)(6) deposition of the Plaintiff and individual deposition of Carl Forsythe for January 30, 2007. The deposition was not able to proceed, however, because Mr. Forsythe was involved in a case which was being tried in Texas and was unavailable.


Signed under pains and penalties of perjury this 2nd day of February, 2007.


Jennifer C. Roman

7

EXHIBIT

218 Fasnacht
12-15-06 CW

# AMERICAN GENERAL LIFE

### Insurance Company

Home Office:
Houston, Texas

2727-A Allen Parkway
P.O. Box 1931
Houston, Texas 77251

(713) 522-1111

RICHARD C SOMERVILLE
POLICY NUMBER: U10005220L



**A STOCK COMPANY**

A Subsidiary of American General Corporation

**WE WILL PAY THE DEATH BENEFIT PROCEEDS** to the Beneficiary if the Insured dies prior to the Maturity Date and while this policy is in force. Payment will be made after we receive due proof of the Insured's death, and will be subject to the terms of this policy.

**WE WILL PAY THE CASH SURRENDER VALUE** of this policy to the Owner on the Maturity Date if the Insured is living on that date.

The consideration for this contract is the application and payment of the first premium. The first premium must be paid on or before delivery of this policy.

This is a FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE POLICY. Adjustable Death Benefit is payable upon the Insured's death prior to the Maturity Date. Premium payments are flexible and payable to the Maturity Date. ACCUMULATION VALUES and CASH VALUES are flexible and will be based on the amount and frequency of premiums paid, and the amount of interest credited. NONPARTICIPATING—NOT ELIGIBLE FOR DIVIDENDS.

### NOTICE OF TWENTY DAY RIGHT TO EXAMINE POLICY

You may return this policy within twenty days after delivery if you are not satisfied with it for any reason. The policy may be returned to us or to the agent through whom it was purchased. Upon surrender of the policy within the twenty day period, it will be void from the beginning, and we will refund any premium paid.

SIGNED AT THE HOME OFFICE ON THE DATE OF ISSUE.

B. Shelby Badz

Secretary

President

### FLEXIBLE PREMIUM ADJUSTABLE LIFE
### READ YOUR POLICY CAREFULLY

95325

## INDEX

| | |
|---|---|
| Accumulation Value | |
| On the Date of Issue | 8 |
| On Each Deduction Day | 8 |
| On Other than a Deduction Day | 9 |
| Age or Sex Incorrectly Stated | 14 |
| Annual Report | 15 |
| Beneficiary and Proceeds | 12 |
| Calculations—How We Calculate | |
| The Monthly Deduction | 9 |
| The Cost of Insurance—Basic Policy | 9 |
| Cash Value | 9 |
| Changing Your Insurance Policy | |
| Change of Ownership or Beneficiary | 12 |
| Changing the Death Benefit Option | 8 |
| Changing the Specified Amount | 7 |
| Changing the Maturity Date | 8 |
| Contract | 6 |
| Cost of Insurance Rate Table | 17 |
| Date of Issue | 3, 6 |
| Death Benefit and Death Benefit Options | 7 |
| Grace Period | 10 |
| Incontestability | 14 |

| | |
|---|---|
| Interest Rate | |
| In Calculating Accumulation Values | 10 |
| For Policy Loans | 12 |
| Maturity Date | 3 |
| Monthly Administration Fee | 3, 10 |
| Monthly Expense Charge Table | 5 |
| Monthly Guarantee Premium Provision | 11 |
| Monthly Guarantee Premium Rate Table | 4 |
| Net Premium | 6 |
| Net Premium Percentage | 3 |
| Policy Loans | 12 |
| Policy Values Provision | 8 |
| Owner, Rights | 6 |
| Payment Options | 12-14 |
| Premium Payments | 6 |
| Reinstatement | 15 |
| Specified Amount | 3 |
| Suicide Exclusion | 14 |
| Surrender, Full or Partial | 11 |
| Surrender Charge Provision | 9 |
| Surrender Charge Table | 18-20 |
| When This Policy Terminates | 15 |

**Company. Reference.** "We", "our", "us", or "Company" means American General Life Insurance Company.

**"You", "Your."** The words "You" or "Your" mean the Owner of this policy.

**Premium Class.** The Premium Class of this policy is shown on page 3 as one or a combination of the following terms:

**Select.** The term "Select" means the Insured qualifies as an above standard mortality risk.

**Preferred.** The term "Preferred" means the cost of insurance is based on the Insured being a non-user of tobacco.

**Standard.** The term "Standard" means the cost of insurance is based on the Insured being a tobacco user. All policies issued to juveniles at issue age 17 or less are designated as "Standard". This means that cost of insurance rates stated in the policy for insurance ages 18 and above are rates for tobacco users. (Rates are not classified on the basis of the Insured being a user or non-user of tobacco at ages 0 through 17.)

**Special.** The term "Special" means an extra premium is being charged due to the Insured's health, occupation or avocation.

Rates on Policy Anniversary Nearest Insured's 18th Birthday (For Insured's Age 17 or Less on Date of Issue). If the Insured's age, nearest birthday, is 17 or less on the Date of Issue of this policy, rates will be based on the Insured being a tobacco user starting on the policy anniversary nearest the Insured's 18th birthday, except as follows. Prior to the anniversary nearest the Insured's 18th birthday, a written statement, signed by the Owner and the Insured, may be submitted to the Company requesting that rates for non-users of tobacco be made effective. The statement must include the date the Insured last used tobacco, or state that the Insured has never used tobacco, whichever applies. If the request is approved, rates for non-users of tobacco will be made effective on the policy anniversary nearest the Insured's 18th birthday. Otherwise, tobacco user rates will apply.

Payment of Interest on Proceeds Not Paid Within 30 Days After Due Proof of Death is Furnished To The Company. If proceeds under this policy are not paid within 30 days after due proof of death of the Insured has been furnished to the Company, the Company will pay interest on such proceeds at the same rate as paid on proceeds left on deposit with the Company.

### NOTICE
This Policy Is A Legal Contract Between
The Policyowner And The Company.

SCHEDULE OF BENEFITS

| | MONTHLY COST | YEARS PAYABLE |
|---|---|---|
| BASIC POLICY | | |
| ADJUSTABLE LIFE | SEE PAGE 17 | 35 |

ADDITIONAL BENEFITS PROVIDED BY RIDERS

NONE

TERM CONVERSION CREDIT (FIRST YEAR ONLY):     $2,800.00

SCHEDULE OF PREMIUMS

| | |
|---|---|
| PREMIUM CLASS: | PREFERRED |
| INITIAL PREMIUM: | $6,136.72 |
| PLANNED PERIODIC PREMIUM: | $4,736.72 PAYABLE SEMI-ANNUALLY |
| DEDUCTION DAY: | 19TH DAY OF EACH MONTH |

MINIMUM DEATH BENEFIT AMOUNT (AFTER A     $100,000
  DECREASE IN SPECIFIED AMOUNT)

MONTHLY GUARANTEE PREMIUM (SEE MONTHLY     $700.00
  GUARANTEE PREMIUM PROVISION THAT
  GUARANTEES THIS POLICY WILL NOT
  TERMINATE DURING THE GUARANTEE
  PERIOD UNDER CERTAIN CIRCUMSTANCES)

MONTHLY EXPENSE CHARGE FOR FIRST 4 YEARS     $175.00
(SEE MONTHLY EXPENSE CHARGE TABLE FOR RATES
APPLYING TO INCREASES IN SPECIFIED AMOUNT)

| | GUARANTEED | INITIAL |
|---|---|---|
| NET PREMIUM PERCENTAGE | 93.00% | 94.50% |
| MONTHLY ADMINISTRATION FEE | $7.00 | $5.00 |

SURRENDER CHARGES ARE DESCRIBED IN THE PAGES THAT FOLLOW.  READ YOUR
POLICY CAREFULLY.

BASED ON GUARANTEED CHARGES, GUARANTEED INTEREST RATES AND YOUR PLANNED
PERIODIC PREMIUM, THE POLICY WILL REMAIN IN FORCE UNTIL  MARCH 2003.

POLICY DATA

| | | |
|---|---|---|
| INSURED: RICHARD C SOMERVILLE | POLICY NUMBER: | U10005220L |
| INSURANCE AGE:  65 | DATE OF ISSUE: | SEPTEMBER 19, 1998 |
| INITIAL SPECIFIED AMOUNT:  $250,000 | MATURITY DATE: | SEPTEMBER 19, 2033 |
| DEATH BENEFIT OPTION: 1 | | |

THIS IS A MASSACHUSETTS CONTRACT

95325                              PAGE 3

PREPARED FOR:    GLOBE RUBBER WORKS INC
POLICY NUMBER:    U10005220L

TABLE OF MONTHLY GUARANTEE PREMIUMS
PER $1,000 OF SPECIFIED AMOUNT

| ISSUE AGE | | ISSUE AGE | | ISSUE AGE | |
|---|---|---|---|---|---|
| 65 | $ 2.79999 | 71 | $ 4.03557 | 76 | $ 5.49813 |
| 66 | 2.99534 | 72 | 4.28045 | 77 | 5.85627 |
| 67 | 3.18720 | 73 | 4.55534 | 78 | 6.26115 |
| 68 | 3.39068 | 74 | 4.86022 | 79 | 6.69604 |
| 69 | 3.58906 | 75 | 5.17673 | 80 | 7.14255 |
| 70 | 3.80231 | | | | |

FOR A SPECIAL (RATED) PREMIUM CLASS WE WILL ADJUST THE RATES TO REFLECT THE MORTALITY RISK.

PREPARED FOR:    GLOBE RUBBER WORKS INC

POLICY NUMBER:    U10005220L

TABLE OF MONTHLY EXPENSE CHARGES FOR THE FIRST FOUR YEARS
PER $1,000 OF SPECIFIED AMOUNT
(ALSO APPLIES TO AN INCREASE IN SPECIFIED AMOUNT DURING
FIRST FOUR YEARS OF THE INCREASE)

| ISSUE AGE | | ISSUE AGE | | ISSUE AGE | |
|---|---|---|---|---|---|
| 65 | 0.70000 | 71 | 1.00889 | 76 | 1.37453 |
| 66 | 0.74884 | 72 | 1.07011 | 77 | 1.46407 |
| 67 | 0.78680 | 73 | 1.13884 | 78 | 1.56529 |
| 68 | 0.84767 | 74 | 1.21506 | 79 | 1.67401 |
| 69 | 0.89727 | 75 | 1.29418 | 80 | 1.78564 |
| 70 | 0.95058 | | | | |

THE MONTHLY EXPENSE CHARGE FOR THE INITIAL SPECIFIED AMOUNT FOR THE FIRST
FOUR YEARS IS SHOWN ON PAGE 3 OF THE POLICY. TO DETERMINE THE MONTHLY
EXPENSE CHARGE FOR AN INCREASE IN SPECIFIED AMOUNT, MULTIPLY THE APPROPRIATE
RATE SHOWN ABOVE BY THE NUMBER OF THOUSANDS OF INCREASE IN SPECIFIED AMOUNT.
THE RESULT WILL BE DEDUCTED FROM THE ACCUMULATION VALUE MONTHLY DURING THE
FIRST FOUR YEARS OF THE INCREASE.

Contract. Your policy is a legal contract that you have entered into with us. You have paid the first premium and have submitted an application, a copy of which is attached. In return, we promise to provide the insurance coverage described in this policy.

The entire contract consists of:

1. The basic policy;

2. The riders that add benefits to the basic policy, if any;

3. Endorsements, if any; and

4. The attached copy of your application, and any amendments or supplemental applications.

Date of Issue. The Date of Issue of this policy is the date on which the first premium is due. The Date of Issue is also the date from which all policy years, anniversaries, and monthly deduction dates are determined.

Owner. The Owner is as stated in the application unless later changed. During the Insured's lifetime, the Owner may exercise every right the policy confers or we allow (subject to the rights of any assignee of record, and to any endorsement on this policy limiting such rights). If you die before the Insured, and you have not named a successor Owner, all of the rights belong to your estate.

Rights of the Owner. As the Owner, you may exercise the rights given by this policy. These include:

1. The right to make flexible premium payments according to the Premium Payments section;

2. The right to choose the Death Benefit Option according to the Death Benefit Proceeds and Death Benefit Options sections;

3. The right to apply for a change in the Specified Amount, Death Benefit Option and Maturity Date subject to the section entitled "Changing Your Insurance Policy";

4. The right to a cash benefit and continued coverage according to the Policy Values Provision;

5. The right to borrow money according to the Policy Loans section;

6. The right to change the Owner or Beneficiary according to the Beneficiary and Proceeds section;

7. The right to choose how proceeds will be paid according to the Payment Options section;

8. The right to assign the policy as security for an obligation according to the General Provisions section;

9. The right to apply for reinstatement of coverage as provided in the General Provisions section.

## PREMIUM PAYMENTS

All premiums after the first are payable in advance. Premium payments are flexible. This means you may choose the amount and frequency of payments.

The actual amount and frequency of premium payments will affect the Cash Values and the amount and duration of insurance. Please refer to the Policy Values Provision for a detailed explanation.

Planned Periodic Premiums. The amount and frequency of the Planned Periodic Premiums you selected are shown on page 3. You may request a change in the amount and frequency. We may limit the amount of any increase.

Unscheduled Additional Premiums. You may pay additional premiums at any time before the Maturity Date shown on page 3. We may limit the number and amount of additional premiums.

Maximum Premium. The sum of the premiums paid under this policy may not exceed the guideline premium limitation as defined by Section 7702, Internal Revenue Code of 1986 (or as later amended).

Any portion of any premium paid which is determined to be in excess of the limit will be refunded.

Where to Pay. You may make your payments to us at our home office or to an authorized agent. A receipt signed by an officer of the Company will be furnished upon request.

Net Premium. The Net Premium is the premium paid multiplied by the Net Premium Percentage. The Net Premium Percentage is adjustable, but will never be less than the guaranteed Net Premium Percentage shown on page 3.

95325

## DEATH BENEFIT AND DEATH BENEFIT OPTIONS

**Death Benefit Proceeds.** If the Insured dies prior to the Maturity Date and while this policy is in force, we will pay the Death Benefit Proceeds to the Beneficiary. The Death Benefit Proceeds will be subject to:

1. The Death Benefit Option in effect on the date of death; and

2. Any increases or decreases made to the Specified Amount. The Initial Specified Amount is shown on page 3.

Guidelines for changing the Death Benefit Option or the Specified Amount will be found in the section entitled "Changing Your Insurance Policy."

The Death Benefit Proceeds will be the Death Benefit amount reduced by any outstanding policy loan and will be subject to the other provisions of the "Beneficiary and Proceeds" section.

**Death Benefit Option.** The Death Benefit Option which you have chosen is shown on page 3 as either Option 1 or Option 2.

**Option 1.** If you have chosen Option 1 the Death Benefit Amount will be the greater of:

1. The Specified Amount on the date of death; or

2. The Accumulation Value on the date of death multiplied by the Death Benefit Percentage Factor for the Insured's age nearest birthday as shown in the table that follows.

**Option 2.** If you have chosen Option 2, the Death Benefit Amount will be the greater of:

1. The Specified Amount plus the Accumulation Value on the date of death; or

2. The Accumulation Value on the date of death multiplied by the Death Benefit Percentage Factor for the Insured's age nearest birthday as shown in the table that follows.

Table of Death Benefit Percentage Factors

| Att'd Age | Percentage Factor | Att'd Age | Percentage Factor | Att'd Age | Percentage Factor | Att'd Age | Percentage Factor |
|---|---|---|---|---|---|---|---|
| 0-40 | 250% | 50 | 185% | 60 | 130% | 70 | 115% |
| 41 | 243 | 51 | 178 | 61 | 128 | 71 | 113 |
| 42 | 236 | 52 | 171 | 62 | 126 | 72 | 111 |
| 43 | 229 | 53 | 164 | 63 | 124 | 73 | 109 |
| 44 | 222 | 54 | 157 | 64 | 122 | 74 | 107 |
| 45 | 215 | 55 | 150 | 65 | 120 | 75-90 | 105 |
| 46 | 209 | 56 | 146 | 66 | 119 | 91 | 104 |
| 47 | 203 | 57 | 142 | 67 | 118 | 92 | 103 |
| 48 | 197 | 58 | 138 | 68 | 117 | 93 | 102 |
| 49 | 191 | 59 | 134 | 69 | 116 | 94 | 101 |
| | | | | | | 95+ | 100 |

## CHANGING YOUR INSURANCE POLICY

You may request a change in the Specified Amount or Death Benefit Option at any time except that a decrease in the Specified Amount may not become effective prior to the end of the first policy year. Your request must be submitted to our home office in writing in a form acceptable to us. This policy must accompany the request.

**Increasing The Specified Amount.** We will require a supplemental application and evidence of insurability satisfactory to us for any increase in the Specified Amount. An increase will be effective on the monthly deduction day on or next following the date the application for increase is approved by us. The effective date will appear in an endorsement to this policy.

**Decreasing the Specified Amount.** Any decrease will go into effect on the monthly deduction day following the day we receive the request. The Death Benefit Amount remaining in effect after any decrease cannot be less than the greater of:

1. The Minimum Death Benefit Amount shown on page 3; or

2. Any Death Benefit Amount which, upon comparing such amount to the sum of premiums already paid, would result in an excess of premium payments. (See the "Maximum Premium" provision.)

Any such decrease will be applied in the following order:

1. Against the Specified Amount provided by the most recent increase;

2. Against the next most recent increases successively;

3. Against the Specified Amount provided under the original application.

Any reduction in Specified Amount will be subject to any applicable Surrender Charges on a pro-rata basis, and the remaining surrender charge will be reduced proportionately.

The Surrender Charges stated on pages 18-20 will apply to each $1,000 of decrease in Specified Amount. The Accumulation Value will be reduced by the amount of any Surrender Charge. However, if such charge would result in a negative Cash Value, the Specified Amount decrease will not be allowed.

Changing the Death Benefit Option. You may request a change in the Death Benefit Option you have chosen.

1. If you request a change from Option 1 to Option 2: The new Specified Amount will be the Specified Amount, prior to change, less the Accumulation Value as of the effective date of the change, but not less than zero.

2. If you request a change from Option 2 to Option 1: The new Specified Amount will be the Death Benefit Amount as of the effective date of the change.

We will not require evidence of insurability for a change in the Death Benefit Option. The change will go into effect on the monthly deduction day following the date we receive your request for change.

Changing the Maturity Date. You may request that the Maturity Date shown on page 3 be changed to any other policy anniversary which is:

1. On or after the 10th policy anniversary; and

2. Before the policy anniversary nearest the Insured's 100th birthday.

Changing the Terms of Your Policy. Any change in your policy must be approved by one of our officers. No agent has the authority to make any changes or waive any of the terms of your policy.

## POLICY VALUES PROVISION

### ACCUMULATION VALUE

The Accumulation Value is based on two types of premiums:

1. Scheduled Premiums: All premiums paid that do not exceed an amount equal to 12 Monthly Guarantee Premiums in a policy year; and

2. Supplemental Premiums: All premiums paid that exceed an amount equal to 12 Monthly Guarantee Premiums in a policy year.

All premiums are subject to the same expense charges. However, the portion of the Accumulation Value resulting from the payment of Supplemental Premiums (Fund Value) will not be subject to surrender charges for a full surrender. Therefore, the Fund Value is maintained separately. If the sum of premiums paid, excluding Supplemental Premiums, does not equal or exceed the sum of Monthly Guarantee Premiums required on such date, an amount equal to the premium required, multiplied by the Net Premium Percentage will be withdrawn from the Fund Value. Partial Surrenders of the Fund Value may be made, subject to the provisions of this policy regarding partial surrenders. We reserve the right to limit the amount or number of Supplemental Premiums.

On the Date of Issue. The Accumulation Value on the Date of Issue will be determined as follows:

1. We will multiply the first premium by the Initial Net Premium Percentage. (The result will be equal to your Accumulation Value before we make the first Monthly Deduction);

2. We will then subtract the Monthly Deduction for the first policy month; (See "How We Calculate a Monthly Deduction.")

The first deduction day is the Date of Issue. The monthly deduction day is shown on page 3.

On Each Deduction Day. On each deduction day after the Date of Issue, we will determine the Accumulation Value as follows:

1. First, we will take the Accumulation Value as of the last deduction day; and

2. Add the interest earned for the month on the excess of the Accumulation Value on the last deduction day over any Partial Surrenders made since the last deduction day; and

3. Add all premiums received since the last deduction day multiplied by the Net Premium Percentage then in effect; and

4.  Subtract any Partial Surrender made since the last deduction day; and

5.  Subtract the Monthly Deduction for the policy month following the monthly deduction day. (See "How We Calculate a Monthly Deduction.")

On Any Day Other Than a Deduction Day. The Accumulation Value on any day other than a deduction day will be:

1.  The Accumulation Value as of the last deduction day;

2.  Less any Partial Surrenders paid since the last deduction day;

3.  Plus all premiums received since the last deduction day multiplied by the Net Premium Percentage then in effect.

Cash Value. The Cash Value of this policy will be equal to the Accumulation Value less the Surrender Charge, if any.

Cash Surrender Value. The Cash Surrender Value of this policy will be equal to the Cash Value less any indebtedness.

Monthly Deductions May Be Made Only if There Is Sufficient Cash Surrender Value (Unless Policy Is Being Continued Under the Monthly Guarantee Premium Provision). Unless this policy is being continued in force under the Monthly Guarantee Premium provision, a monthly deduction from the Accumulation Value may be made only if the Cash Surrender Value is equal to or greater than the Monthly Deduction. The Accumulation Value will be reduced by the amount of each Monthly Deduction which will cause an equal reduction in the Cash Surrender Value. If the Cash Surrender Value on a deduction day is not sufficient to meet the Monthly Deduction for the current month, this policy will be subject to the "Grace Period" and "Monthly Guarantee Premium" provisions.

Surrender Charge. Surrender Charges for the Initial Specified Amount will apply if the Initial Specified Amount is surrendered or reduced during the Surrender Charge Period. Surrender Charges for any increases in Specified Amount will apply if such increases are surrendered or reduced during the Surrender Charge Period of each increase. The Surrender Charge Period will vary according to the age at issue (or age on the date of an increase) as shown in the table on pages 18-20. The table on pages 18-20 also lists the surrender charge rates per $1,000 of Specified Amount at all issue ages.

You may make a request for surrender at any time during the Insured's lifetime before the Maturity Date.

The amount being surrendered or reduced will terminate on the monthly deduction day on or next following the date we receive the request for surrender or reduction.

How We Calculate a Monthly Deduction. Each Monthly Deduction includes:

1.  The cost of insurance provided by the basic policy; and

2.  The cost of insurance for benefits provided by riders; and

3.  The Monthly Administration Fee; and

4.  During the first four policy years, a Monthly Expense Charge. (This charge also applies to the amount of any increase in Specified Amount during the first four years of such increase.)

How We Calculate the Cost of Insurance for the Basic Policy. We calculate the cost of insurance at the beginning of each policy month on the deduction day. The cost of insurance is determined as follows:

1.  Divide the Death Benefit Amount on the deduction day by 1.003675; and

2.  Reduce the result by the amount of Accumulation Value on the deduction day before the cost of insurance deduction is taken, and after the Monthly Expense Charge, if any, and the Monthly Administration Fee are deducted;

3.  Multiply the difference by the cost of insurance rate per $1,000 of net risk amount as provided in the "Cost of Insurance Rate" provision; and

4.  Divide the result by 1000.

If Option 1 is in effect, and there have been increases in the Specified Amount, the Accumulation Value will first be considered part of the Initial Specified Amount. If the Accumulation Value exceeds the Initial Specified Amount, the excess will be considered part of prior Specified Amount increases in the order of the increases.

Cost of Insurance for Benefits Provided by Riders. The cost of insurance for benefits provided by riders will be as stated on page 3 or in an endorsement.

95325

Monthly Administration Fee. An administration fee will be deducted monthly. The amount of the monthly fee may be adjusted, but will never be greater than the guaranteed Monthly Administration Fee shown on page 3.

First Four Years Monthly Expense Charge. A Monthly Expense Charge will be deducted during the first four policy years, and during the first four years of any increase in Specified Amount. The Monthly Expense Charge for the first four years for the Initial Specified Amount is shown on page 3. The Monthly Expense Charge for the first four years for any increase in Specified Amount will be calculated by multiplying the appropriate rate shown on page 5 by the number of thousands of such increase.

Cost of Insurance Rate. The cost of insurance rate for the Initial Specified Amount, and for each Specified Amount increase, is based on the Insured's:

1.  Sex;

2.  Age nearest birthday on each policy anniversary; and

3.  Premium class shown on page 3, associated with the Initial Specified Amount and each increase in the Specified Amount.

The guaranteed monthly cost of insurance rates are shown in the table on page 17. We can use cost of insurance rates that are lower than the guaranteed rates. Any change in rates will apply to all policies in the same rate class as this policy. The rate class of this policy is determined on its Date of Issue according to:

1.  The calendar year of issue and policy year;

2.  The plan of insurance;

3.  The amount of insurance; and

4.  The age, sex and mortality classification of the Insured.

Changes in Rates, Charges and Fees. This policy does not participate in our profits or surplus. Any redetermination of the cost of insurance rates, interest rates, expense charges, net premium percentage or monthly administration fee will be based on our expectations as to investment earnings, mortality, persistency and expenses. We will not change these charges in order to recoup any prior losses.

Interest Rate. The guaranteed interest rate used in calculating Accumulation Values is .3675% per month, compounded monthly. This is equivalent to 4.5% per year, compounded annually. We can use interest rates greater than the guaranteed rates to calculate Accumulation Values. The rate used to credit interest to the Fund Value may be different than the rate used to credit interest to the balance of the Accumulation Value. We will apply a different rate of interest to that portion of the Accumulation Value which equals the amount of the policy loan. The rate applied to amounts offset by policy loans will be at an annual effective rate of not less than 4.5% nor more than 6.5%.

At the end of the first month following the fifth policy anniversary, and at the end of each month thereafter, this policy will be eligible for a current interest bonus. The bonus will be credited monthly to the Accumulation Value subject to the following guidelines:

1.  The declared annual interest rate at the end of each month must be greater than the guaranteed annual interest rate of 4.5%; and

2.  The bonus credited each month will increase the declared annual interest rate applied to the Accumulation Value not offset by a policy loan by 1%.

Grace Period. If the Cash Surrender Value on a deduction day is not enough to meet the Monthly Deduction for the current month, this policy will remain in force during the 61-day period that follows. If the Cash Surrender Value on a policy anniversary is not enough to pay any loan interest due, this policy will remain in force during the 61-day period that follows. Such 61-day period is referred to in this policy as the "Grace Period." There is no Grace Period for the initial monthly deduction.

If the required premium is not paid by the end of the Grace Period this policy will terminate without value. However, we will give you at least 31 days notice prior to termination that your policy is in the Grace Period and advise you of the amount of premium required to keep your policy in force. Such 31 days prior notice will be sent to you at your last known address, and to the assignee of record, if any. If death occurs during the Grace Period, monthly deductions through the policy month in which death occurred will be deducted from the proceeds.

If a surrender request is received within 31 days after the Grace Period commences, the Cash Surrender Value payable will not be less than the

95325-22

Cash Surrender Value on the monthly deduction day the Grace Period commenced. The Monthly Deduction for the policy month following such monthly deduction day will not be subtracted in the calculation of such Cash Surrender Value.

Monthly Guarantee Premium. The Monthly Guarantee Premium for the Initial Specified Amount and any benefit riders in force on the Date of Issue is shown on page 3. The Monthly Guarantee Premium Period (Guarantee Period) on the Date of Issue will be 5 years. This policy will not terminate during the Guarantee Period if, on each monthly deduction day within the Guarantee Period the sum of premiums paid equals or exceeds:

1. the sum of the Monthly Guarantee Premiums from the start of the Guarantee Period, including the current month; plus

2. any partial surrenders and any increase in the loan amount since the start of the Guarantee Period.

If the Specified Amount is increased, a new Monthly Guarantee Premium will be calculated as follows: We will use rates for the Insured's attained age for the amount of the increase, and add the Monthly Guarantee Premium(s) previously calculated for the Initial Specified Amount and each prior increase, plus the cost of any benefit riders. A new 5 year Guarantee Period will begin during which the policy will not terminate if, during the new Guarantee Period, the above paid premium conditions are met. If the Specified Amount is decreased, the Monthly Guarantee Premium will be decreased. Such decrease will not affect the Guarantee Period then in effect, if any.

If a benefit rider is added or increased the Monthly Guarantee Premium will be increased. If a benefit rider is removed or decreased the Monthly Guarantee Premium will be decreased accordingly. Neither change will affect the Guarantee Period then in effect, if any.

If a policy is reinstated with no change to the Specified Amount, Premium Class or benefit riders, if any, the Monthly Guarantee Premium upon reinstatement will be the same as it was when the policy lapsed. Reinstatement will not extend or otherwise change the Monthly Guarantee Premium Period that was in effect when the policy lapsed.

Full Surrender. Subject to the Beneficiary and Proceeds section, you may return your policy to us and request its Cash Surrender Value. The

Cash Surrender Value will be calculated as of the day we receive your request. If surrender takes place within 31 days after a policy anniversary, the Cash Value will not be less than on that anniversary.

Partial Surrender. At any time after the first policy year, you may request withdrawal of a portion of the Cash Surrender Value of the policy. Your request must be made in writing prior to the Maturity Date during the Insured's lifetime.

A partial surrender will result in a reduction of the Cash Value, Accumulation Value and the Death Benefit Amount. The Cash and Accumulation Values will be reduced by the amount of partial surrender benefit. The reduced Death Benefit Amount will be determined in accordance with the Death Benefit Option provision. If your Death Benefit Option is Option 1, the Specified Amount will be reduced by the amount of the partial surrender. (The reduced amount will not be less than zero.) The Death Benefit Amount remaining after this reduction must be no less than the Minimum Death Benefit Amount shown on page 3.

There will be a charge not to exceed $50.00 for each partial surrender in addition to the amounts shown in the Table of Surrender Charges. Any partial surrender that causes a reduction in Specified Amount will be subject to any applicable surrender charges on a pro-rata basis, and the remaining surrender charge will be reduced proportionally.

Payment of Cash Value Benefit. We can delay payment of Cash Surrender Values for up to 6 months, or the period allowed by law, whichever is less. However, we cannot delay payment of a partial surrender if the amount is to be used to pay a premium to us.

Period of Insurance Coverage if Amount or Frequency of Premium Payments Is Reduced or if Premium Payments Are Discontinued. If you reduce the amount or frequency of premium payments, or if you discontinue payment of premiums and do not surrender this policy, we will continue making Monthly Deductions (as long as there is sufficient Cash Surrender Value to make such deductions) until the Maturity Date. This policy will remain in force until the earlier of the following dates:

1. The Maturity Date (if there is sufficient Cash Surrender Value to make Monthly Deductions to that date); or

2. The end of the Grace Period.

95325-22

## POLICY LOANS

You may borrow from us at any time while this policy is in force, an amount which is equal to or less than the policy's loan value. The loan value will be the Cash Value less:

1. Any prior outstanding loan; and

2. Interest on the amount to be borrowed to the next policy anniversary.

Loan Interest. The Annual Policy Loan Interest Rate is 6.1%. On each policy anniversary, loan interest for the next year is due in advance. Interest not paid when due will be added to the loan.

How You May Repay a Policy Loan. You may repay all or part of a policy loan at any time, except that:

1. Repayment may be made only while this policy is in force and prior to the death of the Insured; and,

2. A partial repayment must be at least $10.00.

At any time your policy loan exceeds the Cash Value, this policy will lapse. However, at least 31 days prior notice must be mailed by us to your last known address and to the assignee of record, if any.

We Can Delay Payment. We can delay lending you money for up to 6 months, or the period allowed by law, whichever is less. However, we cannot delay lending you money if the amount is to be used to pay a premium to us.

Obtaining a Loan. You may obtain a policy loan by written request and assignment of the policy as sole security for the loan.

## BENEFICIARY AND PROCEEDS

Beneficiary. The Beneficiary as named in the application, or later changed by you, will receive the proceeds upon the death of the Insured. Unless you have stated otherwise, proceeds will be paid as follows:

1. If any Beneficiary dies before the Insured, that Beneficiary's interest will pass to any other Beneficiaries according to their respective interests.

2. If no Beneficiary survives the Insured, proceeds will be paid to you, as Owner, if you are then living; otherwise proceeds will be paid to your estate.

Change of Ownership Or Beneficiary. You may change the Owner or the Beneficiary at any time during the lifetime of the Insured unless the previous designation provides otherwise. To do so, send a written request to our home office in a form acceptable to us. The change will go into effect when we have recorded the change. However, after the change is recorded, it will be deemed effective as of the date of your written request for change. The change will be subject to any payment made or action taken by us before the request is recorded.

Common Disaster. If we cannot determine whether a Beneficiary or the Insured died first in a common disaster, we will assume that the Beneficiary died first. Proceeds will be paid on this basis unless an endorsement to this policy provides otherwise.

Proceeds. Proceeds means the amount payable on:

1. The Maturity Date;

2. Exercise of the full surrender benefit; or

3. The Insured's death.

The proceeds on the Maturity Date will be the Cash Surrender Value. The proceeds on the Insured's death will be the Death Benefit Amount less any outstanding policy loan.

All proceeds and partial surrender benefits are subject to the provisions of the Payment Options section and the other provisions of this policy.

## PAYMENT OPTIONS

Instead of being paid in one sum, all or part of the proceeds may be applied under any of the Payment Options described below. In addition to these options, other methods of payment may be chosen with our consent.

Payment Contract. When proceeds become payable under a Payment Option, a Payment Contract will be issued to each payee. The Payment Contract will state the rights and benefits of the payee. It will also name those who are to receive any balance unpaid at the death of the payee.

95325

PAYMENT OPTIONS (Cont'd)

Election of Options. The Owner may elect or change any Payment Option while the Insured is living, subject to the provisions of this policy. This election or change must be in writing. Within 60 days after the Insured's death, a payee entitled to proceeds in one sum may elect to receive proceeds under any option.

Option 1. Payments for a Specified Period: Equal monthly payments will be made for a specified period. The Option 1 Table in this policy shows the monthly income for each $1,000 of proceeds applied.

Option 2. Payments of a Specified Amount: Equal monthly payments of a specified amount will be made. Each payment must be at least $60 a year for each $1,000 of proceeds applied. Payments will continue until the amount applied, with interest, has been paid in full.

Option 3. Monthly Payments for Life: Equal monthly payments will be made for a specified period, and will continue after that period for as long as the payee lives. The specified period may be 10, 15 or 20 years, or until total payments equal the amount of proceeds applied under this option. The Option 3 Table in this policy shows the monthly income for each $1,000 of proceeds applied.

At the time payments are to begin under this option, the payee may choose one of the following:

1. Monthly payments based on the Option 3 Table; or

2. Monthly payments equal to a monthly annuity based on our single premium immediate annuity rates then in use.

Option 4. Proceeds Left at Interest: Proceeds may be left on deposit with us for any period up to 30 years. Interest earned on the proceeds may be:

1. Left on deposit to accumulate at the rate of 3% compounded annually; or

2. Paid in installments at the rate for each $1,000 of proceeds of $30 annually, $14.89 semiannually, $7.42 quarterly or $2.47 monthly.

Upon the death of the payee, or at the end of the specified period, any balance left on deposit will be paid in a lump sum or under Options 1, 2 or 3.

Interest Rates. The guaranteed rate of interest for proceeds held under Payment Options 1, 2 and 4 is 3% compounded annually. We may credit interest at a higher rate. The amount of any increase will be determined by us.

Payments. The first payment under Options 1, 2 and 3 will be made when the claim for settlement has been approved. Payments after the first will be made according to the manner of payment chosen. Interest under Option 4 will be credited from the date of death and paid or added to the proceeds as provided in the Payment Contract.

Availability of Options. If the proposed payee is not a natural person, payment options may be chosen only with our consent.

If this policy is assigned, we will have the right to pay the assignee in one sum the amount to which the assignee is entitled. Any balance will be applied according to the option chosen.

The amount to be applied under any one option must be at least $2,000. The payment elected under any one option must be at least $20.

Evidence That Payee is Alive. Before making any payment under a Payment Option, we may ask for proof that the payee is alive. If proof is requested, no payment will be made or considered due until we receive proof.

Death of a Payee. If a payee dies, any unpaid balance will be paid as stated in the Payment Contract. If there is no surviving payee named in the Payment Contract, we will pay the estate of the payee:

1. Under Options 1 and 3, the value as of the date of death of the remaining payments for the specified period, discounted at 3% compounded annually;

2. Under Options 2 and 4, the balance of any proceeds remaining unpaid with accrued interest, if any.

Withdrawal of Proceeds Under Options 1 or 2. If provided in the Payment Contract, a payee will have the right to withdraw the entire unpaid balance under Options 1 or 2. Under Option 1, the amount will be the value of the remaining payments for the specified period discounted at 3% compounded annually. Under Option 2, the amount will be the entire unpaid balance.

95325

## PAYMENT OPTIONS (Cont'd)

Withdrawal of Proceeds Under Option 4. A payee will have the right to withdraw proceeds left under Option 4 subject to the following rules:

1. The amount to be withdrawn must be $500 or more;

2. A partial withdrawal must leave a balance on deposit of $1,000 or more.

Withdrawals May Be Deferred. We may defer payment of any withdrawal for up to 6 months from the date we receive a withdrawal request.

Assignment. Payment Contracts may not be assigned.

Change in Payment. The right to make any change in payment is available only if it is provided in the Payment Contract.

Claims of Creditors. To the extent permitted by law, proceeds will not be subject to any claims of a Beneficiary's creditors.

## GENERAL PROVISIONS

Assigning Your Policy. During the lifetime of the Insured, you may assign this policy as security for an obligation. We will not be bound by an assignment unless it is received in writing at our home office in a form acceptable to us. Two copies of the assignment must be submitted. We will retain one copy and return the other. We will not be responsible for the validity of any assignment.

Incontestability. We rely on the statements made in the application for the policy and applications for any reinstatements or increases in Specified Amount. These statements, in the absence of fraud, are considered representations and not warranties. No statement may be used in defense of a claim under the policy unless it is in such applications.

Except as stated below, we cannot contest this policy after it has been in force during the Insured's lifetime for 2 years from the Date of Issue.

Exceptions: We cannot contest any claim related to an increase in Specified Amount after such increase has been in effect during the Insured's lifetime for 2 years.

If this policy is reinstated, we cannot contest this policy after it has been in force during the Insured's lifetime for 2 years from the date of reinstatement.

We can contest a reinstatement or an increase in Specified Amount only on the basis of the information furnished in the application for such reinstatement or increase.

This 2-year limitation does not apply to any Disability or Accidental Death Benefit, or to the nonpayment of premium.

Suicide Exclusion. If the Insured takes his or her own life, while sane or insane, within 2 years from the Date of Issue, we will limit the Death Benefit Proceeds to the premiums paid less any policy loans and less any partial cash surrenders paid.

If there are any increases in the Specified Amount (See the section entitled "Changing Your Insurance Policy") a new 2 year period shall apply to each increase beginning on the date of each increase. The Death Benefit Proceeds will be the costs of insurance associated with each increase.

When the laws of the state in which this policy is delivered require less than this 2 year period, the period will be as stated in such laws.

Age or Sex Incorrectly Stated. If the age or sex of the Insured as shown on the application is not correct, the benefit to be paid on the death of the Insured will be adjusted. The adjusted benefit will be calculated using the Accumulation Value on the date of death, the Monthly Deduction for the policy month of death, and cost of insurance rate(s) for the correct age, sex, and risk class. By age we mean age nearest birthday as of the Date of Issue.

Statutory Basis of Policy Values. The Cash Values of the policy are not less than the minimum values required by the law of the state where this policy is delivered. The calculation of the Cash Values includes interest at the annual rate of 4.5% and a charge for the cost of insurance, as shown in the Table of Guaranteed Monthly Cost of Insurance Rates.

## GENERAL PROVISIONS (Cont'd)

Calculation of minimum Cash Values and non-forfeiture benefits, and Guaranteed Cost of Insurance Rates are based on the Composite 1980 Commissioners Standard Ordinary Male or Female Mortality Table for the appropriate sex and age nearest birthday. A detailed statement of the method of computing values has been filed with the state insurance department where required.

No Dividends. This policy will not pay dividends. It will not participate in any of our surplus or earnings.

Annual Report. We will send you at least once a year an annual report which shows the following:

1. Premiums paid since the last report;

2. Expense charges deducted since the last report;

3. Interest credited to your Accumulation Value since the last report;

4. The cost of insurance deducted since the last report;

5. Partial surrender benefits paid to you since the last report;

6. The amount of any outstanding policy loan;

7. The current Cash Surrender and Accumulation Values.

Illustrative Report. At any time while this policy is in force, the Owner may request from us an illustration of contract values for the future. The values will be based on both guaranteed and then current assumptions. A reasonable fee, not to exceed $50.00, may be charged for additional reports requested in a policy year.

When This Policy Terminates. This policy will terminate if:

1. You request that this policy be terminated;

2. The Insured dies;

3. The policy matures;

4. The Grace Period ends and there is not sufficient Cash Surrender Value to cover a Monthly Deduction.

Reinstatement. "Reinstating" means placing your policy in force after it has terminated at the end of the grace period. We will reinstate this policy if we receive:

1. Your written request within five years after the end of the grace period and before the Maturity Date; and

2. Evidence of insurability satisfactory to us; and

3. Payment of enough premium to keep the policy in force for two months; and

4. Payment or reinstatement of any indebtedness.

The reinstated policy will be in force from the monthly deduction day on or following the date we approved the reinstatement application.

The original surrender charge schedule which appears on pages 18-20 will apply to a reinstated policy. The Accumulation Value at the time of reinstatement will be:

1. The Surrender Charge at the time of lapse; plus

2. The premium paid multiplied by the Net Premium Percentage; plus

3. Any loan repaid or reinstated; less

4. The monthly deduction for one month.

If a person other than the Insured is covered by an attached rider, coverage will be reinstated according to that rider.

Rights Reserved By Us. Upon notice to you, this policy may be modified by us, but only if such modification is necessary to make any changes as required by the Internal Revenue Code or by any other applicable law, regulation or interpretation in order to continue treatment of this policy as life insurance.

When required by law, we will obtain your approval of changes and we will gain approval from any appropriate regulatory authority.

95325-22

## TABLES OF MONTHLY INSTALLMENTS FOR EACH $1,000 OF PROCEEDS

| OPTION 1 TABLE INSTALLMENTS FOR A SPECIFIED PERIOD | | | | | | | |
|---|---|---|---|---|---|---|---|
| Number of Years Payable | Amount of Monthly Installments | Number of Years Payable | Amount of Monthly Installments | Number of Years Payable | Amount of Monthly Installments | Number of Years Payable | Amount of Monthly Installments |
| 1 | $84.47 | 11 | $8.86 | 21 | $5.32 | 31 | $4.10 |
| 2 | 42.86 | 12 | 8.24 | 22 | 5.15 | 32 | 4.02 |
| 3 | 28.99 | 13 | 7.71 | 23 | 4.99 | 33 | 3.95 |
| 4 | 22.06 | 14 | 7.26 | 24 | 4.84 | 34 | 3.88 |
| 5 | 17.91 | 15 | 6.87 | 25 | 4.71 | 35 | 3.82 |
| 6 | 15.14 | 16 | 6.53 | 26 | 4.59 | 36 | 3.76 |
| 7 | 13.16 | 17 | 6.23 | 27 | 4.47 | 37 | 3.70 |
| 8 | 11.68 | 18 | 5.96 | 28 | 4.37 | 38 | 3.65 |
| 9 | 10.53 | 19 | 5.73 | 29 | 4.27 | 39 | 3.60 |
| 10 | 9.61 | 20 | 5.51 | 30 | 4.18 | 40 | 3.55 |

| OPTION 3 TABLE INSTALLMENTS FOR LIFE WITH SPECIFIED MINIMUM PERIOD | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| AGE OF PAYEE | | GUARANTEED PERIOD | | | | AGE OF PAYEE | | GUARANTEED PERIOD | | |
| Male | Female | 10 Years | 15 Years | 20 Years | Installment Refund | Male | Female | 10 Years | 15 Years | 20 Years | Installment Refund |
| 20* | 24* | $3.06 | $3.05 | $3.05 | $3.05 | 50 | 54 | $4.41 | $4.35 | $4.25 | $4.26 |
| 21 | 25 | 3.08 | 3.08 | 3.07 | 3.07 | 51 | 55 | 4.50 | 4.42 | 4.31 | 4.33 |
| 22 | 26 | 3.10 | 3.10 | 3.09 | 3.09 | 52 | 56 | 4.59 | 4.51 | 4.38 | 4.41 |
| 23 | 27 | 3.12 | 3.12 | 3.12 | 3.11 | 53 | 57 | 4.69 | 4.59 | 4.44 | 4.49 |
| 24 | 28 | 3.15 | 3.15 | 3.14 | 3.13 | 54 | 58 | 4.79 | 4.68 | 4.51 | 4.58 |
| 25 | 29 | 3.17 | 3.17 | 3.17 | 3.16 | 55 | 59 | 4.90 | 4.77 | 4.58 | 4.67 |
| 6 | 30 | 3.20 | 3.20 | 3.19 | 3.18 | 56 | 60 | 5.01 | 4.86 | 4.65 | 4.76 |
| 27 | 31 | 3.23 | 3.23 | 3.22 | 3.21 | 57 | 61 | 5.13 | 4.96 | 4.72 | 4.87 |
| 28 | 32 | 3.26 | 3.25 | 3.25 | 3.24 | 58 | 62 | 5.25 | 5.06 | 4.79 | 4.97 |
| 29 | 33 | 3.29 | 3.28 | 3.28 | 3.27 | 59 | 63 | 5.39 | 5.16 | 4.85 | 5.08 |
| 30 | 34 | 3.32 | 3.32 | 3.31 | 3.29 | 60 | 64 | 5.52 | 5.27 | 4.92 | 5.20 |
| 31 | 35 | 3.35 | 3.35 | 3.34 | 3.33 | 61 | 65 | 5.67 | 5.37 | 4.99 | 5.32 |
| 32 | 36 | 3.38 | 3.38 | 3.37 | 3.36 | 62 | 66 | 5.82 | 5.48 | 5.05 | 5.46 |
| 33 | 37 | 3.43 | 3.42 | 3.41 | 3.39 | 63 | 67 | 5.97 | 5.59 | 5.11 | 5.59 |
| 34 | 38 | 3.46 | 3.46 | 3.44 | 3.43 | 64 | 68 | 6.13 | 5.69 | 5.16 | 5.74 |
| 35 | 39 | 3.50 | 3.50 | 3.48 | 3.46 | 65 | 69 | 6.30 | 5.80 | 5.21 | 5.89 |
| 36 | 40 | 3.55 | 3.54 | 3.52 | 3.50 | 66 | 70 | 6.48 | 5.90 | 5.26 | 6.06 |
| 37 | 41 | 3.59 | 3.58 | 3.56 | 3.54 | 67 | 71 | 6.66 | 6.01 | 5.31 | 6.23 |
| 38 | 42 | 3.64 | 3.62 | 3.60 | 3.58 | 68 | 72 | 6.84 | 6.11 | 5.34 | 6.41 |
| 39 | 43 | 3.69 | 3.67 | 3.65 | 3.63 | 69 | 73 | 7.03 | 6.20 | 5.38 | 6.61 |
| 40 | 44 | 3.74 | 3.72 | 3.69 | 3.67 | 70 | 74 | 7.22 | 6.29 | 5.41 | 6.81 |
| 41 | 45 | 3.79 | 3.77 | 3.74 | 3.72 | 71 | 75 | 7.41 | 6.38 | 5.43 | 7.03 |
| 42 | 46 | 3.85 | 3.82 | 3.79 | 3.77 | 72 | 76 | 7.60 | 6.46 | 5.45 | 7.26 |
| 43 | 47 | 3.90 | 3.88 | 3.84 | 3.82 | 73 | 77 | 7.79 | 6.53 | 5.47 | 7.51 |
| 44 | 48 | 3.97 | 3.94 | 3.89 | 3.87 | 74 | 78 | 7.98 | 6.59 | 5.48 | 7.77 |
| 45 | 49 | 4.03 | 4.00 | 3.95 | 3.93 | 75 | 79 | 8.17 | 6.65 | 5.49 | 8.05 |
| 46 | 50 | 4.10 | 4.06 | 4.00 | 3.99 | 76 | 80 | 8.35 | 6.70 | 5.50 | 8.36 |
| 47 | 51 | 4.17 | 4.13 | 4.06 | 4.05 | 77 | 81 | 8.52 | 6.74 | 5.50 | 9.01 |
| 48 | 52 | 4.25 | 4.20 | 4.12 | 4.12 | 78 | 82 | 8.68 | 6.77 | 5.51 | 9.38 |
| 49 | 53 | 4.33 | 4.27 | 4.18 | 4.18 | 79 | 83 | 8.83 | 6.80 | 5.51 | 9.76 |
| | | | | | | 80** | 84** | 8.96 | 6.82 | 5.51 | |

Payments are based upon the age, nearest birthday, of the Payee on the date the first payment is due. If monthly installments for two or more specified periods for a given age are the same, the specified period of longer duration will apply.

*Also applies to younger ages.    **Also applies to older ages.

95325-NS

## TABLE OF GUARANTEED MONTHLY COST OF INSURANCE RATES
### PER $1,000 OF NET AMOUNT AT RISK

| ATTAINED AGE Nearest Birthday (On Each Policy Anniversary) | MALE | FEMALE | ATTAINED AGE Nearest Birthday (On Each Policy Anniversary) | MALE | FEMALE |
|---|---|---|---|---|---|
| 18 | $0.13 | $0.08 | | | |
| 19 | .14 | .08 | | | |
| 20 | .14 | .08 | 60 | $ 1.06 | $ 0.71 |
| 21 | .13 | .08 | 61 | 1.17 | .76 |
| 22 | .13 | .08 | 62 | 1.29 | .83 |
| 23 | .13 | .08 | 63 | 1.43 | .92 |
| 24 | .13 | .09 | 64 | 1.60 | 1.02 |
| 25 | .12 | .09 | 65 | 1.78 | 1.13 |
| 26 | .12 | .09 | 66 | 1.97 | 1.25 |
| 27 | .12 | .09 | 67 | 2.18 | 1.37 |
| 28 | .12 | .09 | 68 | 2.41 | 1.50 |
| 29 | .12 | .10 | 69 | 2.66 | 1.63 |
| 30 | .12 | .10 | 70 | 2.94 | 1.78 |
| 31 | .12 | .10 | 71 | 3.31 | 1.96 |
| 32 | .12 | .10 | 72 | 3.63 | 2.19 |
| 33 | .12 | .11 | 73 | 4.05 | 2.47 |
| 34 | .13 | .11 | 74 | 4.54 | 2.80 |
| 35 | .14 | .12 | 75 | 5.06 | 3.17 |
| 36 | .14 | .13 | 76 | 5.62 | 3.58 |
| 37 | .15 | .13 | 77 | 6.21 | 4.02 |
| 38 | .16 | .14 | 78 | 6.83 | 4.50 |
| 39 | .17 | .16 | 79 | 7.49 | 5.03 |
| 40 | .19 | .17 | 80 | 8.22 | 5.62 |
| 41 | .20 | .18 | 81 | 9.05 | 6.31 |
| 42 | .22 | .20 | 82 | 9.99 | 7.11 |
| 43 | .23 | .21 | 83 | 11.07 | 8.05 |
| 44 | .25 | .23 | 84 | 12.26 | 9.10 |
| 45 | .27 | .24 | 85 | 13.55 | 10.26 |
| 46 | .29 | .26 | 86 | 14.91 | 11.53 |
| 47 | .32 | .28 | 87 | 16.34 | 12.91 |
| 48 | .34 | .30 | 88 | 17.80 | 14.39 |
| 49 | .37 | .32 | 89 | 19.33 | 16.00 |
| 50 | .41 | .34 | 90 | 20.94 | 17.75 |
| 51 | .44 | .37 | 91 | 22.66 | 19.68 |
| 52 | .48 | .40 | 92 | 24.57 | 21.86 |
| 53 | .53 | .43 | 93 | 26.76 | 24.42 |
| 54 | .59 | .47 | 94 | 29.63 | 27.67 |
| 55 | .65 | .51 | 95 | 33.93 | 32.32 |
| 56 | .72 | .55 | 96 | 41.27 | 40.04 |
| 57 | .79 | .58 | 97 | 56.03 | 55.15 |
| 58 | .87 | .62 | 98 | 83.33 | 83.33 |
| 59 | .96 | .66 | 99 | 83.33 | 83.33 |

The rates shown above represent the guaranteed (maximum) monthly cost of insurance for each $1,000 of net amount at risk. If this policy has been issued in a special (rated) premium class, the guaranteed monthly cost will be calculated as shown on page 3.

95325-NS

## TABLE OF SURRENDER CHARGES PER $1,000 OF SPECIFIED AMOUNT

The following charges apply to each $1,000 of Initial Specified Amount surrendered during the Surrender Charge Period. The charges also apply to each $1,000 of increase in Specified Amount surrendered during the Surrender Charge Period of each increase. The word "surrender" as used in this provision means Full Surrender, or a reduction in Specified Amount at the request of the Owner, or due to a Partial Surrender. The charge for the surrender of all or any portion of the Initial Specified Amount will be equal to the rate shown below for the age at issue and the year of surrender, multiplied by the number of thousands of Initial Specified Amount being surrendered. The charges for surrender of all or any portion of an increase in Specified Amount will be equal to the rates shown below for the age at issue of such increase and year of surrender, multiplied by the number of thousands of such increase being surrendered. In addition, there will be a charge not to exceed $50.00 for each partial surrender. The amount of any Fund Value is not subject to a surrender charge for a full surrender.

### Policy Years

| Issue Age Male | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18 | 14.00 | 14.00 | 14.00 | 14.00 | 13.00 | 13.00 | 13.00 | 11.00 | 9.00 | 7.00 | 7.00 | 7.00 | 6.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 19 | 14.00 | 14.00 | 14.00 | 14.00 | 14.00 | 13.00 | 13.00 | 11.00 | 9.00 | 7.00 | 7.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 20 | 14.00 | 14.00 | 14.00 | 14.00 | 14.00 | 13.00 | 13.00 | 12.00 | 10.00 | 7.00 | 7.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 21 | 14.00 | 14.00 | 14.00 | 14.00 | 14.00 | 13.00 | 13.00 | 12.00 | 10.00 | 7.00 | 7.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 22 | 14.00 | 14.00 | 14.00 | 14.00 | 14.00 | 14.00 | 13.00 | 12.00 | 10.00 | 8.00 | 8.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 23 | 15.00 | 15.00 | 15.00 | 15.00 | 14.00 | 14.00 | 13.00 | 12.00 | 10.00 | 8.00 | 8.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 24 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 14.00 | 13.00 | 12.00 | 10.00 | 8.00 | 8.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 25 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 14.00 | 13.00 | 12.00 | 10.00 | 8.00 | 8.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 26 | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 14.00 | 13.00 | 12.00 | 10.00 | 8.00 | 8.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 27 | 16.00 | 16.00 | 16.00 | 16.00 | 16.00 | 14.00 | 14.00 | 12.00 | 10.00 | 8.00 | 8.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 28 | 16.00 | 16.00 | 16.00 | 16.00 | 16.00 | 15.00 | 14.00 | 12.00 | 10.00 | 9.00 | 8.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 29 | 16.00 | 16.00 | 16.00 | 16.00 | 16.00 | 15.00 | 14.00 | 12.00 | 10.00 | 9.00 | 8.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 30 | 16.00 | 16.00 | 16.00 | 16.00 | 16.00 | 15.00 | 14.00 | 13.00 | 11.00 | 9.00 | 9.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 31 | 17.00 | 17.00 | 17.00 | 17.00 | 16.00 | 15.00 | 14.00 | 13.00 | 11.00 | 9.00 | 9.00 | 7.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 32 | 17.00 | 17.00 | 17.00 | 17.00 | 16.00 | 15.00 | 14.00 | 13.00 | 11.00 | 9.00 | 9.00 | 8.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 33 | 17.00 | 17.00 | 17.00 | 17.00 | 17.00 | 16.00 | 14.00 | 13.00 | 11.00 | 10.00 | 9.00 | 8.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 34 | 18.00 | 18.00 | 18.00 | 18.00 | 17.00 | 16.00 | 15.00 | 13.00 | 11.00 | 10.00 | 9.00 | 8.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 35 | 18.00 | 18.00 | 18.00 | 18.00 | 17.00 | 16.00 | 15.00 | 13.00 | 11.00 | 10.00 | 9.00 | 8.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 36 | 19.00 | 19.00 | 19.00 | 19.00 | 18.00 | 16.00 | 16.00 | 14.00 | 12.00 | 11.00 | 9.00 | 8.00 | 7.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 37 | 19.00 | 19.00 | 19.00 | 19.00 | 18.00 | 17.00 | 16.00 | 14.00 | 13.00 | 11.00 | 10.00 | 9.00 | 8.00 | 6.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 38 | 20.00 | 20.00 | 20.00 | 20.00 | 19.00 | 17.00 | 16.00 | 15.00 | 14.00 | 12.00 | 10.00 | 9.00 | 8.00 | 7.00 | 5.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 39 | 20.00 | 20.00 | 20.00 | 20.00 | 19.00 | 18.00 | 17.00 | 16.00 | 14.00 | 13.00 | 11.00 | 10.00 | 9.00 | 7.00 | 6.00 | 4.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 40 | 21.00 | 21.00 | 21.00 | 21.00 | 20.00 | 19.00 | 18.00 | 16.00 | 15.00 | 14.00 | 12.00 | 11.00 | 9.00 | 8.00 | 6.00 | 5.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 41 | 22.00 | 22.00 | 22.00 | 22.00 | 21.00 | 20.00 | 19.00 | 17.00 | 16.00 | 15.00 | 13.00 | 11.00 | 10.00 | 8.00 | 6.00 | 5.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 42 | 23.00 | 23.00 | 23.00 | 23.00 | 22.00 | 20.00 | 19.00 | 18.00 | 17.00 | 16.00 | 14.00 | 12.00 | 10.00 | 8.00 | 7.00 | 5.00 | 3.00 | 2.00 | 1.00 | 0.00 |
| 43 | 23.00 | 23.00 | 23.00 | 23.00 | 22.00 | 21.00 | 20.00 | 19.00 | 18.00 | 16.00 | 14.00 | 13.00 | 11.00 | 9.00 | 7.00 | 5.00 | 4.00 | 2.00 | 1.00 | 0.00 |
| 44 | 24.00 | 24.00 | 24.00 | 24.00 | 23.00 | 22.00 | 21.00 | 20.00 | 19.00 | 17.00 | 15.00 | 13.00 | 11.00 | 9.00 | 8.00 | 5.00 | 4.00 | 2.00 | 1.00 | 0.00 |

95325-M-NS

## TABLE OF SURRENDER CHARGES PER $1,000 OF SPECIFIED AMOUNT

The following charges apply to each $1,000 of Initial Specified Amount surrendered during the Surrender Charge Period. The charges also apply to each $1,000 of increase in Specified Amount surrendered during the Surrender Charge Period of each increase. The word "surrender" as used in this provision means Full Surrender, or a reduction in Specified Amount at the request of the Owner, or due to a Partial Surrender. The charge for the surrender for all or any portion of the Initial Specified Amount will be equal to the rate shown below for the age at issue and the year of surrender, multiplied by the number of thousands of Initial Specified Amount being surrendered. The charges for surrender of all or any portion of an increase in Specified Amount will be equal to the rates shown below for the age at issue of such increase and year of surrender, multiplied by the number of thousands of such increase being surrendered. In addition, there will be a charge not to exceed $50.00 for each partial surrender. The amount of any Fund Value is not subject to a surrender charge for a full surrender.

### Policy Years

| Issue Age Male | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 45 | 25.00 | 25.00 | 25.00 | 25.00 | 24.00 | 23.00 | 22.00 | 21.00 | 20.00 | 18.00 | 16.00 | 14.00 | 12.00 | 10.00 | 8.00 | 6.00 | 4.00 | 2.00 | 1.00 | 0.00 |
| 46 | 26.00 | 26.00 | 26.00 | 26.00 | 25.00 | 24.00 | 23.00 | 22.00 | 21.00 | 19.00 | 17.00 | 15.00 | 13.00 | 11.00 | 8.00 | 6.00 | 4.00 | 2.00 | 1.00 | 0.00 |
| 47 | 27.00 | 27.00 | 27.00 | 27.00 | 26.00 | 25.00 | 24.00 | 23.00 | 22.00 | 20.00 | 18.00 | 16.00 | 13.00 | 11.00 | 9.00 | 7.00 | 4.00 | 2.00 | 1.00 | 0.00 |
| 48 | 28.00 | 28.00 | 28.00 | 28.00 | 27.00 | 26.00 | 25.00 | 24.00 | 23.00 | 20.00 | 18.00 | 16.00 | 14.00 | 12.00 | 9.00 | 7.00 | 5.00 | 2.00 | 1.00 | 0.00 |
| 49 | 28.00 | 28.00 | 28.00 | 28.00 | 27.00 | 27.00 | 26.00 | 25.00 | 24.00 | 21.00 | 19.00 | 17.00 | 15.00 | 12.00 | 10.00 | 7.00 | 5.00 | 2.00 | 1.00 | 0.00 |
| 50 | 29.00 | 29.00 | 29.00 | 29.00 | 28.00 | 28.00 | 27.00 | 26.00 | 26.00 | 22.00 | 20.00 | 18.00 | 15.00 | 13.00 | 10.00 | 8.00 | 5.00 | 3.00 | 1.00 | 0.00 |
| 51 | 30.00 | 30.00 | 30.00 | 30.00 | 29.00 | 29.00 | 28.00 | 27.00 | 26.00 | 23.00 | 21.00 | 18.00 | 16.00 | 13.00 | 11.00 | 8.00 | 5.00 | 3.00 | 1.00 | 0.00 |
| 52 | 30.00 | 30.00 | 30.00 | 31.00 | 30.00 | 30.00 | 29.00 | 28.00 | 27.00 | 24.00 | 22.00 | 19.00 | 16.00 | 14.00 | 11.00 | 8.00 | 5.00 | 3.00 | 1.00 | 0.00 |
| 53 | 32.00 | 32.00 | 32.00 | 32.00 | 31.00 | 31.00 | 30.00 | 29.00 | 27.00 | 25.00 | 23.00 | 20.00 | 17.00 | 14.00 | 11.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 54 | 33.00 | 33.00 | 33.00 | 33.00 | 32.00 | 32.00 | 31.00 | 30.00 | 28.00 | 25.00 | 23.00 | 20.00 | 18.00 | 15.00 | 12.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 55 | 34.00 | 34.00 | 34.00 | 34.00 | 33.00 | 33.00 | 32.00 | 31.00 | 29.00 | 26.00 | 24.00 | 21.00 | 18.00 | 15.00 | 12.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 56 | 35.00 | 35.00 | 35.00 | 35.00 | 34.00 | 34.00 | 33.00 | 32.00 | 30.00 | 27.00 | 25.00 | 22.00 | 18.00 | 15.00 | 12.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 57 | 36.00 | 36.00 | 36.00 | 36.00 | 35.00 | 35.00 | 34.00 | 33.00 | 31.00 | 27.00 | 25.00 | 22.00 | 19.00 | 15.00 | 12.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 58 | 37.00 | 37.00 | 37.00 | 37.00 | 36.00 | 36.00 | 35.00 | 34.00 | 31.00 | 28.00 | 26.00 | 22.00 | 19.00 | 15.00 | 13.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 59 | 38.00 | 38.00 | 38.00 | 38.00 | 37.00 | 37.00 | 36.00 | 34.00 | 32.00 | 29.00 | 26.00 | 23.00 | 19.00 | 15.00 | 13.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 60 | 39.00 | 39.00 | 39.00 | 39.00 | 38.00 | 38.00 | 37.00 | 35.00 | 33.00 | 29.00 | 27.00 | 23.00 | 20.00 | 15.00 | 13.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 61 | 40.00 | 40.00 | 40.00 | 40.00 | 39.00 | 38.00 | 37.00 | 36.00 | 33.00 | 30.00 | 27.00 | 23.00 | 20.00 | 15.00 | 12.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 62 | 40.00 | 40.00 | 40.00 | 40.00 | 39.00 | 39.00 | 38.00 | 37.00 | 34.00 | 30.00 | 27.00 | 23.00 | 20.00 | 15.00 | 12.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 63 | 41.00 | 41.00 | 41.00 | 41.00 | 40.00 | 40.00 | 39.00 | 37.00 | 34.00 | 30.00 | 27.00 | 23.00 | 19.00 | 15.00 | 12.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 64 | 42.00 | 42.00 | 42.00 | 42.00 | 41.00 | 40.00 | 39.00 | 38.00 | 35.00 | 31.00 | 27.00 | 23.00 | 19.00 | 15.00 | 12.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 65 | 43.00 | 43.00 | 43.00 | 43.00 | 42.00 | 41.00 | 40.00 | 38.00 | 35.00 | 31.00 | 27.00 | 23.00 | 19.00 | 15.00 | 11.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 |
| 66 | 41.00 | 41.00 | 41.00 | 40.00 | 39.00 | 38.00 | 37.00 | 35.00 | 32.00 | 29.00 | 25.00 | 22.00 | 18.00 | 14.00 | 11.00 | 9.00 | 5.00 | 3.00 | 1.00 | 0.00 |
| 67 | 40.00 | 39.00 | 39.00 | 37.00 | 36.00 | 36.00 | 35.00 | 33.00 | 30.00 | 27.00 | 24.00 | 20.00 | 17.00 | 14.00 | 11.00 | 8.00 | 5.00 | 2.00 | 1.00 | 0.00 |
| 68 | 39.00 | 38.00 | 37.00 | 35.00 | 34.00 | 33.00 | 32.00 | 30.00 | 28.00 | 25.00 | 22.00 | 19.00 | 16.00 | 13.00 | 10.00 | 8.00 | 4.00 | 2.00 | 1.00 | 0.00 |
| 69 | 37.00 | 36.00 | 35.00 | 32.00 | 32.00 | 31.00 | 30.00 | 28.00 | 26.00 | 23.00 | 21.00 | 18.00 | 15.00 | 12.00 | 10.00 | 7.00 | 4.00 | 1.00 | 0.00 | 0.00 |
| 70 | 36.00 | 35.00 | 34.00 | 30.00 | 30.00 | 29.00 | 28.00 | 26.00 | 24.00 | 22.00 | 19.00 | 17.00 | 14.00 | 11.00 | 10.00 | 7.00 | 3.00 | 1.00 | 0.00 | 0.00 |
| 71 | 35.00 | 34.00 | 32.00 | 29.00 | 28.00 | 27.00 | 27.00 | 25.00 | 22.00 | 20.00 | 18.00 | 15.00 | 13.00 | 11.00 | 9.00 | 6.00 | 3.00 | 1.00 | 0.00 | 0.00 |
| 72 | 35.00 | 33.00 | 31.00 | 27.00 | 26.00 | 26.00 | 25.00 | 23.00 | 21.00 | 19.00 | 17.00 | 14.00 | 12.00 | 10.00 | 8.00 | 6.00 | 2.00 | 0.00 | 0.00 | 0.00 |
| 73 | 34.00 | 32.00 | 30.00 | 26.00 | 25.00 | 24.00 | 23.00 | 21.00 | 19.00 | 17.00 | 15.00 | 13.00 | 11.00 | 9.00 | 8.00 | 5.00 | 2.00 | 0.00 | 0.00 | 0.00 |
| 74 | 33.00 | 31.00 | 30.00 | 25.00 | 24.00 | 22.00 | 22.00 | 20.00 | 18.00 | 16.00 | 14.00 | 12.00 | 10.00 | 8.00 | 7.00 | 5.00 | 1.00 | 0.00 | 0.00 | 0.00 |

96325-M-MS

## TABLE OF SURRENDER CHARGES PER $1,000 OF SPECIFIED AMOUNT

The following charges apply to each $1,000 of Initial Specified Amount surrendered during the Surrender Charge Period. The charges also apply to each $1,000 of increase in Specified Amount surrendered during the Surrender Charge Period of each increase. The word "surrender" as used in this provision means Full Surrender, or a reduction in Specified Amount at the request of the Owner, or due to a Partial Surrender. The charge for the surrender of all or any portion of the Initial Specified Amount will be equal to the rate shown below for the age at issue and the year of surrender, multiplied by the number of thousands of Initial Specified Amount being surrendered. The charges for surrender of all or any portion of an increase in Specified Amount will be equal to the rates shown below for the age at issue of such increase and year of surrender, multiplied by the number of thousands of such increase being surrendered. In addition, there will be a charge not to exceed $50.00 for each partial surrender. The amount of any Fund Value is not subject to a surrender charge for a full surrender.

### Policy Years

| Issue Age Male | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 75 | 33.00 | 31.00 | 29.00 | 24.00 | 23.00 | 22.00 | 21.00 | 19.00 | 17.00 | 15.00 | 13.00 | 11.00 | 9.00 | 7.00 | 6.00 | 4.00 | 1.00 | 0.00 | 0.00 | 0.00 |
| 76 | 33.00 | 31.00 | 29.00 | 24.00 | 22.00 | 21.00 | 20.00 | 18.00 | 16.00 | 14.00 | 12.00 | 10.00 | 8.00 | 6.00 | 5.00 | 3.00 | 1.00 | 0.00 | 0.00 | 0.00 |
| 77 | 33.00 | 31.00 | 29.00 | 24.00 | 22.00 | 20.00 | 19.00 | 17.00 | 15.00 | 13.00 | 11.00 | 9.00 | 7.00 | 5.00 | 4.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 78 | 33.00 | 31.00 | 29.00 | 24.00 | 22.00 | 20.00 | 19.00 | 17.00 | 15.00 | 12.00 | 10.00 | 8.00 | 6.00 | 4.00 | 3.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 79 | 33.00 | 31.00 | 29.00 | 24.00 | 22.00 | 20.00 | 18.00 | 16.00 | 14.00 | 12.00 | 9.00 | 6.00 | 5.00 | 3.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 80 | 33.00 | 31.00 | 29.00 | 24.00 | 22.00 | 20.00 | 18.00 | 16.00 | 14.00 | 11.00 | 8.00 | 6.00 | 4.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Page 20

95325-M-MS

AMERICAN GENERAL LIFE INSURANCE COMPANY

PREFERRED LOAN ENDORSEMENT

This endorsement has been added to and made a part of the policy to which it is attached.

The following provision is hereby added to "Policy Loans":

Preferred Loans. A "Preferred Loan" is a policy loan that is made at a net cost to the Owner that is less than the net cost of other policy loans. Starting on the tenth policy anniversary, this policy will be eligible for "Preferred Loans" subject to the following guidelines:

1. The maximum amount eligible for Preferred Loans during a policy year is restricted to policy earnings, defined as:

   (a) The Cash Value at the beginning of the policy year; less

   (b) The sum of premiums paid in excess of Partial Withdrawals since the Date of Issue.

2. When a Preferred Loan is made, interest to the next policy anniversary will be charged at the rate shown in the Loan Interest provision.

3. Interest credited to the amount of the Accumulation Value offset by a Preferred Loan:

   (a) Will be at an annual effective rate that is equal to or less than the Policy Loan interest rate; and

   (b) Will be at a higher rate than the rate used to credit interest to values offset by any other policy loan.

The effective date of this Endorsement is the Date of Issue of the Policy.

President

L8890-96

AMERICAN GENERAL LIFE INSURANCE COMPANY

AMENDMENT

This amendment has been attached to and made a part of policy number U10005220L
REPLACED POLICY OR POLICIES

| (1)<br>POLICY NUMBER | (2)<br>DATE OF ISSUE | (3)<br>AMOUNT OF<br>INSURANCE | (4)<br>CASH VALUE<br>TRANSFERRED |
|---|---|---|---|
| A101377990 | 09-19-95 | 250,000.00 | 0.00 |

This policy has been issued as a replacement of the policies listed above. The Company agrees that:

1.  Provisions in this policy regarding Contestability and Suicide will apply to each amount shown in column (3) only to the extent that such provisions would have applied to each policy replaced had the replacement not taken place;

2.  This amendment does not apply to any amount of insurance issued under this policy which exceeds the total of the amounts shown in column (3);

3.  In determining the Cash Surrender Value of this policy Surrender Charges, if any, will be deducted from:

    A.  The amount of Accumulation Value; less

    B.  The total amount of Cash Values shown in Column (4) reduced by the following amounts, but not less than zero;

        (1)  The total amount of any partial withdrawals; and

        (2)  The amount of any policy loan calculated as of the date of surrender.

The effective date of this amendment is the Date of Issue of the policy.

*Brian D. Murphy*

L7175 REV 386                                    New Business Department

# American General Life Insurance Company
### Home Office: Houston, Texas
## Policy Change, Reinstatement and Term Conversion Application
Not to be used for Internal or External Exchanges

**AMERICAN GENERAL**

*U10005ZZ0l*

## SECTION I: Basic Policy Information

| Policy Number | Name of Proposed Insured (A) | Sex | DOB | Ins. Age | Height | Wt | Place of Birth |
|---|---|---|---|---|---|---|---|
| A101377940 | Richard C. Somerville | M | 3/20/34 | 64 | Ft 5 In 11 | 214 | MA. |

**A  PRESENT RESIDENCE OF PROPOSED INSURED (A)**

Driver Lic. Num & State _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_    SS# _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._

Address _344 Keene St_
City _Duxbury_    State _MA_    ZIP _02332_
Telephone _(781) 837-9401_    No. of Yrs. _20+_

**PREMIUM PAYOR**
Name _Globe Rubber Works Inc_
Address _254 Beech St. Rockland MA 02370_
City _____    State ____ ZIP _____
Relationship to Primary Proposed Insured _Company_

**OCCUPATION**
Proposed Insured A
Occupation _Owner - President_    Yrs. _20+_
Employer Name _Globe Rubber Works Inc_
Address _254 Beech St. Rockland MA 02370_
Telephone _(781) 871-3700_

**POLICYOWNER AND TAXPAYOR IDENTIFICATION NUMBER**
(must be completed)
Policyowner Name _Globe Rubber Works Inc._
Address _254 Beech St._
City _Rockland_    State _MA_ ZIP _02370_
Social Security or Tax ID Number _04-1371290_
☐ Insured   ☒ Other   Relationship _Business/Company_

Proposed Insured B
Occupation _____    Yrs. ____
Employer Name _____
Address _____
Telephone ( ) _____

**CONTINGENT OWNER DESIGNATION**
Contingent Policyowner Name _____
Social Security or Tax ID Number _____
(Contingent Policyowner designation becomes effective upon the death of the Primary Owner)

| 1. NAMES OF PERSONS PROPOSED FOR INSURANCE FIRST    MIDDLE    LAST | Sex | Relationship | Date of Birth Mo Day Yr | Ins. Age | Place of Birth | Height Ft In | Weight |
|---|---|---|---|---|---|---|---|
| B. | | | | | | | |
| Drivers Lic Num & State: ____ SS# ____ | | | | | | | |
| C. | | | | | | | |
| Drivers Lic Num & State: ____ SS# ____ | | | | | | | |
| D. | | | | | | | |
| E. | | | | | | | |
| F. | | | | | | | |

2. Do all the persons named above reside at the address of the Proposed Insured?    ☐ Yes   ☐ No
3. Are all children listed the natural or legally adopted children of the Proposed Insured or Spouse?    ☐ Yes   ☐ No
4. Has each child eligible for insurance been included?    ☐ Yes   ☐ No

Give details to "No" answers and identify each person by letter.

_____
_____
_____
_____
_____

## INSTRUCTIONS:
If application is for a Policy Change Request, complete Sections I, II & V (if applicable). Sign page 5.
If application is for Reinstatement of a policy, complete Sections I, III & V. Sign page 5.
If application is for a Term Conversion, complete Sections I, IV & V (if applicable). Sign page 5.

# American General Life Insurance Company
Home Office: Houston, Texas

## Policy Change, Reinstatement and Term Conversion Application

### SECTION IV: Request for Term Conversion
(*Complete Section V)

1. CONVERT TO:  Plan of Basic Insurance          Amount
   _Platinum Provider_                     $ _350,000_
                                           $ _____
   _____      $ _____

   Death Benefit Option:  ☒ 1 - Level  ☐ 2 - Increasing
   (If Increase in Specified Amount, Question #3 must be answered.)

2. BENEFITS TO BE ADDED:
   *☐ ADD
   ☐ Premium Waiver              ☐ Purchaser Insurance
   ☐ Family Insurance Benefit    _____ Units
   ☐ Children's Insurance Benefit _____ Units
   ☐ Accidental Death Benefit
       Amount now in force in all Companies  $_____
   ☐ Option to Purchase Additional Insurance $_____
   ☐ Other:_____
   ☐ Spouse ART:              Amount $_____
                        ☐ Smoker or ☐ Non-Smoker
   ☐ Annual Renewable Term Rider:  Amount $_____
                        ☐ Smoker or ☐ Non-Smoker
   ☐ Single Premium Paid Up Rider    _____ Units

*3. Has Proposed Insured A or B used tobacco in any form in the past 24 months?
   Proposed Insured A  ☐ Yes ☐ No    Proposed Insured B  ☐ Yes ☐ No
   Date last used (month and year)_____

4. PREMIUMS TO BE PAID
   Planned Periodic Premium  $ _4,736.72_
   Conversion Credit (allowed on ABC or annual mode)  $ _2,800.00_
   ☐ Apply to Cash Value  ☒ Reduce Planned Periodic Premium
   ☐ Automatic Bank Check (see attached)
       Use information from existing policy  #_____
   ☒ Direct
   ☐ List Bill or Government Allotment  List Bill #_____
                        Company _____
   ☐ Annually  ☒ Semi-Annually  ☐ Quarterly
   Amount paid with application $ _____ or ☒ None

5. Is Premium Loan Provision to be Automatic,
   if available?                    ☒ Yes ☐ No

6. CONVERSION OF TERM INSURANCE:
   ☒ Policy # _A101377990_
   ☐ Partial Conversion:
       Convert $_____(face amount)
       Balance to be: ☐ Lapsed  ☐ Remain in Force
   ☐ Term Rider Conversion
       ☐ Full Conversion  ☐ Partial Conversion
       Convert $_____
       Balance to be: ☐ Lapsed  ☐ Remain in Force
       Adjusted Planned Periodic Premium $_____

7. OWNER DESIGNATION
   (must be completed)
   Policyowner Name _Globe Rubber Works Inc._
   Address _254 Beech St_
   City _Rockland_          State _MA_ ZIP _02370_
   Social Security or Tax ID Number _04-1371890_
   ☐ Insured  ☒ Other  Relationship _Company._

   CONTINGENT OWNER DESIGNATION
   Contingent Policyowner Name _N/A._
   Social Security or Tax ID Number _____
   (Contingent Policyowner designation becomes effective upon the death of the Primary Owner)

8. BENEFICIARY DESIGNATION
   Proposed Insured A (must be completed)
   _Globe Rubber Works Inc_   _Company_
   First                        Relationship
   _____   _____
   Second                       Relationship
   _____   _____
   Trust Name                   Date of Trust
   Proposed Insured B
   _____   _____
   First                        Relationship
   _____   _____
   Second                       Relationship
   _____   _____
   Trust Name                   Date of Trust

9. SPECIAL INSTRUCTIONS: (State Request Clearly)

   The designation of Owner and Beneficiary on this application applies
   only to the Conversion Policy, and does not change the designation of
   any other policy contracts. For changes of Beneficiary and Owner, be
   sure correct signatures are obtained.

---

For Home Office Endorsement Only. Statement No. _____ Section _____ corrected as follows:    Date Received in
(NOT TO BE USED FOR CHANGE OF PLAN, AMOUNT, BENEFIT, OR AGE)


May not be used in any state where prohibited.                                          Home Office

1 8644-95                                        - 3 -                              0045820

# American General Life Insurance Company
### Home Office: Houston, Texas
### Policy Change, Reinstatement and Term Conversion Application

This is an amendment to my application for the original policy. I have read the above statements or they have been read to me. I represent that such statements are true and complete to the best of my knowledge and belief. I agree that such statements are to be the basis of any action by the Company. I understand that the Company reserves the right to ask for a medical examination.

If this is an application for reinstatement, I understand that the policy will not be placed in force until this application is approved and all premiums due have been paid. A payment by check or draft shall not be considered valid unless: (1) such check or draft is negotiable on the date shown below; and (2) such check or draft is honored when first presented for payment. We can contest a reinstatement or an increase of specified amount only on the basis of information furnished in the application for such reinstatement or increase.

I hereby authorize any of the following that have records or knowledge of me or my health to give to the Company such information: (1) Any licensed physician, medical practitioner, hospital, clinic or other medical facility; or (2) any insurance company, the Medical Information Bureau or other organization or person.

I authorize all said sources, except the Medical Information Bureau, to give such records or knowledge to any agency employed by the insurance company to collect and transmit such information.

A copy of this authorization shall be as valid as the original. This authorization shall be valid for thirty (30) months.

If applicable, I have received: (1) the Medical Information Bureau notice; and (2) The Fair Credit Reporting Act notice.

The Company may amend this application by a notation in the space reserved for "Home Office Endorsement Only" in order to correct errors or omissions except as follows: No change shall be made in the amount of insurance, premium, the plan, the benefits or age at issue without written consent of the Proposed Insured and the Owner.

CERTIFIED TAXPAYER ID. Under penalties of perjury, I certify that: (1) the tax number shown in this application is my correct taxpayer identification number; and (2) that I am not subject to backup withholding under Section 3406(a)(1)(C) of the Internal Revenue Code.

_Rockland        MA_
DATED AT CITY, STATE

_04- 1371290_
OWNER'S TAX I.D./SOCIAL SECURITY NUMBER

_9/3/98_
CURRENT DATE

X _Richard Glamore_ / _R. Somerville_
SIGNATURE OF INSURED

X _____
SIGNATURE OF INSURED

X X _Robert Gustouse V.P._
SIGNATURE OF PRESENT OWNER/TRUSTEE (IF OTHER THAN INSURED
SHOW TITLE OF OFFICER IF SIGNING FOR FIRM)

X X _Robert Gustouse V.P._ / R.G.
SIGNATURE OF OWNER/TRUSTEE OF EXISTING POLICY TO BE CONVERTED

X _____
SIGNATURE OF PRESENT OWNER/TRUSTEE (IF OTHER THAN INSURED
SHOW TITLE OF OFFICER IF SIGNING FOR FIRM)

X _____
SIGNATURE OF OWNER/TRUSTEE OF EXISTING POLICY TO BE CONVERTED

X _____
SIGNATURE OF ASSIGNEE (SHOW TITLE OF OFFICER IF SIGNING FOR FIRM)

X _____
SIGNATURE OF SPOUSE (IF INCLUDED AS A PROPOSED INSURED)

| | Agent's Full Name (Print) | Percent of Credit | Agent's Phone Number | Agency Number/ Agent Number | State License Number |
|---|---|---|---|---|---|
| 1. | Vincent J. Sica, Jr. | 100 % | (781) 828-9559 | B3545 B087738 | |
| 2. | | | ( ) | | |
| 3. | | | ( ) | | |

# AMERICAN GENERAL LIFE
## Insurance Company

This is a FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE POLICY. Adjustable Death Benefit is payable upon the Insured's death prior to the Maturity Date. Premium payments are flexible and payable to the Maturity Date. ACCUMULATION VALUES and CASH VALUES are flexible and will be based on the amount and frequency of premiums paid, and the amount of interest credited. NONPARTICIPATING–NOT ELIGIBLE FOR DIVIDENDS.

For Information, Service or to make a Complaint

Contact your Servicing Agent, or our Policyowner Service Department

2727-A Allen Parkway
P.O. Box 1931
Houston, Texas 77251
1-800-231-3655



A STOCK COMPANY

A Subsidiary of American General Corporation

95325

Mar-01-05  01:19pm  From-AGLIFE COMMISSIONS                    713-831-3572        T-726  P.003/005  10-809A

02/16/2005  17:32  7813982255  7018718831

MCINNIS FINANCIAL



GRW
GLOBE RUBBER WORKS, INC.
24 | Beech Street
Rockland, Massachusetts
02370-0163
USA

Please in FormCalling
The Non-Volatile Form ZEL 1290

781-671-3700
Fax 781-871-0631

September 2, 2004

AIG/ American General
Attention: Policyowner Services
VIA FACSIMILE: 713-831-3028

Re: Policy Number: U10005230L
Owner: Globe Rubber Works, Inc.
Insured: Richard C. Somerville

To Whom It May Concern:

Please be advised that effective July 1st, 2004, we are requesting a change of agent on the
above referenced policy with AIG to:

Neil G. McInnis,
SS# 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
Pension Advisor Group, Inc.
300 South St., Suite 455
Waltham, MA 02453

Please release all pertinent information to Neil G. McInnis with regards to the above
mentioned policy.

Thank you for your consideration.

Sincerely,

Roger Fasnacht, CFO
Globe Rubber Works, Inc.

```
                      LIFE - FONECALL - HPROCESSED - END - Viewable                    Ex 11
              U10005220L -  - SOMERVILLE - 2004-09-02-13.39.18.304728 -  -
   Client ID:        --  -           Policy Number:  U10005220L
   Team:                             PRODUCT ID:
                      Printed on Thursday, February 02, 2006 at 1:59:29PM
=======================================================================================
```

```
   Begin Date:      2004-09-02            Flags:              9990N2
   Begin Time:      13:39:18              DTM Job Name:
   User Id:         BPSI360               DTM Return Code:
   Workstation Id:  AW066120              DTM Task Name:
   Business Area:   LIFE                  DTM Next Task:
   Type:            FONECALL              End Date:           2004-09-02
   Status:          HPROCESSED            End Time:           13:39:18
   Queue:           END
   User Name:       **Francisco, Dom P
DTM Description:
   Comments:
```

---

```
   Begin Date:      2004-09-02            Flags:              9990N0
   Begin Time:      13:39:20              DTM Job Name:
   User Id:         BPSI360               DTM Return Code:
   Workstation Id:  AW066120              DTM Task Name:
   Business Area:   LIFE                  DTM Next Task:
   Type:            FONECALL              End Date:           2004-09-02
   Status:          HPROCESSED            End Time:           13:39:55
   Queue:           END
   User Name:       **Francisco, Dom P
DTM Description:
   Comments:
```

---

```
   Begin Date:      2004-09-02            Flags:
   Begin Time:      13:41:09              DTM Job Name:
   User Id:         BPSI360               DTM Return Code:
   Workstation Id:                        DTM Task Name:
   Business Area:                         DTM Next Task:
   Type:                                  End Date:           2004-09-02
   Status:                                End Time:           13:41:09
   Queue:
   User Name:       **Francisco, Dom P
DTM Description:
   Comments:         as per pc from Neil Mcinnis, he said the owner of this policy has been
                     disolved and they will change it to new owner. sent ownchg form and bene chg
                     form to his email at mcinnisfinancial@reonmale.com.
```

---

RS046



**AMERICAN GENERAL**

American General Life Insurance Company
*Member of American International*
P.O. Box 4373
Houston, Texas 77210-4373
713/831-3170

## ANNUAL STATEMENT OF LIFE INSURANCE
### 09/19/2003 TO 09/19/2004

GLOBE RUBBER WORKS INC                    Agent:
254 BEECH ST
ROCKLAND MA  02370

EXHIBIT

VINCENT J SICA
363 BOLIVAR ST APT C
CANTON MA 02021-4133
(617) 828-9559

Agent ID:  000B08773B          Agency ID:  B3545

### GENERAL INFORMATION

Policy Owner:  GLOBE RUBBER WORKS INC          Product:  PLATINUM PROVIDER
Insured Person:  RICHARD C SOMERVILLE          Plan:  FLEXIBLE PREMIUM ADJUSTABLE LIFE
                                               Riders:                    Benefit:

Policy Number: U10005220L
Date of Issue:  SEPTEMBER 19, 1998
Issue Age:      65          Sex:  MALE
Planned Periodic Premium:  $4,736.72
Mode of Payment:         SEMI-ANNUAL
Loan Interest Rate:       6.100%
Crediting Interest Rates:
    * New Premiums:      4.500%
    Guaranteed:          4.500%
* Current interest rate credited to premiums not eligible for indexed interest.

### POLICY VALUE INFORMATION

|                                   | End of Last Reporting Period | End of Current Reporting Period |
|-----------------------------------|------------------------------|---------------------------------|
| Specified Amount of Insurance:    | $250,000.00                  | $250,000.00                     |
| *Death Benefit Amount:            | $250,000.00                  | $250,000.00                     |
| Death Benefit Option:             | LEVEL                        | LEVEL                           |
| Accumulation Value:               | $17,109.72                   | $23,750.42                      |
| Surrender Charge:                 | $10,500.00                   | $10,250.00                      |
| Outstanding Policy Loan:          | $.00                         | $.00                            |
| Cash Surrender Value:             | $6,609.72                    | $13,500.42                      |

* Any outstanding loans will be deducted from the Death Benefit Amount in determining the proceeds payable upon the death of the Insured Person.



POLICY ACTIVITY SUMMARY
09/19/2003 TO 09/19/2004

Policy Number:    U100052220L

| Month Ending | Premiums Received | Premium Expenses | -Monthly Charges-<br>Base | Rider(s) | Expense Charges | Withdrawals | Interest Credited | Accumulation Value |
|---|---|---|---|---|---|---|---|---|
| 10/18 | .00 | .00 | 301.57 | .00 | 5.00 | .00 | 86.91 * | 16,890.06 |
| 11/18 | 4,736.72 | 260.52 | 301.86 | .00 | 5.00 | .00 | 102.87 * | 21,162.27 |
| 12/18 | .00 | .00 | 296.31 | .00 | 5.00 | .00 | 104.47 * | 20,965.43 |
| 01/18 | .00 | .00 | 296.56 | .00 | 5.00 | .00 | 106.89 * | 20,770.76 |
| 02/18 | .00 | .00 | 296.81 | .00 | 5.00 | .00 | 105.91 * | 20,574.86 |
| 03/18 | .00 | .00 | 297.07 | .00 | 5.00 | .00 | 94.89 * | 20,367.68 |
| 04/18 | .00 | .00 | 297.34 | .00 | 5.00 | .00 | 104.21 * | 20,169.55 |
| 05/18 | 4,736.72 | 260.52 | 297.60 | .00 | 5.00 | .00 | 115.07 * | 24,458.22 |
| 06/18 | .00 | .00 | 292.02 | .00 | 5.00 | .00 | 122.91 * | 24,284.11 |
| 07/18 | .00 | .00 | 292.25 | .00 | 5.00 | .00 | 117.89 * | 24,104.75 |
| 08/18 | .00 | .00 | 292.48 | .00 | 5.00 | .00 | 120.85 * | 23,928.12 |
| 09/18 | .00 | .00 | 292.71 | .00 | 5.00 | .00 | 120.01 * | 23,750.42 |
| TOTAL | 9,473.44 | 521.04 | 3,554.58 | .00 | 60.00 | .00 | $1,302.88 | |

## IMPORTANT POLICY OWNER NOTICE

You should consider requesting more detailed information about your policy to understand how it may perform in the future. You should not consider replacement of your policy or make any changes in your coverage without requesting a current illustration. You may annually request, without charge, such an illustration by calling 1/713-831-3170, writing to the Policyowner Services Department at P. O. Box 4373, Houston TX 77210-4373, or contacting your agent. If you do not receive a current illustration of your policy within 30 days from your request, you should contact your state insurance department.

Interest credited to the accumulation value is based on the annual rate of interest in effect when a payment is received. The guaranteed minimum interest rate, as well as the interest rate currently credited to the new premium payments, can be found on page 1 of this statement. Rates applicable to prior premium payments will vary. Interest at a different rate may be credited to the accumulation value offset by a policy loan. All interest rates shown are effective annual interest rates.

* Current Interest Bonus Paid

RS048

02/16/2005 17:32 -7813982255    MCINNIS FINANCIAL



# FAX TRANSMISSION

EXHIBIT

228 Fosnacht
12-15-06    aw

**Pension & Wealth Management
Advisors**
phone 781 398-0077
fax 781 398-2255
email flavia@pensionwealth.com

POS
Scan Center
B-F4

**FROM:** Flavia

**TO:** Policyowner Service
American General
1-713-831-3028

**DATE:** 02/16/05 at 16:35:09

**PAGES:** 2

**SUBJECT:** change of agent request (2nd request)

FEB 16 2005 17:24    7813982255    PAGE.01

02/16/2005  17:32   7813982255
        FROM /AX 7818718931              MCINNIS FINANCIAL

 **GRW**
GLOBE RUBBER WORKS, INC.
234 Beech Street
Rockland, Massachusetts
02370-0153
USA

Pioneer's in Formulating
The Non-Metallic Agent...Est. 1990

781-871-3700
Fax 781-871-8931

September 2, 2004

AIG/ American General
Attention: Policyowner Services
VIA FACSIMILE: 713-831-3028

Re: Policy Number: U10005220L
Owner: Globe Rubber Works, Inc.
Insured: Richard C. Somerville

To Whom It May Concern:

Please be advised that effective July 1st, 2004, we are requesting a change of agent on the above referenced policy with AIG to:

Neil G. McInnis,
SS# 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
Pension Advisor Group, Inc.
600 South St., Suite 455
Waltham, MA 02453

Please release all pertinent information to Neil G. McInnis with regards to the above mentioned policy.

Thank you for your consideration.

Sincerely,

Roger Fasnacht, CFO
Globe Rubber Works, Inc.

FEB 16 2005 17:24                                        7813982255        PAGE.02

RS209

FEB-17-2005 10:24          781 893 7509                    781 893 7509      P.02/03

Change of Ownership

EXHIBIT
Fasnacht
# 9
1/31/06 SB

**AIG**  AMERICAN GENERAL

American General Life Insurance Company (AGL)
☐ Fixed Life Service Center - P. O. Box 4373, Houston, TX 77210-4373
☐ Variable Life Service Center - P. O. Box 4880, Houston, TX 77210-4880
Member of American International Group, Inc.
Instructions for completing this form are listed on the back. Please reference your contract for availability of certain requests.

| 1. | CONTRACT IDENTIFICATION | CONTRACT No.: U100052202 |
| | | OWNER: _Globe Rubber Works, Inc._   SSN/TIN OR EIN: _74-2922722_ |
| | ☐ Check Here if New Address | ADDRESS: _254 Beech St._   PHONE No.: _781-871-3702_ |
| | | _Rockland MA 02370_ |
| | | EMAIL ADDRESS (optional): |
| | | INSURED/ANNUITANT (if other than Owner): _Richard Somerville_ |
| 2. | NEW OWNER(S) | NEW OWNER'S NAME: _Globe Composite Solutions LTD_ |
| | A. PRIMARY | SSN/TIN OR EIN: _75-2989890_ |
| | | Address: _254 Beech St._ |
| | | _Rockland MA 02370_ |
| | | Phone No.: _781-871-3702_ |
| | B. CONTINGENT | NEW OWNER'S NAME: |
| | | SSN/TIN OR EIN: |
| | | Address: |
| | | Phone No.: |

3. SIGN HERE FOR ABOVE REQUEST

The Company is requested and directed to recognize that the present owner(s) of the Contract has hereby designated the new owner(s) (the "Owner") of the Contract. The Owner designated above shall have sole ownership and control of the Contract during the lifetime of the Insured/Annuitant and shall be entitled to all ownership rights. See back for details.

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number, and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.

The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

Signature of Current Owner _____ Date _2/14/05_          Signature of New Owner _____ Date _2/14/05_

Signature of Current Co-owner          Date          Signature of New Co-owner          Date
(or other party having interest in contract)          (or other party having interest in contract)

RETURN COMPLETED FORM TO THE ADDRESS OF THE COMPANY CHECKED ABOVE.

AGLC 0013 Rev0403                                                        Page 1 of 2

FEB 17 2005 10:43                        781 893 7509          PAGE.02

FEB-17-2005  10:24          781 893 7509                    781 893 7509    P.01/03
                                                            2/18/059:42A
                                                            016098000271

# FAX TRANSMISSION

Pension & Wealth Management
   Advisors
      phone  781 398-0077
      fax    781 398-2255
      email  flavia@pensionwealth.com

FROM:      Flavia

TO:        Policyowner Service
           American General
           1-713-831-3028

DATE:      02/16/05 at 16:35:09

PAGES:     3

SUBJECT:   change of owner request

02/18/2005  10:09   7813982255                    MCINNIS FINANCIAL                    PAGE   01
                                                                          2/18/05 3:29P
                                                                          015100007295

# FAX TRANSMISSION

Pension & Wealth Management
Advisors
    phone  781 398 -0077
    fax      781 398 -2255
    email  flavia@pensionwealth.com



EXHIBIT
229 Fasnacht
12-15-0e   CW

**FROM:**    Flavia

**TO:**    Policyowner Service
         American General
         1-713-831-3028

**DATE:**    02/16/05 at 16:35:09

**PAGES:**    3

**SUBJECT:**  change of beneficiary request

02/18/2005  10:09    7813982255    MCINNIS FINANCIAL    PAGE  02
2/18/05 3:29P
015100007296

**Change of Beneficiary**



## AMERICAN GENERAL

**American General Life Insurance Company (AGL),**
☐ Fixed Life Service Center - P. O. Box 4373, Houston, TX 77210-4373
☐ Variable Life Service Center - P. O. Box 4880, Houston, TX 77210-4880
Member of American International Group, Inc.
**Instructions for completing this form are listed on the back.**

| | | | |
|---|---|---|---|
| **1. CONTRACT IDENTIFICATION** ☐ Check Here if New Address | CONTRACT No.: _U10005220L_ OWNER: _Globe Composite Solutions, LTD_ ADDRESS: _254 Beech St._ _Rockland, MA 02370_ EMAIL ADDRESS (optional): _____ INSURED/ANNUITANT (if other than Owner): _Richard C. Somerville_ | SSN/TIN OR EIN: _75 2989890_ PHONE No.: _781-871-3702_ | |

**2. BENEFICIARY DESIGNATIONS**

One or more of the following may be checked. If nothing is checked, the designation will be in effect for the base insured only.
Designation is in effect for: ☒ Base Insured  ☐ Spouse Insured  ☐ Other _____

**A. PRIMARY**
*Address Required*

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|
| Globe Composite Solutions, LTD | employer | 254 Beech St. Rockland, MA 02370 | 75 2989890 | 100% |

If a living or non-testamentary trust is designated as a primary beneficiary, complete the following:
_____ Dated: _____
Legal Name of Trust

**B. CONTINGENT**
*Address Required*

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|
| | | | | |

_____ Dated: _____
Legal Name of Trust

**3. OPTIONAL CLAUSES**

One or more of the following may be checked if desired:
☐ POSTPONEMENT CLAUSE - COMMON DISASTER
☐ MINOR BENEFICIARY CLAUSE - TRUSTEE FOR CHILDREN
☐ CHILDREN'S CLAUSE - PER STIRPES
☐ IRREVOCABLE BENEFICIARY
Dated: _____
Name of Trust/Trustee

**4. SIGN HERE FOR ABOVE REQUEST**

The undersigned contract owner hereby revokes any previous beneficiary designation and any optional mode of settlement with respect to any death benefit proceeds payable at the death of the Insured/Annuitant.

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number, and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to back-up withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien). The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

_____    _____    2/15/05
Signature of Owner    Date    Signature of Co-owner    Date
(or other party having interest in contract)

_____    _____
Witness    Date

**RETURN COMPLETED FORM TO THE ADDRESS OF THE COMPANY CHECKED ABOVE!**

DS068



**AMERICAN GENERAL**

*Insurance Service Center for:*

American General Life
Insurance Company

February 18, 2005

GLOBE RUBBER WORKS INC
254 BEECH ST
ROCKLAND MA 02370

Contract Number: U10005220L
Insured: RICHARD C SOMERVILLE
Owner: GLOBE RUBBER WORKS INC

Dear GLOBE RUBBER WORKS INC :

We received your request to change the ownership on the above contract.

We are unable to complete your request until such time as the item(s) below have been resolved.

The contract is corporate owned. We will require a corporate resolution authorizing an officer to act on the company's behalf along with the signature and title of officer on company letterhead or paper with corporate seal in order to proceed with your request. Same officer should sign under the Current Owner field in the Change of Ownership form.

Please complete, date, and sign the enclosed change form and return it to our office for handling.

We appreciate the confidence you have shown in us and we thank you for your business. Should you need more information, please contact our Customer Service Center or your servicing agent:

VINCENT J SICA
BROWN, CHARLES P
363-C BOLIVAR ST
CANTON, MA 02021

Sincerely,

Customer Service Center

Corr#: 03929091

0B3545 / 000B08773B
CC: VINCENT J SICA
MC

Enclosure(s):
Change of Ownership Form

**American General Life Insurance Company**
*Member of American International Group, Inc.*
P.O. Box 4373 • Houston, TX 77210-4373 • 1-800-231-3655 • Fax 713-831-3028 • www.aigag.com

040

RS059

**AIG** **AMERICAN GENERAL**

**Change of Ownership**

**American General Life Insurance Company (AGL),**
**AIG Life Insurance Company**
**AIG Life Insurance Company of Puerto Rico**
☐ Fixed Life Service Center - P. O. Box 4373, Houston, TX 77210-4373
☐ Variable Life Service Center - P. O. Box 4880, Houston, TX 77210-4880
*Member companies of American International Group, Inc.*
Instructions for completing this form are listed on the back. Please reference your contract for availability of certain requests.

*Please print or type all information except signatures.*

| | | | |
|---|---|---|---|
| **1.** | **CONTRACT IDENTIFICATION** ☐ Check Here if New Address | CONTRACT No.: _____ OWNER: _____ ADDRESS: _____ _____ EMAIL ADDRESS (optional): _____ INSURED/ANNUITANT (if other than Owner): _____ | SSN/TIN OR EIN: _____ PHONE No.: _____ |
| **2.** | **NEW OWNER(S)** **A. PRIMARY** | NEW OWNER'S NAME: _____ SSN/TIN OR EIN: _____ Address: _____ _____ _____ Phone No.: _____ | |
| | **B. CONTINGENT** | NEW OWNER'S NAME: _____ SSN/TIN OR EIN: _____ Address: _____ _____ Phone No.: _____ | |

**3.  SIGN HERE FOR ABOVE REQUEST**

The Company is requested and directed to recognize that the present owner(s) of the Contract has hereby designated the new owner(s) (the "Owner") of the Contract. The Owner designated above shall have sole ownership and control of the Contract during the lifetime of the Insured/Annuitant and shall be entitled to all ownership rights. See back for details.

Note: Certain changes to your policy may result in adverse Tax consequences. We urge you to consult with your Tax Advisor prior to making any changes. The changes requested are not valid until recorded by the company.

**Under penalties of perjury, I certify that:**

1. The number shown on this form is my correct taxpayer identification number, and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to back-up withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

**You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.**

**The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.**

_____  _____     _____  _____
Signature of Current Owner    Date          Signature of New Owner    Date

_____  _____     _____  _____
Signature of Current Co-owner    Date          Signature of New Co-Owner    Date
(or other party having interest in contract)          (or other party having interest in contract)

**RETURN COMPLETED FORM TO THE ADDRESS OF THE COMPANY CHECKED ABOVE.**

RS060

## - Instructions and Conditions -

| 1. | CONTRACT IDENTIFICATION | Complete all contract information in this section. Complete a separate request form for each contract. |
|---|---|---|
| 2. | NEW OWNER(S) | This Request is made subject to the terms and conditions of the Contract, and shall not result in a change in any provision of the Contract, except as expressly provided in this Request. |
| | | The Owner may transfer the ownership and control of the Contract to a new owner, but such change shall not be effective until approved by the Service Center. If the Owner predeceases the Insured/Annuitant, then the rights of such deceased Owner shall pass to the contingent owner if one is named. If a contingent owner is not named, the rights will pass to the Administrator/Executor of such deceased Owner. |
| | | This Request for Change of Ownership does not change the beneficiary or the mode of payment as a death claim under the Contract. Any payment which becomes due under the Contract during the lifetime of the Insured/Annuitant shall be made to the Owner with the exception that any provision which now expressly provides for payment to the Insured/Annuitant as a life income or annuity shall not be available to the Owner, unless the Owner is the Insured/Annuitant. |
| | | This Request is subject to any existing assignment of record with the company which issued the contract ("the Company"). |
| | | **Trustee Owner** <br> If a trustee is designated as the new owner, the date and legal title of the trust must be stated and Trustee signatures are required in Section 3 as instructed by the trust agreement. |
| | | **Contingent Owner** <br> A contingent owner may be designated, and will be effective only if the new owner is a natural person (not a corporation, partnership or a trust), and the owner, or all designated owners (if more than one), predecease the Insured. A contingent owner may not be designated on an annuity contract. |
| 3. | SIGN HERE FOR ABOVE REQUEST | This request must be dated and all required signatures must be written in ink, using full legal names. |
| | | This request must be signed by: <br> • the person or persons who have the rights of ownership under the terms of the contract (co-owners, irrevocable beneficiary); <br> • by an Assignee if any; and <br> • by any other party who may have an interest in the contract by legal proceedings or statutes. <br> • the spouse of the owner must also sign this request, if the owner resides in a Community Property state. (Community Property states are AZ, CA, ID, LA, NM, NV, TX, WA and WI). |
| | | **Special circumstances – Corporate ownership:** The signature of one officer followed by the officer's title is required. The request must be submitted on a piece of corporate letterhead or paper with the corporate seal signed by that officer; **Partnerships:** The full name of the partnership should be written followed by the signatures of all partner(s), other than the Insured; **Trust:** If the contract is owned by or assigned to a Trustee, current Trustee(s) signatures are required as instructed by the trust agreement. Validation of Trustee(s) signatures may be required. |

RS061

FEB-23-2005  09:48   ...   781 893 7509                    781 893 7509 2/25/05 11:05 01/02
                                                                         014496 004891

# FAX TRANSMISSION

Pension & Wealth Management
    Advisors
        phone  781 398-0077
        fax    781 398-2255
        email  flavia@pensionwealth.com

EXHIBIT

232 *Fersnach*
1275-02e    *CW*

**FROM:**   Flavia

**TO:**   ~~Policyowner Service~~   *Agent's Team*
          American General   *Linda Speights*
          1-713-831-3028

**DATE:**   ~~02/16/05~~ at 16:35:09   *2/23/05*

**PAGES:**   ~~2~~

**SUBJECT:**   change of agent request (2nd request)

          *3rd request*

FEB-23-2005  09:48    781 893 7509

2/22/05

3° REQUEST

GRW
GLOBE RUBBER WORKS, INC.
264 Beech Street
Rockland, Massachusetts
02370-0162
USA

Pioneer in Formulating
The Non-Metallic Aos...ER. 1859

781-871-9700
Fax 781-871-6651

September 2, 2004

AIG/ American General
Attention: Policyowner Services    *Agent's Team*
VIA FACSIMILE: 743-831-3028    *Linda Speights*

Re: Policy Number: U10005220L
Owner: Globe Rubber Works, Inc.
Insured: Richard C. Somerville

To Whom It May Concern:

Please be advised that effective July 1ˢᵗ, 2004, we are requesting a change of agent on the above referenced policy with AIG to:

Neil G. McInnis,
SS# 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
Pension Advisor Group, Inc.
800 South St., Suite 455
Waltham, MA 02453

Please release all pertinent information to Neil G. McInnis with regards to the above mentioned policy.

Thank you for your consideration.

Sincerely,

Roger Fasnacht, CFO
Globe Rubber Works, Inc.

TOTAL P.02

 **AMERICAN GENERAL**

Insurance Service Center for:

American General Life
Insurance Company

February 24, 2005

GLOBE RUBBER WORKS INC
254 BEECH ST
ROCKLAND  MA
02370



Contract Number: U10005220L
Insured: RICHARD C SOMERVILLE
Owner: GLOBE RUBBER WORKS INC

Dear GLOBE RUBBER WORKS INC :

We received your request to change the beneficiary on the above contract.

We are unable to complete your request until such time as the item(s) below have been resolved.

- Ownership must be established first. Alongside with this Change of Beneficiary request is a Change of Ownership, which we are unable to process. If you are to assign a new owner, we need him to sign and date the change of beneficiary form.

Please complete, date, and sign the enclosed change form and return it to our office for handling.

We appreciate the confidence you have shown in us and we thank you for your business.  Should you need more information, please contact our Customer Service Center or your servicing agent:

VINCENT J SICA
BROWN, CHARLES P
363-C BOLIVAR ST
CANTON, MA 02021

Sincerely,

Customer Service Center

Corr#:  03940681

0B3545 / 000B08773B
CC:  VINCENT J SICA

Enclosure(s):
Change of Beneficiary Form

American General Life Insurance Company
*Member of American International Group, Inc.*
P.O. Box 4373 • Houston, TX  77210-4373 • 1-800-231-3655 • Fax 713-831-3028 • www.aigng.com

040

RS070

**AIG**  AMERICAN GENERAL

Change of Beneficiary

**American General Life Insurance Company (AGL)**
**AIG Life Insurance Company**
**AIG Life Insurance Company of Puerto Rico**
*Member companies of American International Group, Inc.*
☐ Fixed Life Service Center - P. O. Box 4373, Houston, TX 77210-4373
☐ Variable Life Service Center - P. O. Box 4880, Houston, TX 77210-4880
Instructions for completing this form are listed on the back.

*Please print or
type all information
except signatures.*

| | | |
|---|---|---|
| 1. | CONTRACT IDENTIFICATION | CONTRACT No.: _____ |
| | | OWNER: _____  SSN/TIN OR EIN: _____ |
| | ☐ Check Here if New Address | ADDRESS: _____  PHONE No.: _____ |
| | | _____ |
| | | EMAIL ADDRESS (optional): _____ |
| | | INSURED/ANNUITANT (if other than Owner): _____ |

**2. BENEFICIARY DESIGNATIONS**

**A. PRIMARY** *Address Required*

One or more of the following may be checked.  If nothing is checked, the designation will be in effect for the base insured only. Must be of legal age, if not Minor Beneficiary Clause must be completed.
Designation is in effect for: ☐ Base Insured ☐ Spouse Insured ☐ Other _____

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

If a living or non-testamentary trust is designated as a primary beneficiary, complete the following:

_____  Dated: _____
Legal Name of Trust

**B. CONTINGENT** *Address Required*

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

_____  Dated: _____
Legal Name of Trust

**3. OPTIONAL CLAUSES**

One or more of the following may be checked if desired:
☐ POSTPONEMENT CLAUSE - COMMON DISASTER
☐ MINOR BENEFICIARY CLAUSE - TRUSTEE FOR CHILDREN
☐ CHILDREN'S CLAUSE - PER STIRPES
☐ IRREVOCABLE BENEFICIARY
Dated: _____

_____
Name of Trust/Trustee

**4. SIGN HERE FOR ABOVE REQUEST**

The undersigned contract owner hereby revokes any previous beneficiary designation and any optional mode of settlement with respect to any death benefit proceeds payable at the death of the Insured/Annuitant. Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number, and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to back-up withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien). The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

_____  _____  _____
Signature of Owner  Title  Date

_____  _____  _____
Signature of Co-Owner, Assignee, Witness  Title  Date

**RETURN COMPLETED FORM TO THE ADDRESS OF THE COMPANY CHECKED ABOVE.**

AGLC0106 (Rev0904)  Page 1 of 2

BS071

## - Instructions and Conditions -

| | | |
|---|---|---|
| 1. | CONTRACT IDENTIFICATION | Complete all contract information in this section. You may use this form for multiple contracts that have the same contract owner and require the same signatures. |
| 2. | BENEFICIARY DESIGNATIONS | Unless otherwise provided, the right to change the beneficiary is reserved to the owner. Such change will be without prejudice to the company which issued the contract ("the Company") on account of any payment made or action taken by it before receipt of such notice at its Service Center. |
| | | Please select the Insureds/Annuitants for which the designation will take effect. |
| | | This designation, when filed with the Company, will become effective as of its date of execution. Such execution will constitute a waiver of any contract provision(s) requiring endorsement of change of beneficiary. All designations are subject to the terms and conditions of the contract, any indebtedness to the Company and any collateral assignment of the contract, whether made prior to or subsequent to the date of this designation. |
| | | The Company is released from all liability by making payment in accordance with this designation and assumes no responsibility for the use of money by any Trustee named herein. If a Trustee is named as the beneficiary, the date and legal title of the Trust must also be included. |
| | | The death proceeds shall be payable in equal shares to the designated beneficiaries, unless otherwise indicated. If beneficiaries are to receive unequal portions of the death benefit, it must be shown as a percentage of the death benefit and not as specific dollar amounts. In the event no beneficiary survives the insured and this form or the contract does not provide otherwise, the proceeds will be paid to the contract owner, or the executors or administrators of the contract owner's estate. |
| | | **SUGGESTED WORDING FOR COMMON DESIGNATIONS** |
| | | **Insured/Annuitant's Estate** – Executors or Administrators of the Insured's/Annuitant's Estate |
| | | **One individual beneficiary** – Mary Doe, wife, 100 N. Main St, Chicago, IL, SSN 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 |
| | | **Two or more individual beneficiaries** – Jane Doe, daughter, 100 N. Main St, Chicago, IL, SSN 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 and John Doe, son, 100 N. Main St, Chicago, IL, SSN 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 . |
| | | **One class or unnamed children** – Children born of the marriage of the Insured and Mary Doe |
| | | **Unequal portions** – Jane Doe, daughter, 75%, 100 N. Main St, Chicago, IL, SSN 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; John Doe, son, 25%, 100 N. Main St, Chicago, IL, SSN 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 |
| | | **Business Associate** – John Smith, Business Associate, 100 N. Main St, Chicago, Il , SSN 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 |
| | | **Not Incorporated** – The Board of Directors of the ADA, 100 N. Main St, Chicago, IL |
| | | **Incorporated** – ADA, 100 N. Main St, Chicago, IL, A Corporation organized under the laws of the State of Illinois |
| 3. | OPTIONAL CLAUSES | **Postponement Clause - Common Disaster** – In no case shall any payment be made to any beneficiary designated in this form until thirty (30) days or state mandated period have elapsed following the Insured's death, and in the event of the death of a beneficiary during such period, payment shall be made in the same manner as provided in this form, had the said beneficiary predeceased the Insured. This provision does not apply to a Trustee. |
| | | **Children's Clause - Per Stirpes** – If a child of the Insured who is designated in this form as a beneficiary predeceases the Insured, leaving children who survive the Insured, then the shares the deceased beneficiary would have received shall be payable in equal shares to the surviving children of the deceased beneficiary. |
| | | **Minor Beneficiary Clause - Trustee for Children** – The Trustee appointed to any beneficiary who is a minor child will receive any payment due on or after the Insured's death on the date such payment falls due. Payment by the Company to such Trustee shall be an absolute and complete release and acquittance of the Company which shall not be held accountable or responsible for the use and application of the death benefit proceeds paid to such Trustee. |
| | | **Irrevocable Beneficiary** – The beneficiary will become an irrevocable beneficiary and must provide consent for future transactions. Minors who are designated as irrevocable beneficiaries will not be permitted to approve future transactions until they reach the age of majority. |
| 4. | SIGN HERE FOR ABOVE REQUEST | This request must be dated and all required signatures must be written in ink, using full legal names. |
| | | Taxpayer Identification Number Certification: You must cross out item 2 if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return. |
| | | This request must be signed by: |
| | | • the person or persons who have the rights of ownership under the terms of the contract (co-owners, irrevocable beneficiary); |
| | | • by any other party who may have an interest in the contract by legal proceedings or statutes; |
| | | • by a disinterested third party; |
| | | • the policy's assignee must also sign any beneficiary or name change request, if the Policy is collaterally assigned; and |
| | | • the spouse of the owner must also sign this request, if the owner resides in a Community Property state. (Community Property status are AZ, CA, ID, LA, NM, NV, TX, WA and WI). |
| | | **Special circumstances – Corporate ownership:** The signature of one officer followed by the officer's title is required. The request must be submitted on a piece of corporate letterhead or paper with the corporate seal signed by that officer; **Partnerships:** The full name of the partnership should be written followed by the signatures of all partner(s), other than the Insured; **Trust:** If the contract is owned by or assigned to a Trustee, current Trustee(s) signatures are required as instructed by the trust agreement. Validation of Trustee(s) signatures may be required. |

AGLC0108 Rev0604

PS072

# Lincoln
## Financial Group®

**Request For Information**



The Lincoln National Life Insurance Company
Client Service Center, MIRI
P.O. Box 5048
Hartford, CT 06102-5048

*Acting as administrative agent of:*
*Aetna Life Insurance Company*
*ING Life Insurance and Annuity Company*

GLOBE RUBBER WORKS INC
254 BEECH STREET
ROCKLAND MA 02730

March 10, 2005
Issuing Company: ING Life Insurance and Annuity
Company
Policy/Certificate Number: G1637194
Insured: RICHARD C SOMERVILLE

Dear Client:

We are sorry that we are unable to record the change of beneficiary you requested on February 16, 2005. The State of Massachusetts requires that a disinterested party of legal age witness this type of change. The witness cannot be the person or persons designated as the new beneficiary.

We have prepared a new beneficiary form for you. We will need the page of the LLC agreement that shows who is authorized to sign on behalf of Globe Composite Solutions, LTD.

We are also returning the ownership change form as we require two officers to sign on behalf of Globe Rubber Works Inc. and controller is not an acceptable officer.

A return envelope is enclosed for your convenience.

At Lincoln Life, we are committed to providing you with quality customer service. If you have any questions or comments, please contact the Client Service Center at 800 334-7586 between the hours of 8:00 a.m. and 6:00 p.m. Eastern Time, Monday through Friday, or contact your financial representative.

Sincerely,

Ttonie Smith
Client Service Center

CSS - FORMREQ - HPROCESSED - END - Viewable
U10005220L - - - 2005-03-24-15.37.24.586100
Policy Number:  U10005220L
PRODUCT ID:

Client ID:
Team:

Printed on Thursday, February 02, 2006 at 2:08:37PM

================================================================

| | | |
|---|---|---|
| Begin Date: | 2005-03-24 | Flags: | 1000N0 |
| Begin Time: | 15:36:56 | DTM Job Name: | |
| User Id: | BPSI369 | DTM Return Code: | |
| Workstation Id: | AW103080 | DTM Task Name: | |
| Business Area: | CSS | DTM Next Task: | |
| Type: | ECORR | End Date: | 2005-03-24 |
| Status: | HCREATED | End Time: | 15:37:24 |
| Queue: | HPROCESS | | |
| User Name: | **Singson, Juan | | |
| DTM Description: | | | |
| Comments: | | | |

---------------------------------------------------------------

**EXHIBIT**

237 Fasnacht
12-15-06   CW

| | | |
|---|---|---|
| Begin Date: | 2005-03-24 | Flags: | |
| Begin Time: | 15:39:00 | DTM Job Name: | |
| User Id: | BPSI369 | DTM Return Code: | |
| Workstation Id: | | DTM Task Name: | |
| Business Area: | | DTM Next Task: | |
| Type: | | End Date: | 2005-03-24 |
| Status: | | End Time: | 15:39:00 |
| Queue: | | | |
| User Name: | **Singson, Juan | | |
| DTM Description: | | | |
| Comments: | Caller: GLOBE RUBBER WORKS INC | | |

Phone # & EXT:
Relationship: Owner
Verified Caller: Yes
Addtl Policy #s:
Message:

Pls Fax Corp Trust Affidavit to : 1-781-871-6631 ATTN: Roger Fasnacht

thanks

---------------------------------------------------------------

| | | |
|---|---|---|
| Begin Date: | 2005-03-25 | Flags: | 2000N0 |
| Begin Time: | 00:22:18 | DTM Job Name: | |
| User Id: | AWDBATCH | DTM Return Code: | |
| Workstation Id: | AWDBATCH | DTM Task Name: | |
| Business Area: | CSS | DTM Next Task: | |
| Type: | ECORR | End Date: | 2005-03-25 |
| Status: | HCREATED | End Time: | 00:22:18 |
| Queue: | HPROCESS | | |
| User Name: | Batch Station & User, BATCH | | |
| DTM Description: | | | |
| Comments: | | | |

---------------------------------------------------------------

RS083

29/2005 15:08 FAX 7818718631                                                ☒001/008



Globe Composite Solutions
254 Beech Street
Rockland, MA 02370
781-871-3700
781-871-6631 (fax)



**EXHIBIT**
238 Fasnacht
12-15-06   CW

# Fax

To: *Elaine Smith*          From: *Roger Fasnacht*

Fax: *860 - 466 - 2835*      Pages: *9*

Phone:                       Date: *3/29/05*

Re: *Policy G1637194*        CC:

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

*In response to your letter dated March 10, 2005, attached are*
*additional documents*

*1. Witness signature for the life Beneficiary Change Form.*
*2. Resolution from the General Partner for Globe Composite*
*Solutions indicating who is authorized to execute insurance*
*contracts.*
*3. Letter from Globe Rubber Works indicated Richard Somerville*
*is the sole owner and officer of Globe Rubber Works*
*4. Copy of MA Annual Return also indicating Mr. Somerville as*
*only officer of Globe Rubber Works.*

*Regards,*
*Roger Fasnacht CFO*

The information contained in this FACSIMILE is CONFIDENTIAL. This FACSIMILE is intended to be reviewed initially by only the individual named above. If the reader of the TRANSMITTAL PAGE is not the intended recipient or representative of the intended recipient specifically authorized to review this information on this FACSIMILE, you are hereby notified that any review, dissemination or copying of this FACSIMILE or the information contained herein is prohibited. If you have received this FACSIMILE in error, please immediately notify GLOBE COMPOSITE SOLUTIONS by telephone and return this FACSIMILE to GLOBE COMPOSITE SOLUTIONS at the above address by mail.

RECEIVED TIME  MAR. 29.  3:03PM

LFG0354

03/28/2005 15:08 FAX 7818718631                                    002/009
MAR-24-2005  16:27                    781 893 7509

 **Lincoln**
Financial Group®

*Request For Information*

Acting as administrative agent of:
Aetna Life Insurance Company
ING Life Insurance and Annuity Company

The Lincoln National Life Insurance Company
Client Service Center, MTR)
P.O. Box 5048
Hartford, CT 06102-5048

GLOBE RUBBER WORKS INC
254 BEECH STREET
ROCKLAND MA 02730

March 10, 2005
Issuing Company: ING Life Insurance and Annuity
Company
Policy/Certificate Number: G1637194
Insured: RICHARD C. SOMERVILLE

Dear Client:

We are sorry that we are unable to record the change of beneficiary you requested on February 16, 2005. The State of Massachusetts requires that a disinterested party of legal age witness this type of change. The witness cannot be the person or persons designated as the new beneficiary.

We have prepared a new beneficiary form for you. We will need the page of the LLC agreement that shows who is authorized to sign on behalf of Globe Composite Solutions, LTD.

We are also returning the ownership change form as we require two officers to sign on behalf of Globe Rubber Works Inc. and controller is not an acceptable officer.

A return envelope is enclosed for your convenience.

At Lincoln Life, we are committed to providing you with quality customer service. If you have any questions or comments, please contact the Client Service Center at 800 334-7586 between the hours of 8:00 a.m. and 6:00 p.m. Eastern Time, Monday through Friday, or contact your financial representative.

Sincerely,

Thonie Smith
Client Service Center

*[handwritten notes]* officer signatures: Richard Somerville ∫ need statement the
on behalf                                       ∫ Richard is sole owner/off.
ask
title Expert

RECEIVE
MAR 2 4 2005

www.lfg.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

03/28/2005 15:08 FAX 7818716631                                    ☒ 003/009

**Beneficiary Designation** (*continued*)

☐ Primary     ☐ Contingent
Name

Social security number/Tax ID #

Relationship to the Insured          Date of birth

Address

City, State, ZIP

If the beneficiary is a trust, complete the following:

☐ Primary     ☐ Contingent

Trust's name

Tax ID number                        Date of trust

Trustee's name

Address

City, State, ZIP

**Agreement and Signatures**

Policy Owner's signature x          Date
Name (print or type)  *Carl Forsythe*     Title* CEO

Policy Owner's signature            Date
Name (print or type)               Title*

Policy Owner's signature            Date
Name (print or type)               Title*

Irrevocable beneficiary's
signature (if applicable)           Date
Name (print or type)               Date

Witness signature
(Massachusetts only)                Date 2/15/05

*Complete if a corporation, partnership or trust. Two officer signatures are required for corporate owned policies.*

**Community property release** – *This section is applicable for community property states (AZ, CA, ID, LA, NV, NM, TX, WA). Determination of Community Property status depends on the current or former resident state of the policy owner.*

By signing below, you the spouse/former spouse agree to the changes indicated above and:

☐ You give up your rights to this policy according to the community property laws in your state.

☐ You do not give up your rights to this policy.

Spouse's Signature                  Date

Name (print or type)

Home Office
Acknowledgement                     Page 2 of 2

RECEIVED TIME   MAR. 29.   3:03PM                    LFG0356

CONSENT OF MEMBERS
IN LIEU OF SPECIAL MEETING
OF
KALFOR SOLUTIONS GROUP, LLC

EFFECTIVE: March 14, 2005

The undersigned, being all the members KALFOR SOLUTIONS GROUP, LLC, a Texas limited liability company (the "Company"), pursuant to the provisions of Articles 2.23 and 8.08 of the Texas Limited Liability Company Act, hereby waive notice of the time, place, and purpose of the special meeting of the members of the Company, and consent to and approve the following resolutions and each and every action effected thereby:

WHEREAS, the Company is the General Partner for Globe Composite Solutions, Ltd., a Texas Limited Partnership ("GCS"); and

WHEREAS, GCS purchased certain life insurance policies from Globe Rubber Works, Inc. as part of an asset purchase agreement of substantially all the assets of Globe Rubber Works, Inc. ; and,

WHEREAS, the life insurance companies require a Resolution stating that a GCS signatory is authorized to execute the Change of Ownership and Change of Beneficiary and legally bind GCS to the terms and conditions of the contracts .

NOW THEREFORE BE IT DECLARED that the General Partners do authorize Carl Forsythe, President and CEO for GCS and Roger Fasnacht, Chief Financial Officer for GCS to execute said insurance company contracts on behalf of the Company for the benefit of GCS.

Further Authorization of Officers.

RESOLVED, that the officers of the Company are hereby authorized to (a) sign, execute, certify to, verify, acknowledge, deliver, accept, file, and record any and all instruments and documents and (b) take, or cause to be taken, any and all such action, in the name and on behalf of the Company or otherwise, as (in their judgment) shall be necessary, desirable, or appropriate in order to effect the purpose of the foregoing resolutions.

EXECUTED on the date indicated below, to be effective as of the date set forth above.

MEMBERS

EMERALD GROVE CAPITAL, LTD.

CONSENT OF MEMBERS   -1-

RECEIVED

MAR 2 4 2005

LEG0357

03/29/2005 15:08 FAX 7818716631                                    ☒005/009

By:     EMERALD GROVE MANAGEMENT,
        LLC, its General Partner

Date: 3/16/05

By: _____
        Carl W. Forsythe, President

CHRIS CRAWFORD, Individually

Date: 3/24/05

By: _____
        Chris Crawford

JOHN P. BOODEE, Individually

Date: 3/17/05

By: _____
        John P. Boodee

CONSENT OF MEMBERS   -2-

RECEIVED

MAR 2 4 2005

RECEIVED TIME   MAR. 29.   3:03PM                                  LFG0358

 **GRW**
GLOBE RUBBER WORKS, INC.
254 Beech Street
Rockland, Massachusetts
02370-0188
USA

Pioneers in Formulating
The Non-Metallic Age...Est. 1000

781-871-3700
Fax 781-871-6681

Ms. Elonie Smith
Client Service Center, MIR1
The Lincoln National Life Insurance Company
Post Office Box 5048
Hartford, CT 06102

         Re:   Beneficiary Change
               Policy/Certificate No: G1637194
               Insured: Richard C. Somerville

Dear Ms. Smith:

        Pursuant to your letter dated March 10, 2005, I have attached the
Annual Report that was filed with the Commonwealth of Massachusetts as
evidence that I, Richard C. Somerville, was the sole Owner/Officer of Globe
Rubber Works, Inc.

Very truly yours,

Richard C. Somerville
Globe Rubber Works, Inc.

/30/2005 16:53 FAX 7818716631           ☒001



**Globe Composite Solutions**
254 Beech Street
Rockland, MA 02370
781-871-3700
781-871-6631 (fax)

Composite Solutions, Ltd.

```
┌─────────────────────┐
│      EXHIBIT         │
│   239 Fisnacht       │
│   12-15-06   CW       │
└─────────────────────┘
```

# Fax

| | | |
|---|---|---|
| To: *Elonie Smith* | From: *Roger Fisnacht* | |
| Fax: *860-466-2835* | Pages: *2* | |
| Phone: | Date: *3/30/05* | |
| Re: *Policy G1639194* | CC: | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

*Elonie,*

*Copy of signed letter from Richard Somerville.*

*Please let me know if all paperwork is complete.*

*Thanks*

*Roger*

The information contained in this FACSIMILE is CONFIDENTIAL. This FACSIMILE is intended to be reviewed initially by only the individual named above. If the reader of the TRANSMITTAL PAGE is not the intended recipient or representative of the intended recipient specifically authorized to review this information on this FACSIMILE, you are hereby notified that any review, dissemination or copying of this FACSIMILE or the information contained herein is prohibited. If you have received this FACSIMILE in error, please immediately notify GLOBE COMPOSITE SOLUTIONS by telephone and return this FACSIMILE to GLOBE COMPOSITE SOLUTIONS at the above address by mail.

RECEIVED TIME  MAR. 30.  4:49PM     PRINT TIME  MAR. 31.  6:28AM   LFG0271

03/30/2005 16:54 FAX 7818716831                                                    @002



**GRW**
GLOBE RUBBER WORKS, INC.
254 Beech Street
Rockland, Massachusetts
02370-0183
USA

Pioneers in Formulating
The Non-Majestic Age...Est. 1920

781-871-8700
Fax 781-871-6631

Ms. Elonie Smith
Client Service Center, MIR1
The Lincoln National Life Insurance Company
Post Office Box 5048
Hartford, CT 06102

          Re:    Beneficiary Change
                 Policy/Certificate No: G1637194
                 Insured: Richard C. Somerville

Dear Ms. Smith:

        Pursuant to your letter dated March 10, 2005, I have attached the
Annual Report that was filed with the Commonwealth of Massachusetts as
evidence that I, Richard C. Somerville, was the sole Owner/Officer of Globe
Rubber Works, Inc.

        Very truly yours,

Richard C. Somerville
Globe Rubber Works, Inc.

**Jennifer C. Roman**

---

| | |
|---|---|
| **From:** | Burhoe, Clare [cburhoe@lawson-weitzen.com] |
| **Sent:** | Tuesday, November 21, 2006 11:23 AM |
| **To:** | Jennifer C. Roman |
| **Cc:** | Lawson, Evan |
| **Subject:** | RE: Somerville/Globe |

Jennifer,

You do not need to re-notice the resumption of Carl's depo, but please let me know what time you'd like to begin so I can let him know.

John Boodee is available on the same dates I gave you for Carl, but we will not bring him here at our client's expense. As you are aware, it is the deponent's prerogative to designate witnesses in a 30(b)(6) deposition and we are redesignating Carl as the witness who will answer questions on the topics of the baffle panels. If you want to continue John's individual depo you can do it by phone, in Dallas, or here at your client's expense. The fact that the deposition was started and suspended does not require us to produce John here where the reason for the suspension, i.e. the baffle issue, was outside of Globe's control, and witnesses to pending litigation are not obligated to remain in state. If you feel otherwise then you can move to compel.

We will be getting the documents you marked for copying out to you today, in addition to some others I realized I hadn't made available to you when you were here. The client has provided us with all its original files on the insurance policies and we do not have the original of the March 30, 2005 fax. Are you still planning to depose the insurance companies on Dec. 21? I haven't received deposition notices for those.

With respect to your request for financial records, could you please be more specific about what you are looking for or refer me back to specific requests for production of documents? Your request could entail any number of records, which may or may not be relevant to the claims asserted in the law suit.

Finally, we have not gotten a return of service on our deposition subpoena of Charlie Stoddard but we are going to have to change the date of that depo anyway. Could you please let me know what dates you and Mark are available in Jan/Feb?

Thanks.
Clare

> -----Original Message-----
> **From:** Jennifer C. Roman [mailto:JRoman@tbhr-law.com]
> **Sent:** Monday, November 20, 2006 3:14 PM
> **To:** Burhoe, Clare
> **Cc:** Mark S. Furman
> **Subject:** RE: Somerville/Globe
>
> Clare,
>
> January 30th is the date we will continue the deposition of Carl. I will send you a confirming letter. (I assume that you do not need a separate notice of deposition to produce Carl since this is a continuation of his prior deposition. If this is not the case, please let me know).
>
> With respect to John Boodee, as you know, John Boodee was originally designated as a GCS 30(b)(6) witness and we expressed an interest in deposing him in his individual capacity as well. We agreed to combine his individual deposition with his testimony as a 30(b)(6) witness for the convenience of everyone. You agreed to produce John Boodee for the combined deposition and we started deposing him. We were in the middle of deposing him in both his individual capacity and in his capacity as a 30(b)(6) witness when his deposition was suspended until such time as GCS produced the additional documents concerning the baffle panels.
>
> Now that we have recently received the additional documents, we are in a position to continue with the previously noticed depositions, including John Boodee.

```
              AWD History for Work object key 2005-05-23-07.52.05.0000C3T01
                 INSSERVICE - OWNERCHG - RETURNED - END - Updateable
       G1637194  AET - SOMERVILLE -   - 999 - V34 - 2005-05-23-07.52.05.000003
                                      - Y
     Agent Code:                     Policy ID:  G1637194  AET
     TEAM NAME:  V34          INSURED'S LAST NAME:  SOMERVILLE
                         Printed on Tuesday, May 23, 2006 at 2:58:39PM
```

==================================================================================

0

| | | |
|---|---|---|
| Queue: | EMSMIT | |
| User Name: | Smith, Elonie | |
| DTM Description: | | |
| Comments: | Suspend | Suspend Reason |
| | Activate Date/Time | 2005-06-07 00:00:00  Activate Status |

EXHIBIT

245 Fasnacht
1275-020   CW

---

| | | | |
|---|---|---|---|
| Begin Date: | 2005-06-03 | Flags: | |
| Begin Time: | 09:53:04 | DTM Job Name: | |
| User Id: | EMSMIT | DTM Return Code: | |
| Workstation Id: | | DTM Task Name: | |
| Business Area: | | DTM Next Task: | |
| Type: | | End Date: | 2005-06-03 |
| Status: | | End Time: | 09:53:04 |
| Queue: | | | |
| User Name: | Smith, Elonie | | |
| DTM Description: | | | |

Comments:

> i called mr. roger Fasnacht, and left him a message that we need the operating
> agreement for GlobeComposite Solutions that shows who can sign on behalf of
> this llc.   The document that was sent to us "Consent of Members", we can not
> accept.  In paragraph 4 of this, it refers to "the life insurance companies
> require a resolution", this is not true, we do not ask for a resolution.  Also
> the document references Emerald Grove Capital as the general partner, however
> we need to have the operating agreement for Globe Composit Solution LTD, LLC.
> His # is 781-871-3700.

---

| | | | |
|---|---|---|---|
| Begin Date: | 2005-06-03 | Flags: | 9990N0 |
| Begin Time: | 09:53:17 | DTM Job Name: | |
| User Id: | EMSMIT | DTM Return Code: | |
| Workstation Id: | CR003124 | DTM Task Name: | |
| Business Area: | INSSERVICE | DTM Next Task: | |
| Type: | OWNERCHG | End Date: | 2005-06-03 |
| Status: | CREATED | End Time: | 09:53:17 |
| Queue: | EMSMIT | | |
| User Name: | Smith, Elonie | | |
| DTM Description: | | | |
| Comments: | End Suspension | | |

---

| | | | |
|---|---|---|---|
| Begin Date: | 2005-06-03 | Flags: | 9990N0 |
| Begin Time: | 09:53:06 | DTM Job Name: | |
| User Id: | EMSMIT | DTM Return Code: | |
| Workstation Id: | AWD_NT | DTM Task Name: | |
| Business Area: | INSSERVICE | DTM Next Task: | |

LFG0281

7/12/0510:20
015610000237

# LAWSON & WEITZEN, LLP

ATTORNEYS AT LAW

88 BLACK FALCON AVENUE, SUITE 345
BOSTON, MASSACHUSETTS 02210-2414

EVAN T. LAWSON
RICHARD B. WEITZEN *
PAMELA B. BANKERT
FRANK L. BRIDGES
IRA H. ZALEZNIK
JOHN J. WELTMAN * * *
VALERIE L. PAWSON
GEORGE F. HAILER +
GEORGE E. CHRISTODOULO, PC
KENNETH B. GOULD
JOSEPH FRIEDMAN
JOHN A. TENNARO
WILLIAM F. COYNE, JR.
DAVID A. RICH *
DENNIS J. MANESIS **
NATALIE A. KANELLIS †

PATRICIA L. FARNSWORTH
K. SCOTT GRIGGS
MICHAEL J. McDEVITT
STEVEN M. BUCKLEY
SONIA K. GUTERMAN, PH.D.
J. MARK DICKISON * *
CLARE B. BURHOE
ROBERT J. ROUGHSEDGE +++
CAROLINE A. O'CONNELL *
MARISSA A. GOLDBERG
MICHAEL WILLIAMS
KATHRYN E. PIECZARKA
DEAN J. HUTCHISON
SCOTT T. BUCKLEY
CHRISTOPHER S. FARNSWORTH
KRISTINA A. ENGBERG

BOSTON
TELEPHONE (617) 439-4990
TELECOPIER (617) 439-3987
EMAIL: POST@LAWSON-WEITZEN.COM
WWW.LAWSON-WEITZEN.COM

CAPE COD
LAWSON, WEITZEN & BANKERT, LLP
SIX GRANITE STATE COURT
BREWSTER, MASSACHUSETTS 02631
TELEPHONE (508) 255-3600

MARLBOROUGH
LAWSON, WEITZEN & HAILER, LLP
17 I'LOCKE DRIVE, SUITE 101
MARLBOROUGH, MASSACHUSETTS 01752
TELEPHONE (508) 616-1025

July 5, 2005



**VIA CERTIFIED MAIL**

American General Life Insurance Company
P.O. Box 4373
Houston, Texas 77210-4373

   Re: Policy Number: U10005220L
     Insured: Richard C. Somerville

To Whom It May Concern:

  This firm represents Globe Composite Solutions, Ltd., a subsidiary of Kalm-Forsythe Globe Innovations, Ltd., which purchased the assets of Globe Rubber Works, Inc. in August 2004. Globe Rubber Works, Inc. owned this life insurance policy through your Company, which insured Richard C. Somerville, the former president of Globe Rubber Works, Inc. After the asset purchase of Globe Rubber Works, Inc. was completed, it assigned the life insurance policy to Globe Composite Solutions, Ltd. by completing a "Change of Ownership" form provided by your Company. See attached. Globe Composite Solutions, Ltd. then designated a new beneficiary. See attached. For several months, your Company has failed to complete the change of ownership transaction, despite acknowledging that it was intended by the parties.

  The policy identified above is now owned by Globe Composite Solutions, Ltd. Further, this letter will serve as notice that Globe Composite Solutions, Ltd. is making a claim under the policy because Richard C. Somerville died on June 6, 2005. By this letter, we are making formal demand for payment. If we do not hear from you within seven days, we will commence litigation.



* ALSO ADMITTED IN NY
* * ALSO ADMITTED IN NH
* * * ALSO ADMITTED IN CA
* ALSO ADMITTED IN DC
++ ALSO ADMITTED IN NJ & PA
+++ ALSO ADMITTED IN RI, CT, NH & ME
† ALSO ADMITTED IN NH & NY

7/12/05 10:20
0 1561 0 000238

# LAWSON & WEITZEN, LLP

American General Life Insurance Company
July 5, 2005
Page 2


Very Truly Yours,

Kathryn E. Pieczarka

Enc.
cc:    Evan T. Lawson, Esq.
       Carl W. Forsythe
       Roger Fasnacht

RS088



**AMERICAN GENERAL**

Change of Ownership
7/12/05 10:20
015610 000239

American General Life Insurance Company (AGL),
　☐ Fixed Life Service Center · P. O. Box 4373, Houston, TX 77210-4373
　☐ Variable Life Service Center · P. O. Box 4880, Houston, TX 77210-4880
Member of American International Group, Inc.
Instructions for completing this form are listed on the back. Please reference your contract for availability of certain requests.

| 1. | CONTRACT IDENTIFICATION | CONTRACT No.: U10005220L |
|---|---|---|
| | | OWNER: *Globe Rubber Works, Inc.*    SSN/TIN OR EIN: 74-2922722 |
| | ☐ Check Here if New Address | ADDRESS: *254 Beech St.*    PHONE No.: 781-871-3702 |
| | | *Rockland, MA 02370* |
| | | EMAIL ADDRESS (optional): _____ |
| | | INSURED/ANNUITANT (if other than Owner): *Richard Somerville* |

| 2. | NEW OWNER(S) | NEW OWNER'S NAME: *Globe Composite Solutions, LTD* |
|---|---|---|
| | A. PRIMARY | SSN/TIN OR EIN: 752989890 |
| | | Address: *254 Beech St.* |
| | | *Rockland, MA 02370* |
| | | Phone No.: 781-871-3702 |
| | B. CONTINGENT | NEW OWNER'S NAME: _____ |
| | | SSN/TIN OR EIN: _____ |
| | | Address: _____ |
| | | Phone No.: _____ |

**3. SIGN HERE FOR ABOVE REQUEST**

The Company is requested and directed to recognize that the present owner(s) of the Contract has hereby designated the new owner(s) (the "Owner") of the Contract. The Owner designated above shall have sole ownership and control of the Contract during the lifetime of the Insured/Annuitant and shall be entitled to all ownership rights. See back for details.

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number, and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to back-up withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.

The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

| x_____ | _____ | _____ | _____ |
|---|---|---|---|
| Signature of Current Owner | Date | Signature of New Owner | Date |
| _____ | _____ | _____ | _____ |
| Signature of Current Co-owner (or other party having interest in contract) | Date | Signature of New Co-Owner (or other party having interest in contract) | Date |

RS089

## - Instructions and Conditions -

| 1. | CONTRACT IDENTIFICATION | Complete all contract information in this section. Complete a separate request form for each contract. |
|----|------------------------|--------|
| 2. | NEW OWNER(S) | This Request is made subject to the terms and conditions of the Contract, and shall not result in a change in any provision of the Contract, except as expressly provided in this Request. |
| | | The Owner may transfer the ownership and control of the Contract to a new owner, but such change shall not be effective until approved by the Service Center. If the Owner predeceases the Insured/Annuitant, then the rights of such deceased Owner shall pass to the contingent owner if one is named. If a contingent owner is not named, the rights will pass to the Administrator/Executor of such deceased Owner. |
| | | This Request for Change of Ownership does not change the beneficiary or the mode of payment as a death claim under the Contract. Any payment which becomes due under the Contract during the lifetime of the Insured/Annuitant shall be made to the Owner with the exception that any provision which now expressly provides for payment to the Insured/Annuitant as a life income or annuity shall not be available to the Owner, unless the Owner is the Insured/Annuitant. |
| | | This Request is subject to any existing assignment of record with the company which issued the contract ("the Company"). |
| | | **Trustee Owner** <br> If a trustee is designated as the new owner, the date and legal title of the trust must be stated and Trustee signatures are required in Section 3 as instructed by the trust agreement. |
| | | **Contingent Owner** <br> A contingent owner may be designated, and will be effective only if the new owner is a natural person (not a corporation, partnership or a trust), and the owner, or all designated owners (if more than one), predecease the Insured. A contingent owner may not be designated on an annuity contract. |
| 3. | SIGN HERE FOR ABOVE REQUEST | This request must be dated and all required signatures must be written in ink, using full legal names. |
| | | This request must be signed by: <br> • the person or persons who have the rights of ownership under the terms of the contract (co-owners, irrevocable beneficiary); <br> • by an Assignee if any; and <br> • by any other party who may have an interest in the contract by legal proceedings or statutes. |
| | | **Special circumstances – Corporate ownership:** The signature of one officer followed by the officer's title is required. The request must be submitted on a piece of corporate letterhead or paper with the corporate seal signed by that officer; **Partnerships:** The full name of the partnership should be written followed by the signatures of all partner(s), other than the Insured; **Trust:** If the contract is owned by or assigned to a Trustee, current Trustee(s) signatures are required as instructed by the trust agreement. Validation of Trustee(s) signatures may be required. |

RS090



 **AMERICAN GENERAL**

Change of Beneficiary

7/12/0510:20
01001000241

**American General Life Insurance Company (AGL),**
☐ Fixed Life Service Center - P. O. Box 4373, Houston, TX 77210-4373
☐ Variable Life Service Center - P. O. Box 4880, Houston, TX 77210-4880
Member of American International Group, Inc.
Instructions for completing this form are listed on the back.

| | |
|---|---|
| **1. CONTRACT IDENTIFICATION**<br><br>☐ Check Here if New Address | CONTRACT No.: *U10005220L*<br>OWNER: *Globe Composite Solutions, LTD*   SSN/TIN OR EIN: *75 2989890*<br>ADDRESS: *254 Beech St.*   PHONE No.: *781-871-3702*<br>*Rockland, MA 02370*<br><br>EMAIL ADDRESS (optional): _____<br>INSURED/ANNUITANT (if other than Owner): *Richard C. Somerville* |

**2. BENEFICIARY DESIGNATIONS**

One or more of the following may be checked.  If nothing is checked, the designation will be in effect for the base insured only.
Designation is in effect for:   ☒ Base Insured   ☐ Spouse Insured   ☐ Other _____

**A. PRIMARY**
*Address Required*

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|
| *Globe Composite Solutions, LTD* | *employer* | *254 Beech St. Rockland MA 02370* | *75 2989890* | *100%* |

If a living or non-testamentary trust is designated as a primary beneficiary, complete the following:
_____   Dated: _____
Legal Name of Trust

**B. CONTINGENT**
*Address Required*

| Full Name | Relationship | Address | SSN | Percentages (if applicable) Must total 100 |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

Dated: _____
Legal Name of Trust

**3. OPTIONAL CLAUSES**

One or more of the following may be checked if desired:
☐ POSTPONEMENT CLAUSE - COMMON DISASTER      ☐ CHILDREN'S CLAUSE - PER STIRPES
☐ MINOR BENEFICIARY CLAUSE - TRUSTEE FOR CHILDREN   ☐ IRREVOCABLE BENEFICIARY
Dated: _____
Name of Trust/Trustee

**4. SIGN HERE FOR ABOVE REQUEST**

The undersigned contract owner hereby revokes any previous beneficiary designation and any optional mode of settlement with respect to any death benefit proceeds payable at the death of the Insured/Annuitant.

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct taxpayer identification number, and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to back-up withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to back-up withholding, and (3) I am a U.S. person (including a U.S. resident alien). The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

_____   _____
Signature of Owner         Date        Signature of Co-owner        Date
(or other party having interest in contract)

_____   _____
Witness                    Date

RS091

7/12/0510:20
0156100002.12

## - Instructions and Conditions -

| 1. | CONTRACT IDENTIFICATION | Complete all contract information in this section. You may use this form for multiple contracts that have the same contract owner and require the same signatures. |
|---|---|---|
| 2. | BENEFICIARY DESIGNATIONS | Unless otherwise provided, the right to change the beneficiary is reserved to the owner. Such change will be without prejudice to the company which issued the contract ("the Company") on account of any payment made or action taken by it before receipt of such notice at its Service Center.

Please select the Insureds/Annuitants for which the designation will take effect.

This designation, when filed with the Company, will become effective as of its date of execution. Such execution will constitute a waiver of any contract provision(s) requiring endorsement of change of beneficiary. All designations are subject to the terms and conditions of the contract, any indebtedness to the Company and any collateral assignment of the contract, whether made prior to or subsequent to the date of this designation.

The Company is released from all liability by making payment in accordance with this designation and assumes no responsibility for the use of money by any Trustee named herein. If a Trustee is named as the beneficiary, the date and legal title of the Trust must also be included.

The death proceeds shall be payable in equal shares to the designated beneficiaries, unless otherwise indicated. If beneficiaries are to receive unequal portions of the death benefit, it must be shown as a percentage of the death benefit and not as specific dollar amounts. In the event no beneficiary survives the insured and this form or the contract does not provide otherwise, the proceeds will be paid to the contract owner, or the executors or administrators of the contract owner's estate.

SUGGESTED WORDING FOR COMMON DESIGNATIONS

**Insured/Annuitant's Estate** – Executors or Administrators of the Insured's/Annuitant's Estate
**One individual beneficiary** – Mary Doe, wife, 100 N. Main St, Chicago, IL, SSN 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
**Two or more individual beneficiaries** – Jane Doe, daughter, 100 N. Main St. Chicago, IL, SSN 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 and John Doe, son, 100 N. Main St, Chicago, IL, SSN 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
**One class or unnamed children** – Children born of the marriage of the Insured and Mary Doe
**Unequal portions** – Jane Doe, daughter, 75%, 100 N. Main St, Chicago, IL, SSN 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; John Doe, son, 25%, 100 N. Main St, Chicago, IL, SSN 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
**Business Associate** – John Smith, Business Associate, 100 N. Main St, Chicago, IL, SSN 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
**Not Incorporated** – The Board of Directors of the ADA, 100 N. Main St, Chicago, IL
**Incorporated** – ADA, 100 N. Main St, Chicago, IL, A Corporation organized under the laws of the State of Illinois |
| 3. | OPTIONAL CLAUSES | **Postponement Clause - Common Disaster** – In no case shall any payment be made to any beneficiary designated in this form until thirty (30) days or state mandated period have elapsed following the Insured's death, and in the event of the death of a beneficiary during such period, payment shall be made in the same manner as provided in this form, had the said beneficiary predeceased the Insured. This provision does not apply to a Trustee.

**Children's Clause - Per Stirpes** – If a child of the Insured who is designated in this form as a beneficiary predeceases the Insured, leaving children who survive the Insured, then the shares the deceased beneficiary would have received shall be payable in equal shares to the surviving children of the deceased beneficiary.

**Minor Beneficiary Clause - Trustee for Children** – The Trustee appointed to any beneficiary who is a minor child will receive any payment due on or after the Insured's death on the date such payment falls due. Payment by the Company to such Trustee shall be an absolute and complete release and acquittance of the Company which shall not be held accountable or responsible for the use and application of the death benefit proceeds paid to such Trustee.

**Irrevocable Beneficiary** – The beneficiary will become an irrevocable beneficiary and must provide consent for future transactions. Minors who are designated as irrevocable beneficiaries will not be permitted to approve future transactions until they reach the age of majority. |
| 4. | SIGN HERE FOR ABOVE REQUEST | This request must be dated and all required signatures must be written in ink, using full legal names.

Taxpayer Identification Number Certification: You must cross out item 2 if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.

This request must be signed by:
- the person or persons who have the rights of ownership under the terms of the contract (co-owners, irrevocable beneficiary);
- by any other party who may have an interest in the contract by legal proceedings or statutes; and
- by a disinterested third party.

Special circumstances – Corporate ownership: The signature of one officer followed by the officer's title is required. The request must be submitted on a piece of corporate letterhead or paper with the corporate seal signed by that officer; Partnerships: The full name of the partnership should be written followed by the signatures of all partner(s), other than the Insured; Trust: If the contract is owned by or assigned to a Trustee, current Trustee(s) signatures are required as instructed by the trust agreement. Validation of Trustee(s) signatures may be required. |

. Page 2 of 2

RS092



LAWSON & WEITZI
ATTORNEYS AT LAW
88 BLACK FALCON AVENUE
BOSTON, MASSACHUSETTS C4

FROM:
CMPR: USPS
TRK(s: 70022030000782350333
RCVD: 7/11/05   10:05

TO: CLAIMS
PH: 8119
MSC: B-F4
PCS: 1

FLR: BSM  MSC: B-F4
CLAIMS

7/12/05 10:20
01561000000243

RS093



Composite Solutions, Ltd.

*Future Solutions: TODAY*

September 15, 2005

Ms. Carolyn Randolph                                    Via FedEx Overnight Delivery
American General Life Insurance Company
2727 Allen Parkway
PO Box 4443
Houston, TX 77210

Re: Policy Number U10005220L

Dear Ms. Randolph:

As a follow-up to our telephone conversation on September 14, 2005, I am enclosing the information
you requested regarding our death benefit claim on life insurance policy U10005220L owned by Globe
Composite Solutions, Ltd.

Specifically, the information that you have asked, and we are providing is:

- Copy of the release of interest for the above-mentioned policy from First National Bank of
  New England, dated September 2, 2004.
- Original death certification of the insured, Richard Somerville.

Please remit claims payment to our corporate office at:

Globe Composite Solutions, Ltd.
10440 North Central Expressway, Suite 1475
Dallas, TX 75231

As I mentioned to you during our call, we are frustrated by American General Life Insurance
Company's lack of response to several previous requests made by our company and our legal
representatives to process this claim. Since your delay has placed an enormous financial burden upon
our small company, we are requesting that this claim be processed as quickly as possible.

Carolyn, we trust that you now have all necessary information. If not, please contact me directly at
214-642-4727 or e-mail at cforsythe@globecomposite.com.

Sincerely,

Carl W. Forsythe

cc: Kate Pieczarka, Esq.

Globe Composite Solutions, Ltd. • 10440 N. Central Expwy., Suite 1475, Dallas, TX 75231 • 214.373.4562 • Fax 214.891.3366 • www.globecomposite.com

RS223

## RELEASE OF GUARANTY

~~August~~ September 2, 2004

Mr. Richard C. Somerville
344 Keene Street
Duxbury, MA 02332

Re:    Guaranty Agreement dated May 19, 1998 with respect to the Obligations of Globe
       Rubber Works, Inc. to First National Bank of New England, n/k/a UPS Capital
       Business Credit

Dear Mr. Somerville:

Please refer to the captioned Guaranty (the "Guaranty") by you (the "Guarantor") of the obligations of Globe Rubber Works, Inc., a Massachusetts corporation (the "Company") to UPS Capital Business Credit (successor in interest to First International Bank, successor in interest to First National Bank of New England) (collectively, the "Bank"). The undersigned Bank hereby releases and discharges you as Guarantor from your obligations to the Bank under the Guaranty, such Guaranty having no further force or effect.

The original executed copy of the Guaranty may be returned to you in due course from the Bank's document center; however, the foregoing release is effective immediately.

Very truly yours,

UPS CAPITAL BUSINESS CREDIT, successor
in interest to FIRST INTERNATIONAL BANK,
successor in interest to FIRST NATIONAL
BANK OF NEW ENGLAND

By:  _____
     Josephine Joseph , duly authorized

RS224

To All People to whom these Presents shall come, Greeting:

KNOW YE, THAT FIRST NATIONAL BANK OF NEW ENGLAND

does hereby release and discharge a certain CONDITIONAL ASSIGNMENT OF LEASES AND RENTS from GLOBE RUBBER WORKS, INC. to FIRST NATIONAL BANK OF NEW ENGLAND dated MAY 19, 1998 and recorded MAY 20, 1998 in the PLYMOUTH COUNTY REGISTRY OF DEEDS OFFICE, State of MASSACHUSETTS in BOOK 16211 at PAGE 74, which reference may be had:

254 BEECH STREET
ROCKLAND MA

IN WITNESS WHEREOF, Josephine Joseph, Product Support Manager has hereunto set her hand this 2nd day of SEPTEMBER 2004.

Signed and Delivered in the presence of:  First National Bank of New England

_____              By _____
Susan P. Levin                             Josephine Joseph, Product Support Mgr.

_____
Darlene Graham

STATE OF CONNECTICUT:          ss. Hartford      September 2, 2004
COUNTY OF HARTFORD:

Personally Appeared Josephine Joseph, Product Support Manager as aforesaid, Signer of the foregoing Instrument, and acknowledged the same to be her free act and deed as such and the free act and deed of said corporation/partnership, before me.

_____
SUSAN P. LEVIN
Notary Public
My commission expires 12/31/05

# 3000329-0001

09/29/2005 11:30 0015884 544

RS225

To All People to whom these Presents shall come, Greeting:

KNOW YE, THAT FIRST NATIONAL BANK, OF NEW ENGLAND

do hereby release and discharge a certain MORTGAGE (Participation) from GLOBE RUBBER WORKS INC. to FIRST NATIONAL BANK OF NEW ENGLAND dated MAY 19, 1998 and recorded MAY 20, 1998 in the PLYMOUTH COUNTY REGISTRY OF DEEDS OFFICE, State of MASSACHUSETTS in BOOK 16211 at PAGE 69, and ASSIGNED to HSBC BANK USA, f/k/a Marine Midland Bank and recorded MARCH 8, 1999 in BOOK 17221 at PAGE 281 which reference may be had:

        254 BEECH STREET
        ROCKLAND MA

The intent of this Release is to release and discharge the premises from the lien of the Mortgage.  All rights of the Mortgagee vis a vis the Mortgagors or other parties in connection with the Mortgage indebtedness are reserved.

IN WITNESS WHEREOF, Josephine Joseph, Product Support Manager has hereunto set her hand this 2nd day of SEPTEMBER 2004.

*Signed and Delivered in the presence of:*    First National Bank of New England

_____            By: _____

Susan P. Levin                          Josephine Joseph, Product Support Manager

_____
Darlene Graham

STATE OF CONNECTICUT:        ss. Hartford   September 2, 2004
COUNTY OF HARTFORD;

RS226

STATE OF NEW YORK )

COUNTY OF KINGS )
                                    ss:

On the       day of SEPTEMBER  in the year 2004 before me, the undersigned

A Notary Public in and for said State, personally appeared Marie DePalma, Assistant Vice

President of HSBC Bank USA, N.A. F/K/A Marine Midland Bank, personally known to me

(Or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to

The within instrument and acknowledged to me that she executed the same in her authorized

capacity, and that by her signature the instrument, the individual, or the entity on behalf of

which person acted executed the instrument.

Witness my hand and official seal,

Notary Public

PAULETTE E. SHAW
Notary Public, State of New York
No. 01SH6009038
Qualified in Queens County
Commission Expires June 22, 2006

09/29/2005 11:30 0015884 546

# TOWN OF DUXBURY, MASSACHUSETTS

## OFFICE OF THE TOWN CLERK



**TELEPHONE**
934-1131

ON REVERSE SIDE)
USE BY
UNS AND
EXAMINERS

### The Commonwealth of Massachusetts
STANDARD CERTIFICATE OF DEATH
REGISTRY OF VITAL RECORDS AND STATISTICS

REGISTERED NUMBER: 69

STATE USE ONLY

| DECEDENT - NAME FIRST | MIDDLE | LAST | SEX | DATE OF DEATH (Mo., Day, Yr.) |
|---|---|---|---|---|
| Richard | C. | Somerville | M | June 7, 2005 |

**DECEDENT**

| PLACE OF DEATH (City/Town) | COUNTY OF DEATH | HOSPITAL OR OTHER INSTITUTION - Name (if not in either, give street and number) |
|---|---|---|
| Duxbury | Plymouth | 344 Keene St. |

| PLACE OF DEATH (Check only one) HOSPITAL: ☐ Inpatient ☐ ER/Outpatient ☐ DOA | OTHER: ☐ Nursing Home ☒ Residence ☐ Other (Specify) | SOCIAL SECURITY NUMBER 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 | IF US WAR VETERAN SPECIFY WAR Korea |
|---|---|---|---|

| WAS DECEDENT OF HISPANIC ORIGIN (If yes, Specify Puerto Rican, Dominican, Cuban, etc.) ☒ NO ☐ YES | RACE (e.g. White, Black, American Indian, etc.) Specify White | DECEDENT'S EDUCATION (Highest Grade Completed) Elementary Sec (0-12) College (1-4, 5+) 12 |
|---|---|---|

| AGE - Last Birthday 71 (Yrs) | UNDER 1 YEAR MOS. DAYS | UNDER 1 DAY HOURS MINS | DATE OF BIRTH (Mo., Day, Yr.) Mar. 20, 1934 | BIRTHPLACE (City and State or Foreign Country) Boston, MA |
|---|---|---|---|---|

| MARRIED, NEVER MARRIED WIDOWED OR DIVORCED Married | LAST SPOUSE (if wife, give maiden name) Anne Patricia Roche | USUAL OCCUPATION President | KIND OF BUSINESS OR INDUSTRY Manufacturing |
|---|---|---|---|

| RESIDENCE - NO. & ST., CITY/TOWN, COUNTY, STATE/COUNTRY 344 Keene St., Duxbury, Plymouth, MA, USA | ZIP CODE 02332 |
|---|---|

**INFORMANT**

| FATHER - FULL NAME Murray G. Somerville | STATE OF BIRTH (if not in US, name country) Canada | MOTHER - NAME (GIVEN) (MAIDEN) Mildred Steeves | STATE OF BIRTH (if not in US, name country) Canada |
|---|---|---|---|

| INFORMANT'S NAME Anne Patricia Roche | MAILING ADDRESS - NO. & ST., CITY/TOWN, STATE, ZIP CODE 344 Keene St., Duxbury, MA 02332 | RELATIONSHIP Wife |
|---|---|---|

**DISPOSITION**

| METHOD OF DISPOSITION ☐ BURIAL ☒ CREMATION ☐ ENTOMBMENT ☐ REMOVAL FROM STATE ☐ DONATION ☐ OTH. SPEC. | FUNERAL SERVICE LICENSEE OR OTHER DESIGNEE Albert E. Sullivan, Jr. | LICENSE # 5114 |
|---|---|---|

| PLACE OF DISPOSITION (Name of Cemetery, Crematory or other) Duxbury Crematory. | LOCATION (City/Town, State) Duxbury, MA |
|---|---|

| DATE OF DISPOSITION June 13, 2005 | NAME AND ADDRESS OF FACILITY OR OTHER DESIGNEE Sullivan Funeral Home 551 Washington St. Hanover, MA | 02339 |
|---|---|---|

**CERTIFIER**

28 PART I - Enter the diseases, injuries, or complications that caused the death. Do not use only the mode of dying, such as cardiac or respiratory arrest, shock or heart failure. List only one cause on each line (a through d) PRINT OR TYPE LEGIBLY.

Approximate interval Between Onset and Death: MINUTES

| IMMEDIATE CAUSE (Final disease or condition resulting in death) | HANGING | DUE TO (OR AS A CONSEQUENCE OF) |
|---|---|---|

Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (disease or injury that initiated events resulting in death) LAST

DUE TO (OR AS A CONSEQUENCE OF)

DUE TO (OR AS A CONSEQUENCE OF)

PART II - Other significant conditions contributing to death but not resulting in underlying cause given in Part I.

| WAS AUTOPSY PERFORMED? (Yes or No) Yes | WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH (Yes or No) Yes |
|---|---|

09/29/2005 11:30 0015884 547

RS228

 **Globe**
Composite Solutions, Ltd.

*Future Solutions: TODAY*

September 16, 2005

Ms. Carolyn Randolph                                    Via FedEx Overnight Delivery
American General Life Insurance Company
2727 Allen Parkway
PO Box 4443
Houston, TX 77210

Re: Release of Assignment of Life Insurance Policy for Policy Number U10005220L

Dear Ms. Randolph:

In our package of information that you received today, we noticed that we inadvertently left out the Release of Assignment of Life Insurance Policy from UPS Capital Business Credit, formerly known as the First National Bank of New England. This information is provided to you in regard to our death benefit claim on life insurance policy U10005220L owned by Globe Composite Solutions, Ltd.

Carolyn, we trust that you now have all necessary information to process our claim. If not, please contact me directly at 214-642-4727 or e-mail at cforsythe@globecomposite.com.

Sincerely,

Carl W. Forsythe

cc: Kate Pieczarka, Esq.



Globe Composite Solutions, Ltd. • 10440 N. Central Expwy., Suite 1475, Dallas, TX 75231 • 214.373.4562 • Fax 214.891.3366 • www.globecomposite.com

RS229

SEP. 16. 2005 1:22PM UPS CAPITAL NO. 2742 P. 2

UPS Capital Business Credit
280 Trumbull Street
Hartford, CT 06103
860.727.0700 Tel

09/29/2005 11:31 0015384 549

## RELEASE OF ASSIGNMENT OF LIFE INSURANCE POLICY

For value received all right, title and interest of the undersigned assignee in and to Policy # U10005220L issued by **AMERICAN GENERAL LIFE** on the life of **RICHARD SOMERVILLE** is hereby relinquished and released.

Signed and sealed this 13th day of September 2005

UPS Capital Business Credit
fka First National Bank of New England

_Susan P. Levin_
Susan P. Levin

By: _Josephine Joseph_
Josephine Joseph
Product Support Manager

_Haydee Medina_
Haydee Medina

STATE OF CONNECTICUT )
                      )  ss.  Hartford   September 16, 2005
COUNTY OF HARTFORD    )

Personally appeared Josephine Joseph, Product Support Manager of UPS Capital Business Credit as signer of the foregoing instrument, and acknowledged the same to be her free act and deed as such, and the free act and deed of said corporation, before me.

_Susan Levin_
Susan Levin
Notary Public
My commission expires December 31, 2005

RS230

FedEx | Ship Manager | Label 7917 3146 8628

From: ' Origin ID:  (214)373-4582
Carl Forsythe
Globe Composite Solutions, Ltd
10440 N. Central Expressway
Suite 1475
DALLAS, TX 75231


FedEx.
Express

Ship Date: 16SEP05
Actual Wgt: 1 LB
System#: 1882322/INET2200
Account#: S *********

REF:


Delivery Address Bar Code

SHIP TO:  (800)247-8837          BILL SENDER
**Carolyn Randolph**
**American General Life Insurance Co.**
**2727 Allen Parkway**

**Houston, TX 77210**



**PRIORITY OVERNIGHT**               **MON**
                                      Deliver By:
TRK#  7917 3146 8628   FORM          19SEP05
                        0201
                              LAH     A1

77210    -TX-US

NH WHTA



Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

RS 231

FedEx | Ship Manager | Label 7906 4640 7251

From:  'Origin ID:   (214)373-4582
Carl Forsythe
Globe Composite Solutions, Ltd
10440 N. Central Expressway
Suite 1475
DALLAS, TX 75231





Ship Date: 15SEP05
Actual Wgt: 1 LB
System#: 1682322/INET2200
Account#: S ********

REF:

Delivery Address Bar Code

SHIP TO:   (800)247-8837          BILL SENDER
**Carolyn Randolph**
**American General Life Insurance Co.**
**2727 Allen Parkway**

**Houston, TX 77210**



**PRIORITY OVERNIGHT**                          **FRI**

                                                Deliver By:
TRK#   **7906  4640  7251**    FORM    16SEP05
                              0201
                                          **IAH**    A1

**77210**    -TX-US



A9 WHTA

`hipping Label: Your shipment is complete
.  Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2.  Fold the printed page along the horizontal line.
3.  Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GLOBE COMPOSITE SOLUTIONS, LTD. ) F/K/A KALM-FORSYTHE GLOBAL ) INNOVATIONS, LTD. ) Plaintiff, ) ) v. ) ) RICHARD C. SOMERVILLE, ANNE ) ROCHE-SOMERVILLE, and ) SOLAR CONSTRUCTION, INC. F/K/A ) GLOBE RUBBER WORKS, INC. ) Defendants. ) | Civil Action No. 05-10323DPW |

## AFFIDAVIT OF RICHARD C. SOMERVILLE

I, Richard C. Somerville, do hereby depose and state:

1.      I am an individual residing at 344 Keene Street, Duxbury, Massachusetts.

2.      I am the President of Solar Construction, Inc. f/k/a Globe Rubber Works, Inc.

("Globe Rubber").

3.      I began working at Globe Rubber in approximately 1956 and I remained working

in the technical areas of the company until the mid-1970s.  On or about 1984, I acquired

Globe Rubber.

4.      Prior to Globe Composite, Globe Rubber and I entering into an asset purchase

agreement in August 2004, Globe Rubber served a diverse set of industrial, commercial

and military customers in its design and manufacture of non-metallic components.

5.     Globe Rubber's revenues in 2002 were approximately $4,392,000. In 2003 Globe's Rubber's revenues were approximately $6,770,000.

6.     Globe Rubber began manufacturing Radio Frequency Identification ("RFID") conveyors for Globe Composite Solutions, Ltd. f/k/a Kalm-Forsythe Global Innovations, Ltd. ("Globe Composite") sometime on or about 2002.

7.     On or about February 2003, Carl Forsythe ("Forsythe") approached me and initiated negotiations related to the potential acquisition of the Globe Rubber business.

8.     Negotiations occurred over approximately one and a half (1 ½) years, during which time I gave Forsythe and/or his representative(s) and/or agent(s), including but not limited to, John Boodee, full access to the Globe Rubber facility and its personnel to examine the financial and operational aspects of Globe Rubber and to conduct detailed due diligence, including investigations into all aspects of Globe Rubber's business.

9.     During the time that Forsythe and I were negotiating the sale of the business of Globe Rubber, Globe Rubber was experiencing financial difficulties, of which Globe Composite and Forsythe were well aware. On or about November 2003, Globe Rubber received a commitment letter for a working capital credit facility, but Globe Composite through Forsythe asked that Globe Rubber not consummate that potential loan and rely on Globe Composite funds. Globe Composite extended a loan to Globe Rubber in the amount of $150,000 to Globe Rubber on September 9, 2003 and a second loan to Globe Rubber in the amount of $200,000 on April 19, 2004. Globe Composite agreed to assume these outstanding liabilities in the Asset Purchase Agreement as part of the consideration for purchasing Globe Rubber's assets.

10.    In or about August 2004, Forsythe, on behalf of Globe Composite, Globe Rubber

and I executed an Asset Purchase Agreement. A copy of the Asset Purchase Agreement

without exhibits is attached as **Exhibit** A. The Globe Disclosure Schedule which was

part of the Asset Purchase Agreement is attached as **Exhibit B**. In summary, as

consideration for the purchase of the business of Globe Rubber and certain intellectual

property and goodwill of Somerville, Globe Composite agreed in the Asset Purchase

Agreement to:

(i)     pay $898,000 in cash to Globe Rubber and assume certain Globe

Rubber liabilities;

(ii)    pay me $1,502,000 in cash for my intellectual property;

(iii)   pay me an additional $750,000 for my intellectual property via

three promissory notes: one in the amount of $400,000, one in the amount

of $200,000, and one in the amount of $150,000 (the $400,000 promissory

note was also executed by Forsythe as a co-maker);

(iv)    pay me approximately $1,250,000 over five (5) years under an

employment agreement;

(v)     deliver 7.5% of all outstanding limited partnership interests in

Globe Composite to me.

11.    In the Asset Purchase Agreement, Globe Composite agreed to pay Globe Rubber

for the Globe Rubber assets as follows, *inter alia*:

(a)     The consideration for the [Globe Rubber] Assets, payable to
[Globe Rubber], will be (i) [$898,000] in cash, and (ii) the assumption of
the [Globe Rubber] Assumed Liabilities pursuant to the [Globe Rubber]
Bill of Sale, Assignment and Assumption Agreement (collectively, the
"[Globe Rubber] Asset Purchase Price").

Exh. A, § 2.4(a).

12.    In the Asset Purchase Agreement, Globe Composite agreed to pay to Somerville

for his intellectual property as follows, *inter alia*:

> (b) The consideration for the Somerville Intellectual Property, payable to
> Somerville, shall be (i) [$1,502,000] in cash, (ii) a promissory note …
> executed by [Globe Composite] and payable to Somerville in the amount
> of [$200,000], which note shall be in the form attached as Exhibit
> 2.4(b)(ii) and shall be subordinate to [Globe Composite]'s senior credit
> facility, (iii) a promissory note … executed by [Globe Composite] and
> payable to Somerville in the amount of [$150,000] which note shall be in
> the form of Exhibit 2.4(b)(iii) and shall be subordinate to [Globe
> Composite]'s senior credit facility, and (iv) a promissory note … executed
> by [Globe Composite and Forsythe] and payable to Somerville in the
> amount of [$400,000], which note shall be in the form attached as Exhibit
> 2.4(b)(iv) and shall not be subordinate to [Globe Composite]'s senior
> credit facility.

Exh. A, § 2.4(b).

The promissory note payable in the original principal amount of $200,000 is attached

hereto as **Exhibit C** (the "**$200,000 Note**"). The promissory note payable in the original

principal amount of $150,000 is attached hereto as **Exhibit D** (the "**$150,000 Note**").

The promissory note payable in the original principal amount of $400,000 is attached

hereto as **Exhibit E** (the "**$400,000 Note**").

13.    Globe Composite agreed to pay $100,000 due under the $200,000 Note together

with all accrued interest, to me on or before August 3, 2005. Globe Composite agreed to

pay the remaining principal, with interest, on the $200,000 Note to me on or before

August 3, 2006.

14.    Globe Composite agreed to pay the $150,000 Note to me in twelve (12) quarterly

installments with payment deferred until August 2, 2005 at which time the first three

quarterly installments are due. Globe Composite agreed to pay the outstanding principal,

with interest, on the $150,000 Note to me on or before August 3, 2007.

15.    Globe Composite and Forsythe jointly and severally, agreed to pay the $400,000 Note to me on or before 120 days from August 3, 2004 (approximately December 1, 2004). Globe Composite and Forsythe further promised to pay interest at a rate of one and a half percent (1 ½%) per month upon an event of default in failing to pay the $400,000 Note and to pay any costs and expenses (including reasonable attorney fees) incurred by me in the enforcement or collection of the $400,000 Note.

16.    Globe Composite and Forsythe failed and refused to make any payments under the $400,000 Note.

17.    Globe Composite further agreed that failure to pay any payment due under the $400,000 Note was an event of default under the $200,000 Note and the $150,000 Note. Upon such event, the unpaid balance of the principal and interest of the $200,000 Note and the $150,000 Note would be rendered due and payable at my option. Upon default Globe Composite promised to pay interest at the rate of 1 ½ % per month and to pay any costs and expenses (including reasonable attorneys fees) incurred by me in the enforcement or collection of the $200,000 Note and/or the $150,000 Note.

18.    In the Asset Purchase Agreement, Globe Composite, Globe Rubber and I agreed to enter into an escrow agreement whereby $190,000 was placed in an escrow account (the "Escrow Agreement"). A copy of the Escrow Agreement is attached as **Exhibit F**. The escrow amount was designated for two purposes in the Escrow Agreement as set forth, *inter alia*, as follows:

> [Globe Rubber] and [Globe Composite] desire to establish an escrow account ... for the purpose of holding [**$190,000**] (the "Escrow Amount) out of the cash portion of the [Globe Rubber] Assets Purchase Price (as defined in the Asset Purchase Agreement) received at the Closing (as defined in the Asset Purchase Agreement), to consist of **$25,000 escrow** to cover costs to be incurred by [Globe Rubber] for repairs to the

underground septic system serving 254 Beach Street, Rockland,
Massachusetts (the "Rockland Premises") for compliance with Title V of
the Code of Massachusetts Regulations (310 CMR Sec. 15, et seq.) (the
"**Title V Escrow Amount**") and a separate **$165,000 escrow** (the
"**Indemnification Escrow Amount**").

Exh. E (emphasis added).

19.    In the Asset Purchase Agreement, I further agreed to contribute to Globe

Composite all of my right, title and interest in the personal goodwill that I possessed as a

result of my individual achievements and reputation in the business community, and

Globe Composite agreed to issue 7.5% of the equity interest in Globe Composite to me

under the terms set forth in the Asset Purchase Agreement. Forsythe and his financial

advisors placed a $750,000 value on the 7.5% equity interest in Globe Composite for

purposes of the conversations concerning the structure of the deal and the taxation of it.

20.    In the Asset Purchase Agreement, Globe Composite and I also agreed to enter into

an employment agreement for an initial term of five (5) years (the "Employment

Agreement"). The Employment Agreement is attached as **Exhibit G.**

21.    Pursuant to the Employment Agreement, Globe Composite agreed to provide

various compensation and benefits to me, including an annual salary of $200,000 per year

for five (5) years and any renewal years, bonuses, five (5) weeks paid vacation and

medical, retirement and insurance benefits.

22.    The Employment Agreement provided that if Globe Composite terminated me

"without cause," I would be entitled to a lump sum payment within ten (10) days of the

termination equal to my yearly salary for the remaining years of the Employment

Agreement and $50,000 in bonuses for each of those remaining years. Exh. F, 8(f).

Paragraph 8(f) of the Employment Agreement stated as follows:

(A) a lump sum payment to Employee equal to the aggregate of the Base Salary Employee would have been entitled to for the remaining period of the Employment Period or such Renewal Period, and

(B) a lump sum payment on account of the bonus payments Employee would have received for the remainder of the Employment Period or such Renewal Period, this amount being stipulated as equal to $50,000 for each full calendar year (and the prorated amount thereof for each partial calendar year) remaining in the Employment Period or such Renewal Period.

Exh. G, 8(f).

23.    Globe Composite agreed that the termination of me for any reason other than those reasons **expressly specified** in the Employment Agreement as "for cause" would be deemed to be a termination of employment "without cause." See Exh. G, 8(c)(iii).

24.    A "for cause" termination pursuant to the Employment Agreement is defined as follows:

(1)    the Employee's **conviction** of either (x) a felony, (y) a misdemeanor involving moral turpitude, or (z) any crime **in connection with his employment by the Employer** the nature of which involves dishonesty, assault, battery or which brings disrepute to the Employer by virtue of its association with the Employee, but specifically shall not include traffic offenses;

(2)    any intentional act by the Employee not undertaken in good faith that is clearly contrary to the best interests of the Employer;

(3)    the Employee's repeated and willful failure to take actions within the scope of his duties, his abilities and which are permitted by law to implement policies, strategies or initiatives of the Employer which the Employer has communicated to him in writing after thirty (30) days notice and opportunity to cure has been afforded to him by the Employer;

7

(4)    the repeated and continued failure of the Employee to attend to his duties and responsibilities after 30 days written notice and opportunity to cure has been afforded to him by the Employer;

(5)    any willful act by the Employee against the Employer to attend to enrich the Employer in a material respect in derogation of his duties to the Employer and at the expense of the Employer; or

(6)    **the material breach** of any term or provision of this Agreement or the Asset Purchase Agreement by the Employee and such breach is not cured within thirty (30) days of written notice thereof from Employer.

Exh. G, 8(c)(ii) (emphasis added).

25.    On or about December 1, 2004, Globe Composite and Forsythe breached their obligations under the $400,000 Note by failing to pay the $400,000 Note when it became due.

26.    Globe Composite and Forsythe had no justification for failing to pay such $400,000 Note.

27.    The $400,000 Note was not paid by Globe Composite and Forsythe in an effort to evade their obligations under the $400,000 Note and in an effort to renegotiate the terms of the Asset Purchase Agreement after the closing of the transaction.

28.    At the time Globe Composite and Forsythe intentionally breached their obligations under the $400,000 Note, Globe Composite had as security for any claims that Globe Composite could assert against Globe Rubber and/or me under the Asset Purchase Agreement, in addition to the $400,000 Note, the following:

(i)    the $190,000 escrow described above;

(ii)    the right to set off amounts payable under the $200,000 Note under Article 7.6 of the Asset Purchase Agreement;

8

      (iii)    the right to set off amounts payable under the $150,000 Note under Article 7.6 of the Asset Purchase Agreement; and

      (iv)    my right to 7.5% of the equity interest in Globe Composite.

29.    Therefore, had Globe Composite paid the $400,000 Note when due, Globe Composite would still have had $540,000 of remaining security for any claims Globe Composite could assert against Globe Rubber and/or me. In addition, Globe Composite would have had as additional security, my right to 7.5% of the equity interest in Globe Composite, which as set forth above was ascribed a value of $750,000.

30.    Globe Composite and Forsythe failed and refused to pay the $400,000 Note when it became due because Globe Composite and Forsythe sought to use it as leverage in its attempt to renegotiate the terms of the Asset Purchase Agreement after the closing of the transaction.

31.    On or about February 1, 2005, Globe Composite and Forsythe continued their wrongful attempt to evade their obligations under the Asset Purchase Agreement by terminating me from my employment with Globe Composite.

32.    Globe Composite and Forsythe wrongfully claimed that I was terminated with cause in furtherance of its efforts to:

      (i)    evade Globe Composite's obligation to pay me the agreed upon termination payment, in excess of $1 million, to which I was entitled upon being terminated without cause; and

      (ii)    evade Globe Composite's obligation to issue 7.5% of the equity interest in Globe Composite to me as required by Article 3.2 of the Asset Purchase Agreement.

33.    The termination of my employment was without cause pursuant to the Employment Agreement.

34.    I believe that Globe Composite and Forsythe's claim that there was cause for the termination was a pretext in furtherance of Globe Composite and Forsythe's attempt to evade Globe Composite's obligations to pay the full purchase price under the Asset Purchase Agreement.

35.    Because my employment at Globe Composite was terminated without cause pursuant to the Employment Agreement, I became entitled to a lump sum payment of in excess of $1,000,000 as required by Section 8(f) of the Employment Agreement.

36.    I believe that the actions by Forsythe and Globe Composite in failing to pay the $400,000 Note when due and in falsely claiming that the termination of me was for cause were wrongful actions designed to avoid paying to me the amounts to which I was entitled to in return for selling the agreed intellectual property and goodwill to Globe Composite.

37.    By letter dated January 31, 2005, Globe Composite wrongfully demanded that all escrow funds, including those escrow funds designated to reimburse me for expenses I actually incurred relating to the remedial measures related to the sewer system at the Globe facility, be released to it to satisfy approximately $230,000 in alleged claims for alleged damages, expenses and warranty claims.  Globe Rubber has refused to release the funds on the basis that the Globe Composite demand was not justified under the Asset Purchase Agreement and/or the Escrow Agreement.

38.    On or about February 4, 2005, I demanded full payment of the $400,000 Note.  A copy of the demand is attached hereto as **Exhibit H**.

39.    As of the present time, Globe Composite and Forsythe have failed and refused to pay the amounts due under the $400,000 Note.

40.    Globe Composite and Forsythe have no lawful justification to withhold payment of the $400,000 Note.

41.    On or about March 28, 2005, I declared the $200,000 Note and the $150,000 Note to be immediately due and payable.

42.    Globe Composite has also failed to pay the $200,000 Note and the $150,000 Note.

43.    Globe Composite continues to fail to pay to me the amounts that I am owed under Section 8(f) of the Employment Agreement, which amounts are in excess of $1,000,000.

44.    I have also incurred over $36,000 in costs related to the sewer line remedial measures I undertook at the Globe Composite facility.  Accordingly, I am entitled to be reimbursed $25,000 from the escrow held pursuant to the Asset Purchase Agreement and the Escrow Agreement.

45.    Additionally, I have a right to 7.5% of the equity interest in Globe Composite in accordance with the terms of the Asset Purchase Agreement.

46.    Global Composite's claim is in this case are without merit.  The only agreement was the Asset Purchase Agreement, its exhibits and the documents executed simultaneously with the execution of the Asset Purchase Agreement and which are referenced in the Asset Purchase Agreement.  It was a lengthy agreement negotiated over many months, with each party represented by counsel.  The Asset Purchase Agreement specifically provided in Article 10.7.

### 10.7 ENTIRE AGREEMENT AND MODIFICATION

This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the

documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.  This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

47.    The Asset Purchase stated that the indemnification provisions in Article 7 would be the sole and exclusive remedy of the parties.  Article 7.7 entitled "Exclusive Remedy" stated

> Each party agrees that the indemnification provisions of this Article 7 shall be the sole and exclusive remedy for Damages incurred by a party hereto arising out of claims for breach of warranties, representations or covenants contained in this Agreement.

48.    The Asset Purchase Agreement also contained a limitation on damages in Article 7.5.

49.    At the present time, Globe Composite has the following obligations outstanding and owed to me and/or Globe Rubber:

i.     $190,000 in cash in an escrow account;

ii.    the $400,000 Note which was due on December 1, 2004, but has not been paid by Globe Composite and/or Forsythe;

iii.   the $200,000 Note which is in default and due;

iv.    the $150,000 Note which is in default and due

v.     the obligation to honor my right to receive 7.5% of the equity interest in Globe Composite; and

vi.    my right to a lump sum payment of over $1,000,000 under the Employment Agreement.

50.    In the event it is determined any monies are owed to Globe Composite, Globe

Composite has a right of set-off under Article 7.6 of the Asset Purchase Agreement.

Article 7.6 provides in relevant part that a party asserting a claim for indemnification

> may set-off any amount to which it may be entitled under
> this ARTICLE 7 against amounts otherwise payable
> hereunder to the other party. The exercise of such right of
> set-off by either party, in good faith, if ultimately
> determined to be justified, will not constitute an extent of
> default hereunder.

51.    Prior to the acquisition of the business of Globe Rubber in August 2004, Globe

Rubber was experiencing difficulty in its production of gaskets for General Dynamics.

Globe Composite, through Forsythe and John Boodee, was aware of this. This was raised

in the presence of Forsythe. Shortly thereafter, I heard Mr. Boodee say to Forsythe words

to the effect that Globe Rubber was not hitting the numbers on the gaskets. The gasket

contract generated approximately $48,000 in 2003, less than 1% of Globe Rubber's

annual revenues. In 2002, the gasket contract represented less than 1.5% of Globe

Rubber's annual revenues. Globe Composite will not have to make large expenditures to

conform the gaskets to government specifications. Any such amounts will present a

small portion of the $190,000 in escrow. There is no reason that Globe Composite will

have to revamp the quality control area, upgrade equipment and/or expend extraordinary

management time to modify the gaskets.

52.    If it is ultimately determined that any monies are owed to Globe Composite, it has

a total of $940,000 of obligations to Globe Rubber and/or me against which it may

exercise its set-off rights under Article 7.6 of the Asset Purchase Agreement. This

$940,000 of obligations owed to me and/or Globe Rubber does not include the over

$1,000,000 I am owed under the Employment Agreement and the 7.5% equity interest I

am entitled to receive in Globe Composite, with an ascribed value of $750,000 as set forth above.

53.   The expenses allegedly attributable to Globe Rubber in paragraph 8 of Carl Forsyth's affidavit are not justified.  These are not the responsibility of Globe Rubber or me under the Asset Purchase Agreement.

54.   Globe Composite is solely responsible for its inability to deliver $800,000 in product orders to Newport News Shipbuilding, Inc., General Dynamics Corporation and DFAS.  These product orders do not relate to the gaskets.  Globe Composite entered into these contracts after the Asset Purchase Agreement.  On or about September 2004, Globe Composite ordered raw material from PRC DeSoto to construct baffles for the production of sonar panels for submarines even though Globe Composite had not yet received the DMTA test sheets that authorized the material to be manufactured.  PRC De Soto delivered the raw material without the DMTA authorization that the materials met United States Navy specifications.  Globe Composite proceeded to manufacture the baffles even though they had not received the required certification.  Accordingly, any expenses that arose due Globe Composite's inability to deliver the $800,000 in product orders had nothing to do with either Globe Rubber or me.

55.   Forsythe intentionally and/or knowingly disregarded the Shuster Non-Solicitation Agreement when Globe Composite took an order from National Oilwell on November 30, 2004.  Globe Rubber entered into a Non-Solicitation Agreement with Shuster on May 1, 2001 whereby Globe Rubber agreed that it would produce products for one or more of Shuster's customers.  Additionally, Globe Rubber agreed that it would not directly or

indirectly solicit any orders from Shuster's customers. Globe Composite took a small order from National Oilwell in October 2004.

56.     In November, 2004, Shuster contacted Forsythe to inform Globe Composite that any direct sales to National Oilwell would be a violation of the Non-Solicitation Agreement. Forsythe disregarded that warning and took another order directly from National Oilwell on or about November 30, 2004. At no time did Globe Rubber take an order from National Oilwell.

57.     Globe Composite has not suffered harm to its reputation and future business potential as result of the gasket problem. Globe Composite recently was awarded a $6.4 million multi-year contract to provide composite components to outfit seven (7) submarines. A copy of Globe Composite's press release announcing the contract is attached as **Exhibit I.**

58.     Under Article 7.2 of the Asset Purchase Agreement, incidental and consequential damages are excluded from the indemnification provisions.

59.     I am the one owed money in this case, not Globe Composite. I am owed the $400,000 Note, the $200,000 Note, the $150,000 Note and the lump sum payment under the Employment Agreement of in excess of $1,000,000. I am also entitled to 7.5% of the equity interest in Globe Composite. I am also owed monies which are held in escrow.

60.     Based upon the conduct of Globe Composite and Forsythe after the execution of the Asset Purchase Agreement, I believe that Globe Composite never intended to

      i.     pay the $400,000 Note;

      ii.    pay the $200,000 Note;

      iii.   pay the $150,000 Note;

iv.   pay its obligations under the Employment Agreement; and

v.   provide me with a 7.5% equity interest in Globe Composite.

61.   Based upon the conduct of Globe Composite and Forsythe after the execution of the Asset Purchase Agreement, I believe that Forsythe never intended to

i.   pay or allow Globe Composite to pay the $400,000 Note;

ii.   allow Globe Composite to pay the $200,000 Note;

iii.   allow Globe Composite to pay the $150,000 Note;

iv.   allow Globe Composite to pay its obligations under the Employment Agreement; and

v.   allow a 7.5% equity interest in Globe Composite to be delivered to me.

62.   There is no need for an attachment of any type in this case given the fact that Globe Composite

i.   does not have a reasonable likelihood of success; and

ii.   has $940,000 of security already for its claims.

Signed under the pains and penalties of perjury this 28th day of March, 2005.

Richard C. Somerville

CERTIFICATE OF SERVICE
I hereby certify that on 3/28/05,
I served a copy of the within pleading
upon counsel of record by mailing same
postage prepaid, ...



EXHIBIT
Fasnacht
109
2/21/06  KMS



## PROMISSORY NOTE

As of August 3, 2004

$400,000.00

FOR VALUE RECEIVED, on or before the date 120 days from the date hereof (as such date may be accelerated in accordance with this Note, "*Maturity Date*"), the undersigned, jointly and severally (hereinafter referred to as "*Borrower*"), promises to pay to the order of Richard Somerville ("*Somerville*") at his offices at 254 Beach Street, Rockland, Massachusetts 02370 the principal amount of Four Hundred Thousand And No/100 Dollars ($400,000.00) ("*Total Principal Amount*"), without interest prior to an Event of Default, and following the occurrence and during the pendency of an Event of Default, interest at the rate of eighteen percent (18%) per annum calculated on the basis of the actual days elapsed but computed as if each year consisted of three hundred sixty (360) days until paid in full. Borrower by execution of this Note acknowledges that the Total Principal Amount is currently outstanding.

The principal on this Note, together with all accrued and unpaid interest, shall be due and payable in one lump sum on or before the Maturity Date.

Borrower is also indebted to Somerville under (i) a certain Promissory Note of even date herewith, executed by Borrower to Somerville, in the original principal amount of $150,000.00, and (ii) a certain Promissory Note of even date herewith, executed by Borrower to Somerville, in the original principal amount of $200,000.00 (collectively, the "*Remaining Notes*").

This Note may be prepaid in whole or in part at any time without penalty or premium. The interest payable hereunder shall be calculated on the basis of a 360-day year, and payments shall be computed by using the actual number of days in any given period.

The undersigned agrees to pay on demand all costs and expenses, including all reasonable attorneys' fees, for the enforcement or collection of this Note, whether or not suit is initiated. The undersigned also agrees to pay interest on all amounts not paid when due, pursuant to the terms hereof, by acceleration, or otherwise, at the rate of one and one-half (1 ½%) percent per month or portion thereof until paid in full.

The occurrence of any of the following ("*Events of Default*") shall render the unpaid balance of all outstanding principal and interest immediately due and payable forthwith at the option of Somerville:

(i)   Failure to pay any payment due hereunder when due;

(ii)  Failure to pay any payment due under the Remaining Notes, or either of them, when due;

(iii) Failure to pay when due any payment due by Borrower to Somerville under any other written agreement between the Borrower and Somerville or among the Borrower, Somerville and any other persons;

(iv)  Any payment default by Borrower under debt owed by Borrower from time to time to any of The Property and Casualty Initiative, LLC, Banknorth, N.A., or The

Massachusetts Business Development

(v) If Borrower shall make an assignment for the benefit of creditors, or file a voluntary petition under any bankruptcy or insolvency laws, or any other federal or state insolvency law, or apply for or consent to the appointment of a receiver, trustee or custodian of all or part of its respective property;

(vi) If the Borrower shall have an involuntary petition filed against it under any bankruptcy law, or any other federal or state insolvency law and such proceeding shall not have been dismissed within 60 days of filing; or

(vii) If a proceeding shall be commenced against the Borrower seeking the appointment of a trustee, receiver or custodian of all or part of its respective property.

In addition, this Promissory Note shall become immediately due and payable in full upon (i) the sale of all or substantially all of the property or assets or capital stock of the Borrower, or (ii) upon a merger or consolidation of the Borrower with another entity where, after giving effect to such transaction, the holders of the capital stock of the Borrower immediately prior to such transaction, hold after giving effect to such transaction, less than fifty one (51%) percent of the capital stock of the entity surviving such merger or consolidation transaction.

All payments and prepayments of principal on this Note shall be made in lawful money of the United States of America in immediately available funds, at the address of Somerville indicated above, or such other place as the holder of this Note shall designate in writing to Borrower. If any payment of principal on this Note shall become due on a day which is not a Business Day (as hereinafter defined), such payment shall be made on the next succeeding Business Day. As used herein, the term "*Business Day*" shall mean any day other than any day on which commercial banks in the State of Massachusetts are authorized to be closed.

The Borrower does hereby waive presentment, demand, notice of dishonor, non-payment and protest and notice of protest and all suretyship defenses and defenses in the nature thereof and assent to any extension or postponement of time of payment or other indulgence which at any time may be granted by Somerville. No delay or omission on the part of Somerville in exercising any right hereunder shall operate as a waiver of such right or of any other rights of Somerville, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any further occasion.

No single or partial exercise of any power hereunder or under any other written agreement of which the Borrower and Somerville are parties shall preclude other or future exercise thereof or the exercise of any other power, nor is Somerville obligated to pursue remedies following an Event of Default in any particular order or sequence.

This Note and all of the other Loan Documents are intended to not require interest payments that exceed the maximum amount permitted by applicable usury laws. If any provision hereof or of any of the other Loan Documents or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the application of such provision to any other person or circumstance nor the remainder of the instrument in which such provision is contained shall be affected thereby and shall be enforced to the greatest extent permitted by law.

PROMISSORY NOTE – Page 2

Borrower and Somerville each hereby irrevocably submit to the personal jurisdiction of any state or Federal court sitting in the Commonwealth of Massachusetts over any suit, action or proceeding arising out of or relating to this Note. Borrower and Somerville each hereby irrevocably waive to the fullest extent permitted by applicable law any objection which it may have or hereafter have to laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any suit, action or proceeding brought in such a court has been brought in an inconvenient forum. Borrower agrees that service of process in any action or suit shall be sufficient if made by certified mail to 254 Beach Street, Rockland, Massachusetts 02370, or to such other address as Borrower shall have given Holder not less than ten days written notice by certified mail.

THIS NOTE HAS BEEN EXECUTED UNDER, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MASSACHUSETTS, WITHOUT REFERENCE TO CHOICE OF LAW PRINCIPLES.

[Remainder of Page Intentionally Left Blank]

This Promissory Note has been executed and shall take effect as a sealed instrument.

BORROWER

KALM-FORSYTHE GLOBAL
INNOVATIONS, LTD.

By:    KalFor Solutions Group, LLC,
       General Partner

By: _____
       Carl W. Forsythe, President

_____
Carl W. Forsythe, Individually

Dallas_1\4005985\1
41932-2 7/25/2004

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05 10323 DPW

```
****************************************
GLOBE COMPOSITE SOLUTIONS, LTD.        *
F/K/A KALM-FORSYTHE GLOBAL             *
INNOVATIONS, LTD.                      *
                          Plaintiff    *
vs.                                    *
RICHARD C. SOMERVILLE, ANNE            *
ROCHE-SOMERVILLE, and                  *
SOLAR CONSTRUCTION, INC. F/K/A         *
GLOBE RUBBER WORKS, INC.               *
                          Defendants   *
**************************************** VOLUME 3
RICHARD C. SOMERVILLE and              *
SOLAR CONSTRUCTION, INC. F/K/A         *
GLOBE RUBBER WORKS, INC.               *
                                       *
       Plaintiffs-in-Counterclaim      *
                                       *
vs.                                    *
                                       *
GLOBE COMPOSITE SOLUTIONS, LTD.        *
                                       *
F/K/A KALM-FORSYTHE GLOBAL             *
                                       *
INNOVATIONS, LTD. and                  *
                                       *
CARL W. FORSYTHE,                      *
                                       *
       Defendants-in-Counterclaim      *
                                       *
****************************************
```

COPLEY COURT REPORTING
(617) 423.5841

**Page 2**

DEPOSITION OF ROGER FASNACHT, a witness
called on behalf of the Defendants/
Plaintiffs-in-Counterclaim, taken pursuant to the
provisions of the Federal Rules of Civil
Procedure, before Christine L. Warwick, a
Certified Shorthand Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Tarlow, Breed, Hart & Rodgers, P.C.,
101 Huntington Avenue, Suite 500, Boston,
Massachusetts 02199, on Friday, December 15,
2006, commencing at 3:10 p.m.

COPLEY COURT REPORTING
58 Batterymarch Street, Suite 317
Boston, Massachusetts 02110
(617) 423-5841

COPLEY COURT REPORTING
(617) 423.5841

**Page 3**

1  APPEARANCES:

2  TARLOW, BREED, HART & RODGERS, P.C.
3  (Mark S. Furman, Esquire)
   (Jennifer C. Roman, Esquire)
4  101 Huntington Avenue, Suite 500
   Prudential Center
5  Boston, Massachusetts 02199
   Counsel on behalf of the Defendants/
6  Plaintiffs-In-Counterclaim

7  LAWSON & WEITZEN, L.L.P.
   (Clare B. Burhoe, Atty-at-Law)
8  88 Black Falcon Avenue
   Boston, Massachusetts 02210
9  Counsel on behalf of the Plaintiff/
   Defendants-in-Counterclaim

11  ALSO PRESENT:

12  Carl Forsythe

COPLEY COURT REPORTING
(617) 423.5841

**Page 4**

1  I N D E X

2  Witness:    Direct  Cross  Redirect  Recross

3  ROGER FASNACHT
   (By Mr. Furman)  8

7  E X H I B I T S

8  Exhibit No.                              Page

9  212  March 15, 1999 - Fax Transmittal from
        American General Enclosing Letter to
10       Globe Rubber Works Dated October 23,
        1998                                   8

12  213  March 27, 2002 - Fax from First
        International Bank to Title Changes
        re: Policy #U100005220L               8

14  214  September 1, 2001 - Lincoln Financial
        Group - Annual Report - Universal Life
        Insurance                              8

16  215  September 26, 2003 - American General -
        Annual Statement of Life Insurance,
        9/19/02 to 9/19/03                     8

18  216  September 23, 2004 - American General -
        Annual Statement of Life Insurance,
        9/19/03 to 9/19/04                     8

20  217  December 13, 2004 - Email from Jason
        Dahlberg to Bob Evans re: Plug Molds
        for Baffle Panels                      8

22  218  September 3, 1998 - American General
        Life Insurance Policy No.
        U100005220L                            8

24  219  September 3, 1998 - Aetna Life Insurance
        and Annuity Company Policy No.
        G1637194                               8

COPLEY COURT REPORTING
(617) 423.5841

5

E X H I B I T S   C O N T I N U E D

Exhibit No.                                              Page

220  April 15, 2004 - The State Life Insurance
     Company Policy No. S110095310        8

221  March 16, 2004 - Email from Neil McInnis
     to Roger Fasnacht re: Delivery of Richard
     Somerville Life Insurance Policy     8

222  September 2, 2004 - Letter from Roger
     Fasnacht to AIG re: Policy No.
     U100005230L                          8

223  May 23, 2006 - AWD History for Aetna
     Life Insurance from 9/3/04 to
     9/10/04                              8

224  September 23, 2004 - American General -
     Annual Statement of Life Insurance,
     9/19/03 to 9/19/04                   8

224A  February 16, 2005 - Fax from Flavia,
      Pension & Wealth Management Advisors to
      American General enclosing Change of
      Ownership Request                  24

225  November 17, 2004 - Travelers Property
     Casualty - New Business Application 8

226  Undated - St. Paul Travelers - Directors
     and Officers Liability Coverage Part
     Declarations, Policy No. 104425997  8

227  February 16, 2005 - Fax from Flavia,
     Pension & Wealth Management Advisors to
     Lincoln Financial enclosing Change of
     Ownership Request                   8

228  February 16, 2005 - Fax from Flavia,
     Pension & Wealth Management Advisors to
     American General Enclosing Change of
     Request (2nd request)               8

COPLEY COURT REPORTING
(617) 423.5841

---

7

E X H I B I T S   C O N T I N U E D

Exhibit No.                                              Page

241  May 23, 2006 - AWD History for Aetna Life
     Insurance from 3/31/05 - 4/22/05    8

242  Fax from Roger Fasnacht to Elonie re:
     Police G1637194 - Life Beneficiary
     Change Form                         8

243  May 23, 2006 - AWD History for Aetna Life
     Insurance from 5/23/05 to 5/31/05   8

244  May 23, 2006 - AWD History for Aetna Life
     Insurance from 5/31/05 to 6/3/05    8

245  May 23, 2006 - AWD History for Aetna Life
     Insurance for 6/3/05                8

246  June 9, 2005 - Fax from Roger Fasnacht to
     Elonie Smith re: Documentation      8

247  July 5, 2005 - Letter from Lawson &
     Weitzen to AIG                      8

248  July 5, 2005 - Letter from Lawson &
     Weitzen to Lincoln Financial        8

249  Undated - Lincoln Financial Group -
     Life Insurance Change Form          8

250  July 19, 2005 - Letter from AIG to
     Lawson & Weitzen                    8

251  May 23, 2006 - AWD History for Aetna
     Life Insurance for 7/21/05          8

252  September 16, 2005 - Release of
     Assignment of Life Insurance Policy
     Issued by American General          8

253  January 31, 2005 - Letter from Carl
     Forsythe to Richard Somerville
     Terminating Employment             25

COPLEY COURT REPORTING
(617) 423.5841

---

6

E X H I B I T S   C O N T I N U E D

Exhibit No.                                              Page

229  February 16, 2005 - Fax from Flavia,
     Pension & Wealth Management Advisors to
     American General Enclosing Change of
     Beneficiary Request                 8

230  February 17, 2005 - Fax from Lincoln
     Financial Group to Neil McInnis     8

231  February 18, 2005 - Letter from AIG
     to Globe Rubber Works, Inc.         8

232  February 23, 2005 - February 16, 2005 -
     Fax from Flavia, Pension & Wealth Management
     Advisors to American General Enclosing
     Change of Request (3rd Request)     8

233  February 24, 2005 - Letter from AIG to
     Globe Rubber Works, Inc.            8

234  May 23, 2006 - AWD History for Aetna
     Life Insurance for 3/10/05          8

235  May 23, 2006 - AWD History for Aetna
     Life Insurance for 3/10/05          8

236  March 10, 2005 - Letter from Lincoln
     Financial Group to Globe Rubber Works
     re: Request for Information         8

237  February 2, 2006 - AWD History fro AIG
     from 3/24/05 - 3/25/05              8

238  March 29, 2005 - Fax from Roger Fasnacht
     to Elonie Smith re: Policy No.
     G1637194                            8

239  March 30, 2005 - Fax from Roger Fasnacht
     to Elonie Smith re: Policy No.
     G1637194                            8

240  May 23, 2006 - AWD History for Aetna Life
     Insurance for 4/26/05               8

COPLEY COURT REPORTING
(617) 423.5841

---

8

1     P R O C E E D I N G S

2         (Documents were marked as Exhibit Nos.

3     212 through 252 for identification.)

4         MR. FURMAN:  So this is just the

5     continuation of the deposition of Roger

6     Fasnacht.4.

7         R O G E R  F A S N A C H T, of lawful age, being

8     first properly identified and duly sworn, deposes

9     and says as follows in answer to direct

10    interrogatories

11    BY ATTORNEY FURMAN:

12 Q. Mr. Fasnacht, I'd like to show you Exhibit 66.  I

13    did ask you some questions the last time we were

14    together about this document.  This was the escrow

15    demand document, you might recall, from the end of

16    January '05.  But you may also recall we didn't

17    ask any questions on the subject of baffles at

18    that time.

19        And so I'd like to know what, if

20    anything, on Exhibit 66 relates to baffles?

21        MR. FURMAN:  Same stipulations, Clare?

22        MS. BURHOE:  Yes.

23 A. I'm trying to recall.  On the DOD investigation of

24    test reports?

COPLEY COURT REPORTING
(617) 423.5841

9

1  Q. Yes, on the last page?
2  A. Yes.
3  Q. GD/Newport News?
4  A. Yes.
5  Q. That's a reference to General Dynamics, Newport
6     News?
7  A. Yes.
8  Q. That's for the customers on the baffle panels?
9  A. Yes.
10 Q. So that's the one entry that relates to the
11    subject of the baffle panels?
12 A. Yes, it is.
13 Q. On Exhibit 206, which I'd like you to take a look
14    at, have you seen that document before?
15 A. Yes.
16 Q. Did you prepare it?
17 A. Yes, part of it.  I put the schedule down here.
18 Q. By schedule, you mean the entire document or --
19 A. I'm sorry.  This is not the document I'm thinking
20    of.  No, I did not prepare this.
21 Q. Have you ever seen this document before?
22 A. No.
23 Q. So I take it you don't know who prepared it?
24 A. I do not, no.

10

1  Q. You don't know when it was prepared?
2  A. I do not.
3  Q. You said that you prepared some kind of schedule.
4     Can you help me with what that schedule might be?
5  A. I was thinking this was a different subject when I
6     looked at it, and it was not on the baffles that I
7     was thinking of.
8  Q. What subject was it on?
9  A. It was on, if I recall, the impairment issue.
10    That's what I thought this was the start of.
11 Q. The impairment issue?
12 A. Yeah, on the goodwill.
13 Q. Impairment of goodwill?
14 A. Yeah.
15 Q. You ceased, stopped working at Globe Composite
16    when?
17 A. September of '05.
18 Q. And are you still at Hartney Greymont?
19 A. Yes.
20 Q. Have you had any recent communications with
21    Mr. Forsythe on the subject of this case?
22 A. No.
23 Q. Let me show you Exhibit 208.  Have you ever seen
24    that document?

11

1  A. No.
2  Q. Do you know who prepared it?
3  A. No.
4  Q. Do you know when it was prepared?
5  A. I do not.
6  Q. Okay.  I show you Exhibit 108.  That is not a
7     document that you prepared, is that correct?
8  A. No.
9  Q. That document has a date on it that's after you
10    left?
11 A. Yes.
12 Q. And it's not a document you're familiar with at
13    all?
14 A. No.
15 Q. An earlier incarnation of that document?
16 A. No.
17        MR. FURMAN:  Okay.  Clare, were you able
18    to locate the back-up for the January 31?
19        MS. BURHOE:  No.  I mean, if you're
20    talking about the file that Mr. Fasnacht referred
21    to in his earlier part of his deposition, no.
22        MR. FURMAN:  Okay.
23 Q. Do you recall the file that we're just talking
24    about?  You had a file with the back-up for the

12

1     Exhibit 66, the January 31 escrow demand?
2  A. Correct.
3  Q. It was in your office?
4  A. Yes.
5  Q. And it was in the file cabinet in your office when
6     you left Globe Composite?
7  A. Yes.
8  Q. Exhibit 210 is a document that is entitled Initial
9     Disclosures or Some Variation, Automatic
10    Disclosure of Globe Composite Solutions.  If you
11    look at Paragraph 29 at the bottom of I guess it's
12    three pages from the end, did you participate in
13    the preparation of either Exhibit 29 or 30, the
14    numbers that constitute, that are referenced in
15    Paragraph 29 and 30?
16        In asking the question, don't tell
17    me any conversations that you may have had with
18    counsel for Globe Composite.
19        MS. BURHOE:  I'm sorry, I think you're
20    getting exhibits mixed up because that's actually
21    on 211.  The paragraph numbers you're referencing
22    are 211.
23        MR. FURMAN:  Okay.  I'm sorry.  I meant
24    to ask about Exhibit 210.

**13**

1  Q. Do you have 210 in front of you?
2  A. I do. But there is no --
3  Q. There's no Paragraph 29?
4  A. Right.
5  Q. I stand corrected. I meant to be asking you about
6     Page 4 at the bottom, there's a section that's
7     entitled Computation of Damages. And that goes on
8     for a couple of pages. And the date on the last
9     page of this document you'll notice is July 28,
10    '05 at the very end in the certificate of service?
11 A. Yes.
12 Q. So I'm just trying to give you a time reference.
13    What, if any, involvement did you have in the
14    preparation of the damage components without
15    getting into the substance of communications with
16    counsel for Globe Composite?
17 A. As I recall, my involvement was helping to put
18    some of the numbers together that went into this.
19 Q. So you remember working on that?
20 A. On the numbers, yeah.
21 Q. On the numbers?
22 A. I didn't get involved with the preparation of this
23    document.
24 Q. Just as you worked on the numbers on the

**14**

1     January 31, 2005 demand Exhibit 66?
2  A. Correct.
3  Q. So the first item I think is the first full
4     paragraph on Page 5, $175,239.17, what involvement
5     did you have in calculating that number?
6  A. I recall, you know, being -- providing numbers
7     that went into this document.
8  Q. Would you have used your information that you had
9     collected for the January 31 Exhibit 66 escrow
10    demand in working up certain numbers that appear
11    in Exhibit 210?
12 A. I believe so, yes.
13 Q. Do you know whether or not you worked on the
14    $175,000 number in the first full paragraph?
15 A. I don't recall the numbers now, but.
16 Q. Do you recall working on any items that are listed
17    on Page 5?
18 A. I recall the categories of the expenses and the
19    cost, I should say.
20 Q. And did you work --
21 A. But I don't remember the numbers.
22 Q. And you worked with Mr. Forsythe on them?
23 A. I would have provided Mr. Forsythe with the
24    documents or with the schedule, I should say.

**15**

1  Q. Do you have any specific recollection of any of,
2     you know, the particular categories at the present
3     time as you sit here today?
4  A. I mean, I'd have to look at my schedule that, you
5     know, to refresh my memory. The categories I
6     recognize.
7  Q. So there was some kind of schedule you put
8     together, and it certainly wasn't the additional
9     cost schedule that I showed you --
10 A. It was not that schedule, no.
11 Q. And it wasn't the schedule that's attached to
12    Exhibit 66, the January 31 escrow demand?
13 A. The one I was looking at earlier on the baffles,
14    you mean?
15 Q. Yeah.
16 A. I think that was one of the schedules that I would
17    have been using to compile the numbers.
18 Q. But you might have had some other schedules?
19 A. Probably, yeah.
20 Q. Whatever you had would be in your, in the file
21    that you left behind in the file cabinet?
22 A. Correct.
23 Q. Would that particular file be the best way for me
24    to be able to understand and verify the numbers

**16**

1     that appear in Exhibit 66?
2  A. Yes.
3  Q. And verify numbers that appear in Exhibit 210?
4  A. Yes.
5  Q. The document we're looking at now, that's correct?
6  A. Yes.
7  Q. Now, you were the CFO of Globe Composite while you
8     were employed by them?
9  A. Yes.
10 Q. And did you have any involvement at any time while
11    in the employ of Globe Composite in calculating
12    the profitability of the baffle business?
13 A. I would have had -- yeah, I would have had
14    occasion to get into the discussions of --
15 Q. Do you recall that there were a series of orders
16    that came in to Globe Composite for production of
17    baffles while you were in the employ of Globe
18    Composite?
19 A. Yes.
20 Q. Basically, one submarine a year for six or seven
21    years?
22 A. Correct.
23 Q. And do you recall speaking with anyone about
24    baffle profitability at Globe Composite?

17

1  A. Yes.
2  Q. And what do you recall talking about in terms of
3     profitability of the business?
4  A. Just trying to come up with estimates of the
5     profitability.
6  Q. Do you recall any specifics?
7  A. I don't recall any specifics on the numbers right
8     now.
9  Q. Do you recall that the contracts were each in the
10    900 to $1 million range?
11 A. Yes.
12 Q. Can you recall any range of profit based upon your
13    employment at Globe Composite?
14 A. I would be guessing.
15 Q. I don't want you to guess. Exhibit 119, 120 and
16    121, are these documents that you have seen
17    before?
18 A. They look familiar.
19 Q. Did you prepare them?
20 A. I did not.
21 Q. But you may have seen them at some point?
22 A. Correct.
23 Q. Do you have any personal knowledge about how they
24    were prepared, when they were prepared, who

COPLEY COURT REPORTING
(617) 423.5841

18

1     prepared them?
2  A. I do not. I wasn't involved with putting this
3     together.
4  Q. Let me ask you some questions about insurance
5     policies. You recall there were different
6     policies. One was an AIG policy, and another was
7     a Lincoln Financial policy?
8  A. Yes.
9  Q. Do you recall that?
10 A. Yes.
11 Q. Okay. So I've got some questions to ask you about
12    those policies. Since you were here, we received
13    some documents from insurance companies. So I
14    want to show you some of those documents, see if
15    you're familiar with them.
16        Exhibit 212 is a document produced by
17    American General which includes an assignment of
18    life insurance policy. Have you seen this
19    document before or parts of this document?
20 A. I do not recall seeing this.
21 Q. Did you have a recollection -- did you know that
22    the American General policy was assigned to a
23    third party?
24 A. I'm trying to remember. There were some insurance

COPLEY COURT REPORTING
(617) 423.5841

19

1     policies that were assigned for financing
2     purposes, I recall. And I don't recall exactly
3     which financing company required it.
4  Q. Let me show you Exhibit 213. Is this a -- does
5     this refresh your recollection on this subject?
6  A. First International Bank would have been the
7     financing institution, yes.
8  Q. That financed Globe Rubber?
9  A. Yes, at that time.
10 Q. Exhibit 214 produced by Lincoln Financial, did you
11    ever see an annual report of the type that is
12    reflected in Exhibit 214?
13 A. I have not seen this, no.
14 Q. Did you ever see Exhibit 215, an annual statement
15    for the period September 19, '02 to September 19,
16    '03 from AIG?
17 A. I do not recall seeing this, no.
18 Q. How about Exhibit 216, an annual statement for the
19    period 9/19/03 to 9/19/04?
20 A. I have not seen this.
21 Q. Okay. Here's 217. Switching gears for a second
22    to the baffles, you're copied on an e-mail from
23    Mr. Dahlberg and Mr. B. Evans on the subject of
24    plug molds for baffle panels. This is in the

COPLEY COURT REPORTING
(617) 423.5841

20

1     December 2004 time frame, I believe. Do you
2     recall this document?
3  A. I don't recall the document. I recall the
4     subject.
5  Q. And what was the subject matter?
6  A. It had to do with the suppliers' commitments on
7     providing new materials.
8  Q. And do you recall that PRC DeSoto was a supplier
9     of raw materials --
10 A. Correct.
11 Q. -- used to manufacture the baffles?
12 A. Correct.
13 Q. And that certain lots of raw material came in
14    without DMTA certifications?
15 A. Correct.
16 Q. And they're supposed to come in with DMT
17    certifications?
18 A. Yes.
19 Q. And Globe Composite started manufacturing the
20    product before the DMT certifications arrived?
21 A. I recall, yes.
22 Q. And that certain lots ultimately failed the DMTA
23    tests which were shipped without the DMTA
24    certifications?

COPLEY COURT REPORTING
(617) 423.5841

21

1  A. **Correct.**
2  Q. Do you recall this baffle timeline document?
3  A. **I don't recall offhand.**
4  Q. I'll just show it to you real quick, Exhibit 61.
5     Do you recall seeing the documents?
6  A. **I recall seeing it.**
7  Q. But you didn't work on it?
8  A. **I did not.**
9  Q. It wasn't your input?
10 A. **No, it was not.**
11 Q. But you generally knew what was going on in terms
12    of difficulties with PRC DeSoto?
13 A. **I would see information regarding this.**
14 Q. Did you ever see the American General policy which
15    has been marked as Exhibit 218?
16 A. **I did not.**
17 Q. Okay. And there was an Aetna policy that, Aetna
18    Life Insurance & Annuity Company which we believe
19    is actually the Hartford policy --
20    MS. ROMAN:  The Lincoln policy.
21 Q. The Lincoln policy, I'm sorry.
22    MS. BURHOE:  It does say Hartford,
23    Connecticut.  Maybe that's why.
24 A. **No, I have not seen this.**

22

1  Q. Okay. How about Exhibit 220, a State Life policy?
2  A. **This one I do believe I've seen.**
3  Q. Okay. Is this a policy dated '04, right?
4  A. **Yes, it is, yes.**
5  Q. 2004. And did you see this e-mail, Exhibit 221
6     dated March 16, '04 that references Exhibit 220?
7  A. **I have seen this.**
8  Q. Let me show you Exhibit 222. Is that a letter
9     that you prepared?
10 A. **Yes.**
11 Q. And signed?
12 A. **Yes.**
13 Q. Okay. And on September 2, 2004, you were employed
14    by Globe Composite Solutions Limited, right?
15 A. **Correct.**
16 Q. But this letter was written on Globe Rubber Works,
17    Inc. letterhead, right?
18 A. **Yes.**
19 Q. And you signed as CFO of Globe Rubber Works, Inc.?
20 A. **Yes.**
21 Q. And in the beginning, you identified the, under
22    policy number, the owner as Globe Rubber Works,
23    Inc., correct?
24 A. **Yes.**

23

1  Q. Exhibit 223 is a document that was produced by
2     Lincoln Financial who we think administers that
3     Aetna policy.  I take it this was not a document
4     you ever saw?
5  A. **It is not.**
6  Q. Could you read the second page under "not
7     approved," see if it refreshes your recollection
8     as to what was going on in the September '04 time
9     frame regarding the letter we just looked at,
10    Exhibit 222?
11    (Witness perusing document.)
12 A. **Yes.**
13 Q. It does refresh your recollection?
14 A. **Well, yes, it refreshes my recollection of the**
15    **circumstances.**
16 Q. That there was a submittal by Mr. McInnis, by you
17    appointing, seeking to appoint Mr. McInnis that
18    was not approved by the Lincoln Financial
19    Insurance Company at that time?
20 A. **At that time, yes.**
21 Q. Okay. Did you ever see Exhibit 224, an annual
22    statement of life insurance?
23 A. **I have not.**
24 Q. Actually, this should be two separate documents; a

24

1     copying error.
2  A. **Oh, okay. Yeah, this document.**
3     MS. BURHOE:  So Page 47 and 48 would
4     be --
5     MR. FURMAN:  Would be 224. And why don't
6     we mark the last four pages as Exhibit 224A.
7     (Document was marked as Exhibit No. 224A
8     for identification.)
9  Q. I think you said you've never seen 224, correct?
10 A. **Correct.**
11 Q. And 224A, did you ever see any part of that
12    document?
13 A. **I believe so, yes.**
14 Q. And this was a document from Pension & Wealth
15    Management Advisors, Mr. McInnis' firm, his
16    agency?
17 A. **He made arrangements to get these documents from**
18    **AIG at my request.**
19 Q. And were you present when Mr. Somerville signed
20    the second page of Exhibit 224A?
21 A. **Yes.**
22 Q. And he did not sign it on February 14, 2005?
23 A. **I don't know.**
24 Q. He was fired on January 31, 2005, correct?

25

1    A. That I don't remember.
2    Q. Okay. Well, let me see if I can refresh your
3       recollection on that.
4          (Document was marked as Exhibit No. 253
5       for identification.)
6    Q. Exhibit 253 is a letter of termination. Does that
7       refresh your recollection, reviewing Exhibit 253,
8       that Mr. Somerville was terminated on or about
9       January 31, 2005?
10   A. Correct.
11   Q. And Page 2 of the Exhibit 224A has a date of
12      February 14, 2005, correct?
13   A. Correct.
14   Q. And you never saw Mr. Somerville after he was
15      fired from Globe Rubber?
16   A. I don't recall.
17   Q. You don't recall seeing him after he was fired
18      from Globe Rubber?
19   A. I don't recall if I had seen him after that or
20      not.
21   Q. Do you have a recollection of Mr. Somerville
22      signing this document on February 14, 2005?
23   A. I have a recollection of Mr. Somerville signing it
24      because I gave it to him to sign. I don't have a

COPLEY COURT REPORTING
(617) 423.5841

26

1       recollection on the date.
2    Q. How many documents did you give Mr. Somerville to
3       sign?
4    A. Offhand, I don't recall.
5    Q. Do you have a recollection --
6    A. It was about three insurance policies or whatever
7       at different times that I gave him to sign.
8    Q. So do you have a recollection of giving him three
9       documents to sign?
10          MS. BURHOE: Could you specify a time
11      frame, please?
12   Q. Can you specify a time frame that you recall
13      giving --
14   A. A time frame would have been anywhere from
15      September of '04 to '05 --
16   Q. To?
17   A. To try and get documents that the insurance
18      companies would accept the transfer of policies.
19      We must have signed three or four of these. And
20      again, the dating of it, I'm not -- you know, I
21      don't recall.
22   Q. Well, I'm just, I'm trying to get your best
23      recollection of how many insurance documents you
24      gave Mr. Somerville to sign at some point between

COPLEY COURT REPORTING
(617) 423.5841

27

1       September and June '05, September '04 to June '05?
2    A. I mean, I don't recall the number. I do recall
3       getting a lot of requests from insurance companies
4       to re-sign documents that had been sent to him
5       previously.
6    Q. So are you able to recall whether you gave him
7       five or more documents or less than five documents
8       to sign?
9    A. I don't recall the specific number because we're
10      talking maybe three different policies that were
11      involved here in the transfers.
12   Q. Do you recall giving him -- okay. Do you recall
13      whether you gave him more, ten or more documents
14      to sign on the subject of insurance?
15   A. I would say, I would doubt that it was ten or
16      more. It would have been less than ten.
17   Q. Less than ten?
18   A. Yes.
19   Q. But you don't recall --
20   A. No.
21   Q. Was it more than one?
22   A. Yes.
23   Q. Was it more than three?
24   A. Yes. As I said, we were required to resubmit the

COPLEY COURT REPORTING
(617) 423.5841

28

1       documentation every time we sent something in.
2       And therefore, we were doing this numerous times.
3       We were given various forms to fill out which were
4       then rejected, and they would send us a request
5       for additional forms.
6    Q. Well, this is -- isn't it Mr. Forsythe who dated,
7       put the date next to Mr. Somerville's signature?
8    A. That I don't know.
9    Q. Okay. So anytime that Mr. Somerville signed an
10      insurance document between September 2004 and his
11      death in 2005, is it your testimony he signed it
12      in your presence?
13   A. Yes.
14   Q. Now, did you -- and on each occasion, was it
15      signed at Globe Composite's headquarters?
16   A. Yes.
17   Q. You never went to his house to get him to sign
18      insurance documents?
19   A. No.
20   Q. Okay. And you never -- and he never came into
21      Globe Composite after he was sued by Globe
22      Composite, did he?
23   A. I don't recall. I mean, I just don't recall if he
24      was back after that or not after his termination.

COPLEY COURT REPORTING
(617) 423.5841

---

29

1  Q. Well, what leads you to think, Mr. Fasnacht, that
2      he might have returned to Globe Composite after he
3      was fired, received Exhibit 253 and was sued by
4      Globe Composite?
5  A. Well, again, the suit happened prior to his being
6      fired. And you know, I recall Dick being around
7      periodically. Whether it was after January 31st,
8      I don't recall.
9  Q. So you don't recall specifically whether or not
10     Mr. Somerville was in Globe Composite's office
11     after January 31, 2005?
12 A. I don't at this stage, no.
13 Q. And you don't recall the date that Globe Composite
14     sued him, right?
15 A. Offhand, I don't. I thought it was in the
16     December time frame right there, '04.
17 Q. But you don't know whether or not he may have
18     been, come back after he'd been sued?
19 A. I don't recall. I don't recall the dates.
20 Q. But do you have any reason to suspect he came back
21     after he was sued?
22 A. I know he was around. I just don't remember when
23     he was around and when he was last at Globe.
24 Q. On Exhibit 253, on the top of Page 2, the

COPLEY COURT REPORTING
(617) 423.5841

---

30

1  termination letter directs Mr. Somerville in the
2      second sentence to leave the premises immediately.
3      Do you see that?
4  A. Which paragraph is this?
5  Q. The first paragraph.
6  A. The first paragraph.
7  Q. The second sentence, Page 2. Sorry.
8  A. Yes.
9  Q. After reviewing 253, the termination letter does
10     not seem to invite Mr. Somerville to return to
11     Globe Composite just whenever he chooses to, does
12     it?
13 A. No.
14 Q. Reviewing that letter, does that refresh your
15     recollection that Mr. Somerville was not
16     authorized to return to Globe Composite after he
17     was terminated?
18 A. Yes.
19 Q. And that any documents he signed, he signed before
20     he was terminated?
21 A. Probably, I guess.
22 Q. Well, that's your best recollection?
23 A. That's my best recollection, yes.
24 Q. And that if Mr. Somerville signed the second page

COPLEY COURT REPORTING
(617) 423.5841

---

31

1  of Exhibit 224A, he would have done it prior to
2      February 1, correct?
3  A. Correct.
4  Q. Now, Exhibit 225 is a Travelers Property Casualty
5      application. Is this something you're familiar
6      with, some kind of a business umbrella policy? I
7      think I saw -- it seemed to be in the
8      November/December time frame of 2004.
9  A. Yes, I recall applying for this and filling out
10     these forms; or not me filling the forms out, but
11     having them prepared by the agent.
12 Q. There's a document, the Bate stamp number is sort
13     of cut off. But it's about halfway through, and
14     there's a handwritten section?
15 A. Yes.
16 Q. Do you recognize that handwriting?
17 A. Yes, that's mine.
18 Q. Oh, okay.
19         MR. FURMAN: Just for the record, it's
20     the page after the page numbered Page 7 of 7. So
21     I guess the eighth page of the exhibit, the bottom
22     right-hand corner.
23 Q. I was referring to the Page 1 of 7. There's one
24     that says Page 7 of 7.

COPLEY COURT REPORTING
(617) 423.5841

---

32

1  A. Oh, okay. I got you.
2  Q. Right before the page we're talking about.
3  A. Okay.
4         MS. BURHOE: Just trying to identify the
5      page that has your handwritten notes on it, right?
6         MR. FURMAN: Yes. I don't have any
7      questions about it.
8  Q. It's the next page after that we were talking
9      about?
10 A. Yes.
11 Q. In fact, Globe Composite did purchase the
12     Travelers, St. Paul Travelers policy?
13 A. Correct.
14 Q. Okay. Everything you did regarding, you know,
15     obtaining Mr. Somerville's signature on the closing
16     various insurance documents between the closing
17     and Mr. Somerville's termination was done at the
18     request of Mr. Forsythe, correct?
19 A. Yes. I mean, it was part of the agreement, and we
20     were following up to get the policy ownership
21     changed.
22 Q. Well, the agreement as we discussed last time was
23     the asset purchase agreement, the very thick
24     document? It wasn't part of that document? It

COPLEY COURT REPORTING
(617) 423.5841

---

33

1    wasn't in that document, was it?
2  A. Apparently not.
3  Q. Well, let's -- but throughout this period, you
4      know, there was this shiftover. Mr. Forsythe
5      became your boss?
6  A. Yes.
7  Q. And he wanted you to have certain documents signed
8      by Mr. Somerville regarding insurance?
9  A. Correct.
10  Q. And Exhibit 227 is another document. Have you
11      seen any of the pages of 227?
12  A. Yes, I am familiar.
13  Q. And Mr. Forsythe has a signature at the bottom of
14      the last page with a date of February 15, '05?
15  A. Correct.
16  Q. And Mr. Somerville above what purports to be his
17      signature, it's also dated February 15, '05, the
18      same day as Mr. Forsythe's signature is dated?
19  A. Correct.
20  Q. Fifteen days after Mr. Somerville was told to
21      leave Globe Composite?
22  A. Yes.
23  Q. This document, this second to last page of Exhibit
24      227 was not signed in your presence on

35

1  A. It is, yes.
2  Q. And again, it's another document that he dates
3      February 15, 2005?
4  A. That's what the date says here. I don't know if
5      he put the date there.
6  Q. Okay. It's not your handwriting, the date?
7  A. No, it's not.
8  Q. Any of these documents that I've shown you so far,
9      you didn't date Mr. Somerville's signature?
10  A. I did not.
11  Q. Okay. And on February 15, 2005, Mr. Somerville
12      had been terminated on January 31, correct?
13  A. Correct.
14  Q. Mr. Somerville was not an employee of Globe
15      Composite, correct?
16  A. Correct.
17  Q. And the relationship of Mr. Somerville as the base
18      insured to Globe Composite is described in this
19      change of beneficiary form as employer; the Globe
20      Composite is Mr. Somerville's employer, do you see
21      that?
22  A. Okay.
23  Q. That was not true on February 15 because
24      Mr. Somerville had been terminated, correct?

34

1      February 15, 2005, correct?
2  A. Not February 15th.
3  Q. Okay. Exhibit 228 is another document which
4      apparently is a sending -- Pension Wealth
5      Management is the agent of Globe Composite,
6      correct?
7  A. Yes.
8  Q. On February 16, Pension Wealth Management as the
9      agent for Globe Composite sends to American
10      General a copy of your letter of September 2?
11  A. Correct.
12  Q. And the document that was enclosed in the
13      February 16 fax, the attachment refers to the
14      owner of the policy as Globe Rubber Works; is that
15      correct?
16  A. Correct.
17  Q. Exhibit 229 is another document. I'll ask you to
18      take a look at it, a document faxed on
19      February 16.
20  A. Okay.
21  Q. According to the fax cover sheet, is that right?
22  A. Correct.
23  Q. And it encloses a document that -- is that
24      Mr. Forsythe's signature?

36

1  A. Correct.
2  Q. On Exhibit 230, have you ever seen this document?
3  A. I don't recall if I saw this or not. I don't
4      recognize it.
5  Q. If you saw it, you would have shared it with
6      Mr. Forsythe?
7  A. Yes.
8  Q. Okay. Exhibit 232 -- I'm sorry. I may have made
9      a mistake. 231, did I give you 231?
10  A. Yes.
11  Q. Okay.
12  A. Sorry.
13  Q. 231 is a letter dated February 18, 2005 from
14      American General to Globe Rubber Works. Did you
15      see this document?
16  A. I probably did, yes.
17  Q. And so according to -- this relates to the change
18      in ownership --
19  A. Correct.
20  Q. -- of the American General policy? And American
21      General is clearly telling you that they are
22      unable to complete the request for change of
23      ownership on February 18, 2005, correct?
24  A. Correct.

37

1   Q. 232, another submittal of the letter dated
2       September 2, this time faxed on February 23. And
3       the attachment, the second page of Exhibit 232,
4       again, identifies Globe Rubber Works, Inc. as the
5       owner, correct?
6   A. Correct.
7   Q. And Globe Composite's agent faxed this document,
8       Exhibit 232, to the insurance company, AIG or
9       American General on or about February 23, 2006,
10      correct?
11  A. (Witness nods head.)
12  Q. Another letter from AIG, American General, to
13      Globe Rubber Works, this one dated February 24.
14      This is just the next day, "unable to complete the
15      request to change the beneficiary," and giving
16      some various reasons. Did you receive Exhibit
17      233?
18  A. Probably, yes.
19  Q. But you're aware that they had rejected the change
20      of beneficiary, had rejected the change of
21      ownership in February of 2005?
22  A. Yes.
23  Q. And Exhibit 234 is an internal document from
24      Lincoln Financial which reflects that a COO, which

COPLEY COURT REPORTING
(617) 423.5841

38

1       I'm surmising is a change of ownership form, that
2       some other signature is required. Do you see that
3       in the entry March 10, 2005, a third of the way
4       down?
5   A. Oh, you're right here, okay. Okay. I've not seen
6       this, but yes.
7   Q. But it's consistent with your recollection that
8       there were -- certain documents were submitted to
9       the insurance company and were rejected for some
10      reason or another and were not accepted by the
11      insurance company as of that time?
12  A. Correct.
13  Q. And a similar document, Exhibit 235, another
14      Lincoln document bearing the date March 10, the
15      first box on the document indicates that a COB
16      form didn't have the correct paperwork. I'm
17      assuming COB is change of beneficiary? Is that
18      consistent with your recollection as to what was
19      going on in the March time period in 2005?
20  A. Correct. This was started in September and was
21      continuing into that time period.
22  Q. March 10, 2005, this is a letter, Exhibit 236,
23      from Lincoln telling you they can't record the
24      change of beneficiary that was requested and

COPLEY COURT REPORTING
(617) 423.5841

39

1       giving certain reasons. Is this a document you
2       received?
3   A. I don't recall it, but probably.
4   Q. The failure of Lincoln to record is consistent
5       with your recollection as to what was going on in
6       March?
7   A. Correct.
8   Q. 237 indicates halfway down that somebody from
9       Globe Rubber Works called identifying their
10      relationship as the owner. Was that you who
11      called?
12  A. I do not recall.
13  Q. But in any event, there was an entry made by the
14      company to fax an affidavit to you?
15  A. Correct.
16  Q. And in fact, at some point you were -- you did
17      communicate with insurance companies orally? You
18      did call insurance companies one or more times?
19  A. I did not personally call because we were using
20      the agent to contact the insurance company.
21  Q. Okay.
22  A. I would respond to their requests --
23  Q. Okay.
24  A. -- is what I was doing.

COPLEY COURT REPORTING
(617) 423.5841

40

1   Q. Well, here's a fax, Exhibit 238 that you sent on
2       March 29 according to Lincoln Financial's records.
3       Does this refresh your recollection that on
4       March 29 you sent a fax to Lincoln Financial?
5   A. Yes.
6   Q. And the document as produced by Lincoln, the
7       document as produced by Lincoln says that, you
8       know, you have this cover fax sheet. And the
9       document they produced, it has consecutive Bate
10      stamp numbers on the bottom right. And the last
11      page is an unsigned letter that calls for
12      Mr. Somerville's signature. Do you recall this at
13      all?
14  A. I don't recall.
15  Q. But this is your handwriting on the fax?
16  A. Yes, it is.
17  Q. And on the second page of this document, can you
18      recognize any of the handwriting?
19  A. I cannot.
20  Q. And the third page, you can recognize
21      Mr. Forsythe's signature?
22  A. Yes.
23  Q. And there's some typed stuff, a couple pages, and
24      then an unsigned letter with a fax tag line across

COPLEY COURT REPORTING
(617) 423.5841

41

1    the top?
2  A. Yes.
3  Q. So your best recollection is that on March 29 you
4     faxed these documents to Lincoln Financial?
5  A. Correct.
6  Q. Exhibit 239, the next day, March 30th, you faxed a
7     document to Lincoln. It's your handwriting on the
8     fax cover sheet?
9  A. Correct.
10 Q. And you have what purports to be Mr. Somerville's
11    signature now on that letter that was faxed
12    without his signature the next night, the night
13    before or the day before, correct?
14 A. Correct.
15 Q. So now this is March 30th. It's two months after
16    Mr. Somerville's been fired. It's two months
17    after the letter that directs him to get out of
18    Globe Composite. It is not your testimony, is it,
19    Mr. Fasnacht, that Mr. Somerville signed this
20    document in your presence in late March 2005?
21 A. No.
22       MS. BURHOE: Objection.
23 A. I don't know.
24 Q. Okay. You don't have a recollection of him

COPLEY COURT REPORTING
(617) 423.5841

42

1    signing it in your presence in March of 2005?
2  A. I don't.
3  Q. The next document, 240, this is another Lincoln
4     document now. Once again, a third of the way
5     down, they're talking about return by fax a change
6     of beneficiary form and to fax it to you. Still,
7     they're not satisfied with the paperwork, correct?
8  A. Correct.
9  Q. And that's consistent with your recollection in
10    this time period which is now April 26, 2005?
11 A. Correct.
12 Q. 241, another Lincoln Financial document, another
13    return. Well, actually, this may be the same
14    document. Page 2 seems to be the same document.
15    Never mind. Sorry about that.
16       April 27, Exhibit 242, a fax from you to
17    Lincoln with Mr. Forsythe's signature on a change
18    of beneficiary form?
19 A. Correct.
20 Q. This one not handwritten, but do you have a
21    recollection of sending Exhibit 242?
22 A. I probably did, yes.
23 Q. Exhibit 243, Lincoln Financial document, 280
24    two-thirds of the way down, there's a reference to

COPLEY COURT REPORTING
(617) 423.5841

43

1    needing more documents for Globe, LLC; and the
2    beneficiary form is not dated. They still haven't
3    accepted it, have they, as of June 3 -- I'm sorry,
4    as of May 23, 2005, correct?
5  A. Correct.
6  Q. June 3, 2005, another Lincoln Financial document.
7     This one LFG 0274, a little below the halfway mark
8     on the page telling, confirming they called you
9     and left a message that the document that was sent
10    was not acceptable. Do you recall that
11    conversation?
12 A. I do, yes.
13 Q. So on June 3, Lincoln had still not accepted the
14    paperwork, right?
15 A. Correct.
16 Q. Exhibit 245 bears a strong resemblance to 244, but
17    there is a slight change. This seems to be
18    similar, not identical?
19 A. Correct.
20 Q. They hadn't accepted it, correct?
21 A. Correct.
22 Q. June 7, 2005, Mr. Somerville dies, correct?
23 A. Correct.
24 Q. And on June 9th, as of June 7, Lincoln Financial

COPLEY COURT REPORTING
(617) 423.5841

44

1    hadn't accepted the paperwork, correct?
2  A. Correct.
3  Q. As of June 7, American General hadn't accepted the
4     paperwork, correct?
5  A. Correct.
6  Q. And on June 9, you're faxing more documents two
7     days after Mr. Somerville's death to Lincoln,
8     correct?
9  A. Correct.
10 Q. And that's Exhibit 246?
11 A. Correct.
12 Q. 247 and 248, I just want to know if you've seen
13    those documents? They're letters from the
14    Lawson & Weitzen law firm, one to American
15    General, one to Lincoln.
16 A. Correct.
17 Q. 249 is a document that looks like one of the
18    earlier documents. But this one doesn't have any
19    signature around Mr. Forsythe's name, signature,
20    Mr. Somerville's alleged signature, Mr. Slaney's
21    alleged signature; but Lincoln had an unsigned,
22    undated document in their file, Exhibit 249,
23    correct?
24 A. According to this, yes.

COPLEY COURT REPORTING
(617) 423.5841

45

1  Q. And American General, according to Exhibit 250 is
2     writing a letter to Lawson & Weitzen saying this
3     is going to legal, correct?
4  A. Correct.
5  Q. And Exhibit 251, a document produced by Lincoln
6     Financial, Document 213 to 219, showing you now, I
7     take it you've never seen this document before?
8  A. I have not.
9  Q. As of July 21, 2005, you understood that the
10    insurance company still hadn't accepted the
11    paperwork?
12 A. Correct.
13 Q. And let me next show you 252 which is a release of
14    the UPS capital business credit assignment of the
15    American General policy which is dated
16    September 13, 2005 which is over three months
17    after Mr. Somerville's death, correct?
18 A. Correct.
19 Q. Did you have any conversations with Mr. Forsythe
20    about why he would want Globe Composite to insure
21    the life of Mr. Somerville after Mr. Somerville
22    was fired from Globe Composite and told to get
23    out?
24 A. Did I have conversations?

COPLEY COURT REPORTING
(617) 423.5841

46

1  Q. Yes.
2  A. Yes.
3  Q. And in those conversations, did Mr. Forsythe tell
4     you why he wanted those policies?
5  A. Yes. It was part of the agreement and to have
6     keyman life insurance on Dick Somerville.
7  Q. And keyman life insurance he told you was to what?
8  A. Well, at the time of the agreement, it was to
9     protect the company if anything happened to Dick,
10    protect the company for his intellectual knowledge
11    and whatnot.
12 Q. But on February 1, Mr. Forsythe didn't want
13    Mr. Somerville's knowledge. He told him to get
14    out.
15 A. The insurance policy requests started in September
16    soon after the closing. It was part of the
17    understanding and the agreement.
18 Q. Well, it's not in the asset purchase agreement?
19 A. That may be true, but that was the agreement.
20 Q. My question is a little bit different. I'm asking
21    you whether you had conversations about why after
22    February 1 after Mr. Forsythe fired Mr. Somerville
23    Mr. Forsythe would have any interest in
24    Mr. Somerville's insurance policies?

COPLEY COURT REPORTING
(617) 423.5841

47

1     In other words, the notion as a CFO, the
2     notion of a keyman policy is not an unusual
3     concept in business, right?
4  A. Correct.
5  Q. Based upon your experience?
6  A. Correct.
7  Q. And the normal rationale for a keyman policy is
8     you have a keyman who is in the employ of the
9     company, correct?
10 A. Correct.
11 Q. That's a person whose loss of employment to the
12    company would lead to financial loss to the
13    company, correct?
14 A. Correct.
15 Q. And so the notion of a keyman policy is to offset
16    in the event of the involuntary departure by death
17    of the keyman to cover some of the losses that
18    would suffer, correct?
19 A. Correct.
20 Q. And in the case of a voluntary termination by the
21    employer of a former employee, that is not a
22    normal circumstance where an employer has any
23    interest in a keyman policy in your experience, is
24    it?

COPLEY COURT REPORTING
(617) 423.5841

48

1  A. Well, in my experience, it's a, it's an asset of
2     the company. And a company can hang on to an
3     insurance policy even when the individual has
4     left. It happens many times when small business
5     owners are bought out and they leave the company,
6     and the insurance policy stays with the company as
7     an asset.
8  Q. And when there's a -- strike that.
9        Around the time of the termination, did
10    your conversations with Mr. Forsythe about the
11    insurance include any conversation about the
12    subject of Mr. Somerville's health?
13 A. No.
14 Q. Did you know the condition of Mr. Somerville's
15    health in February of 2005?
16 A. I did not.
17 Q. Had you been involved in any way in the 2004
18    application?
19 A. You mean 2004 application for --
20 Q. The State Life application?
21 A. Yes.
22 Q. And did you ever have occasion through that
23    process to learn anything about Mr. Somerville's
24    health?

COPLEY COURT REPORTING
(617) 423.5841

49

1  A. He was required to go through a physical with the
2     insurance company.
3  Q. But did you know any of the specifics of that?
4  A. I don't recall knowing the specifics. I just know
5     that he was accepted at that time.
6  Q. Did you have an understanding of Mr. Somerville's
7     health in February of 2004?
8  A. (Witness shrugs.)
9  Q. 5, I'm sorry?
10  A. I'm mean, there was always concern at that time.
11  Q. What was the concern?
12  A. Well, that he was, you know, under a lot of
13     duress, if you will. I think everybody was
14     concerned about his health.
15  Q. So did you discuss that with Mr. Forsythe?
16  A. Probably, yeah.
17  Q. The extreme duress that Mr. Somerville was under
18     in 2005?
19  A. Yes.
20  Q. Did Mr. Forsythe indicate in any way that he
21     understood that Mr. Somerville was under a great
22     deal of stress at that time?
23  A. I'm sure he did, yes.
24  Q. I don't recall, Mr. Fasnacht, are you a C.P.A.?

51

1  A. No.
2  Q. He never told you that?
3  A. No.
4        MR. FURMAN: Can I take a few minutes?
5        (Short recess taken.)
6        MR. FURMAN: Based upon the documents
7     that I have today, I have no further questions.
8        MS. BURHOE: I have no questions.
9        (Whereupon, the deposition adjourned at
10     4:35 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

50

1  A. Yes.
2  Q. And you did say that your understanding is that
3     keyman policies are an asset of the company?
4  A. Yes.
5  Q. Now, was there a kind of grapevine of information
6     at Globe Composite about how Mr. Somerville was
7     doing after he was fired?
8  A. I was not aware of any grapevine.
9  Q. And that was not a subject that Mr. Forsythe ever
10     discussed with you or you with him?
11  A. No.
12  Q. The last time when we took your deposition, you
13     indicated that in mid-December 2004, Mr. Forsythe
14     told you that he wasn't going to pay the $400,000
15     note?
16  A. Correct.
17  Q. And did he also at that time tell you he wasn't
18     going to pay the other notes?
19  A. He did not, no.
20  Q. Did he ever tell you that?
21  A. No, he did not.
22  Q. At any time, did he tell you that he was not going
23     to give to Mr. Somerville at least voluntarily the
24     7.5 percent equity that was part of the deal?

52

1        I, **ROGER FASNACHT**, having read the
2     foregoing transcript of my testimony, do hereby
3     certify the same contains a true and accurate
4     record of my answers to the questions herein set
5     forth, together with correction pages, if any,
6     attached.
7
8     Signed under the pains and penalties of perjury
9     this _____ day of _____, 2007.
10
11
12     _____
13     Deponent's Signature
14
15
16
17
18     Subscribed and sworn to before me
19     this _____ day of _____, 2007.
20
21     _____
22     Notary Public
23
24

53

```
 1              C E R T I F I C A T E

 2

    COMMONWEALTH OF MASSACHUSETTS
 3  ESSEX, SS.

 4       I, Christine L. Warwick, a Certified
    Shorthand Reporter and Notary Public duly
 5  commissioned and qualified in and for the
    Commonwealth of Massachusetts, do hereby certify
 6  that there came before me on the fifteenth day of
    December, 2006, at 3:10 p.m. the person
 7  hereinbefore named, who was by me duly sworn to
    testify to the truth and nothing but the truth of
 8  his knowledge touching and concerning the matters
    in controversy in this cause; that he was
 9  thereupon examined upon his oath, and his
    examination reduced to typing; and that the
10  deposition is a true record of the testimony given
    by the witness.

11
         I further certify that I am neither
12  attorney or counsel for, nor related to or
    employed by, any of the parties to the action in
13  which this deposition is taken, and further that I
    am not a relative or employee of any attorney or
14  counsel employed by the parties hereto or
    financially interested in the action.

15
         IN WITNESS WHEREOF, I have hereunto set
16  my hand and Notarial Seal this twelfth day of
    January, 2006.

17

18
         _____
19       CHRISTINE L. WARWICK
         Certified Shorthand Reporter
20       Notary Public

    My Commission Expires:
21    May 14, 2010

22  THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
    DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
23  ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
    DIRECTION OF THE CERTIFYING REPORTER
24
```

COPLEY COURT REPORTING
(617) 423.5841

54

```
 1        C O P L E Y   C O U R T   R E P O R T I N G
          58 Batterymarch Street, Suite 317
 2            Boston, Massachusetts 02110
                  (617) 423-5841
 3

 4

    Date:   January 12, 2007
 5

 6  To:   Clare B. Burhoe, Atty-at-Law
          Lawson & Weitzen, L.L.P.
 7        88 Black Falcon Avenue
          Boston, MA 02210

 8  IN RE:  GLOBE COMPOSITE, et al. vs.
            RICHARD SOMERVILLE, et al.
 9          DEPOSITION OF ROGER FASNACHT

10  Dear Ms. Burhoe:

11       Enclosed herewith is your copy of the
    transcript of the deposition of Roger Fasnacht,
12  Volume 3, Pages 1 through 53, taken on Friday,
    December 15, 2006 in the above-mentioned case.
13  Also enclosed are the signature pages. Would you
    kindly arrange to have Mr. Fasnacht read the
14  transcript and sign the signature pages. Please
    return one signature page to Atty. Furman
15  including a copy of any errata sheet with the
    signature page.
16       Thank you for your anticipated
    cooperation. If you have any questions, please
17  feel free to call on me.

18            Very truly yours,

19

20            Christine L. Warwick

21  Enclosure
    CC: Mark S. Furman, Esquire
22
23
24
```

COPLEY COURT REPORTING
(617) 423.5841

1

VOLUME:  II
PAGES:  1 through 205
EXHIBITS:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

GLOBE COMPOSITE SOLUTIONS, LTD. )
F/K/A KALM-FORSYTHE GLOBAL       ) Civil Action No.
INNOVATIONS, LTD.,               )   05 10323 DPW
          Plaintiff,       )
                                 )
                                 )
    vs.                          )
                                 )
RICHARD C. SOMERVILLE, SOLAR     )
CONSTRUCTION, INC. F/K/A GLOBE   )
RUBBER WORKS, INC. and ANNE      )
ROCHE-SOMERVILLE,                )
          Defendants.      )

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

RICHARD C. SOMERVILLE, SOLAR     )
CONSTRUCTION, INC. F/K/A GLOBE   )
RUBBER WORKS, INC. and ANNE      )
ROCHE-SOMERVILLE,                )
   Plaintiffs-in-Counterclaim,   )
                                 )
                                 )
    vs.                          )
                                 )
                                 )
GLOBE COMPOSITE SOLUTIONS, LTD. )
F/K/A KALM-FORSYTHE GLOBAL       )
INNOVATIONS, LTD. and            )
CARL W. FORSYTHE,                )
   Defendants-in-Counterclaim.    )

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

    **DEPOSITION OF CARL W. FORSYTHE**, a witness
called on behalf of the Plaintiffs in
Counterclaim, taken pursuant to the Provisions of
the Federal Rules of Civil Procedure, before
Julie A. Healey, a Certified Shorthand Reporter,
Registered Professional Reporter, and Notary
Public in and for the Commonwealth of
Massachusetts, at the offices of Tarlow, Breed,
Hart & Rodgers, P.C., 101 Huntington Avenue,
Boston, Massachusetts, on January 4, 2007,
commencing at 10:13 a.m.

COPLEY COURT REPORTING, INC.
(617) 423-5841

2

1  APPEARANCES:

2  TARLOW, BREED, HART & RODGERS, P.C.
     BY: Mark S. Furman, Esq.
3       Jennifer C. Roman, Esq.
     101 Huntington Avenue
4  Prudential Center
     Boston, Massachusetts 02199
5  Counsel for the Plaintiffs-in-Counterclaim

6

7  LAWSON & WEITZEN, LLP
     BY: Clare B. Burhoe, Esq.
8  88 Black Falcon Avenue, Suite 345
     Boston, Massachusetts 02210
9  Counsel for the Defendants-in-Counterclaim

10

11

12

13

14
15
16
17
18
19
20
21
22
23
24

---

3

1              I N D E X

2  Witness          Direct     Cross

3  CARL W. FORSYTHE

4  (By Mr. Furman)      8

5

6

7              E X H I B I T S

8  Exhibit No.              Page

9

10   254  Letter dated 9/19/05      48

11   255  Letter dated 9/16/05      48

12   256  2005 U.S. Partnership    104
          Tax Return
13
     257  Personal Financial       119
14        Statement

15   258  Personal Financial       122
          Statement
16
     259  Personal Financial       122
17        Statement

18   260  Personal Financial       122
          Statement
19
     261  Letter dated 4/5/06      129
20
     262  Letter dated 12/20/06    129
21
     263  Pay Reductions           134
22
     264  Employees Payroll List   135
23
     265  Employee Profile of      136
24        Cari Forsythe

---

4

1              E X H I B I T S

2  Exhibit No.              Page

3
     266  Employee Profile of      136
4        John Boodee

5   267  Employee Profile of       136
         Nancy Walker
6
     268  Employee Profile of      136
7        Kevin Lynch

8   269  E-mails                   136

9   270  E-mails                   138

10   271  E-mail                   139

11   272  E-mail                   139

12   273  Invoice                  139

13   274  GTC Sonar Baffle Panel   139
          Manufacturing Procedure
14
     275  Invoice                  139
15
     276  Invoice                  139
16
     277  Balance Sheet            139
17
     278  Statement of Operations  139
18
     279  E-mail                   139
19
     280  E-mail                   139
20
     281  E-mail                   139
21
     282  E-mail                   140
22
     283  Balance Sheet            140
23
     284  92-Inch Gasket           140
24        Tear Strength

---

5

1              E X H I B I T S

2  Exhibit No.              Page

3
     285  Purchase Requisition     140
4
     286  Invoice                  140
5
     287  Invoice                  140
6
     288  Invoice                  140
7
     289  Invoice                  140
8
     290  E-mail                   154
9
     291  Invoice                  160
10
     292  Invoice                  160
11
     293  Invoice                  160
12
     294  Invoice                  160
13
     295  Invoice                  160
14
     296  E-mail                   160
15
     297  E-mail                   160
16
     298  Confidential Private     172
17        Placement Memorandum

18   299  E-mail                   173

19   300  E-mail                   173

20   301  E-mail                   173

21   302  E-mail                   173

22   303  Schedule and Documentation  173
          Regarding Equipemnt Purchase
23
     304  Document                 173
24

---

6

1              E X H I B I T S

2  Exhibit No.              Page

3
     305  Document                 173
4
     306  General Requirements     188
5
     307  Manufacturing Produceure 188
6
     308  92-Inch Gasket Inprocess 188
7        Dimensions

8   309  Document                  188

9   310  92-Inch Gasket Visual     188
          Inspection Only
10
     311  Physical Properties      188
11
     312  92-Inch Gasket Inprocess 188
          Dimensions
12
     313  Gasket Material Properties  189
13
     314  Document                 189
14
     315  Document                 189
15
     316  Physical Properties      189
16
     317  Document                 189
17
     318  Document                 189
18
     319  Document                 189
19
     320  E-mail                   189
20
     321  E-mail                   189
21
     322  E-mail                   189
22
     323  E-mail                   189
23
     324  E-mail                   189
24

---

7

1              E X H I B I T S

2  Exhibit No.              Page

3
     325  E-mail                   190
4
     326  Invoice                  190
5
     327  Letter dated 11/30/04    190
6
     328  Purchase Order           190
7
     329  Purchase Requisition     190
8
     330  Purchase Order           190
9
     331  Test Report              190
10
     332  E-mails                  190
11
     333  Test Report              190
12
     334  Document                 190
13

14

15

16
17
18
19
20
21
22
23
24

**8**

1  PROCEEDINGS
2  CARL W. FORSYTHE, a witness called
3  for examination by counsel for the Plaintiffs in
4  Counterclaim, having been duly sworn, testified as
5  follows:
6  MR. FURMAN: This is the continuation
7  of the combined 30(b)(6) deposition of the
8  plaintiff, Globe Composite Solutions, Limited and
9  Carl Forsythe individually, and we'll have the
10  same stips that we've had right along.
11  MS. BURHOE: Yes.
12  DIRECT EXAMINATION
13  BY MR. FURMAN:
14  Q. Mr. Forsythe, you were present during
15  Mr. Fasnacht's deposition in December 2006?
16  A. Yes, I was.
17  Q. And do you recall I asked him a series of
18  questions about the communications between Globe
19  Composite and American General Insurance Company
20  and Lincoln Life Insurance Company?
21  A. I recall you had asked questions, not the
22  specific questions.
23  Q. Okay. In September 2004, it was your
24  understanding that under the agreement between

**9**

1  Globe Rubber Works, Mr. Somerville and KFGI, that
2  the Lincoln Life and American General policies
3  were assigned to KFGI?
4  A. That's incorrect. I had that assumption
5  in March of '04, that occurred well before the
6  closing.
7  Q. Did you have that assumption in September
8  '04?
9  A. Yes, I did.
10  Q. And that continued to be your assumption
11  to the present?
12  A. That's correct.
13  Q. And similarly, it was your understanding
14  Mr. Somerville had the same assumption in
15  September 2004?
16  A. We had discussed it, yes.
17  Q. And it was your understanding that you're
18  unaware at any time prior to Mr. Somerville
19  being terminated that he communicated to you that
20  his assumption had changed?
21  A. No, he hadn't communicated to us at all
22  on that subject.
23  Q. And based on your understanding, at some
24  point in the fall of 2004, you asked Mr. Fasnacht

**10**

1  to arrange for the transfer of the insurance
2  ownership?
3  A. That's not correct, I asked him in August
4  of '04 immediately after we closed on, probably
5  August 20th, the day after we took over.
6  Q. Okay, and you asked Mr. Fasnacht to
7  attend to that paperwork both with regard to
8  American General and the Lincoln policy?
9  A. There were I believe three policies at
10  the time, the third one escapes me, but yes, he
11  was working on those policies changes.
12  Q. At your request?
13  A. At my request. Well, let me back up, it
14  was not my, I had asked him to follow-up on it.
15  He had already had that as one of his post closing
16  duties, I didn't think I needed to tell him that,
17  I just wanted to check up on the status
18  periodically through the close.
19  We had several post closing items, we had
20  to come up with a post closing balance sheet and
21  things like that, and you know, Roger already had
22  that on his to-do list, I wanted to make sure that
23  it got taken care of.
24  Q. And at some point, Mr. Fasnacht delivered

**11**

1  to you some documents that had been signed by
2  Mr. Somerville?
3  MS. BURHOE: Objection.
4  BY MR. FURMAN:
5  A. I can't tell you whether the documents
6  had been signed by Somerville before my signature
7  or after. I know I did sign some transfer papers,
8  I signed several sets of transfer papers, I
9  couldn't tell you whether his signature was on it
10  or not.
11  I don't think it was, but I'm not, I
12  can't tell you for sure.
13  Q. Well, is it, are you saying that, there's
14  certain dates on the documents, correct, that were
15  signed in connection with the insurance?
16  A. I would assume so.
17  Q. You don't know so?
18  A. I would have to review the documents
19  you're referring to. There are so many transfer
20  documents, I'm not sure which ones you're
21  referring to.
22  Q. Okay. So, but as you sit here today you
23  don't know whether, who signed first, right,
24  whether you signed first or Mr. Somerville signed

**12**

1  first?
2  A. That's correct.
3  Q. And but I take it that any documents that
4  you dated the date that you signed the document on
5  the form was an accurate date?
6  A. I'm not sure. I think there's some
7  discussion and question as to whether those were
8  my, you know, my signature on those dates, so, I
9  couldn't tell you whether those were accurate
10  dates or not.
11  Q. But did you at any time sign a document
12  and date it a date different than you signed it
13  with regard to --
14  A. No.
15  Q. -- American General?
16  A. No, I wouldn't do that, no.
17  Q. So, if you signed an American General
18  document and dated it February 2005, I can take to
19  the bank that you signed it in February 2005?
20  A. If you're referring to the specific
21  document that's in discussion here at this point,
22  I don't think my answer would, would, I don't
23  think I can answer that.
24  If you're referring to that document, I

**13**

1  think there is some discussion as to what the date
2  was on it. That's not my signature on the date,
3  and so, if I do sign something and it has my
4  signature and my handwriting on a specific date,
5  that's the date in which the document was, was
6  perfected.
7  Q. So, at no time --
8  A. So, I can't, I can't, I can't attest to
9  the particular document you're referring to.
10  Q. Without seeing the document?
11  A. Without seeing the document.
12  Q. Okay. I'll show you the documents in a
13  minute, but just a couple more preliminary
14  questions, I just want to make sure I understand
15  your testimony.
16  If your signature appears on an American
17  General document with a date next to it in your
18  handwriting of February 2005, then it would be
19  your testimony you signed that document in
20  February 2005?
21  A. That would be correct.
22  Q. And at no time did you falsely date a
23  document submitted to American General with regard
24  to your signature?

### 14

1    **A.**  No, never.
2    **Q.**  And with regard to Lincoln, the same
3 thing is true?
4    **A.**  That's correct.
5    **Q.**  Fasnacht Exhibit 9 bears your signature,
6 does it not?
7    **A.**  That's correct.
8    **Q.**  And did you write in the 2/14/05 next to
9 your name?
10    **A.**  No, that's not my signature.
11    **Q.**  Do you know who dated that document?
12    **A.**  I think there is some supposition that it
13 was perhaps the insurance agent, the broker
14 handling the transaction, but it was not mine.
15    **Q.**  And did you sign, the does your writing
16 appear anyplace else on this document?
17    **A.**  No, it doesn't.
18    **Q.**  Okay.  Did you sign Mr. Somerville's
19 name?
20    **A.**  No.
21    **Q.**  Did you date Mr. Somerville's, the date
22 next to his signature?
23    **A.**  No.
24    **Q.**  This document is dated sometime after

### 15

1 Mr. Somerville had been terminated from Globe
2 Composite, correct?
3    **A.**  That's correct.
4    **Q.**  And you never saw Mr. Somerville again
5 after you terminated him?
6    **A.**  I don't believe so.
7    **Q.**  Let me show you Exhibit 27, does your
8 handwriting appear on that document, the second
9 page or the third page?
10    **A.**  Not on the second page, and it is on the
11 third page.
12    **Q.**  Where on the third page?
13    **A.**  Down at the bottom, the signature of new
14 owner.
15    **Q.**  Okay.  Anything else your signature?
16    **A.**  No, it's not my writing on the title of
17 CEO, not my writing on date, not my writing on
18 print name.
19    **Q.**  Okay.  Now, do you recognize the, any of
20 the other handwriting on this page LFG339?
21    **A.**  Do I recognize any of the handwriting?
22    **Q.**  Yes.
23    **A.**  Only the names of people that have
24 written their names down, I don't recognize the

### 16

1 handwriting at all.
2    **Q.**  Okay, and do you know who wrote Rockland,
3 Mass. on 2/15/05 --
4    **A.**  No.
5    **Q.**  -- about a fifth of the way down from the
6 top?
7    **A.**  No, I couldn't tell you.
8    **Q.**  This document according to page 1, the
9 fax cover sheet, was submitted by Pension and
10 Wealth Management Advisors.  Are you familiar with
11 that company?
12    **A.**  No, I'm not.
13    **Q.**  Are you familiar with, who was, did Globe
14 Composite in February of 2005 have anybody, an
15 insurance person assisting them in interfacing
16 with either Lincoln or American General?
17    **A.**  I couldn't tell you other than what I've
18 heard from Roger's testimony that we had, but I
19 have no firsthand knowledge of that.  I couldn't
20 tell you who it would have been, what their names
21 are, what firms they represented.
22    **Q.**  But your recollection is that Globe
23 Composite did have somebody helping them?
24    **A.**  No, that wasn't my understanding.  I

### 17

1 wasn't sure of the relationship, I didn't know
2 whether we just paid premiums to them or whether
3 they were helping transfer the accounts or
4 servicing us, I couldn't tell you what the scope
5 of the relationship was with us.
6    **Q.**  Okay.  Do you know when you signed
7 Exhibit 227 on page 3?
8    **A.**  On page 3?
9    **Q.**  Yes.
10    **A.**  No, I couldn't tell you.
11    **Q.**  Do you know in what year you signed it?
12    **A.**  I would suspect it was in 2004, the only
13 reason I would suspect that is Paul Slaney was the
14 controller at -- it would have to be before
15 December 2004, this document had to be done before
16 December 2004.
17    I would, and the only inference I would
18 draw from that is because Paul Slaney was the
19 controller, and he no longer worked for Globe
20 after December of 2004, December 1st I believe.
21    **Q.**  But you don't know whether you signed
22 this document --
23    **A.**  No.
24    **Q.**  -- before Mr. Slaney or after?

### 18

1    **A.**  No.  Your question was you were asking me
2 when it was signed, and I'm telling you it was a
3 supposition.  I don't have any firsthand
4 knowledge.
5    **Q.**  Okay, and you don't know whether you
6 signed this document before or after
7 Mr. Somerville?
8    **A.**  I could not tell you that, no.
9    **Q.**  And this document was not signed in your
10 presence by Mr. Somerville and Mr. Slaney?
11    **A.**  No.
12    **Q.**  And Fasnacht No. 9 was also not signed in
13 your presence by Mr. Somerville?
14    **A.**  I don't believe so.
15    **Q.**  Let me show you Exhibit 229, your
16 signature appears on this document?
17    **A.**  Yes, it does.
18    **Q.**  And you did not date this document?
19    **A.**  That's not my handwriting.
20    **Q.**  And there is no other handwriting of
21 yours on this document?
22    **A.**  No, there isn't.
23    **Q.**  Did you, do you know in what year you
24 signed this document?

### 19

1    **A.**  No, I would suspect I signed a variety of
2 documents for American General and Lincoln
3 probably in September of '04.  That's when Roger
4 was able to spend some time getting these policies
5 transferred over.
6    I suspect I signed, I suspect I signed
7 most of these documents between September and
8 December of '04 but not in 2005.
9    **Q.**  Do you have a recollection of that or are
10 you surmising?
11    **A.**  I'm only surmising, I'm only surmising.
12    **Q.**  So, you don't have a specific
13 recollection of when you signed them?
14    **A.**  No, I don't.
15    **Q.**  Did you --
16    MS. BURHOE:  Can you just identify
17 that for the record?
18    MR. FURMAN:  I'm showing Exhibit 231.
19 BY MR. FURMAN:
20    **Q.**  It's a letter dated February 18, '05 from
21 American General.  Did you receive this document
22 in February 2005?
23    **A.**  The question is did I or did the company?
24    **Q.**  Did you?

**20**

1  A. No.
2  Q. When did you first receive it?
3  A. When we were in here for Roger Fasnacht's
4 deposition in December.
5  Q. Okay. To your knowledge, did Globe
6 Composite receive it in February 2005?
7  A. To my knowledge meaning now knowing that
8 with Roger's deposition or firsthand when it
9 occurred? I don't have any knowledge of us
10 receiving this.
11  Q. Okay. Now, in business I'm sure you sign
12 a lot of documents, Mr. Forsythe?
13  A. That's correct.
14  Q. And some documents call for a date next
15 to a signature and some don't?
16  A. That's correct.
17  Q. Is it your practice to not date documents
18 that you sign when the document itself calls for a
19 date?
20  A. It depends on the instructions I'm being
21 given. Lawyers will ask me not to do that, not to
22 put dates on signatures, on forms, I've been asked
23 many, numerous times in my career not to date
24 certain documents.

**21**

1  Q. Did you, do you know whether the form,
2 the documents that I've shown you so far, do you
3 know whether or not sections 1 and 2 were filled
4 out at the time you signed Exhibit 9?
5  A. I believe they would have been, yes. I
6 don't sign, generally I don't sign blank
7 documents.
8  Q. And you have a specific recollection of
9 that?
10  A. I believe so, yes.
11  Q. Okay, and just so the record is clear as
12 to Exhibit 227, is it your testimony that that
13 document was filled out in terms of the
14 handwriting, I'm not talking about the signatures
15 at the time you signed it?
16  A. I believe so, yes, with the exception of
17 the handwriting at the top that doesn't match the
18 rest of the handwriting in the document which says
19 Rockland, Mass. 2/15/05, the date.
20  I do recall seeing the document, and I do
21 recall seeing it filled out this way, I don't
22 recall the dissimilar handwriting on the document.
23  Q. At the time you signed Exhibit 227, was
24 the date on it above Mr. Somerville's name?

**22**

1  A. I couldn't tell you that, no.
2  Q. And at the time you signed the document,
3 was the date on it for your signature?
4  A. I'm not sure I understand the question.
5  Q. Was, at the time you signed the Exhibit
6 227, had somebody already written in 2/15/05?
7  A. No.
8  Q. At the time you signed Exhibit 229, had
9 somebody filled in 2/15/05?
10  A. No.
11  Q. So, that is something that was added
12 after you signed it?
13  A. I believe so.
14  Q. Did you first see Exhibit 233 in December
15 2005, 2006, sorry?
16  A. I saw this at Roger Fasnacht's
17 deposition.
18  Q. For the first time?
19  A. For the first time.
20  Q. Did you see Exhibit 236, a letter dated
21 March 10, for the first time in Roger Fasnacht's
22 deposition in December 2006?
23  A. That's correct.
24  Q. Had you seen Exhibit 8 at any time prior

**23**

1 to Mr. Fasnacht's deposition in July, in December
2 2006?
3  A. Yes.
4  Q. And did you see the entire document or
5 just part of the document?
6  A. Well, I didn't see the fax cover sheet, I
7 believe I probably saw the last three pages,
8 excuse me, the last four pages of the document. I
9 don't recall seeing the first two, the first two
10 pages of the life beneficiary change form.
11  Q. And is your the only handwriting of
12 yours your signature on the fifth page of the
13 document and the last page of the document?
14  A. Yes, my, where it asked me to print the
15 name, that's not my writing, and similarly, not my
16 writing under print the name as well as the title
17 CEO and the date.
18  Q. Okay. Now, in the first half of 2005,
19 Mr. Fasnacht continued to work as CFO at Globe
20 Composite?
21  A. I believe he worked up through August of
22 2005.
23  Q. And did he report to you?
24  A. Yes, he did.

**24**

1  Q. So, did he communicate to you his
2 frustration in communicating with Lincoln Life and
3 American General?
4  A. He expressed that frustration in
5 September of 2004, he felt he was getting the
6 runaround by, by AIG, and I had asked around, and
7 it was common, from what I understand, a very
8 common practice for AIG to drag their feet on
9 things.
10  So, we were aware of difficulties right
11 from the get-go of getting all the paperwork done
12 and completed for the transfer of the policies.
13  Q. Well --
14  A. He was frustrated from, from September of
15 '04 to the time he left the organization.
16  Q. I haven't seen a document produced before
17 February 2005, Mr. Forsythe, to American General.
18  A. Numerous documents were prepared and sent
19 over to Lincoln Financial and American General in
20 August, September, October 2004. This is what,
21 this, this is an issue that did not start in
22 February of 2005, this was an issue that started
23 immediately after our acquisition of the Globe
24 Rubber assets.

**25**

1  Q. And it was Globe Composite's practice to
2 maintain copies of documents submitted to American
3 General or Lincoln, correct?
4  A. I believe it's a general practice,
5 whether Roger kept copies or not is a question for
6 Roger.
7  Q. Did you ever see a single submittal to
8 American General in 2004 of a change of owner or
9 change of beneficiary form?
10  A. Yes, I have.
11  Q. So, you saw a, either a cover letter or
12 fax cover sheet sending that to American General
13 and Lincoln in 2004?
14  A. I signed several forms for Lincoln
15 National and American General in 2004 for change
16 of ownership of the policies. You asked me
17 whether I saw transmittal forms, I couldn't, no, I
18 can't. When I sign them, I assume they get sent.
19  Q. Well, I thought, did I misunderstand that
20 you did not remember or have a specific
21 recollection of when you signed these documents?
22  A. No, your question to me was what my
23 recollection of those particular documents were.
24  Q. Okay.

26

1    A.   My answer is I signed numerous documents
2 that could have or could not have been the
3 documents you showed me affecting the transfer of
4 ownership and beneficiary.
5    Q.   Okay.  So, just so I'm clear, you
6 remember signing Lincoln change of ownership and
7 Lincoln change of beneficiary forms in 2004?
8    A.   That's correct.
9    Q.   You didn't see any transmittal to Lincoln
10 in 2004?
11    A.   That's correct.
12    Q.   You signed American General change of
13 ownership and change of beneficiary forms in 2004?
14    A.   That's correct.
15    Q.   But you didn't see any transmittal to
16 that company either in 2004?
17    A.   That's correct, that's correct.
18    Q.   And you don't know whether you signed the
19 form before Mr. Somerville signed the form or not?
20    A.   That's correct.
21    Q.   Did you receive, have you ever seen
22 Exhibit 238 before?
23    A.   Other than seeing this I believe at
24 Fasnacht's deposition, I did not see the first

27

1 page before, I have not seen the second page.  I
2 signed the third page, and I prepared and signed
3 the, the consent minutes for the insurance
4 policies, and I have never seen the last form.
5    Q.   Okay.  On the second page there is some
6 handwriting?
7    A.   Yes.
8    Q.   Do you recognize that handwriting?
9    A.   No.
10    Q.   It's not your handwriting?
11    A.   No, it's not.
12    Q.   It's not Roger Fasnacht's handwriting?
13    A.   I couldn't tell you that.
14    Q.   Do you recognize Roger Fasnacht's
15 handwriting on page 1 of the document, Exhibit
16 238?
17    A.   No, I don't, other than it says it's
18 signed by Roger Fasnacht, so, I assume that he had
19 prepared this document.
20    Q.   Okay.  So, we have, the second page is a
21 letter, it's the same letter that I had shown you
22 earlier, Exhibit 236?
23    A.   Yes, it is.
24    Q.   Okay, and it's dated March 10, 2005.  Do

28

1 you know when you signed the third page of this
2 document, Exhibit 238?
3    A.   Are you referring to Bates stamp LFG0356?
4    Q.   Yes, sir.
5    A.   There is no date on there.
6    Q.   But do you recall in what month you
7 signed that document?
8    A.   I would only be guessing.
9    Q.   Okay, I don't want you to guess.  The
10 fourth and fifth page is a document that you
11 caused to be prepared and you signed on the fifth
12 page for Emerald Grove Management?
13    A.   Yes.
14    Q.   And that was a document that was prepared
15 in March 2005?
16    A.   Yes, it is.
17    Q.   Okay, and it was prepared for the purpose
18 of submitting the document to an insurance
19 company, right?
20    A.   That's correct.
21    Q.   Or both insurance companies, do you know?
22    A.   I couldn't tell you which one.
23    Q.   But at least prepared for the purpose of
24 submitting to at least either Lincoln or American

29

1 General or both?
2    A.   That's correct.
3    Q.   So, you knew in March that it was
4 necessary to submit additional documents to at
5 least one and maybe both insurance companies for
6 the insurance companies to process the change of
7 ownership and change in beneficiary forms?
8    A.   Well, I knew well before then.  We had
9 been given numerous instructions, differing
10 instructions from both Lincoln National and
11 American General since September of '04 about what
12 their requirements were for the change of
13 ownership.
14        That's why we signed so many documents
15 between, between September of '04 and March of '05
16 as witnessed by this consent of members.
17    Q.   But when you prepared and signed the
18 consent of members, you knew that more was
19 required?
20    A.   More was required?
21    Q.   In the eyes of the insurance companies?
22    A.   I don't know if more was required, I know
23 this was required.
24    Q.   Okay, let me show you Exhibit 239.  Were

30

1 you aware that on or about March 30, 2005
2 Mr. Fasnacht submitted to Lincoln Exhibit 239?
3    A.   No.
4    Q.   And the second page of this document is
5 not dated, correct?
6    A.   Not on this document.
7    Q.   Well, this is the document that was
8 produced by Lincoln in this case.  We have asked
9 to see the original of this document in Globe
10 Composite's files but were told they don't have
11 it.  Have you made an investigation?
12    A.   Yes, I have.  I mean this is a Globe
13 Rubber Works document.  It appears to be signed
14 well after our acquisition of the assets, so, I
15 would suspect this would be in Dick's files.
16    Q.   So, Mr. Fasnacht said he never saw
17 Mr. Somerville after the termination, you've said
18 you never saw Mr. Somerville after the
19 termination, you have no evidence this is
20 Mr. Somerville's signature, do you?
21        MS. BURHOE:  Objection.
22 BY MR. FURMAN:
23    A.   I don't have evidence that any of these
24 documents are accurate or not or authentic or not.

31

1 I mean, yeah, I mean I don't know if this is
2 Dick's signature or not.  I don't know if this is
3 Roger's signature on the first page.
4    Q.   Did you sign Mr. Somerville's name?
5    A.   No, I didn't.
6    Q.   Did you trace it from another signature?
7    A.   No, I didn't.
8    Q.   Well, in March, the letter begins
9 "Pursuant to your letter dated March 10, 2005,"
10 that would suggest the letter was written on or
11 after March 10, 2005, isn't that a fair
12 assumption?
13    A.   That would be a pretty fair assumption to
14 me.
15    Q.   So, as of March 10, 2005, you had
16 terminated Mr. Somerville, correct?
17    A.   That's correct.
18    Q.   You had made an escrow demand, correct?
19    A.   That's correct.
20    Q.   Mr. Somerville had declined to accept
21 that escrow demand?
22    A.   I don't know if he did, his lawyers did.
23    Q.   Well, you have seen a document from
24 Mr. Somerville where he rejects the escrow demand,

---

**32**

1 haven't you?
2  **A.**  I believe so, yes.
3  **Q.**  And then a couple days after that, Globe
4 Composite brings suit against Mr. Somerville and
5 Globe Rubber Works, correct?
6  **A.**  That's correct.
7  **Q.**  And so, certainly in February, the
8 relationship between Globe Composite and Globe
9 Rubber Works and Mr. Somerville was in litigation?
10  **A.**  That's correct.
11  **Q.**  Okay. Now, you had, on February, by
12 January 31, you had decided that it was in the
13 best interests of Globe Composite to terminate
14 Mr. Somerville, correct, from his employment?
15  **A.**  Well, that decision was made well before
16 January 31st.
17  **Q.**  Okay. Was that made on or about
18 December 13th, 2004?
19  **A.**  No, it was made in early January.
20  **Q.**  Okay, and so, you're familiar with the
21 concept of key man life insurance from your
22 business experience?
23  **A.**  Yes, I am.
24  **Q.**  And is the basis of key man life

---

**33**

1 insurance that employers want to protect
2 themselves from the loss of a key employee as a
3 result of their untimely death?
4  **A.**  There are several reasons why
5 organizations get key man life insurance, that is
6 one of them.
7  **Q.**  Is that the most common one?
8  **A.**  I couldn't tell you that.
9  **Q.**  Okay, and when you terminated
10 Mr. Somerville, did you consider whether or not
11 you wanted Globe Composite to have insurance on
12 Mr. Somerville's life?
13      MS. BURHOE: Objection.
14      THE WITNESS: Can you repeat that?
15      MR. FURMAN: Would you.
16      (Last question read back by the court
17 reporter.)
18 BY MR. FURMAN:
19  **A.**  At the time of terminating Dick
20 Somerville, we had not given any thought or
21 consideration to key man life insurance. That was
22 not a part of any of the decision making process
23 of terminating Dick Somerville.
24  **Q.**  But once you decided to terminate him,

---

**34**

1 did you consider whether or not it was in Globe
2 Composite's interest to continue to have insurance
3 on Mr. Somerville's life?
4  **A.**  Yes, we did.
5  **Q.**  And you decided that you wanted to
6 insure, you wanted Globe Composite to insure
7 Mr. Somerville's life?
8  **A.**  That's correct.
9  **Q.**  Okay, and Globe Composite took active
10 steps after the termination to try to get these
11 change of ownership and change of beneficiary
12 forms accepted and approved and recorded by
13 Lincoln Life and American General?
14  **A.**  We were just trying to complete the
15 transaction that we initiated in September before
16 Dick's termination.
17  **Q.**  So, for what purpose did you want to have
18 insurance?
19  **A.**  Several reasons, first is we had several
20 patents in process that Dick was either the author
21 of or had knowledge of and that at some point we
22 would, if, if he had died or become incapacitated
23 and was unable to assist us in completing those
24 patents, we wanted to have some protection.

---

**35**

1      Secondly, there is always the possibility
2 of Dick rejoining the company, and given his age,
3 it would have been difficult to reinsure him, and
4 so, we kept the policies in effect, so, it was
5 basically a twofold purpose.
6  **Q.**  Well, in January 2005, you had no intent
7 to rehire Mr. Somerville after you fired him,
8 right?
9  **A.**  That's correct.
10  **Q.**  And --
11  **A.**  Excuse me, I had no intent at that point
12 to rehire Dick Somerville.
13  **Q.**  Well, was, in January through the time
14 Mr. Somerville passed away, was there ever a time
15 that Globe Composite intended to surrender these
16 policies once the transfer of ownership and change
17 of beneficiaries were accepted and recorded by the
18 insurance company?
19  **A.**  Surrender them to whom?
20  **Q.**  To the insurance company?
21  **A.**  I don't understand the terminology of
22 surrendering.
23  **Q.**  Did you ever intend between January and
24 June 2005 of not continuing the policies in force?

---

**36**

1  **A.**  Obviously not because we made premium
2 payments on them.
3  **Q.**  So, it was Globe Composite's intent to
4 continue to insure Mr. Somerville's life had he
5 continued to live through 2006 or beyond?
6  **A.**  Or until a point where we felt we had
7 enough technical knowledge of the processes, the
8 recipes, the formulations, the designs, the
9 customer relationships where we could effectively
10 transfer those responsibilities to other folks in
11 Globe Composite Solutions.
12      So, it was, I couldn't tell you at what
13 point that date would have been, would it have
14 been in 2005, would it have been in 2006, would it
15 still be now, I don't know, but the purpose of the
16 key man was to protect our, our purchase, the
17 assets that we acquired and to make sure that we
18 had access to Dick's knowledge and Dick's
19 reservoir of information, and if he passed away or
20 was incapacitated, then we would be protected
21 against that.
22  **Q.**  Which patents were in process at the time
23 of Dick's termination?
24  **A.**  Well, we had the Brandonite patent had

---

**37**

1 gone through, was in the final stages of being
2 declined, we had the Chain patent, that was in
3 process and had been applied for, we had, I
4 believe we had submitted or was in the process of
5 submitting the provisional patent applications for
6 the Postal System, and we were in the process of
7 cataloging all other technologies that may be
8 candidates for patent protection.
9  **Q.**  And at any time prior to Mr. Somerville's
10 death and after he was terminated, was he
11 requested to, by you to assist Globe Composite
12 with regard to the patents in process?
13  **A.**  I did not request that of him, I can't
14 answer as to whether other people at the company
15 had been discussing information with him.
16  **Q.**  Did you ever direct anybody to
17 communicate with Mr. Somerville on the subject of
18 patents?
19  **A.**  I don't recall specific conversations.
20  **Q.**  Do you recall a general conversation with
21 anybody?
22  **A.**  No. Well, I would suspect we had several
23 conversations with Rob Karnes who may have had
24 discussions with Dick regarding ongoing patent

---

38

1 with technology issues, but I could not tell you,
2 I could not point to any specific conversations or
3 whether I had directed Rob Karnes to contact Dick
4 Somerville, but I would not be surprised if he
5 had.
6    Q.   Did you direct anybody to get
7 Mr. Somerville's signature on the second page of
8 Exhibit 239?
9    A.   No, I didn't.
10    Q.   Now, so, did Mr. Fasnacht after March
11 tell you that he was still having problems with
12 the insurance companies?
13    A.   No, he didn't.  Yes, he did, I back that
14 up.  We had problems with the insurance, we had
15 problems with the insurance companies when we were
16 submitting the claims under, under our insurance
17 policies after Dick died in June.
18    Q.   Well, did Mr. Fasnacht tell you that he
19 had received a fax returning the change of
20 beneficiary forms from Lincoln in April 2005?
21    A.   No.
22    Q.   Did Mr. Fasnacht tell you that he was
23 communicating with Lincoln later in April, that
24 would be Exhibit 242?

39

1    A.   No.
2    Q.   Did he ever tell you that the consent of
3 members was not acceptable?
4    A.   What date, ever?
5    Q.   Well, the consent of members was dated I
6 think March 2005, we saw it a short time ago?
7    A.   I was unaware that there were any
8 problems with the policies until after submitting
9 claims for, on Dick's life, the policies that we
10 owned.
11       I had assumed in March when we signed the
12 consents that everything had been taken care of
13 and hadn't received any feedback from Roger
14 contrary to that.
15    Q.   But it was Roger's duty to inform you of
16 problems that he was having with insurance
17 companies, right?
18    A.   Our problems at that time was so great in
19 other areas as a result of Dick's fraud that we,
20 that this took a back seat to just about
21 everything else, so, this was, if there were
22 problems, this would have been by far the smallest
23 problem we were dealing with at the time.
24    Q.   Well, you were present when Mr. Fasnacht

40

1 testified about Exhibit 244?
2    A.   Yes, I was.
3    Q.   Okay, and is it your testimony that
4 Mr. Fasnacht did not communicate to you that the
5 consent of members was not acceptable in June of
6 2005 prior to Mr. Somerville's death?
7    A.   I don't recall the date, I knew we had
8 troubles, as I mentioned earlier, from September
9 of '04 to, to June of '05.
10    Q.   Did you know you had troubles from
11 September '04 to June of '05 as a result of things
12 that Mr. Fasnacht told you?
13    A.   I don't understand the question.
14    Q.   Well, you had said you knew you had
15 troubles with the insurance companies, right?
16    A.   Right.
17    Q.   In getting these change of ownership and
18 change of beneficiary forms accepted and recorded
19 by the insurance companies?
20    A.   That's correct.
21    Q.   Is the source of that information
22 Mr. Fasnacht in that period of time?
23    A.   It would have only come from Roger.
24    Q.   Okay, and so, here is a document, a

41

1 Lincoln document, Exhibit 245 dated June 3, 2005
2 now requiring the operating agreement for Globe
3 Composite Solutions.  Did Mr. Fasnacht communicate
4 this further problem?
5    A.   Well, there were a litany of questions as
6 I mentioned in my earlier testimony from both
7 insurance companies for that period asking for
8 lots of different documents and lots of follow-up
9 was required and the reasons for which the
10 policies would be transferred kept changing in our
11 view, and so, I could not tell you whether or not
12 he had mentioned in June whether we were still
13 having problems.
14       I was aware that we were having problems
15 throughout because it did not appear that Lincoln
16 nor AIG really knew what they wanted from us
17 because we were a limited partnership.
18    Q.   Let me show you Exhibit 246,
19 Mr. Forsythe.  Now, Mr. Somerville had died on
20 June 7th, is that your recollection?
21    A.   Whatever the death certificate says.
22    Q.   Okay, but by June 9th, he had passed
23 away, correct?
24    A.   If he died on June 7th, then by June 9th

42

1 he certainly had passed away by then.
2    Q.   Now, this is a document that Lincoln
3 produced, but there appears to be some documents
4 enclosed, and the last page of this document is
5 the first page of a consent of members of KalFor
6 Solutions Group, LLC effective June 6, 2003?
7    A.   That's correct.
8    Q.   Okay.  Now, and the earlier document was
9 a KalFor Solutions Group, LLC document dated
10 April 27, 2003 on the second page of the exhibit?
11    A.   That's correct.
12       MS. BURHOE:  I'd just like to note
13 for the record there appears to be pages missing
14 from what was produced by Lincoln between page 16
15 and page 29, so, I don't know if that's
16 significant or not.
17       THE WITNESS:  These are two separate
18 documents too.
19       MS. BURHOE:  They are?
20       THE WITNESS:  Yes, they are.
21 BY MR. FURMAN:
22    Q.   And there is, the fax cover page
23 indicates the two documents are being faxed by
24 Mr. Fasnacht?

43

1    A.   Where does it make reference to that?
2    Q.   "Enclosed are sections of KalFor
3 Solutions Group, LLC regulation," and then it has
4 a No. 2, "Consent of members of KalFor Solutions,"
5 so, that led me to believe that he was sending two
6 documents.
7    A.   And those would be the two documents in
8 question is, they're enclosed here, this is the
9 consent of members (indicating), this is the
10 second part, and this (indicating) is the first
11 part, so, both of those are on there.
12    Q.   So, were you aware that Globe Composite
13 Solutions through Mr. Fasnacht was still trying to
14 get the insurance companies to approve the change
15 of ownership, change of beneficiaries after
16 Mr. Somerville's death?
17    A.   Well, I'm not sure when we became aware
18 of Dick's suicide, and so, I would assume that
19 Roger was just following the normal course of
20 responding to the litany of changing requests from
21 the insurance companies.
22    Q.   Well, when did you first learn that
23 Mr. Somerville had passed away?
24    A.   I got a call from George Hailer sometime

44

1 in early June letting me know that Dick had killed
2 himself.
3     Q.    And George Hailer is one of your
4 attorneys I take it?
5     A.    Yes, he is.
6     Q.    Now, was that, so, that's a call that you
7 would have received during a business day I take
8 it at Globe Composite Solutions?
9     A.    That's correct.
10     Q.    And do you know whether or not that call
11 was received on or before June 9, 2005?
12     A.    I couldn't tell you.
13     Q.    All you know is early June?
14     A.    Sometime in June.
15     Q.    Well, a minute ago you said early June.
16     A.    Yeah.
17     Q.    Was the law firm of Lawson & Weitzen
18 retained by Globe Composite Solutions to send
19 these two letters (indicating) dated July 5, 2005
20 to Lincoln and American General?
21     A.    That's correct.
22          MS. BURHOE:  Can you just identify
23 the exhibits?
24          MR. FURMAN:  Exhibit 247 and 248.

45

1 BY MR. FURMAN:
2     Q.    And those letters were sent at your
3 request and direction?
4     A.    I'm not sure whether it was my request or
5 whether it was Roger's.  We were frustrated by the
6 lack of response we were getting from both
7 insurance companies.  It could have been myself or
8 it could have been Roger or both of us.
9     Q.    And on the first paragraph of each
10 letter, both letters have as the last sentence
11 "For several months your company has failed to
12 complete the change of ownership transaction
13 despite acknowledging that the," well -- actually,
14 the words are different in each after that.
15          Let me, I better take them separately in
16 the interest of clarity.  Exhibit 247, a letter to
17 American General, it was your understanding that
18 on July 5 that American General had still not
19 completed the change of ownership?
20     A.    I'm not sure if that was the case or not.
21 I know we were, when we submitted the claim for
22 his -- well, I'm not sure.
23     Q.    And you were copied on this letter,
24 right?

46

1     A.    That's correct.
2     Q.    And you're not aware of any follow-up
3 letter saying that, saying that your lawyers were
4 mistaken regarding the, what was written here,
5 right?
6     A.    No.
7     Q.    And it was similarly referencing Exhibit
8 248 to Lincoln, it was your understanding on
9 July 5 that Lincoln had still not completed the
10 assignment of the ownership and beneficiary?
11     A.    That's correct.
12     Q.    And you were frustrated in July 2005 with
13 both, on July 5, you were frustrated that neither
14 Lincoln nor American General had completed the
15 assignment of the transfer of ownership and
16 transfer of beneficiary?
17     A.    I'm not sure, I was frustrated by us not
18 getting any confirmation that they had been
19 transferred.
20     Q.    And you had reached the point that you
21 authorized and directed your lawyers to threaten
22 litigation as per the last sentence of each letter
23 on the first page?
24     A.    That's correct.

47

1     Q.    In 2005 -- strike that.
2          Yes, in 2005 at the time of
3 Mr. Somerville's death, did you have any
4 understanding as to whether or not Globe Rubber
5 Works had maintained any lending relationship with
6 UPS Capital Business Credit prior to the closing?
7     A.    You'll have to repeat that, I think
8 there's, I don't understand the question.
9     Q.    Okay.  Well, at the time that KFGI which
10 later became Globe Composite Solutions acquired
11 certain assets of Globe Rubber Works, Inc., were
12 you aware that at some point in time, Globe Rubber
13 Works had borrowed money from UPS Capital Business
14 Credit?
15     A.    Yes.
16     Q.    And that company was formerly known as
17 First National Bank of New England, it doesn't
18 ring a bell?
19     A.    It does not ring a bell.
20     Q.    And that continued to be your
21 understanding to the time Mr. Somerville passed
22 away?
23     A.    No.
24     Q.    Okay.

48

1     A.    Those loans were paid off concurrent with
2 the transaction, and at that point I believe
3 Somerville and Globe Rubber Works did not have any
4 relationship with UPS Bank.
5     Q.    And in the fall, summer and fall of 2005
6 after Mr. Somerville's death, you were aware that
7 part of the documentation that you would need to
8 obtain for American General was documentation
9 relating to the release of a lien that UPS Capital
10 Business Credit had on the Globe Rubber Works,
11 Inc. insurance policy with American General,
12 correct?
13     A.    Yes.
14     Q.    And you or Globe Composite made efforts
15 to obtain paperwork from UPS?
16     A.    Yes.
17          (Exhibit No. 254, Letter dated
18 9/19/05, marked for identification.)
19          (Exhibit No. 255, Letter dated
20 9/16/05, marked for identification.)
21 BY MR. FURMAN:
22     Q.    And you sent a letter dated September 15,
23 2005 to American General which is the second page
24 of Exhibit 254?

49

1     A.    That's correct.
2     Q.    And you also sent the letter dated
3 September 16, 2005 to American General?
4     A.    That's correct.
5     Q.    And each of these documents were sent on
6 or about the date that they're dated, correct?
7     A.    I would assume so.
8     Q.    You sent them in September?
9     A.    I would assume so.
10     Q.    Mr. Forsythe, how is, could you describe
11 the progress of the Globe marine division since
12 the, since the closing in August 2004?
13     A.    Improving.
14     Q.    Has that division been a source of sales
15 growth?
16     A.    No, nominal sales growth.
17     Q.    I recall a, I believe it was an investor
18 update in which you referred to that division as a
19 jewel in the rough; do you recall that?
20     A.    Probably a diamond in the rough.
21     Q.    A diamond in the rough.  What did you
22 mean by that?
23     A.    It had tremendous uncapped potential, at
24 that time we thought it had, it had been

50

1 mismanaged by the Somerville's for years and
2 years, they had alienated a lot of representatives
3 and dealers, and we felt that with new management
4 attention and marketing dollars we could grow that
5 segment of our business.
6     Q.    And do you recall at the time of the
7 closing how much business that division generated?
8     A.    Probably somewhere between 550 and
9 $650,000 in sales.
10     Q.    And in 2006, what would the sales be
11 approximately?
12     A.    650 to $680,000, about the same, not
13 significantly more.
14     Q.    Are you still optimistic about the future
15 of that particular division?
16     A.    Well, we spent considerable time and
17 money on that division this year, and we're going
18 to wait and see if, we're going to wait and see if
19 we can, if we see some benefit from all the
20 expenditures that we made in that division.
21           The marine industry has gone through a
22 downturn, an economic downturn, and so, we're
23 cautiously optimistic that there will be some
24 growth in that area next year.

51

1     Q.    What is the marine division, what does it
2 exactly do?
3     A.    It basically sells, it basically sells
4 drive shafts and impellers, these are two products
5 that Globe Composite has to either manufacturers
6 and users, distributors, or installers of drive
7 systems in either recreational or commercial
8 watercraft.
9     Q.    And who is in charge of that division?
10     A.    An individual named Matt Koenig.
11     Q.    Do you have, and how long has he been
12 employed by the company?
13     A.    Matt joined us in, somewhere between May
14 and July of 2005.
15     Q.    And prior to his joining the company, who
16 was responsible for that division for Globe
17 Composite?
18     A.    No one.
19     Q.    So, it's really only been sixteen months
20 that there has been somebody --
21     A.    That's correct.
22     Q.    -- who has their employment focus trying
23 to grow that division?
24     A.    That's correct.

52

1     Q.    And do you hold a top secret security
2 clearance from the government?
3     A.    I hold a classified security clearance.
4     Q.    And who else at Globe Composite holds
5 that clearance?
6     A.    Excuse me, I, when I say I have a
7 classified security clearance, I don't have a
8 classified level of security, I have a security
9 clearance that's classified.
10           There are several other individuals in
11 the organization that have security clearances,
12 Charles Foley who is our facilities FSO,
13 facilities security officer, Kevin Lynch, David
14 Renaud, I believe there are several other people,
15 and I would just be guessing as to who they would
16 be.
17     Q.    Did KFGI prior to the closing in August
18 2004 do analysis of the cost that Globe Rubber
19 Works incurred in making a gasket?
20     A.    I don't know -- well, I don't believe
21 KFGI did any analysis, I believe Globe Rubber
22 Works performed that analysis if they did and then
23 sent it to us. I don't recall seeing it. We
24 would not have done the analysis ourselves.

53

1     Q.    And you don't recall seeing analysis?
2     A.    No.
3     Q.    Prior to the closing, did KFGI perform
4 analysis of the cost of making a baffle pin?
5     A.    No, I believe we reviewed analysis that
6 was prepared by Roger Fasnacht in March of '04,
7 but we did not, we did not prepare the analysis
8 ourselves.
9     Q.    And is that a document that was produced
10 in this case?
11     A.    Yes, it is.
12     Q.    And what do you remember about that
13 document?
14     A.    The analysis I believe showed that Globe
15 Rubber Works made somewhere between 5 and $600,000
16 per order for the submarine baffle, B-A-F-F-L-E,
17 panels.
18           MR. FURMAN: Let's take a break.
19           (A short break was taken.)
20 BY MR. FURMAN:
21     Q.    Mr. Forsythe, does Exhibit 206 look like
22 the document you just referenced before the break
23 regarding something that was furnished to you by
24 Mr. Fasnacht in March 2004?

54

1     A.    That's correct.
2     Q.    And did you and Mr. Fasnacht have any
3 discussion about this document?
4     A.    I did not have discussion with Roger on
5 this document.
6     Q.    Did you ever learn from anybody that
7 someone else associated with KFGI had discussions
8 with Mr. Fasnacht?
9     A.    I believe John Boodee did.
10     Q.    Now, since the closing in August 2004,
11 has Globe Composite done analysis of the
12 profitability of baffles?
13     A.    I would imagine that it has, but I don't
14 recall seeing any.
15     Q.    Okay. Globe Composite has purchase
16 orders for baffles that extend out into the future
17 for several years, correct?
18     A.    That's correct.
19     Q.    Basically one a year?
20     A.    Technically the contracts are for a
21 number of submarines, but depending on how much
22 spending the government has, they could do two a
23 year or one a year.
24     Q.    And each of those are in the 900,000 to

55

1 million dollar range per?
2     A.    It's about $940,000 per submarine.
3     Q.    Were you involved in the preparation of
4 Exhibit 208?
5     A.    No, I wasn't.
6     Q.    Okay. Who are the people at Globe
7 Composite who were involved in that?
8     A.    This is a preliminary analysis performed
9 by John Boodee in July of 2006 as part of our
10 effort to determine more finitely the total
11 damages from the Globe Rubber Works fraud. This
12 is incomplete, and it has been, is in the process
13 of being updated right now.
14     Q.    And who is updating this?
15     A.    Actually, we have retained an independent
16 CPA firm to work with us on documenting the
17 profitability and the additional costs of the
18 panels as a result of addressing the fraud related
19 issue, production issues.
20     Q.    And which firm is that?
21     A.    Tonneson, T-O-N-N-E-S-O-N, Tonneson &
22 Associates.
23     Q.    And is the increased, the alleged
24 increased cost of producing panels, baffle panels

56

1 one element of damages that Globe Composite
2 Solutions claims in this case?
3    A.  Yes, it is.
4    Q.  And how has this document changed?
5    A.  Well, this was prepared by John Boodee
6 who hasn't, as I mentioned in July of 2006, and he
7 has not been involved in the production of baffle
8 panels for almost a year, and I think he was
9 trying to go from memory as to what the
10 incremental, the incremental cost is per shift
11 set.  This is just a working paper.
12    Q.  Is there another version of this?
13    A.  Yes, there is.
14    Q.  And Globe Composite has that?
15    A.  I don't know whether we have it or our
16 accounting firm has it, excuse me, whether
17 Tonneson has it.
18    Q.  Okay, and but you've seen other versions
19 of this document?
20    A.  No, we looked at it a completely
21 different way.  This was based on John's
22 recollection of what was being done a year prior
23 to this being prepared, and so, what we did is
24 we've taken a look at what our current practices

57

1 are and compared those to what was done by Globe
2 Rubber Works in the past.
3    Q.  Okay, and have the alleged damages
4 increased or decreased since Exhibit 206 was
5 prepared?
6    A.  They're substantially higher.
7    Q.  And what are the components that make
8 them higher?
9    A.  There are several components, one is
10 preparation time, material testing, the actual
11 production, the mixing of the materials, the
12 degassing of the materials, the test, the post
13 production testing, the application of the
14 adhesive between the layers.
15        There are significant changes in the
16 process from when we order the material to when we
17 ship the gasket from production to quality control
18 to material certification.
19        MS. BURHOE:  I believe you just said
20 gasket, did you mean panel?
21        THE WITNESS:  Well, it could be
22 gaskets too, but the same holds true obviously for
23 gaskets but for panels, I'm sorry.
24        MS. BURHOE:  Okay.

58

1 BY MR. FURMAN:
2    Q.  And that analysis regarding baffles, has
3 that, does that arrive at an increased cost over
4 some period of years?
5    A.  It takes a look at the increased cost for
6 all of the contracted baffle panels.
7    Q.  And what does the new analysis arrive at
8 as increased cost?
9    A.  I believe it's somewhere between 900,000
10 and a million dollars total.
11    Q.  And has a similar analysis been done for
12 gaskets?
13    A.  I believe one is being prepared for
14 gaskets as well.  I have not seen those numbers.
15    Q.  In 2006, did Globe Composite have any
16 gasket orders?
17    A.  If we did, it was, you know, ten here,
18 twelve here, very small orders.
19    Q.  So, the increased cost of baffle
20 production and the increased cost of gasket
21 production are two of the elements in which Globe
22 Composite claims damages in this case?
23    A.  That's correct.
24    Q.  What are the other elements?

59

1    A.  There are several other elements, one is
2 we had to acquire a number of pieces of testing
3 equipment, of chart recorders, of processing
4 equipment, we had to increase the amount of
5 compressed air through the plant for the gaskets,
6 we've had to, we've had to put in additional power
7 specifically for that.
8        We are in the process of acquiring some
9 specialized machinery to allow us to manufacture
10 the gaskets during the, excuse me, manufacture the
11 panels during the spring and summer months to be
12 able to conform to the Navy specifications,
13 various pieces of capital equipment have been
14 acquired or in the process of being installed.
15        We also had to purchase a new Instron
16 testing machine to be able to demonstrate to
17 General Dynamics in Newport News that the tests
18 that were being performed were accurate and could
19 not be, could not be falsified again.
20        So, lots of pieces of different capital
21 equipment.  Similarly, the entire management team
22 and the research and development group and the
23 production people and the quality assurance people
24 have been immersed in trying to address the

60

1 problems associated with the gaskets and the
2 baffle panels for, for actually, you know,
3 actually since these problems became known to us
4 at GCS.
5    Q.  What is the, you said one of the, one of
6 the pieces of equipment that was required was a
7 chart recorder?
8    A.  Chart recorders.
9    Q.  How many of those were purchased?
10    A.  Possibly one, it is such a small
11 acquisition piece.
12    Q.  How much did it cost?
13    A.  I don't know, I couldn't tell you.
14    Q.  When was it purchased?
15    A.  I couldn't tell you.
16    Q.  You said processing equipment was also
17 purchased?
18    A.  That's correct.
19    Q.  Does that have a more complete name?
20    A.  Well, there's a whole litany of new
21 pieces of equipment that we've added to improve
22 the processes, the production of both baffle
23 panels and gaskets, new ovens, new mixers, new
24 sifters, new pumps, new compressors, new

61

1 balancers, really it's a variety of different
2 pieces of equipment.
3    Q.  So, when you use the term processing
4 equipment, you were referring to ovens, mixers,
5 sifters, pumps, compressors, and balancers?
6    A.  And also increased, we had to increase
7 the air flow within the facility to draw --
8    Q.  Is that the increasing the compressed air
9 in the plant?
10    A.  No.
11    Q.  That's something else?
12    A.  Completely different.  We had to increase
13 the air flow through the facility to try to cool
14 it down and try to remove the humidity for both
15 the gasket production and the baffle panel
16 production.
17    Q.  To cool it down and reduce humidity you
18 said?
19    A.  That's correct.
20    Q.  Is increasing the air flow to cool it
21 down, is that air conditioning?
22    A.  Air conditioning would have been way, way
23 too expensive for us, we couldn't afford to put
24 air conditioning in the facility.

62

1    Q.    What is the mechanism that's used?
2    A.    Just large circulation fans that are
3 installed throughout the facility.
4    Q.    And how much money has been spent on
5 large circulation fans?
6    A.    Somewhere between 25 and $50,000.
7    Q.    And how much has been spent in the
8 processing equipment that's designed to improve
9 the manufacturing process associated with baffles?
10    A.    This is all being tabulated by the
11 Tonneson folks, but I believe it's going to be
12 somewhere between $350 and $450,000 for the baffle
13 panels alone.
14    Q.    And what about for gaskets, is processing
15 equipment improvements made to improve the
16 production of gaskets?
17    A.    Somewhere between a hundred and $200,000
18 I suspect.  These are guesstimates on my part.
19    Q.    But you're the person most knowledgeable
20 according to the 30(b)(6) designation --
21    A.    That's correct.
22    Q.    -- on the subject of Globe Composite's
23 damages?
24    A.    That's correct.

63

1    Q.    Now, you said you had to increase the
2 compressed air in the plant?
3    A.    Yes, I did.
4    Q.    Can you tell me as a layperson what that
5 means?
6    A.    In order to produce the gaskets, the
7 gaskets, you have to heat and mix the material and
8 you pour this into a mold and then you put it in
9 what is called an autoclave, which is a large
10 pressure vessel, and then to remove the air
11 bubbles that are entrapped in the material, you
12 either degas, meaning you take air out, or you
13 compress it.
14        And so, we take two steps, before we mix,
15 we degas it, and after we mix and put it into the
16 mold, we put it into an autoclave which takes the
17 air molecules and try to shrink them to the
18 smallest possible size.
19        This is required to achieve the, this is
20 necessary for us to attempt to achieve the
21 specifications for the gaskets.
22        The autoclave is a very large autoclave,
23 it is eighteen or twenty feet long, it is three
24 and a half or four feet in diameter, so, it needs

64

1 to be rapidly pressurized before the material sets
2 up.
3        It's an extremely fast setting material,
4 and so, you have to fill that chamber with
5 compressed air very quickly, so you have to
6 acquire at great expense a compressor that would
7 fill that chamber within two or three minutes
8 versus the twelve or fifteen minutes it was taking
9 before.
10    Q.    And how much did that piece of equipment
11 cost?
12    A.    There were two components to it, one was
13 the actual compressor itself and the storage
14 tanks, and then the second component has to deal
15 with the, then, we had to go to a 480 volt
16 system to be able to accommodate the compressor.
17        I don't know, I believe the total cost
18 for both the compressor and the power is somewhere
19 between 75 and $110,000 because there is wiring,
20 installation, and all of that.
21    Q.    And when you said earlier you had to
22 increase the power, are you referring to the
23 installation of the 480 volt system?
24    A.    That's correct.

65

1    Q.    You also referenced that the, that
2 certain specialized machinery was being purchased
3 in order to be able to manufacture in the spring
4 and summer months?
5    A.    That's correct.
6    Q.    And what is the name of that equipment?
7    A.    Well, we attempted to do it in two
8 stages, one was the air hanging equipment to try
9 to address the problem.
10    Q.    Is that the compressed air?
11    A.    No, that's the air paneling systems, the
12 fans throughout the facility.
13    Q.    Oh, the increased air flow to try to cool
14 down the facility?
15    A.    Yes.
16    Q.    Okay.
17    A.    And we found we couldn't, that would,
18 it would be, when we found that would not fix the
19 problem and the cost to air condition the facility
20 would have been way too high, we began an
21 investigation of coming up with a closed loop
22 system that would mix and heat and depressurize
23 the material all in a closed system so that we
24 could dispense it without being subject to heat

66

1 and humidity conditions.
2        That, we spent a year with a company in
3 Iowa developing it, we've ordered it, and it
4 should be delivered this month.
5    Q.    And how much did that piece of equipment
6 cost?
7    A.    Once again that will occur, that cost
8 will occur in three steps, one is the cost to
9 prepare the site for the machine, then there is
10 the machine cost itself, and then there is, then
11 there is the cost of installing and testing that
12 machine.
13        I'm not sure what the demolition and
14 preparation costs are, that will be highlighted in
15 the damage summary.  The cost for the machine I
16 believe, the cost for the machine itself without
17 rigging or anything else is $217,000, $217,500 I
18 believe.
19        MR. FURMAN:  Clare, have any of these
20 things been produced, these costs?
21        MS. BURHOE:  Everything that Tonneson
22 has to document its calculations is being sent to
23 me and I've produced them to you.
24        MR. FURMAN:  Yesterday?

67

1        MS. BURHOE:  Either yesterday or I
2 sent some of it over I think it was the middle of
3 December.
4        MR. FURMAN:  I know I haven't seen
5 yesterday's, but I know in the December 28
6 production none of this stuff was in there.
7        MS. BURHOE:  Yes, probably, there was
8 other things from Tonneson but I don't think it
9 was this.
10 BY MR. FURMAN:
11    Q.    Now, you also said that one of the pieces
12 of equipment that was acquired was an Instrom, I
13 assume that's I-N-S-T-R-O-M, testing machine?
14    A.    Instron.
15    Q.    Instron, when was that acquired?
16    A.    We, we ordered that piece of equipment
17 within weeks of finding the fraud, I believe that
18 was in December of '04 it was ordered and I
19 believe installed either in December of '04 or
20 January of '05.
21    Q.    And the specialized machinery to
22 manufacture in the spring and the summer, does
23 that have a name for that machine?
24    A.    The one we just talked about?

| 68 | 71 |
|---|---|
| 1  **Q.**  Yes, the $217,000. | 1  **Q.**  Is it your testimony that there will be |
| 2  **A.**  I think we refer to it commonly as the | 2  no labor savings except in the area of reworking |
| 3  ITWC machine or meter mixing machine. | 3  bad panels? |
| 4  **Q.**  And this was the machine that I spoke | 4  **A.**  That's not what I said, no. |
| 5  with Mr. Boodee about a little bit at his | 5  **Q.**  Well, I'm trying to understand all of the |
| 6  deposition a few weeks ago? | 6  labor savings that -- |
| 7  **A.**  That's correct. | 7  **A.**  Well -- |
| 8  **Q.**  And what are the advantages of the ITWC | 8  **Q.**  -- you anticipate from the meter mixing |
| 9  machine or meter mixing machine, what is it going | 9  machine with regard to matters other than |
| 10  to do for you? | 10  reworking bad panels? |
| 11  **A.**  Hopefully, it will make conforming | 11  **A.**  There is a potential to save labor in |
| 12  products year-round without any rework or wasting | 12  some form or fashion associated with the |
| 13  material. | 13  production of the panels.  We won't know what the |
| 14  **Q.**  Mr. Boodee said that it was going to | 14  magnitude of the savings are until we get it |
| 15  eliminate certain steps in the manufacturing | 15  installed and we run a machine. |
| 16  process, is that true? | 16     We don't even know how efficient this |
| 17  **A.**  Hopefully that will be true, yes. | 17  machine is going to be to address the problem in |
| 18  **Q.**  What are the steps that it is anticipated | 18  the first place. |
| 19  the meter mixing machine are going to eliminate? | 19  **Q.**  What information have you received that |
| 20  **A.**  Well, the steps are the rework on bad | 20  leads you to conclude that this machine, meter |
| 21  panels, on panels that are nonconforming as a | 21  mixing machine has the potential to reduce labor |
| 22  result of the humidity that gets into the panels | 22  costs and actual manufacturing as opposed to |
| 23  themselves. | 23  reworking bad panels? |
| 24  **Q.**  Are there any other steps in the | 24  **A.**  We don't. |

| 69 | 72 |
|---|---|
| 1  manufacturing process that it is anticipated that | 1  **Q.**  Have you had discussions with anybody at |
| 2  the meter mixing machine is going to eliminate? | 2  Globe Composite or outside Globe Composite that |
| 3  **A.**  I don't know if it's going to eliminate, | 3  leads you to believe that this machine has the |
| 4  it's going to help automate some of the steps. | 4  potential to reduce labor costs in the areas other |
| 5  All of the steps are going to be necessary still, | 5  than reworking bad panels? |
| 6  mixing, preparation, testing, degassing, heating, | 6  **A.**  Yes. |
| 7  those steps will probably still be the same, but | 7  **Q.**  And who have you spoken with? |
| 8  this machine will do it in a closed loop, that is, | 8  **A.**  Well, we, we've talked about this to our |
| 9  it will be under a nitrogen blanket where it will | 9  bankers because we're trying to secure financing |
| 10  be pressurized, and it will not allow | 10  for it.  We're trying to show them that this is a |
| 11  contamination from the outside in the material. | 11  good decision for us, and we're requesting |
| 12  **Q.**  Is it going to reduce the amount of time | 12  financing for it. |
| 13  that employees of Globe Composite is going to have | 13     We have not submitted a formal request, |
| 14  to devote to particular functions in the | 14  we don't have a loan document in place or a loan |
| 15  manufacturing process of the baffle panels? | 15  application, but we've talked to them about the |
| 16  **A.**  Well, we know it's going to reduce the | 16  pros and cons of us spending $217,000 plus |
| 17  amount of rework which is an important part of our | 17  probably another 30 or $40,000 in installation and |
| 18  production, the other components right now we'll | 18  testing. |
| 19  kind of wait and see. | 19     We hope there will be some efficiencies, |
| 20     We are not taking steps here to try to | 20  there will be reduced scrap, clearly it will allow |
| 21  save money, we are taking steps to try to produce | 21  us to produce year-round.  That's the full intent. |
| 22  conforming panels, so, if there are any savings, | 22  **Q.**  But when you say some efficiencies, are |
| 23  that's great, but right now we're most concerned | 23  you referring to decreased labor costs? |
| 24  about our inability to, our inability to produce | 24  **A.**  We, yes, we believe that there may be |

| 70 | 73 |
|---|---|
| 1  panels year-round. | 1  some decreased labor cost at some point, we don't |
| 2  **Q.**  Mr. Boodee, you heard Mr. Boodee talk | 2  know yet. |
| 3  about how it was going to eliminate certain steps | 3  **Q.**  Has anybody given you any information or |
| 4  in the manufacturing process at his deposition? | 4  order of magnitude about what efficiencies you can |
| 5  **A.**  I don't recall that part of it, but I'll | 5  hope to get from this equipment in the area of |
| 6  assume you're correct. | 6  reduced labor costs? |
| 7  **Q.**  Okay.  Well, if he said that, would that | 7  **A.**  In terms of reduced labor costs? |
| 8  testimony have been true or untrue? | 8  **Q.**  Yes. |
| 9  **A.**  Well, I think his perspective would have | 9  **A.**  I don't know specifically about reduced |
| 10  been the same as mine as I just answered, I | 10  labor costs.  There is, you know, we hope to save |
| 11  believe Mr. Boodee did answer that it would reduce | 11  somewhere between 30 and $50,000 per ship in terms |
| 12  the rework which is a step of production. | 12  of reduced scrap, rework, and reduced labor cost, |
| 13  **Q.**  And is it your -- I'm sorry. | 13  I believe that's the number, it could be higher or |
| 14  **A.**  I would also say that you're asking John | 14  lower. |
| 15  Boodee, an individual who hasn't been associated | 15  **Q.**  30 to $50,000 per ship, is that what you |
| 16  with any aspect of panel production for nearly a | 16  said? |
| 17  year, on information related to the production or | 17  **A.**  Ship, yes. |
| 18  the acquisition of the machine. | 18  **Q.**  And by ship you mean? |
| 19     So, John, John's point of reference is | 19  **A.**  Per order. |
| 20  completely different back then as ours is today, | 20  **Q.**  Per order, okay, and what's the, how many |
| 21  so, I'm not, you know, John may have believed that | 21  baffle panels are in an order? |
| 22  at the time or maybe you misinterpreted it, but I | 22  **A.**  Sixty-one. |
| 23  believe John's testimony had to deal with reducing | 23  **Q.**  And is it a sixty-one panel order that |
| 24  rework and scrap. | 24  the cost is that $900,000 plus cost? |

74

1  A.  That's correct, $940,000.
2  Q.  Has Globe Composite done a baffle
3  profitability analysis using this meter mixing
4  machine?
5  A.  Not that I'm aware of.
6  Q.  Has Globe Composite done a profitability
7  analysis based on what was shipped in 2006 on
8  baffle panels?
9  A.  Not that I'm aware of.
10  Q.  How about in 2005?
11  A.  Not that I'm aware of.
12  Q.  Do you have an understanding as to the
13  profitability of the baffle contracts, you know,
14  looking ahead into the future?  I mean was the
15  2006 shipments, was that profitable business?
16  A.  I would hope so or we wouldn't be doing
17  it.  Specific numbers, I couldn't tell you what
18  our specific profitability is.  I could give
19  ranges, they would be guesses.
20  Q.  Well, I don't want you to guess but just
21  give me your best estimate of the range of cost?
22  A.  The range of cost or the range of
23  profitability?
24  Q.  I think I can probably figure out the

75

1  math if I had the range of cost.
2  A.  I'm guessing we probably make today under
3  current manufacturing processes around $300,000
4  per ship set.  That would be just gut feel, no
5  analytics, just anecdotal.
6  Q.  And in coming up with that number, do you
7  attribute, what overhead do you attribute to that?
8  A.  I don't know, you asked me to guess and
9  I guessed, and so, that's my estimate.
10  Q.  Actually, I asked you not to guess, but.
11  A.  I couldn't tell you, you're asking me
12  more detail, and I told you up front I'm not able
13  to provide you with that detail.
14  Q.  Is material cost the single largest cost
15  in manufacturing a baffle?
16  A.  It may be about equal to labor costs
17  under current processing practices.
18  Q.  But I take it your hope is that the meter
19  mixing machine will reduce some of those labor
20  costs?
21  A.  It's my hope that it reduces material
22  costs, rework costs, scrap costs, allows us to
23  produce over a twelve-month period versus a four-
24  or five-month period.  There's lots of

76

1  expectations we have for this machine.
2  Q.  So, it could save on both labor and
3  materials?
4  A.  It could also produce a conforming panel
5  for us as well, that's our primary goal.
6  Q.  But your hope is it will save on both
7  labor and material costs?
8  A.  It's my hope that it also makes my coffee
9  in the morning, but it may or may not happen.
10  Q.  Mr. Forsythe, isn't it true that the
11  asset purchase agreement contained no
12  representations from Globe Rubber Works regarding
13  the cost of producing gaskets?
14  A.  I don't recall.  I would be surprised if
15  it specifically culled out that.
16  Q.  And similarly, the asset purchase
17  agreement contained no representations from Globe
18  Rubber Works regarding the cost of producing
19  baffles?
20  A.  Same answer as the first question.
21  Q.  And after the closing, you, at the time
22  of the closing, you understood that Globe
23  Composite was assuming the responsibilities to
24  manufacture baffles and gaskets?

77

1  A.  We were assuming contracts and contracts
2  in process, yes.
3  Q.  And you were assuming the risks that
4  machinery would malfunction?
5  A.  We were assuming risks that we had been
6  able to correctly identify and to mention and be
7  willing to accept those risks, whether it's
8  related to equipment reliability, people,
9  products, processes.
10  We did extensive due diligence on the
11  company prior to our acquisition of the assets,
12  and we felt we had identified all of the risks
13  associated with this acquisition.
14  Q.  Well, you knew that one of the risks was
15  that machinery could break or malfunction?
16  A.  That's always a risk.
17  Q.  That labor costs could increase?
18  A.  That's always a risk.
19  Q.  That the cost of raw materials could
20  increase?
21  A.  That's correct.
22  Q.  That raw materials that were manufactured
23  before there were DMTA certifications would turn
24  out to not appropriately pass certifications?

78

1  A.  That's not correct.
2  Q.  That the risks that other competitors
3  could enter a particular market in which Globe
4  Composite was engaged in business?
5  A.  That happens every day.
6  Q.  Now, has Globe Composite as of today
7  found the back up material that was in
8  Mr. Fasnacht's file cabinet which support the
9  January 31, 2005 escrow demand letter?
10  A.  We have searched his office top to
11  bottom, I have personally looked through his
12  office, John Mattern has looked through his
13  office, and we could not find any such folder.
14  Q.  Okay, and --
15  A.  I suspect that that folder was taken
16  apart and distributed as part of the discovery
17  process.  That's the only thing I can, I can come
18  to some conclusion on, so, I believe you have all
19  the information related to this lawsuit with
20  regard to Roger's file.
21  Q.  That's your assumption?
22  A.  That is my assumption.
23  Q.  Do you have any personal knowledge that I
24  have it?

79

1  A.  If, if Roger said that there was a file,
2  I would believe Roger in saying that there is a
3  file, and I believe nobody has gone in and removed
4  that file from his office.  I believe Roger
5  probably took that file and sent it to you or our
6  lawyers as a result of the discovery process.
7  Q.  Did you ever see this file?
8  A.  No.
9  Q.  Did he ever tell you how it was
10  organized?
11  A.  I didn't even know he had a file.
12  Q.  As of the time of the closing in August
13  2004, you had no experience in manufacturing
14  baffles, correct?
15  A.  That's correct.
16  Q.  Or gaskets?
17  A.  That's correct.
18  Q.  You wouldn't consider yourself an expert
19  in the manufacturing of baffles?
20  A.  Then or now?
21  Q.  Then.
22  A.  No.
23  Q.  Today you do?
24  A.  No.

**80**

1 **Q.** With regard to gaskets, did you consider
2 yourself an expert then?
3 **A.** No.
4 **Q.** And today?
5 **A.** No.
6 **Q.** Which employees of Globe Composite at the
7 present time do you consider to be an expert in
8 the manufacturing of baffles?
9 **A.** I would say it's probably between three
10 individuals, Jason Dahlberg, Tom Roberts, and a
11 third individual, Buddy Cumming, C-U-M-M-I-N-G,
12 Cummings I believe, Cummings.
13 **Q.** Do they still work for GCS?
14 **A.** Yes, they do.
15 **Q.** Mr. Dahlberg's position?
16 **A.** He is like the lead foreman for military
17 products, production in military products.
18 **Q.** So, that includes gaskets and baffles?
19 **A.** Technically it does, I believe Tom
20 Roberts oversees most of the gasket production.
21 **Q.** What is Mr. Roberts' title?
22 **A.** Production supervisor.
23 **Q.** And Mr. Cummings' position?
24 **A.** He is a lead foreman as well.

**81**

1 **Q.** Any former employees of Globe Composite
2 who you consider experts in baffle or gasket
3 production?
4 **A.** Well, I mean the term expert is, I can
5 tell you people that were very knowledgeable about
6 the production of both were Rob Karnes, Bob
7 Murray, Dick Somerville, to a lesser extent,
8 Charlie Stoddard.
9 I believe those would be individuals all
10 extremely knowledgeable about those processes.
11 **Q.** Mr. Dahlberg, was he a former Globe
12 Rubber Works employee?
13 **A.** Yes.
14 **Q.** Mr. Roberts?
15 **A.** Yes.
16 **Q.** Mr. Cummings?
17 **A.** I believe he had just started at Globe
18 Rubber Works right around the time that we
19 acquired the assets.
20 **Q.** Since the closing in August 2004, has
21 Globe Composite ever incurred greater expenses
22 than it anticipated in manufacturing other
23 products other than gaskets and baffles?
24 **A.** Yes.

**82**

1 **Q.** Which products?
2 **A.** Well, we recently won an order from
3 Sandia International Laboratories to produce large
4 high energy barriers, it was more expensive than
5 we initially anticipated.
6 **Q.** What were the components that made it
7 more expensive?
8 **A.** Well, actually, we had to send out the
9 disks to be machined and that was much more
10 expensive than we had anticipated, it was an
11 external cost that we bore.
12 **Q.** Anything else come to mind?
13 **A.** Well, I'm sure there's lots of, many
14 products that we manufacture that, that have
15 either greater cost or less cost than we initially
16 anticipated, but it would be a fairly narrow band.
17 If it got to be significant, we'd either reprice
18 it or discontinue offering that product.
19 **Q.** Have there been any increased costs
20 associated with the business that Globe
21 Composite's been able to continue to receive from
22 the Postal Service?
23 **A.** Oh, clearly, I mean material costs have
24 increased substantially as a result of the

**83**

1 increase in oil costs, steel costs have increased
2 as a result of increased steel shipments to China,
3 you know, things, raw material costs do increase
4 and will continue to.
5 After today's inauguration, labor costs
6 are going to increase substantially.
7 **Q.** Because of an increase in the minimum
8 wage?
9 **A.** Or something like that.
10 **Q.** I think the minimum wage increase is
11 January 1 from what I understand.
12 **A.** I'm talking about business increase.
13 **Q.** Oh, okay, it is a political statement, I
14 get it. In any of the other lines of business
15 other than gaskets and baffles, has Globe
16 Composite manufactured any nonconforming parts?
17 **A.** No, if we do manufacture nonconforming
18 parts, they're either destroyed or we get a sign
19 off from the customer accepting those parts or the
20 parts are accepted by the salespeople on behalf of
21 the customer.
22 **Q.** So, it is true that in other, in other
23 lines of business from time to time the Globe
24 Composite manufacturing process has manufactured

**84**

1 nonconforming parts? I'm not talking about what
2 shipped.
3 **A.** We make nonconforming parts every day.
4 **Q.** And when you make nonconforming parts,
5 you, that increases the total cost of
6 manufacturing those products?
7 **A.** Yes, and we are tracking those costs now.
8 **Q.** Do Globe Composite in areas other than
9 baffles and gaskets ever experience a problem in
10 employees making mistakes in the manufacturing
11 process, so-called human error?
12 **A.** If you're implying that the errors in
13 gaskets and panels were accidental, the answer is
14 no, it wasn't accidental.
15 **Q.** You know that wasn't my question,
16 Mr. Forsythe, right?
17 **A.** No, I don't, no, I don't, I don't know
18 what you're trying to find.
19 **Q.** I'm trying very specifically to ask you
20 about manufacturing of products other than gaskets
21 and baffles, is that clear enough?
22 **A.** If we're, if we are excluding discussion
23 on baffle panels and gaskets?
24 **Q.** Yes, sir.

**85**

1 **A.** We, there is human error, there is
2 material error, there is machine error, there is
3 testing error, there is environmental error, those
4 are all parts of the manufacturing process.
5 **Q.** And that, those errors apply to every
6 line of business of Globe Composite?
7 **A.** That's correct.
8 **Q.** And has since the closing in August 2004
9 there been unforeseen increases in material costs
10 in lines of business other than gaskets or
11 baffles?
12 **A.** Yes.
13 **Q.** Have there been any increase in material
14 costs in baffles?
15 **A.** No.
16 **Q.** In gaskets?
17 **A.** Not that I'm aware of.
18 **Q.** But there have been increased energy
19 costs since the closing, have there not?
20 **A.** I would assume so.
21 **Q.** I show you Exhibit 101 and this is an
22 investor update dated September 1, 2005.
23 **A.** Yes.
24 **Q.** And under the section near the beginning

86

1 "Net income sales" in the second paragraph, the
2 second sentence says that "We were held back from
3 delivering fifteen submarine panels, $200,000 to
4 Newport News Shipbuilding due to substandard
5 material received from our raw material supplier."
6    A.   That's correct.
7    Q.   Who was the raw material supplier that
8 you have referenced in that sentence?
9    A.   PRC DeSoto, D-E, capital S-O-T-O.
10    Q.   Are these submarine panels part of the
11 baffle panels that are part of your claim?
12    A.   That's correct. Oh, I'm not sure that
13 this damage, I want to be very careful in how I
14 answer that, we're not claiming any damage I
15 believe related to these fifteen panels.
16    Q.   But your manufacturing success with
17 regard to manufacturing panels is in part
18 dependent upon the quality of the raw material
19 that you receive from your raw material supplier,
20 correct?
21    A.   It's one of the elements, yes.
22    Q.   Now, what was the total sales of Globe
23 Composite in 2006?
24    A.   I couldn't tell you that until our

87

1 auditors give us the final number.
2    Q.   Well, I'm sure you know within some --
3    A.   No, I don't.
4    Q.   Okay. You don't know whether your sales
5 were more or less than 10 million dollars in 2006?
6    A.   I couldn't tell you that because it's
7 going to be a function of how they accrue some
8 advanced orders that we received from the Postal
9 Service.
10    Q.   Are you an accrual based taxpayer?
11    A.   Yes, we are.
12    Q.   Okay, and are your financial statements
13 prepared on an accrual base?
14    A.   Yes, they are.
15    Q.   And --
16    A.   GAAP and tax basis, we keep two sets of
17 books.
18    Q.   So, the financial statements are prepared
19 on a GAAP basis?
20    A.   That's correct.
21    Q.   And the tax return is prepared on an
22 accrual basis?
23    A.   Tax basis.
24    Q.   An accrual tax basis?

88

1    A.   Well, yes, you can have a tax basis
2 that's cash or accrual, but it's accrual.
3    Q.   The financial statements are audited
4 financials that are prepared in accordance with
5 generally accepted accounting principles?
6    A.   That's correct.
7    Q.   On a cash basis, approximately how much
8 in sales revenue was received by Globe Composite
9 in 2006?
10    A.   I can't, I can't tell you that.
11    Q.   How much business did Globe Composite
12 receive from the Postal Service in 2006
13 approximately?
14    A.   I would say somewhere between 5 and 6
15 million dollars.
16    Q.   And what percentage of Globe Composite's
17 total sales did the Post Office represent?
18    A.   If we, well, it's going to be a function
19 of what our total number is. It could account for
20 40 to 60 percent of our sales.
21    Q.   Now, the reason that you have this
22 uncertainty relates to how the auditors are going
23 to accrue certain orders received that involve the
24 production of manufacturing of equipment or

89

1 machines at some point in the future, is that what
2 can affect the number?
3    A.   We received an order from the Postal
4 Service in September or October that we are in the
5 process of building but not delivering, and so,
6 it's a question of revenue recognition or
7 components that are manufactured, stored off site,
8 what are the rules going to be governing the
9 recognition of that revenue.
10    Q.   How big an order is that?
11    A.   Well, the total order I think John Boodee
12 mentioned is 3.2 million dollars.
13    Q.   Have you had any discussions with Nancy
14 Walker about this case?
15    A.   Well, when you say about this case, are
16 you talking about the initial fraud or the lawsuit
17 that ensued afterwards? I need more information.
18    Q.   Let's say both, but I don't want to hear
19 about anything that was told in which the only
20 people present are Lawson & Weitzen, someone from
21 Lawson & Weitzen and you and Nancy Walker.
22    A.   Right, well, I had several conversations
23 with Nancy in the December 2004, January 2005
24 period, and then I had a subsequent discussion

90

1 with her briefly about, that was related to the
2 fraud from Globe Rubber Works and had a very brief
3 conversation with her regarding, urging her to, to
4 participate in a deposition, not talking about the
5 specifics of the case but just encouraging her to
6 cooperate in being deposed.
7    Q.   And when was that conversation?
8    A.   That had to be about a month ago, three
9 to four weeks ago.
10    Q.   And what did she say?
11    A.   She said that she has to talk with her
12 lawyer and listen to what her lawyer has to say.
13    Q.   Okay, and what were your conversations
14 with her in December '04 and January '05?
15    A.   Well, once I discovered the fraudulent
16 documents, I confronted her and asked her what her
17 role was in this. Excuse me, those discussions I
18 did not have any discussions with her in December,
19 I had discussions with her after January 6th of
20 2005.
21        I wanted to understand what her role was
22 in falsifying the data, I wanted to get a sense of
23 how complicit she was in working both with Dick
24 Somerville and Charlie Stoddard in the fraud.

91

1    Q.   And what was your conversation with her,
2 what did you say, what did she say?
3    A.   Well, I mean that was the substance of my
4 conversation with her. She said that, you know,
5 she felt she had to do what she had to do because
6 she was afraid she may lose her job if she didn't
7 cooperate with Dick and Charlie, that she didn't
8 really play as big a role as they did, she was
9 sorry for it, but you know, she said that her, her
10 involvement was really limited to testing the
11 materials, and what happened to the test results
12 after that was really not her responsibility
13 although she was fully aware, she did acknowledge
14 she was aware of the fraud that was happening on
15 the gaskets and on the baffle panels.
16        She also mentioned she was more involved
17 on the gaskets than on the baffle panels and had
18 cataloged all of the test results of the new
19 gaskets.
20    Q.   Anything else you recall about those
21 conversations in January '05?
22    A.   Not specifically.
23    Q.   Is Nancy Walker still employed by Globe
24 Composite?

92

1  A.  Yes, she is.
2  Q.  Does she still perform the same duties
3 today?
4  A.  She provides, she performs a variety of
5 activities today with obviously increased
6 oversight, she also accurately reports data now,
7 so, there is a change in responsibility, but I'd
8 say essentially she is probably doing a majority
9 of what she did in the past.
10  Q.  In December 2004, you told Mr. Fasnacht
11 that you would not pay Mr. Somerville the $400,000
12 note, correct?
13  A.  That's correct.
14  Q.  And in December 2004, you told
15 Mr. Somerville you wouldn't pay any of the notes,
16 Globe Composite would not pay any of the notes to
17 Mr. Somerville?
18  A.  Are you asking me whether I said that to
19 Dick in December of '04?
20  Q.  No, I meant -- I'll rephrase the
21 question.
22  A.  Because I don't know what the question
23 was.
24  Q.  That wasn't what I wanted to ask so I'll

93

1 try again.  In December 2004, you told
2 Mr. Fasnacht that Globe Composite would not pay
3 Mr. Somerville anything more on any of the notes?
4  A.  Well, I know we specifically talked about
5 the $400,000 and that discussion occurred on the
6 14th or 15th of December immediately after the
7 fraud was discovered.
8      Whether I said we are not going to pay
9 him on anything I don't recall that specific
10 conversation.  It wouldn't surprise me that I
11 would be feeling that way, but I don't know if I
12 said all of the amounts owed to him or not.
13  Q.  But it's your recollection that you
14 didn't make the decision to terminate
15 Mr. Somerville until sometime in early January
16 2005?
17  A.  Until after the, until after the
18 Department of Defense and the Navy Criminal
19 Investigation Services folks completed their
20 investigation.
21  Q.  But when they completed their
22 investigation, that was early January?
23  A.  They began the investigation on
24 December 27th, they came in, and they came in to

94

1 our facility on January 6th, January 5th and
2 January 6th.
3  Q.  And then you wore a wire for them on what
4 date?
5  A.  I believe it was January 6th.
6  Q.  The same day?
7  A.  Well, they were in, they came in the
8 night before and removed a lot of information.
9  Q.  The, had you decided to terminate
10 Mr. Somerville before or after you had your wired
11 discussion with him?
12  A.  I hadn't made a decision to terminate him
13 until he admitted to me that he fraudulently
14 prepared and oversaw alternate activities on the
15 baffle panels and the gaskets which occurred on
16 January 6th.
17  Q.  So, that's the date that you decided that
18 you would terminate him?
19  A.  Or shortly thereafter.  Dick and I had
20 absolutely no discussion related to the fraud
21 until the morning of January 6th.
22  Q.  Now, in the middle of December, you
23 didn't know what damages Globe Composite would
24 incur as a result of the false certifications that

95

1 you talked about?
2  A.  Did I know the dollar amount or the
3 extent or whether there would be damages?
4  Q.  Just my question is you didn't know what
5 damages would be incurred?
6  A.  I knew there were going to be significant
7 damages in the middle of December, possibly up to
8 and including the shutting down of our business.
9  Q.  And --
10  A.  I thought we were going to go out of
11 business.
12  Q.  And by the end of December 2004, you
13 didn't know what damages Globe Composite would
14 incur as a result of the false certifications?
15  A.  I thought we would have catastrophic
16 damages.
17  Q.  And on January 31, you didn't know what
18 damages would be incurred?
19  A.  I felt we'd have catastrophic damages
20 then.
21  Q.  And at some point did you decide that
22 Globe Composite's damages would not be
23 catastrophic?
24  A.  In retrospect they were, they are and

96

1 with the exception of the government shutting us
2 down, I think all of our fears were realized.
3  Q.  Now, have you heard the tape of when you
4 wore the wire?
5  A.  No, I haven't heard it, I briefly read
6 the transcript which is poorly interpreted, but,
7 but I remember it very clearly.
8  Q.  The, the transcript has in a lot of
9 sections, the word unintelligible appears
10 throughout the transcript at fairly regular times;
11 is that correct?
12  A.  In the transcript itself?
13  Q.  Yes.
14  A.  I don't recall the word, but I wouldn't
15 be surprised.
16  Q.  And the transcript has some translations
17 in it that are just wrong?
18  A.  Right, that's correct.
19  Q.  Whatever was said it wasn't what some of
20 the words that were typed by the transcriber?
21  A.  That's correct, that's correct.
22  Q.  And at the time you wore the wire, you
23 had already decided that the promissory notes
24 would not be paid?

97

1  A.  Well, at least one of them was, we
2 suspended the payment on at least one of them.
3  Q.  And at the time you wore the wire, you
4 had already decided that Globe Composite would be
5 seeking the escrow account that was put aside for
6 claims post closing under the asset agreement?
7  A.  I couldn't tell you what I was thinking.
8 All I knew is that we weren't going to pay Dick
9 any money after uncovering huge fraud, that's all
10 I knew.  I don't think I was thinking further
11 ahead with respect to escrow, lawsuits or anything
12 like that.
13  Q.  And you certainly decided you weren't
14 going to give him 7.5 percent of the equity
15 interest in Globe Composite at that time?
16  A.  I hadn't thought about it, but I'm sure
17 at the time I probably wouldn't have.
18  Q.  By the beginning of January, you expected
19 to bring suit against Mr. Somerville?
20  A.  By January 6th, I expected to bring a
21 suit against Dick Somerville, that's when he
22 confessed.
23  Q.  And you thought that wearing the wire and
24 having this interview with Mr. Somerville could

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GLOBE COMPOSITE SOLUTIONS, LTD.) | CIVIL ACTION NO. |
| F/K/A KALM-FORSYTHE GLOBAL ) | |
| INNOVATIONS, LTD. ) | 05 10323 DPW |
|    Plaintiff, ) | |
| VS. ) | |
| RICHARD C. SOMERVILLE, ANNE ) | |
| ROCHE-SOMERVILLE, and ) | |
| SOLAR CONSTRUCTION, INC. F/K/A ) | |
| GLOBE RUBBER WORKS, INC. ) | |
|    Defendants. ) | |

RICHARD C. SOMERVILLE and )
SOLAR CONSTRUCTION, INC. F/K/A )
GLOBE RUBBER WORKS, INC., )
   Plaintiffs-in-Counterclaim)
VS. )
GLOBE COMPOSITE SOLUTIONS, LTD.)
F/K/A KALM-FORSYTH GLOBAL )
INNOVATIONS, LTD. and )
CARL W. FORSYTHE, )
   Defendants-in-Counterclaim)

**************************************************
ORAL DEPOSITION OF LIZA GLASS
JANUARY 31, 2007
**************************************************


ORAL DEPOSITION OF LIZA GLASS, produced as

a witness at the instance of the Defendants/

Plaintiffs-in-Counterclaim, and duly sworn, was

taken in the above-styled and -numbered cause on

the 31st day of January, 2007, from 10:14 a.m.

to 12:03 p.m., before LORI A. BELVIN, CSR, and

Notary Public in and for the State of Texas,

LIZA   GLASS   —   January 31, 2007

Page 2

```
 1   reported by stenographic means, at the Law Offices
 2   of Wilson Elser Moskowitz Edelman & Dicker, LLP,
 3   5847 San Felipe Street, Suite 2300, Houston, Texas,
 4   pursuant to the Federal Rules of Civil Procedure.
 5
 6                  - - - - -
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                   INDEX
 2                               PAGE
 3   Appearances.................................... 3
 4   Stipulations.................................. 2
 5   LIZA GLASS
 6     Examination by MS. ROMAN.................. 19
 7     Examination by MS. BURHOE................. 73
 8
 9                 EXHIBITS
10   NO.    DESCRIPTION      PAGE REFERRED
11   1 - Subpoena With a Return of Service with
         attached Schedule A...................... 23
12       (Not Bates-stamped)
13   2 - Richard C. Somerville Adjustable Life
         Insurance Policy Number: U1000522OL -
14       $250,000.................................. 25
         (Bates-stamped 0045713 0 0045838)
15
     3 - Custom Life Insurance Illustration of a
16       Flexible Premium Adjustable Life Insurance
         Policy and Policy Transmittal............. 30
17       (Bates-stamped RS 0128 - RS 0136)
18   4 - American General Life Insurance Company
         "Welcome Letter" and Schedule of Benefits
19       page and attachments..................... 31
         (Bates-stamped RS 137 - RS 143)
20
     5 - 9/19/ 1998 to 9/19/1999 Annual Statement
21       on Policy Number U10005220L - Richard C.
         Somerville............................... 33
22       (Not Bates-stamped)
23   6 - 9/19/1990 to 9/19/2000 Annual Statement on
         Policy Number U10005220L - Richard C.
24       Somerville............................... 35
         (Not Bates-stamped)
25
```

Page 3

```
 1   APPEARANCES:
 2
     COUNSEL FOR THE PLAINTIFFS/DEFENDANTS-IN-
 3   COUNTERCLAIM:
 4     Ms. Clare B. Burhoe (VIA TELECOMMUNICATIONS)
       LAWSON & WEITZEN, LLP
 5     88 Black Falcon Avenue, Suite 345
       Boston, Massachusetts 02210-2424
 6       Telephone: (617) 439.4990
         Facsimile: (617) 439.3987
 7       Email: cburhoe@lawson-weitzen.com
         Email: elawson@lawson-weitzen.com
 8
 9   COUNSEL FOR THE DEFENDANTS/PLAINTIFFS-IN-
     COUNTERCLAIM:
10
       Ms. Jennifer C. Roman (VIA TELECOMMUNICATIONS)
11     TARLOW BREED HART & RODGERS, P.C.
       101 Huntington Avenue - Prudential Center
12     Boston, Massachusetts 02199
         Telephone: (617) 281.2000
13       Facsimile: (617) 267.7673
         Email: jroman@tbhr-law.com
14
15   COUNSEL FOR THE WITNESS, LIZA GLASS:
16     Ms. Carey L. Bertrand (VIA TELECOMMUNICATIONS)
       Ms. Linda P. Wills
17     WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
       5847 San Felipe, Suite 2300
18     Houston, Texas 77057-4033
         Telephone: (713) 785.7784
19       Facsimile: (713) 785.7780
         Email: linda.wills@wilsonelser.com
20
     AND
21
       Mr. Vincent Bhatti - General Counsel
22     AMERICAN GENERAL LIFE COMPANIES, LLC
       2727-A Allen Parkway
23     Houston, Texas 77019
         Telephone: (713) 522.1111
24
25
```

Page 5

```
 1                 EXHIBITS
 2   NO.    DESCRIPTION      PAGE REFERRED
 3   7 - 9/19/2000 to 9/19 2001 Annual Statement on
         Policy Number U10005220L - Richard C.
 4       Somerville............................... 36
         (Not Bates-stamped)
 5
     8 - 9/19/2001 to 9/19/2002 Annual Statement on
 6       Policy Number U10005220L - Richard C.
         Somerville............................... 37
 7       (Bates-stamped RS 042 - RS 043)
 8   9 - 9/19/2002 to 9/19/2003 Annual Statement on
         Policy Number U10005220L - Richard C.
 9       Somerville............................... 37
         (Bates-stamped RS 044 - RS 045)
10
     10 - Letter from AIG American General from Globe
11        Rubber Works, Inc. dated 9/2/04 with attached
          Fax Transmission.......................... 38
12        (Bates-stamped RS 079 - RS 080)
13   11 - "Life - Forecall" - History of Processed
          Tasks for Policy Number U10005220L -
14        Richard C. Somerville..................... 42
          (Bates-stamped RS 046)
15
     12 - 9/19/2003 to 9/19/2004 Annual Statement on
16        Policy Number U10005220L - Richard C.
          Somerville............................... 43
17        (Bates-stamped RS 047 - RS 048)
18   13 - Change of Ownership form................. 46
          (Bates-stamped RS 055 - RS 058)
19
     14 - Change of Beneficiary form.............. 50
20        (Bates-stamped RS 067 - RS 069)
21   15 - Change of Agent letter.................. 52
          (Bates-stamped RS 208 - RS 209)
22
     16 - Letter response to the request to change
23        the ownership on the policy insuring Richard
          Somerville dated February 18, 2005........ 53
24        (Bates-stamped RS 059 - RS 061)
25
```

BILL   J.   McFERRON,   CSR
(713)   626-2629

Page 6

```
1              EXHIBITS
2  NO.      DESCRIPTION          PAGE REFERRED
3  17 - Computer History of Processed Tasks for
        Policy Number U10005220L - Richard C.
4      Somerville............................. 55
        (Bates-stamped RS 073 and RS 074)
5
   18 - Computer History of Processed Tasks for
6      Policy Number U10005220L - Richard C.
        Somerville............................. 58
7      (Bates-stamped RS 063 and RS 064)
8  19 - Change of Agent letter................. 59
        (Bates-stamped RS 206 - RS 207)
9
   20 - Letter response to the request to change
10     the ownership on the policy insuring Richard
        Somerville dated February 24, 2005........ 60
11     (Bates-stamped RS 070 - RS 072)
12 21 - Computer History of Processed Tasks for
        Policy Number U10005220L - Richard C.
13     Somerville............................. 62
        (Bates-stamped RS 077 and RS 078)
14
   22 - Computer History of Processed Tasks for
15     Policy Number U10005220L - Richard C.
        Somerville............................. 64
16     (Bates-stamped RS 083)
17 23 - Computer History of Processed Tasks for
        Policy Number U10005220L - Richard C.
18     Somerville............................. 66
        (Bates-stamped RS 085 and RS 086)
19
   24 - July 5th, 2005 letter from Lawson & Weitzen
20     with attachments...................... 69
        (Bates-stamped RS 087 and RS 093)
21
   25 - September 15, 2005 letter addressed to
22     American General Life Insurance Company from
        Globe Composite Solutions, Ltd. with
23     attachments........................... 70
        (Bates-stamped RS 223 and RS 228)
24
25
```

Page 7

```
1              EXHIBITS
2  NO.      DESCRIPTION          PAGE REFERRED
3  26 - September 16, 2005 letter addressed to
        American General Life Insurance Company from
4      Globe Composite Solutions, Ltd. with
        attachments........................... 71
5      (Bates-stamped RS 229 and RS 232)
6  27 - Letter response to request a collateral
        assignment on the policy insuring Richard
7      Somerville dated October 23, 1998......... 71
        (Bates-stamped RS 059 - RS 061)
8      (Bates-stamped RS 106 and RS 112)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
1              PROCEEDINGS
2        (Exhibit Nos. 1 - 27 pre-marked.)
3        MS. WILLS:  This is Linda Wills,
4   representing Liza Glass, who's the deponent; and
5   we also have Vincent Bhatti, who's the internal
6   Counsel for American General, and the court
7   reporter here.
8        MS. ROMAN:  Great.
9        THE REPORTER:  We're on the record, going
10  under the Rules.  And would you like your client to
11  read and sign, Linda?
12       MS. WILLS:  Yes.
13       THE REPORTER:  Reading and signing the
14  transcript.
15       MS. WILLS:  Can you hear us okay?
16       MS. ROMAN:  Yeah, I can.
17       MS. WILLS:  Great.
18       MS. ROMAN:  This is Jennifer Roman
19  speaking, for purposes of the court reporter.  With
20  respect to the normal stipulations, what I would
21  suggest is to -- I think the goal is to try to
22  avoid having American General have to testify at
23  trial, that any objections be raised now versus,
24  you know, just "objections as to form," so that
25  way everything is covered now, in terms of the
```

Page 9

```
1   transcript, should it be used at trial in lieu of
2   testimony.  Is that okay with everyone?
3        MS. BURHOE:  Not really.  I mean, I
4   guess, I wished you would have told me that ahead
5   of time; but I'd prefer to stick with the usual
6   stipulations that we've been having in the rest of
7   the case, "per the Rules."
8        MS. ROMAN:  For the record, just to be
9   clear, the usual stipulations, is that we are
10  waiving all objections, except as to form and, I
11  believe, motions to strike; is that correct, Clare?
12       MS. BURHOE:  Right, yep.
13       MS. ROMAN:  Okay.  Linda, do you have any
14  thoughts on this?
15       MS. WILLS:  Whatever you guys want to do,
16  is fine with us on that issue.
17       MS. ROMAN:  Okay.  I guess that kind of
18  leads me, then, to the question of -- just in terms
19  of a jurisdictional issue, in terms of the subpoena
20  power, I know that Attorney Bertrand from the
21  Boston office, you know, when we had spoken
22  yesterday -- I mean, obviously, the goal is to do
23  the deposition so, hopefully, that will avoid
24  American General from having to appear at trial,
25  which is why I had suggested doing all objections
```

3 (Pages 6 to 9)

LIZA   GLASS   -   January 31, 2007

Page 10

1  now.
2      Since Attorney Burhoe doesn't necessarily
3  agree with that, I just want to clarify that
4  American General, if need be, for some reason,
5  would make a representative available for trial?
6      MS. WILLS:  You know, do you want us to
7  try to conference Carey in?
8      MS. ROMAN:  If that needs to be, that
9  would be fine with me, yeah.
10      MS. WILLS:  Okay.  Why don't we go off
11  the record for a second and let me give her a call
12  so that she can get into the group.
13      MS. ROMAN:  Sure.
14      MS. BURHOE:  Okay.
15      (Discussion off the record; after
16      which time, Ms. Carey L. Bertrand
17      was conferenced into the deposition
18      proceedings via telephonic
19      communications.)
20      MS. ROMAN:  We were just talking about --
21  and I had suggested that, up to this point, we've
22  just been doing the usual stipulations.
23      MS. BERTRAND:  Right.
24      MS. ROMAN:  And I had suggested that
25  since speaking with you, my sense was that your

Page 11

1  client preferred to do the deposition in an attempt
2  to avoid having to be subpoenaed for trial --
3      MS. BERTRAND:  Right.
4      MS. ROMAN:  -- should it come to that
5  down the road.
6      MS. BERTRAND:  Right.
7      MS. ROMAN:  And, so, Clare would rather
8  stick with the usual stipulations, which for us
9  would just be reserving all objections except as to
10  form --
11      MS. BERTRAND:  Okay.
12      MS. ROMAN:  -- and motions to strike.
13  And I said, well, I'm okay with that as long as I
14  can get a representation from American General
15  that, should we need to subpoena American General
16  for trial, because, for whatever reason, the
17  transcript isn't acceptable, that we would be able
18  to have somebody appear on behalf of American
19  General to testify.  So we wanted to pull you into
20  that conversation about that to get your thoughts
21  on that.
22      MS. WILLS:  Oh, you know, that's not what
23  we heard; and, you know, obviously, we're not going
24  to agree to that.  She's more than 100 miles away
25  from the courthouse, too.

Page 12

1      MS. BERTRAND:  Yeah.  I mean, as far as
2  the objection issue is concerned, you know, we're
3  comfortable with, you know, either way you want to
4  do it, you know, as far as if you want to do this
5  regular standard Massachusetts, you know, reserve
6  all objections as to form or if you want to have
7  all the objections on the record, that's fine with
8  us.  So you can do it either way.
9      You know, we're here today, like you
10  said, Jennifer, because we don't want to be called
11  up for trial.  Let's get it done today and have
12  that be it.  So, you know, as Linda said, you know,
13  "Yep, we're going to come up for trial," you know,
14  we're not agreeable to that and that's why we're
15  doing this today, instead of the affidavit.
16      MS. ROMAN:  Right, which is why I wanted
17  to have all objections raised now so that the
18  transcript would be -- you know, for example, any
19  leading questions could be corrected or, you know,
20  any issues could be raised on the record versus
21  reserving them for time of trial.
22      MS. BERTRAND:  We're okay with doing it
23  either way; so, you know, whatever you guys can
24  work out amongst yourself --
25      MS. ROMAN:  Okay.

Page 13

1      MS. BERTRAND:  -- is fine with us on the
2  objection issue.
3      MS. ROMAN:  Yeah, that was my sentiment.
4  Okay.  So, then, for the subpoena issue, I guess it
5  wouldn't necessarily be -- that is something I was
6  going to explore during the deposition itself, you
7  know, because Linda had mentioned the deponent is
8  over 100 miles away, and it wouldn't necessarily be
9  the deponent, but somebody from American General
10  who was closer to the courthouse.
11      Yeah, I'm just trying to avoid having to
12  subpoena somebody for trial, should it get to that
13  point.  So, I guess, really, the issue then is
14  between Clare and I, in terms of what we can
15  ultimately agree to.
16      MS. BURHOE:  Yeah.
17      MS. BERTRAND:  Right, right.
18      MS. WILLS:  Yeah, I mean, leading
19  questions would be "form."  So, I mean, that would
20  have to be raised now.
21      MS. BURHOE:  Right, I agree with that.
22      MS. ROMAN:  Right.  Yeah, that was a bad
23  example.
24      MS. BURHOE:  But I would have just liked
25  a little warning, I guess.  You know, my feeling is

4 (Pages 10 to 13)

BILL   J.   McFERRON,   CSR
(713)   626-2629

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA GLASS - January 31, 2007

Page 14

1  still the same about it, so anyway.
2        MS. ROMAN: So should I --
3        MS. BURHOE: Because, to me, it's like
4  I'm acquiescing that all these exhibits would have
5  been admissible, too, when I'm not necessarily --
6  and, you know, I haven't given any thought to
7  whether or not I think that's the case; but I don't
8  want to be acquiescing to that, either.
9        MS. ROMAN: I think we could -- if that's
10 the primary concern, Clare, and I don't know if
11 that's the only concern -- there probably are
12 others. But if that's the primary concern, I think
13 that's something that we could -- you know,
14 assuming a proper foundation is laid for the
15 admission of these exhibits, which all came from
16 American General, with the exception of Exhibits
17 1 and 2, then I think that would take care of that
18 issue, you know, if that was the concern about them
19 being business records and whether or not they were
20 admissible, that can be taken care of now during
21 the deposition.
22       MS. BURHOE: Yeah.
23       MS. BERTRAND: Yeah, and I certainly
24 think we could certainly take care of a lot of
25 it at the deposition today and also -- I mean,

Page 15

1  these documents, for the most part, are documents
2  that were produced, you know, as part of the
3  interpleader action originally. You know, there
4  was representation made, you know, that they were
5  true and accurate copies in that respect. So we're
6  going to have, you know, multi-layering of laying
7  the foundation that these documents are what they
8  are.
9        MS. ROMAN: Right. And a lot of these
10 exhibits, too, have already been introduced at
11 other depositions. And I just did it like this
12 just to keep it simple, since some of them are
13 duplicates; but I just wanted to keep it as a
14 complete packet, rather than having two exhibit
15 stickers on them as a cleaner record.
16       MS. BERTRAND: Right.
17       MS. ROMAN: So, I guess, I go back to say
18 Clare on that: Are you comfortable with that, or
19 is it still a concern for you?
20       MS. BURHOE: Yeah, you know, I just -- I
21 am not the one that is "lead" managing this case.
22 I don't feel like I can make this decision,
23 frankly, without talking to Evan; and he's not
24 available right now, which is why I'm doing this.
25 So, I mean, if I had an opportunity to speak with

Page 16

1  him and he's okay with it, then, I guess, that
2  would be fine. But this is not something I can
3  make this call on myself, so....
4        I mean, I can put you guys on hold and
5  see if I can interrupt him; but I don't think he's
6  going to be happy about that. So, I guess, we'd
7  have to say either we should do usual stipulations
8  or, you know, we should put it off until I get a
9  chance to talk to him about it.
10       MS. BERTRAND: Well, I mean, from our
11 standpoint, from the company's standpoint, we want
12 to get this done; and I know you guys wanted to
13 get it done. So, you know, we were willing to go
14 around -- I mean, I know you guys are on a tight
15 deadline. So, you know, we would like to get
16 this done to help you guys with your deadlines;
17 but then, again, we don't want to start this and
18 then -- you know, have it start up and then in an
19 hour have a real breakdown on issues; and, then,
20 you know, we're setting aside time out of the day.
21       MS. ROMAN: Right.
22       MS. BERTRAND: So I don't -- Linda, would
23 you prefer that Clare try, at least, to get in
24 touch with Evan so that we don't start this whole
25 thing and have it break down after an hour and then

Page 17

1  we're going on another day?
2        MS. WILLS: That seems to make sense.
3  Also, I mean, it occurs to me, Clare, that even if
4  you can't get in touch with him and you're not
5  comfortable committing to that position, maybe you
6  could, you know, make the objections that you see
7  during the deposition to give Jennifer a chance to
8  clean up anything so that we've got as clean a
9  transcript as possible.
10       MS. BURHOE: Okay. Well, let me put you
11 guys on hold for a second and let me see if I can
12 get in touch with him, okay?
13       MS. WILLS: That'll be great.
14       MS. ROMAN: Thanks.
15       MS. ROMAN: Okay. And I'm going to go on
16 hold a second, too, just to touch base with Mark;
17 and I'll be back as well.
18       (Discussion off the record.)
19       MS. BURHOE: Okay. He's actually here,
20 but he's on a conference call with an arbitrator in
21 in an arbitration, so I can't interrupt him.
22       MS. BERTRAND: Oh, okay. I think
23 Jennifer's still not back on.
24       MS. BURHOE: Oh, okay.
25       (Discussion off the record.)

5 (Pages 14 to 17)

LIZA   GLASS   —   January 31, 2007

| Page 18 | Page 20 |
|---------|---------|
| 1    MS. ROMAN: I'm sorry, I just got back. | and Solar Construction, formerly known as Globe |
| 2  And, Clare, I heard what you said, that you | Rubber Works, Inc.; and they are the Defendants, |
| 3  couldn't reach Evan? | Plaintiffs-in-Counterclaim in this lawsuit. |
| 4    MS. BURHOE: Yeah. | And, Ms. Talls (phonetic), have you ever |
| 5    MS. ROMAN: What if we just agree to go | been deposed before? |
| 6  forward, then, with just pursuant to the Rules of | A.   Was that addressed to me? |
| 7  Federal Procedure and get the deposition going? | Q.   Yes. |
| 8    MS. BURHOE: I mean, you know, that's how | A.   Okay. It's Glass, G-l-a-s-s. |
| 9  I'd prefer it, so.... | Q.   Oh, G-l-a-s-s. I'm sorry, I understood it as |
| 10   MS. ROMAN: Okay. We'll just go forward, | "T." I apologize. |
| 11  then, without any stipulations one way or the | A.   That's okay. |
| 12  other; and that way we can just do it pursuant to | Q.   Have you ever been deposed before? |
| 13  the Rules and we'll deal with it later. | A.   Yes. |
| 14   MS. BURHOE: Yeah, yeah. | Q.   Okay. So you're familiar, then, with how the |
| 15   MS. BERTRAND: Okay. That's works from | process works? |
| 16  our end. | A.   Yes. |
| 17   MS. ROMAN: Thanks for your input, Carey, | Q.   If at anytime you need to take a break for |
| 18  and I think we're ready to go and all set with your | any reason, just let us know; and we can certainly |
| 19  assistance. | accommodate that. Likewise, if you need to speak |
| 20   MS. BERTRAND: All right. Well, I will | with either of your Counsel, please, let us know |
| 21  get off the line then and let you guys proceed. | that and we can make accommodations for that as |
| 22   MS. ROMAN: Thank you. | well. |
| 23   MS. BERTRAND: Thank you. Bye. | If you could just, please, state your |
| 24   MS. BURHOE: Bye. | name for the record? |
| 25   MS. ROMAN: Before we actually go back on | A.   Liza Glass. |

| Page 19 | Page 21 |
|---------|---------|
| 1  the record with the deposition, can I get the | Q.   And what is your address, Ms. Glass? |
| 2  witness to spell her last name? | A.   2727-A Allen Parkway, Houston, Texas, 77080 |
| 3    THE WITNESS: It's Liza Glass, G-l-a-s-s. | [sic] (77019). |
| 4    (Discussion off the record.) | Q.   And is that your work address? |
| 5    MS. ROMAN: All right. So, is everyone | A.   Yes. |
| 6  all set then? | Q.   And who's your employer? |
| 7    MS. BURHOE: Yeah. | A.   AIG American General. |
| 8    MS. ROMAN: Okay. It's hard not being | Q.   What is your title within AIG American |
| 9  able to see people. Back on the record then: We | General? |
| 10  have marked Exhibits 1 through 27 and there should | A.   Vice President - Customer Service. |
| 11  be a copy with the court reporter. Clare Burhoe | Q.   And throughout this deposition if I use the |
| 12  has a copy and I have a copy. Is that correct, | term "AIG" and "American General" interchangeably, |
| 13  everyone's got a copy that needs one? | will you understand that to mean the same company |
| 14   MS. BURHOE: Yeah. | "AIG American General," the company that employs |
| 15   THE WITNESS: This is Liza, yes. | you? |
| 16   MS. ROMAN: Okay. Terrific. Why don't | A.   Yes. |
| 17  we get started then. | Q.   And could you, please, just tell me what some |
| 18        * * * | of your responsibilities include as being a Vice |
| 19      LIZA GLASS, | President of Customer Service? |
| 20  having been first duly sworn, testified as follows: | A.   I oversee the operational areas that handle |
| 21        * * * | the incoming mail, the scanning of documents, the |
| 22    E X A M I N A T I O N | retention of records, and the claims operations. |
| 23  BY MS. ROMAN: | Q.   How long have you been the VP of Customer |
| 24  Q.   This is Jennifer Roman. I represent the | Service at American General? |
| 25  Estate of Richard Somerville, Anne Roche-Somerville | A.   One year. |

6 (Pages 18 to 21)

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA GLASS - January 31, 2007

Page 22

1  Q. Were you employed by American General prior
2  to this past year as being the VP of Customer
3  Service?
4  A. Yes.
5  Q. How were you employed?
6  A. I was a director of customer service.
7  Q. How long were you a director of customer
8  service?
9  A. Three years.
10 Q. And how long have you been with American
11 General in total?
12 A. 22 years.
13 Q. And has that been in various capacities?
14 A. Yes.
15 Q. And has it always been within the customer
16 service department?
17 A. Yes.
18 Q. Are you familiar with where AIG American
19 General maintains its offices?
20 A. Yes.
21 Q. Could you tell me where they have offices?
22 A. They have multiple locations. They have a
23 location in Houston, a location in Springfield,
24 Illinois; Dallas, Texas; Nashville, Tennessee; and
25 there may be additional offices that I'm not aware

Page 23

1  of. Those are the primary offices.
2  Q. Okay. And do you know the location of
3  American General's principal office?
4  A. Well, AIG's principal office is in New York
5  City.
6  Q. And is American General a subsidiary of AIG?
7     MS. WILLS: If you know.
8  A. I don't know for certain what the legal
9  entity structure is.
10 Q. (BY MS. ROMAN) Okay. But American General
11 is considered to be an AIG company; is that
12 correct?
13 A. Yes.
14 Q. Let me draw your attention to Exhibit 1,
15 which is a subpoena with a return of service. Is
16 this the subpoena that you're appearing in response
17 to today?
18 A. My understanding is as I'm appearing, yes, to
19 Schedule A.
20 Q. And looking at Schedule A, there are nine
21 topic areas there. Are you going to testify as to
22 all nine topic areas or do you know?
23 A. Yeah, I'm in a position to answer questions
24 depending on what they are on all areas, yes.
25 Q. Right. So you have some level of knowledge,

Page 24

1  then, to each of the nine areas listed; is that
2  correct?
3  A. Yes.
4  Q. Do you have any knowledge as to any action
5  that may have been taken by American General after
6  Exhibit 1, the subpoena, that was served upon you
7  in December of 2006?
8  A. I don't understand the question.
9  Q. Okay. After American General received this
10 subpoena, which is Exhibit 1, do you know if any
11 action was taken on behalf of American General in
12 response to the subpoena?
13 A. That would have been handled by our legal
14 area.
15 Q. Okay. Do you know if American General
16 conducted any type of search of documents in
17 response to the subpoena?
18 A. Based on what I understand, yes, they did.
19 Q. Did you participate in that search at all?
20 A. My staff participated in that search.
21 Q. And, so, your staff, are these people that
22 work under your supervision?
23 A. Yes.
24 Q. And what did you personally do to prepare for
25 this deposition?

Page 25

1  A. I reviewed the Bates-stamped documents.
2  Q. By Bates-stamped documents, which Bates
3  stamps are you referring to? If you could just
4  describe what the Bates-stamp looks like.
5  A. It's the RS series of documents, RS 001
6  through RS 251.
7  Q. And do you know if those documents were
8  documents produced by American General at some
9  point during litigation?
10 A. I can't say for certain when they were
11 exactly produced and at what part they were
12 produced.
13 Q. But do you know if they were produced on
14 behalf of American General?
15 A. Yes.
16 Q. Exhibit 2, do you have that in front of you?
17 A. Yes, I do.
18 Q. If you could just take a look through that
19 document for me. It should on Bates-stamp 0045813
20 and continue through Bates-stamp -- and it might be
21 a little cut off -- 0045838. Is that what you have
22 as Exhibit 2 in front of you?
23 A. Yes.
24 Q. Does this document loom familiar to you at
25 all?

7 (Pages 22 to 25)

BILL J. McFERRON, CSR
(713) 626-2629

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA   GLASS   -   January 31, 2007

| Page 26 |
| --- |

1   A.   Yes.
2   Q.   And how are you familiar with this document?
3   A.   Based on my history with the company, this
4   looks to me to be the policy that would have been
5   received by the insured.
6   Q.   And for this particular policy, Exhibit 2, is
7   Richard C. Somerville the insured?
8   A.   Yes.
9   Q.   Are you aware of the circumstances of
10  American General filing an interpleader in the
11  Boston federal court surrounding this policy?
12  A.   Yes.
13  Q.   If I refer to Exhibit 2 as "the policy," will
14  you understand it to be this particular exhibit,
15  Exhibit 2, the policy insuring the life of
16  Mr. Somerville?
17  A.   Yes.
18  Q.   And do you know if, as part of this
19  production of documents, if American General
20  conducted a diligent search for all documents
21  concerning this policy, Exhibit 2?
22  A.   They would have conducted a search for any
23  documents in our possession.
24  Q.   And did you personally participate in that
25  search?

| Page 27 |
| --- |

1   A.   I did not personally participate, no.
2   Q.   Did anybody on your staff participate in that
3   search, to your knowledge?
4   A.   Yes.
5   Q.   And you have since reviewed the documents
6   that you identified as being the Bates-labeled
7   RS 001 through, I believe, RS 251. Is that the
8   correct number that you referenced that you had
9   looked at?
10  A.   One moment. RS 251, yes.
11  Q.   Okay. And going back to say Exhibit 2, if I
12  could just ask you to take a look at this. Could
13  you tell me what kind of policy this is? I mean,
14  other than the fact that it's an insurance policy
15  can you just describe for me the general terms of
16  the policy you're looking at now?
17  A.   Based on the schedule of benefits page, it
18  appears to be an adjustable life policy with a
19  $250,000 face value.
20      MS. BURHOE:  And can we just clarify that
21  the Schedule of Benefits page is Bates-stamped
22  0045815?
23      THE WITNESS:  Yes, that's the page I'm
24  looking at.
25      MS. BURHOE:  Okay.  Thank you.

| Page 28 |
| --- |

1   Q.   (BY MS. ROMAN)  And this particular
2   adjustable life policy, which is issued by American
3   General, is this considered to be a whole life
4   policy or a term policy?
5   A.   This is a whole life policy.
6   Q.   From your review of this particular policy,
7   does this policy have the ability to build cash
8   value?
9   A.   Yes.
10  Q.   Now, I just direct you to Exhibit 2, the page
11  that's Bates-stamped 0045824.  Do you see that
12  page?  On the top, it says "Policy Loans" and in
13  the middle it says "Beneficiary And Proceeds"?
14  A.   Yes.
15  Q.   And if I could just have you look at the
16  middle part of the page underneath the "Beneficiary
17  And Proceeds" section of that policy, there's a
18  heading that says "Change of Ownership Or
19  Beneficiary" on the left column of that page.  Do
20  you see that?
21  A.   Yes.
22  Q.   Under this heading, "Change of Ownership Or
23  Beneficiary," does this paragraph identify the
24  steps that an individual would need to take in
25  order to change the ownership of the policy?

| Page 29 |
| --- |

1   A.   One moment while I read it, please.
2   Q.   Certainly.
3   A.   The language is correct.
4   Q.   And does this same paragraph, also, address
5   what an individual would need to do to change the
6   beneficiary of the policy?
7   A.   Yes.
8   Q.   And, according to this paragraph, what is
9   required -- and let's just break them down -- to
10  change the ownership of the policy from American
11  General's perspective?
12  A.   You want it literally or a summary?
13  Q.   A summary would be fine.
14  A.   In summary, a written request needs to be
15  submitted to the company.  That request needs to be
16  acknowledged and the change of beneficiary --
17  excuse me -- change of ownership, I believe we're
18  discussing, would be recorded by the company.
19  Q.   Does the change of beneficiary, also, need to
20  be done as a written request?
21  A.   Yes.
22  Q.   Does that, also, need to be acknowledged by
23  the company or, using your term, does "recorded"
24  mean acknowledged?
25  A.   "Recorded" means "acknowledged."

8  (Pages 26 to 29)

BILL   J.   McFERRON,   CSR
(713)   626-2629

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA  GLASS  -  January 31, 2007

| Page 30 | Page 32 |
|---|---|

**Page 30**

1  Q.  Okay.  And are there certain forms that
2  American General generates to help somebody change
3  the ownership of a policy?
4  A.  Yes.
5  Q.  Is there, also, a standard form that's
6  generated by American General to change the
7  beneficiary of a policy?
8  A.  Yes.
9  Q.  If I could just ask you to take a look at
10  Exhibit 3 for me, please.
11  A.  I have it.
12  Q.  Okay.  Could you tell me what Exhibit 3 is,
13  if you know?
14  A.  One moment while I look through it, please.
15  Q.  Take your time.
16  A.  One portion of the policy is the illustration
17  provided to the insured.  The last page Bates-stamp
18  RS 136 is a policy transmittal that's included with
19  the delivery of the policy.
20  Q.  Is this a document that's generated and
21  maintained by American General in its normal course
22  of business?
23  A.  Yes.
24  Q.  Does this Exhibit 3 relate back to Exhibit 2,
25  the policy in any way?

**Page 32**

1  in the policy that should match Exhibit 2 as is
2  RS 139.
3  The additional pages appear to be value
4  pages that are -- that may or may not be inserted
5  in the actual policy upon delivery.  There may
6  be outside of the policy; but they're, typically,
7  included with the policy when delivered.
8  Q.  Okay.  And Exhibit 4, it identifies the
9  insured as Richard C. Somerville; is that correct,
10  on page RS 137?
11  A.  Page RS 137 does indicate Richard C.
12  Somerville as the insured.
13  Q.  And who does it identify as the policy owner?
14  A.  Globe Rubber Works, Inc.
15  Q.  And looking at page RS 138 on the left-hand
16  side under the beneath the Schedule of Benefits, it
17  identifies it as a "Basic Policy" and then
18  underneath that "Adjustable Life"; is that correct?
19  A.  Yes.
20  Q.  And is that consistent with Exhibit 2, which
21  is the actual policy?
22  A.  One moment while I compare them, please.
23  Q.  Sure.
24  A.  Yes, RS 138 appears to be a copy of
25  Bates-stamp 0045815 that's in Exhibit 2.

| Page 31 | Page 33 |
|---|---|

**Page 31**

1  A.  Yes.
2  Q.  How does this relate?
3  A.  I can't speak exactly for how the
4  illustration relates.  That's not my expertise.
5  Typically, in my opinion and based on my experience
6  with an illustration, it provides a summary of
7  information on the policy in an effort to help
8  the insured make a decision when buying the policy.
9  The policy transmittal sheet, however, I
10  do have experience with; and that is attached to
11  the policy upon delivery to allow the agent to --
12  it's a summary for the agent on what may be
13  outstanding and gives him instructions on what to
14  do to deliver the policy to the insured.
15  Q.  Would you take a look at Exhibit 4 for me,
16  please?
17  A.  I have it.
18  Q.  Could you just take a look at that for me and
19  tell me if you're familiar with this document?
20  A.  Yes, I'm familiar with the document.
21  Q.  And what is this document, Exhibit 4?
22  A.  Bates-stamped R S137 is known as a "Welcome
23  Letter," which is, basically, welcoming the client
24  when a policy is issued.  Bates-stamp R S138 is the
25  Page 3 or the Schedule of Benefits that is inserted

**Page 33**

1  Q.  And is Exhibit 4 a business record of
2  American General which is generated and maintained
3  in American General's ordinary course of business?
4  A.  Yes.
5  Q.  Now, I'm going to ask you to take a look at
6  group of documents next.  Exhibits 5 through 9, if
7  you'll pull those out in front of you, please.
8  A.  Okay.  I have them.
9  Q.  I'm going to ask you about them one at a
10  time, but I'd just ask you to look at them all at
11  once.  I think they are a similar-type document.
12  So starting with Exhibit 5, if you could, just take
13  a look at that.
14  A.  I have it.
15  Q.  Do you recognize -- are you familiar with
16  this document?
17  A.  Yes, I am.
18  Q.  And are you familiar with it in your capacity
19  as an employee of AIG American General?
20  A.  Yes.
21  Q.  And could you just tell me what Exhibit 5 is,
22  please?
23  A.  It's the 1998 to 1999 Annual Statement on
24  policy -- I was looking for the policy number --
25  U10005230 -- I'm sorry the numbers are kind of --

9 (Pages 30 to 33)

BILL  J.  McFERRON,  CSR
(713)  626-2629

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA GLASS - January 31, 2007

**Page 34**

1  U10005220L, it looks like, on the life of Richard
2  Somerville.
3  Q.  Does this Exhibit 5 appear to relate back to
4  Exhibit 2, which is the same life insurance policy?
5  A.  Yes.
6  Q.  And do you know what an annual statement of
7  life insurance, what purpose it's issued to the
8  insured for?
9  A.  It is to provide an annual summary of the
10 policy provisions and include any values at the
11 ending date of the annual statement.
12 Q.  And by "values," are you referring to a cash
13 surrender value?
14 A.  There are multiple values listed on and
15 including the death benefit amount as well as
16 the surrender value and certain charges and loan
17 information.
18 Q.  On a whole life policy, would an annual
19 statement, such as Exhibit 5, contain information
20 on the cash surrender value of the policy?
21 A.  Yes.  Although under this policy, I believe
22 it's -- yes, it does contain cash surrender value.
23 Q.  And on Exhibit 5, does this exhibit indicate
24 what the cash surrender value was on the policy
25 from September 19th of 1998 to September 19th of

**Page 35**

1  1999?
2  A.  Yes, it does.
3  Q.  What does it indicate that cash surrender
4  value to be?
5  A.  $1,037.52.
6  Q.  And is this a document that's maintained and
7  generated by American General in its ordinary
8  course of business?
9  A.  Yes.
10 Q.  Now, Exhibit 6, does this appear -- strike
11 that.
12     If you could just take a look at Exhibit
13 6, please.
14 A.  I'm sorry, you broke up.
15 Q.  I'm sorry.  Could you take a look at Exhibit
16 6, please?
17 A.  Yes, I have it.
18 Q.  Is this the same type of document as
19 Exhibit 5, meaning that it's an annual statement of
20 life insurance for the policy?
21 A.  Yes.
22 Q.  And can you take a look at Exhibit 7, please?
23 A.  I have it.
24 Q.  And I apologize, if I could just ask you one
25 question about Exhibit 6.  Is Exhibit 6 a document

**Page 36**

1  that's maintained and generated by American General
2  in its ordinary course of business?
3  A.  Yes.
4  Q.  Now on to Exhibit 7.  Are you familiar with
5  this document?
6  A.  Yes.
7  Q.  And what type of document is this?
8  A.  The annual statement for the period of 9/2000
9  to 9/2001.
10 Q.  And does this appear to be an annual
11 statement for the policy, which is Exhibit 2?
12 A.  Yes.
13 Q.  And does this Exhibit 7, also, indicate the
14 cash surrender value of the policy as of the annual
15 statement?
16 A.  Yes.
17 Q.  And what does it indicate the cash surrender
18 value to be?
19 A.  $1,949.09.
20 Q.  And is this a document that's generated and
21 maintained by American General in its ordinary
22 course of business?
23 A.  Yes.
24 Q.  And I'd just ask you to take a look at
25 Exhibit 8, please.

**Page 37**

1  A.  Is that Exhibit 8?
2  Q.  Yes.
3  A.  I have it.
4  Q.  And could you, please, identify this document
5  for me?
6  A.  It's the annual statement for the policy on
7  Richard Somerville from September 2001 to September
8  2002.
9  Q.  And does this document indicate the cash
10 surrender value of the policy as of the date of the
11 statement?
12 A.  Yes.
13 Q.  And what does it indicate the cash surrender
14 value to be?
15 A.  $4,439.25.
16 Q.  And is this document maintained and generated
17 by American General in its ordinary course of
18 business?
19 A.  Yes.
20 Q.  And I'd ask you to take a look at Exhibit 9,
21 please.
22 A.  I have it.
23 Q.  And could you, please, identify Exhibit 9 for
24 me?
25 A.  It's the annual statement for the policy

BILL J. McFERRON, CSR
(713) 626-2629

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA  GLASS  -  January 31, 2007

Page 38

1  insuring Richard Somerville from 9/2002 to 9/2003.
2  Q.  And does it indicate a cash surrender value
3  for the policy?
4  A.  Yes.
5  Q.  What's the cash surrender value as indicated
6  on this statement?
7  A.  $6,609.72.
8  Q.  And who is identified as the owner of the
9  policy on this particular statement?
10  A.  Globe Rubber Works, Inc.
11  Q.  Is this document maintained and generated by
12  American General in its ordinary course of
13  business?
14  A.  Yes.
15  Q.  I'd just ask you to take a look at Exhibit
16  10, please.
17  A.  I have it.
18  Q.  Have you seen Exhibit 10 before?
19  A.  Yes, I have.
20  Q.  Okay.  And do you recall when the first time
21  you saw it was?
22  A.  When I was reviewing the file for this
23  deposition.
24  Q.  And Exhibit 10 appears to be a document that
25  was, also, dated -- the letter part of the first

Page 39

1  page identified as RS 079 indicates the date of
2  September 2nd, 2004; the second page RS 080 is the
3  actual fax transmission page.  Is that correct?
4  A.  Based on the sequence numbers in the file, I
5  would say that it was used to fax this cover
6  sheet -- or was used as a cover sheet for this
7  letter, yes.
8  Q.  And taking a look -- and I know the numbers
9  are kind of jarbled -- is there any way to tell
10  from looking at RS 079, which is the first page of
11  Exhibit 10, when this document was received by
12  American General?
13  A.  Yes, there is.
14  Q.  And how could you tell that?
15  A.  The identifying mark in the upper right-hand
16  corner, there are actually two of them, which
17  indicates we received this document in the scan
18  center twice.  It indicates that the document was
19  scanned in on originally February 28th -- and I
20  can't read that date -- and then again on March
21  3rd.
22  Q.  And that's a number -- there's a grouping.
23  It looks like three rows of numbers that have the
24  same type of font; is that correct?
25  A.  Correct.

Page 40

1  Q.  And are those all numbers that are generated
2  by American General at the scan center?
3  A.  Yes.
4  Q.  And looking at page RS 080, the second page,
5  there's some handwriting kind of on an angle on the
6  right side that says "POS underline Scan Center"
7  and then it looks like "B-F4."  Does that have any
8  significance for you, those words?
9  A.  Yes.
10  Q.  What significance does it have?
11  A.  That indicates to me, is that this fax was
12  received in the policy owner service area in the
13  building and then routed to the scan center.
14  That's the scan center address for scanning.
15  Q.  Okay.  And is this a document that was
16  maintained by American General in its regular and
17  ordinary course of business?
18  A.  Yes.
19  Q.  Could you just explain to me -- you mentioned
20  a couple of different -- the scan center, the
21  policy owner service area, could you explain how
22  documents are received by American General and what
23  happens to them once they are received by American
24  General with respect to the customer service area
25  that you handle?

Page 41

1  A.  During this time frame or current procedure?
2  Q.  During this time frame of 2005, early 2005.
3  A.  Okay.  In this time frame -- we'll start with
4  the faxes -- faxes at that time were received in
5  the policy owner service area, and they were sent
6  to the scan center to be imaged into an optical
7  system; and then the processing area works from
8  that image rather than the paper.
9      The general Post Office box mail or
10  street mail or overnight mail is delivered directly
11  to the scan center from the mail center and imaged,
12  and the imaged documents are routed to the
13  processing area.
14  Q.  What happens to the original fax or the
15  original hard copy after it's been scanned into the
16  scanning area?
17  A.  It's retained for 90 days and then shredded
18  on-site in a secured shredder.
19  Q.  And that's the case as of January '05?
20  A.  Yes.
21  Q.  Does it continue to be that way -- or at some
22  point, did that change?
23  A.  It has not changed, no.
24  Q.  Now, in hard copy, the documents that are
25  received in the mail and faxed copies that come in

11 (Pages 38 to 41)

BILL  J.  McFERRON,  CSR
(713)  626-2629

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA  GLASS  -  January 31, 2007

Page 42

1  are treated the same way for purposes of scanning
2  and imaging and then subsequent destruction; is
3  that correct?
4  A.  Yes.
5  Q.  I ask you to take a look at Exhibit 11,
6  please.
7  A.  I have it.
8  Q.  Now, is this a document that you're familiar
9  with?
10  A.  Yes.
11  Q.  And what type of document is this?
12  A.  This is a copy of the history within our
13  imaging system.  Every piece of work has a "created
14  work."  In this case, I'll refer to the top of the
15  page.  You can see it says "Life - Fonecall,"
16  F-o-n-e-c-a-l-l."  That indicates that that was a
17  piece of work that was created within our imaging
18  system, and the additional text on the document
19  indicates what history went on with that piece of
20  work.
21  Q.  So the "Type," where it says "Fonecall,"
22  would then indicate that a phone call was actually
23  received versus a piece of mail or something; is
24  that correct?
25  A.  Yes.

Page 43

1  Q.  Then looking down at the bottom of the page,
2  then, it begins with a date of "2004-09-02."  Do
3  you see that?
4  A.  Yes.
5  Q.  And there's a section for "Comments"; is that
6  correct?
7  A.  Yes.
8  Q.  And there's some notes under the "Comments"
9  section.  If you could just take a look at that,
10  please.
11  A.  Yes.
12  Q.  Now, what significance, if anything, does
13  this have for you being the customer service agent?
14  A.  This simply indicates that Neil McInnis
15  called in and indicated that the ownership had been
16  dissolved and it, also, indicates the forms were
17  sent.  Other than that, it has no significance.
18  Q.  Is this document, Exhibit 11, is this a
19  document that is generated and maintained by
20  American General in its ordinary course of
21  business?
22  A.  Yes.
23  Q.  I ask you to take a look at Exhibit 12,
24  please.
25  A.  I have it.

Page 44

1  Q.  And what is Exhibit 12?
2  A.  It is an annual statement on the policy
3  insuring Richard Somerville for the period of
4  9/2003 - 9/2004.
5  Q.  Who is indicated as the owner of this
6  particular policy?
7  A.  Globe Rubber Works, Inc.
8  Q.  And does it indicate a cash surrender value?
9  A.  Yes.
10  Q.  What value does it indicate?
11  A.  $13,500.42.
12  Q.  And up in the upper right-hand corner, it
13  appears to be a date "9/23/04," it appears to be,
14  with a series of long numbers underneath it.  Is
15  that a number that was placed on this document by
16  American General's scan system?
17  A.  Yes.
18  Q.  And is this document generated and maintained
19  by American General in its ordinary course of
20  business?
21  A.  Yes.
22  Q.  And does Exhibit 12 relate back to the
23  policy, which is Exhibit 2?
24  A.  Yes.
25  Q.  Could you, please, describe for me how a

Page 45

1  change of ownership -- what the process is for
2  effectuating a change of ownership on an American
3  General life insurance policy?
4  A.  Can you be more specific?
5  Q.  Sure.  If an individual wanted to change the
6  owner of an existing policy that was issued by
7  American General, is there a certain form that
8  would need to be filled out and sent back to
9  American General; or is there some type of process
10  that needs to be followed?  In other words, how
11  would I do that, if I wanted to change the
12  ownership?
13  A.  There is a form that requires changing and
14  depending on what the policy circumstances on who
15  owns it and what type of ownership and/or
16  beneficiary designation determines if there are
17  additional forms required.
18  Q.  Okay.  And is there a difference for
19  accomplishing the change of ownership if the policy
20  is a corporate-owned policy versus a policy owned
21  by an individual?
22  A.  Yes.
23  Q.  And what sort of differences might there be
24  be for a corporate-owned policy versus a policy
25  owned by an individual to change the ownership?

12 (Pages 42 to 45)

BILL  J.  McFERRON,  CSR
(713)  626-2629

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA  GLASS  -  January 31, 2007

Page 46

1    A.  The primary difference is that, in addition
2  to the change forms, we require evidence that the
3  owners are associated and have authorization to
4  sign on behalf of the corporations.
5    Q.  If you could take a look at Exhibit 13 for
6  me, please.
7    A.  I have it.
8    Q.  And looking at this document on the page
9  that's labeled RS 056 and it goes through RS 058.
10   A.  I have it.
11   Q.  Is this the type of change of ownership form
12  that you were just speaking about?
13   A.  Yes.
14   Q.  Is Exhibit 13, with the exception of the
15  cover page a document, that's generated by American
16  General?
17   A.  Yes.  Although for the record, RS 057 is a
18  blank piece of paper.
19   Q.  Yes, that is accurate.  Thank you.
20      MS. WILLS:  And, Jennifer, just to
21  clarify, you mean the form itself as opposed to the
22  writing on 056?
23      MS. ROMAN:  Yeah, thank you, Linda.  I do
24  mean the form itself versus the writing.
25   Q.  (BY MS. ROMAN)  And speaking of the writing

Page 47

1  on Exhibit 13, do you know whose handwriting that
2  is?  Does that look familiar to you up at the top
3  where it says "Contract No."?
4    A.  No, I do not know whose handwriting that is.
5    Q.  Okay.  And on the top of the page RS 056,
6  again, there's a date, which appears to be
7  "2/18/05" with a series of numbers underneath it.
8  Is that a number placed there by American General's
9  scanning system?
10   A.  Yes.
11   Q.  And what does that date indicate to you?
12   A.  That date indicates the time that the
13  document was entered into the imaging system, and
14  the series of numbers underneath indicates a
15  location within the box that that paper will be
16  placed.
17   Q.  Now, from the last page of Exhibit 13, that's
18  labeled RS 058 and it's entitled "Instructions and
19  Conditions."  Do you see that?
20   A.  Yes.
21   Q.  Does this page outline the steps for what an
22  individual needs to do in order to change the
23  ownership of a life insurance policy which is
24  issued by American General?
25   A.  Yes.

Page 48

1    Q.  And does Section 3 under "Special
2  Circumstances," does that refer to special
3  circumstances, for example, of a corporate-owned
4  policy?
5    A.  Yes.
6    Q.  And are these the additional conditions that
7  you were referring to earlier when you said a
8  corporate-owned policy would have to establish
9  identity of ownership of a policy?
10   A.  Yes.
11   Q.  What happens if a corporate-owned policy --
12  if somebody submits for a corporate-owned policy a
13  change of ownership form, but they do not comply
14  with the special circumstances outlined under
15  Section 3 of Exhibit 13 on document labeled
16  RS 058, what happens to the request for change of
17  ownership from American General's side?
18   A.  Do you mean the processing or the actual form
19  itself?
20   Q.  The processing.
21   A.  The processing would be that a letter would
22  be sent to the current owner, indicating that the
23  ownership change submitted was not accepted and
24  would also indicate why it was not accepted and
25  what they needed to be accepted and it would

Page 49

1  include a new blank form.
2    Q.  I'm going to avoid jumping ahead, but I will
3  come back to your answer on that, Ms. Glass.
4    A.  Okay.
5    Q.  And did American General produce all its
6  documents in its possession, custody, or control
7  concerning any attempt to change the owner of this
8  particular circumstances, the policy that's
9  Exhibit 2?
10   A.  Yes.
11   Q.  And from the documents that you reviewed
12  that were produced by American General and labeled
13  RS 001 to RS 251, did you see any documents in
14  there indicating that a change of ownership had
15  been submitted for this policy prior to this
16  document, Exhibit 13, which is the fax cover page
17  dates it February 16th of 2005 and the American
18  General date-stamp dates it February 18th of 2005?
19   A.  No.
20   Q.  Can you tell by looking at Exhibit 13 how
21  this was received by American General?  Was it by
22  fax, mail, or both?
23   A.  Exhibit 13 was received by fax.
24   Q.  And is it American General's policy to accept
25  and acknowledge change of ownership forms that are

13 (Pages 46 to 49)

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA  GLASS  -  January 31, 2007

Page 50

1   received by fax or does it require a hard copy?
2   A.  If you mean by hard copy original, the answer
3   is that they accept them by fax.
4   Q.  And that is what I meant.  Thank you.
5       Taking a look at Exhibit 14, please.
6   A.  I have it.
7   Q.  Taking a look at the second page, which is
8   RS 068 -- and it looks like RS 069 is a blank
9   page -- is this a document, Exhibit 14, with the
10  exception of the fax transmission line, is this a
11  document that is generated by American General?
12  A.  Again, the form itself is generated, yes.
13  Q.  And do you recognize the handwriting on the
14  form at all?
15  A.  No.
16  Q.  And does this appear to be a complete change
17  of beneficiary form to you?
18  A.  Can you define "complete"?
19  Q.  Does it appear to have all of the pages that
20  a typical change of beneficiary form would have
21  attached to it?
22  A.  No, it does not.
23  Q.  Can you tell what pages are missing, if any?
24  A.  It appears that the instruction page is not
25  included.

Page 51

1   Q.  Okay.  What is this particular form used for,
2   assuming that it has the instruction page attached
3   to it, what would it be used for?
4   A.  It would be used to request a change of
5   beneficiary on the policy.
6   Q.  And is this the type of document that would
7   be accepted by American General as a fax versus an
8   original hard copy?
9   A.  Yes.
10  Q.  And the change of beneficiary form is a
11  document that is generated and maintained by
12  American General in its ordinary course of
13  business; is that correct?
14  A.  Yes.
15  Q.  And did American General produce all of the
16  documents concerning any attempts to change the
17  beneficiary on the policy, which is Exhibit 2, in
18  this case?
19  A.  Yes.
20  Q.  And when you reviewed the documents produced
21  by American General, RS 001 to RS 251, did you see
22  any documents in there indicating that a change of
23  beneficiary had been requested prior to the date on
24  the cover page of this fax, which is February 16th
25  of 2005, Exhibit 14?

Page 52

1   A.  No.
2   Q.  And can you tell by looking at Exhibit 14
3   whether or not American General ever was in
4   possession of the hard copy original of this
5   particular document?
6   A.  It does not appear that we were in possession
7   of the original.
8   Q.  I ask you to take a look at Exhibit 15,
9   please.
10  A.  I have it.
11  Q.  And is this a document that you've seen
12  before?
13  A.  Yes.
14  Q.  And with the exception of the cover page on
15  this document, does this appear to be the same
16  letter as Exhibit 10?
17  A.  One moment while I reference it, please.
18  Q.  Certainly.
19  A.  Yes, the text would indicate it's a copy of
20  the same letter.
21  Q.  Who's identified as the owner on the letter
22  attached to Exhibit 15?
23  A.  Globe Rubber Works, Inc.
24  Q.  And can you tell when this document was
25  received at American General's scan center?

Page 53

1   A.  This particular copy in Exhibit 15 was
2   actually received and scanned on 9/21/05.
3   Q.  9/21/05?
4   A.  In the scan center.
5   Q.  Can you tell me where you see that date?
6   A.  If you look on the right-hand side of the
7   document, just below the thick black line, that is
8   the new scanner spray marks.  It's the equivalent
9   of what the older scanners used to scan in that
10  upper right-hand corner.
11      Based on the history of these dates, this
12  appears to me to be that this document originally
13  was scanned on February 25th.  Most likely a
14  processor printed a copy and sent it back down to
15  the scan center as part of the history of the file
16  to be re-scanned on 9/21/05.
17  Q.  Okay.  And, then, this document, Exhibit 15,
18  is a document that's maintained in the ordinary
19  course of American General's business?
20  A.  Yes.
21  Q.  So if I could just ask you to take a look at
22  Exhibit 16, please.
23  A.  I have it.
24  Q.  Do you recognize this document?
25  A.  Yes.

14 (Pages 50 to 53)

BILL  J.  McFERRON,  CSR
(713)  626-2629

LIZA   GLASS   –   January 31, 2007

<table>
<tr><td>

**Page 54**

1  Q.  And what is this document?
2  A.  This document is the response to the request
3  to change the ownership on the policy insuring
4  Richard Somerville.
5  Q.  And what's the date on Exhibit 16?
6  A.  February 18th, 2005.
7  Q.  Who is identified as the owner of the policy
8  on Exhibit 16?
9  A.  I'm sorry, that question broke up.
10  Q.  Sure.  Who's identified as the owner of the
11  policy on Exhibit 16?
12  A.  Globe Rubber Works, Inc.
13  Q.  And does Exhibit 16 appear to be a response
14  to Exhibit 13?
15  A.  One moment while I check.  Yes.
16  Q.  And is Exhibit 16 the type of letter that you
17  were referencing earlier, when you said that the
18  change of ownership could not be acknowledged by
19  American General, a letter with a new change of
20  ownership form would be sent out to the owner?
21  A.  Yes.
22  Q.  And is this letter prepared in the ordinary
23  course of American General's business?
24  A.  Yes.
25  Q.  And is this letter maintained in American

</td><td>

**Page 56**

1  [sic] (RS 074) of Exhibit 17, there's a comment
2  section there.  Does that help you determine if it
3  was a response to the change of ownership request
4  or the change of beneficiary request?
5  A.  Well, based on that comment, it would appear
6  to be a response to the change of beneficiary
7  request.
8  Q.  And what significance does that comment have
9  for you?
10  A.  It would indicate to me that the change of
11  beneficiary was not done because the ownership
12  required verification and that a letter and form
13  were sent out.
14  Q.  And what date does that comment --
15  (inaudible)
16  A.  Excuse me?  You broke up.  I couldn't get
17  that question.
18  Q.  I'm sorry.  Can you tell what date the
19  comment is referring to when that comment was made
20  in the work history system?
21  A.  February 24th, 2005.
22  Q.  And where do you see that date?
23  A.  I see that on RS 074 on the first line that
24  says "Begin Date."
25  Q.  I'm sorry.  I was referring to Exhibit 17

</td></tr>
<tr><td>

**Page 55**

1  General's ordinary course of business?
2  A.  Yes.
3  Q.  Okay.  And can you tell from Exhibit 16,
4  as of February 18th, 2005, had American General
5  acknow- -- I'm sorry, I'm just trying to get the
6  terminology right -- had American General
7  acknowledged the request for the change of
8  ownership?
9  A.  They had not recorded it.  They had
10  acknowledged receiving it, but they had not
11  recorded it because the proper documents were not
12  received.
13  Q.  Okay.  Taking a look at Exhibit 17.
14  A.  I have it.
15  Q.  Would you, please, identify Exhibit 17 for
16  me?
17  A.  This would be the work object that was
18  created, indicating we had a beneficiary change.
19  It would have been created as a result of scanning
20  in the document received on -- in Exhibit 14.  It
21  might be Exhibit 13 or 14.  I can't tell without
22  looking in the actual image system which actual
23  document, but it would have been either the change
24  of ownership or change of beneficiary.
25  Q.  On the second page of this document, RS 064

</td><td>

**Page 57**

1  RS 063 and RS 064.  Are you looking at the same
2  document?
3  A.  Exhibit 17?
4  Q.  Yes.
5  A.  Exhibit 17 is RS 073 and RS 074.
6  Q.  I have Exhibit 17 as RS 063 and RS 064?
7      MS. WILLS:  That's what we've got as
8  Exhibit 18.
9      MS. ROMAN:  Oh, okay.  I apologize.  I'm
10  on the wrong document.
11  Q.  (BY MS. ROMAN)  Okay.  I'm with you now.  I
12  see that.  So Exhibit 17 then actually says -- I
13  misspoke earlier -- under this 2005-02-24 date,
14  the "Comment" section reads "Ownership must be
15  established first.  Sent letter and form."  Is that
16  what you were referring to earlier?
17  A.  Yes.
18  Q.  Okay.
19  A.  And, just to clarify, based on that comment
20  and the work type being called "BENECHG," that
21  would indicate that these comments go with the
22  change of beneficiary form.
23  Q.  Okay.  Thank you.  Sorry for the confusion
24  then.
25  A.  That's okay.

</td></tr>
</table>

15  (Pages 54 to 57)

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA    GLASS    -    January 31, 2007

| Page 58 |
|---|
| 1  Q.  Exhibit 18 is RS 063 and RS 064, correct?<br>2  A.  Yes.<br>3  Q.  And looking at Exhibit 18 on the second page,<br>4  which is RS 064 --<br>5      MS. BURHOE:  I'm sorry, I have 073 and<br>6  074.<br>7      MS. ROMAN:  Yeah.  Clare, those two just<br>8  got reversed.<br>9      MS. BURHOE:  Oh, okay.  All right.<br>10      MS. ROMAN:  So their Exhibit 17 RS 073<br>11  and RS 074, and Exhibit 18 is RS 063 and RS 064.<br>12      MS. BURHOE:  All right.  Thank you.<br>13      MS. ROMAN:  You're welcome.  Sorry about<br>14  that.<br>15  Q.  (BY MS. ROMAN)  Back to Exhibit 18, RS 063<br>16  and RS 064:  On page RS 064, there's also as<br>17  "Comment" section there.  What significance, if<br>18  any, does the comment section have for you?<br>19  A.  It indicates that on February 18th the<br>20  processor indicated that -- I would have to<br>21  speculate.  The actual comment says "Asked for<br>22  corporate owned."  Based on what's in the file,<br>23  that would indicate that they sent a letter out<br>24  requiring the correct forms.<br>25  Q.  And is Exhibit 18 a document that's generated |

| Page 59 |
|---|
| 1  by American General?<br>2  A.  Yes.<br>3  Q.  Is it maintained in the ordinary course of<br>4  American General's business?<br>5  A.  Yes.<br>6  Q.  So moving on to Exhibit 19, which should be<br>7  RS 206 and RS 207.  Do you have that?<br>8  A.  Yes.<br>9  Q.  Is this a document that you're familiar with?<br>10  A.  Yes.<br>11  Q.  With the exception of the cover page, which<br>12  is the fax transmission page labeled RS 206, does<br>13  this appear to be the same letter as Exhibit 10 and<br>14  Exhibit 15?<br>15  A.  It does; but based on the comments on the<br>16  letter, it appears to be additional requests.<br>17  Q.  And can you tell from looking at the letter<br>18  when this particular fax, Exhibit 19, was received<br>19  by American General in the scan center?<br>20  A.  As with the other document, this appears to<br>21  be a copy received -- this particular exhibit was<br>22  received on 9/21/05.  It was originally received in<br>23  the scan center on February 25th, '05.<br>24  Q.  Is this a document that's maintained by<br>25  American General in the ordinary course of |

| Page 60 |
|---|
| 1  business?<br>2  A.  Yes.<br>3  Q.  Drawing your attention to Exhibit 20, please.<br>4  A.  I have it.<br>5  Q.  All right.  And it should be RS 070 through<br>6  RS 072; is that correct?<br>7  A.  Yes.<br>8  Q.  And do you recognize this document?<br>9  A.  Yes.<br>10  Q.  What kind of document is this?  What do you<br>11  recognize this document to be?<br>12  A.  This would be the response to the request for<br>13  the change of beneficiary received in February.<br>14  Q.  Is this a letter that's generated by American<br>15  General?<br>16  A.  Yes.<br>17  Q.  What would be the purpose of this letter?<br>18  A.  To acknowledge to the owner of the policy<br>19  that the beneficiary request was not accepted and<br>20  that additional requirements were necessary and to<br>21  also send them a new blank copy of the form to<br>22  complete.<br>23  Q.  Who is identified as the owner of the policy<br>24  on this February 24, 2005 letter, Exhibit 20?<br>25  A.  Globe Rubber Works, Inc. |

| Page 61 |
|---|
| 1  Q.  And it's referencing the policy, Exhibit 2;<br>2  is that correct?<br>3  A.  Yes.<br>4  Q.  And does this Exhibit 20 -- I'm going to ask<br>5  you to refer back to say Exhibit 17 -- does that<br>6  help clarify what the "Comments" section on<br>7  Exhibit 17 were in reference to, since they seem to<br>8  relate to each other?<br>9  A.  Yes.<br>10  Q.  And is this the type of document that's<br>11  maintained by American General in its ordinary<br>12  course of business?<br>13  A.  Yes.<br>14  Q.  Does letter indicate to the owner of the<br>15  policy, Globe Rubber Works, what American General<br>16  needs before it can process the change of<br>17  beneficiary form?<br>18  A.  Yes.<br>19  Q.  And what does it indicate Globe Rubber Works<br>20  needs to do?<br>21  A.  It indicates that it needs to establish the<br>22  ownership and that the change of "bene" request and<br>23  the change of ownership were not processed and they<br>24  need to have -- it says "If you are to assign a new<br>25  owner, we need him to sign and date the change of |

16 (Pages 58 to 61)

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA   GLASS   —   January 31, 2007

| Page 62 |
| --- |

1  beneficiary forms." So it, basically, indicates
2  that the change of ownership form that was received
3  along with the change of beneficiary form was not
4  honored.
5  Q.  As of February 24th, 2005, had American
6  General recorded the request for change of
7  beneficiary?
8  A.  No.
9  Q.  Was this letter sent in the ordinary of
10  course of American General's business?
11  A.  Yes.
12  Q.  I ask you to take a look at Exhibit 21,
13  please, which should be Bates-stamped RS 0077 and
14  RS 078.
15  A.  I have it.
16  Q.  Do you recognize this document?
17  A.  Yes.
18  Q.  What do you recognize it to be?
19  A.  This is the comments in our imaging system
20  for a work object titled "LIFE-AGTCHG," which is an
21  agent change.
22  Q.  And is this a document that is generated by
23  American General?
24  A.  Yes.
25  Q.  And is it maintained in American General's

| Page 63 |
| --- |

1  ordinary course of business?
2  A.  Yes.
3  Q.  In looking at the second page, RS 078,
4  there's a "Comments" section. What significance
5  does the comment section have for you?
6  A.  That comment section is referring to the
7  change of agent request that originally appears to
8  have come in February, indicating that the
9  processing of the service agent was changed.
10  Q.  And what can you tell by looking at this that
11  it's referring to correspondence -- a change of
12  agent request that came in in February?
13  A.  I don't understand the question.
14  Q.  Is there something on Exhibit 21 that
15  indicates to you that the comment section is
16  relating back to certain agent's request from
17  February?
18  A.  The comment -- not the comment section
19  specifically, but the work type and the history of
20  when the document was scanned in in relation to the
21  images under Exhibit 19, as well as some additional
22  exhibits, would indicates that these comments go
23  with that document.
24  Q.  Okay.  Great.
25  A.  Just to clarify, when you're actually look at

| Page 64 |
| --- |

1  the system, the image comes up underneath these
2  comments.  So when you recreate them to paper, it's
3  more difficult to say for certainty that those
4  comments go with that actual image.  However, when
5  you're visually looking at them on the system, you
6  can say with certainty that that document belongs
7  to those comments.
8  Q.  Okay.  Looking at Exhibit 22, RS 083, do you
9  have that in front of you?
10  A.  Yes, I do.
11  Q.  And are you familiar with this document?
12  A.  Yes, I am.
13  Q.  What is this document?
14  A.  These are the AWD history -- AWD being our
15  imaging system -- history comments for work type
16  CSS - FORMREQ," which indicates that a request for
17  forms was asked for and generated.
18  Q.  Is this a document that's generated by
19  American General?
20  A.  Yes.
21  Q.  And in the middle of the page, it says "Begin
22  Date" and it has a date of 2005-03-24; and there's
23  a comment section in that same block.  Do you see
24  that?
25  A.  Yes.

| Page 65 |
| --- |

1  Q.  And the comment indicates that there was a
2  caller, and it gives the name Globe Rubber Works,
3  Inc.  What significance does that have for you?
4  A.  That indicates to me that when the caller
5  called in they identified themselves as belonging
6  to that company.
7  Q.  And it also has a "Relationship" line; is
8  that correct?
9  A.  Yes.
10  Q.  And does it in fact -- what does the
11  "Relationship" line say?
12  A.  "Owner."
13  Q.  And does that have any significance for you?
14  A.  That indicates that the person calling
15  indicated that they were the owner of that
16  contract.
17  Q.  So, what does "Verified Caller" mean?
18  A.  "Verified Caller" indicates that in the
19  "Comments" section -- it references a name -- but
20  what it would have meant is that the person making
21  that phone call had to answer certain questions to
22  verify they were associated with Globe Rubber Works
23  and that they had the authority to receive the
24  information.
25  Q.  What kind of questions would have a person

17 (Pages 62 to 65)

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA  GLASS  -  January 31, 2007

Page 66

1  answer to verify that they were involved with Globe
2  Rubber Works and authorized to receive the
3  information?
4  A. I can't say for certain. Typically -- I
5  contact say for certain on this particular call.
6  In general, they have to answer questions, such as
7  identifying a tax ID number, an address, and some
8  additional information.
9  Q. And does the "Comments" section here indicate
10  with whom this customer service representative was
11  speaking?
12  A. It does not. It indicates to whom the forms
13  are to be faxed.
14  Q. Okay. And it does provide a name there; is
15  that correct?
16  A. Yes.
17  Q. And it has Roger Fasnacht, F -a-s-n-a-c-h-t?
18  A. F-a-s-n-a-c-h-t, yes.
19  Q. Is this document maintained by American
20  General in its ordinary course of business?
21  A. Yes.
22  Q. I'd ask you to take a look at Exhibit 23,
23  please, Bates-labeled RS 085 and RS 086.
24  A. I have it.
25  Q. Do you recognize this document?

Page 67

1  A. Yes.
2  Q. What do you recognize this document to be?
3  A. I recognize this document to be the AWD
4  history on a work object titled "CSS - FORMREQ,"
5  which indicates that the processing involved the
6  sending of forms.
7  Q. And on the second page, which is labeled
8  RS 086, does that indicate to you what type of form
9  might have been processed or sent?
10  A. Yes, it does.
11  Q. And what kind of form?
12  A. The corporate trust affidavit.
13  Q. What does "PO" refer to at the end of the
14  "Comments" section?
15  A. Policy owner.
16  Q. Can you tell by looking at this -- or strike
17  that.
18      Based upon the documents that you've seen
19  to date, who would the policy owner be that this
20  affidavit would have been sent to?
21  A. Globe Rubber Works, Inc.
22      MS. WILLS: Jennifer, we'd like to take a
23  break when you get to a stopping point.
24      MS. ROMAN: Sure. Let me ask two or
25  three more questions on this particular exhibit and

Page 68

1  they'll be brief and then we can take a break. Is
2  that all right?
3      THE WITNESS: That's fine.
4  Q. (BY MS. ROMAN) Okay. As of March 31st,
5  2005, sticking with Exhibit 23, had the ownership
6  of the policy been changed?
7  A. I can't say for certain; but from looking at
8  this exhibit, I know from looking in the file it
9  had not been changed.
10  Q. Okay. And I apologize if I asked you this
11  already. Is Exhibit 23 a document generated by
12  American General?
13  A. Yes.
14  Q. And is the document maintained in the
15  ordinary course of American General's business?
16  A. Yes.
17      MS. ROMAN: Let's go off the record.
18      (Whereupon, a recess was taken
19      from 11:40 a.m. to 11:52 a.m.)
20      MS. WILLS: We're good and we're back on
21  this end.
22  Q. (BY MS. ROMAN) If I could just ask you,
23  Ms. Glass, to take a look at Exhibit 24, which
24  should start with Bates-label RS 087?
25  A. I have it.

Page 69

1  Q. It's a July 5th, 2005 letter from an attorney
2  at Lawson & Weitzen. Her name is Kathryn E.
3  Pieczarka, P-i-e-z-c-a-r-k-a. Is this a document
4  that you've seen before?
5  A. Yes.
6  Q. And do you know if as of July 5th, 2005, the
7  date of Exhibit 24, if American General had a
8  recorded change of ownership request for the
9  policy?
10  A. Based on my review of the file, it had not
11  changed it.
12  Q. And as of July 5th, 2005, had American
13  General recorded the change of beneficiary request
14  for the policy?
15  A. Based on the review of the file, they had
16  not.
17  Q. Do you know if as of July 5th, 2005 American
18  General had received the documents requested in
19  response to Exhibit 16, which was the February
20  18th, 2005 letter from American General to Globe
21  Rubber Works?
22  A. There was no indication that we received
23  those.
24  Q. Do you know if as of July 5th, 2005 American
25  General had received any of the documents that it

18 (Pages 66 to 69)

BILL  J.  McFERRON,  CSR
(713)  626-2629

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA  GLASS  —  January 31, 2007

Page 70

1  had requested in its February 24th, 2005 letter to
2  Globe Rubber Works, Exhibit 20?
3  A.  There was no indication that we had received
4  those.
5  Q.  Moving to Exhibit 25.
6  A.  I have it.
7  Q.  It should start with Bates-stamp RS 223 and
8  go through RS 228.  Is that the document that you
9  have an Exhibit 25 in front of you?
10  A.  Yes.
11  Q.  Okay.  And have you seen this document
12  before?
13  A.  Yes.
14  Q.  And do you know if this document was received
15  by American General?
16  A.  Yes.
17  Q.  And in the second paragraph, there's two
18  bullet points.  Now, the first bullet point refers
19  to a copy of the release of interest for the
20  above-mentioned policy from First National Bank of
21  New England dated September 2nd, 2004.  Do you see
22  that in there?
23  A.  I see the bullet, yes.  Are you asking me if
24  I see the assignment as well or the release of
25  assignment or just the bullet?

Page 71

1  Q.  I'm just asking you if you saw the bullet
2  point there.
3  A.  Yes, I do.
4  Q.  I just wanted to make sure I captured that
5  correctly.
6      Exhibit 26, is this a document that
7  you've seen before?
8  A.  Yes.
9  Q.  And in this document in the first paragraph
10  it references, again, this release of assignment of
11  life insurance; is that correct?
12  A.  It references a release of assignment of life
13  insurance, yes.
14  Q.  And does this letter enclose that particular
15  release of assignment of life insurance?
16  A.  It does enclose a release of assignment of
17  life insurance, yes.
18  Q.  Okay.  Now, drawing your attention to Exhibit
19  27.
20  A.  I have it.
21  Q.  Is this a document that you've seen before?
22  A.  Yes.
23  Q.  And can you tell me what this document is?
24  A.  This is a request for a collateral of
25  assignment and a cover letter, indicating that

Page 72

1  we've received that request and that there was
2  additional requirements necessary to process it.
3  Q.  And Exhibit 27, does this relate to Exhibit
4  25 and 26 at all?
5  A.  Yes.
6  Q.  How does it relate?
7  A.  It's the original assignment of the policy
8  that was then being released in Exhibit 25 and
9  Exhibit 26.
10  Q.  Has American General ever received the
11  information that it requested from the owner of
12  the policy in its February 18th, 2005 letter,
13  Exhibit 16?
14  A.  We have no indication of receiving that.
15  Q.  Has American General ever received any
16  information that it requested in its February 24th,
17  2005 letter, Exhibit 20?
18  A.  We have no indication of having received
19  that.
20  Q.  And do you have any knowledge as to whether
21  or not a change of ownership was ever recorded for
22  the policy, which is Exhibit 2?
23  A.  It does not appear so from reviewing the
24  file.
25  Q.  Do you have any knowledge whether or not a

Page 73

1  change of beneficiary was ever recorded for the
2  policy, which is Exhibit 2?
3  A.  It does not appear so from reviewing the
4  file.
5      MS. ROMAN:  I don't have any further
6  questions.
7      MS. BURHOE:  I have just a few.
8      E X A M I N A T I O N
9  BY MR. BURHOE:
10  Q.  My name is Clare Burhoe.  I'm one of the
11  attorneys that represents Globe Composite Solutions
12  in this lawsuit.  I have just a couple of questions
13  for you.
14      Can you explain just, generally, what is
15  the difference between a whole life policy and a
16  term life policy?
17  A.  The primary difference between a whole life
18  and a term policy is that a whole life policy
19  provides a living benefit value while the policy is
20  in force and a term policy does not.
21  Q.  And are there any other differences?
22  A.  Typically, a whole life policy does not
23  terminate in any contractual period other than up
24  to age 100.  A term policy, typically, is purchased
25  for a certain set period of time.

19 (Pages 70 to 73)

LIZA GLASS  -  January 31, 2007

Page 74

1  Q. Okay. To your knowledge, does AIG offer any
2  term policy products that do include a cash
3  accrual?
4  A. I am not -- I would not know that.
5  Q. You wouldn't know?
6  A. That's not my expertise, no.
7  Q. Okay. So you're not familiar with all the
8  types of policies that AIG -- or life policies that
9  AIG offers?
10  A. Correct.
11  Q. Okay. If I could direct your attention back
12  to Exhibit 10.
13  A. I have it.
14  Q. Okay. I believe you referred to this as a
15  service agent earlier. Can you tell me what a
16  service agent does?
17  A. I'm sorry, your question broke up. Could you
18  repeat it?
19  Q. Can you tell me what a service agent does?
20  A. Typically, the service agent is the one who
21  assists the policyholder with any kind of changes
22  on the policy or maintenance of the policy or
23  answers any questions on the policy.
24  Q. Okay. And does American General have any
25  policies with respect to who is authorized to

Page 75

1  communicate with regarding specific policies?
2  A. I don't understand the question.
3  Q. Well, does American General, typically, deal
4  just with the service agent when it's communicating
5  about a specific policy or are there other people
6  that it can -- that it will deal with?
7  A. There are other people that they'll discuss
8  the policy with.
9  Q. Who are the other people?
10  A. The policy owner, if there is any assignee on
11  the policy.
12  Q. Okay. So, what is the significance, then, of
13  having to request a change of agent?
14  A. The reason for having to request the change
15  of agent is that we cannot -- we, as a company,
16  cannot arbitrarily just change agents. There's a
17  requirement that a policy owner requests that
18  change.
19  Q. Okay. So, does that mean that until a policy
20  owner requests a change of agent that you will not
21  communicate with a new agent regarding the policy?
22  A. I can't speak for that exact process because
23  it's not under my jurisdiction.
24  Q. Okay. Who would be able to speak that
25  process?

Page 76

1  A. I would have to find out who -- if that falls
2  under a policy owners service area or what area
3  that falls under.
4      MS. BURHOE: Okay. I don't have any more
5  questions.
6      MS. ROMAN: I don't have any follow-ups
7  and thank you very much.
8      THE WITNESS: You're welcome.
9      MS. WILLS: Thank you. We have no
10  questions.
11      MS. BURHOE: Okay. Bye-bye.
12      MS. ROMAN: Thanks. Bye.
13      (Deposition concluded at 12:03 p.m.)
14
15      -- SIGNATURE REQUIRED --
16
17
18
19
20
21
22
23
24
25

Page 77

1          CHANGES AND SIGNATURE
2  WITNESS NAME: LIZA GLASS
3  DATE OF DEPOSITION: JANUARY 31, 2007
4  PAGE    LINE    CHANGE        REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

BILL  J.  McFERRON,  CSR
(713)  626-2629

ccbd8642-3632-4d2f-b686-02fcf57796bc

LIZA   GLASS   -   January 31, 2007

Page 78

1     I, LIZA GLASS, have read the foregoing
deposition and hereby affix my signature that same
2   is true and correct, except as noted above.
3
_____
4             LIZA GLASS
5
6   THE STATE OF TEXAS )
7   COUNTY OF _____ )
8     Before me, _____, on this day
9   personally appeared LIZA GLASS, known to me(or
10  proved to me under oath or through _____)
11  (description of identity card or other document)
12  to be the person whose name is subscribed to the
13  foregoing instrument and acknowledged to me that
14  she executed the same for the purposes and
15  consideration therein expressed.
16
17    Given under my hand and seal of office, this
18  _____day of _____, _____.
19
20        _____
          NOTARY PUBLIC, STATE OF TEXAS
21
22  My commission expires: _____
23
___ No Changes Made ___ Amendment Sheet(s) Attached
24
GLOBE COMPOSITE SOLUTIONS VS. RICHARD SOMERVILLE
25

Page 79

1   THE STATE OF TEXAS :
2   COUNTY OF HARRIS :
3     I, Lori A. Belvin, a Certified Shorthand
4   Reporter and Notary Public in and for the State of
5   Texas, do hereby certify that this transcript is a
6   true record of the proceedings as transcribed
7   herein.
8     I further certify that I am neither attorney
9   nor counsel, related to, nor employed by any of the
10  parties to the action in which this testimony was
11  taken.
12    I, also, further certify I am not a relative
13  or employee of any attorney of record in this
14  cause, nor do I have a financial interest in the
15  action.
16    Certified to on this, the 2nd day of
17  February, 2007.
18
19        _____
          Lori A. Belvin, CSR No. 2572
20        Expiration Date: 12-31-2007
          Firm Registration No. 62
21        4545 Post Oak Place, Suite 350
          Houston, Texas  77027-3105
22        Phn. No.: (713) 626.2629
          Fax No.: (713) 626.1966
23
24
25

21 (Pages 78 to 79)

BILL   J.   McFERRON,   CSR
(713)   626-2629

ccbd8642-3632-4d2f-b686-02fcf57796bc


**Lincoln**
Financial Group
Lincoln Life

Cheryl A. Wilson
Senior Paralegal
The Lincoln National Life
   Insurance Company
Law Department, MLW1
Metro Center
350 Church Street
Hartford, CT 06103-1106

Telephone: 860 466 2858
Facsimile: 860 466 1778

**VIA Facsimile Only: (617) 261 - 7673**            February 2, 2007

Jennifer Roman, Esquire
Tarlow Breed Hart & Rogers
101 Huntington Avenue, Suite 500
Boston, MA 02199

Re:   <u>Globe Composite Solutions, Ltd. V. Somerville v. Forsythe</u>
      Affidavit of Cheryl A. Wilson
      Case Number: 05-10323 DPW

Dear Attorney Roman:

Policy G1637194 insuring the life of Richard Somerville was not a term life insurance product. A term life insurance policy does not build any cash values and premiums submitted to an insurer for a term policy are to pay for the cost of insurance charges only.

The Somerville policy was a flexible premium adjustable life policy – a universal life policy. The major benefit of this policy is that it has flexible premium payments that may be made at the owner's discretion. This being said, there must be sufficient value in the cash value account to pay the cost of insurance charges. If so, the policy remains active and does not lapse.

Below are the policy values for G1637194 as of August 1, 2004.
-   Gross cash value:    $28,535.18
-   Net cash value  :    $18,928.18

The above values were for the beginning of the day. Surrender charges were applicable to the policy. Cost of insurance charges for August 1, 2004 were $286.17. They were deducted on that day in accordance with contractual provisions thereby reducing both Gross and Net cash values from the above figures.

Should you need to contact me, my direct telephone number is (860) 466 - 2858.

As signed under the pains and penalties of perjury.

*Cheryl A. Wilson*

Cheryl A. Wilson