UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GLOBE COMPOSITE SOLUTIONS, LTD.
f/k/a Kalm-Forsyth Global
Innovations, Ltd.,
     Plaintiff and
     Defendant in Counterclaim,


v.                                          CIVIL ACTION NO.
                                            05-10323-DPW

RICHARD C. SOMERVILLE,
ANNE ROCHE-SOMERVILLE, and
SOLAR CONSTRUCTION, INC.
f/k/a Globe Rubber Works, Inc.,
     Defendants and
     Plaintiffs in Counterclaim.


**REPORT AND RECOMMENDATION RE:
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
(DOCKET ENTRY # 57); DEFENDANTS' MOTION FOR RELIEF
PURSUANT TO FED. R. CIV. P. 56(F)
(Docket Entry # 78)**

**July 12, 2007**


**BOWLER, U.S.M.J.**

Pending before this court are:  (1) a motion for partial summary judgment (Docket Entry # 57) filed by plaintiff and defendant in counterclaim Globe Composite Solutions, Ltd. ("Globe Composite"), formerly known as Kalm-Forsyth Global Innovations, Ltd. ("KFGI"); and (2) a motion for relief pursuant to Rule 56(f), Fed. R. Civ. P., ("Rule 56(f)") (Docket Entry # 78) filed by defendants and plaintiffs in counterclaim Anne Roche-Somerville ("Roche-Somerville"), in her individual capacity and

in her capacity as Executrix of the Estate of Richard C.

Somerville, and Solar Construction, Inc. ("Solar") formerly known

as Globe Rubber Works, Inc. ("Globe Rubber") (collectively:

"defendants").  The motions are opposed.  Both parties filed

supporting memoranda and separate statements of undisputed facts.

After conducting a hearing on April 5, 2007, this court took the

motions (Docket Entry ## 57 & 78) under advisement.


<u>STANDARD OF REVIEW</u>

The standard of review for a summary judgment motion is well

established.  "Summary judgment is appropriate when 'the

pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law.'"

<u>Barbour v. Dynamics Research Corp.</u>, 63 F.d 32, 36-37 (1st Cir.

1995) (quoting Rule 56).  In determining whether summary judgment

is appropriate, "genuine" means "'that the evidence about the

fact is such that a reasonable jury could resolve the point in

favor of the nonmoving party.'"  <u>Velez-Rivera v. Agosto-Alicea</u>,

437 F.3d 145, 150 (1st Cir. 2006) (quoting <u>United States v. One

Parcel of Real Prop.</u>, 960 F.2d 200, 204 (1st Cir. 1992).

"Similarly, a fact is 'material' if it is 'one that might affect

2

the outcome of the suit under the governing law.'"  Id. (quoting

Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st

Cir. 1994)).


PROCEDURAL BACKGROUND

The underlying action stems from an alleged breach of an

asset purchase agreement between Globe Composite, the buyer, and

Richard C. Somerville ("Somerville") and Globe Rubber, the

sellers ("the asset purchase agreement").  Defendants allege in

relevant part breach of Somerville's employment agreement with

Globe Composite (Count III), breach of the asset purchase

agreement (Count IV), declaratory relief pursuant to

Massachusetts General Laws Chapter 231A, section 1 (Count VII),

violation of Massachusetts General laws Chapter 93A, sections 2

and 11 (Count IX), unjust enrichment (Count XI), money had and

received (Count XII), tortuous interference with contractual

relations (Count XIII) and conversion (Count XIV).  (Docket Entry

# 43).  In the present motion for partial summary judgment, Globe

Composite requests a declaration that it is the owner and

beneficiary of two separate key man life insurance policies on

the life of Somerville.  The policies in dispute are a Lincoln

Financial Group $250,000 policy ("the Lincoln policy") and an

American General Life Insurance Company $250,000 policy ("the American General policy").[1]  (Docket Entry # 71, Ex. 2, p. 4).


## FACTUAL BACKGROUND

The entirety of the relationship and transactions between the parties is complex and spanned approximately four years prior to litigation.  (Docket Entry # 59, Ex. D, p. 13).  In and around 2002, Globe Composite entered into a supply contract with Globe Rubber to supply sections for Globe Composite's nonmetallic conveyor systems.  KFGI, later Globe Composite, engaged in the sale of these conveyor systems to airports around the country. (Docket Entry # 59, Ex. D, p. 11).  According to Carl Forsyth ("Forsyth"), Chief Executive Officer of Globe Composite, the company had a patent to produce nonmetallic conveyor systems using radiofrequency identification to keep track of luggage as it moved through an airport's conveyor system.  (Docket Entry # 59, Ex. D, pp. 10-11).

In December 2002, after repeated production delays by Globe Rubber, Forsyth approached Somerville, President, Director and Assistant Clerk of Globe Rubber, about a possible acquisition. (Docket Entry # 59, Ex. D, p. 19).  The two discussed potential

---

[1]  The Lincoln policy is an Aetna policy administered by Lincoln Financial Group ("Lincoln Financial").

terms of an acquisition in the winter of 2003 and executed a
letter of intent in August 2003.  (Docket Entry # 59, Ex. D, p.
18-21).[2]  Due diligence was conducted during the fall of 2003.
Negotiations as to the terms and structure of the ultimate asset
purchase agreement continued through the winter and spring of
2004.[3]  These negotiations included discussions of both the
Lincoln policy and the American General policy owned by Globe
Rubber.  (Docket Entry # 59, Ex. K, pp. 45 & 51-62 ; Docket Entry
# 59, Ex. E, pp. 83-106).  The ultimate conclusions reached
during the discussions are disputed.

      Fasnacht and Forsyth testified that the insurance policies
were discussed during negotiations.  Fasnacht noted it was agreed
that the Lincoln and American General policies would "stay with
the company" or "be a part of the assets that were being acquired
by Globe Composite" and Forsyth referenced the two policies as

---

[2]  Among other proposed terms of acquisition, Forsyth testified
the price fluctuated over the course of the negotiations. (Docket
Entry # 59, Ex. D, pp. 19-21).

[3]  Deposition testimony of Forsyth, Roger Fasnacht ("Fasnacht"),
Chief Financial Officer of Globe Rubber prior to and at closing
and Chief Financial Officer of Globe Composite post closing, and
Bill Rodgers ("Rodgers"), the attorney representing the
Somervilles and Globe Rubber in the asset acquisition, confirms
that there were "many back and forth iterations" in reaching the
final agreement.  (Docket Entry # 59, Ex. K, p. 16).  The
structure of the agreement also changed during this time from a
stock purchase agreement to an asset purchase agreement.  (Docket
Entry # 59, Ex. E, p. 19).

those "that we knew we were going to be acquiring." (Docket
Entry # 59, Ex. E, p. 86; Docket Entry # 59, Ex. D, p. 44).
Rodgers, however, testified that Globe Composite proposed a
transfer of the insurance policies but that he advised the
Somervilles to refuse this proposal and his "understanding of the
deal was that those policies were to be retained by Globe Rubber
and were not sold and not to be transferred." (Docket Entry #
59, Ex. K, pp. 45, 51 & 62). Notwithstanding this testimony,
Rodgers acknowledged that he would expect the owner of the
insurance policies to pay the premiums. (Docket Entry # 59, Ex.
K, p. 62).

Forsyth and Globe Composite wanted to ensure key man life
insurance for Somerville after the acquisition.[4] Somerville would
assume the position of Director of Research and Development for
Globe Composite after the anticipated acquisition. (Docket Entry
# 59, Ex. C). Fasnacht noted in his deposition testimony that
discussions of the insurance policies during negotiations
"revolved around what protections the company needed going
forward after the acquisition. Being that [Somerville] was being
hired on as a key man, the intent was to have some key man life

---

[4] Key man life insurance typically "enables a company to insure
the life of a person whose continued services are critical to the
financial success of the company's business." Commonwealth v.
Levin, 417 N.E.2d 440, 442 (Mass.App.Ct. 1981).

insurance for his involvement with the company going forward."
(Docket Entry # 59, Ex. E, pp. 83-84).

The parties executed the asset purchase agreement on August 3, 2004. Section 2.1 governed the Globe Rubber assets to be sold and provided that "all of Globe's right, title and interest in and to all of Globe's property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located, including the following (but excluding the Excluded Globe Assets)." (Docket Entry # 59, Ex. A, p. 8-9).

Section 2.2 captioned "Excluded Globe Assets" listed the assets excluded from the asset purchase agreement. The list of excluded assets included "all insurance polices" and states that:

> Notwithstanding anything to the contrary in
> Section 2.1 or elsewhere in this Agreement, the
> following assets of Globe are not part of the sale
> and purchase contemplated hereunder, are excluded
> from the Globe assets and shall remain the property
> of Globe after the Closing. . . 2.2© all insurance policies
> and rights thereunder.

(Docket Entry # 59, Ex. A, p. 10). During his deposition, Forsyth acknowledged that the American General and Lincoln policies were not "referenced as assets being purchased by [Globe Composite]" in the agreement. (Docket Entry # 59, Ex. E, p. 46).

Also on August 3, 2004, Somerville and Globe Composite entered into an employment agreement ("the employment agreement"). (Docket Entry # 59, Ex. C). The employment

7

agreement states, "Whereas the consummation of the transactions

contemplated by the Asset Purchase Agreement by Employer, Globe

and Employee is conditioned upon the execution and delivery of

this Agreement by Employee and Employer, respectively." (Docket

Entry # 59, Ex. C). Consequently, execution of the employment

agreement was dependent upon execution of the asset purchase

agreement. Likewise, the asset purchase agreement listed

execution of the employment agreement as an obligation pursuant

to closing the sale of Globe Rubber. (Docket Entry # 59, Ex. A,

p. 16).

   The employment agreement also addressed "Key Man Life

Insurance" and provided that:

       The Employee agrees to use his best efforts to
       cooperate with the Employer in procuring "key man"
       insurance policies in the Employee's name for the
       benefit of the Employer at any time during the
       Employment Period, such cooperation to include,
       without limitation, the Employee being available
       for and consenting to any physical examinations,
       providing medical history record or other
       information or taking any other actions that may be
       necessary or advisable.

(Docket Entry # 59, Ex. C, § 13). Globe Rubber's disclosure

schedule, as required by the asset purchase agreement, listed all

insurance policies to which Globe Rubber "is a party or under

which Globe [Rubber], or any director of Globe [Rubber] in such

capacity, is or has been covered at any time since January 1,

2003." (Docket Entry # 59, Ex. I). Schedule 4.18 lists these policies and under the sub-heading "Key Man Life Insurance on Somerville." Three policies are listed, including the American General and Lincoln policies.[5] (Docket Entry # 59, Ex. I).

Subsequent to executing the agreements, Globe Composite began paying the premiums on both the Lincoln and American General policies. Globe Composite submitted with its motion canceled checks from the company's bank account showing premium payments to Lincoln Financial in the amount of $4,544.62, on August 27, 2004 and March 2, 2005. The canceled checks show premium payments to American General Life Insurance Company ("American General") in the amount of $4,736.72 on September 28, 2004 and March 23, 2005. (Docket Entry # 59, Ex. I). At some point after the closing and before Somerville's death in June 2005, Globe Composite engaged in efforts to transfer ownership of both policies from Globe Rubber to Globe Composite and to change the beneficiary on both from Globe Rubber to Globe Composite.

The efforts made to transfer ownership and the exact dates on which individuals acted are in dispute. On or before February

---

[5]    The third was a State Life policy in the amount of $400,000. The record indicates Globe Composite made premium payments on the American General and Lincoln Financial policies after the acquisition. The record contains no information of any payments or correspondence with regard to the State Life policy after the acquisition.

16, 2005, Fasnacht faxed completed transfer of ownership and
change of beneficiary requests to agents of the Lincoln and
American General policies. (Docket Entry # 75, Ex. 5). These
forms appear to have been signed by Somerville. Fasnacht
testified that Somerville signed the transfer of ownership and
change of beneficiary forms in his presence at Globe Composite
headquarters. (Docket Entry # 75, Ex. 22, pp. 24-25 & 28).

Forsyth's and Fasnacht's depositions include testimony that
early in the fall of 2004 Fasnacht initiated contact with the
insurance companies to inquire about transfer of ownership and
change of beneficiary on the policies and that there was a great
deal of back and forth with the insurers about the information
and forms necessary to comply with the companies' transfer
policies. (Docket Entry # 75, 23, pp. 9-10; Docket Entry # 59,
Ex. E pp. 93-96). Roche-Somerville and Solar, formerly Globe
Rubber, allege that this communication with the insurance
companies was done in bad faith. The record shows Fasnacht sent
a letter on Globe Rubber stationary, signed as the Chief
Financial Officer, after the acquisition and after his employment
with Globe Rubber had ended. (Docket Entry # 75, 2).
Furthermore, Roche-Somerville and Solar assert Fasnacht
represented the policies were transferred to Globe Composite
despite the fact that by that time he had no authority to act on

10

behalf of Globe Rubber.  These requests to transfer ownership were subsequently rejected.

Lincoln Financial rejected the request by letter dated March 10, 2005, and specified additional information was needed, namely a letter from Somerville and a copy of a Globe Rubber corporate resolution acknowledging his authority to transfer ownership of the policies.  (Docket Entry # 75, Ex. 11).  American General also rejected the February request by letter dated February 18, 2005.  (Docket Entry # 75, Ex. 8).  The record contains no indication of additional contact with American General until July 2005 when Globe Composite directed its attorney to send a demand letter for proceeds under the policy.  (Docket Entry # 75, Ex. 17).  Roche-Somerville and Solar contend this letter was deliberately misleading as it indicated the transfer occurred as part of the asset purchase agreement.  (Docket Entry # 75, Ex. 17).

Around the beginning of December 2004, the relationship between Forsyth and Somerville began to deteriorate for various reasons.  Somerville did not receive some scheduled payments on the purchase price pursuant to the asset purchase agreement and despite making demands to Forsyth, it was never fully paid.[6]

_____

[6] The asset purchase agreement provided that Globe Rubber's assets were sold in consideration of $898,000 in cash, $165,000 of which was deposited in an escrow account to be disbursed on

11

Furthermore, on or before the beginning of December, Forsyth

learned that despite prior assurances from Somerville, some of

Globe Composite's products delivered under its Defense Department

contracts did not meet the necessary governmental specifications.[7]

On January 31, 2005, Forsyth terminated Somerville's employment

with Globe Composite.[8]  (Docket Entry # 59, Ex. L).  As noted

above, in February and after Somerville's termination, Fasnacht,

on behalf of Globe Composite, continued to make efforts to

---

the first anniversary of the closing date provided no outstanding
indemnification claims related to the transaction were pending as
of that date.  (Docket Entry # 59, Ex. A, pp. 11-12).
Somerville's intellectual property was sold in consideration of a
total of $1,502,000 cash, as well as $750,000 in promissory
notes, $400,000 of which Forsyth signed personally, despite the
lack of that obligation in the asset purchase agreement.  (Docket
Entry # 59, Ex. A, p. 11; Docket Entry # 59, Ex. K, pp. 33-34).
Rodgers testified as to Forsyth's signing of the $400,000
promissory note in his individual capacity.  The parties agreed
the $400,000 note would be payable on or before 120 days of the
August 3 closing.  Neither Globe Composite nor Forsyth made
payment on the $400,000 note.  (Docket Entry # 75, Ex. 20, p. 5).

[7]  Globe Composite alleges that Somerville acted fraudulently
with respect to the contracts and certified the parts supplied to
the United States Navy met all specifications when, in fact, they
did not.  (Docket Entry # 59, Ex. E, pp. 122-128).

[8]  The termination letter stated, in relevant part:

      You are required to immediately turn over to me
      all Company property in your possession or control,
      including but not limited to identification, keys
      and other Company property.  You are to leave the
      premises immediately and arrangement will be made to
      have your personal belongings delivered to your home.

(Docket Entry # 59, Ex. L, p. 2).

effectuate the transfers of ownership and changes of beneficiary on the Lincoln and American General policies.

On March 29, 2005, as directed by the March 10 rejection letter from Elonie Smith, a Lincoln Financial employee, Fasnacht sent an unsigned letter via facsimile transmission, written over Somerville's name and stipulating his authority to transfer the Globe Rubber policies.  (Docket Entry # 75, Ex. 13).  Lincoln Financial responded by insisting the letter be signed.  The next day, Fasnacht faxed a copy of the letter with Somerville's signature.  (Docket Entry # 75, Ex. 14).

Roche-Somerville and Solar legitimately question the authenticity of this signature.  The record contains no information about who approached Somerville about signing the letter or how the signature was obtained.  Fasnacht and Forsyth testified they did not see Somerville after the January 31 termination.  (Docket Entry # 75, Ex. 22, p. 30; Docket Entry # 75, Ex. 23, p.15).  Forsyth acknowledged that the March 30 facsimile transmission indicates the letter to Lincoln Financial was signed after receipt of the March 10 correspondence.  (Docket Entry #75, Ex. 23, pp. 30-31).

Somerville died June 7, 2005, at his home in Duxbury.  The coroner's report indicated the cause of death was by hanging.  (Docket Entry # 75, Ex. N).  As noted above, on or before July 5,

2005, Globe Composite directed its attorneys to send a demand
letter to American General requesting it effectuate the
previously requested transfer of ownership and change of
beneficiary and that it pay the $250,000 proceeds to Globe
Composite in accordance with those changes.  (Docket Entry # 75,
Ex. 17).

On June 3, 2005, Globe Composite contacted Lincoln Financial
about payment on the Lincoln policy.  Lincoln Financial paid the
$250,000 proceeds to Globe Composite on August 1, 2005.  (Docket
Entry # 59, Ex. Q).  American General filed an interpleader
action in the district court.  The district judge consolidated
that action with this case (Docket Entry # 56) and entered a
final decree on the interpleader action on September 14, 2006,
discharging American General "from any and all liability arising
out of the [p]olicy, and on account of the death of Richard
Somerville, having deposited its admitted, full and total
liability with the Clerk of this Court."  (Docket Entry # 28,
Civil Action No. 05-11925-DPW).


## DISCUSSION

As expressly stated in section 10.13, the asset purchase
agreement is governed by Massachusetts law.  It is also without
doubt that the asset purchase agreement is an integrated

agreement representing the parties' final expression.  As
expressed in Section 10.7 of the agreement:

> This Agreement supersedes all prior agreements
> between the parties with respect to its subject
> matter and constitutes (along with the documents
> referred to in this Agreement) a complete and
> exclusive statement of the terms of the agreement
> between the parties with respect to its subject
> matter.  This Agreement may not be amended except
> by a written agreement executed by the party to be
> charged with the amendment.

 (Docket Entry # 59, Ex. A).

To the extent there is any doubt as to integration, the
completeness, specificity, length of the agreement and
sophistication of the parties uniformly dictate that it is an
integrated agreement.  See Coll v. PB Diagnostic Sys., Inc., 50
F.3d 1115, 1123 (1st Cir. 1995) (where parties reduce agreement to
a writing "which in view of its completeness and specificity
reasonably appears to be a complete agreement, it is . . . an
integrated agreement unless" otherwise established as not a final
expression); Town & Country Fine Jewelry Group, Inc. v. Hirsh,
875 F.Supp. 872, 876 (D.Mass. 1994) (factors to assess in
determining if agreement is integrated include length, existence
of integration clause and parties' prior negotiations).

When looking at an integrated agreement as opposed to an
unintegrated one, the language and the parties' word choices are
crucial.  Thus, "[t]he interpretation of an integrated agreement

15

is directed to the meaning of the terms of the writing or writings in the light of the circumstances of the transaction." Boston Edison Co. v. Federal Energy Regulatory Comm'n, 856 F.2d 361, 365 (1st Cir. 1988) (internal citations omitted); accord Robert Industries, Inc. v. Spence, 291 N.E.2d 407, 409-410 (Mass. 1973) (construing integrated agreement and noting, "interpretation is directed to the meaning of the terms of the writing in light of the circumstances, not to the meaning of the conversations of the parties" during negotiations).  Examining the words of an agreement in the context of the entire writing is a search for the "manifested meaning, not a privately held belief or intent of one party" left uncommunicated "to other parties to the bargain."  Donoghue v. IBC USA (Publications), Inc., 70 F.3d 206, 212 (1st Cir. 1995).

      Absent any ambiguity in the written contract, Massachusetts contract law excludes parol evidence to ascertain a contract's meaning where, as here, the parties executed a fully integrated agreement.  "The Parol Evidence Rule 'bars the introduction of prior or contemporaneous written or oral arguments that contradict, vary or broaden an integrated writing." Berezin v. Regency Bank, 234 F.3d 68, 72 (1st Cir. 2000); see also Fairfield 274-278 Clarendon Trust v. Dwek, 970 F.2d 990, 993 (1st Cir. 1992).  Whether the contract is ambiguous is a question of law

16

for the court. <u>Lanier Professional Services, Inc. v. Ricci</u>, 192
F.3d 1, 4 (1st Cir. 1999) (citing <u>Allison H. v. Byard</u>, 163 F.3d
2,6 (1st Cir. 1998)). The ultimate meaning of the contract or
ambiguity is normally a question for the factfinder. <u>Id.</u> (citing
<u>Colasanto v. Life Ins. Co. of N. Am.,</u> 100 F.3d 203, 211 (1st Cir.
1996)); <u>accord</u> <u>Den Norske Bank As v. First Nat. Bank of Boston</u>,
75 F.3d 49, 52 (1st Cir. 1996).

"A contract is not ambiguous simply because litigants
disagree about its proper interpretation." <u>Federal Deposit
Insurance Corp. v. Singh</u>, 977 F.2d 18, 22 (1st Cir. 1992). An
agreement is considered ambiguous only where its "'terms are
inconsistent on their face or where the phraseology can support
reasonable difference of opinion as to the meaning of the words
employed and obligations undertaken.'" <u>Rey v. Lafferty</u>, 990 F.2d
1379, 1384 (1st Cir. 1993). If the court determines a contract is
ambiguous on its face, then the court may consider extrinsic
evidence to ascertain the parties' intent. <u>Den Norske Bank As v.
First Nat. Bank of Boston</u>, 75 F.3d at 52.

Where a fully integrated agreement is unambiguous, the parol
evidence rule prohibits consideration of evidence of prior or
contemporaneous negotiations. <u>See</u> <u>Armstrong v. Rohm and Hass
Co., Inc.</u>, 349 F.Supp.2d 71, 76 (D.Mass. 2004); <u>accord</u> <u>Berezin v.
Regency Sav. Bank</u>, 234 F.3d 68, 72 (1st Cir. 2000). Thus, where

17

the agreement or the particular provision therein is unambiguous, "'parties are bound by the plain terms of their contract' and their subjective contemplations are immaterial." Coll v. PB Diagnostic Systems, Inc., 50 F.3d at 1122.

Massachusetts law, however, permits introduction of the parties' subsequent conduct to show a later oral modification of a written agreement based upon consideration. Cambridgeport Sav. Bank v. Boersner, 597 N.E.2d 1017, 1021 (Mass. 1992) (characterizing this as a "settled principle of law"); see also Schinkel v. Maxi-Holding, Inc., 565 N.E.2d 1219, 1223 (Mass.App.Ct. 1991) (observing a later modification to a written agreement may be proved through conduct of the parties). A provision in the integrated document which, as here, requires any subsequent modification to be in writing does not preclude the possibility of oral modification. Cambridgeport Sav. Bank v. Boersner, 597 N.E.2d at 1022. "Mutual agreement on modification of the requirement of a writing may. . . 'be inferred from the conduct of the parties and from attendant circumstances' of the instant case." Id. (quoting First Pa. Mortgage Trust v. Dorchester Sav. Bank, 481 N.E.2d 1132, 1139 (Mass. 1985) (internal citations omitted). The party endeavoring to prove the existence of a subsequent oral modification must present evidence of "sufficient force to overcome the presumption that the

18

integrated and complete agreement, which requires written consent
to modification, expresses the intent of the parties."
Cambridgeport Sav. Bank v. Boersner, 597 N.E.2d at 1022 n.10.

Where, as here, the parties execute multiple written
documents as part of a simultaneous transaction, all documents
are reviewed as part of a single transaction.  See Wilmot H.
Simpson Co., Inc. v. Green Textiles Assoc., Inc., 755 F.2d 217,
219-20 (1st Cir. 1985) (reading a purchase agreement and related
employment agreement as the same transaction); Chelsea Indus.,
Inc. v. Florence, 260 N.E.2d 732, 735-36 (Mass. 1970)
(considering an employment contract contemplating a separate
purchase contract where term of employment was a provision of the
purchase contract as interrelated and one transaction for
purposes of interpretation); see also Chase Commercial Corp. v.
Owen, 588 N.E.2d 705, 707 (Mass.App.Ct. 1992) ("if the documents
were in essence part of one transaction, they must be read
together to effectuate the intention of the parties"); Bergson v.
H.P. Hood & Sons, Inc., 15 N.E.2d 196, 198 (Mass. 1938).  Factors
considered in applying this approach include the timing of
execution of the agreements, whether the agreements are between
the same parties and whether the agreements relate to the same
subject matter or are aspects of the same transaction.  See 11
Richard A. Lord, Williston on Contracts § 30:26 at 239-42 (1999)

(citing <u>Bielanski v. Westfield Sav. Bank</u>, 48 N.E.2d 627, 628-29
(Mass. 1943) (applying this contract construction principle in
Massachusetts)); <u>accord</u> <u>Bergson v. H.P. Hood & Sons, Inc.</u>, 15
N.E.2d at 198 ("The assignment . . . discharge . . . and all
other documents executed on the same day were parts of the same
transaction" because "[t]he various undertakings of the parties
were so interrelated that they constituted one transaction").

The integrated asset purchase agreement and the employment
agreement, executed the same day, cannot be viewed as separate
transactions.  Rather, placed in their factual setting or
circumstances, <u>see</u> <u>Wilmot H. Simpson Co., Inc. v. Green Textiles
Assoc., Inc.</u>, 755 F.2d at 219 ("meaning given by the parties to a
term in an integrated agreement may be affected by the factual
setting in which the agreement is negotiated"); <u>accord</u> <u>Boston
Edison Co. v. Federal Energy Regulatory Comm'n</u>, 856 F.2d at 365
(interpretation of integrated agreement directed towards the
meaning of the terms "of the writing or writings in the light of
the circumstances"), the agreements are read together as a unit.
<u>See</u> <u>Wilmot H. Simpson Co., Inc. v. Green Textiles Assoc., Inc.</u>,
755 F.2d at 220 (reading the purchase agreement and related
employment "as a unit").  As further explained by the First
Circuit in <u>Wilmot</u>, "Where, 'the two contracts together seem
reasonably complete,' Massachusetts law provides that they 'are

20

to be treated as an integrated agreement setting forth the entire understanding reached by the parties.'" Id. at 220.

As previously explained, absent an ambiguity, "The parol evidence rule bars giving effect to any agreement not contained in the integrated writings." Wilmot H. Simpson Co., Inc. v. Green Textiles Assoc., Inc., 755 F.2d at 220. Viewing the factual setting and circumstances and reading the agreements as a unit, it is apparent that the agreement is unambiguous with respect to the insurance polices. Section 2.2 of the asset purchase agreement included insurance policies in the list of "Excluded Globe Assets." In interpreting the agreement, the written language must be given its normal meaning and any ambiguity must be clear on the face of the agreement. Rey v. Lafferty, 990 F.2d at 1384. The asset purchase agreement unambiguously lists under the heading "Excluded Globe Assets," "all insurance policies and rights thereunder." If there were any doubt as to the identification of the insurance policies intended to be covered by this section, the disclosure schedule prepared by Globe Rubber and attached to the asset purchase agreement clearly named both the Lincoln and American General policies as key man insurance owned by Globe Rubber.

Nor does any language in the employment agreement, when read as a unit with the asset purchase agreement, convince this court

21

an ambiguity exists.  While the employment agreement also discusses key man life insurance on Somerville, it is silent as to the Lincoln, American General or any other specific policy in existence at the time of closing.  The more general provisions applicable to key man insurance in the employment agreement therefore contrast sharply with the more specific provisions of the disclosure schedule required by the asset purchase agreement which identifies the Lincoln and American General policies by name.  Furthermore, the provision in the employment agreement referring to key man insurance expresses the parties' intent to procure the insurance at some point in the future after the closing.  Thus, the employment agreement provided that Somerville was "to use his best efforts to cooperate with [Globe Composite] in procuring key man insurance policies."  Where a contract is unambiguous, "the terms stated by the parties are to be given their plain and ordinary" meaning.  See Rogaris v. Albert, 730 N.E.2d 869, 871 (Mass. 2000) (citing Morse v. Boston, 157 N.E. 523 (1927), and cases cited therein).  Inasmuch as the employment agreement does not identify any specific insurance policies intended for key man insurance on Somerville after he assumed his role at Globe Composite and uses the term "procuring," this court finds that identification of those policies and procurement of them was understood by the parties to occur subsequent to

22

execution of the agreements.  Accordingly, the employment
agreement does not obviate the unambiguous exclusion in the asset
purchase agreement of the American General or Lincoln policies.

Globe Composite nonetheless urges this court to find that
the parties intended to transfer these two policies as part of
the agreement and their omission from the final document does not
reflect the real understanding of the parties.  In support of
this, Globe Composite points to the negotiations of the parties
prior to the August 3 closing.  Having determined that the asset
purchase agreement and employment agreement are unambiguous with
respect to the policies, the parol evidence rule bars this court
from taking into account evidence of prior negotiations to
ascertain the meaning of a fully integrated agreement.

Globe Composite's reliance on Insurance Co. v. Dutcher, 95
U.S. 269 (1877), to encourage this court to examine the parties'
conduct post-closing as evidence of their intent is not well
taken.  In that case, unlike here, there was not a dispute as to
what the parties agreed to in their contract but whether a
subsequently changed company policy could apply retroactively to
the insured.  The court in Dutcher was not required to look at
the parties' negotiations prior to execution of the insurance
contract, nor was the parol evidence rule at issue.

23

Having found the asset purchase agreement and employment agreement unambiguous with respect to the Lincoln and American General policies, this court finds the policies were not transferred on August 3 through execution of the agreement. The parol evidence rule therefore applies and evidence of prior negotiations is inadmissible to determine the parties' intent with respect to transfer of the Lincoln and American General policies. The conduct of Globe Composite and Somerville post-closing, however, creates a genuine issue of material fact as to whether the Lincoln and American General policies were transferred to Globe Composite.

At the April 5, 2007 hearing, counsel for Globe Composite argued *inter alia* that transfers of the Lincoln and American General policies were executed in satisfaction of the employment agreement's key man provisions. Effectuating a valid change of beneficiaries requires the insured to comply with the requirements of a policy to make such a change or substantially comply with such requirements. See Resnek v. Mutual Life Ins. Co._, 286 Mass. 305, 309, 190 N.E. 603 (Mass. 1934) (further noting that substantial conformance with requirements may be found where "insured does everything in his power to bring about a change of beneficiaries and that end is not accomplished merely because of deficiencies in the performance of specified

24

formalities by the company"); accord Colasanto v. Life Ins. Co. of N. Am., 100 F.3d 203, 208 (1st Cir. 1996) (failure of literal compliance with policy's requirements to effectuate change of ownership "will be excused only if the insured did everything he could do to comply with these provisions").

The record provides factual support for a reasonable jury to find that such transfers were executed. Globe Composite commenced payment of the premiums for the Lincoln and American General policies. Mindful of the employment agreement's provision that Somerville promised to "use his best efforts to cooperate with [Globe Composite] in procuring key man insurance policies," nothing in the record indicates Globe Composite or Somerville endeavored to procure a different key man policy after Somerville's employment at Globe Composite began. Further, Globe Composite provided copies of transfer of ownership and change of beneficiary forms for both the Lincoln and Amercian General policies that appear to be signed by Somerville.

On the other hand, there is sufficient evidence for a jury to find that forgeries took place thereby invalidating any transfer. Although a signature may be presumed valid unless proven otherwise, see Montgomery v. Jackson v. Jackson, 2006 WL 3530559 (Mass. Land Ct. Dec. 8, 2006), there is sufficient evidence in the record to raise a genuine issue regarding the

25

authenticity of the signatures at issue.  See, e.g., Mortgage
Lenders Network USA, Inc. v. Adkins, 2007 WL 963212 (D.Ohio March
28, 2007); Perdue v. C.I.R., 2000 WL 46129 at * 4 (U.S.Tax Ct.
Jan. 21, 2000) ("respondent has presented probative evidence
(including statements that Ms. Cade made prior to her death and
the report of a forensic document examiner) that Ms. Cade's
signature on the durable power of attorney may have been forged"
thereby precluding summary judgment).

Roche-Somerville and Solar offered evidence questioning the
authenticity of Somerville's signatures and the conduct of Globe
Composite to transfer the policies.  A reasonable jury presented
with the evidence offered to defeat the authenticity of
Somerville's signatures could find the existence of forgeries.
The failure of Fasnacht, Forsyth or the record to provide any
explanation for Somerville's signature on the March 30 letter to
Lincoln, after his termination from Globe Composite and the
testimony that Somerville signed the transfer and beneficiary
forms in the fall of 2005 despite the February 2006 dates beside
his signatures are sufficient evidence to overcome summary
judgment as to their authenticity.

Finally, in light of the recommended denial of Globe
Composite's partial summary judgement motion, defendants' request

26

for additional time to engage in discovery under Rule 56(f)is

moot.

CONCLUSION

This court **RECOMMENDS**[9] that Globe Composite's motion for

partial summary judgment (Docket Entry # 57) be **DENIED** and that

defendants' motion for Rule 56(f) relief (Docket Entry # 78) be

denied as **MOOT.**


                                   /s/ Marianne B. Bowler
                                   **MARIANNE B. BOWLER**
                                   United States Magistrate Judge

---

[9]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.  <u>United States v. Escoboza Vega</u>, 678 F.2d 376, 378-379 (1st Cir. 1982); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).